# 12-105-cv(L)

**12-109-cv (CON), 12-111-cv (CON), 12-157-cv (CON), 12-158-cv (CON),
12-163-cv (CON), 12-164-cv (CON), 12-170-cv (CON), 12-176-cv (CON),
12-185-cv (CON), 12-189-cv (CON), 12-214-cv (CON), 12-909-cv (CON),
12-914-cv (CON), 12-916-cv (CON), 12-919-cv (CON), 12-920-cv (CON),
12-923-cv (CON), 12-924-cv (CON), 12-926-cv (CON), 12-939-cv (CON),
12-943-cv (CON), 12-951-cv (CON), 12-968-cv (CON), 12-971-cv (CON)**

## United States Court of Appeals

*for the*

## Second Circuit

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,

*Plaintiffs-Appellees,*
*(continued on inside cover)*

— v. —

REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF DEFENDANT-APPELLANT
THE REPUBLIC OF ARGENTINA**

*Of Counsel:*              CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jonathan I. Blackman       *Attorneys for Defendant-Appellant*
Carmine D. Boccuzzi        One Liberty Plaza
Sara A. Sanchez            New York, New York 10006
Michael M. Brennan         (212) 225-2000

*(Plaintiffs-Appellees Continued)*

ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

PRELIMINARY STATEMENT ........................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 5

ISSUES PRESENTED .......................................................................... 6

STATEMENT OF THE CASE ............................................................. 8

STATEMENT OF FACTS .................................................................... 9

    A.   The Pari Passu Clause ................................................. 9

    B.   NML's Previous Attempt To Create A New Meaning For The Pari Passu Clause ............................................... 12

    C.   After Six-Year Delay, NML Moves For Injunctive Relief Pursuant To The Pari Passu Clause ......................... 16

    D.   The District Court Enters The Permanent Injunctions Requiring Full Payment To Plaintiffs And Purporting To Restrain Payments To Other Bondholders ............................... 20

    E.   The "Me Too" Plaintiffs ........................................... 23

STANDARD OF REVIEW .................................................................. 24

SUMMARY OF ARGUMENT ........................................................... 25

ARGUMENT ......................................................................................... 29

I.   THE ORDERS BELOW MUST BE VACATED BECAUSE NML'S READING OF THE PARI PASSU CLAUSE IS WRONG ........................................................................... 30

    A.   The Pari Passu Clause Does Not Require Simultaneous "Pro Rata" Payments Or Proportional Distribution Of Payment Amounts ............................................... 31

        1.   The Plain Meaning Of The Pari Passu Clause Deals With The Formal Ranking Of Creditor Claims ............. 31

        2.   The Impropriety Of NML's Interpretation Of The Pari Passu Clause Is Further Demonstrated By Canons Of Contract Interpretation And The Fact That It Leads To Absurd Results ........................................... 37

i

                                                                    **Page**

  B.   The 2005 "Lock Law" And Law 26,547 Did Not Violate
       The Pari Passu Clause ...............................................................45

  C.   The Remedy For Breach Of The Pari Passu Clause Is
       Acceleration ..............................................................................48

II.   THE PERMANENT INJUNCTIONS VIOLATE THE FSIA............49

III.  THE PERMANENT INJUNCTIONS PURPORT TO RESTRAIN
      PROPERTY IN WHICH NEITHER PLAINTIFFS NOR THE
      REPUBLIC HAVE ANY INTEREST ...............................................53

IV.   PLAINTIFFS HAVE NOT SUFFERED IRREPARABLE HARM...56

V.    THE PERMANENT INJUNCTIONS ARE CONTRARY TO
      THE PUBLIC INTEREST AND THE BALANCE OF
      HARDSHIPS MILITATES TOWARDS THEIR DENIAL...............60

VI.   PLAINTIFFS' PARI PASSU CLAIMS ARE BARRED BY
      LACHES ...............................................................................65

  A.   Plaintiffs Knew Of The Alleged Pari Passu "Breach" Years
       Before Bringing Their Claims, And Inexcusably Delayed In
       Bringing Them .........................................................................65

  B.   The Republic, Its Citizens And Third Party Creditors Will
       Suffer Prejudice As A Result Of Plaintiffs' Inexcusable
       Delay ........................................................................................68

VII.  THE PRELIMINARY INJUNCTION MUST BE VACATED .........70

CONCLUSION ....................................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West*,
2 F. App'x 162 (2d Cir. 2001) ........................................................ 65

*Amedeo Hotels Ltd. P'ship v. Zwicker Elec. Co., Inc.*,
739 N.Y.S.2d 10 (1st Dep't 2002) .................................................. 66

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989)......................................................................... 50

*Aurelius Capital Partners, LP v. Republic of Argentina*,
584 F.3d 120 (2d Cir. 2009)...........................................2, 25, 50, 54

*Aurelius Capital Partners, LP v. Republic of Argentina*,
No. 07 Civ. 2715 (TPG), 2010 WL 2925072 (S.D.N.Y. July 23, 2010)........ 51

*Aurelius Capital Partners, LP v. Republic of Argentina*,
No. 07 Civ. 2715 (TPG), 2010 WL 768874 (S.D.N.Y. Mar. 5, 2010) .......... 50-51

*Bass v. Bass*,
528 N.Y.S.2d 558 (1st Dep't 1988) ................................................ 54

*Beal v. Stern*,
184 F.3d 117 (2d Cir. 1999).......................................................... 60

*Brody v. Vill. of Port Chester*,
261 F.3d 288 (2d Cir. 2001)........................................................... 60

*Burns v. Egan*,
501 N.Y.S.2d 742 (3d Dep't 1986)................................................. 69

*Calhoun v. Delhi & M.R. Co*,
24 N.E. 27 (N.Y. 1890)................................................................... 68

*Cantrell v. Hayduk*,
45 N.Y.2d 925 (N.Y. 1978) .....................................................66-67, 69

*Capital Ventures Int'l v. Republic of Argentina*,
282 F. App'x 41 (2d Cir. 2008) ................................................ 53, 64

**Page(s)**

*Carte Blanche (Singapore) PTE., Ltd. v. Carte Blanche Int'l, Ltd.*,
888 F.2d 260 (2d Cir. 1989)..................................................................... 67-68

*Centauri Shipping Ltd. v. W. Bulk Carriers KS*,
528 F. Supp. 2d 186 (S.D.N.Y. 2007) ............................................................ 57

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985)..................................................................... 58

*City of N.Y. v. N.Y. Cent. R.R. Co.*,
275 N.Y. 287 (1937) ................................................................................. 66

*D.O. Haynes & Co. v. Druggists' Circular*,
32 F.2d 215 (2d Cir. 1929)..................................................................... 70

*Durkin v. Nassau Cnty. Police Dep't*,
175 F. App'x 405 (2d Cir. 2006) ................................................................. 67

*EM Ltd. v. Republic of Argentina*,
131 F. App'x 745 (2d Cir. 2005) ............................................................. 14, 64

*EM Ltd. v. Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007) ............................................................... 2, 53-54

*Farries v. Stanadyne/Chi. Div.*,
832 F.2d 374 (7th Cir. 1987) ................................................................... 67

*Fort v. Am. Fed. of State, Cnty. and Mun. Emps.*,
375 F. App'x 109 (2d Cir. 2010) ............................................................... 57

*Fox Film Corp. v. Springer*,
273 N.Y. 434 (1937) ................................................................................. 31

*Galliher v. Cadwell*,
145 U.S. 368 (1892)................................................................................. 68

*Grain Traders, Inc. v. Citibank, N.A.*,
160 F.3d 97 (2d Cir. 1998)..................................................................... 55

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007)..................................................................... 71

**Page(s)**

*Haulage Enters. Corp. v. Hempstead Res. Recovery Corp.*,
426 N.Y.S.2d 52 (2d Dep't 1980).................................................................... 57

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946).................................................................................... 68

*In re Estate of Zuckerman*,
670 N.Y.S.2d 752 (Sur. Ct. 1998)............................................................... 53

*In re Lipper Holdings, LLC*,
766 N.Y.S.2d 561 (1st Dep't 2003) ............................................................ 40

*In re Schulz*,
81 N.Y.2d 336 (1993) ............................................................. 29, 67, 68-69, 70

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
309 F.3d 76 (2d Cir. 2002)......................................................................... 31

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*,
596 F.2d 70 (2d Cir. 1979)......................................................................... 57

*Juliano v. Health Maint. Org. of N.J.*,
221 F.3d 279 (2d Cir. 2000)....................................................................... 24

*Lamar Adver. of Penn. v. Town of Orchard Park*,
356 F.3d 365 (2d Cir. 2004)......................................................................... 6

*Lightwater Corp. v. Republic of Argentina*,
No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) ....... 13

*Marine Midland Trust Co. of N.Y. v. Alleghany Corp.*,
28 F. Supp. 680 (S.D.N.Y. 1939) ............................................................... 60

*McKusick v. City of Melbourne*,
96 F.3d 478 (11th Cir. 1996) ...................................................................... 59

*N.Y. Pub. Interest Research Grps., Inc. v. Levitt*,
404 N.Y.S.2d 55 (3d Dep't 1978)............................................................... 69

*Nacional Financiera, S.N.C. v. Chase Manhattan Bank, N.A.*,
2003 WL 1878415, No. 00 Civ. 1571 (JSM) (S.D.N.Y. Apr. 14, 2003)........ 44-45

**Page(s)**

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
992 F.2d 430 (2d Cir. 1993)........................................................ 57

*Newmont Mines, Ltd. v. Hanover Ins. Co.*,
784 F.2d 127 (2d Cir. 1986)........................................................ 37

*NML Capital, Ltd. v. Banco Central de la República Argentina*,
652 F.3d 172 (2d Cir. 2011)......................................................... 2

*NML Capital, Ltd. v. Republic of Argentina*,
No. 02 Civ. 3804 (TPG), 2005 WL 743086 (S.D.N.Y. Mar. 31, 2005),
*aff'd sub nom.*, *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745
(2d Cir. 2005)........................................................................ 17

*Patterson v. Hewitt*,
195 U.S. 309 (1904).............................................................. 66, 68

*Plenum Fin. & Invs. Ltd. v. Bank of Zambia*,
No. 95 Civ. 8350 (KMW), 1995 WL 600818 (S.D.N.Y. Oct. 11, 1995) ....... 58

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
109 F.3d 850 (2d Cir. 1997)........................................................ 14

*Republic of Philippines v. Pimentel*,
553 U.S. 851 (2008)................................................................ 59

*Roach v. Morse*,
440 F.3d 53 (2d Cir. 2006)...................................................... 25, 30

*Rothenberg v. Lincoln Farm Camp, Inc.*,
755 F.2d 1017 (2d Cir. 1985)...................................................... 37

*S&S Machinery Co. v. Masinexportimport*,
706 F.3d 411 (2d Cir. 1983)............................................... 27, 52, 53

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)...................................................... 32

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*,
585 F.3d 58 (2d Cir. 2009) ........................................................ 56

vi

Page(s)

*Sierra Club v. Hennessy,*
695 F.2d 643 (2d Cir. 1982)................................................................    63

*Stephens v. Nat'l Distillers & Chem. Corp.,*
69 F.3d 1226 (2d Cir. 1996)...........................................................    52-53

*Weston Compagnie de Finance et d'Investissement, S.A. v.
La Republica del Ecuador,*
No. 93 Civ. 2698 (LMM), 1993 WL 267282 (S.D.N.Y. July 14, 1993)........    57

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ...........................................................................    60

**Rules and Statutes**

12 C.F.R. § 210.25 .........................................................................    55

11 U.S.C. § 303(b)(1)......................................................................    41

11 U.S.C. § 303(h)(1)......................................................................    41

28 U.S.C. §1291 .............................................................................    6

28 U.S.C. §1292(a)(1)......................................................................    6

28 U.S.C. §1330 .............................................................................    5

28 U.S.C. §1605(a)(1)......................................................................    5

28 U.S.C. §1609 .........................................................................26, 33-34

28 U.S.C. § 1610 ............................................................................    27, 34

28 U.S.C. § 1610(a) ........................................................................    50

Fed. R. Civ. P. 69(a)(1) ...................................................................    51

N.Y. U.C.C. § 4-A-503 ....................................................................    54, 55

N.Y. U.C.C. § 8-102(a)(7) ................................................................    9

N.Y. C.P.L.R. § 5222(b) ..................................................................    54

**Page(s)**

N.Y. Gen. Oblig. § 13-105...........................................................    66

N.Y. Gen. Oblig. § 13-107(1). ....................................................    66

**Other Authorities**

*American Heritage Dictionary* (3d ed. 2000)................................    31-32

*Black's Law Dictionary* (7th ed. 1999)............................................31, 32, 47

Edwin Borchard, 1 *State Insolvency and Foreign Bondholders* (1951).........    12

Lee C. Buchheit & Ralph Reisner, *The Effect of the Sovereign Debt Restructuring Process on Inter-Creditor Relationships*, 1988 Univ. Ill. Law Rev. 493 .........................................................10-11, 26, 35

Lee C. Buchheit & Jeremiah S. Pam, *The Pari Passu Clause in Sovereign Debt Instruments*, Working Paper, Harvard Law School Program on International Financial Systems (2003) ..........................................    11-12

Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189 (2009).....................................................    13-14

Stephen J. Choi and G. Mitu Gulati, *Contract as Statute*, 104 Mich. L. Rev. 1129 (2006)..........................................................    33

G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 Bus. Law. 635 (2001)................................................................    12, 15

H.R. Rep. No. 94-1487 (1976) *reprinted in* 1976 U.S.C.A.A.N. 6604..........    30

Rodrigo Olivares-Caminal, *Legal Aspects of Sovereign Debt Restructuring* (Sweet & Maxwell 2009)................................    44

United Nations Centre on Transnational Corporations, Advisory Studies, No. 4, Series B, *International Debt Restructuring: Substantive Issues and Techniques* (1989)............................................................    10

Christopher Whittall, et al., *Vulture Funds Prepare to Battle Greek Default*, Int'l Fin. Rev. (Feb. 16, 2012) ........................................................    24

**Page(s)**

Philip R. Wood, *Pari Passu Clauses – What Do They Mean?*,
Butterworths J. of Int'l Banking and Fin. L. 371 (2003) .............................. *passim*

Philip R. Wood, *Sovereign State Restructurings and Credit Default Swaps*,
Butterworths J. of  Int'l Banking & Fin. L. 559 (2011) ................................    46

## PRELIMINARY STATEMENT

The present appeals are from unprecedented district court Orders (the "Permanent Injunctions") affirmatively requiring defendant-appellant Republic of Argentina (the "Republic") to use immune sovereign assets to pay plaintiffs-appellees 100% of their defaulted debt, while restraining payments to holders of performing, restructured debt unless the Republic pays plaintiffs in full. Just two months before entering the Permanent Injunctions, the district court rejected plaintiffs' request for the *same* injunctive relief, recognizing that it threatened to destroy the Republic's 2005 and 2010 Exchange Offers – voluntary debt restructurings consistent with U.S. law and policy that resolved a shattering financial crisis and resulted in the restructuring of over 91% of the Republic's defaulted debt. And throughout the February 2012 hearing in which the district court ultimately entered the Permanent Injunctions, the court acknowledged that they are marred by "a lot of problems."

The district court nonetheless entered the Permanent Injunctions because in the court's view, notwithstanding the law, the injunctions might create "leverage" over the Republic that could force it to pay these holdout plaintiffs and "end the litigation." That "leverage" is nothing less than the denial of payment to bondholders who accepted the Republic's Exchange Offers at a significant discount to the face amount of their prior holdings (holders of approximately $75

billion in defaulted debt) unless the holdout plaintiffs – by and large hedge funds

who purchased their debt after default – get immediate payment, *without* any

discount, of every penny of principal and interest on their claims.  The effect of the

Permanent Injunctions, if not reversed, would not be "to end the litigation."[1]

Rather, the injunctions will injure the holders of the billions of dollars of

restructured Republic debt (undoubtedly triggering still *more* litigation), send the

Republic into another economic crisis, imperil payments to lenders of last resort

like the IMF, the World Bank, the Inter-American Development Bank ("IADB")

and other multilateral institutions, and make impossible debt restructurings by

Greece, Portugal, Ireland, Spain and other states now or in the future facing similar

financial straits.

       The Permanent Injunctions must be vacated.  First, they rest on an

entirely fictional reading of the pari passu clause, a boilerplate provision in

sovereign and non-sovereign debt instruments providing that payment obligations

"shall at all times rank at least equally" with other unsecured and unsubordinated

---

[1]    This Court has repeatedly rejected other attempts by plaintiff NML Capital, Ltd. ("NML") to overreach in violation of the limits on execution under the Foreign Sovereign Immunities Act.  *See e.g.*, *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007) (affirming vacatur of attachment of central bank reserves); *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 197 (2d Cir. 2011) (vacating attachment of same reserves); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 124-25 (2d Cir. 2009) (rejecting attempt to restrain assets to be acquired by Argentine social security system).

debt.  Despite the decades-long existence of the pari passu clause in bond documentation, the clause has *never* been held by a U.S. court, and *never* been understood by any market participant, to require that payment to one creditor requires payment to all, and with good reason – *the clause plainly does not say that*.  And nothing supports the conclusion that, even if the clause were breached, it would entitle plaintiffs to anything but acceleration of principal – the remedy expressly provided for in the contract.  Plaintiffs' interpretation of the pari passu clause would produce disastrous results for any sovereign in financial distress – including the Republic here – as well as the U.S. and international capital markets, as attested below by the United States in its Statement of Interest and by *amici* the New York Clearing House Association L.L.C. (the "Clearing House") and the Federal Reserve Bank of New York (the "Federal Reserve").

The novel injunctions also fail under the Foreign Sovereign Immunities Act (the "FSIA") and state law.  By essentially ordering the Republic to "turn over" assets from outside the United States to satisfy prospective judgments, the district court disregarded the FSIA's limitation on attachment and execution to property of the sovereign being used for a commercial activity in the United States.  And to the extent that the Permanent Injunctions are directed to funds in or passing through the United States to pay the holders of restructured Republic debt, both the FSIA and New York law prevent their restraint, because

3

those funds are *not* property of the Republic, but are held in trust for the holders of that restructured debt.

The Permanent Injunctions also flunk the basic requirements for any grant of injunctive relief, which the district court ignored.  NML – whose parent invented the erroneous pari passu theory in *ex parte* Belgian proceedings against Peru in 2000 – and the other "me too" plaintiffs held or knowingly bought defaulted debt throughout the period of over six years that the Republic was servicing its performing, restructured debt.  These holdout plaintiffs, whose monetary claims are unimpaired, cannot be said to suffer any injury (let alone irreparable injury) when holders of restructured debt receive payment on other bonds.

Moreover, the district court made no findings as to the balance of hardships or the harm to the public caused by these injunctions, which alone requires vacatur.  No equitable principle supports denying payments to the holders of billions of dollars of restructured debt who participated, at a significant discount, in the Republic's 2005 and 2010 Exchange Offers.  This Court in fact *protected* those debt restructurings from disruption by holdout creditors, including NML.  Finally, the Permanent Injunctions are manifestly contrary to public policy, which favors voluntary debt restructurings and opposes the backdoor creation of

4

unbargained-for contractual rights for holdout creditors seeking to "leverage" their positions by disrupting such restructurings.

The irony of plaintiffs' position is that while it purports to be based on the "Equal Treatment Provision" (the new tag plaintiffs have given the pari passu clause), plaintiffs seek anything but "equal treatment."  It is not equal treatment to get paid full, undiscounted interest and principal on defaulted debt because other bondholders, who accepted deeply discounted debt through exchange offers, are receiving a single scheduled interest payment on their restructured debt. Recognizing how bizarre, unequal and unfair their theory is, plaintiffs in fact stood idle, and did not raise their claim when the Republic announced its 2005 Exchange Offer (and when, according to plaintiffs, the first "breach" of the "Equal Treatment Provision" occurred).   The district court acknowledged this deliberate delay, but in another legal error refused to give any consideration to the Republic's laches defense, although it is hard to see a clearer case of laches.

The Permanent Injunctions, and all associated and underlying orders, should be vacated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the underlying actions against the Republic, a foreign state, under the FSIA, 28 U.S.C. §§ 1330, 1605(a)(1).

The Republic filed timely notices of appeal on March 6, 2012. A-2355-57, A-3390-97, A-3675, A-3800. This Court has jurisdiction over the appeals of the Permanent Injunctions, along with the preliminary injunction and the declaratory orders upon which the injunctions are expressly based, under 28 U.S.C. § 1292(a)(1). *Lamar Adver. of Penn. v. Town of Orchard Park*, 356 F.3d 365, 372 (2d Cir. 2004). The Court also has jurisdiction over the appeals of the Permanent Injunctions and all underlying and associated orders, including the preliminary injunction and the declaratory orders, under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Did the district court err in concluding that the pari passu clause in the Republic's defaulted debt instruments – which states that the Republic's payment obligations shall "rank at least equally" with other unsecured Republic debt – requires the Republic to pay the full undiscounted principal amount, plus interest, of its defaulted debt whenever it makes a single scheduled interest payment on performing debt restructured at a significant discount?

2.      Did the district court err in concluding that the pari passu clause also precluded the Republic from enacting legislation preventing the Argentine Executive from re-opening a debt restructuring or otherwise settling with holdout creditors absent the approval of the Argentine Congress?

3.     Did the district court err when it permanently enjoined the Republic, pursuant to the pari passu clause, from making a single interest payment to holders of the Republic's restructured debt unless it simultaneously pays plaintiffs the full, undiscounted principal amount, with all past-due interest payments, owed on their defaulted debt, along with pre-judgment interest?

4.     Do the Permanent Injunctions issued by the district court violate the FSIA by ordering the Republic to satisfy potential judgments against it with sovereign assets located outside the United States?

5.     Did the district court err by permanently enjoining financial intermediaries from transferring funds in which neither the Republic nor plaintiffs have any interest?

6.     Did the district court err in holding that plaintiffs suffer irreparable harm when their only "injury" is that sovereign immunity makes it harder for them to collect judgments against a foreign state?

7.     Did the district court err in not considering the significant harm to third party creditors, the Republic and the public interest created by the Permanent Injunctions?

8.     Did the district court err in rejecting, without any consideration of the relevant factors, the Republic's defense of laches, including plaintiffs' five-year delay in asserting their alleged "rights" under the pari passu clause, as well as the

prejudice to the Republic and the holders of billions of dollars of performing restructured debt?

## STATEMENT OF THE CASE

These appeals arise from Permanent Injunctions entered by the district court (Griesa, J.) on February 23, 2012, enjoining the Republic from making payments on the discounted debt issued pursuant to its 2005 and 2010 Exchange Offers, unless the Republic simultaneously pays in full all past due principal and interest owed to plaintiffs (beneficial owners of Republic-issued debt who rejected the 2005 and 2010 Exchange Offers).  SPA-28-54.

The Permanent Injunctions purport to enforce December 2011 Orders (the "Declaratory Orders"), which held that the Republic violates the pari passu clause in its defaulted debt documentation by servicing its restructured debt without paying plaintiffs the principal and interest on their undiscounted, defaulted debt.[2]  SPA-10-25.  The district court also concluded that the Republic violated this clause when it enacted legislation in 2005 preventing the Argentine Executive from re-opening the Republic's 2005 Exchange Offer or otherwise settling with holdouts without Congressional approval (the "Lock Law"), and legislation in 2009 temporarily suspending the Lock Law to allow the 2010 Exchange Offer to go forward.  *See e.g.*, SPA-12-14.

---

[2]  Plaintiff Olifant Fund, Ltd. ("Olifant") obtained a single order on February 23, 2012 granting both declaratory and injunctive relief.  SPA-42-49.

8

On February 23, 2012, the district court also converted into a preliminary injunction a January 3, 2012 TRO preventing the Republic from altering the mechanisms by which it pays its restructured debt (the "Preliminary Injunction").  SPA-26-27; Feb. 23 Tr. at 54:10-11 (A-2343).

The district court stayed the effect of the Permanent Injunctions on March 5, 2012 pending this appeal; the district court did not stay the Preliminary Injunction.  A-2350-54.

## STATEMENT OF FACTS

### A.    The Pari Passu Clause

The October 19, 1994 Fiscal Agency Agreement ("FAA") governing the bonds in which plaintiffs own interests[3] contains a standard clause found in sovereign (and non-sovereign) unsecured debt agreements known as the pari passu clause.  *See* Philip R. Wood, *Pari Passu Clauses – What Do They Mean?*, Butterworths J. of Int'l Banking and Fin. L. 371, 371 (2003) ("Wood") (A-1917). Section 1(c) of the FAA provides that:

> The Securities [the debt issued under the FAA] will constitute (except as provided in Section 11 below) direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank

---

[3]    Although the technical term for what plaintiffs and other creditors hold is a "security entitlement" with respect to Republic-issued bonds, terms such as "beneficial interests," "interests," "bonds," or "bondholders" are also used for simplicity's sake.  *See* N.Y. U.C.C. § 8-102(a)(7).

> *pari passu* and without any preference among
> themselves.  The payment obligations of the Republic
> under the Securities shall at all times rank at least equally
> with all its other present and future unsecured and
> unsubordinated External Indebtedness (as defined in this
> Agreement).

A-157; *see also, e.g.*, Certificate of Bond ISIN US040114AN02 ("NML Bond") at

A-6 (A-1989) (same language).  The debt instruments are governed by New York

law.  *See* FAA ¶ 23 (A-185).

   For decades, the pari passu clause has been a standard part of loan

documentation, commonly understood to prohibit a borrower from creating

unsecured debt ranking senior in legal right of payment.  The clause was *not*

understood to regulate the order or amount of payments made to creditors, or to

require pro rata payments to creditors.  *See* United Nations Centre on Transnational

Corporations, Advisory Studies, No. 4, Series B, *International Debt Restructuring:*

*Substantive Issues and Techniques*, at 29 (1989) (A-1877) ("[Pari passu] clauses do

not, of course, obligate the borrower to repay all of its debt at the same time.  A

*pari passu* covenant will, however, restrict the borrower from legally subordinating

in a formal way the debt being incurred or rescheduled in favour of some other

external obligation.").[4]

---

[4] *See also* Lee C. Buchheit & Ralph Reisner, *The Effect of the Sovereign Debt
Restructuring Process on Inter-Creditor Relationships*, 1988 Univ. Ill. Law
Rev. 493, 497 ("Buchheit") (A-1860) ("The borrower does not violate [the pari
passu] clause by electing as a matter of practice to pay certain indebtedness in

Pari passu clauses are common in both private sector bonds, and in sovereign debt instruments governed by New York or English law, including those instruments restructured during the 1980s and 1990s by Mexico, Russia, Ukraine, Pakistan and Ecuador.  No creditor during this period ever suggested that the pari passu clause legally prevented payment of restructured debt if creditors who declined to participate in restructurings remained unpaid, or that the clause precluded sovereigns from making payments to official creditors like the IMF before other groups of creditors.  *See* Statement of Interest of the United States, dated Jan. 12, 2004 ("US Br.") at 12 (A-1777) ("The customary inclusion of *pari passu* provisions in sovereign debt instruments throughout the 1980s and 1990s was never viewed as a barrier to the resolution of sovereign defaults on foreign loans through the negotiation of consensual rescheduling and restructuring agreements.").  Indeed, it was common practice throughout this period for sovereigns to exclude some debt from restructuring – such as debt owed to trade creditors or multilateral institutions – while restructuring other debt.  *See* Lee C. Buchheit & Jeremiah S. Pam, *The Pari Passu Clause in Sovereign Debt*

---

preference to the obligations outstanding under the agreement in which this clause appears.").  Buchheit is a partner of Cleary Gottlieb uninvolved in its representation of Argentina, who wrote on this subject long before the Argentine debt crisis began.

11

*Instruments* 11, Working Paper, Harvard Law School Program on International

Financial Systems (2003).[5]

## B.    NML's Previous Attempt To Create A New Meaning For The Pari Passu Clause

In September 2000, Elliott Associates, a hedge fund specializing in

buying and suing on distressed sovereign debt that is NML's corporate parent,

invented the radical theory that as long as any debt subject to a pari passu provision

remained unpaid, the borrower was prohibited from paying *any* of its other debts or

obligations, including debt issued pursuant to an exchange offer. *See* G. Mitu

Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 Bus. Law. 635 ("Gulati and

Klee"), 635-39 (2001) (A-1900-02). Claiming this theory represented well-settled

New York law – when in fact no New York case or treatise supported it – Elliott

obtained an *ex parte* injunction from a Belgian court preventing Peru from paying

new debt issued to creditors who had agreed to participate in Peru's restructuring.

*See Elliott Assocs. L.P. v. Banco de la Nacion*, General Docket No. 2000/QR/92

(Appeals Ct. of Brussels Sept. 26, 2000) (A-1357-60). The *only* "authority"

supporting the decision was the conclusory declaration of a law professor that cited

---

[5]    As Yale Law School professor Edwin Borchard explained decades ago, "[t]he principle of equality [in sovereign lending] . . . does not signify uniformity of treatment. . . . All that the principle implies is that preferential treatment shall not be accorded to particular classes of bondholders without valid cause. . . . [D]ifferential treatment of the holders of foreign government bonds in case of default is the ordinary rule." Edwin Borchard, 1 *State Insolvency and Foreign Bondholders* 337-38 (1951).

no relevant caselaw and would have been inadmissible in a New York court.  *See*

Letter from J. Blackman to J. Griesa, dated Jan. 15, 2004, at 2-3 (A-2000-01).

      The effect of that *ex parte* Belgian injunction was to give

Elliott, a single holdout creditor, the ability to force Peru into default on its

restructured obligations unless it paid Elliott the full amount of its old debt.  Elliott

did not – because it could not – point to any legal authority to support the notion

that any party to a sovereign debt contract had ever intended the boilerplate pari

passu clause to have such sweeping and disastrous consequences for both lenders

and borrowers.

      In light of the *Elliott* ruling, in 2003 the Republic sought from the

district court a declaration as to the meaning of the pari passu clause so as to

prevent holdouts like NML from using the Elliott "interpretation" to disrupt

payments made in connection with its contemplated debt restructuring.  *See* Mot.

Pursuant to CPLR § 5240, *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507

(S.D.N.Y. Dec. 12, 2003).  That restructuring, necessitated by the Republic's

massive economic crisis at the end of 2001,[6] was consistent with international

---

[6]   The Republic's economic and financial crisis, during which it suffered a
cumulative fall in output almost twice that experienced by the United States
during the Great Depression, was the worst in its modern history.  *See*
*Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL
1878420, at *2 (S.D.N.Y. Apr. 14, 2003); *see also* Ross P. Buckley, *The
Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189,
1196 (2009) ("The living standards of over one-half of the Argentine people fell

norms and United States policy.  *See Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 853, 855 (2d Cir. 1997) (noting that IMF debt resolution procedures, which are commonly followed and consistent with U.S. policy, include voluntary debt restructurings); *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) (recognizing that the Republic's 2005 "[debt] restructuring [was] obviously of critical importance to the economic health of a nation").

In support of the Republic's 2003 motion, the United States, the Federal Reserve, and the Clearing House made submissions uniformly stating that NML's pari passu interpretation is contrary to market understanding, New York law, United States policy and the public interest.  The United States characterized the *Elliott* ruling as a "belated 'discovery'" of "an additional contract right – a right that [Elliott] did not bargain for," and noted that it "undermine[d] the decades of effort the United States has expended on encouraging a system of cooperative debt resolution."  US Br. at 15 (A-1780).  The Federal Reserve stated that the Brussels court "erroneously interpreted the *pari passu* clause at issue in that case" and described the decision as "plainly inconsistent with the public policy of the United States favoring settlement," because it "allows a holdout to a debt restructuring to pressure a sovereign debtor by threatening to terrorize the settlements with

below the poverty line, and over a third could not afford basic food.  Children were fainting in class from hunger, regularly.  Adults were rioting and breaking into supermarkets, regularly, in search of food.").

14

creditors who have compromised."  Mem. of Law of *Amicus Curiae* Federal

Reserve, dated Jan. 12, 2004 ("Fed. Br.") at 5, 13 (A-1795, A-1803).  The Clearing

House, speaking on behalf of market participants, noted that the ruling was clearly

incorrect under New York law because it "conflicts with longstanding market

practice and understanding."  Mem. of *Amicus Curiae* the Clearing House, dated

Jan. 12, 2004 ("CH Br.") at 4 (A-1813).

        These authorities were not alone in rejecting the NML "reading" of

the pari passu clause.  The Bank of England created a "Pari Passu Clauses Working

Group" that issued a formal report concluding that Elliott's interpretation of the

clause is incorrect as a matter of law.  *See* Financial Markets Law Committee,

Issue 79 – Pari Passu Clauses, dated March 2005 ("England Rep.") at 22 (A-1848).

Numerous sovereign debt practitioners and academics joined in describing the

Belgian decision as inconsistent with market understanding and New York law.

*See* Troland Link Declaration, *LNC Invs. LLC v. Republic of Nicaragua,* Folio

2000 1061, R.K. 240/03 (Commercial Ct. of Brussels) ¶ 15 ("Link") (A-1856);

Wood at 373 (A-1919); *see generally* Gulati and Klee (A-1900-15).  Drawing on

over forty years of experience representing commercial banks and underwriters in

connection with syndicated and non-syndicated credit transactions and having

directly participated in "literally hundreds of transactions" involving sovereign

debtors and pari passu clauses, one of the most respected practioners unequivocally

stated that the pari passu clause "cannot be given [Elliott's ratable payment] construction."  *See* Link ¶¶ 1, 3 (A-1851-52).

Notably, the reason the district court never ruled on the Republic's 2003 motion for declaratory relief was because NML represented that neither it, nor any other creditor, was seeking pari passu "relief," and asserted that no justiciable controversy therefore existed.  *See* Letter from K. Reed to J. Griesa, dated Jan. 14, 2004 ("Reed Letter"), at 2 (A-209).  At a hearing on January 15, 2004, the court nevertheless noted that NML's interpretation of the pari passu clause was "very odd."  Hr'g Tr. at 14:10 (A-1702).  In the years following, NML repeatedly prevented the adjudication of Republic counterclaims for declaratory relief concerning the pari passu clause, stating that nothing in the record suggested "a likelihood that [NML will invoke the clause] at any time in the near or distant future."  *See e.g.*, Mem. of Law in Supp. of Pl.'s Mot. to Dismiss Counterclaim, dated May 23, 2005, at 8 (A-2042).

## C.   After A Six-Year Delay, NML Moves For Injunctive Relief Pursuant To The Pari Passu Clause

On October 20, 2010, over six years after NML had convinced the district court that the pari passu question raised no justiciable controversy, NML moved for an injunction on its incorrect reading of the pari passu clause.  By that time:

- The Republic had completed its global, voluntary 2005 Exchange Offer of new, performing bonds for 76% of its non-performing debt, or approximately $62.5 billion in principal amount, making it the largest sovereign debt restructuring in history at that time. *See* Jan. 28, 2010 Registration Statement, Amend. No. 1, at 4 (the "Registration Statement") (A-2057). The new debt was issued to participants in the 2005 Exchange Offer at a substantial discount to the face value of the defaulted debt.

- NML had unsuccessfully tried to disrupt the 2005 Exchange Offer, without raising the pari passu issue. *See NML Capital, Ltd. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2005 WL 743086 (S.D.N.Y. Mar. 31, 2005), *aff'd sub nom.*, *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745 (2d Cir. 2005).

- The Republic for over five years (since June 2005 when the 2005 Exchange Offer closed) had made regular interest payments to bondholders who accepted the new performing debt. *See* Registration Statement at 4 (A-2057).

- The Republic had re-opened its 2005 Exchange Offer in 2010 to holders of eligible securities who had not tendered in 2005, resulting in owners of approximately $12.4 billion of old debt tendering and receiving new debt at approximately the same discounted value that participants in the 2005 Exchange Offer had received.[7] With the consummation of the 2005 and 2010 Exchange Offers, the Republic successfully restructured over 91% of its non-performing debt. *See id*.

Almost another year later, at a September 28, 2011 hearing, the

district court granted NML's motion for partial summary judgment on the pari

passu clause. Notwithstanding the years of delay by NML, the court without

---

[7]   *See* Republic of Argentina, Annual Report (Form 18-K) at 17 (Sept. 30, 2011) ("Annual Report"), *available at* http://www.sec.gov/Archives/edgar/data/914021/000090342311000486/roa-18k_0928.htm.

17

explanation rejected the Republic's laches defense with the simple statement: "I see no merit in the laches argument at all." Hr'g Tr. at 9:2 (A-2125). The court's refusal to consider laches was especially puzzling because the court itself identified the tactical reason behind NML's delay – namely, that raising a pari passu claim at the time of the 2005 Exchange Offer would have undercut NML's arguments on the clause because NML would have been seeking "equal treatment" with similarly situated creditors who had just accepted significantly discounted restructured debt. As the district court noted,

> [W]hat would need to be done to apply the pari passu clause is to do something, which of course the plaintiffs would not want at all, but it would be to give the plaintiffs the same percentage of the face amount of the bonds that the exchanges received, *because they're not receiving 100 percent*.

*Id.* at 12:8-13 (A-2128) (emphasis added).

The district court did not rule in September 2011 that the Republic had violated the pari passu clause when it made payments to restructured debt holders. It instead expressed the view that the Republic violated the pari passu clause when in February 2005 it passed the so-called Lock Law, a legislative enactment that prevented the Republic's Executive from re-opening the 2005 Exchange Offer, or otherwise settling with creditors holding defaulted debt without Congressional approval, and when in 2009 it passed Law 26,547, which temporarily suspended the Lock Law to allow the 2010 Exchange Offer to go

forward. *Id.* at 41:10-15 (A-2157). The district court denied without prejudice NML's motion for injunctive relief, concluding that the requested relief "might [have] interfere[d] with an exchange offer" and "would [have] prejudice[d] the rights and opportunities of people who want to make exchanges." *Id.* at 40:9-14 (A-2156).

The Declaratory Order entered by the district court on December 7, 2011 in the NML cases confirmed the grant of partial summary judgment at the hearing, but broadened the court's holding by declaring that the Republic not only violated the pari passu clause when it enacted the 2005 and 2009 legislation, but that it also violates the clause "when it ma[kes] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds." SPA-13. The district court thus adopted, without explanation or analysis, the same interpretation of the pari passu clause deemed legally erroneous, against market practice and unworkable by the United States, the Federal Reserve, the Clearing House, the Bank of England and every sovereign debt practitioner to have weighed in on the issue. The court denied NML's motion for injunctive relief "to permit further consideration by the court regarding the means of enforcement" of the Order. SPA-14.

**D.    The District Court Enters The Permanent Injunctions Requiring Full Payment To Plaintiffs And Purporting To Restrain Payments To Other Bondholders**

Following the entry of the December 7 Declaratory Order, NML submitted on January 6, 2012 a "renewed" motion for relief and a proposed Order (ultimately signed by the court in its original form) requesting the exact relief sought by NML in its October 2010 papers.  A-2243-44; SPA-36-41.  At the February 23, 2012 hearing on the "renewed" motion, the district court repeatedly acknowledged that there is no legal basis for enjoining the Republic from servicing its restructured debt under the pari passu clause.  *See* Feb. 23, 2012 Hr'g Tr. ("Feb. 23 Tr.") at 11:25-12:2 (A-2300-1) (THE COURT: "I don't understand the pari passu clause or my [Declaratory Order] to mean that the Republic is forbidden to pay the exchange offers unless they pay NML."); *id.* at 9:13-15 (A-2298) (THE COURT: "I don't see a legal authority for me saying to the Republic, you cannot pay the exchange offer people unless you pay NML."); *id.* at 13:10-12 (A-2302) (THE COURT: "The rights of the exchangers were not conditional on NML getting paid under the pari passu clause."); *id.* at 16:1-7 (A-2305) (THE COURT: "I think that I cannot interfere with the rights of the exchange offers by putting conditions on them or impediments on them . . . . If I felt there was a legal ground for doing so that would be something.  I just don't think there is.").  The district court also appeared to recognize the nonsensical nature of characterizing as "equal

20

treatment" NML's request to be paid 100% on its defaulted debt "because the exchange people are not getting 100 percent of their bonds, of course, they are getting something less[.]" *Id.* at 23:1-3 (A-2312).

The district court made no findings or conclusions to contradict the Republic's legal arguments demonstrating the impropriety of NML's requested injunction. Nor did the court even address the Republic's point that, once in the United States, the funds subject to its Orders are not property of the Republic, but property held in trust for the beneficial owners of the Republic's restructured debt. *See* Indenture, dated June 2, 2005 (the "Indenture") §§ 3.1, 3.5(a) (A-2282-85); Declaration of Matias Isasa, dated Feb. 1, 2012 ("Isasa Decl."), ¶ 4 (A-2288).

Apparently none of this mattered to the district court, because, in its view, unpaid judgments against the Republic by holdout creditors like NML were an "overriding problem" that justified granting a Permanent Injunction against payment of restructured debt. *See* Feb. 23 Tr. at 48:24-49:2 (A-2337-38). In response to the Republic's stressing that there is no authority to enjoin payments to restructured debt holders, the district court candidly stated, "[t]hat's all well and good. The thing is the Republic has been in here for years saying no." *Id.* at 30:3-4 (A-2319). The court continued:

> There are *lots of problems with this pari passu argument* at this point, *lots of problems*. But there is a way that the plaintiffs are seeking after all these years to finally get some leverage

21

so that they might have hope of getting paid.

*Id.* at 31:23-32:2 (A-2320-21) (emphasis added).

> What the plaintiffs here are trying to do is to see if there is yet another device which might get them their just payments and end the litigation.  *It has a lot of problems*, *but [NML's counsel] Mr. Olson and his colleagues, they know their problems. They are not poor law students.*  But they are trying to do something which is intended to overcome the lawlessness of the Republic.

*Id.* at 48:18-23 (A- 2337) (emphasis added).

> I fully recognize that there are problems with the order that the plaintiffs present and I am sure this will go very quickly to the Court of Appeals and *there are problems on appeal*.  There are problems. . . . *Whether it will be ultimately sustained on appeal, that's not my business*.

*Id.* at 49:7-23 (A-2338) (emphasis added).

The district court was therefore quite open about its rationale: Judge Griesa was not acting on an analysis of either the law of pari passu or the legal requirements for injunctive relief, but ultimately, out of frustration that, despite two successful debt restructurings that both he and this Court had upheld, there remained a hard core of holdout creditors whose litigation efforts – because of the limitations imposed on sovereign execution by the FSIA – had been largely unsuccessful.[8]  His Order was not the product of a well-grounded legal analysis, but a self-conscious effort to cut a perceived Gordian knot without a legal or

---

[8]   *See* n.1, *supra.*

22

equitable basis.  At the conclusion of the hearing, the district court confirmed that it would sign NML's proposed injunctive Order (as it did later that day, *see* SPA-36-41), but granted the Republic's request to stay the effect of that Permanent Injunction pending an expedited appeal.  *See id.* at 52:10-12 (A-2341).  The court also converted into the Preliminary Injunction a January 3, 2012 TRO preventing the Republic from altering the mechanisms by which it pays its restructured debt. *Id.* at 54:10-11 (A-2343).

**E.    The "Me Too" Plaintiffs**

Under NML's theory, every remaining holdout creditor is entitled to be paid in full on its defaulted debt simply because the Republic settled at a significant discount with the vast majority of similarly situated creditors in its Exchange Offers, which were offered on the exact same terms to NML and the other holdouts, but which they declined to accept.  The amount already sued upon in the United States and potentially subject to pari passu claims under plaintiffs' theory is well over $6 billion.

To date, following NML's lead, plaintiffs in ten other cases have demanded and obtained the same injunctions as NML.  On December 13, 2011, the district court entered additional Declaratory Orders granting the *Varela* plaintiffs and *Aurelius* plaintiffs the same declaratory relief that it granted NML on December 7, 2011.  SPA-15-25.  And on February 23, 2012, the district court

23

issued Permanent Injunctions granting those plaintiffs the same Permanent

Injunction that it awarded to NML that day, SPA-28-35; SPA-50-54, and entered

an Order granting another hedge fund, Olifant, the same declaratory and injunctive

relief obtained by all other plaintiffs, SPA-42-49.

Were these Orders upheld, no doubt other holdout creditors would

seek them as well.  The Republic's debt restructuring, which like all voluntary

sovereign debt restructurings was premised on treating all similarly situated

creditors equally and offering no better terms to one than another, obviously could

not have occurred at all if holdout creditors could have thwarted it in this fashion.

If the district court's rulings are treated as precedent on the issue in other

jurisdictions, future voluntary debt restructurings of Greece, Spain, Ireland, or any

other country will essentially be rendered impossible.[9]

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's Declaratory Orders

granting partial summary judgment under the pari passu clause.  *See Juliano v.*

*Health Maint. Org. of N.J.*, 221 F.3d 279, 286 (2d Cir. 2000).  To the extent they

deny FSIA immunity to the Republic's property, this Court reviews the Permanent

---

[9]   "Vulture" funds have been reportedly buying up stakes in certain Greek bonds
for this purpose.  *See e.g.*, Christopher Whittall, et al., *Vulture Funds Prepare to
Battle Greek Default*, Int'l Fin. Rev. (Feb. 16, 2012), *available at*
http://www.ifre.com/vulture-funds-prepare-to-battle-greek-
default/20048814.article.

Injunctions and Preliminary Injunction *de novo*. *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 129 (2d Cir. 2009). The Court otherwise reviews those injunctions for abuse of discretion, which occurs when a district court "relies on clearly erroneous findings of fact or an error of law." *See Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

## SUMMARY OF ARGUMENT

As the district court "fully recognize[d]," the Permanent Injunctions have "a lot of problems," plaintiffs' "pari passu argument" has "lots of problems," and there are "problems on appeal." Feb. 23 Tr. at 49:7-10 (A-2338); *id.* at 48:20 (A-2337); *id.* at 31:23-24 (A-2320). Each of these "problems" consitutes legal error requiring reversal.

*First*, the district court was wrong to adopt, without explanation or legal citation, plaintiffs' incorrect interpretation of the boilerplate pari passu clause. The plain language of the clause refers to legal "rank" and does not require a sovereign or other debtor to pay defaulted debt in order to pay creditors holding restructured debt. Such a reading defies market understanding of this provision and runs exactly counter to U.S. policy favoring voluntary debt restructurings. The United States, the Federal Reserve, the Clearing House, the Bank of England, highly respected sovereign debt practioners, and numerous others have gone on record to denounce the so-called "ratable payment" reading of the pari passu

25

cluase.  *See generally* US Br. (A-1761-1785); Fed. Br. (A-1787-1804); CH Br. (A-1806-1822); England Rep. (A-1824-1849); Wood (A-1917-1920); Link (A-1851-1856); Buchheit (A-1858-1874).  And as a matter of basic contract interpretation, NML's reading must be rejected because it conflicts with other contract provisions and produces absurd results, including an unworkable web of third party liability claims.  Nor is plaintiffs' argument improved by the 2005 passage in Argentina of the "Lock Law," as they urged below.  Both before and after passage of that Argentine law, plaintiffs' bonds remained "direct, unconditional, unsecured and unsubordinated obligations of the Republic" with the same legal "rank" as any other debt.  That is all the pari passu clause requires.  In any event, even if the clause had been violated, the contractually agreed upon remedy is acceleration of principal, an action already taken by these plaintiffs.

*Second*, the district court erred in ordering the Republic to pay plaintiffs with immune property located outside the United States.  *See* 28 U.S.C. §1609 (SPA-6).  The entire basis for plaintiffs' motions was that because the Republic has no executable assets located in the United States, the only way to "end" the litigation is to require the Republic to pay plaintiffs with assets indisputably not here (obviously, if Republic assets being used for a commercal activity *were* in the United States, plaintiffs would attach or restrain them).  As this Court has held, district courts "may not grant, by injunction, relief which they may

not provide by attachment," as "[t]he FSIA would become meaningless if courts could eviscerate its protections" in the manner proposed by plaintiffs. *S&S Machinery Co. v. Masinexportimport*, 706 F.3d 411, 418 (2d Cir. 1983). The only enforcement mechanism that the Orders below even resemble – a so-called turnover order – would of course be limited by FSIA Section 1610's requirement that the turned-over property be in the United States and used for a commercial activity here. *See* 28 U.S.C. § 1610 (SPA-7). The district court recognized these limitations on its jurisdiction at other times in these cases, but it ignored them here.

*Third*, the Orders erroneously purport to restrain property in the possession of banks acting as trustee for third party bondholders and to prevent those banks from otherwise transferring money to them. *See e.g.,* SPA-39-40. Such assets are not property of the Republic (and so cannot be attached or restrained by the Republic's creditors). Nor does the pari passu clause give plaintiffs any interest in those funds.

*Fourth*, the district court incorrectly concluded that plaintiffs will suffer irreparable harm in the absence of an injunction. The only "harm" to these plaintiffs is the same harm they voluntarily assumed when they continued to hold and purchase, year after year and for pennies on the dollar, defaulted debt of the Republic: unpaid principal and interest payments, *i.e.*, money damages. The years of delay by plaintiffs in bringing their motions destroys any notion that irreparable

27

injury exists here, as does the fact that these plaintiffs continue to pursue actively and aggressively in multiple jurisdictions the legal remedies available to them.

*Fifth*, the district court's conclusion – which followed no analysis – that the public interest and balance of hardships warranted the granting of the Permanent Injunctions was error. The hardship to holders of the Republic's restructured debt and to the Republic itself as obligor that stem from the Permanent Injunctions far outweighs the purported prejudice to holdouts, who bought their debt at or near default with full knowledge of the limitations on their ability to collect. The public interest in effective debt restructuring by financially distressed states is also defeated by the Permanent Injunctions, which, unless reversed, will thrust the Republic into another economic crisis and "undermin[e] the consensual [sovereign debt] restructuring process the United States has been at pains to foster for the past several decades." US Br. at 16 (A-1781). Restraining funds to be paid to third party bondholders will lead to an unworkable "web of claims, counterclaims, and cross-claims" among the various constituents that will "place an enormous burden on courts [in addition to making] virtually impossible an orderly restructuring of [sovereign] indebtedness," CH Br. at 11-12 (A-1820-21), and threaten the "stability of the global financial system by seriously impacting on the reliability and certainty of large value payments" by intermediary banks, Fed. Br. at 8 (A-1798).

*Sixth*, the district court erred in not barring plaintiffs' claims due to laches. The Republic tried to resolve the meaning of the pari passu clause *before* its restructuring, starting in December 2003 – but *at NML's urging* the court deemed the issue unripe for adjudication. Plaintiffs then sat silent as the Republic restructured over 91% of its defaulted debt and made regular biannual payments to holders of its restructured debt, each of which – on plaintiffs' theory – constituted a separate purported breach of the pari passu clause. In the face of this inexcusable delay, plaintiffs cannot now rely on "equity" to interfere with payments to third parties who have obviously developed a reasonable expectation of that regular source of income. *See, e.g.*, *In re Schulz*, 81 N.Y.2d 336, 348-50 (1993).

*Finally*, the district court erred in issuing the Preliminary Injunction preventing the Republic from altering the manner in which it services its restructured debt. This improper relief was both in service of the erroneously granted ultimate relief (the Permanent Injunctions) and otherwise based on the incorrect premise that the Republic could be required to use payment mechanisms that would subject third party bondholder money to process by a U.S. court.

## ARGUMENT

In granting the Permanent Injunctions designed to restrain payments to holders of the Republic's restructured debt unless the Republic pays plaintiffs the full principal amount, plus interest, owed on their defaulted debt, the district

29

court manifestly failed to find – as it was required to do – that plaintiffs had

succeeded on the legal merit of their pari passu claim and met the equitable

injunction requirements. *See Roach*, 440 F.3d at 56; *see also* H.R. Rep. No. 94-

1487 (1976), *reprinted in* 1976 U.S.C.A.A.N. 6604, 6621 (a court should not issue

an injunction against a sovereign unless "clearly appropriate").  Plaintiffs' failure

to establish their entitlement to the extreme relief granted below is patent on the

face of the record; the district court's acknowledgements that plaintiffs' proposed

Orders and arguments suffered from "a lot of problems,"  Feb. 23 Tr. at 48:20 (A-

2337); *see also id.* at 31:23-24 (A-2320); *id.* at 49:7-10 (A-2338), is an

understatement.

## I.    THE ORDERS BELOW MUST BE VACATED BECAUSE NML'S READING OF THE PARI PASSU CLAUSE IS WRONG

The theory underlying all of the Orders on appeal is that a pari passu

clause in a sovereign debt instrument prevents the sovereign from repaying a single

creditor unless it also pays *all* of its other creditors on a "pro rata" basis, a term

plaintiffs define to mean full payment to them of principal and interest whenever

any bondholder gets a single interest payment.  *See, e.g.,* NML Declaratory Order

at 4 (SPA-13) ("[T]he Republic lowered the rank of NML's bonds in violation of

[the pari passu clause] when it made payments currently due under the Exchange

Bonds, while persisting in its refusal to satisfy its payment obligations currently

due under NML's Bonds."); NML Permanent Injunction at 3-4 (SPA-38-39)

(ordering, pursuant to the pari passu clause, that the Republic "make a 'Ratable Payment' [] to NML" whenever "the Republic pays any amount due under [the 2005 and 2010 Exchange Offers].").  This theory is wrong as a matter of law.

**A.    The Pari Passu Clause Does Not Require Simultaneous "Pro Rata" Payments Or Proportional Distribution Of Payment Amounts**

> **1.  The Plain Meaning Of The Pari Passu Clause Deals With The Formal Ranking Of Creditor Claims**

Under New York law, where a boilerplate contract term is subject to only one reasonable interpretation, courts must give such language its plain meaning as evidenced by the words of the contract itself, in light of custom and usage.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002); *Fox Film Corp. v. Springer*, 273 N.Y. 434, 437 (1937).  Here, the repetitive use of the word "rank," as modified by the terms "pari passu" and "equally," makes it self-evident that the clause prevents legal or contractual *subordination* of debt – not that it somehow requires "ratable" or any other type of payments, as invented by Elliott.  *See* FAA ¶ 1(c) (A-157); NML Bond at A-6 (A-1989); *Black's Law Dictionary* 1563 (7th ed. 1999) (defining subordinate as "to place in a lower *rank*, class, or position") (emphasis added).

The term "rank" has a meaning of hierarchy, and not a quantitative or temporal meaning.  *See* Link  ¶ 8 (A-1853); *see also American Heritage Dictionary* 1497 (3d ed. 2000) (defining the verb "rank" as "[t]o place in a row or

31

rows" or "[t]o give a particular order or position to; to classify"). The correct adjectives to be used with "rank" are therefore those such as "senior," and "subordinate," not "earlier," "simultaneous," or "later." Link ¶ 8 (A-1853). Likewise, Black's Law Dictionary defines "priority" as "[t]he status of being earlier in time *or* higher in degree or rank," thereby recognizing the distinction between a priority in timing of payment and a priority in legal rank. *Black's Law Dictionary* 1212 (7th ed. 1999) (emphasis added). Put simply, "'[r]ank' means 'rank.' It does not mean 'will pay,' nor does it mean 'will give equal treatment to creditors.'" Wood at 372 (A-1918). Thus, where the FAA states that the "payment obligations . . . shall at all times rank at least equally," the language means that the Republic will not *subordinate* its bondholders' right of payment. A-157.

Examining the pari passu clause in the context of market custom and usage reinforces this plain meaning. Boilerplate provisions such as the pari passu clause must be given "a consistent, uniform interpretation" to avoid the creation of "enduring uncertainties. . . [that] would decrease the value of all debenture issues and greatly impair the efficient working of capital markets." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *see also* US Br. at 14 (A-1779) (describing the pari passu clause as "boilerplate language contained in almost all sovereign debt instruments"); CH Br. at 4 (A-1813) ("There are trillions of dollars of unsecured debt obligations outstanding under New York law

32

that benefit from *pari passu* clauses.").  Although NML argued below that the

clause is not boilerplate because some sovereign debt instruments specifically refer

to payment obligations while others do not, slight changes in wording do not

detract from the market's understanding of the clause as a boilerplate provision.

*See* Stephen J. Choi and G. Mitu Gulati, *Contract as Statute*, 104 Mich. L. Rev.

1129, 1136 (2006) (A-1929) (concluding from practitioner surveys that slight

"differences [in pari passu clauses] are more idiosyncratic than due to any

purposeful intent to change the *pari passu* clause to favor (or disfavor) holdouts.  A

court attempting to read meaning into such differences runs a risk of

misinterpreting the clause."); *id.* at 1150 ("With boilerplate, small differences in

language should not be treated as having great meaning.  The market does not price

these differences as meaningful, the lawyers do not understand them as such.").

   In the context of private sector borrowers, pari passu status is most

relevant in bankruptcy, when "the power to order payments of debt has been taken

out of the discretion of the debtor and put into the judicially supervised workout

[(Chapter 11)] mode" or liquidation (Chapter 7).  Link  ¶ 11 (A-1854); *see also*

Declaration of Professor Stephen Choi, dated Dec. 10, 2010 ("Choi") ¶ 9 (A-2089).

   In the case of sovereign borrowers, bankruptcy laws of course do not

apply and no comparable asset distribution occurs; to the contrary, sovereign assets

are generally protected from attachment and execution by creditors.  28 U.S.C.

§ 1609 (SPA-6).  As has been the case for decades, creditors must rely on a

sovereign to voluntarily satisfy its payment obligations, or otherwise try to locate

and execute on assets that fall under one of the narrow exceptions to sovereign

immunity.  *See* 28 U.S.C. § 1610 (SPA-7-9).  The limited purpose of the pari passu

clause in the sovereign context, as it has been universally understood for over 50

years, is to provide protection from legal subordination or other discriminatory

legal ranking by preventing the creation of legal priorities by the sovereign in favor

of creditors holding particular classes of debt.  This interpretation has *never* been

disputed by a market participant, and indeed has been confirmed by the institutions

and practitioners most familiar with the intentions underlying the parties' inclusion

of the clause in sovereign debt contracts, including by the Republic's original

creditors.

            In its 2004 *amicus* brief, the Clearing House plainly stated: "[o]ur

member banks, and other participants in credit markets have long understood [the

pari passu] clause – which is standard language included in substantially the same

form in numerous credit documents – to prohibit a debtor from creating unsecured

debt that ranks senior in legal right of payment to the payment obligations the

debtor has to creditors for whose benefit the covenant is made."  CH Br. at 2 (A-

1811).  The Clearing House further noted that "[t]he clause is not intended [] to do

more than what it says – to provide certainty on the issue of involuntary

subordination." *Id.* at 5 (A-1814). This statement represents the most definitive declaration to date by market participants on the meaning of the clause, as the Clearing House banks and their affiliates – a network of the largest banks in the world – are "significant participants as lenders, underwriters and financial advisors in the U.S. and international credit markets, including, in particular, *as lenders to sovereign borrowers such as the Republic of Argentina*." *Id*. at 1 (A-1810) (emphasis added).

Unbiased commentators in the sovereign debt area, representing both creditors and debtors, uniformly agree. *See* Wood at 373 (A-1919) ("[T]he clause must mean that, for example, there is no statutory or constitutional or other rule of law . . . subordinating the debt to other debt. While such a law might seem rare now, in the past the practice of states in allocating the payment of loans by decree to particular revenues was not uncommon[.]"); Link ¶ 7 (A-1853) ("[T]he contemplation of the draftsman at the outset. . . . is to assure that the debtor does not know of (and will not create) any legal excuse based on the relative status of classes of debt which may throw into question the nature of the legal obligation to pay the protected debt at maturity."); Buchheit at 497 (A-1860) ("[T]he borrower violates [the clause] only by attempting to create a class of senior indebtedness in preference to that outstanding under the loan agreement in which the clause appears.").

35

Not only have the Clearing House and preeminent sovereign debt practitioners affirmed this meaning of the pari passu clause, but they, along with the United States, the Federal Reserve, the Bank of England, and numerous others, have also resoundingly rejected the idea that the parties to sovereign debt contracts ever intended the provision to have the interpretation invented by Elliott and erroneously accepted by the district court below – that it requires the "pro rata" payment of all unsecured debt obligations.  *See* US Br. at 15 (A-1780) (Elliott's interpretation of the pari passu clause grants holdout creditors "an additional contract right – a right that they did not bargain for"); Fed. Br. at 5 (A-1795); England Rep. at 22 (A-1848).  The Clearing House unequivocally stated that NML's pari passu reading is "incorrect as a matter of law, and would constitute a dramatic and disruptive departure from how New York law-based credit markets have functioned in this area."  CH Br. at 3 (A-1812); *see also id.* at 6 (A-1815).

> The practitioners are again in accord:
>
> Never in my [40 year career] did a creditor involved in [a credit] transaction[], whether as draftsman or negotiator, take the position, as [Elliott] does [], that a *pari passu* provision . . . should be construed in such a way as to require that all of the creditors of a sovereign debtor be paid simultaneously on a pro rata basis. . . . I am simply saying that this construction would have appeared inconceivable and unworkable to the lawyers actually drafting the transaction documents . . . whether from the perspective of prospective lenders, or the sovereign borrowers itself. . . . In my experience, the *pari passu* provision has never been intended in any sense to affect the timing of payment as such.

Link ¶¶ 4, 6 (A-1852).

> Or in the words of the leading English practitioner:
>
> [N]obody would ever agree to such an impracticable prohibition. Established professional markets do not habitually require clauses which are unworkable or which might invite lender liability. . . . The [interpretation created by Elliott] would give the clause a more draconian impact than normal fraudulent preference statutes[.]

Wood at 373 (A-1919).

Plainly, the clause – as it has been understood by those negotiating and executing the very contracts in which it exists – simply does not speak to whether one creditor is paid ahead of another.

### 2. The Impropriety Of NML's Interpretation Of The Pari Passu Clause Is Further Demonstrated By Canons Of Contract Interpretation And The Fact That It Leads To Absurd Results

The error of plaintiff's position is further demonstrated by the fact that it would leave other provisions commonly appearing alongside pari passu clauses without effect or purpose, *see Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir. 1985), and would lead to absurd results to which no party – debtor or creditor – would ever agree, *see Newmont Mines, Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 135 (2d Cir. 1986).

*First*, NML's interpretation of the pari passu clause as requiring "ratable" payments to creditors would render meaningless other standard loan contract clauses, such as "most favored nation" clauses, "negative pledge" clauses,

37

and "sharing" clauses, which do actually address the issue of payment to one creditor before another.  *See* Wood at 373 (A-1919) ("Where a wider equality is desired, creditors can and do draft an appropriate clause – a most favoured debt clause, a negative pledge, a pro rata sharing clause, a provision for payment to a trustee of a bond issue on default who then pays bondholders on a pro rata basis, or a cross default clause.").  Sharing clauses, for example, typically provide that "any disproportionate payment received by one member of the syndicate will be shared rateably by the rest."  Choi ¶ 12 (A-2090).  Sharing clauses provide a coordinating mechanism for the borrower to make payments to creditors on a "pro rata" basis via an agent bank, which in turn distributes the payments to creditors – provisions *not* found in the altogether separate pari passu clause.  *Id.*  As the Clearing House explained, "[sharing] clauses are often found in loan agreements under which the creditors separately are protected against involuntary subordination through a *pari passu* clause," and thus "these two types of clauses [must] serve different purposes."  CH Br. at 7 (A-1816).

Moreover, sharing clauses, which govern clear, defined sets of creditors, contain "complex 'payover' provisions which are necessary to reallocate among creditors disproportionate payments."  *Id.*  Given the specific restrictions contained in sharing clauses, "it is implausible to contend that the market intends *pari passu* clauses to accomplish the same thing in a much vaguer and open-ended

38

way." *Id.* at 8 (A-1817); *see also* Link ¶ 9 (A-1853) (noting the numerous considerations that would need to be addressed by a mechanism governing "pro rata" payments to *all* unsecured creditors "were not – indeed, could not have been – remotely addressed in the drafting" of the pari passu clause).[10]  The fallacy of plaintiffs' position is borne out by the fact that their proposed Orders included an NML-created definition of "Ratable Payment," *see e.g.*, SPA-39 – which entitles plaintiffs to 100% payment of principal and interest – although if the parties had contemplated the pari passu clause to function in this way, then surely the bonds themselves would have defined the concept.  In fact, another creditor who invoked NML's interpretation of the pari passu clause – in a case that did not result in a district court opinion – created an entirely different formula by which to calculate "proportionate" payments.  *See* Red Mountain Br. at 9 n.7, dated Apr. 30 2001 (A-2883).[11]

NML's "ratable" interpretation is also "wholly inconsistent" with the FAA provision known as the "repurchase" provision, which by its terms permits

---

[10]  The FAA does not contain a sharing clause, nor are they included in New York law-governed fiscal agency agreements generally.  *See* CH Br. at 8 (A-1817).  The practice and effect of their absence in this context was of considerable debate in the 1990s, and although official sector participants proposed that emerging market bonds begin to include them, *bond market investors* resisted and the market ultimately did not adopt the proposal.  *Id.* at 8-9 (A-1817-18).

[11]  *See* n.14, *infra*.

the Republic to repurchase its securities from creditors in separately negotiated transactions (the functional equivalent to repayment of the bond interests).  *See* FAA § 9(c) (A-169); CH Br. at 9-10 (A-1818-19).  Unsurprisingly, nothing in the FAA's repurchase provision states that it exists "notwithstanding" the pari passu clause, or that it obligates the Republic to purchase its securities on a "pro rata" basis from bondholders.  *See* FAA §§ 9(c), (d) (A-169).  Nor does anything in the "repurchase" provision somehow suggest that the repurchase and cancellation of one creditor's debt results in the impermissible "subordination" of another's debt.  Such a reading would eviscerate the entire purpose of the "repurchase" clause: to permit the Republic to negotiate debt repurchases with creditors on an individual basis.

    *Second*, NML's interpretation of the pari passu clause must be rejected because it produces absurd results.  *See In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003); Link ¶ 4 (A-1852) ("[NML's] construction would have appeared inconceivable and unworkable to the lawyers actually drafting the transaction documents"); England Rep. at 13 (A-1839) ("[T]he practical consequences that follow from the payment interpretation are such that the parties would not have agreed that the *pari passu* clause should have that meaning had they been presented with these consequences at the time that they entered into their contract.").

Under NML's interpretation, a debtor is precluded from making payments to *any* of its creditors unless it is able to *satisfy in full all of its obligations to all of its creditors*, and would be forced to default on *all* of its obligations upon default on any single obligation.  *See* Wood at 372-73 (A-1918-19).  A temporary shortfall of funds would automatically be converted into an across-the-board debt crisis every time a single creditor or small group of creditors was not paid, resulting in severe disruptions and uncertainty in the sovereign debt markets, as no bondholder or trader could ever know whether or when its payment streams might be enjoined by a single disaffected creditor.[12]  And as the United States observed, the practical effect of this reading is to "grant a single judgment creditor the ability to thwart the implementation of an internationally-supported restructuring plan."  US Br. at 15 (A-1780).  Creditors who wished to restructure would become hostage to those who do not, those willing to accept the financial sacrifices necessary to restructure would be blocked from receiving payment even

---

[12]  In the corporate context, NML's interpretation would also provide a single creditor holding debt including a pari passu clause with the *de facto* power to force a debtor into involuntary bankruptcy in violation of 11 U.S.C. § 303(b)(1), which provides that an involuntary bankruptcy case can be commenced "by *three* or more entities," and only if the Court finds that "the debtor is generally not paying [its] debts as such debts become due," 11 U.S.C. § 303(h)(1).  The fact that no caselaw supports this theory, and that the result would disrupt the well-understood rules of debtor-creditor relationships, again suggests the absence of any legal basis for NML's interpretation of the pari passu clause.

on the new debt reflecting that sacrifice, and debt restructuring would effectively become impossible. *See* England Rep. at 17 (A-1843) ("From the sovereign debtor's perspective and from the perspective of the majority of the creditors who wish to restructure the defaulted indebtedness in order to maximise the dividend they will receive as a class, the use of the *pari passu* clause as a tool to disrupt the process does not make business sense.").

*Finally*, NML's fallacious reading of the pari passu clause also precludes the Republic from making any payments *to NML*, unless the Republic also "ratably" pays any and all other outstanding debt, whether performing or defaulted sovereign bonds, multilateral debt or trade debt, at the same time. Any of the Republic's *other* unpaid external creditors would have just as much right to enjoin the Republic from paying NML as NML would have to enjoin the Republic from paying the vast majority of creditors who do not hold defaulted claims against the Republic. *See* CH Br. at 11 (A-1820). The result of this Hobbesian "war of all against all" would be market paralysis and chaos, and demonstrates why NML's interpretation is wrong as a matter of law. *See* England Rep. at 15 (A-1841) ("[L]enders in a standard international syndicated loan or bond issue would not have intended the *pari passu* clause to expose them" to "liability to third parties as a result of the obligations that they have agreed to in a loan agreement."); Choi ¶ 11 (A-2089).

Indeed, the common practice has historically been for sovereigns forced to restructure to treat lenders of last resort like the IMF, World Bank, and the IADB as *de facto* preferred creditors in order to ensure the continued functioning of the multilateral lending system and to maintain continued access to it. *See* US Br. at 17 (A-1782) ("[A]s a matter of established custom, sovereign debtors routinely service debts owed to [international financial institutions] – even though those debtors may lack the resources to pay their other obligations.  This custom is well understood by the international financial community."); World Bank Executive Directors Memorandum, dated July 19, 1990, at 2 (A-1880). Without this practice, these lenders would be unable to safeguard countries on the brink of crisis, which would not only force more countries into default, but also serve to destabilize the international financial system as a whole.  No such treatment has ever been understood to violate the pari passu clause. *See* Choi ¶ 10 (A-2089); *see also* Br. for the United States of America as *Amicus Curiae* at 20, *NML Capital, Ltd. v. Banco Central de la República Argentina*, No. 10-1487-cv(L) (2d Cir. Nov. 3, 2010) ("[T]he Republic's decision to pay the IMF in preference to its other creditors was consistent with the long-standing policy of the United States and the other sovereign members of the IMF to recognize the preferred creditor status of the IMF.  In order to protect the funds of its member states (including the

43

funds invested by the United States), the IMF rightly expects to be paid even when other creditors are not.").

In light of the foregoing, it is hardly surprising that prior to the district court's Declaratory Orders, no New York court had *ever* accepted NML's interpretation of the pari passu clause.  The authority upon which NML relied below is a patchwork of non-binding judicial decisions, including the 2000 Belgian *ex parte* ruling in *Elliott* that has been condemned by the United States, the Federal Reserve, the Clearing House, and the Bank of England, among numerous others;[13] a vacated California district court order that does not even mention the pari passu clause, let alone determine its meaning;[14] and a passing reference to hypothetical injunctive relief in dicta from a district court opinion.[15]  By contrast, the only other

---

[13]   The *Elliott* decision was also rendered ineffective in Belgium itself, when the state enacted Belgian Law 4765 specifically preventing creditors from obtaining similar injunctions in the future.  *See* Rodrigo Olivares-Caminal, *Legal Aspects of Sovereign Debt Restructuring* 94 (Sweet & Maxwell 2009).

[14]   *See* Order, *Red Mountain Fin. Inc. v. Democratic Republic of Congo*, CV 00-0164 R (BQRx) (C.D. Cal. May 29, 2001) (A-1369-73).  In *Red Mountain*, Judge Real did not explain the basis for his injunction, but, presumably intentionally, crossed out the section of the proposed order tendered to him by the plaintiff that referenced and relied on the pari passu clause.  The case was settled before an appeal could be taken.

[15]   *See Nacional Financiera, S.N.C. v. Chase Manhattan Bank, N.A.*, 2003 WL 1878415, No. 00 Civ. 1571 (JSM), at *2 (S.D.N.Y. Apr. 14, 2003).  This opinion further demonstrates why NML's invocation of the pari passu clause is improper here.  Then-Judge Martin only contemplated the relevancy of the pari

common law court to discuss the issue, the English High Court in *Kensington Int'l Ltd. v. Republic of Congo*, 2002 No. 1088 (Commercial Ct. 16 Apr. 2003) (Tomlinson, J.), implicitly rejected NML's theory.  In that case, brought by another Elliott affiliate, the English court denied the plaintiff's application for injunctive relief under the pari passu clause on equitable grounds, but in the course of doing so expressed skepticism about the validity of NML's theory.

## B.    The 2005 "Lock Law" And Law 26,547 Did Not Violate The Pari Passu Clause

The district court further erred in holding that the Republic breached the pari passu clause when it enacted the 2005 Lock Law and Law 26,547 in 2009, which temporarily suspended the Lock Law.  *See e.g.*, SPA-14.

*First*, the Lock Law simply prevents the Argentine Executive from unilaterally re-opening the 2005 Exchange Offer or engaging in settlements with defaulted bondholders.  *See* Lock Law (A-436); Choi ¶ 17 (A-2092).  The Argentine Congress retained for itself, and continues to hold (consistent with Argentine public policy and the Argentine Constitution), the ability to permit future exchange offers and settlements, which is precisely what it did in 2009, when it suspended the Lock Law in order to conduct the 2010 Exchange Offer. *See* Law 26,547 (A-440).  This type of announcement, which is commonly made

passu clause in "insolvency proceedings," which do not exist in the sovereign context, where debt crises must be resolved by voluntary debt restructurings.

45

by a sovereign when it restructures debt that is not subject to a collective action clause, is not and has *never* been viewed as a legal subordination of that debt.[16]

Second, and critically, plaintiffs' beneficial interests *remain* "direct, unconditional, unsecured and unsubordinated obligations of the Republic" because they are now – just as they have always been – enforceable against the Republic to the extent permitted by the FSIA (or the sovereign immunity laws of other jurisdictions). Neither the Lock Law nor Law 26,547 rendered the claims of plaintiffs, which are governed by New York law, or any other creditor unenforceable in any court, and plaintiffs continue to vigorously pursue the enforcement of their claims both in the United States and in countries around the world. The fact that the Lock Law states that the Republic may not settle with holdout creditors – *i.e.*, that it will not offer them a better deal than the creditors who accepted the restructuring – does not change this conclusion.

---

[16] *See* Philip R. Wood, *Sovereign State Restructurings and Credit Default Swaps*, Butterworths J. of  Int'l Banking & Fin. L. 559, 661-62 (2011) ("Sovereign issuers who make voluntary offers usually – in the absence of a collective action clause – also make a statement that they will not pay those bondholders who were eligible to accept the offer but did not accept the offer (Greece did not say this originally). If they did not say this, then there would be less incentive on bondholders to accept because, if most people did accept, leaving a small rump that did not (almost invariably a tiny minority of holders do not accept), then the rump might get paid ahead of the rescheduled bondholders who did accept. So the issuer makes a commitment not to give any bondholders a better deal than the deal on offer in the voluntary exchange.").

46

*Third*, the Lock Law and Law 26,547 did not create a "legally preferred" class of creditors. "Priority" in the context of corporate insolvency and sovereign default refers to the legal right of certain claims to be paid before others. *See Black's Law Dictionary* 1313 (7th ed. 1999) (defining priority as "a creditor's right to have a claim paid before other creditors of the same debtor"). The Republic's non-payment of its defaulted debt and the ability to participate in the Exchange Offers applied *equally* to all creditors holding eligible defaulted Republic debt. Far from granting a preference to participating creditors' claims with respect to their defaulted debt, the effect of the Exchange Offers was to *extinguish* such claims entirely, while creating new debt (on less advantageous terms to its holders) with no legal preference whatever *vis à vis* the old indebtedness; any claims that may arise from the Republic's restructured debt have no priority in any court of law over claims arising out of the Republic's unrestructured debt. *See* CH Br. at 7-8 (A-1816-17) ("[P]*ari passu* clauses . . . address only the ranking of legal right, as opposed to the fact, of payment. . . . [and] the legal right of payment is enforced in courts, which have their own procedures and remedies[.]"). A holder of defaulted debt cannot *voluntarily* decline to participate in a restructuring and then afterward assert that the creditors who elected to settle their claims are a "preferred class." *See* Choi ¶ 17 (A-2092) ("No creditor is given any affirmatively greater legal rights [by the Lock Law].

47

The Lock Law does not promise that the other creditors that agree to the exchange offer will be paid.").

*Finally*, the court's conclusion that Law 26,547 violated the pari passu clause is particularly ironic, because that enactment states that the Executive is prohibited from offering holdout creditors "*more favorable* treatment" than participants in the Exchange Offers. *See e.g.*, SPA-12 (emphasis added). In no rational sense can the *prohibition* of treating some creditors more favorably than others be read to mean that principles of "equal treatment" have thereby been violated.

## C.    The Remedy For Breach Of The Pari Passu Clause Is Acceleration

The district court also erred in granting the Permanent Injunctions because, regardless of the meaning of the pari passu clause, its breach does not entitle plaintiffs to injunctive or other equitable relief. Like any other covenant in the FAA, breach of the pari passu clause is an event of default that permits creditors to accelerate principal and interest payments not yet due and owing. *See* FAA § 12 (A-172-73) (permitting acceleration upon default and defining default to include instances when "the Republic does not perform or comply with any one or more of its other obligations in the Securities"). Thus, even if the Republic had breached the pari passu clause, plaintiffs are limited to the contractually agreed upon remedy of acceleration. Nothing in the pari passu clause purports to grant a

48

creditor the extraordinary right to interfere with payments to other creditors or claim an interest in assets paid to those creditors.

The district court in fact appeared to acknowledge that, even under NML's incorrect interpretation, the provision is an obligation of the Republic and does not dictate the remedy for breach of that obligation or impose conditions on that obligation that would otherwise support the issuance of an injunction:

> [T]he Republic has two obligations; one, to pay exchange offers because they have agreed to do that, and they have a second obligation under the pari passu clause to make an appropriate payment to NML. Two obligations. But that as a matter of grammar, as a matter of my understanding, does not necessarily mean that *as a condition* of paying the exchange offers they must pay [plaintiffs].

*See* Feb. 23 Tr. at 11:18-24 (A-2300) (emphasis added); *id.* at 11:25-12:2 (A-2300-1) (THE COURT: "I don't understand the pari passu clause or my [Declaratory Order] to mean that the Republic is forbidden to pay the exchange offers *unless* they pay NML.") (emphasis added); *see also id.* at 13:10-12 (A-2302); *id.* at 16:1-7 (A-2305).  The court's entry of the Permanent Injunctions was thus, as it essentially conceded, wholly unsupported by the underlying contract and was therefore erroneous as a matter of law.

## II.     THE PERMANENT INJUNCTIONS VIOLATE THE FSIA

Even if NML's pari passu interpretation were correct – which it clearly is not – the Permanent Injunctions must still be vacated because they

interfere with the Republic's use of its property located outside the United States, where it is indisputably immune from restraint by United States courts under the FSIA. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (the FSIA is exclusive source of authority for judgment creditor's action to enforce its judgment against sovereign debtor); 28 U.S.C. § 1610(a) (SPA-7); *Aurelius Capital Partners LP*, 584 F.3d at 130; US Br. at 18 (A-1783) ("[T]he United States expresses doubt as to whether [enjoining a sovereign's use of its assets outside the United States is] consistent with the [FSIA].").

Here, the Republic makes its payments on the restructured debt *outside the United States* when it transfers the necessary funds to a trustee, which then holds the funds in trust solely for itself and the beneficial owners of the Republic's restructured debt. *See* Isasa Decl. ¶ 4 (A-2288); Indenture §§ 3.1, 3.5(a) (A-2282-85). Once that transfer takes place, the Republic has no right to the funds and they are no longer the property of the Republic. *See* Isasa Decl. ¶ 4 (A-2288); Indenture § 3.5(a) (A-2284-85).

Because the payments and property targeted by NML are located outside the United States, they are indisputably immune from the jurisdiction of the United States courts and thus are improperly the subject of the Permanent Injunctions. *See Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715 (TPG), 2010 WL 768874, at *4 (S.D.N.Y. Mar. 5, 2010) (rejecting

50

attachment attempt over funds at Citibank Argentina because transaction between the Republic and Citibank Argentina took place *in Argentina* and the funds were therefore immune from restraint under the FSIA); *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715 (TPG), 2010 WL 2925072, at *4 (S.D.N.Y. July 23, 2010) (finding that the Trust Bonds sought to be seized by turnover order were sitused *in Argentina* and therefore outside scope of execution under the FSIA); Fed. R. Civ. P. 69(a)(1) (incorporating state execution remedy of turnover, limited by FSIA); *see also* Dec. 17, 2010 Hr'g Tr. at 48:16-21 (A-2275) (denying injunctive relief and noting lack of jurisdiction to compel the Republic to bring attachable assets to the United States: "[I]f the Republic wishes to structure [bond transactions] . . . in Argentina . . . I do not see why they are not legally entitled to do that."), *aff'd Rossini v. Republic of Argentina*, No. 11-100-cv, 2011 WL 2600404, at *3 (2d Cir. July 1, 2011).

        In recognition of the fact that no exceptions to FSIA immunity even arguably apply here, plaintiffs tried below to escape the statute's reach by arguing that the immunities afforded to sovereign property are inapplicable because plaintiffs were somehow *not* seeking an attachment or execution, but "relief" to prevent the Republic from breaching its "contractual commitments."  This is nothing more than wordplay.  Plaintiffs are plainly using the pari passu clause to compel the payment of missed principal and interest payments – *i.e.*, to *enforce*

51

their pending judgments.[17]  When NML first presented its erroneous pari passu

theory to the district court in January 2004, it embraced the notion that the clause is

an execution device, characterizing it as an "enhanced judgment enforcement

mechanism[]."  *See* Reed Letter at 3 (A-210).

      In any event, regardless of the label that NML strategically selected

below, the Permanent Injunctions, at bottom, restrain the Republic from both freely

using billions of dollars of its otherwise *immune* property, and compel the Republic

to "turn over" over one billion more dollars (and multiples of that, if the Permanent

Injunctions are affirmed and the inevitable "me too" motions are made), of

otherwise *immune* property to plaintiffs in an amount that would exactly satisfy

plaintiffs' pending judgments.  The district court's expressed rationale for the

Permanent Injunctions was precisely that they would force the Republic to turn

over a material portion of its foreign currency reserves to satisfy plaintiffs'

eventual judgments.  Feb. 23 Tr. at 31:23-33:5 (A-2320-22).

      This Court has flatly rejected this type of end-run around the FSIA,

because "[t]he FSIA would become meaningless if courts could eviscerate its

protections merely by denominating their restraints as injunctions against the . . .

use of property rather than as attachments of that property."  *S&S Machinery Co. v.*

*Masinexportimport*, 706 F.3d 411, 418 (2d Cir. 1983); *see also Stephens v. Nat'l*

---

17  With the exception of Olifant, plaintiffs have all obtained summary judgment in
these actions for missed principal and interest payments on their defaulted debt.

*Distillers & Chem. Corp.*, 69 F.3d 1226, 1230 (2d Cir. 1996) ("[T]he principle behind the [FSIA's] prohibition against attachments should apply broadly."). Thus, the Court has instructed that district courts "may not grant, by injunction, relief which they may not provide by attachment." *S&S Machinery Co.*, 706 F.3d at 418. Because there is no question that plaintiffs are not entitled to attach or execute upon the assets at issue, the district court erred in enjoining the Republic's use of them.

### III. THE PERMANENT INJUNCTIONS PURPORT TO RESTRAIN PROPERTY IN WHICH NEITHER PLAINTIFFS NOR THE REPUBLIC HAVE ANY INTEREST

The Permanent Injunctions are also improper to the extent that they purport to restrain the funds at issue when they enter the United States, because they are then, and are at all points thereafter, held in trust for the beneficial owners of the Republic's restructured debt. *See* Isasa Decl. ¶ 4 (A-2288); *In re Estate of Zuckerman*, 670 N.Y.S.2d 752, 753 (Sur. Ct. 1998) ("[A]n essential characteristic of a trust is that the trustee holds title to the corpus."); *see also Capital Ventures Int'l v. Republic of Argentina*, 282 F. App'x 41, 42 (2d Cir. 2008) (instructing the district court to "take care to craft [] orders so as to avoid interrupting Argentina's regular payments to bondholders").

Under black letter law, a creditor may not execute upon or otherwise interfere with property that does not belong to the debtor. *See EM Ltd. v. Republic*

*of Argentina*, 473 F.3d 463, 476 n.13 (2d Cir. 2007) (A "party seeking to enforce a

judgment . . . . cannot reach . . . assets in which the judgment debtor has no

interest.") (citation and internal quotation marks omitted); *see also Bass v. Bass*,

528 N.Y.S.2d 558, 560-61 (1st Dep't 1988) ("CPLR 5201(b) provides that a

judgment may be enforced [only] against any property which could be assigned or

transferred, that is, property that the judgment debtor has the power to assign or

transfer.") (citation and internal quotation marks omitted); N.Y. C.P.L.R. § 5222(b)

(restraining notice served on a third party "is effective only if, at the time of

service, he or she owes a debt to the judgment debtor or obligor or he or she is in

the possession or custody of property in which he or she knows or has reason to

believe the judgment debtor or obligor has an interest"); *Aurelius*, 584 F.3d at 131

("[B]efore the [assets] at issue could be subject to attachment, the funds *in the*

*hands of the Republic* must have been 'used for a commercial activity' [in the

United States].").  Funds that formerly belonged to the Republic, but no longer do

at the time they enter the United States, cannot be restrained by a creditor of the

Republic.

>          The same result follows under Article 4-A-503 of the U.C.C., which

determines the rights, duties and liabilities of parties involved in the funds transfer

process in New York and in the rest of the United States.[18]  *See Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 102-03 (2d Cir. 1998).  Under Article 4-A-503, a court may only restrain (i) an originator from issuing a payment order; (ii) an originator's bank from executing the payment order; or (iii) a beneficiary's bank from releasing the funds to the beneficiary or the beneficiary from withdrawing the funds.  Outside of these three scenarios, "[a] court may not . . . restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer."  N.Y. U.C.C. § 4-A-503 (SPA-1).  The official commentary to this section expressly states that it protects intermediary banks from injunctions such as those entered below.  *See* N.Y. U.C.C. § 4-A-503 official comment (noting that "[t]his section . . . . is designed to prevent interruption of a funds transfer after it has been set in motion" and that other than the specified exceptions involving banks of originators and beneficiaries, "*[n]o other injunction is permitted*.  In particular, intermediary banks are protected[.]") (emphasis added).

       Here, the "originator" is the Republic, whose actions and property outside the United States cannot be restrained under the FSIA.  The beneficiary of the transfer is not the Republic, but the holders of its restructured debt, and once the funds are *in* the United States they do not belong to the Republic, and may not

---

[18]  The Federal Reserve has adopted the provisions of § 4-A-503 as federal law in its Regulation J.  *See* 12 C.F.R. § 210.25 (2002).

be interfered with in the hands of any intermediary bank.  *See Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 71 (2d Cir. 2009) ("Because [electronic fund transfers] in the temporary possession of an intermediary bank are not property of either the originator or the beneficiary under New York law, they cannot be subject to attachment.").  Accordingly, once the funds are transferred into the United States, statutory law prevents the Republic's creditors from disrupting their path.   As the Federal Reserve noted in its 2004 *amicus* brief, the relief to which NML then suggested it was entitled – an injunction like the one Elliott had obtained in Belgium – would have been precluded by Article 4-A-503 of the U.C.C.[19]  A-1799-1801.

## IV.   PLAINTIFFS HAVE NOT SUFFERED IRREPARABLE HARM

The district court erred in concluding that plaintiffs face irreparable harm, the *sine qua non* requirement for any injunctive relief.[20]  Where, as here, a plaintiff's injury can be "fully redressed by monetary damages as exemplified by

---

[19]  The Permanent Injunctions premise that Federal Rule of Civil Procedure 65(d)(2) prevents intermediary banks from processing payments to holders of restructured debt unless they receive notice that the Republic has made a "Ratable" payment to plaintiffs.  *See e.g.*, SPA-39-40.  Of course, because Article 4-A-503 prevents the intermediary banks from being enjoined here, plaintiffs cannot otherwise restrain the banks via Rule 65(d)(2).

[20]  The district court failed to address irreparable harm at all at the February 23 hearing.  Instead, the district court simply signed plaintiffs' proposed Orders, which state in conclusory fashion that the requirements of irreparable harm have been satisfied.  *See e.g.*, SPA-37.

56

the cause of action seeking [a specified dollar amount]," it is black letter law that the plaintiff has an adequate remedy at law and that irreparable harm does not exist. *See Haulage Enters. Corp. v. Hempstead Res. Recovery Corp.*, 426 N.Y.S.2d 52, 54 (2d Dep't 1980); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).[21]

      *First,* plaintiffs' ultimate injury – difficulty in collecting on money judgments against the Republic because of the FSIA limits on such collection – does not, as a matter of law, rise to the level of "irreparable injury." *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 186, 194 (S.D.N.Y. 2007) (no irreparable injury where plaintiff was seeking a stay to ensure the ability to collect on a money judgment against the defendant); *Weston Compagnie de Finance et d'Investissement, S.A. v. La Republica del Ecuador,* No. 93 Civ. 2698 (LMM), 1993 WL 267282, at *2 (S.D.N.Y. July 14, 1993). Plaintiffs are actively pursuing other enforcement avenues against purported property of the Republic, both in the United States and elsewhere, which defeats any claim that they would

---

[21] Despite "plaintiffs' effort to recast their claim [below] as one for specific performance of contractual obligations," the Permanent Injunctions are clearly just that: injunctions, and thus the test for injunctive relief applies. *Fort v. Am. Fed. of State, Cnty. and Mun. Emps.*, 375 F. App'x 109, 112 (2d Cir. 2010). The standard for obtaining specific performance overlaps with the requirements for injunctive relief, and to the extent the Court determines that the test for specific performance applies, the Permanent Injunctions fail for the same reasons set forth below. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993).

necessarily be irreparably injured in the absence of an injunction here.  *See Plenum Fin. & Invs. Ltd. v. Bank of Zambia*, No. 95 Civ. 8350 (KMW), 1995 WL 600818, at *3 (S.D.N.Y. Oct. 11, 1995) ("This court is not convinced that the injury to Plenum from such a transfer would be irreparable, however, for it is not clear, and Plenum has not argued, that the English judgment would otherwise be unenforceable[.]").  And in any case, difficulty in collecting a judgment is not "solved," at law or equity, by the grant of a new right for which the creditor never bargained.

      *Second,* plaintiffs' delay of approximately half a decade in asserting their alleged pari passu claims further undercuts the argument that they have or are suffering irreparable injury.  *Cf. Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (reversing grant of an injunction for lack of irreparable harm where movant waited approximately two months: "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.").  Plaintiffs did not present a single case below – and we are aware of none – where a purported breach of contract that had been ongoing for such an extensive duration was found to constitute irreparable harm.

      *Third*, the very argument that NML has suffered irreparable injury since 2005 defies law and logic.  Since 2005 alone, NML has, consistent with its business model of buying non-performing sovereign debt, continued to purchase

58

the Republic's defaulted debt, filed *nine* complaints, and obtained summary

judgment for money damages in *ten* cases.[22]  A sophisticated hedge fund like NML

whose entire business is buying and suing on defaulted sovereign debt would not

have behaved in this fashion – doubling, tripling, and quadrupling its bets on

potential damages recoveries – had it truly been subject to irreparable injury from

these alleged violations.[23]

Recognizing that there is no support for injunctive relief based on a

pari passu clause, plaintiffs below analogized their position to that of *secured*

creditors.  This formulation fails by the express terms of the pari passu clause itself

– which plainly provides that holders of the debt are *unsecured* creditors having no

security interest of any kind.  *See* FAA ¶ 1(c) (A-157).  Unlike secured creditors,

who have a property right to collateral *in addition to* their contractual right to

repayment, unsecured creditors like plaintiffs only have the latter contractual right

---

[22]  Likewise, the *Aurelius* plaintiffs and Olifant, hedge funds with similar business models, also purchased their bond interests well after the Republic's default.

[23]  Conversely, there is self-evident harm to the sovereignty of the Republic by U.S. court injunctions requiring the Republic to pay creditors with assets maintained entirely outside of the United States, even if the FSIA permitted such orders.  *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008) (a federal court should not "bypass" the "dignity interests" of a foreign state "without right or good cause"); *McKusick v. City of Melbourne*, 96 F.3d 478, 488 (11th Cir. 1996) ("[T]here is not an absolute right to an injunction in a case in which it would impair or affront the sovereign powers or dignity of a state or a foreign nation.") (internal quotation marks omitted) (alteration in original).

to repayment, the remedy for which is – and has always been – money damages.  It is axiomatic that in a suit against a debtor, unsecured creditors are "relegated to an action for damages and [] share [a] debtor's property with other *unsecured creditors*."  *Marine Midland Trust Co. of N.Y. v. Alleghany Corp.*, 28 F. Supp. 680, 684 (S.D.N.Y. 1939) (emphasis added).

## V.   THE PERMANENT INJUNCTIONS ARE CONTRARY TO THE PUBLIC INTEREST AND THE BALANCE OF HARDSHIPS MILITATES TOWARDS THEIR DENIAL

The district court failed to conduct any weighing of the relevant hardships, which itself is reversible error.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 32 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction"; "[T]he balance of equities and consideration of the public interest [] are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent."); *Brody v. Vill. of Port Chester*, 261 F.3d 288, 290 (2d Cir. 2001) (vacating a preliminary injunction where plaintiff suffered no injury and "the district court failed to consider the public interests at issue" and "weigh them against" the plaintiff's interests); *Beal v. Stern*, 184 F.3d 117, 123 n.2 (2d Cir. 1999) ("courts 'must sensitively assess all the equities of the situation, including the public interest.'" (quoting *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125 (2d Cir. 1998))).  Had it done so, it would have been evident that the

60

Permanent Injunctions and their underlying erroneous pari passu theory are contrary to the public interest.

        *First*, the Permanent Injunctions "undermine [the] well-understood established framework" for debt restructurings, which, in accordance with United States policy, "'contemplates the sharing of financial sacrifices between sovereign debtors and their commercial creditors in the context of negotiated and mutually agreed-upon arrangements.'" US Br. at 11, 15 (A-1776, A-1780) (citation omitted). It is unfair and inequitable to permit holdouts to use the vast majority of creditors who made those "financial sacrifices" as "leverage" to try to extract payment in full. If the Permanent Injunctions are upheld, creditors will be disincentivized from participating in debt restructurings, given the very real threat that payments to them would be re-routed to holdout creditors. This fallout alone would "undermine[] the consensual restructuring process the United States has been at pains to foster for the past several decades," US Br. at 16 (A-1781) and infringe on principles of public policy by granting a windfall to holdouts at the expense of those who made financial sacrifices. And while requiring payment in full to all creditors will make restructuring impossible going forward and jeopardize payments to lenders of last resort, in this instance it would plunge the Republic into a new financial and economic crisis. *Id.* at 18 (A-1783) ("Both policy and equity considerations weigh against permitting holdout creditors from

61

sabotaging Argentina's restructuring efforts by barring payments to other creditors, including creditors who have negotiated in good faith to reduce the amount of their debt as part of a consensual restructuring process.").  Voluntary debt restructurings exist to help sovereigns emerge from crises, but the Permanent Injunctions obtained by plaintiffs would pull the Republic back into one.

*Second,* the relief granted by the district court below, by interfering with payments to third party creditors of the Republic and the banks involved in those payments, will result in a wholly unworkable "web of claims, counterclaims, and cross-claims" against sovereign debtors and amongst creditors that will "place an enormous burden on courts [in addition to making] virtually impossible an orderly restructuring of [sovereign] indebtedness."  CH Br. at 11-12 (A-1820-21).  As the Clearing House observed, "it is hard to imagine how the remedies . . . would work in practice."

> Suppose that when [NML] commenced litigation, the Republic had paid them in full in accordance with its obligations under the bonds.  Under [NML's] reading of the *pari passu* clause, other bondholders (and, for that matter, any other creditors entitled to a *pari passu* clause), could have sought to interfere with the payment to [NML].  And if those other creditors succeeded in receiving a *pro rata* portion (assuming proration in the context of the Republic's billions of dollars of unsecured and unsubordinated debt entitled to *pari passu* treatment could sensibly be made), then the Republic and such other creditors (and for that matter [NML]) in turn would be at risk that yet another set of unpaid bondholders would bring a similar action.

CH Br. at 11 (A-1820). This unfeasible scenario would transform every sovereign debt restructuring into a mass of chaotic litigation.

*Finally*, the Permanent Injunctions will have larger consequences on credit markets as a whole, as they "allow holdout creditors to disrupt the efficient operation of payment and settlement systems, create legal uncertainty for those systems, and ultimately cause adverse economic implications far beyond the sovereign bond dispute." Fed. Br. at 5-6 (A-1795-96). According to the Federal Reserve, banks compelled to comply with such an injunction would be required to search individual wire transfers – hundreds of thousands of wire transfers for any given day – which would in turn affect the efficiency and certainty of payment systems like Fedwire. *Id.* at 7-8 (A-1797-98). Even a temporary disruption such as this to payment systems could cause severe liquidity shortages and thereby threaten the "stability of the global financial system by seriously impacting on the reliability and certainty of large value payments." *Id*. at 8 (A-1798).

The error of the district court in refusing to weigh any of these hardships is not remedied by the general recitation that the Permanent Injunctions purport to serve the public interest of "enforcing contracts and upholding the rule of law." *See e.g.*, SPA-38; *see Sierra Club v. Hennessy*, 695 F.2d 643, 649 (2d Cir. 1982) (reversing permanent injunction for abuse of discretion where district court failed to properly balance the "public consequences" of the relief granted). Apart

63

from the fact that the principle on which the Permanent Injunctions are based is not the law, that statement proves too much, as it holds that *any* breach of contract would warrant an injunction.  That clearly is also *not* the law.

Nor are the Permanent Injunctions saved because they state that "the Republic has engaged in an unprecedented, systematic *scheme* of making payments on other external indebtedness, after repudiating its payment obligations to [plaintiffs], in direct violation of [the pari passu clause]."  *See e.g.*, SPA-38 (emphasis added).  The Republic's restructuring of approximately $75 billion of defaulted debt and its servicing of that debt was not a "scheme" to violate the pari passu clause, but a necessary process consistent with U.S. policy and international norms that, as this Court recognized, was "obviously of critical importance to the economic health of a nation."  *See EM Ltd.*, 131 F. App'x at 747.  Neither the district court, when it protected the 2005 Exchange Offer, nor this Court, when it affirmed that ruling, authorized an inequitable "scheme."   Plaintiffs' revisionist history, which is in fact simply pejorative re-labeling, cannot change that fact.  *See also Capital Ventures Int'l*, 282 F. App'x at 42 (instructing the district court to "take care to craft [] orders so as to avoid interrupting Argentina's regular payments to bondholders").

# VI.  PLAINTIFFS' PARI PASSU CLAIMS ARE BARRED BY LACHES

The district court additionally erred in concluding that plaintiffs' claims are not barred by laches, because plaintiffs inexcusably delayed in bringing their pari passu motions, to the prejudice of the Republic and its bondholders. Laches is established when (i) the plaintiff knew of the defendant's alleged misconduct; (ii) the plaintiff inexcusably delayed in taking action; and (iii) the defendant was prejudiced by the delay. *Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West*, 2 F. App'x 162, 164 (2d Cir. 2001). Despite the fact that each of the factors is satisfied here, the district court refused to consider them at all.

## A.  Plaintiffs Knew Of The Alleged Pari Passu "Breach" Years Before Bringing Their Claims, And Inexcusably Delayed In Bringing Them

For years, NML, like all plaintiffs here, had full knowledge of each relevant fact and alleged breach of the pari passu clause. It knew that the Republic was embarking on its historic debt restructuring years before the first Exchange Offer was consummated in 2005. The enactment of the Lock Law was likewise public knowledge (and disclosed in the 2005 Exchange Offer prospectus). NML purchased its debt with full knowledge of *all* of this, and also knowing that the Republic has been servicing its restructured debt for years – and yet it *now* argues that these actions constitute breaches of the pari passu clause. *See, e.g.*, Reed Letter at 2 (A-209); Apr. 2, 2004 Hr'g Tr. at 8-11 (A-2015-18); Answer, *NML*

65

*Capital, Ltd. v. Republic of Argentina*, 03 Civ. 8845 (Feb. 3, 2004) (TPG) ¶¶ 46-48 (A-2010); Answer, *NML Capital, Ltd. v. Republic of Argentina*, 05 Civ. 2434 (Apr. 29, 2005) (TPG) ¶¶ 39-47 (A-2027-30).

The *Varela* plaintiffs, who obtained their bond interests well before the 2005 Exchange Offer, similarly sat on their rights, waiting until 2011 to bring their pari passu claim. And the *Aurelius* plaintiffs and Olifant, who purchased defaulted Republic debt and waited until after NML's belated motion to invoke the pari passu clause, otherwise acquired their claims subject to all available equitable defenses against their predecessors in interest, who themselves necessarily slept on their rights while the Republic restructured its debt and thereafter serviced it. *See* N.Y. Gen. Oblig. §§ 13-105, 13-107(1); *see also Amedeo Hotels Ltd. P'ship v. Zwicker Elec. Co., Inc.*, 739 N.Y.S.2d 10, 11 (1st Dep't 2002). In sum, plaintiffs had full knowledge of the purported basis of their pari passu claims, and yet waited at least half a decade before asserting them.

It is a "cardinal rule that in an action to specifically enforce a contract the one seeking enforcement must act promptly." *City of N.Y. v. N.Y. Cent. R.R. Co.*, 275 N.Y. 287, 293 (1937). Even a delay of a few months can bar the claim of a plaintiff who fails to act diligently. *See Patterson v. Hewitt*, 195 U.S. 309, 319 (1904) (delay may be measured by "months rather than by years"); *Cantrell v. Hayduk*, 45 N.Y.2d 925, 927-28 (N.Y. 1978) (delay of less than three months

66

resulted in laches); *In re Schulz*, 81 N.Y.2d 336, 348 (1993) (delay of one year from enactment of legislation at issue, and sixty days from sale of bonds, resulted in laches).

At the February 23 hearing, the district court repeatedly acknowledged that "[t]he effort under the pari passu clause comes late." Feb. 23 Tr. 50:7-8 (A-2339); *see also id.* at 32:2 (A-2321); *id.* at 43:7-8 (A-2332). Yet the district court ignored plaintiffs' gross delay – based in part on the flawed reasoning that plaintiffs were "trying to do other things" to collect on their debt. *Id.* at 32:2-4 (A-2321); *see also id.* at 50:7-11 (A-2339). But no authority exists for the proposition that a plaintiff is excused from laches because it was doing "other things" – in fact, a plaintiff's attempt to enforce alleged rights through *other* means only highlights its excusable delay. *See Durkin v. Nassau Cnty. Police Dep't*, 175 F. App'x 405, 408 (2d Cir. 2006) (laches barred motion to enforce consent decrees where plaintiffs' internal complaints demonstrated their knowledge of the claim and their "unexplained reluctance to take their complaints to a higher authority"); *see also Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 380-81 (7th Cir. 1987).

Finally, plaintiffs' argument below that laches is inapplicable because they brought their pari passu claims pre-judgment[24] and within the six-year statute

---

[24] NML claimed below that it reserved its "rights" to seek enforcement of the pari passu clause in its post-judgment cases. Such an attempt would be barred not only under laches, but also under the principle of merger. *See Carte Blanche*

of limitations is wrong.  The doctrine of laches applies to injunctive relief even when a plaintiff brings a claim within the applicable statute of limitations, especially where, as here, a plaintiff's delay threatens the stability of established economic relationships and expectations.  *See, e.g.*, *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892); *Patterson*, 195 U.S. at 319 (1904); *Calhoun v. Delhi & M.R. Co.*, 24 N.E. 27, 82 (N.Y. 1890).

## B.    The Republic, Its Citizens And Third Party Creditors Will Suffer Prejudice As A Result Of Plaintiffs' Inexcusable Delay

The foremost consideration under laches is whether granting the relief sought would result in inequity toward the defendant or third parties.  *See Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946); *Galliher*, 145 U.S. at 373.

The prejudice to defendants and third parties is most obvious in cases like this one, where a party brings a belated challenge to disrupt the public (and, in this case, international) finance sector.  For this reason, in cases involving statutory and budgetary matters, New York courts have repeatedly barred claims against state and local governments even when they are brought after a relatively short delay, as *any* delay can pose a grave threat to the interests of the public and third party creditors.  *See, e.g.*, *In re Schulz*, 81 N.Y.2d at 347 (barring challenge of state financing programs even though appellants had filed the lawsuit "within one year

---

*(Singapore) PTE., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 269 (2d Cir. 1989).

of the enactment of the enabling legislation . . . [and] within 60 days of the actual sale[] of bonds."); *Burns v. Egan*, 501 N.Y.S.2d 742, 745 (3d Dep't 1986) (barring lawsuit challenging a statute authorizing the issuance of municipal bonds, even though the suit was filed less than two years after the effective date of the statute); *N.Y. Pub. Interest Research Grps., Inc. v. Levitt*, 404 N.Y.S.2d 55, 56-57 (3d Dep't 1978) (barring action to void an agreement among state and local governments to finance a construction project through the issuance of municipal bonds, even though the statute of limitations had not run); *Cantrell,* 45 N.Y.2d at 927-28 (reversing and dismissing plaintiffs' action because plaintiffs waited more than two months to challenge a legislative proposal).

Here, plaintiffs' pari passu claims come after the Republic has successfully restructured approximately $75 billion of its defaulted debt, which represents over 20 % of the Republic's total GDP in 2010.  *See* Annual Report at 33.  The Republic, its citizens and third party creditors have developed legitimate expectations that the restructuring process was settled and the new bonds would continue to perform without interference by holdout creditors.

The district court was right to be concerned that the Permanent Injunctions would imperil the rights of those creditors who participated in the Exchange Offers, and wrong to enter the injunctions despite this.  *See* Feb. 23 Tr. at 16:1-2 (A-2305) (THE COURT:  "I think that I cannot interfere with the rights

69

of the exchange offers by putting conditions on them or impediments on them.");

*see also id.* at 9:13-15 (A-2298).  But its Permanent Injunctions are designed to

stop payment on all of the Republic's new performing debt unless the Republic

spends a huge part of its foreign reserves to pay plaintiffs many multiples of what

the participants in the restructuring will receive.  Nothing could be further from

equity.[25]  *See, e.g.*, *D.O. Haynes & Co. v. Druggists' Circular*, 32 F.2d 215, 217

(2d Cir. 1929) (laches protects "the peace and repose of society" against belated

claims); *In re Schulz*, 81 N.Y.2d at 348-49 (challenges to "public financing of such

massive and profound dimension, possibly causing traumatic disturbance to settled

matters of public finances and governance should be undertaken reasonably

promptly" to avoid "greater harm to the public").

## VII.   THE PRELIMINARY INJUNCTION MUST BE VACATED

At the February 23 hearing, the district court converted an *ex parte*

TRO entered on January 3, 2012 into the Preliminary Injunction.  The Preliminary

Injunction (which remains in place pending this appeal), prevents the Republic

"from altering or amending" the processes or transfer mechanisms by which it pays

---

[25]  And as NML stated below, its erroneous pari passu theory applies to *any*
external indebtedness of the Republic, not just the debt issued in the Republic's
Exchange Offers.  *See* Sept. 28, 2011 Hr'g Tr. at 5:4-24 (A-2121).  The
potential inequitable harm and disruption to legitimate third party creditor
relationships from such a result would be virtually limitless.

holders of its restructured debt, SPA-26-27, and must be vacated along with the Permanent Injunctions and the underlying Declaratory Orders.

*First*, the Preliminary Injunction was issued in service of the Permanent Injunctions, which for all the reasons discussed above are legally invalid.

*Second*, plaintiffs utterly failed to demonstrate that they will "suffer an injury that is neither remote nor speculative, but actual and imminent" in the absence of a preliminary injunction. *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

*Third*, the Preliminary Injunction supposedly protects the district court's jurisdiction by preventing the Republic from employing agents beyond the Court's jurisdiction to make payments on its restructured debt. But as demonstrated above, the Republic's payments on restructured debt *already* take place outside the United States and beyond the district court's jurisdiction.

*Finally*, nothing requires the Republic or third party banks to pay the Republic's creditors in a particular manner, and plaintiffs have no right to demand that payments to others be structured to create assets that plaintiffs can try to subject to attachment or restraint in the United States.

71

## CONCLUSION

For the foregoing reasons, the Court should reverse and vacate the

Permanent Injunctions, the Preliminary Injunction, and all underlying and associated

Orders, including the Declaratory Orders.

Dated:  New York, New York
        March 21, 2012

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: _____/s/ Carmine Boccuzzi_____
        Jonathan I. Blackman (jblackman@cgsh.com)
        Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

*Of Counsel:*

Sara A. Sanchez              One Liberty Plaza
Michael M. Brennan           New York, New York 10006
                             (212) 225-2000

                             Attorneys for the Republic of Argentina

72

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the Order granting the Republic's motion to file an oversized brief of 17,500 words, *see* 12-105-cv(L), Dkt. # 76, because it contains 17,461 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  New York, New York
        March 21, 2012

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  _____/s/ Carmine Boccuzzi_____
       Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for the Defendant-Appellant Republic of Argentina*