# 12-105-cv(L)

**12-109-cv (CON), 12-111-cv (CON), 12-157-cv (CON), 12-158-cv (CON), 12-163-cv (CON), 12-164-cv (CON), 12-170-cv (CON), 12-176-cv (CON), 12-185-cv (CON), 12-189-cv (CON), 12-214-cv (CON), 12-909-cv (CON), 12-914-cv (CON), 12-916-cv (CON), 12-919-cv (CON), 12-920-cv (CON), 12-923-cv (CON), 12-924-cv (CON), 12-926-cv (CON), 12-939-cv (CON), 12-943-cv (CON), 12-951-cv (CON), 12-968-cv (CON), 12-971-cv (CON)**

## United States Court of Appeals

*for the*

### Second Circuit

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,

*Plaintiffs-Appellees,*
*(continued on inside cover)*

— v. —

REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**PETITION FOR PANEL REHEARING AND REHEARING EN BANC OF
DEFENDANT-APPELLANT THE REPUBLIC OF ARGENTINA**

| | |
|---|---|
| *Of Counsel:* | CLEARY GOTTLIEB STEEN & HAMILTON LLP |
| Jonathan I. Blackman | *Attorneys for Defendant-Appellant* |
| Carmine D. Boccuzzi | One Liberty Plaza |
| Michael M. Brennan | New York, New York 10006 |
| | (212) 225-2000 |

*(Plaintiffs-Appellees Continued)*

ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

RULE 35(b) STATEMENT.................................................................... 1

REASONS FOR GRANTING REHEARING ...................................... 4

A.  In Upholding Unprecedented Injunctions Restraining The Republic's
Use Of Its Property Outside The United States, The Decision
Conflicts With Second Circuit Precedent, The Text And Purpose Of
The FSIA, And The Position Of The United States.................................... 4

B.  The Decision's Pari Passu Clause Interpretation Is Contrary To
Market Understanding, And Its "Ratable Payment" Remedy Threatens
Future Sovereign Debt Restructurings........................................................ 10

CONCLUSION .................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Af-Cap, Inc. v. Republic of Congo*,
462 F.3d 417 (5th Cir. 2006) .......................................................... 8

*Allied Bank Int'l v. Banco Credito de Cartago*,
757 F.2d 516 (2d Cir. 1985)............................................................ 11

*Aurelius Capital Partners, LP v. Republic of Argentina*,
584 F.3d 120 (2d Cir. 2009)............................................................ 8

*Aurelius Capital Partners, LP v. Republic of Argentina*,
No. 07 Civ. 2715 (TPG), 2010 WL 768874 (S.D.N.Y. Mar. 5, 2010) .......... 8

*Autotech Techs. LP v. Integral Research & Dev. Corp.*,
499 F.3d 737 (7th Cir. 2007) .......................................................... 5

*EM Ltd. v. Republic of Argentina*,
No. 03 Civ. 2507 (TPG), 2012 WL 1028109 (S.D.N.Y. Mar. 28, 2012)....... 8

*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*,
637 F.3d 373 (D.C. Cir. 2011).......................................................... 9

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) ........................................................ 5, 9

*S&S Machinery Co. v. Masinexportimport*,
706 F.2d 411 (2d Cir. 1983)........................................................... *passim*

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)......................................................... 3, 13

*Stephens v. Nat'l Distillers & Chem. Corp.*,
69 F.3d 1226 (2d Cir. 1996).......................................................... 4

*Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica del Ecuador*,
823 F.Supp. 1106 (S.D.N.Y. 1993) ................................................. 5

**Rules and Statutes**

28 U.S.C. § 1609 ................................................................ 1, 5, 9

28 U.S.C. § 1610 ................................................................ 1, 5, 9

28 U.S.C. § 1611 ................................................................ 1, 5, 9

Fed. R. App. P. 35(a)(2) ......................................................... 1

**Other Authorities**

Jonathan Stempel & Guido Nejamkis, *U.S. court rejects Argentina's debt fix*, Reuters, Oct. 26, 2012 ....................................................... 1

Robin Wigglesworth & Joseph Cotterill, *Creditors weigh up Argentina debt ruling*, Financial Times, Nov. 4, 2012 ....................................... 2

Stephen J. Choi & Gulati, *Contract as Statute*, 104 MICH. L. REV. 1129, 1136–37 (2006) ................................................................ 13

# RULE 35(b) STATEMENT

Defendant-appellant the Republic of Argentina (the "Republic") petitions for panel rehearing and rehearing *en banc* of the panel's October 26, 2012 decision (the "Decision" or "Dec.").  The Decision affirmed the district court's unprecedented orders restraining the Republic from making payments outside the United States to the holders of over 91% of its defaulted debt who participated, at a significant discount, in the Republic's debt restructuring, unless the Republic makes an undefined "Ratable" payment to plaintiffs on their defaulted debt with funds also located outside the United States that are categorically immune from attachment and restraint under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1609–1611 ("FSIA").

This petition presents questions of exceptional importance, because the Decision conflicts with *S&S Machinery Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir. 1983), and interprets a boilerplate provision contained in agreements governing trillions of dollars of New York debt in a manner that is inconsistent with market understanding, and will exacerbate future sovereign debt crises by making voluntary debt restructuring essentially impossible.  *See* Fed. R. App. P. 35(a)(2).  For these reasons it has sparked widespread consternation in the marketplace, which recognizes that, if unremedied, the Decision will cause a seismic change in the landscape of sovereign debt restructuring.  *See* Jonathan Stempel & Guido

Nejamkis, *U.S. court rejects Argentina's debt fix*, Reuters, Oct. 26, 2012 ("There is no way a government can restructure its debt and be shielded from litigation, apart from exercising sovereign immunity. . . . Argentina's shield now seems to have a hole in it, and this ruling signals that every sovereign's shield could now have a hole in it."); Robin Wigglesworth & Joseph Cotterill, *Creditors weigh up Argentina debt ruling*, Financial Times, Nov. 4, 2012, ("Experts say the judgment significantly expands the right of private sector creditors of governments, leading to potentially far-reaching implications for 'official sector' lenders" in debt restructurings).

*First*, the panel incorrectly found that the injunctions, which restrain the Republic from making scheduled interest payments – outside the United States – to the trustee for holders of its restructured debt, do not violate the FSIA's sovereign property immunities. That ruling raises an issue of vital importance regarding the scope of a U.S. court's ability to interfere with a foreign state's use of its property outside the United States, was opposed by the United States (whose views on this issue the panel did not discuss), and conflicts with the principle set forth in *S&S Machinery* and its progeny that courts "may not grant, by injunction, relief which they may not provide by attachment." 706 F.2d at 418. The panel stated that its ruling was consistent with *S&S Machinery* because the injunctions do not result in the district court's exercise of "dominion or control" over the Republic's property,

Dec. at 25, but that is precisely what the injunctions accomplish.  Accordingly, the

first question presented for panel rehearing and rehearing *en banc* is:

> Under the FSIA, which provides the sole basis for obtaining jurisdiction over,
> and enforcing a judgment against, a foreign state, may a court, in order to
> enforce a monetary claim, issue an injunction restraining a foreign state's use
> of its property outside the United States and thus beyond the scope of
> enforcement contemplated by the FSIA?

*Second*, the panel erred in affirming an unprecedented "ratable payment"

remedy based on its incorrect conclusion that a pari passu clause[1] prohibits a debtor

from paying any of its other bonds unless it also pays the bonds governed by the

pari passu clause, Dec. at 18, which in the sovereign context amounts to an

inconceivable promise never to restructure the state's debt regardless of the financial

and economic necessity to do so.  In making this finding, the panel ignored the tide

of authority – set forth in the briefs of the United States and the New York Clearing

House Association, as well as previous statements by the Federal Reserve Bank of

New York, the Bank of England Financial Markets Law Committee, and numerous

practitioners – concluding that this idiosyncratic "interpretation" runs counter to

market understanding.  *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691

F.2d 1039, 1048 (2d Cir. 1982) (boilerplate terms "must be given a consistent,

---

[1] The pari passu clause at issue states that: "The Securities will constitute . . .
direct, unconditional, unsecured and unsubordinated obligations of the Republic
and shall at all times rank *pari passu* and without any preference among
themselves.  The payment obligations of the Republic under the Securities shall at
all times rank at least equally with all its other present and future unsecured and
unsubordinated External Indebtedness (as defined in this Agreement)."  A-157.

uniform interpretation" to avoid the creation of "enduring uncertainties . . . [that] would decrease the value of all debenture issues and greatly impair the efficient working of capital markets").  The panel also ignored plaintiffs' and its own acknowledgment that the clause itself does not require "ratable payment."  Dec. at 19 n.10.  Accordingly, the second question for rehearing and rehearing *en banc* is:

> May a court create an unprecedented remedy – here, barring payment on performing debt unless a "ratable payment" is made to plaintiffs on their defaulted debt – based on a boilerplate pari passu clause that neither the market nor plaintiffs understand to require "ratable payments"?

## REASONS FOR GRANTING REHEARING

**A.    In Upholding Unprecedented Injunctions Restraining The Republic's Use Of Its Property Outside The United States, The Decision Conflicts With Second Circuit Precedent, The Text And Purpose Of The FSIA, And The Position Of The United States**

The panel's Decision is the first time a U.S. court has upheld enjoining a sovereign's use of its own property *outside* the United States – where it is indisputably immune from attachment and execution under the FSIA – and directly contradicts this Court's holding in *S&S Machinery* that courts "may not grant, by injunction, relief which they may not provide by attachment," 706 F.2d at 418, and the consistent line of authority applying that ruling, *see, e.g.*, *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1229–30 (2d Cir. 1996) (order directing foreign state to pay pre-answer security requirement violates FSIA; "the prohibition against attachments should apply broadly"); *Weston Compagnie de Finance et*

*D'Investissement, S.A. v. La Republica del Ecuador*, 823 F.Supp. 1106, 1115–16 (S.D.N.Y. 1993) (denying injunction directing sovereign to return to New York funds located abroad).  In reaching this unprecedented conclusion, the panel failed even to address the position of the United States, which, in addition to noting that the injunctions run afoul of *S&S Machinery*, pointed out that they contravene the purpose and structure of the FSIA, and harm the foreign relations of the United States.  U.S. *Amicus* Brief, Dkt. #238 ("US Br.") at 22–30.

This Court held in *S&S Machinery* that courts may not side-step the FSIA's property immunities by achieving through injunction what they are prohibited from doing under their limited FSIA execution authority.  706 F.2d at 418.  Those immunities render presumptively immune from attachment and restraint all sovereign property that is not located in the United States and used for a commercial activity here.  *See* 28 U.S.C. §§ 1609–1611; *see also Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1131–32 (9th Cir. 2010) (sovereign property located in France is "immune from execution" under the FSIA because it is not "property in the United States"); *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) (rejecting idea of extraterritorial restraints: "We would need some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction.").  *S&S Machinery* instructed that courts may not render the FSIA's property immunity "meaningless" and

5

"eviscerate its protections . . . by denominating their restraints as injunctions against the . . . use of property rather than as attachments of that property," and that "any other means to effect the same result" as an attachment "could only . . . result[] in the disingenuous flouting of the FSIA['s]" immunity.  706 F.2d at 418.

Notwithstanding the clear holding of *S&S Machinery*, the panel affirmed the Injunctions that have both the effect and the expressed intention of flouting the FSIA's execution immunities by restraining the Republic's use of property upon which plaintiffs cannot execute in order to compel the Republic to turn over to plaintiffs other property upon which plaintiffs are likewise barred from executing. *See* US Br. at 24–25 ("If plaintiffs were to reduce their claims to money judgment, they would be prevented from seeking to attach the funds utilized to pay the exchange bonds under the FSIA's strictures on enforcement of judgments[.] . . . Presumably in an effort to avoid these restrictions, plaintiffs-appellees chose instead to move for equitable relief that purports to constrain Argentina's use of such property."); Dec. at 25 (suggesting Republic pay plaintiffs with Central Bank reserves, which this Court has twice declared immune, *see* Dec. at 9 n.5).  The Decision thus directly conflicts with *S&S Machinery*, because although the Injunctions "do not formally effectuate a transfer of property interests, [they] have the practical effect of requiring Argentina to transfer funds amounting to the balance of principal and interest owed to plaintiffs[] on the next occasion that it makes a

payment on the exchange bonds," US Br. at 25 – a result that courts are prohibited from achieving in the exercise of their limited execution authority under the FSIA. The Court effectively commandeered immune Republic assets to pay plaintiffs, and ordered the Republic not to use equally immune assets to pay other legitimate debts unless it submitted to this commandeering.  A greater affront to sovereignty and sovereign immunity is harder to imagine.

The panel tried to square its ruling with *S&S Machinery* by reasoning that the Injunctions "direct Argentina to comply with its contractual obligations" and "do not operate as attachments," Dec. at 24–25, because they "can be complied with without the court's ever exercising dominion over sovereign property," *id.* at 25; *see also id.* ("[T]he injunctions do not transfer any dominion or control over sovereign property.  Accordingly, [they] do not violate § 1609.").  But the Injunctions *do* subject the Republic's property to the "control" of the court – at all times they restrain the Republic from using its funds to pay holders of its restructured debt.  That the Republic can use its designated funds for other purposes or avoid the effect of the improper restraint by making a "ratable" payment to plaintiffs does not change the fact that the court's injunctions prevent the Republic from using its funds as it wishes, and thereby subject the funds to the court's dominion in the most blatant possible way.  Indeed, the court's "dominion" over the funds used to pay the restructured debt holders is patent from the fact that the

Injunctions purport to restrain those specific funds in the hands of all banks through which they might subsequently flow. SPA-39–40. When a similar attempt was made to restrain funds used to pay other bondholders, the district court properly vacated as violative of the FSIA *ex parte* attachments and restraining orders interfering with those payments, *EM Ltd. v. Republic of Argentina*, 2012 WL 1028109, at *8–9 (S.D.N.Y. Mar. 28, 2012), but neither the district court nor the panel saw the anomaly of doing the exact opposite here.

Apart from their conflict with *S&S Machinery*, as the United States explained, US Br. 22–28, the Injunctions cannot be reconciled with the text and purpose of the FSIA, which sets forth the "sole, comprehensive scheme" for obtaining and enforcing a judgment against a sovereign state. *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 428 (5th Cir. 2006); *see also Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130–31 (2d Cir. 2009) (restraining orders violated FSIA because targeted property not "used for a commercial activity" in the United States); *Aurelius Capital Partners, LP v. Republic of Argentina*, 2010 WL 768874, at *4 (S.D.N.Y. Mar. 5, 2010) (funds in Argentina are not "in the United States" and are thus "immune from attachment, restraint and execution" under FSIA). Outside the narrow exceptions to immunity, "a plaintiff must rely on the government's diplomatic efforts, or a foreign sovereign's generosity, to satisfy a judgment." *FG Hemisphere Assocs., LLC v.*

8

*Democratic Republic of Congo*, 637 F.3d 373, 377 (D.C. Cir. 2011); *see also*

*Peterson*, 627 F.3d at 1128 ("Congress fully intended to create rights without

remedies, aware that plaintiffs would often have to rely on foreign states to

voluntarily comply with U.S. court judgments.") (*citing Autotech*, 499 F.3d at 749).

The FSIA's broad grant of immunity, which includes "[s]overeign property

located outside of the United States," "reflect[s] a deliberate policy choice on the

part of Congress" to strictly limit interference with foreign state property because

"at the time it enacted the FSIA, 'enforcement [of] judgments against foreign state

property remain[ed] a somewhat controversial subject in international law.'" US Br.

at 23–24 (citation omitted). There is no indication that Congress meant for those

immunities to protect certain sovereign property from attachment and execution on

the one hand, but to expose that same property to "equitable" restraints that

effectively function as execution devices on the other. As the United States noted:

> [P]arties cannot avoid the limitations deliberately imposed by Congress on
> judicial execution authority and expand the scope of remedies available to
> them in an action against a sovereign simply by refraining from asking the
> court to reduce their claims to judgment. There is no indication in the
> statutory text or history that Congress intended for litigants to be able to
> sidestep sections 1609–1611 by seeking an injunction that restrains the
> sovereign's use of immune assets until a judgment is satisfied, rather than an
> order of execution against those same assets. *Id.* at 28.

The United States also urged reversal because the Injunctions are

"particularly likely to raise foreign relations tensions," as the laws of many nations

do not even allow a court to enter an injunction against a foreign state, let alone one

that "not only purport[s] to exercise jurisdiction over foreign state property, but also ha[s] the effect of dictating to a sovereign state the implementation of its sovereign debt policy within its own territory." *Id.* at 29. Although the United States' views regarding the foreign policy implications of particular exercises of a court's jurisdiction under the FSIA are accorded special deference by courts, *see id.* at 28, the panel ignored them entirely.

**B.    The Decision's Pari Passu Clause Interpretation Is Contrary To Market Understanding, And Its "Ratable Payment" Remedy Threatens Future Sovereign Debt Restructurings**

In holding that a boilerplate pari passu clause prevents a sovereign from paying holders of other bonds – including restructured debt – unless it also pays on bonds subject to the clause, Dec. at 18, the panel effectively held that the provision is a promise by a sovereign to never restructure its debt. This dangerous interpretation represents a "dramatic and disruptive departure" from market understanding, Clearing House *Amicus* Brief, Dkt # 237 ("CH Br.") at 4–5, and defies common sense: no sovereign debtor or creditor would ever agree to such a prohibition, which would prevent a sovereign from ever emerging from a financial crisis, and keep *all* bondholders from receiving payments in the event of default. The Decision is thus erroneous under basic principles of contract law, and represents a significant – and improper – shift in the legal rights of the holders of the "trillions

of dollars of outstanding unsecured debt obligations governed under New York law"
that contain pari passu clauses. *Id.* at 9.

As the Republic, joined by the United States and the Clearing House, made
clear, the pari passu clause is a "boilerplate" contract provision, US Br. at 5, that has
been understood for decades to prevent the issuing debtor from creating other debt
that ranks senior to the debt subject to the pari passu clause. *See* US Br. at 11; CH
Br. at 2.[2] The market plainly does *not* understand the pari passu clause to prevent a
debtor from paying one group of creditors, and not others. *See* US Br. at 12
("[M]arket understanding has consistently reflected that a 'borrower does not violate
[the *pari passu*] clause by electing as a matter of practice to pay certain
indebtedness in preference to the obligations'" subject to this clause); CH Br. at 4
(such an interpretation is inconsistent with "how credit markets have negotiated and
understood these clauses to operate for many decades"). As a leading New York
sovereign debt practitioner stated:

---

[2] The Argentine "Lock Law", the sole legislative enactment referred to by the
panel, could not have subordinated plaintiffs' debt under the pari passu clause even
if it did "bar[] [the Republic's] courts from recognizing plaintiffs' judgments,"
Dec. at 20: that does not and could not constitute a "subordination" of plaintiffs'
rights under New York law or in U.S. courts. *See Allied Bank Int'l v. Banco
Credito de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985) (refusing to recognize as
valid directives of the Costa Rican government purporting to affect right to
payment under New York law-governed debt instruments). The Lock Law
prevents the Executive from re-opening the 2005 Exchange Offer, or otherwise
settling with holdout creditors without Congressional approval, reserving for
Congress the power to deal with holdouts. A-436. Congress has delegated that
power when it considers it necessary to do so, for example when it suspended the
Lock Law to allow the 2010 Exchange Offer to go forward. A-440.

> Never in my [40 year career] did a creditor involved in [a debt] transaction[], whether as draftsman or negotiator, take the position . . . that a *pari passu* provision . . . require[d] that all of the creditors of a sovereign debtor be paid simultaneously on a pro rata basis. . . . this construction would have appeared inconceivable and unworkable to the lawyers actually drafting the transaction documents . . . whether from the perspective of prospective lenders, or the sovereign borrowers itself. . . . In my experience, the *pari passu* provision has never been intended in any sense to affect the timing of payment as such.

A-1852; *see also* A-1919 (leading English practitioner stating: "[N]obody would ever agree to such an impracticable prohibition. Established professional markets do not habitually require clauses which are unworkable or which might invite lender liability," and an interpretation that prohibits payment to some creditors unless others are paid "would give the clause a more draconian impact than normal fraudulent preference statutes[.]"). The Federal Reserve and the Financial Markets Law Committee, among others, were in accord. A-1795; A-1848.

Despite this weight of authority, the panel improperly dismissed the universal market understanding as inconclusive and "arguably biased." Dec. at 16–17. The panel then held, in a ruling without precedent by a United States court, that the pari passu clause at issue both prevents the Republic from formally subordinating the FAA bonds by issuing superior debt, *and* "prohibits Argentina . . . from paying on other bonds without paying on the [] bonds [subject to the clause]," Dec. at 18. This ruling was doubly wrong.

*First*, the panel's reading of the pari passu clause runs afoul of Circuit precedent requiring that boilerplate provisions be given a consistent meaning, which

here is the universal market understanding, regardless of minor variances in wording. *Sharon Steel Corp.*, 691 F.2d at 1048 ("[B]oilerplate must be distinguished from contractual provisions which are peculiar to a particular indenture and must be given a consistent, uniform interpretation"). The panel based its finding that the provision prevents payment on other bonds on the use of the phrase "payment obligations" in the second sentence of the pari passu clause (dubbed the "Equal Treatment Provision" by the panel), which states that "[t]he payment obligations . . . shall rank at all times at least equally with all its other present and future unsecured and unsubordinated [debt]." Dec. at 18–19. But "market participants [have] uniformly confirmed" that the inclusion of words like those are *not* a "conscious attempt" to vary the market understanding of the clause. Stephen J. Choi & Gulati, *Contract as Statute*, 104 MICH. L. REV. 1129, 1136–37 (2006) (A-1929–30) ("[Over] a dozen versions of the clause" exist, but the "differences are more idiosyncratic than due to any purposeful intent to change the . . . clause to favor (or disfavor) holdouts. A court attempting to read meaning into such differences runs a risk of misinterpreting the clause.").

*Second*, the panel's reading of the "Equal Treatment Provision" to require the *prohibition* of payments on other bonds is entirely unsupported by the provision's text, which simply states that the "payment obligations . . . shall at all times rank at least equally." Dec. at 18. As even the district court recognized, the plain language

13

of the provision does not *prevent* the Republic from paying any of its other debt, but is only an affirmative statement that the bonds will "*rank*" equally with it. *See* A-2300-1 (district court: "I don't understand the pari passu clause . . . to mean that the Republic is forbidden to pay the exchange offers unless they pay NML.").

Based on this erroneous interpretation, the panel affirmed the district court's "ratable payment" remedy even though the panel concluded that the pari passu clause itself does not entitle plaintiffs to "ratable payments". Dec. at 19 n.10 (stating that "ratable payments" were a "*remedy* for Argentina's breach of the Provision") (emphasis in original). Although the panel stated that its Decision will not allow creditors to disrupt sovereign debt restructurings because so-called "collective action clauses" – which allow a super-majority of bondholders to force the remaining debt holders to accept a restructuring – effectively eliminate holdout litigation, that assertion is factually wrong and legally irrelevant. Dec. at 27. As an initial matter, it ignores that there is at least $68.5 billion dollars of sovereign debt outstanding that is *not* subject to such clauses. *See* NML Br. at 53. Moreover, it fails to acknowledge that the Decision eliminates the incentive to participate in debt restructurings in the first place – if every creditor thinks that it can decline to restructure, and then obtain injunctive relief that compels the sovereign to pay the full amount of its defaulted debt, there will never *be* any super-majority to "cram down" the remainder. Finally, it neglects the fact that

much of the debt subject to collective action clauses does not provide for aggregating super-majorities across bond issuances, and thus holdout creditors can buy up blocking stakes of a single bond series, and seek to enjoin payments to creditors who restructure other issuances.[3]

## CONCLUSION

The Court should grant the Republic's petition.

Dated: New York, New York
      November 13, 2012

                        Respectfully submitted,

                        CLEARY GOTTLIEB STEEN & HAMILTON LLP

                        By:       /s/ Carmine Boccuzzi
                                Jonathan I. Blackman (jblackman@cgsh.com)
                                Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

*Of counsel*:                One Liberty Plaza
Michael M. Brennan      New York, New York 10006
                        (212) 225-2000

                        *Attorneys for the Republic of Argentina*

---

[3] The panel's broad pari passu ruling also throws into doubt the validity of customary, and essential, preferential payments to lenders of last resort, such as the IMF, a conclusion specifically highlighted by the United States.  US Br. at 19–22. The panel did not reach this issue, Dec. at 21, but nothing in its holding or analysis would exclude these payments from its pari passu interpretation.

**ADDENDUM A**

12-105(L)
NML Capital, Ltd. v. Republic of Argentina

1       **UNITED STATES COURT OF APPEALS**
2              FOR THE SECOND CIRCUIT
3                    _____
4
5                   August Term, 2011
6
7    (Argued: July 23, 2012              Decided: October 26, 2012)
8
9      Docket Nos. 12-105(L), 12-109(CON), 12-111(CON), 12-157(CON), 12-158(CON),
10      12-163(CON), 12-164 (CON), 12-170(CON), 12-176 (CON), 12-185 (CON), 12-189 (CON),
11      12-214 (CON), 12-909 (CON), 12-914 (CON), 12-916 (CON), 12-919 (CON), 12-920 (CON),
12      12-923 (CON), 12-924 (CON), 12-926 (CON), 12-939 (CON), 12-943 (CON), 12-951 (CON),
13                        12-968 (CON), 12-971 (CON)
14
15                    _____
16
17      NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL
18     CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES
19      BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL
20     POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA
21     ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES,
22              MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,
23
24                                        *Plaintiffs-Appellees*,
25
26                              v.
27
28              THE REPUBLIC OF ARGENTINA,
29
30                                      *Defendant-Appellant*.
31
32   Before: POOLER, B.D. PARKER and RAGGI, *Circuit Judges*.
33
34                    _____
35
36       Plaintiffs appeal from permanent injunctions entered by the United States District Court
37   for the Southern District of New York (Griesa, *J.*) designed to remedy Argentina's breach of its
38   promise to pay bondholders after a 2001 default on its sovereign debt.  We hold that Argentina
39   breached its promise and, accordingly, affirm the underlying judgments of the district court.
40   Further, we find no abuse of discretion in the injunctive relief fashioned by the district court.
41   However, given the need for clarity as to how the injunctions are to function, the case is
42   remanded to the district court for such proceedings as are necessary to address this matter.
43
44       **AFFIRMED in part** and **REMANDED in part**.

1

———————————

THEODORE B. OLSON (Matthew D. McGill, Jason J. Mendro, *on the briefs*), Gibson, Dunn & Crutcher LLP, Washington, D.C.; Robert A. Cohen, Charles I. Poret, Eric C. Kirsch, Dechert LLP, New York, N.Y., *for Plaintiff-Appellee NML Capital, Ltd.*

Stephen D. Poss, Robert D. Carroll, Goodwin Procter LLP, Boston, Mass., *for Plaintiff-Appellee NML Olifant Fund, Ltd.*

Michael C. Spencer, Milberg LLP, New York, N.Y., *for Plaintiffs-Appellees Pablo Alberto Varela, et al.*

Edward A. Friedman, Daniel B. Rapport, Friedman Kaplan Seiler & Adelman LLP, New York, N.Y.; Jeffrey A. Lamken, MoloLamken LLP, Washington, D.C., *for Plaintiffs-Appellees Aurelius Capital Master, Ltd., ACP Master, Ltd., Blue Angel Capital I LLC,* and *Aurelius Opportunities Master Fund II, LLC.*

JONATHAN I. BLACKMAN (Carmine D. Boccuzzi, Sara A. Sanchez, Michael M. Brennan, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, N.Y., *for Defendant-Appellant The Republic of Argentina.*

David W. Rivkin, Suzanne M. Grosso, Debevoise & Plimpton LLP, New York, N.Y.; Ronald Mann, Esq., *pro se*, New York, N.Y., *for Amici Curiae Prof. Ronald Mann and EM Ltd., in support of Plaintiffs-Appellees.*

Walter Rieman, Andrew W. Amend, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, N.Y., *for Amici Curiae Montreux Partners, L.P. and Wilton Capital, in support of Plaintiffs-Appellees.*

Richard A. Samp, Washington Legal Foundation, Washington, D.C., *for Amicus Curiae the Washington Legal Foundation, in support of Plaintiffs-Appellees.*

2

1          Kevin S. Reed, Quinn Emanuel Urquhart & Sullivan,
2              LLP, New York, N.Y., *for Amicus Curiae Prof.*
3              *Kenneth W. Dam, in support of Plaintiffs-Appellees.*
4

5          JOHN D. CLOPPER (Jeannette A. Vargas, Sarah S.
6              Norman, *on the brief*), Assistant United States
7              Attorneys, *for* Preet Bharara, United States
8              Attorney for the Southern District of New York,
9              N.Y.; Stuart F. Delery, Acting Assistant Attorney
10             General, Mark B. Stern, Sharon Swingle, Attorneys,
11             Appellate Staff, Civil Division, Department of
12             Justice, Washington, D.C.; George W. Madison,
13             General Counsel, Department of the Treasury,
14             Washington, D.C.; Harold Hongju Koh, Legal
15             Advisor, Department of State, Washington, D.C.,
16             *for Amicus Curiae the United States of America, in*
17             *support of Defendant-Appellant.*
18

19         Paul Saltzman, Joseph R. Alexander, H. Rodgin Cohen,
20             Michael Wiseman, The Clearing House Association
21             L.L.C., New York, N.Y.; Sergio J. Galvis, Joseph F.
22             Neuhaus, Michael J. Ushkown, Sullivan &
23             Cromwell LLP, New York, N.Y., *for Amicus*
24             *Curiae the Clearing House Association L.L.C., in*
25             *support of Defendant-Appellant.*
26

27

28    BARRINGTON D. PARKER, *Circuit Judge*:

29             The Republic of Argentina appeals from permanent injunctions entered by the

30    United States District Court for the Southern District of New York (Griesa, *J.*) designed to

31    remedy Argentina's failure to pay bondholders after a default in 2001 on its sovereign debt.  The

32    district court granted plaintiffs summary judgment and enjoined Argentina from making

33    payments on debt issued pursuant to its 2005 and 2010 restructurings without making

34    comparable payments on the defaulted debt.  We hold that an equal treatment provision in the

35    bonds bars Argentina from discriminating against plaintiffs' bonds in favor of bonds issued in

36    connection with the restructurings and that Argentina violated that provision by ranking its

1    payment obligations on the defaulted debt below its obligations to the holders of its restructured

2    debt.  Accordingly, we affirm the judgment of the district court; we find no abuse of discretion in

3    the injunctive relief fashioned by the district court, and we conclude that the injunctions do not

4    violate the Foreign Sovereign Immunities Act ("FSIA").  However, the record is unclear as to

5    how the injunctions' payment formula is intended to function and how the injunctions apply to

6    third parties such as intermediary banks.  Accordingly, the judgment is affirmed except that the

7    case is remanded to the district court for such proceedings as are necessary to clarify these two

8    issues.  *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

## BACKGROUND

### Overview

11         In 1994, Argentina began issuing debt securities pursuant to a Fiscal Agency

12   Agreement ("FAA Bonds").  A number of individual plaintiffs-appellees bought FAA Bonds

13   starting around December 1998.  The remaining plaintiffs-appellees, hedge funds and other

14   distressed asset investors, purchased FAA Bonds on the secondary market at various times and

15   as recently as June 2010.[1]  The coupon rates on the FAA Bonds ranged from 9.75% to 15.5%,

16   and the dates of maturity ranged from April 2005 to September 2031.

17         The FAA contains provisions purporting to protect purchasers of the FAA Bonds

18   from subordination.  The key provision, Paragraph 1(c) of the FAA, which we refer to as the

19   "*Pari Passu* Clause," provides that:

20               [t]he Securities will constitute . . . direct, unconditional, unsecured
21               and unsubordinated obligations of the Republic and shall at all times rank

---

[1] These plaintiffs include NML Capital, Ltd. ("NML"); Aurelius Capital Master, Ltd., ACP Master, Ltd., Aurelius Opportunities Fund II, LLC, and Blue Angel Capital I LLC (collectively, "Aurelius et al."); and Olifant Fund, Ltd. ("Olifant").

> *pari passu* without any preference among themselves. *The payment*
> *obligations of the Republic under the Securities shall at all times rank at*
> *least equally with all its other present and future unsecured and*
> *unsubordinated External Indebtedness . . . .*

J.A. at 157 (emphasis added) ("External Indebtedness" is limited to obligations payable

in non-Argentine currency. J.A. at 171.).[2] We refer to the second sentence of the *Pari Passu*

Clause as the "Equal Treatment Provision." Following the 2001 default on the FAA Bonds,

Argentina offered holders of the FAA Bonds new exchange bonds in 2005 and 2010 (the

"Exchange Bonds"). Argentina continued to make payments to holders of those Exchange

Bonds while failing to make any payments to persons who still held the defaulted FAA Bonds.

After Argentina defaulted, its President in December 2001 declared a "temporary

moratorium" on principal and interest payments on more than $80 billion of its public external

debt including the FAA Bonds. Each year since then, Argentina has passed legislation renewing

the moratorium and has made no principal or interest payments on the defaulted debt. Plaintiffs

estimate that, collectively, their unpaid principal and prejudgment interest amounts to

approximately $1.33 billion.

---

[2]The practical significance of an equal ranking obligation is readily apparent in the event of the bankruptcy or insolvency of a corporate debtor. Lee C. Buchheit & Jeremiah S. Pam, *The Pari Passu Clause in Sovereign Debt Instruments*, 53 Emory L.J. 869, 873 (2004). In a corporate bankruptcy, holders of senior obligations have a priority claim over the debtor's assets. *Id.* In the case of sovereign borrowers, however, the impact of the clause is less clear because creditors cannot force them into bankruptcy-like proceedings, and no comparable asset distribution plan applies. Thus, in the event of a debt crisis, sovereigns wishing to honor some portion of their defaulted debt must negotiate with individual creditors or groups of creditors to effectuate restructurings. Typically, these proceedings leave in their wake so-called "holdout" creditors who refuse to restructure, opting instead to seek judgments against the sovereign. *See generally* William W. Bratton, *Pari Passu and a Distressed Sovereign's Rational Choices*, 53 Emory L.J. 823, 828-33 (2004).

The plaintiffs allege that Argentina's conduct violated the *Pari Passu* Clause by both subordinating their FAA Bonds to the Exchange Bonds and lowering the ranking of their FAA Bonds below the Exchange Bonds.  The primary issues on appeal are whether Argentina violated the *Pari Passu* Clause, and if so, whether the remedy the district court ordered was appropriate.

**Argentina's Restructurings**

In 2005, Argentina initiated an exchange offer in which it allowed FAA bondholders to exchange their defaulted bonds for new unsecured and unsubordinated external debt at a rate of 25 to 29 cents on the dollar.  In exchange for the new debt, participants agreed to forgo various rights and remedies previously available under the FAA.  To induce creditors to accept the exchange offer, Argentina stated in the prospectus under "Risks of Not Participating in [the] Exchange Offer" the following:

> *Existing defaulted bonds eligible for exchange that are not tendered may remain in default indefinitely.*  As of June 30, 2004, Argentina was in default on approximately U.S. $102.6 billion of its public indebtedness . . . .  *The Government has announced that it has no intention of resuming payment on any bonds eligible to participate in [the] exchange offer . . . that are not tendered or otherwise restructured as part of such transaction.*  Consequently, if you elect not to tender your bonds in an exchange offer there can be no assurance that you will receive any future payments in respect of your bonds.

2005 Prospectus, J.A. at 465 (second emphasis added).

That same year, in order to exert additional pressure on bondholders to accept the exchange offer, the Argentine legislature passed Law 26,017 (the "Lock Law") declaring that:

> Article 2 – The national Executive Power may not, with respect to the bonds . . . , reopen the swap process established in the [2005 exchange offer].

6

Article 3 – *The national State shall be prohibited from conducting any type of in-court, out-of-court or private settlement with respect to the bonds . . . .*

Article 4 – The national Executive Power must . . . remove the bonds . . . from listing on all domestic and foreign securities markets and exchanges.

2005 Lock Law, J.A. at 436 (emphasis added).  The 2005 exchange offer closed in June 2005 with a 76% participation rate, representing a par value of $62.3 billion.  Plaintiffs did not participate.

In 2010, Argentina initiated a second exchange offer with a payment scheme substantially identical to the 2005 offer.  To overcome the Lock Law's prohibition against reopening the exchange, Argentina temporarily suspended the Lock Law (the "Lock Law Suspension").[3]  Like the 2005 prospectus, the 2010 exchange offer prospectus also warned of "Risks of Not Participating in the [2010 restructuring]":

*Eligible Securities that are in default and that are not tendered may remain in default indefinitely and, if you elect to litigate, Argentina intends to oppose such attempts to collect on its defaulted debt.*

Eligible Securities in default that are not exchanged pursuant to the Invitation may remain in default indefinitely.  In light of its

---

[3] The Lock Law Suspension, Law 26,547, explained that

[t]he holders of government bonds that were eligible for the [2005] swap . . . who wish to participate in the [2010] restructuring . . . will have to waive all of the rights that pertain to them by virtue of the [FAA Bonds], including those rights that may have been recognized by any judicial or administrative judgment, . . . and waive and discharge the Republic of Argentina of any judicial . . . action, initiated or that may be initiated in the future, with regard to the [FAA Bonds] . . . .  It is prohibited to offer the holders of government bonds who may have initiated judicial . . . action, more favorable treatment than what is offered to those who have not done so.

Lock Law Suspension, J.A. at 440.

7

financial and legal constraints, *Argentina does not expect to resume
payments on any Eligible Securities in default that remain outstanding
following the expiration of the Invitation*. Argentina has opposed
vigorously, and intends to continue to oppose, attempts by holders who
did not participate in its prior exchange offers to collect on its defaulted
debt through . . . litigation . . . and other legal proceedings against
Argentina. Argentina remains subject to significant legal constraints
regarding its defaulted debt. . . .

> Consequently, if you elect not to tender your Eligible
Securities in default pursuant to the Invitation *there can be no assurance
that you will receive any future payments or be able to collect through
litigation in respect of your Eligible Securities in default.*

2010 Prospectus, J.A. at 980 (second and third emphases added). As with the 2005

exchange offer, plaintiffs did not participate in the 2010 restructuring. After the two exchange

offers, Argentina had restructured over 91% of the foreign debt on which it had defaulted in

2001.

An important new feature of the Exchange Bonds was that they included

"collective action" clauses. These clauses permit Argentina to amend the terms of the bonds and

to bind dissenting bondholders if a sufficient number of bondholders (66 2/3% to 75% of the

aggregate principal amount of a given series) agree.[4] With the inclusion of collective action

clauses, the type of "holdout" litigation at issue here is not likely to reoccur.

Argentina has made all payments due on the debt it restructured in 2005 and

2010. Under the indentures for the 2005 and 2010 Exchange Bonds, Argentina makes principal

and interest payments to a trustee in Argentina that in turn makes an electronic funds transfer

("EFT") to U.S.-registered exchange bondholders. The EFTs are made from the the trustee's non-

---

[4] *See* 2010 Prospectus at 122, J.A. at 1054 (providing that certain "modification[s] to the terms
and conditions of [the Exchange Bonds] . . . may generally be made, and future compliance therewith
may be waived, with the consent of Argentina and the holders of not less than 75% in aggregate principal
amount or notional amount . . . of the [Exchange Bonds] at the time outstanding.").

8

1    U.S. bank to the registered holder's U.S. bank, often routed through one or more intermediary

2    banks.

3    **Proceedings Below**

4    Plaintiffs sued Argentina on the defaulted FAA Bonds at various points from

5    2009 to 2011, alleging breach of contract and seeking injunctive relief, including specific

6    performance of the Equal Treatment Provision.[5]  The FAA is governed by New York law and

7    further provides for jurisdiction in "any state or federal court in The City of New York."  J.A. at

8    184.  However, Argentina's courts have held that the Lock Law and the moratoria on payments

9    prevent them from recognizing New York judgments regarding the FAA Bonds.  In SEC filings,

10   Argentina has stated that it has classified unexchanged FAA Bonds as a category separate from

11   its regular debt and that, since 2005, it has "not [been] in a legal . . . position to pay" that

12   category.  Republic of Arg., Annual Report (Form 18-K) ("18-K"), at 2, 11 (Sept. 30, 2011)

13   In December 2011, the district court granted plaintiffs partial summary judgment

14   (the "Declaratory Orders").[6]  The court observed that the Republic violates the Equal Treatment

---

[5] In separate litigation on different bonds, plaintiffs hold judgments against Argentina that, as we have seen, its courts have refused to honor, and the FSIA has largely prevented plaintiffs from attaching the Republic's foreign assets to satisfy those judgments. *See, e.g.*, *EM Ltd. v. Republic of Arg.*, 473 F.3d 463, 472 (2d Cir. 2007) (affirming vacatur of attachment of central bank reserves); *NML Capital, Ltd. v. Banco Central de la República Arg.*, 652 F.3d 172, 197 (2d Cir. 2011) (vacating attachment of same reserves); *Aurelius Capital Partners, LP v. Republic of Arg.*, 584 F.3d 120, 131 (2d Cir. 2009) (rejecting attempt to restrain assets to be acquired by Argentine social security system); *but see NML Capital Ltd. v. Republic of Arg.*, 680 F.3d 254, 260 (2d Cir. 2012) (affirming attachment and restraining orders); *EM Ltd. v. Republic of Arg.*, 389 F. App'x 38, 43 (2d Cir. 2010) (affirming post-judgment restraint and pre-judgment attachment orders on certain assets of Argentina held in trust in the United States).

[6] The remainder of the procedural history discussed below, while referencing "plaintiffs," describes the district court's rulings with respect to NML Capital.  The court subsequently entered essentially identical judgments with respect to all other plaintiffs.

9

Provision "whenever it lowers the rank of its payment obligations under [plaintiffs'] Bonds below that of any other present or future unsecured and unsubordinated External Indebtedness." The district court then held that Argentina "lowered the rank" of plaintiffs' bonds in two ways: (1) "when it made payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under [plaintiffs'] Bonds" and (2) "when it enacted [the Lock Law] and [the Lock Law Suspension]." Special App. at 13-14. As the court explained:

> it's hard for me to believe that there is not a violation of the [Equal Treatment Provision] accomplished by the congressional legislation in '05 and '10, simply saying that the Republic will not honor these judgments. It is difficult to imagine anything would reduce the rank, reduce the equal status or simply wipe out the equal status of these bonds under the [Equal Treatment Provision] [more than the Lock Law and the Lock Law Suspension]. . . . [The Equal Treatment Provision] can't be interpreted to allow the Argentine government to simply declare that these judgments will not be paid, and that's what they have done.

J.A. at 2124.

> In January 2012, the district court issued a temporary restraining order enjoining

Argentina

> from altering or amending the processes or specific transfer mechanisms (including the use of specific firms) by which it makes payments due to holders of bonds or other securities issued pursuant to its 2005 and 2010 exchange offers, including without limitation by using agents, financial intermediaries and financial vehicles other than those used at the time of this Order.

Special App. at 26.

**The District Court's Injunctions**

> In February 2012, the district court granted injunctive relief, ordering Argentina

to specifically perform its obligations under the Equal Treatment Provision (the "Injunctions").

10

1    *Id.* at 38.  The Injunctions provide that "whenever the Republic pays any amount due under the

2    terms of the [exchange] bonds," it must "concurrently or in advance" pay plaintiffs the same

3    fraction of the amount due to them (the "Ratable Payment").[7]  We are unable to discern from the

4    record precisely how this formula is intended to operate.  It could be read to mean that if, for

5    example, Argentina owed the holders of restructured debt $100,000 in interest and paid 100% of

6    that amount then it would be required to pay the plaintiffs 100% of the accelerated principal and

7    all accrued interest.  Or it could be read to mean that, if such a $100,000 payment to the

8    exchange bondholders represented 1% of the principal and interest outstanding on the

9    restructured debt, then Argentina must pay plaintiffs 1% of the amount owed to them.  We

10    cannot tell precisely what result the district court intended.  On remand the district court will

11    have the opportunity to clarify precisely how it intends this injunction to operate.

12           Anticipating that Argentina would refuse to comply with the Injunctions and in

13    order to facilitate payment, the district court ordered that copies of the Injunctions be provided to

14    "all parties involved, directly or indirectly, in advising upon, preparing, processing, or

15    facilitating any payment on the Exchange Bonds."  These could include Argentina's agent-banks

16    located in New York that hold money in trust for the exchange bondholders and process

17    payments to them under the terms of those bonds.  Under Rule 65(d)(2), parties, their "officers,

18    agents, servants, employees, and attorneys," as well as "other persons who are in active concert

_____

[7] Under the Injunctions' terms, calculating the Ratable Payment requires first determining a "Payment Percentage," a fraction calculated by dividing "the amount actually paid or which the Republic intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds."  Special App. at 39.  The Payment Percentage is in turn multiplied by "the total amount currently due to [plaintiffs]," including pre-judgment interest.  *Id.*  Because Argentina has defaulted on all of plaintiffs' bonds, the "amount currently due" on the FAA Bonds is the amount due under the FAA's Acceleration Clause – the entire principal amount of the bonds – plus pre-judgment interest which, according to plaintiffs, totals approximately $1.33 billion.

11

or participation with" them, are bound by injunctions.  Furthermore, the Injunctions expressly

prohibit Argentina's agents from

> aiding and abetting any violation of this ORDER, including any further violation by [Argentina] of its obligations under [the Equal Treatment Provision], such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a ratable payment to [plaintiffs].

Special App. at 40.

To give effect to this provision, the Injunctions prevent Argentina from "altering

or amending the processes or specific transfer mechanisms by which it makes payments on the

Exchange Bonds" without approval of the court (the "Preliminary Injunction").  Special App. at

40.  Finally, the Injunctions require Argentina to certify to the court, concurrently or in advance

of making a payment on the Exchange Bonds, that it has satisfied its obligations under the

Injunctions.

In justifying the remedy ordered, the court reasoned that

> [a]bsent equitable relief, [plaintiffs] would suffer irreparable harm because the Republic's payment obligations to [plaintiffs] would remain debased of their contractually-guaranteed status, and [plaintiffs] would never be restored to the position [they were] promised that [they] would hold relative to other creditors in the event of default.

*Id.* at 37.  Further, there was no adequate remedy at law "because the Republic has made

clear – indeed, it has codified in [the Lock Law] and [the Lock Law Suspension] – its intention

to defy any money judgment issued by this Court."  *Id.*

The court further reasoned that the balance of the equities tipped in plaintiffs'

favor because of (1) Argentina's "unprecedented, systematic scheme of making payments on

other external indebtedness, after repudiating its payment obligations to Plaintiffs, in direct

violation of" the Equal Treatment Provision and (2) Argentina's ability to "violate [that Provision] with impunity" in the absence of injunctive relief.  *Id.* at 37-38.  The district court also stated that "if there was any belief that the Republic would honestly pay its obligations, there wouldn't be any need for these kinds of paragraphs" in the Injunctions.  J.A. at 2319.  The court noted that the Injunctions "require[] of [Argentina] only that which it promised Plaintiffs and similarly situated creditors to induce those creditors to purchase [Argentina's] bonds."  The court further observed that Argentina now "has the financial wherewithal to meet its commitment of providing equal treatment to [plaintiffs] and [to the exchange bondholders]."  Special App. at 37-38.  As to the exchange bondholders, the Injunctions do not "jeopardiz[e] [their] rights" because "all that the Republic has to do" is "honor its legal obligations."  J.A. at 2339.  Finally,

> [t]he public interest of enforcing contracts and upholding the rule of law will be served by the issuance of th[ese] [Injunctions], particularly here, where creditors of the Republic have no recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises.  No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

Special App. at 38.[8]

---

[8] The court also rejected Argentina's argument that, because plaintiffs had full knowledge of the purported basis of their *Pari Passu* Clause claims as early as 2004, and yet waited until the 2010 exchange offer was completed to bring those claims, those claims were barred by the equitable defense of laches.  The district court found "no merit" to the defense because any delay by plaintiffs in advancing their claim for equitable relief was due to the fact that they "were trying to do other things" to obtain payment on their bonds.  J.A. at 2125, 2321; *see also id.* at 2339 ("The effort under the pari passu clause comes late.  But it is absolutely true[,] and this court knows the facts and history painfully well, . . . that the plaintiffs have tried in many ways to enforce their rights.  They are now attempting to make use of a very important provision in the [FAA]. . . .  They are entitled to do so.").

13

1    **Argentina's Appeal from the Injunctions**

2         In March 2012, Argentina timely appealed from the Injunctions and the

3    Declaratory Orders.  We have jurisdiction over the Injunctions under 28 U.S.C. § 1292(a)(1).

4    The Declaratory Orders are also properly before us because they are "inextricably intertwined"

5    with the Injunctions.  *Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365,

6    371 (2d Cir. 2004).[9]

7         Argentina advances a host of reasons as to why the district court erred.  First, the

8    Republic argues that it has not violated the Equal Treatment Provision because it has not given

9    the exchange bondholders a legally enforceable preference over the FAA Bonds in the event of

10   default on the Exchange Bonds – even if it has favored the exchange bondholders by honoring

11   their payment rights while violating plaintiffs'.  Argentina contends that plaintiffs' bonds have

12   always remained "direct, unconditional, unsecured and unsubordinated obligations of the

13   Republic" with the same legal "rank" as any other debt – which is all the Equal Treatment

14   Provision requires.  Appellant's Br. 45-48.  In any event, even if the Provision had been violated,

15   Argentina argues the contractually agreed upon remedy is acceleration, which has already

16   occurred.

---

[9] In January 2012, after the district court issued the Declaratory Orders but before it entered the Injunctions, Argentina filed notices of appeal from the Orders "[o]ut of an excess of caution and to rebut any possible future argument that it did not preserve all appellate rights with respect to the Declaratory Orders."  Appellant's Opp'n to Appellees' Mot. To Dismiss Prior Appeals at 5.  Those appeals were subsequently consolidated with the ones over which we have jurisdiction.  Therefore, there are two sets of appeals before this Court that Argentina concedes are "overlapping" and "clogging the dockets."  *Id.* at 7.  Because Argentina's second set of appeals have successfully reached this Court, Plaintiffs' motion to dismiss the first set of appeals is therefore granted.  *See* Appellees' Mot. to Dismiss the Premature Appeals.  The clerk of the court is directed to dismiss appeal nos. 12-105, 12-109, 12-111, 12-157, 12-158, 12-163, 12-164, 12-170, 12-176, 12-185, 12-189, and 12-214.

1    Second, Argentina argues that the Injunctions violate the FSIA by ordering the

2    Republic to pay plaintiffs with immune property located outside the United States.  *Id.* at 26-27

3    (citing *S&S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983) (holding

4    district courts "may not grant, by injunction, relief which they may not provide by attachment").

5    Third, the Republic contends that the assets the Injunctions restrain are not

6    property of the Republic, but are held in trust for exchange bondholders, and therefore, under

7    New York law, may not be reached by creditors.  Moreover, the Injunctions, which by their

8    terms apply to "indirect facilitators" of payments on the Exchange Bonds, Special App. at 39,

9    violate the U.C.C., which prohibits injunctive relief against "intermediary banks" responsible for

10   processing fund transfers.  U.C.C. § 4-A-503 cmt.  Since subjecting exchange bondholder money

11   to process in U.S. courts is improper, Argentina argues, the court erroneously restricted it from

12   utilizing other methods to service its debt.

13   Fourth, because the only harm plaintiffs suffer is monetary, Argentina argues that

14   the district court incorrectly concluded that such harm was irreparable.

15   Fifth, Argentina argues that the hardship to exchange bondholders and to the

16   Republic stemming from the Injunctions far outweighs the purported prejudice to "holdouts,"

17   who bought their debt at or near default with full knowledge of the limitations on their ability to

18   collect.  The Injunctions "will thrust the Republic into another economic crisis and undermin[e]

19   the consensual [sovereign debt] restructuring process the United States has been at pains to foster

20   for the past several decades."  *Id.*

21   Sixth and finally, Argentina argues that plaintiffs' claims are barred by laches.

15

1    We review a district court's decision to grant equitable relief for abuse of

2  discretion.  *See Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66,

3  76 (2d Cir. 2004); *Leasco Corp. v. Taussig*, 473 F.2d 777, 786 (2d Cir. 1972); *Citigroup Global*

4  *Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010).  We

5  review *de novo* a district court's grant of partial summary judgment.  *See Juliano v. Health*

6  *Maint. Org. of N.J., Inc.*, 221 F.3d 279, 286 (2d Cir. 2000).

7

8                                  **DISCUSSION**

9                                        **I.**

10    We first address Argentina's argument that the district court erred in its

11  interpretation of the Equal Treatment Provision.  The district court held that Argentina violated

12  the Provision  when it made payments currently due under the Exchange Bonds while persisting

13  in its refusal to satisfy its payment obligations to plaintiffs and when it enacted the Lock Law

14  and the Lock Law Suspension.

15    "In New York, a bond is a contract. . . ."  *Arch Ins. Co. v. Precision Stone, Inc.*,

16  584 F.3d 33, 39 n.4 (2d Cir. 2009).  Thus, the parties' dispute over the meaning of the Equal

17  Treatment Provision presents a "simple question of contract interpretation."  *EM Ltd. v. Republic*

18  *of Argentina*, 382 F.3d 291, 292 (2d Cir. 2004) (interpreting Acceleration Clause in FAA).

19  Argentina argues that the *Pari Passu* Clause is a boilerplate provision that, in the sovereign

20  context, "has been universally understood for over 50 years . . . to provide protection from *legal*

21  *subordination* or other discriminatory *legal ranking* by preventing the creation of *legal priorities*

16

1    by the sovereign in favor of creditors holding particular classes of debt."  Appellant's Br. 32, 34

2    (emphasis added); *accord* Clearing House Amicus Br. 2, 10.

3         We are unpersuaded that the clause has this well settled meaning.  Argentina's

4    selective recitation of context-specific quotations from arguably biased commentators and

5    institutions notwithstanding, the preferred construction of *pari passu* clauses in the sovereign

6    debt context is far from "general, uniform and unvarying," *Law Debenture Trust Co. of N.Y. v.*

7    *Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (quotation marks omitted).  Argentina's

8    primary authorities and Argentina itself appear to concede as much.  *See* Appellant's Reply Br.

9    21 n.9 ("*[N]o one knows* what the clause really means" (emphasis in Appellant's Reply Br.));

10   Lee C. Buchheit, *The Pari Passu Clause Sub Specie Aeternitatis*, 10 Int'l Fin. L. Rev. 11, 11

11   (1991) ("[N]o one seems quite sure what the clause really means, at least in the context of a loan

12   to a sovereign borrower."); G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 Bus. Law

13   635, 646 (2001) ("[I]n the sovereign context there is at least disagreement about the meaning of

14   the clause."); Stephen Choi & G. Mitu Gulati, *Contract As Statute*, 104 Mich. L. Rev. 1129,

15   1134 (2006) ("The leading commentators on sovereign contracts acknowledged that there exists

16   ambiguity as to the meaning of this clause."); Philip R. Wood, *Project Finance, Subordinated*

17   *Debt and State Loans* 165 (1995) ("In the state context, the meaning of the clause is uncertain

18   because there is no hierarchy of payments which is legally enforced under a bankruptcy

19   regime.").  In short, the record reveals that Argentina's interpretation of the *Pari Passu* Clause is

20   neither well settled nor uniformly acted upon.

21        Once we dispense with Argentina's customary usage argument, it becomes clear

22   that the real dispute is over what constitutes subordination under the *Pari Passu* Clause.

17

1  Argentina contends the clause refers only to legal subordination and that none occurred here

2  because "any claims that may arise from the Republic's restructured debt have no priority in any

3  court of law over claims arising out of the Republic's unrestructured debt."  Appellant's Br. 47.

4  Plaintiffs, on the other hand, argue that there was "de facto" subordination because Argentina

5  reduced the rank of plaintiffs' bonds to a permanent non-performing status by passing legislation

6  barring payments on them while continuing to pay on the restructured debt and by repeatedly

7  asserting that it has no intention of making payments on plaintiffs' bonds.

8  　　　　We disagree with Argentina because its interpretation fails to give effect to the

9  differences between the two sentences of the *Pari Passu* Clause.  *See Singh v. Atakhanian*, 818

10  N.Y.S.2d 524, 526 (N.Y. App. Div. 2d Dep't 2006) ("A contract should not be interpreted in

11  such a way as would leave one of its provisions substantially without force or effect." (internal

12  quotation marks and citation omitted)).

13  　　　　Instead, we conclude that in pairing the two sentences of its *Pari Passu* Clause,

14  the FAA manifested an intention to protect bondholders from more than just formal

15  subordination.  *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398,

16  404 (2009).  The first sentence ("[t]he Securities will constitute . . . direct, unconditional,

17  unsecured, and unsobrdinated obligations . . . .") prohibits Argentina, as bond *issuer*, from

18  formally subordinating the bonds by issuing superior debt.  The second sentence ("[t]he payment

19  obligations . . . shall at all times rank at least equally with all its other present and future

20  unsecured and unsubordinated External Indebtedness.") prohibits Argentina, as bond *payor*,

21  from paying on other bonds without paying on the FAA Bonds.  Thus, the two sentences of the

22  *Pari Passu* Clause protect against different forms of discrimination: the issuance of other

18

1  superior debt (first sentence) and the giving of priority to other payment obligations (second

2  sentence).[10]

3        This specific constraint on Argentina as payor makes good sense in the context of

4  sovereign debt: When sovereigns default they do not enter bankruptcy proceedings where the

5  legal rank of debt determines the order in which creditors will be paid.  Instead, sovereigns can

6  choose for themselves the order in which creditors will be paid.  In this context, the Equal

7  Treatment Provision prevents Argentina as payor from discriminating against the FAA Bonds in

8  favor of other unsubordinated, foreign bonds.

9        The record amply supports a finding that Argentina effectively has ranked its

10  payment obligations to the plaintiffs below those of the exchange bondholders.  After declaring a

---

[10] Argentina, along with the Clearing House, argues that the FAA's "repurchase" provision, authorizing the Republic to "at any time purchase Securities at any price in the open market or otherwise," is inconsistent with "NML's 'ratable' interpretation."  FAA § 9(c), J.A. at 169; Appellant's Br. 39.  Leaving aside that that is not NML's "interpretation," we find the repurchase provision wholly consistent with the Equal Treatment Provision:  Were Argentina to make such a repurchase, it would not be fulfilling its "payment obligations" on the Securities, Securities that by the FAA's own terms are not "redeemable prior to maturity."  FAA § 9(a), J.A. at 167.  Rather, it would be purchasing them, potentially at a discount or premium reflecting the market's expectations of the Republic's likelihood of fulfilling those obligations, in an arms-length transaction with a willing seller.  Such repurchases would not breach Argentina's promise, under the Equal Treatment Provision, not to discriminate against outstanding bondholders in meeting its payment obligations to them.  To conclude otherwise would be to hold that the 2005 and 2010 exchange offers themselves violated the Equal Treatment Provision, a position not even plaintiffs have taken.

Argentina and the Clearing House also argue that "NML's interpretation of the pari passu clause as requiring 'ratable' payments to creditors would render meaningless other standard loan contract clauses" such as "sharing clauses" which "do actually address the issue of payment to one creditor before another."  Appellant's Br. 37-38.  Leaving aside that NML does not "interpret . . . the pari passu clause as requiring 'ratable' payments" – it proposed ratable payments as a *remedy* for Argentina's breach of the Provision – this argument fails.  A "sharing clause" (which does not even appear in the FAA) is an agreement made among *lenders* to divide payments that a debtor makes (or that are obtained by other means, such as offsets); it is not a promise made by the *borrower*.  *See* Clearing House Amicus Br. 12 (citing Lee C. Buchheit, *How to Negotiate Eurocurrency Loan Agreements* 76-81 (2d ed. 2004)).  Thus, a sharing clause, unlike the Equal Treatment Provision, could not ensure against the *debtor*'s discrimination in favor of other, non-sharing creditors.  The fact that sharing clauses "contain complex payover provisions which are necessary to reallocate among creditors disproportionate payments," *id.* at 13, is not surprising given that they serve as a coordinating mechanism among a number of lenders.

1    moratorium on its outstanding debt in 2001, Argentina made no payments for six years on

2    plaintiffs' bonds while simultaneously timely servicing the Exchange Bonds.  Argentina has

3    renewed that moratorium in its budget laws each year since then.  It declared in the prospectuses

4    associated with the exchange offers that it has no intention of resuming payments on the FAA

5    Bonds.  2005 Prospectus, J.A. at 465; 2010 Prospectus, J.A. at 980.  It stated in SEC filings that

6    it had "classified the [FAA Bonds] as a separate category from its regular debt" and is "not in a

7    legal . . . position to pay" them.  18-K at 2, 11.  Its legislature enacted the Lock Law, which has

8    been given full effect in its courts, precluding its officials from paying defaulted bondholders

9    and barring its courts from recognizing plaintiffs' judgments.  By contrast, were Argentina to

10   default on the Exchange Bonds, and were those bondholders to obtain New York judgments

11   against Argentina, there would be no barrier to the Republic's courts recognizing those

12   judgments.  Thus, even under Argentina's interpretation of the Equal Treatment Provision as

13   preventing only "legal subordination" of the FAA Bonds to others, the Republic breached the

14   Provision.  *See* Appellant's Br. 35 (stating that "'the clause must mean that, for example, there is

15   no statutory or constitutional or other rule of law . . . subordinating the debt to other debt'").

16          In short, the combination of Argentina's executive declarations and legislative

17   enactments have ensured that plaintiffs' beneficial interests do *not* remain direct, unconditional,

18   unsecured and unsubordinated obligations of the Republic and that any claims that may arise

19   from the Republic's restructured debt *do* have priority in Argentinian courts over claims arising

20   out of the Republic's unstructured debt.  Thus we have little difficulty concluding that Argentina

21   breached the *Pari Passu* Clause of the FAA.

1         We are not called upon to decide whether policies favoring preferential payments

2 to multilateral organizations like the IMF would breach *pari passu* clauses like the one at issue

3 here.  Indeed, plaintiffs have never used Argentina's preferential payments to the IMF as

4 grounds for seeking ratable payments.  Far from it; they contend that "a sovereign's *de jure* or *de*

5 *facto* policy [of subordinating] obligations to commercial unsecured creditors beneath

6 obligations to multilateral institutions like the IMF would **not** violate the Equal Treatment

7 Provision for the simple reason that commercial creditors never were nor could be on equal

8 footing with the multilateral organizations."  Appellees' (NML et al.'s) Br. 40.

9         Moreover, plaintiffs' claims are not barred by laches.  Argentina argues that, after

10 it sought to resolve the meaning of the Equal Treatment Provision in December 2003 (and the

11 court deemed the issue unripe for adjudication),[11] plaintiffs "sat silent as the Republic

12 restructured over 91% of its defaulted debt and made regular biannual payments to holders of its

13 restructured debt."  Appellant's Br. 29.  In the face of this "inexcusable delay," Argentina

14 argues, "plaintiffs cannot now rely on 'equity' to interfere with payments to third parties who

15 have obviously developed a reasonable expectation of that regular source of income."  *Id.*

16         This contention has no merit.  Under New York law, the equitable defense of

17 laches requires: (1) conduct giving rise to the situation complained of, (2) delay in asserting a

18 claim for relief despite the opportunity to do so, (3) lack of knowledge or notice on the part of

---

[11] In 2003, in separate Argentine bondholder litigation, Argentina moved to preclude plaintiffs from interfering with payments it anticipated making in connection with its contemplated debt restructuring and with its debt to creditors such as the IMF "based on [a] misconstruction of the *Pari Passu* Clause."  J.A. at 237.  The district court found the issue not ripe for review because the plaintiffs, including appellee NML as intervenor, were not at that time seeking any relief under the *Pari Passu* Clause and further agreed by joint stipulation to give Argentina thirty days' notice before seeking any such relief.

1    the offending party that the complainant would assert the claim, and (4) injury or prejudice to the

2    offending party as a consequence relief granted on the delayed claim.  *See Denaro v Denaro*, 84

3    A.D.3d 1148, 1149-50 (N.Y. App. Div. 2d Dep't 2011); *see also Cohen v. Krantz*, 227 A.D.2d

4    581, 582 (N.Y. App. Div. 2d Dep't 1996) (citation omitted).

5    　　　　Argentina's laches argument fails because it had not yet violated the Equal

6    Treatment Provision when it sought a declaration in 2003 that plaintiffs could not invoke the

7    Provision to impede its restructuring efforts.  It violated the Provision later by persisting in its

8    policy of discriminatory treatment of plaintiffs, for example, by passing the Lock Law.  In any

9    event, we do not see how Argentina can claim prejudice by plaintiffs' purported delay.

10   Argentina has known since 2004 that NML retained the option to pursue the claim.  Moreover,

11   because equitable relief was not granted until 2012, Argentina was able to hold its 2005 and

12   2010 exchange offers unimpeded.

13   　　　　　　　　　　　　　　　　**II.**

14   　　　　We turn now to Argentina's challenges to the Injunctions and their requirement

15   that it specifically perform its obligations under the FAA.  Specific performance may be ordered

16   where no adequate monetary remedy is available and that relief is favored by the balance of

17   equities, which may include the public interest.  *Guinness-Harp Corp. v. Jos. Schlitz Brewing

18   Co.*, 613 F.2d 468, 473 (2d Cir. 1980); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992

19   F.2d 430, 433 (2d Cir. 1993); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 32 (2008)

20   (noting that "the balance of equities and consideration of the public interest [] are pertinent in

1  assessing the propriety of any injunctive relief, preliminary or permanent."); *eBay Inc. v.*

2  *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[12]

3         Once the district court determined that Argentina had breached the FAA and that

4  injunctive relief was warranted, the court had considerable latitude in fashioning the relief.  The

5  performance required by a decree need not, for example, be identical with that promised in the

6  contract.  *Greenspahn v. Joseph E. Seagram & Sons, Inc.*, 186 F.2d 616, 620 (2d Cir. 1951).

7  Where "the most desirable solution" is not possible, this Court may affirm an order of specific

8  performance so long as it achieves a "fair result" under the "totality of the circumstances."

9  *Leasco*, 473 F.2d at 786.

10         Argentina's first contention is that, even assuming it breached the *Pari Passu*

11  Clause, plaintiffs are limited to the "contractually agreed upon remedy of acceleration."

12  Appellant's Br. at 48.  This argument is easily dispensed with.  While paragraph 12 of the FAA

13  specifies acceleration as one remedy available for a breach of the Equal Treatment Provision, the

14  FAA does not contain a clause limiting the remedies available for a breach of the agreement.

15  Nor does the FAA contain a provision precluding specific performance or injunctive relief.

16  Under New York law the absence of the parties' express intention in the FAA to restrict the

17  remedies available for breach of the agreement means that the full panoply of appropriate

18  remedies remains available.  *Vacold LLC v. Cerami*, 545 F.3d 114, 130 (2d Cir. 2008) (New

19  York courts "recognize limitations on available remedies" "only when the contract contains a

20  clause *specifically* setting forth the remedies available. . . .") (quotation marks omitted)).

---

[12] To be eligible for specific performance of a contractual provision, a party also needs to show that "(1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) plaintiff and defendant are each able to continue performing their parts of the agreement."  *Nemer Jeep-Eagle*, 992 F.2d at 433.  There is no dispute that these factors are satisfied here.

1          Moreover, it is clear to us that monetary damages are an ineffective remedy for

2     the harm plaintiffs have suffered as a result of Argentina's breach.  Argentina will simply refuse

3     to pay any judgments.  It has done so in this case by, in effect, closing the doors of its courts to

4     judgment creditors.  In light of Argentina's continual disregard for the rights of its FAA creditors

5     and the judgments of our courts to whose jurisdiction it has submitted, its contention that

6     bondholders are limited to acceleration is unpersuasive.  Insofar as Argentina argues that a

7     party's persistent efforts to frustrate the collection of money judgments cannot suffice to

8     establish the inadequacy of a monetary relief, the law is to the contrary.  *See Pashaian v.*

9     *Eccelston Props., Ltd.*, 88 F.3d 77, 87 (2d Cir. 1996); Restatement (Second) of Contracts § 360

10    cmt. d ("Even if damages are adequate in other respects, they will be inadequate if they cannot

11    be collected by judgment and execution.").  In this context, the district court properly ordered

12    specific performance.

13          Next, we conclude that because compliance with the Injunctions would not

14    deprive Argentina of control over any of its property, they do not operate as attachments of

15    foreign property prohibited by the FSIA.  Section 1609 of the FSIA establishes that "the property

16    in the United States of a foreign state shall be immune from attachment arrest and execution."

17    28 U.S.C. § 1609.  Each of these three terms refers to a court's seizure and control over specific

18    property.[13]  However, courts are also barred from granting "by injunction, relief which they may

_____

[13]An "attachment" is the "seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment."  *Black's Law Dictionary* 123 (9th ed. 2009); *see also* 6 Am. Jur. 2d *Attachment and Garnishment* § 1.  An arrest is "[a] seizure or forcible restraint."  *Black's Law Dictionary* 124 (9th ed. 2009).  "Execution" is "an act of dominion over specific property by an authorized officer of the court . . . which results in the creation of a legal right to subject the debtor's interest in the property to the satisfaction of the debt of his or her judgment creditor."  30 Am. Jur. 2d *Executions* § 177; *see also Black's Law Dictionary* (9th ed. 2009) ("Judicial enforcement of a money judgment, usu. by seizing and selling the judgment debtor's property.").

1     not provide by attachment."  *S&S Machinery Co.*, 706 F.2d at 418; *see also Stephens v. Nat'l*

2     *Distillers & Chem. Corp.*, 69 F.3d 1226, 1229 (2d Cir. 1995).

3         The Injunctions at issue here are not barred by § 1609.  They do not attach, arrest,

4     or execute upon any property.  They direct Argentina to comply with its contractual obligations

5     not to alter the rank of its payment obligations.  They affect Argentina's property only

6     incidentally to the extent that the order prohibits Argentina from transferring money to some

7     bondholders and not others.  The Injunctions can be complied with without the court's ever

8     exercising dominion over sovereign property.  For example, Argentina can pay all amounts owed

9     to its exchange bondholders provided it does the same for its defaulted bondholders.  Or it can

10     decide to make partial payments to its exchange bondholders as long as it pays a proportionate

11     amount to holders of the defaulted bonds.  Neither of these options would violate the Injunctions.

12     The Injunctions do not require Argentina to pay any bondholder any amount of money; nor do

13     they limit the other uses to which Argentina may put its fiscal reserves.  In other words, the

14     Injunctions do not transfer any dominion or control over sovereign property to the court.

15     Accordingly, the district court's Injunctions do not violate § 1609.[14]

16         Nor does the FSIA create any other impediment to the injunctive relief ordered by

17     the district court.  Argentina voluntarily waived its immunity from the jurisdiction of the district

18     court, and the FSIA imposes no limits on the equitable powers of a district court that has

19     obtained jurisdiction over a foreign sovereign, at least where the district court's use of its

20     equitable powers does not conflict with the separate execution immunities created by § 1609.  A

---

[14]For similar reasons, we see no merit to Argentina's argument that the Injunctions violate New York trust or attachment law on the theory that they "execute upon" funds that do not belong to Argentina.  Appellant's Br. 53-54.  Nothing in the Injunctions suggests that plaintiffs would "execute upon" any funds, much less those held in trust for the exchange bondholders.

1    "federal court sitting as a court of equity having personal jurisdiction over a party has power to

2    enjoin him from committing acts elsewhere."  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 716

3    (2d Cir. 2004) (internal quotation marks and citation omitted).

4              Turning to Argentina's argument that the balance of equities and the public

5    interest tilt in its favor, we see no abuse of discretion in the district court's conclusion to the

6    contrary.  The FAA bondholders contend with good reasons that Argentina's disregard of its

7    legal obligations exceeds any affront to its sovereign powers resulting from the Injunctions.[15]

8              Moreover, nothing in the record supports Argentina's blanket assertion that the

9    Injunctions will "plunge the Republic into a new financial and economic crisis."  Appellant's Br.

10    61.  The district court found that the Republic had sufficient funds, including over $40 billion in

11    foreign currency reserves, to pay plaintiffs the judgments they are due.  *See* Special App. at 37-

12    38 (concluding that Argentina "has the financial wherewithal to meet its commitment of

13    providing equal treatment to [plaintiffs] and [the exchange bondholders]").  Aside from merely

14    observing that these funds are dedicated to maintaining its currency, Argentina makes no real

15    argument that, to avoid defaulting on its other debt, it cannot afford to service the defaulted debt,

16    and it certainly fails to demonstrate that the district court's finding to the contrary was clearly

17    erroneous.

---

[15]Argentina repeatedly expresses its frustration with plaintiffs for refusing to accept the
exchange offers.  *See* Appellant's Br. 47 ("A holder of defaulted debt cannot *voluntarily* decline
to participate in a restructuring and then afterward assert that the creditors who elected to settle
their claims are a 'preferred class.'" (emphasis in original)).  But plaintiffs were completely
within their rights to reject the 25-cents-on-the-dollar exchange offers.  And because the FAA
does not contain a collective action clause, Argentina has no right to force them to accept a
restructuring, even one approved by a super-majority.

26

1    Nor will the district's court's judgment have the practical effect of enabling "a

2    single creditor to thwart the implementation of an internationally supported restructuring plan,"

3    as the United States contends.  U.S. Amicus Br. 5.  It is up to the sovereign – not any "single

4    creditor" – whether it will repudiate that creditor's debt in a manner that violates a *pari passu*

5    clause.[16]  In any event, it is highly unlikely that in the future sovereigns will find themselves in

6    Argentina's predicament.  Collective action clauses – which effectively eliminate the possibility

7    of "holdout" litigation– have been included in 99% of the aggregate value of New York-law

8    bonds issued since January 2005, including Argentina's 2005 and 2010 Exchange Bonds.  Only

9    5 of 211 issuances under New York law during that period did not include collective action

10    clauses, and all of those issuances came from a single nation, Jamaica.[17]  Moreover, none of the

11    bonds issued by Greece, Portugal, or Spain – nations identified by Argentina as the next in line

12    for restructuring – are governed by New York law.

13    However, we do have concerns about the Injunctions' application to banks acting

14    as pure intermediaries in the process of sending money from Argentina to the holders of the

15    Exchange Bonds.  Under Article 4-A of the U.C.C., intermediary banks, which have no

---

[16] Further, to the extent the district court suggested that a breach would occur with *any* non-payment that is coupled with payment on other debt, *see* Special App. at 13 (holding that Argentina breaches the Equal Treatment Provision "whenever it . . . fail[s] to pay the obligations currently due under [plaintiffs'] Bonds while at the same time making payments currently due *to holders of other unsecured and unsubordinated External Indebtedness*" (emphasis added)), we need not decide whether it was correct.  Nor need we determine whether "legislative enactment" alone could result in a breach of the Equal Treatment Provision.  *See id.*  We simply affirm the district court's conclusion that Argentina's course of conduct here did.

[17] See Datalogic, Bloomberg, and other publicly available sources.  Although these sources identified 221 issuances, data on the presence of collective action clauses was available only for 211 of those issuances (96% of the aggregate value of all issuances); the figures above are compared against those 211 issuances with sufficient data.  *See also* Michael Bradley & Mitu Gulati, Collective Action Clauses for the Eurozone: An Empirical Analysis 11-12 (Oct. 24, 2011) (unpublished manuscript), available at http://ssrn.com/abstract=1948534.

1    obligations to any party with whom they do not deal directly, are not subject to injunctions

2    relating to payment orders.  *See, e.g.*, N.Y. U.C.C. § 4-A-503 cmt.  Any system that seeks to

3    force intermediary banks to stop payments by a particular entity for a particular purpose imposes

4    significant costs on intermediary banks and risks delays in payments unrelated to the targeted

5    Exchange Bond payments.  *Grain Traders, Inc v. Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir.

6    1998).  Plaintiffs claim that the Injunctions do not encompass intermediaries, but they fail to

7    offer a satisfactory explanation for why intermediary banks would not be considered "indirect[] .

8    . . facilitat[ors]" apparently covered by the Injunctions.  Special App. at 39.

9            Our concerns about the Injunctions' application to third parties do not end here.

10    Oral argument and, to an extent, the briefs revealed some confusion as to how the challenged

11    order will apply to third parties generally.  Consequently, we believe the district court should

12    more precisely determine the third parties to which the Injunctions will apply before we can

13    decide whether the Injunctions' application to them is reasonable.  Accordingly, we remand the

14    Injunctions to the district court under *United States v. Jacobson*, 15 F.3d at 22, for such further

15    proceedings as are necessary to address the Injunctions' application to third parties including

16    intermediary banks and to address the operation of their payment formula.

17                                    **CONCLUSION**

18            For the reasons stated, the judgments of the district court (1) granting summary

19    judgment to plaintiffs on their claims for breach of the Equal Treatment Provision and (2)

20    ordering Argentina to make "Ratable Payments" to plaintiffs concurrent with or in advance of its

21    payments to holders of the 2005 and 2010 restructured debt are affirmed.  The case is remanded

22    to the district court pursuant to *United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994) for such

                                            28

1    proceedings as are necessary to address the operation of the payment formula and the

2    Injunctions' application to third parties and intermediary banks.  Once the district court has

3    conducted such proceedings the mandate should automatically return to this Court and to our

4    panel for further consideration of the merits of the remedy without need for a new notice of

5    appeal.