# 12-105-cv(L)

**12-109-cv(CON),   12-111-cv(CON),   12-157-cv(CON),   12-158-cv(CON),
12-163-cv(CON),   12-164-cv(CON),   12-170-cv(CON),   12-176-cv(CON),
12-185-cv(CON),   12-189-cv(CON),   12-214-cv(CON),   12-909-cv(CON),
12-914-cv(CON),   12-916-cv(CON),   12-919-cv(CON),   12-920-cv(CON),
12-923-cv(CON),   12-924-cv(CON),   12-926-cv(CON),   12-939-cv(CON),
12-943-cv(CON),   12-951-cv(CON),   12-968-cv(CON),   12-971-cv(CON),
12-4694-cv(CON), 12-4829-cv(CON), 12-4865-cv(CON)**

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA

*(caption continued on inside cover)*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————

### BRIEF FOR NON-PARTY INTERVENORS
### EURO BONDHOLDERS

—————————

CHRISTOPHER J. CLARK
CRAIG A. BATCHELOR
MICHAEL E. BERN
LATHAM & WATKINS, LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200

*Attorneys for Non-Party
Intervenors Euro Bondholders*

LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees,*

—v.—

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant,*

THE BANK OF NEW YORK MELLON, as Indenture Trustee, EXCHANGE BONDHOLDER GROUP, ICE CANYON LLC, FINTECH ADVISORY INC.,

*Non-Party Appellants,*

EURO BONDHOLDERS,

*Non-Party Intervenors.*

i

## CORPORATE DISCLOSURE STATEMENT

Knighthead Capital Management, LLC is a Delaware limited liability company.  There is neither a parent company to Knighthead Capital Management LLC, nor a publicly held corporation that owns 10% or more of its stock.

Redwood Capital Management, LLC is a Delaware limited liability company.  There is neither a parent company to Redwood Capital Management, LLC, nor a publicly held corporation that owns 10% or more of its stock.

Perry Capital, LLC is a Delaware limited liability company.  There is neither a parent company to Perry Capital, LLC, nor a publicly held corporation that owns 10% or more of its stock.

ii

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT............................................1

BACKGROUND ................................................................3

STANDARD OF REVIEW ..................................................8

ARGUMENT ....................................................................8

I.   THE DISTRICT COURT IMPROPERLY
ENJOINED THIRD PARTY FINANCIAL
INSTITUTIONS THAT PLAY NO ROLE IN
WHETHER THE REPUBLIC COMPLIES
WITH THE INJUNCTION AND WERE NOT
BEFORE THE COURT..................................................8

     A.   The Foreign Financial Institutions that
Process Payments to the Euro
Bondholders Are Not the Republic's
Agents.................................................................9

     B.   The Foreign Financial Institutions that
Process Payments to the Euro
Bondholders Do Not Aid and Abet the
Republic's Violation of the Injunction. ...............9

     C.   The District Court Erred By Enjoining
Parties Not Before the Court. ...........................15

II.   THE INJUNCTION IS OVERBROAD TO
THE EXTENT IT PURPORTS TO ENJOIN
FOREIGN ENTITIES BEYOND THE
COURT'S JURISDICTION. .......................................16

     A.   The District Court's Injunction Was
Premised on a Clear Factual Error About
the Situs and Parties Involved in the
Payment Process for Euro Bonds. .....................16

iii

B.    The Court Erred by Purporting to Enjoin Foreign Parties Over Which It Lacks Jurisdiction............................................................. 18

C.    The Court Improperly Purported to Enjoin Foreign Entities From Fulfilling Foreign Legal Obligations on Foreign Soil.20

D.    The Injunction Is Unenforceable Against the Foreign Third Parties Under Their Own Forums' Laws. ........................................... 23

III.    THE DISTRICT COURT'S INJUNCTION SHOULD BE MODIFIED TO AVOID SUBSTANTIAL DISRUPTION TO THE INTERNATIONAL PAYMENT PROCESS AND INTERFERENCE WITH FOREIGN LAW. ............................................................................ 26

A.    Left Unmodified, the District Court's Injunction Will Foment International Financial Chaos. .................................. 27

B.    The Inclusion of Foreign Financial Institutions in the Injunction Will Lead to Foreign Litigation and Inconsistent Judgments. ........................................... 29

IV.    REMAND IS UNNECESSARY BECAUSE THE UNDISPUTED RECORD MAKES CLEAR THAT THE INJUNCTION IS IMPROPER AS TO THE FOREIGN THIRD PARTIES PROCESSING PAYMENTS UNDER THE EURO BONDS. .................................. 30

CONCLUSION ................................................................. 32

iv

## <u>CASES</u>

*Alemite Mfg. Corp. v. Staff,*
   42 F.2d 832 (2d Cir. 1930) .......................................10, 14

*Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.,*
   869 F.2d 34 (2d Cir. 1989) .............................................20

*Chase Manhattan Bank, N.A. v. Am. Nat'l Bank &*
   *Trust Co.,*
   93 F.3d 1064 (2d Cir. 1996) ..........................................30

*Chase Nat'l Bank v. Norwalk,*
   291 U.S. 431 (1934) ......................................................10

*City of New York v. Mickalis Pawn Shop, LLC,*
   645 F.3d 114 (2d Cir. 2011) .......................................8, 14

*Clough v. Bond*
   (1838) 1 My & Cr 80 .....................................................21

*Dow Jones & Co. v. Harrods, Ltd.,*
   237 F. Supp. 2d 394 (S.D.N.Y. 2002) ......................23, 24

*Goya Foods, Inc. v. Wallack Mgmt. Co.,*
   290 F.3d 63 (1st Cir. 2002)............................................14

*Grupo Mexicano de Desarollo, S.A. v. Alliance*
   *Bond Fund,*
   527 U.S. 308 (1999) ......................................................14

*Halberstam v. Welch,*
   705 F.2d 472 (D.C. Cir. 1983).......................................10

*Herrlein v. Kanakis,*
   526 F.2d 252 (7th Cir. 1975) .........................................15

*Heyman v. Kline,*
   444 F.2d 65 (2d Cir. 1971) ............................................10

*Hilao v. Estate of Marcos (In re: Estate of Marcos*
   *Human Rights Litig.),*
   94 F.3d 539 (9th Cir. 1996) ......................................18, 19

v

*In re Amaranth Natural Gas Commodities Litig.*,
  612 F. Supp. 2d 376 (S.D.N.Y. 2009) ............................ 13

*In re Sealed Case*,
  825 F.2d 494 (D.C. Cir. 1987) ........................................ 21

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005) ............................................. 14

*Indenture Capital Ventures Int'l v. Republic of Arg.*,
  552 F.3d 289 (2d Cir. 2009) ........................................... 19

*Knox v. Salinas*,
  193 F.3d 123 (2d Cir. 1999) ................................. 8, 16, 18

*Lake Shore Asset Mgmt. v. CFTC*,
  511 F.3d 762 (7th Cir. 2007) ........................................ 15

*Laker Airways, Ltd. v. Sabena, Belgian World
  Airlines*,
  731 F.2d 909 (D.C. Cir. 1984) ....................................... 18

*Motorola Credit Corp. v. Uzan*,
  388 F.3d 39 (2d Cir. 2004) ............................................ 21

*New York v. Operation Rescue Nat'l*,
  80 F.3d 64 (2d Cir. 1996) ............................................. 31

*Nguyen Thang Loi v. Dow Chem. Co. (In re Agent
  Orange Prod. Liab. Litig.)*,
  373 F. Supp. 2d 7 (E.D.N.Y. 2005) ............................... 24

*R.M.S. Titanic, Inc. v. Haver*,
  171 F.3d 943 (4th Cir. 1999) ........................................ 10

*Reebok Int'l v. McLaughlin*,
  49 F.3d 1387 (9th Cir. 1995) ............................. 21, 23, 24

*Regal Knitwear Co. v. NLRB*,
  324 U.S. 9 (1945) ................................................. 8, 10, 13

*Reliance Ins. Co. v. Mast Constr. Co.*,
  84 F.3d 372 (10th Cir. 1996) ........................................ 14

vi

*Rosner v. Bank of China*,
  528 F. Supp. 2d 419 (S.D.N.Y. 2007) ............................ 13

*Rubin & Anor v. Eurofinance SA & Ors*,
  [2012] UKSC 46 ............................................................ 26

*Seijas v. Republic of Argentina*,
  No. 04 Civ. 400 (TPG) (S.D.N.Y. Apr. 30, 2008) ..... 7, 20

*Shaknes v. Berlin*,
  689 F.3d 244 (2d Cir. 2012) ........................................... 14

*United States Fire Ins. Co. v. General Reinsurance Corp.*,
  949 F.2d 569 (2d Cir. 1991) ........................................... 31

*United States v. Bernard Parish*,
  756 F.2d 1116 (5th Cir. 1985) ....................................... 19

*United States v. First Nat'l City Bank*,
  379 U.S. 378 (1965) ....................................................... 18

*Vanity Fair Mills, Inc. v. T. Eaton Co.*,
  234 F.2d 633 (2d Cir. 1956) .................................... 23, 24

*Waldman Publishing Corp. v. Landoll, Inc.*,
  43 F.3d 775 (2d Cir. 1994) ............................................ 15

*Zabala v. Astrue*,
  595 F.3d 402 (2d Cir. 2010) .......................................... 30

*Zenith Radio Corp. v. Hazeltine Research*,
  395 U.S. 100 (1969) ................................................. 15, 19

## **STATUTES**

Article 9 of the Belgian Act of April 28, 1999
  implementing the EU Settlement Finality
  Directive as amended by Article 15 of the Law of
  November 19, 2004 ....................................................... 25

## **RULES**

Fed. R. Civ. P. 65(d) ................................................... passim

vii

## <u>OTHER AUTHORITIES</u>

11A C. Wright & A. Miller, Federal Practice and
Procedure § 2960 ............................................................20

17 C.J.S. Contempt § 64 .....................................................20

Agustino Fontevecchia, *Fed's $2.6T Payments
System Risks Paralysis as Judge Orders
Argentina to Pay Defaulted Bonds*, FORBES, Nov.
26, 2012 .....................................................................27, 28

Albert A. Ehrenzweig, A Treatise on the Conflict of
Laws, § 51 (1962) .........................................................23

Developments in the Law—Injunctions, 78 Harv. L.
Rev. 997 (1965) .............................................................19

Eliana Raszewski & Katia Porzecanski, *Reserves
Drain Shows Dollar Curbs Backfiring:
Argentina Credit*, WASH. POST, Nov. 2, 2012 ...........28

EU Clearing and Settlement Legal Certainty Group
Questionnaire Horizontal Answers 294.........................25

Financial Markets Law Committee Report .........................22

Jude Webber, *Argentina Seeks To Free Bond-Row
Ship*, Financial Times, Dec. 16, 2012............................24

Landon Thomas Jr., *Greece Is in a Face-Off With
Its Bond Holders*, N.Y. Times, Apr. 3, 2012.................28

Monetary Market From 17th to 21st of December,
CENT. BANK OF ARG. (Dec. 28, 2012)......................28

Restatement (Third) of the Foreign Relations Law
of the U. S., § 441(1)(a) (1987) .......................................23

1

The Euro Bondholders respectfully submit this brief as interested non-parties supporting reversal of the permanent injunction issued by the United States District Court (Griesa, J.) on November 21, 2012 (the "Injunction").[1]

## PRELIMINARY STATEMENT

This Court expressly directed the district court on remand to address its concerns regarding the application of the prior injunction to third parties. In response, the district court entered a permanent injunction prohibiting a vast array of financial third parties around the world from processing payments—that no one disputes are validly owed—to non-party exchange bondholders who have done and can do nothing to contribute to Argentina's failure to pay Plaintiffs. Through the Injunction, the district court greatly exceeded its authority to enjoin non-parties under Rule 65(d) of the Federal Rules of Civil Procedure and the territorial limits on its power.

Although the Injunction was premised in part on the court's understanding that the payment process for the exchange bonds "without question takes place in the United States," that is not accurate with respect to the over €10 billion of euro-denominated bonds issued by the Republic of Argentina (the "Republic") pursuant to its 2005 and 2010 exchange offers ("Euro Bonds"). Unlike the Republic's dollar-denominated bonds ("USD Bonds") on which the district court seemed to focus, payments under the Euro Bonds are made in euros outside of the United States through

---

[1] The Euro Bondholders are Knighthead Capital Management, LLC, Redwood Capital Management, LLC, and Perry Capital, LLC (each on behalf of one or more investment funds or accounts managed or advised by it).

2

foreign entities, and are exclusively governed by the laws of England and Wales.  The district court lacked any authority to enjoin the foreign financial parties that process payments to the Euro Bondholders for several reasons.

*First*, the foreign banks and financial institutions that process payments to the Euro Bondholders are not agents of the Republic, and they certainly are not "in active concert or participation" with it in the sense meant by Rule 65(d).  The Republic will violate the Injunction if it fails to pay Plaintiffs—a decision in which the third parties that process payments to the exchange bondholders have no role.  We are aware of no case that has interpreted Rule 65 so broadly as to prohibit a non-party from fulfilling an ordinary contractual or legal obligation to an innocent third party, and the district court cited none.

*Second*, the Injunction is at least invalid as to the *foreign* financial institutions that process payments on the Euro Bonds.  Unlike the payment process for the Republic's USD Bonds, payments on the Euro Bonds are made by foreign entities.   The Republic makes payments to an account of a Luxembourg-based entity in a bank in Argentina, after which funds are transferred to an account of a Belgium-based entity in a bank in Germany, and then distributed by clearinghouses in Belgium and Luxembourg to the ultimate beneficiaries.  A district court should not issue unenforceable injunctions against parties beyond its personal jurisdiction, or which are inconsistent with parties' obligations under their forum law.  Here, the district court did both.

*Third*, the Injunction threatens to spur a flood of foreign litigation and increase uncertainty in financial markets worldwide.  As parties rush to assert their rights in foreign forums, the financial institutions processing payments will be left subject to competing legal obligations across multiple jurisdictions.  Meanwhile, the Injunction will promote discord and insecurity in the market for sovereign

3

debt and the international payment system.  That quagmire threatens to harm financial markets and damage international comity.

For all these reasons, the Injunction should be reversed with respect to the financial third parties that process payments to the Euro Bondholders.  Because the district court has twice failed to exclude inappropriate third parties from the scope of its Injunction, and the record is clear that foreign third parties outside its jurisdiction are beyond its authority, further remand is unnecessary.

## **BACKGROUND**

The Injunction is, astonishingly, broader and more burdensome to third parties than the district court's prior permanent injunction, which this Court found problematic. On February 23, 2012, the district court issued an injunction that enjoined the Republic from making further payment on its exchange bonds unless it concurrently or in advance made a ratable payment to Plaintiffs ("February 23 Order"). February 23 Order ¶ 2(a) (A-2346-47).  The February 23 Order also enjoined "all parties involved, directly or indirectly, in advising upon, preparing, processing or facilitating any payment on the Exchange Bonds" from "aiding and abetting any violation … including any further violation by the Republic."  *Id.* ¶ 2(e) (A-2347-48).[2]  The

---

2    At the February 23 hearing when it issued its original injunction, the district court stated:  "[The February 23 Order] has a lot of problems …. It's not the first time that a court has signed an order that may have problems …. I fully recognize that there are problems with the order that the plaintiffs present and I am sure this will go very quickly to the Court of Appeals and there are problems on appeal. There are problems …. Whether it will ultimately be

(continued…)

4

February 23 Order did not specifically identify the third parties to which it would apply.

The Republic appealed the February 23 Order to this Court, which expressed concern with the order's application to third parties. At oral argument, Judge Raggi told counsel for Plaintiffs, "I'm not sure that courts enter injunctions primarily for the purpose of taking action against such third parties." July 23, 2012 Hr'g Tr. at 56:12-14 (SPE-872).

The parties' briefing and argument on appeal from the February 23 Order did not expressly address the order's potential extraterritorial application, but both the Court and counsel for Plaintiffs appeared to understand that it could apply *only* to entities in the United States. Judge Raggi characterized the injunction as seeking "relief from banks or entities *in the United States* that you would charge with facilitating the contempt." *Id.* (emphasis added). Plaintiffs' counsel (incorrectly) stated that the Republic has to use "instruments" and "entities in the United States" to pay the exchange bondholders[3] (*id.* at 53-54 (SPE-869-70)); that he expected "corporations doing business in New York will respect the orders of the federal district court" (*id.* at 54 (SPE-870)); and that entities "*subject to the jurisdiction of this Court* … will be subject to this decree." (*id.* at 63 (SPE-879) (emphasis added)).

───────────────────

(continued)

sustained on appeal, that's not my business." Feb. 23, 2012 Hr'g Tr. at 48:20-49:23 (A-2237-38).

[3]   Counsel for Plaintiffs either was referring only to the Republic's USD Bonds or incorrectly describing the payment process for the Euro Bonds.

5

On October 26, 2012, this Court affirmed the February 23 Order as to the Republic, but expressed "concerns" with its "application to third parties," and remanded the case to the district court to, among other things, "more precisely determine the third parties to which the [injunction would] apply before [this Court could] decide whether [its] application to them is reasonable." October 26, 2012 Opinion ("Oct. 26 Op.") at 28 (SPE-295).

On remand, rather than engage in any meaningful fact-finding regarding the third parties potentially subject to the Injunction, the district court held no evidentiary hearing, demanded that the issues be briefed in ten days, and did not permit oral argument. The district court even denied motions to intervene submitted by the very third parties that could address whether the injunction could or should apply to them. Regardless, the record on remand included clear and uncontroverted evidence that the payment process for the Euro Bonds takes place through foreign entities. *See* Binnie Decl. ¶ 10 (SPE-623-24).

Pursuant to the Indenture, the Bank of New York Mellon ("BNY Mellon"), the Indenture Trustee, has appointed The Bank of New York (Luxembourg) S.A. ("BNY Luxembourg") as the "trustee paying agent" for the Euro Bonds. *Id.* ¶ 7, n.2 (SPE-623). To make payments on the Euro Bonds, the Republic transfers funds to a euro deposit account in the name of BNY Luxembourg at Banco Central de la Republica de Argentina ("Banco Central") in Argentina. *Id.* ¶ 10 (SPE-623). The funds are then transferred from Banco Central to "a Deutsche Bank account in Frankfurt, Germany, in the name of The Bank of New York Mellon S.A. N.V.," a Belgian entity ('BNYM Brussels'). *Id.* ¶ 10 (SPE-624). Next, "BNYM Brussels transfers the funds to Euroclear or Clearstream for distribution to its participants, who then distribute the funds to beneficial holders." *Id.* Euroclear and Clearstream are foreign clearinghouses located in Belgium and Luxembourg,

6

respectively. *Id.* ¶ 8 (SPE-623). The entire payment process for the Euro Bonds involves only foreign banks and other financial institutions. The district court in no way recognized, discussed, or considered that fact.

Plaintiffs also effectively ignore or obscure the differences between payments on the USD Bonds and the Euro Bonds. For example, Plaintiffs argued in their brief on remand that the Republic relies on payment systems in the United States and entities in New York to make payments on the exchange bonds, which is not true for the Euro Bonds.[4] All but one of the documents that Plaintiffs submitted in support of this point relate to the USD Bonds only. *See* Nov. 13, 2012 Cohen Decl. Exs. S, T, U, V, and W (SPE-526-537); Y, AA, and BB (previously submitted as A-1187, 1227, and 667 respectively). Plaintiffs claimed that the remaining document showed that the trustee paying agent for the exchange bonds was required to maintain an office in New York, but that document actually specifies that the trustee paying agent for the Euro Bonds must maintain an office in *London*. *See* Cohen Decl. Ex. Z at R-3 (SPE-545). In sum, Plaintiffs have offered zero record evidence that the payments for the Euro Bonds are processed through entities in the United States. They are not.

On November 21, 2012, the district court issued the amended Injunction, which is arguably more expansive than the original February 23 Order. In regard to third parties, the court ordered that the "persons and entities who act in active concert or participation with the Republic, to assist the

---

[4]    Plaintiffs also stated without authority that "all arguments pertaining to [Depository Trust Company] apply to [Euroclear and Clearstream] equally," without acknowledging that Euroclear and Clearstream are foreign entities. Pltfs' Reply Br. at 17, n.12.

7

Republic in fulfilling its payment obligations under the Exchange Bonds" were enjoined from processing payments to the exchange bondholders unless the Republic also paid the Plaintiffs. Injunction ¶ 2(f) (SPE-1382). The district court identified certain third parties subject to the Injunction, including Euroclear, Clearstream[5], BNY Luxembourg, and Bank of New York Mellon (London)—all of which are foreign entities outside the jurisdiction of the district court.

On November 21, 2012, the district court also issued an opinion regarding the Injunction ("Nov. 21 Op."). The court attempted to describe the payment process for the exchange bonds, but discussed only the entities that process the payments for the USD Bonds, and omitted any discussion of the foreign entities that process payments for the Euro Bonds. *See* Nov. 21 Op. at 10 (SPE-1369). Although the court acknowledged that there was a dispute regarding whether the initial payment (for the USD Bonds) takes place in Argentina or the United States, it concluded that "[t]he rest of the process, without question takes place in the United States." *Id.* at 10 n.2 (SPE-1369). That may summarize the record regarding the USD Bonds, but it is utterly incorrect as to the Euro Bonds. The district court did not otherwise address the extraterritorial application of the Injunction to foreign parties.

---

5    The district court enjoined Euroclear and Clearstream despite previously acknowledging that it lacked jurisdiction over them and denying injunctive relief on that basis. *See* April 30, 2008 Hr'g Tr. at 51:11-13, 52:7-9, *Seijas v. Republic of Argentina*, No. 04 Civ. 400 (TPG) (S.D.N.Y. Apr. 30, 2008) (SPE-1096-97).

8

## STANDARD OF REVIEW

This Court reviews *de novo* whether an injunction complies with Fed. R. Civ. P. 65(d).  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143 (2d Cir. 2011). A district court's entry of a permanent injunction will be reversed for abuse of discretion where the court "relied on clearly erroneous findings of fact or an error of law."  *Knox v. Salinas*, 193 F.3d 123, 128-29 (2d Cir. 1999).

## ARGUMENT

**I.    THE DISTRICT COURT IMPROPERLY ENJOINED THIRD PARTY FINANCIAL INSTITUTIONS THAT PLAY NO ROLE IN WHETHER THE REPUBLIC COMPLIES WITH THE INJUNCTION AND WERE NOT BEFORE THE COURT.**

This Court identified substantial "concerns" with the February 23 Order's prospective application to third parties. Oct. 26 Op. at 28 (SPE-295).  On remand, the district court nonetheless purported to enjoin an indeterminate set of international financial institutions from the ministerial act of processing payments owed to the innocent non-party exchange bondholders—even though no one disputes that the exchange bondholders are legally obligated to be paid and entitled to receive and keep such payment.  In so doing, the district court plainly exceeded its authority under Fed. R. Civ. P. 65(d), which permits injunctions against only the parties, the parties' agents, and persons "in active concert or participation" with them.  The rule's "essence … is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."  *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).  Because the foreign third parties that process valid payments due to the Euro Bondholders are not the Republic's agents, do nothing to aid and abet the Republic's failure to pay plaintiffs, and were not

9

even before the court, the district court committed legal error by purporting to enjoin them.

**A.    The Foreign Financial Institutions that Process Payments to the Euro Bondholders Are Not the Republic's Agents.**

The third parties that process payments due to the Euro Bondholders are not the Republic's agents. Under the Indenture governing the Euro Bonds, the Republic is required to make periodic payments in Argentina to the trustee paying agent—BNY Luxembourg. Indenture at C-3 (SPE-699); Binnie Decl. ¶ 7, n.2 (SPE-623). The Indenture expressly states that "the Republic shall have no authority over or any direct relationship with any such trustee paying agent or agents." Indenture § 3.5(c) (SPE-651). The Republic similarly has no authority over or agency relationship with any of the numerous European financial intermediaries that simply process payments from the trustee paying agent to the Euro Bondholders. Indeed, the district court acknowledged that "[i]t is probably true that these parties are not all agents of Argentina," but nevertheless enjoined them. Nov. 21 Op. at 10-11 (SPE-1369-70). Because the district court made no findings that these parties are agents of the Republic, and the undisputed record demonstrates that they are not, the Injunction cannot be sustained on an agency theory.

**B.    The Foreign Financial Institutions that Process Payments to the Euro Bondholders Do Not Aid and Abet the Republic's Violation of the Injunction.**

The district court concluded—without any discussion or explanation—that parties processing payments to the exchange bondholders "surely are 'in active concert or participation' with Argentina." *Id.* at 11 (SPE-1370). That *ipse dixit* determination is unsupported by the record and

misapprehends the circumstances in which non-parties may be enjoined under Rule 65(d).

The Supreme Court has held that a non-party may be punished for violating an injunction against a named defendant when knowingly aiding a defendant in performing a prohibited act" and only "if their relation is that of *associate or confederate*." *Chase Nat'l Bank v. Norwalk*, 291 U.S. 431, 436 (1934) (Brandeis, J.) (emphasis added). It is not enough to show that that a non-party has "helped to bring about … merely what the decree has forbidden." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (L. Hand, J). Rather, the non-party must be "legally identified with the defendant and privy to his contempt." *Chase Nat'l Bank*, 291 U.S. at 436; s*ee also*, *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 958 (4th Cir. 1999) (evaluating whether a non-party "conspired with or encouraged [a party] to violate the district court's injunction"); *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (to establish aiding and abetting liability, the third party "must knowingly and substantially assist the principal violation").

In other words, for a non-party to be enjoined as an aider and abettor, evidence must exist that it is knowingly working together with the enjoined party to violate the injunction, rather than merely acting independently. *Heyman v. Kline*, 444 F.2d 65, 66 (2d Cir. 1971) ("Rule 65(d) does not grant a court power so broad 'as to make punishable the conduct of persons who act independently….' ") (quoting *Regal Knitwear*, 324 U.S. at 13). Here, neither the Euro Bondholders themselves,[6] nor the foreign financial entities

---

6    Although Plaintiffs avoid mention of the exchange bondholders when identifying the non-parties subject to the Injunction, it is apparent that Plaintiffs' ultimate intention is to attempt to enforce the Injunction against the bondholders

(continued…)

that process payment to them, are legally identified with the Republic, and any actions taken by the financial institutions to process payments to the Euro Bondholders are taken pursuant to independent contracts that have been in place for years.

Furthermore, the third party financial institutions cannot do *anything* to aid and abet a violation of the Injunction, which requires the Republic to "concurrently or in advance make a 'Ratable Payment' [to plaintiffs]" when it pays the exchange bondholders. Injunction ¶ 2(a) (SPE-1381). That is, the Republic violates the Injunction when it *fails to pay Plaintiffs*. The Injunction can be violated *solely* by the Republic—none of the third parties that the district court purported to enjoin have any involvement with Argentina's decision not to make a simultaneous payment to Plaintiffs. Although making payment to the exchange bondholders is a condition precedent to a violation, it is *not* a violation itself. Rather, it is *permissible* so long as the Republic pays Plaintiffs.[7] The financial parties that process

_____

(continued)

themselves. Indeed, Plaintiffs already have served subpoenas on the Euro Bondholders and other exchange bondholders seeking all documents concerning the Injunction, despite the fact that Plaintiffs have presented no evidence of any connection whatsoever between the exchange bondholders and the Republic's compliance with the Injunction. Suits involving any exchange bondholder likely will result in the interpleading of other exchange bondholders in the United States and in the United Kingdom—a process that will result in chaotic and never-ending litigation involving thousands of creditors.

[7]   *See, e.g.*, Nov. 21 Op. at 11 (SPE-1370) ("*If Argentina complies with the rulings of the Court of Appeals*, there will

(continued…)

12

payments lawfully owed to the exchange bondholders are not transformed into aiders and abettors by the Republic's independent failure to fulfill its distinct obligation to Plaintiffs. [8]

There is no evidence that any of the third parties subject to the Injunction had any role in the Republic's decision to enact legislation, such as the Lock Law, which this Court has noted forbids the Republic's officials from paying Plaintiffs. Indeed, in its brief before this Court, the Republic suggested *sua sponte* that it may be willing to enact new legislation that would allow it to make payments to Plaintiffs so long as the Court adopts a Ratable Payment formula "that treats plaintiffs the same as exchange bondholders." Argentina Br. at 4. The third parties subject to the Injunction had nothing to do with that decision. The

---

(continued)

be no problem about funds destined for exchange bondholders being deposited with [Bank of New York]") (emphasis added); Oct. 26 Op. at 25 (SPE-292) (finding it would not violate the Injunction if the Republic "pay[s] all amounts owed to its exchange bondholders provided it does the same for its defaulted bondholders.").

[8] Indeed, because any noncompliance with the Injunction turns solely on the Republic's payment actions, any violation of the Injunction is consummated *before* any financial third party can take any further steps. Even under the most aggressive interpretation of the Injunction, therefore, the financial third parties take no actions that aid and abet the Republic's already-completed violation. Even Plaintiffs admit as much. *See* Pltfs' Reply Br. 13 (acknowledging that BNY Mellon "cannot prevent Argentina from tendering a payment that violates this Court's Orders").

13

Republic's proposed compromise illustrates that it alone retains exclusive control of its ability to comply with the Injunction by paying Plaintiffs.

Further, Plaintiffs have offered no evidence that any purportedly enjoined third party is actively working with the Republic to prevent it from making a Ratable Payment to Plaintiffs or taking any steps to amend the payment process. That is not surprising because the third parties play no role in the Republic's decision whether to pay Plaintiffs. The Republic's obligation to pay Plaintiffs is *precipitated* when it makes a payment to the exchange bondholders; but the financial parties that process payments lawfully owed to the exchange bondholders are not transformed into aiders and abettors by the Republic's independent failure to fulfill its distinct obligation to Plaintiffs.

The Supreme Court has held that "courts … may not grant an … injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear*, 324 U.S. at 13. Plaintiffs offer no support—and we are aware of none—for the proposition that a bank or clearing system aids and abets a violation by fulfilling its pre-existing independent contractual obligations to innocent third parties. In fact, cases holding the opposite are legion. *See, e.g.*, *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007) (bank could not be held liable for aiding and abetting violation when there was "no evidence that [the bank] was doing anything more than providing its usual banking services to a customer"); *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 392-93 (S.D.N.Y. 2009) ("a clearing broker cannot be held liable as an aider and abettor simply because it performed its contracted-for services."). "Financial transactions that are not considered 'atypical' or 'non-routine' do not constitute substantial assistance," *Rosner*, 528 F. Supp. 2d at 427, as

14

would be necessary to establish aiding and abetting liability, *see In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005).[9]

To the extent that the Injunction is construed to preclude worldwide financial actors from processing lawful payments validly due to innocent third party bondholders, it is manifestly overbroad.  *See Alemite*, 42 F.2d at 832-33 (L. Hand) (holding that a court "cannot lawfully enjoin the world at large, no matter how broadly it words its decree"). As this Court has explained, "[a]n injunction is overbroad when it restrains defendants from engaging in legal conduct."  *Shaknes v. Berlin*, 689 F.3d 244, 257 (2d Cir. 2012) (citing *Mickalis Pawn Shop*, 645 F.3d at 145); *cf. Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund*, 527 U.S. 308, 315 (1999) (injunctive relief impermissible where it "was issued not to enjoin *unlawful* conduct, but rather to *render* unlawful conduct that would otherwise be permissible").  It is undisputed that the Republic owes a legitimate debt to the Euro Bondholders, and its payment to the Euro Bondholders is not only lawful, but contractually

---

9    For this reason, among others, the cases on which Plaintiffs rely are inapplicable to this dispute.  In *Reliance Ins. Co. v. Mast Constr. Co.*, 84 F.3d 372 (10th Cir. 1996), a bank aided and abetted a violation of a restraining order when it helped the defendant execute "a fairly complicated series of fund withdrawals and transfers in apparent violation of the … restraining order" that resulted in distributions to the defendant himself, not innocent third parties.  *Id.* at 377. Likewise, in *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002), non-parties were held to aid and abet the violation of an restraining order when, despite awareness of that order, they acted "for the benefit of, or to assist" the party defendant in violating the injunction—not to fulfill an independent obligation to an innocent third party.

15

required under the Indenture. *Cf. Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775 (2d Cir. 1994) ("Injunctive relief should be narrowly tailored to fit specific legal violations. Accordingly an injunction should not impose unnecessary burdens on lawful activity."). Indeed, the district court recognized this fact at the February 23 hearing, but enjoined the banks anyway. *See* Feb. 23 Hr'g Tr. at 7:22-24 (A-2296) ("The banks wouldn't be aiding and abetting. The banks only pay the exchange offer people. That's what they do.").

Because the foreign financial third parties do not aid and abet the Republic's violation of the Injunction and because their conduct is entirely lawful, their inclusion in the scope of the Injunction is reversible error.

## C. The District Court Erred By Enjoining Parties Not Before the Court.

At a minimum, the district court erred by concluding that an indeterminate set of financial institutions are in active concert with the Republic, even though none of those entities was before the court. Injunction ¶ 2(f) (SPE-1382). The Supreme Court has held that it is error to enter an injunction against a non-party on the theory that he is in active concert or participation with a party defendant unless that determination is made "in a proceeding to which [the non-party is] a party." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 112 (1969). "[*W*]*hether* a particular person … is among the … persons in active concert or participation with [the defendant] is a decision that may be made only after the person is given notice and an opportunity to be heard." *Lake Shore Asset Mgmt. v. CFTC*, 511 F.3d 762, 767 (7th Cir. 2007); *see also Herrlein v. Kanakis*, 526 F.2d 252, 255 (7th Cir. 1975) (it is a "primary axiom of our jurisprudence that no man shall be subject to judicial sanction without the opportunity for a hearing on the merits of the claim against him").

16

## II.  THE INJUNCTION IS OVERBROAD TO THE EXTENT IT PURPORTS TO ENJOIN FOREIGN ENTITIES BEYOND THE COURT'S JURISDICTION.

Regardless of the merits of the Injunction generally, the district court erred by purporting to bind foreign entities that process payments outside the United States and that are governed by foreign law.  The district court either failed to make any factual findings regarding those foreign parties, or erroneously found that the payment process is identical for *all* exchange bondholders, contrary to the undisputed factual record.  The district court lacks personal jurisdiction over foreign parties operating in foreign countries, and it improperly enjoined those parties from performing legal obligations governed by foreign law.  For all of these reasons, the Injunction should be reversed.

### A.  The District Court's Injunction Was Premised on a Clear Factual Error About the Situs and Parties Involved in the Payment Process for Euro Bonds.

A permanent injunction will be reversed for abuse of discretion where the court "relied on clearly erroneous findings of fact."  *Knox*, 193 F.3d at 128-29.  The district court did not separately discuss the Euro Bonds, and any findings it made regarding the parties or locations involved in the payment stream pertain *only* to the USD Bonds.  Nov. 21 Op. at 10 n.2 (SPE-1369)  Indeed, the district court did not make any findings about the location of payments for the Euro Bonds, or whether it had jurisdiction over the entities that process payments under those Bonds.  If, however, the court's findings are understood to embrace the Euro Bonds, those findings are clearly erroneous.

The third parties that process payments for the Euro Bonds do not reside in the United States.  Pursuant to the Indenture, the Republic makes payments on its euro-

17

denominated debt by posting funds in a bank account in Argentina held by BNY Luxembourg. [10]  Binnie Decl. ¶ 10; ¶ 7 n.2 (SPE-623-24).  That entity, which serves as the trustee paying agent for the Euro Bonds, then transfers funds to an account in Germany in the name of BNYM Brussels, a Belgium-based entity.  *Id.* ¶ 10 (SPE-624).  Funds are then transferred to foreign clearing houses (either Euroclear, in Belgium, or Clearstream, in Luxembourg) for further distribution.  *Id.* ¶ 8 (SPE-623).  Even the registered owner of the bonds—the Bank of New York Depository (Nominees) Limited—is a foreign entity based in England. *Id.*  Each payment-processing step takes place outside the United States and through foreign entities.  Moreover, while New York law governs disputes concerning the USD Bonds, the laws of England and Wales govern disputes concerning the Euro Bonds.  In short, the district court could not have been further mistaken if it premised its Injunction on a belief that the payment process largely involves United States entities and "without question takes place in the United

---

[10]    Although BNY Mellon serves as the Indenture Trustee and appoints the trustee paying agent who actually receives payment from the Republic, the Indenture specifies that BNY Mellon does not control and is not responsible for the actions of the trustee paying agent for the Euro Bonds (BNY Luxembourg) with respect to the payments covered by the Injunction.  *See* Indenture § 3.5(a) (SPE-650) ("The Republic may provide directly to any such trustee paying agent … the funds … payable on the Debt Securities …; *and the Trustee shall have no responsibility with respect to any funds so provided by the Republic to any such trustee paying agent or for any act or omission of any trustee paying agent.*")  (emphasis added).

18

States." [11] Nov. 21 Op. at 10, n.2 (SPE-1369). Accordingly, to the extent it covers the Euro Bonds, the Injunction is based on a clearly erroneous finding of fact and should be reversed for abuse of discretion. *See Knox*, 193 F.3d at 128-29.

## B.    The Court Erred by Purporting to Enjoin Foreign Parties Over Which It Lacks Jurisdiction.

The Injunction is also overbroad to the extent that the district court purported to bind foreign parties over which it lacked personal jurisdiction. "Injunctions operate only on the parties within the personal jurisdiction of the courts." *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984). That follows closely from the well-established principle that "[a] court should not issue an unenforceable injunction." *Hilao v. Estate of Marcos (In re: Estate of Marcos Human Rights Litig.)*, 94 F.3d 539, 545 (9th Cir. 1996); *see also United States v. First Nat'l City Bank*, 379 U.S. 378, 390 (1965) ("It is basic to traditional notions of equity that to justify the issuance of a[n] …

---

[11]    In its appeal brief, the Republic was similarly imprecise when it stated that "BNYM sends a funds transfer from its account in Argentina to its account in the United States" when paying exchange bondholders. Argentina Br. at 14 [Dkt. 657]. That is not true for the Euro Bonds. The Republic cites the Declaration of Kevin J. Binnie of BNY for its statement, but that declaration is clear that payments under the Euro Bonds are not processed by entities in the United States. *See* Binnie Decl. ¶ 10 (SPE-623-24) (explaining that payments on the Euro Bonds flow from Argentina to a bank in Germany and then to other European banks and clearing systems).

19

injunction there must exist a substantial probability that
jurisdiction, judgment, and enforcement will be obtained
with respect to the person sought to be affected."); *United
States v. Bernard Parish*, 756 F.2d 1116, 1123 (5th Cir.
1985) ("It is black letter law that an injunction will not issue
when it would be ineffectual.").

Accordingly, courts properly reject calls to enjoin
non-parties over which they cannot obtain personal
jurisdiction. [12]  *See Hilao*, 94 F.3d at 545 ("an injunction
against [the target] in the absence of personal jurisdiction
over it would be futile, as the court would be powerless to
enforce its injunction"); Developments in the Law—
Injunctions, 78 Harv. L. Rev. 997, 1012 (1965) ("The
inability to punish potential disobedience has often been
given as a reason to refuse to enjoin the performance of acts
outside of the forum by nonresidents of the forum.").  A
court cannot enforce an eventual contempt ruling against a
non-party unless it can acquire personal jurisdiction against
that party.  *See Zenith Radio Corp.*, 395 U.S., at 112 (finding

---

[12]    Indeed, it is doubtful that the district court has
jurisdiction even over *Argentina* with respect to the Euro
Bonds.   Under the terms of the Indenture, the Republic
waived its sovereign immunity and submitted itself *only* to
the jurisdiction of the courts of England or Argentina with
respect to the Euro Bonds.  Indenture at 55-56 (SPE-687-88).
Unlike other offerings, the Republic's Indenture respecting
these bonds does *not* contain a general waiver of sovereign
immunity outside of the "Specified Court[s]" where suit is
possible, i.e., England and Argentina.   *Compare, e.g.*,
Indenture § 12.10 *with Indenture Capital Ventures Int'l v.
Republic of Arg.*, 552 F.3d 289, 291-92 (2d Cir. 2009)
(including provision waiving immunity in "*any court*")
(emphasis added).

20

that "a nonparty with notice [of an injunction] cannot be held in contempt until shown to be in concert or participation" in a subsequent "proceeding to which [the nonparty is made] a party."); 17 C.J.S. Contempt § 64 ("It is essential to the power to punish for contempt that the court … have jurisdiction of the person.").

Indeed, *the district court itself* earlier rejected a request for injunctive relief against Euroclear and Clearstream.  The court held, "*I have no jurisdiction over property that is solely in a foreign country.  I just don't, period … I have a document on its face which has requests for injunctive relief about trust bonds held in Belgium and Germany.  I can't do that.*"  April 30, 2008 Hr'g Tr. at 51:11-13, 52:7-9, *Seijas v. Republic of Argentina*, No. 04 Civ. 400 (TPG) (S.D.N.Y. Apr. 30, 2008) (SPE-1096-97) (emphasis added).  The district court was correct.

This Court has made clear that "[a] district court cannot exercise personal jurisdiction over a nonparty to a litigation, on the basis that the nonparty is acting 'in active concert or participation', within the meaning of Fed. R. Civ. P. 65(d), with a party who is subject to an injunction, unless personal jurisdiction is established over the nonparty." *Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 40 (2d Cir. 1989); *see also* 11A C. Wright & A. Miller, Federal Practice and Procedure § 2960, at 377 (1995).  An injunction entered against a non-party over which the district court has no personal jurisdiction is therefore unenforceable.

### C.    The Court Improperly Purported to Enjoin Foreign Entities From Fulfilling Foreign Legal Obligations on Foreign Soil.

The Injunction also was inappropriately issued against foreign third parties because it purported to restrict them from fulfilling their contractual and legal duties on foreign soil, under foreign law.  "[I]t is well established that 'a state may not require a person to do an act in another state

21

that is prohibited by the law of that state.' " *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law § 441 (1987)). "[N]or can the person be required to refrain from an act that is required," in a foreign nation by that country's laws. *Reebok Int'l v. McLaughlin*, 49 F.3d 1387, 1392 (9th Cir. 1995); *see also In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (rejecting "attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory").

Pursuant to the Indenture and applicable law, the financial institutions that receive or process a payment from Argentina are obligated to pass through those funds to the Euro Bondholders. *See, e.g.*, Indenture §3.5(c)(i) (SPE-651) (the "trustee paying agent will hold all sums received by it as such agent for the payment of the Debt Securities of that Series in trust *for the exclusive benefit of the Trustee and the Holders of the Debt Securities* in accordance with their respective interests") (emphasis added); Terms and Conditions of the Securities § 2 (SPE-698) (providing that following the Republic's payment, there shall be a "wire transfer of such amount … to … the registered owner of the Securities, which will receive the funds in trust for distribution to the beneficial owners of the Securities"). Under English law, a trustee is bound by all of the obligations in the trust instrument; a trustee does not have powers that are more extensive than those set out in the trust instrument, and any breach of those obligations will constitute a breach of trust. *See Clough v. Bond* (1838) 1 My & Cr 80.

Moreover, in a suit in an English court for breach of their obligations, the financial institutions would have no defense for their breach based on this Court's interpretation of the *pari passu* clause. Under English law, the *pari passu* clause would be interpreted to impose a requirement of only equal ranking—not equal payment. In 2005, the Financial

22

Markets Law Committee, a committee of English legal experts organized by the Bank of England, concluded that "so far as English law is concerned, the wide 'payment' interpretation [given to various *pari passu* clauses] is incorrect and that the 'ranking' interpretation is correct."[13] Importantly, the Committee expressly confronted and analyzed a *pari passu* clause close in language to that governing plaintiffs' bonds. *Compare* Oct. 26 Op. at 4-5 (SPE-271-72) (FAA Bonds) ("[t]he Securities … shall at all times rank *pari passu* without any preference among themselves. *The payment obligations* of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness") *with* FMLC Report 19 (Croatia Bonds) ("The Notes and Coupons rank *pari passu*, without any preference among themselves, and at least *pari passu in right of payment* with all other present and future unsecured obligations of the Republic") (emphasis added). Notwithstanding the inclusion of a "payment" clause, the Committee concluded that these additional words did not create an equal payment obligation under English law. *See* FMLC Report 19-21. Rather, the Committee interpreted the clause only to impose an equal ranking requirement, in conflict with this Court's own interpretation of the clause.

---

[13]   The Committee found its conclusion compelled by three factors: (1) the unworkable and unacceptable consequences of the payment interpretation to debtors and creditors "would offend the 'business commonsense' principle used by English courts when construing a contract"; (2) general principles of contract construction in the context of debt obligation transactions; (3) English case law. *See* FMLC Report 19-21.

23

The Injunction thus inappropriately presumes to forbid foreign third parties from satisfying duties abroad that they are required to perform under foreign law. That is reversible error. *See, e.g.*, *Reebok Int'l*, 49 F.3d, at 1392 (rejecting order restraining Luxembourg bank from releasing funds in Luxembourg based on the fact that "Luxembourg banking law normally compels … the release of depositors' funds on demand"). By attempting to compel foreign parties to act in a manner that contravenes their legal responsibilities under their own law, the district court ran afoul of longstanding principles restraining courts from extraterritorial overreaching. *See, e.g., Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 647 (2d Cir. 1956) ("[C]ourts of one state are reluctant to impose liability upon a person who acts pursuant to a privilege conferred by the law of the place where the acts occurred."); *Reebok Int'l*, 49 F.3d, at 1392 (quoting Restatement (Third) of the Foreign Relations Law of the U. S., § 441(1)(a) (1987)) ("one state cannot require a person 'to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national,' nor can the person be required to refrain from an act that is required"); *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 413 (S.D.N.Y. 2002) (quoting Albert A. Ehrenzweig, A Treatise on the Conflict of Laws, § 51, at 183 (1962)) ("Courts of foreign countries … will be reluctant to give effect to any injunctions purporting to restrain their own citizens and transactions.").

### D.    The Injunction Is Unenforceable Against the Foreign Third Parties Under Their Own Forums' Laws.

The district court's extraterritorial Injunction should also be reversed because it would be unenforceable under the foreign laws governing the foreign entities the court proposed to enjoin. This Court has warned that enjoining activities on foreign soil "should be exercised with great reluctance when it [would] be difficult to secure compliance

24

… or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country." *Vanity Fair Mills,* 234 F.2d at 647; *see also Nguyen Thang Loi v. Dow Chem. Co. (In re Agent Orange Prod. Liab. Litig.)*, 373 F. Supp. 2d 7, 45 (E.D.N.Y. 2005), aff'd 517 F.3d 104 (2d Cir. 2008) ("Requests for extraterritorial injunctions often raise serious concerns for sovereignty and enforceability which compel denial."). Such concerns are particulate acute when a court attempts to "arrogate to the federal courts the power to control the banking systems of other countries within their own territory." *Reebok Int'l*, 49 F.3d, at 1395; s*ee also Harrods*, 237 F. Supp. 2d at 413.[14]

Here, both Belgian and Luxembourgian law render unenforceable any court orders purporting to restrain clearing systems from their duty to process payments. In response to a previous effort to enjoin Euroclear from distributing funds to the exchange bondholders of another nation's sovereign debt, the Belgian parliament enacted a law in 2004 that expressly precludes enforcement of an

---

[14] Litigation stemming from the default is already contributing to chaos abroad, as holders of the FAA bonds seek to enforce judgments against Argentine around the world. For instance, Elliott Associates caused an international incident in October when it seized the Republic's flagship naval frigate that was docked in Ghana. This resulted in a standoff at gunpoint when Ghanaian officials attempted to move the ship. The International Tribunal for the Law of Sea was forced to intervene, ruling on December 16 that Ghana was required to "unconditionally release" the vessel. *See* Jude Webber, *Argentina Seeks To Free Bond-Row Ship*, Financial Times, Dec. 16, 2012.

injunction against Euroclear or other Belgian or foreign credit institutions acting as cash correspondents.[15] Luxembourgian law likewise prohibits the enforcement of an injunction against funds passing through Clearstream. *See* European Commission, EU Clearing and Settlement Legal Certainty Group Questionnaire Horizontal Answers 294 (Apr 24, 2006) ("In accordance with Article 15 of the [Luxembourg] Securities Act, neither an attachment of, nor an enforcement against, nor a conservatory measure with respect to accounts to which securities accounts in the securities settlement system are booked are permitted"). Because the district court's extraterritorial order is expressly improper under both nations' sovereign laws, the order could not be enforced against either party.

At minimum, foreign courts would hold the Injunction unenforceable against foreign parties that were not within the personal jurisdiction of the district court, served with process, or given an opportunity to be heard. Recently, the UK Supreme Court refused to recognize or enforce a US Bankruptcy Court judgment because the UK defendant was not a party to the proceedings and had not

---

[15]    The law reads: "Any cash settlement account maintained with the operator of a system or with a cash settlement agent, as well as any cash transfer, through a Belgian or foreign credit institution, to be credited to such cash settlement account, cannot be attached, put under sequestration or otherwise blocked by any means by a participant (other than the operator or the settlement agent), a counterpart or a third party."  Article 9 of the Belgian Act of April 28, 1999 implementing the EU Settlement Finality Directive as amended by Article 15 of the Law of November 19, 2004.

26

submitted to the jurisdiction of the US court.[16]  *See Rubin & Anor v. Eurofinance SA & Ors,* [2012] UKSC 46.  Other European courts follow the same principle.  *See, e.g.* Brussels I Regulation, Art. 34(2)  (providing that a foreign judgment shall not be recognized "if the defendant was not served with the document which instituted the proceedings or with an equivalent document in sufficient time and in such a way as to enable him to arrange for his defense").

**III.  THE DISTRICT COURT'S INJUNCTION SHOULD BE MODIFIED TO AVOID SUBSTANTIAL DISRUPTION TO THE INTERNATIONAL PAYMENT PROCESS AND INTERFERENCE WITH FOREIGN LAW.**

If this Court leaves the Injunction unmodified, it will destabilize the international financial markets and substantially disrupt the worldwide system by which millions of payments are transferred between institutions in the global financial network.  This Court's determination also could establish a dangerous precedent that would jeopardize ongoing sovereign debt restructuring efforts, such as in Greece and elsewhere, of fundamental importance to the international economy.  Moreover, because the Indenture provides that any disputes regarding the Euro Bonds must be heard in English or Argentine courts and will be governed by the laws of England and Wales, the overbroad Injunction will lead to inconsistent foreign judgments and obligations.

---

16    The UK Supreme Court refused to create an exception to the general requirements for recognizing judgments for insolvency cases, which are closely related to the present case even though sovereigns cannot go insolvent.

27

## A. Left Unmodified, the District Court's Injunction Will Foment International Financial Chaos.

If the Injunction is left unmodified,  the serious negative consequences that will follow cannot be exaggerated.  The United States cautioned that the district court's decision "may adversely affect future voluntary sovereign debt restructurings, the stability of international financial markets, and the repayment of loans extended by international financial institutions."  U.S. Motion on Rehearing En Banc at 4 [Dkt. 583-2].  The financial press likewise has explained that the court's ruling threatens to "paralyze the Fed's largely automated payments system, which processes an average [of] $2.6 trillion a day," by requiring that over 500,000 heretofore seamless and immediate transactions *each day* be dissected to gauge compliance with the court's ruling.  Agustino Fontevecchia, *Fed's $2.6T Payments System Risks Paralysis as Judge Orders Argentina to Pay Defaulted Bonds*, FORBES, Nov. 26, 2012.

The Injunction also threatens to set a precedent that could jeopardize the prospect of future sovereign debt restructurings of critical financial importance to the world economy.  Notwithstanding Plaintiffs' promises to this Court, the presence of collective action clauses in many recent offerings does not make it "highly unlikely" that its ruling will affect future sovereign debt restructurings.  *See* Oct. 26 Op. at 27 (SPE-294).  As an initial matter, there remain multiple bonds without such clauses.  For instance, the New York Times recently warned that "[t]he battle between Greece and the vulture investors is about to begin," explaining that "[u]nlike the Greek law bonds, which include clauses that allow Athens to enforce conditions on all holders after winning the approval of a majority of holders, the contracts of the 36 foreign law bonds offer more protections for investors and hold that a separate agreement must be

28

reached for each bond." Landon Thomas Jr., *Greece Is in a Face-Off With Its Bond Holders*, N.Y. Times, Apr. 3, 2012, at B1. In addition, collective action clauses would prove unreliable under the Court's interpretation of the *pari passu* clause because most bondholders would have every incentive to reject exchange deals. Instead, they would litigate as soon as the defaulting sovereign issued new debt—an effective certainty.

Moreover, independent analysts have questioned the district court's apparent assumption that its order will neither precipitate a worldwide default of the Republic's debt, nor impose an onerous burden on the Republic's finances. *See* Fontevecchia, *supra* (noting risk of default and finding that the Republic's cumulative debt to holdouts and exchange holders totals $36 billion, precipitously close to the Republic's $40 billion of total foreign reserves).[17]

---

17    A close examination of the Republic's foreign reserves reveals that it likely cannot pay Plaintiffs under the terms of the Injunction. Although it has $43 billion of reserves, that number is actually closer to $19 billion after accounting for foreign denominated private sector loans, deposits, foreign lines of credit, and its 2013 budget law earmarking $8 billion for its debt. *See* Monetary Market From 17th to 21st of December, CENT. BANK OF ARG. (Dec. 28, 2012), http://www.bcra.gov.ar/pdfs/polmon/infomondiai.pdf (last visited Jan. 1, 2013); Eliana Raszewski & Katia Porzecanski, *Reserves Drain Shows Dollar Curbs Backfiring: Argentina Credit*, WASH. POST, Nov. 2, 2012. The Republic faces $12 billion of "me too" claims if the Injunction is affirmed, which would lead to catastrophic consequences for the Republic. Additionally, it is well established that a country's reserves do not exist merely to service foreign debt obligations; rather, they also support the country's local

(continued…)

29

The United States, the Federal Reserve Bank of New York, the Clearing House Association, and countless others have predicted that the Injunction will sharply damage global financial markets if left in place.  Plaintiffs utterly fail to show why this Court should ignore the dire warnings from these financially disinterested and unquestionably qualified authorities.

**B.    The Inclusion of Foreign Financial Institutions in the Injunction Will Lead to Foreign Litigation and Inconsistent Judgments.**

If the Injunction is upheld against the foreign third parties that process payments to the Euro Bondholders, the holders of the euro-denominated debt will be compelled to sue in foreign courts to vindicate their contractual rights under the Indenture.  As explained *supra*, those courts will conclude that the foreign financial parties have no basis under English law for forgoing their contractual obligations to pass through payment to the Euro Bondholders. Moreover, they will find that foreign law expressly precludes the extraterritorial enforcement of the district court's Injunction upon the foreign parties.  The result will be a morass of inconsistent judgments under which foreign courts compel the financial third parties to fulfill their contractual responsibilities, while the Injunction purports to require them to do the opposite.[18]   Rather than bring an end to the

_____

(continued)

currency, facilitate the importation of goods and services by the country's citizens, and provide confidence to the market.

[18]   In its appeal brief, BNY Mellon asks this Court to clarify that it will not be liable for failing to fulfill its obligations under the Indenture if this Court affirms the

(continued...)

30

litigation, the Injunction will lead only to chaos and uncertainty if it is upheld.

## IV.    REMAND IS UNNECESSARY BECAUSE THE UNDISPUTED RECORD MAKES CLEAR THAT THE INJUNCTION IS IMPROPER AS TO THE FOREIGN THIRD PARTIES PROCESSING PAYMENTS UNDER THE EURO BONDS.

A remand to the district court for a *third* opportunity to fashion a proper injunction is unwarranted. "Remand is unnecessary … where application of the correct legal standard could lead to only one conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010). Indeed, this Court "has the power to decide cases on appeal if the facts in the record adequately support the proper result or if the record as a whole presents no genuine issue as to any material fact." *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Trust Co.*, 93 F.3d 1064, 1072 (2d Cir. 1996). When "all relevant …

———————————————

(continued)

Injunction. While that request is understandable (and highlights the certainty of future litigation if the Injunction is affirmed), this Court has no authority to adjudicate the contractual rights of bondholders who are not parties to the instant dispute. Moreover, whatever the ability of this Court to opine on BNY Mellon's obligations under the USD Bonds, it plainly cannot adjudicate the distinct contractual obligations of BNY Luxembourg under the Euro Bonds because disputes related to the Euro Bonds can only be fully resolved by an English court. Further, as explained *supra* at 21-23, the *pari passu* clause would provide no basis under English law to enjoin foreign parties like BNY Luxembourg as the court has done here.

31

evidence … has already been presented to the trial court, and is contained in the record, a remand is unnecessary." *United States Fire Ins. Co. v. General Reinsurance Corp.*, 949 F.2d 569, 574 (2d Cir. 1991).

The district court has twice squandered the opportunity to impose an injunction against only those parties over which it has the authority to do so. Even when this Court explicitly expressed concerns with the Injunction's proposed application to third parties, and directed the district court to carefully address the scope of and justification for any third party injunction, the district court gave the question short shrift, dismissing it as "not an issue which requires a long time." Nov. 9 Hr'g Tr. at 5:10-11 (SPE-450). Rather than tailor an injunction to the limits of its jurisdiction and power under Rule 65(d), the court simply accepted Plaintiffs' proposed order in its entirety, imposing a vastly overbroad injunction against third parties around the world. It did so without an evidentiary hearing or oral argument, and only after it denied third party intervention and allowed the parties a few days to brief these important issues.

Here, the record with respect to the payment process for Euro Bonds is clear—it flows entirely through foreign financial institutions located outside of the United States. Nothing in the record provides the district court with jurisdiction to bind the foreign third parties and restrain their conduct under Rule 65(d). *Cf. New York v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996). ("The party seeking enforcement of an order [under Rule 65(d)] bears the burden of demonstrating that the persons to be held in contempt are within the scope of the injunction."). Accordingly, this Court should not remand the case again. Instead, it should reverse the Injunction as to the third parties that process payments to exchange bondholders, or—at

32

minimum—overturn the Injunction's application to the foreign third parties that process payments under the Euro Bonds.[19]

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should reverse the Injunction as to the third parties that process payments to the exchange bondholders.

Dated:      New York, New York
            January 4, 2013

Respectfully submitted,

LATHAM AND WATKINS LLP

By:  /s/  Christopher J. Clark

Christopher J. Clark
Craig A. Batchelor
Michael E. Bern
885 Third Avenue
New York, NY 10022
Tel.:  (212) 906-1200

*Attorneys for the Euro Bondholders*

---

[19]    Certain other exchange bondholders in this appeal have invited a remand, but the issues pertaining to the Euro Bonds are distinct and, once resolved by this Court, *dispositive* for the foreign entities that process payments under the Euro Bonds.

33

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 8,973 words in this brief.

Dated:   January 4, 2013

By:   /s/  Christopher J. Clark

**LATHAM AND WATKINS LLP**
Christopher J. Clark
Craig A. Batchelor
Michael E. Bern
885 Third Avenue
New York, NY 10022
Tel.:  (212) 906-1200

*Attorneys for the Euro Bondholders*

## <u>CERTIFICATE OF SERVICE & CM/ECF FILING</u>

**12-105-CV(L)**

I hereby certify that I caused the foregoing Brief for Non-Party Intervenors Euro Bondholders to be served on counsel via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25.1:

I certify that an electronic copy was uploaded to the Court's electronic filing system.   Six hard copies of the foregoing Brief for Non-Party Intervenors Euro Bondholders were sent to the Clerk's Office by hand delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
United States Courthouse
500 Pearl Street, 3rd floor
New York, New York 10007
(212) 857-8500

on this 4th day of January 2013.

/s/ Ramiro Honeywell
Ramiro Honeywell