# 12-105(L)

12-109 (CON), 12-111 (CON), 12-157 (CON), 12-158 (CON), 12-163 (CON),
12-164 (CON), 12-170 (CON), 12-176 (CON), 12-185 (CON), 12-189 (CON),
12-214 (CON), 12-909 (CON), 12-914 (CON), 12-916 (CON), 12-919 (CON),
12-920 (CON), 12-923 (CON), 12-924 (CON), 12-926 (CON), 12-939 (CON),
12-943 (CON), 12-951 (CON), 12-968 (CON), 12-971 (CON), 12-4694 (CON),
12-4829 (CON), 12-4865 (CON)

## In the United States Court of Appeals
## for the Second Circuit

NML Capital, Ltd., Aurelius Capital Master, Ltd., ACP Master, Ltd., Blue Angel Capital I LLC, Aurelius Opportunities Fund II, LLC, Pablo Alberto Varela, Lila Ines Burgueno, Mirta Susana Dieguez, Maria Evangelina Carballo, Leandro Daniel Pomilio, Susana Aquerreta, Maria Elena Corral, Teresa Munoz De Corral, Norma Elsa Lavorato, Carmen Irma Lavorato, Cesar Ruben Vazquez, Norma Haydee Gines, Marta Azucena Vazquez, Olifant Fund, Ltd.,

*Plaintiffs-Appellees*,

-v.-

Republic of Argentina,

*Defendant-Appellant*,

(*Caption Continued on Inside Cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**RESPONSE OF APPELLEES TO THE REPUBLIC OF ARGENTINA'S
MARCH 29 PROPOSAL**

(*Appearances on Inside Cover*)

THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE, EXCHANGE
BONDHOLDER GROUP, FINTECH ADVISORY INC.,

*Non-Party Appellants*,

EURO BONDHOLDERS, ICE CANYON LLC, EURO BONDHOLDERS,

*Intervenors.*

Robert A. Cohen
Eric C. Kirsch
DECHERT LLP
1095 Avenue of the Americas
New York, N.Y. 10036
(212) 698-3500

Theodore B. Olson
Matthew D. McGill
Jason J. Mendro
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiff-Appellee NML Capital, Ltd.*

Edward A. Friedman
Daniel B. Rapport
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
7 Times Square
New York, N.Y. 10036
(212) 833-1100

Roy T. Englert, Jr.
Mark T. Stancil
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER &
SAUBER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 775-4500

*Counsel for Plaintiffs-Appellees Aurelius Entities and Blue Angel Capital I LLC*

Leonard F. Lesser
SIMON LESSER, P.C.
420 Lexington Avenue
New York, N.Y. 10170
(212) 599-5455

*Counsel for Plaintiff-Appellee
Olifant Fund, Ltd.*

Michael C. Spencer
Gary Snitow
MILBERG LLP
One Pennsylvania Plaza
New York, N.Y. 10019
(212) 594-5300

*Counsel for Plaintiffs-Appellees Pablo
Alberto Varela et al.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................1

ARGUMENT ............................................................................................5

I.    Argentina's Proposal Contravenes Both This Court's October 26
      Decision And This Court's March 1 Order .....................................5

II.   Argentina's Proposal Fails To Demonstrate That The District Court
      Abused Its Discretion ..................................................................8

CONCLUSION .......................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Chemical Bank New York Trust Co. v. Kheel*,
  369 F.2d 845 (2d Cir. 1966) .................................................................10

*Elliott Assocs. L.P. v. Banco de la Nacion*,
  194 F.3d 363 (2d Cir. 1999) .................................................................14

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
  414 F.3d 325 (2d Cir. 2005) ...................................................................9

*NML Capital, Ltd. v. Republic of Argentina*,
  699 F.3d 246 (2d Cir. 2012) ...........................................................*passim*

*Savoie v. Merchants Bank*,
  84 F.3d 52 (2d Cir. 1996) ....................................................................14

*W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork,
  Linoleum & Plastic Workers of Am.*,
  461 U.S. 757 (1983) ............................................................................12

*Weltover, Inc. v. Republic of Argentina*,
  941 F.2d 145 (2d Cir. 1991) .................................................................14

## PRELIMINARY STATEMENT

With its latest submission in this Court, the Republic of Argentina continues its long and consistent pattern of defaulting on its contractual obligations, defying the laws of the United States (which its contracts expressly invoked), and showing contempt for the courts to whose jurisdiction it unreservedly submitted. The government of Argentina plainly believes the rule of law does not apply to it.

To recapitulate briefly how the parties and this Court have come to this point: Argentina has defaulted on its indebtedness pursuant to instruments it created to raise funds under the laws of the United States. Argentina undertook a "unilateral and coercive approach to [its] debt restructuring," rejecting practices that have allowed other "[s]overeign bond restructurings" to be "resolved quickly, without severe creditor coordination problems, and involving little litigation." Ex. A, at 1-2. In keeping with that approach, it refused to comply with its explicit commitment to treat its "payment obligations" on the bonds held by Appellees "at least equally with . . . its other . . . unsubordinated External Indebtedness." 699 F.3d 246, 251 (2d Cir. 2012). The district court, after reviewing numerous briefs and conducting multiple hearings over the course of 16 months—which provided Argentina more than ample opportunities to be heard on every conceivable argument it wished to advance—held that Argentina violated the Equal Treatment Provision that it had written into its bonds, that an equitable remedy was necessary and

appropriate, and that a suitable equitable remedy was to require Argentina to make a ratable payment to Appellees whenever it makes a payment on the Exchange Bonds. The district court found as fact that Argentina had ample resources to pay Appellees, as well as the Exchange Bondholders, and that the balance of the equities overwhelmingly supported the remedy ordered.

This Court unanimously affirmed the district court's findings and conclusions. 699 F.3d at 257-64. The Court further held that Appellees "were completely within their rights to reject the 25-cents-on-the-dollar exchange offers" that Argentina had made in 2005 and 2010. *Id.* at 263 n.15. Panel rehearing and rehearing *en banc* were denied without dissent. This Court explained that the ***only*** task that remained as to the Injunction's application to Argentina was for the district court to clarify "how the injunctions' payment formula is intended to function" (*id.* at 250), which the district court did. This Court nevertheless gave Argentina one final chance to submit in writing "the precise terms of any alternative payment formula and schedule to which it is prepared to commit." Dkt. No. 903, at 1 ("March 1 Order").

In response, Argentina has now submitted a predictably and characteristically defiant response that fails completely to comply with its equal treatment obligations or to take seriously the specific directions in this Court's March 1 Order. Instead of proposing a formula for "repay[ing] debt obligations on the ***original***

2

bonds" (*id.* at 2), Argentina offers to eliminate those obligations in return for new, deeply-discounted, potentially unenforceable, and unmarketable paper, payable decades hence. Indeed, according to Argentina's own math, those new securities would be worth *less than 15%* of what Argentina owes on the FAA Bonds. Argentina Resp. 9; *accord* Ex. C, at 1 (Bloomberg estimating the value of Argentina's offer at "one-sixth" of what Appellees are owed). Argentina's response manifests yet again its contempt for its obligations, the laws of the United States, and the orders of U.S. courts.

Astoundingly, Argentina has the temerity to claim that its submission reflects "a *good faith* effort to comply with the Court's [October 26] ruling to the extent possible." Argentina Resp. 13 n.10 (emphasis added). But Argentina's statements to this Court and to the public belie any genuine willingness to comply with the Court's orders. At the most recent hearing before this Court, Argentina's counsel declared that Argentina would *not* "voluntarily obey" any order "other than" the one it "proposed." Transcript of Feb. 27 Oral Argument 12:23-24, 13:1-2 ("Tr."), Ex. B. Then, in its March 29 proposal, Argentina portended that "great harm to the exchange bondholders"—which could be caused only by Argentina's own actions—would come if this Court affirms the district court's Injunction. Argentina Resp. 11. And just 12 hours after Argentina issued this proposal, its Vice President declared at a press conference that Argentina is seeking a "mechanism"

3

to pay on the Exchange Bonds without paying Appellees, in direct violation of any ratable payment injunction and the preliminary injunction currently in effect, adding that "under any condition, in any instance, whatever the [court] result . . . one way or another, Argentina is going to pay" on the Exchange Bonds.  Ex. D; Ex. E, ¶ 2.  This is exactly how Argentina has dealt with creditors for the last decade: unilaterally dictate pennies-on-the-dollar "exchange offers," and threaten to pay nothing if the offer is rejected.  Argentina has now treated the Court the same way; that is the very antithesis of "good faith."

Argentina's duplicity confirms that the district court was well within its "considerable latitude" (699 F.3d at 261) to require Argentina—***after 11 years of paying Appellees nothing***—to pay what it currently owes Appellees under the FAA Bonds the next time it pays what it currently owes under the Exchange Bonds.  Argentina's statements that it will attempt to evade the Injunction if this Court does not accede to its demands further reinforce that the Injunction is equitable and—given Argentina's unyielding disregard for the law to which it voluntarily submitted—necessary to provide Appellees the relief to which they are entitled.  The district court's remedy is manifestly within its broad discretion to fashion relief in equity, is fully consonant with the governing contractual agreements, and should be affirmed.

# ARGUMENT

## I.    Argentina's Proposal Contravenes Both This Court's October 26 Decision And This Court's March 1 Order

In its October 26 Decision, this Court held that Appellees were entitled to specific performance of their rights under the FAA Bonds and explained that Appellees "were completely within their rights to reject the 25-cents-on-the-dollar exchange offers."  699 F.3d at 261-64 & n.15.  Then, in its March 1 Order, this Court asked Argentina to articulate: "(1) how and when it proposes to make current those debt obligations on the original bonds that have gone unpaid over the last 11 years; (2) the rate at which it proposes to repay debt obligations on the original bonds going forward; and (3) what assurances, if any, it can provide that the official government action necessary to implement its proposal will be taken, and the timetable for such action."  March 1 Order, at 2.  Argentina's response does none of these things.  More troubling still, Argentina acts as if this Court had neither issued the October 26 Decision nor denied its petition for rehearing from that ruling.

Argentina's proposal entails no plan to "make current those debt obligations on the original bonds that have gone unpaid over the last 11 years" or to repay them "going forward."  It includes no plan to "repay debt obligations on the original bonds" at all.  Argentina proposes to never pay its obligations on Appellees' FAA Bonds and, instead, to replace those Bonds with an assortment of new bonds modeled on—but actually substantially worse than—the exchange offers this Court

5

determined Appellees "were completely within their rights to reject."  699 F.3d at 263 n.15.  Even under Argentina's own math, this package of IOUs is worth just $210 million—**_less than 15%_** of the $1.47 billion Appellees were owed under the FAA Bonds as of March 1, 2013—and would not begin to repay principal for more than a decade.  Argentina Resp. 9, 12 & n.9.

For instance, the Discount Option—the only option available for 99.9% of the value of the bonds at issue in this case—ensures that most of the principal on the FAA Bonds will never be paid; under the Discount Option, the FAA Bonds are replaced with new securities whose total principal amount is only a fraction— about one third—of the original principal on the FAA Bonds.  And with respect to past due interest, Argentina's suggestion that it is "prepared to compensate plain- tiffs for past due interest to bring them current" (Argentina Resp. 5) is simply false.  Argentina does not offer to pay its 11 years of past due interest on the FAA Bonds, either now or ever.  Instead, it proposes to pay—in the form of new bonds—an amount calculated (i) based on the interest rate of the Discount Bonds, which is lower than most FAA Bonds, (ii) only on the vastly lower principal amount of the Discount Bonds, and (iii) only on cash interest that would have been paid on this substantially reduced principal amount of the Discount Bonds since 2004.  Argen- tina thus proposes to pay Appellees only a small percentage of the past due interest it owes, and then only in the form of Argentine IOUs, not in cash.  The entire tan-

gled array of unreliable and likely unmarketable securities that comprise Argentina's proposal is further explained in Appendix A hereto.

Not only are the details of Argentina's proposal unacceptable and unresponsive; Argentina fails even to provide this Court with meaningful "assurances" that it will actually comply with its own proposal.  March 1 Order, at 2.  Argentina's vague statement that it is willing to submit unspecified legislation to its Congress is not paired with any assurances (much less security) that it will not impose a new moratorium on payments on its new obligations to Appellees.  This is, after all, a country run by the same administration that promised to "not pay a peso" to Appellees.  Ex. F.  And the danger of a renewed default would become particularly acute if Argentina succeeds in implementing its widely reported plan to move offshore its payments on the Exchange Bonds.  *See* Ex. D (Vice President Boudou: "under any condition, in any instance, whatever the [court] result . . . one way or another, Argentina is going to pay" on the Exchange Bonds).[1]  Argentina appears to believe

---

[1]    The Vice President's declarations are consistent with reports—both preceding and following the February 27 oral argument—that Argentina is actively devising a scheme to move the payments on the Exchange Bonds outside of the United States.  Ex. J ("We are hearing that Buenos Aires has advanced materially in an eventual 'Plan B. . . .' [which] will include jurisdiction change (Buenos Aires and perhaps Italy?), a reopening of the swap for hold-out investors that are not included in the group that is currently litigating with Argentina, and perhaps even a buyback offer for NY-law debt. . . ."); Ex. K (reporting that "[t]he government is only now preparing alternative

[Footnote continued on next page]

7

this Court should take its word as its bond that it will honor its new, patently unacceptable proposal.  But the long history of this litigation—and now Argentina's own words—amply demonstrates the opposite.

## II.    Argentina's Proposal Fails To Demonstrate That The District Court Abused Its Discretion

In its prior decision, this Court explained that the district court "had considerable latitude" to fashion equitable relief.  699 F.3d at 261.  The payment formula in the district court's Injunction was well within this broad equitable mandate, and, unlike Argentina's proposal, was completely consistent with the language of the FAA under which Argentina willingly borrowed money, waived sovereign immunity, and submitted to the jurisdiction of this Court.  Appellees' Post-Remand Brief, Dkt. No. 821, at 17-48.  That Argentina has now proposed a wholly inadequate alternative remedy, which is directly contrary to this Court's October 26 Decision and March 1 Order, cannot possibly make the district court's considered decision to award the Injunction an abuse of discretion.

Argentina's proposal is inequitable most obviously because it would offer Appellees less than 15% of the $1.47 billion Argentina acknowledges that Appellees are owed under the terms of the FAA Bonds—less even than what bondhold-

_____

[Footnote continued from previous page]

> payment schemes including seeking protection that is 100% legal so that they can make them abroad, including to Argentine bondholders").

ers received in the 2005 and 2010 exchanges.  Argentina thus wishes to ensure that it never has to make current its obligations on Appellees' FAA Bonds.  Moreover, these new securities (assuming they are similar to those offered in the 2005 and 2010 exchanges) potentially could include a wide range of clauses and covenants materially less protective of creditors than those of the FAA Bonds, further impairing the proposal's actual value.

Argentina mischaracterizes the plain text of the Equal Treatment Provision when it claims that it need only accord "equal treatment among **bondholders**." Argentina Resp. 4 (emphasis added).  As this Court's October 26 Decision squarely held, the Provision does not require Argentina to rank or treat **bondholders** equally; it requires Argentina to rank "**payment obligations**" at least equally.  699 F.3d at 259 (emphasis added).  The district court's Injunction enforced the Provision by requiring Argentina to pay Appellees what is currently due under the FAA Bonds whenever, and to the same extent, that Argentina pays what is currently due on the Exchange Bonds.  Argentina's proposal, in contrast, makes no attempt to honor its "payment obligations" under the FAA Bonds, now or ever.  Under well-established equitable principles, each creditor should receive "what it is entitled to," even if "other creditors do not receive the same thing" because they are not similarly situated.  *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 344 (2d Cir. 2005).  As Judge Friendly observed, "[e]quality among

9

creditors who have bargained for different treatment is not equity but its opposite." *Chem. Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) (Friendly, J., concurring).[2]

What is more, Argentina apparently would issue the securities for this proposal in a new series. The securities in this new series would be at obvious risk for future default given Argentina's oft-repeated promise never to pay Appellees. This inevitably will diminish—if not eliminate entirely—the pool of potential secondary purchasers of these securities, and this diminished demand inevitably will impair the market value of these new bonds. As Argentina's former Secretary of Finance (who was in charge of the 2005 exchange) recently explained to an Argentine news agency, the "very low liquidity" of the bonds in the proposal "is a way to punish

---

[2]    Based on the market value of the bonds Argentina is offering as of March 1, 2013 (even on the generous assumption that this separate series of securities would be valued in line with those issued in prior exchanges, *see infra* at 10-11), Appellees calculate that Argentina's Discount Option proposal is worth about 34% less than the value an investor would have received had the investor participated in the 2005 exchange offer and about 24% less than the 2010 exchange offer—in other words, the sum of all cash payments from the Exchange Bonds plus their remaining market value. The difference arises in large part because of the past payments on the GDP Units, to which Appellees would not be entitled under the proposal. Argentina Resp. 7. The other major part of the difference is the lesser value of "Global 17s" that would be issued in lieu of interest, as compared to the cash coupon payments that the Exchange Bondholders received over the last several years. Argentina's assertion that its proposal provides for "equal treatment among bondholders" (Argentina Resp. 4) thus fails even on its own terms.

the holdouts because there will be no markets for trading." Ex. G. Hence, analysts have summarized Argentina's proposal: "The plaintiffs are merely given yet another chance to be paid mainly in highly risky, long-term IOUs the little money that Argentina wants to pay them." Ex. H.

Argentina's belated assertion that it lacks the financial resources to comply with the district court's Injunction (Argentina Resp. 12-13) is not only contrary to the finding of the district court affirmed by this Court (699 F.3d at 263), but is demonstrably false. Argentina's recent claim that it could suddenly be exposed to liabilities of $43 billion is bogus. Argentina Resp. 13. Argentina has **decades** to repay its obligations on the Exchange Bonds, and has promised to do so "under any condition, in any instance, whatever the [court] result." Ex. D. Argentina paying Appellees the $1.47 billion that it owes Appellees now would not in any way impair its ability to honor its payment obligations on the Exchange Bonds over the coming decades.

Argentina's suggestion that paying Appellees somehow would trigger an immediate obligation to pay the entire amount outstanding on the Exchange Bonds is likewise blatantly false. Argentina misleadingly invokes the Exchange Bondholders' "Rights Upon Future Offers" clause (Argentina Resp. 7-8 & Annex B), but that clause comes into play only if Argentina "voluntarily makes an offer to purchase or exchange" defaulted bonds. *Id.* Nothing in this clause prevents Ar-

11

gentina from complying with an injunction, issued by a district court of the United States. After all, compliance with an injunction is in no sense "voluntary." *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983) ("An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn.").

Accordingly, the ***only*** amount Argentina would pay as a result of this Court affirming the district court's Injunction is $1.47 billion, which is a mere fraction of what Argentina paid to the Exchange Bondholders in December 2012 alone. If holders of other defaulted indebtedness later bring equal treatment claims of their own, Argentina will have ample opportunity both to litigate the merits (taking into account any factors that may distinguish those bonds from the ones at issue here, including different contractual language and governing law) and to make a showing of financial need, based on circumstances then prevailing, for the district court to consider in shaping a remedy.

Similarly meritless is Argentina's attempt to reassert its argument that the Injunction will upset sovereign restructurings by other countries. This Court already rejected that argument in its October 26 Decision (699 F.3d at 263-64), and again when it denied Argentina's petition for rehearing. And evidence continues to mount to support this Court's conclusion. As Moody's recently observed,

"[s]overeign bond restructurings have generally been resolved quickly, without severe creditor coordination problems, and involving little litigation." Ex. A, at 1. Moody's further noted that Argentina is the sole exception—the "only" case among "the 34 sovereign bond exchanges" that resulted in "persistent litigation"—that can be explained by the fact that "Argentina was and remains unique in its unilateral and coercive approach to the debt restructuring." *Id.* at 2. Similarly, the Institute of International Finance (a leading organization that helped negotiate Greece's debt restructuring) recently noted that "Argentina finds itself in the present messy situation because of its own behavior, evidenced by more than a decade of unilateral treatment of its creditors." Ex. I, at 5.

Argentina also levels a new, desperate attack on the Injunction, asserting without ***any*** record evidence that the Injunction leads to "exorbitant" returns for certain Appellees. In the first instance, the amount that Argentina owes today is the result only of Argentina's obdurate refusal for 11 years to make payment on its FAA Bonds. Argentina's imaginations about the "returns" Appellees will garner are based only upon conjecture as to the amount that certain Appellees paid for their bonds on the secondary market, and, in any event, take no account of the extraordinary lengths to which Appellees have had to go in pursuit of payment. Argentina Resp. 9-10 & n.6. More importantly, this argument flies in the face of this Court's pronouncement that "[a] well-developed market of secondary purchasers

13

of defaulted sovereign debt" provides valuable "incentives for primary lenders to continue to lend to high-risk countries." *Elliott Assocs. L.P. v. Banco de la Nacion*, 194 F.3d 363, 380 (2d Cir. 1999); *see also Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 153 (2d Cir. 1991) ("If individuals or corporate entities become wary of their ability to protect their rights in business transactions conducted in New York they will look elsewhere."), *aff'd*, 504 U.S. 607 (1992).  If, as Argentina claims, the purchasers of bonds on the secondary market were entitled to a lesser form of relief than original holders, the secondary market for such bonds would rapidly dry up.  In turn, that would make it more difficult for countries to finance their budgets—a result that would harm both creditors and borrowers.[3]

Finally, Argentina's proposal is inequitable because it would "require the continuing supervision of the Court for its enforcement." *Savoie v. Merchs. Bank*, 84 F.3d 52, 58 (2d Cir. 1996).  Argentina's proposal would string out its payments

---

[3]    In calculating the discount that the Exchange Bondholders supposedly took, Argentina conveniently ignores that many of those investors also purchased their bonds at discounts on the secondary market, in some cases in advance of the Exchange Offers, in other cases after the Injunction was issued, and in others even after this Court issued its decision of October 26, 2012.  Some of these investors accepted the Exchange Offers gleefully, because they profited handsomely (yet now present themselves to this Court as "victims").  This only amplifies the irony that it was the Exchange Bondholders who demanded that Argentina violate the Equal Treatment Provision by passing the Lock Law.  JA-850.

on the new bonds for more than 20 years, a proposal that seems calculated princi-pally to allow it an opportunity to implement its plan—now confirmed by its own Vice President—to find a "mechanism" to move offshore its payments on the Ex-change Bonds, so that it could default on Appellees' new bonds.  In contrast, the district court's formula is simple and faithful to the contractual terms of the FAA Bonds:  If Argentina makes its next periodic payment on the Exchange Bonds[4]—as it has repeatedly promised to do—it must also pay 100% of what it currently owes to Appellees.  The Court recognized this simplicity at oral argument, noting that the 100% formula "effectively means that [Appellees] only need[ ] to get one pay-ment out of this, if [Argentina] pay[s] 100%.  Then you're done."  Tr. 45:8-10. Under the district court's Injunction, the Court's role will end decades sooner than under Argentina's proposal.

---

[4]     Argentina's next payment on the Exchange Bonds is due on June 2, 2013, followed by another payment on June 30.

## CONCLUSION

Argentina's years of defiance cannot be cured by a convoluted offer to give Appellees yet more Argentine IOUs, worth pennies-on-the-dollar. Argentina's disregard for this Court's March 1 instructions only serves to demonstrate that it does not respect its voluntarily assumed obligations or the rule of law. The district court's Injunction was in no sense an abuse of discretion, and should be affirmed.

Dated: April 19, 2013

Respectfully submitted,

By: _/s/ Theodore B. Olson_____

Robert A. Cohen
(robert.cohen@dechert.com)
Eric C. Kirsch
(eric.kirsch@dechert.com)
DECHERT LLP
1095 Avenue of the Americas
New York, N.Y. 10036
(212) 698-3500

Theodore B. Olson
(tolson@gibsondunn.com)
Matthew D. McGill
(mmcgill@gibsondunn.com)
Jason J. Mendro
(jmendro@gibsondunn.com)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiff-Appellee NML Capital, Ltd.*

Edward A. Friedman
(efriedman@fklaw.com)
Daniel B. Rapport
(drapport@fklaw.com)
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
7 Times Square
New York, N.Y. 10036
(212) 833-1100

Roy T. Englert, Jr.
(renglert@robinsrussell.com)
Mark T. Stancil
(mstancil@robinsrussell.com)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER &
SAUBER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 775-4500

*Counsel for Plaintiffs-Appellees Aurelius Entities and Blue Angel Capital I LLC*

Leonard F. Lesser
(llesser@simonlesser.com)
SIMON LESSER, P.C.
420 Lexington Avenue
New York, N.Y. 10170
(212) 599-5455

*Counsel for Plaintiff-Appellee
Olifant Fund, Ltd.*

Michael C. Spencer
(mspencer@milberg.com)
Gary Snitow
(gsnitow@milberg.com)
MILBERG LLP
One Pennsylvania Plaza
New York, N.Y. 10019
(212) 594-5300

*Counsel for Plaintiffs-Appellees Pablo
Alberto Varela et al.*

17

# APPENDIX A

This Appendix will explain and value Argentina's proposal, which consists of an elimination Appellees' existing FAA Bonds in return for an alternative packages of new securities. Even under the most favorable assumptions, Argentina's proposal offers less than 15% of the amount currently due and payable to Appellees. In form, the proposal resembles Argentina's 2010 exchange offer. However, in substance this proposal is materially worse than either prior exchange offer, even under the implausible assumption that the bonds Argentina offers will trade at the same value as existing Exchange Bonds. *See supra* at 10 n.2.

## I.     <u>The Discount Option</u>

Under the limitations imposed by Argentina, the Discount Option is the only alternative available for 99.9% of the value of Appellees' existing bonds. It comprises three new securities:

(1) <u>Discount Bonds</u>:  The principal and unpaid interest under Appellees' existing FAA Bonds as of December 31, 2001, would be reduced by roughly two-thirds (66.3%) to establish the total principal amount (not market value) of new Discount Bonds. These new bonds would pay 8.28% interest (part of which would be capitalized and paid out only with principal), less than most of the FAA Bonds, on this substantially diminished principal amount. Argentina Resp. 5. Repayment

of the new principal amount would not begin until June 2024 and final repayment would not occur until 2033, two decades from now. *Id.* at 16.

(2) <u>Global 17s Bonds</u>:  Argentina claims that these bonds would be used to pay past due interest.  The total face amount of Global 17s delivered to Appellees is calculated based upon cash interest that Argentina would have paid on the deeply reduced (by 66.3%) principal amount of Discount Bonds (not the FAA Bonds) using the Discount Bond contract rate, which is lower than most FAA Bonds, and only since 2004. *Id.* at 5.  The Global 17s Bonds would pay 8.75% interest, and principal would be repaid at maturity in 2017. *Id.*

(3) <u>GDP Units</u>:  This complex security yields payments only when Argentina reports significantly rising levels of economic growth.  Argentina Resp. 6-7.  Although the country's current growth rate is well below the trigger, GDP Units previously generated a significant portion of the returns obtained to date by Exchange Bondholders, including a payment of more than $3 billion in December 2012.  Because of a payment cap built into the Units, these prior disbursements have substantially diminished potential future payments, such that only 30% of the notional amount of the GDP Units remains. *Id.*  Argentina's proposal refuses to give Appellees the prior payments that were made to Exchange Bondholders under the GDP Units. *Id.* at 7.

## II.    The Par Option

The Par Option is available only to "individual, retail plaintiff bondholders" limited to "$50,000 per series of bonds."   Argentina Resp. 3.   The Par Option would be available to satisfy less than one-tenth of one percent of Argentina's ob-ligations at issue in this appeal.   The Par Option is made up of three components:

(1) Par Bonds: Amounts due under Appellees' existing FAA Bonds as of December 31, 2001 would be converted into Par Bonds.   The new bonds would pay only 2.5% interest until 2019, thereafter rising to 3.75% through 2029 and 5.25% thereafter.   Principal repayment would not begin until September 2029 and final repayment would not occur until 2038.   *Id.* at 16-17.

(2) Cash Payment: Argentina claims to pay past due interest in cash.   The to-tal value of this cash payment is calculated based upon cash interest that Argentina would have paid on the Par Bonds since 2004.   That interest is calculated at only 1.33% until March 2009 and 2.5% thereafter.   *Id.* at 5.   The cash payment would total less than $100,000.

(3) GDP Units:   The Par Option also includes GDP Units, under the same terms as those included in the Discount Option.

## III.    Valuation

Argentina concedes that its proposal should be valued in terms of the antici-pated market values of the new securities that it offers.   Argentina Resp. 8-9.   Us-

ing market prices of Exchange Bonds as of March 1, 2013, Argentina calculates that its Discount Option is worth $210 million. This constitutes less than 15% of the $1.47 billion due under Appellees' FAA Bonds. Argentina conceals the fact that the Par Option would be worth less than $250,000 in total, by quoting figures only in terms relative to one hand-selected FAA Bond. Argentina Resp. 9. Even as to the few FAA Bonds eligible for this Option, Argentina would pay less than 27-cents-on-the-dollar, and in many instances much less.

Even these paltry sums are overstated for at least three reasons. First and foremost, the new securities will be issued in different series from the Exchange Bonds. *See supra* at 10-11. The smaller size of the issue and very real possibility of future discrimination will inevitably diminish the marketability and value of the new securities relative to existing Exchange Bonds. Second, any effort by Appellees to sell these bonds—to the extent it is possible at all—is certain to severely depress market prices. Third, the new securities might well lack many important protections of the FAA Bonds, not least equal treatment provisions unconstrained by collective action requirements.

# EXHIBIT A

# MOODY'S
## INVESTORS SERVICE

SPECIAL COMMENT

Rate this Research »»

Sovereign Defaults Series:
# The Role of Holdout Creditors and CACs in Sovereign Debt Restructurings

Table of Contents:

I. SOVEREIGN BOND RESTRUCTURINGS
HAVE GENERALLY BEEN RESOLVED
QUICKLY                                        3
II. HOLDOUTS HAVE NOT PRESENTED
SIGNIFICANT PROBLEMS                           8
III. CACS AND EXIT CONSENTS HAVE
PLAYED A SIGNIFICANT ROLE IN BOND
EXCHANGES                                     11
IV. CONCLUSION                                13
REFERENCES                                    14
MOODY'S RELATED RESEARCH                      16
APPENDIX: SOVEREIGN BOND
EXCHANGES SINCE 1997 - DEBT
EXCHANGE DETAILS AND INVESTOR
LOSSES                                        17

Analyst Contacts:

NEW YORK                    +1.212.553.1653

Elena Duggar               +1.212.553.1911
Group Credit Officer - Sovereign Risk
elena.duggar@moodys.com

Richard Cantor             +1.212.553.3628
Chief Credit Officer
richard.cantor@moodys.com

Bart Oosterveld            +1.212.553.7914
Managing Director - Sovereign Risk
bart.oosterveld@moodys.com

Creditor litigation in the case of Argentina is drawing attention to the role of holdout creditors in sovereign debt restructurings. At the same time, in order to facilitate sovereign debt exchanges, the European Stability Mechanism (ESM) Treaty is mandating that Collective Action Clauses (CACs) be introduced into euro area bond contracts. Despite the ongoing discussion in the capital markets and the extensive theoretical literature on the subject, empirical evidence on sovereign debt litigation and the effect of CACs is scarce. In this report, we survey the 34 sovereign bond exchanges since 1997 and examine the role of holdout creditors, CACs, and exit consent clauses in them.[1] Our findings include:

» Sovereign bond restructurings have generally been resolved quickly, without severe creditor coordination problems, and involving little litigation.

» On average, sovereign bond restructurings closed 10 months after the government had announced its intention to restructure and 7 months after the start of negotiations with creditors.

» Of the 34 sovereign bond exchanges since 1997, only two have been affected by holdout creditors – the exchanges of Argentina in 2005 and Dominica in 2004. Holdouts did not impact the recent large Greek debt exchanges.

» A high level of participation in sovereign bond restructuring offers has been the norm outcome: creditor participation averaged 95%. The only exchanges with lower participation rates were those of Argentina and Dominica, where the realized participation rates were 76% and 72% respectively immediately after the exchange. Later on, however, participation rates increased to 93% in Argentina and close to 100% in Dominica.

» About 35% of sovereign debt exchanges relied on using CACs or exit consents included in the bond contracts in order to bind a larger share of creditors in the restructuring.

The creditor coordination problem has been one of the most widespread concerns about sovereign debt restructurings in the modern era of bond finance, both in terms of coordinating potentially thousands of bondholders to agree on a restructuring proposal in a timely fashion, and in terms of free rider incentives. Creditor coordination problems have also motivated a large body of theoretical work in the sovereign debt literature.

---

[1]  This comment does not represent a legal opinion or interpretation but summarizes our views on the potential credit implications in light of the structure of sovereign bond contracts and past experience with sovereign restructurings. The author would like to thank Rodrigo Olivares-Caminal and Lee Buchheit for valuable comments. The views in this report as well as remaining errors are responsibility of the author.

Our analysis of the 34 sovereign bond restructurings over the past decade and a half shows that concerns over coordination problems are exaggerated. In most cases, a bondholder committee was formed within a reasonably short time frame and negotiations over the restructuring were concluded relatively quickly, even though almost half of debt exchanges involved a dispersed creditor structure.

We find that concerns about free rider problems are exaggerated as well. Among the 34 sovereign bond exchanges, in only two cases did holdout creditors represent more than 10% of the value of outstanding bonds and only one case – that of Argentina – resulted in persistent litigation. Moreover, the case of Argentina was and remains unique in its unilateral and coercive approach to the debt restructuring.

Two strategies have been employed in order to bind non-participating investors in sovereign debt exchanges – the use of CACs in order to amend the payment terms of bonds and the use of exit consents to amend non-payment terms. In bonds issued under New York law, CACs became popular after 2003 as an alternative to the top-down administered mechanism for sovereign debt restructuring (SDRM) suggested by the IMF. They are currently commonly included in almost all New York law issuances. CACs originated in English law bonds in 1879. English law bonds at least since the 1990s have typically contained "modification clauses" that enable bondholders to approve a restructuring in a vote that binds even dissenting bondholders. The modification clause in English law bonds requires between 18.75% and 75% voting thresholds,[2] compared to the 75% threshold typical of New York law CACs.

Starting in January 2013, the euro area has mandated the inclusion of CACs in all euro area bond issuances, as part of the Treaty establishing the European Stability Mechanism (ESM). The euro area CAC clause applies a 66.6% majority threshold to individual bond series and also includes a novel feature – an aggregate CAC across all bond series with a 75% majority threshold. In principle, the inclusion of CACs represents a weakening of bondholder rights, and to the extent that CACs increase the likelihood of a debt restructuring to the detriment of bondholders, they are credit negative for bondholders. In practice, however, the impact is likely only marginal.

The majority of euro area debt is issued under domestic law. Domestic law bonds can be restructured with an act of legislature or CACs can be retroactively inserted in domestic law bonds by an act of legislature, as was done in Greece in early 2012. For English law bonds, the impact will depend on whether the new CAC clause replaces an existing modification clause, which could have a majority threshold higher or lower than 66.6%; in the latter case, the new CAC might actually make a debt restructuring more difficult.

---

[2]   The 18.75% threshold could be reached in the case where a bondholder meeting does not reach a quorum and after a second meeting the quorum is ratcheted down.

# I. Sovereign Bond Restructurings Have Generally Been Resolved Quickly

Creditor coordination problems have motivated a large body of theoretical work in the sovereign debt literature. Creditor coordination has been one of the most widespread concerns about sovereign debt restructurings, especially in the modern era of bond finance which substituted the concentrated creditor structure of bank lending of the 1970s and 1980s with the dispersed creditor structure of bond financing of the 1990s and 2000s. It was feared that the dispersed bond ownership would create problems both in terms of coordinating potentially thousands of bondholders to agree on a restructuring proposal in a timely fashion, and in terms of free rider incentives.

Despite the large body of theoretical literature, empirical evidence on the subject is scarce. In this study, we examine the role of creditor coordination problems by analyzing the sovereign bond exchanges that have occurred over the past decade and a half.

## On average, sovereign bond exchanges were negotiated in 7 months

There have been 34 exchanges of sovereign bonds since 1997, including both Moody's-rated and unrated debt instruments. The exchanges have involved 20 sovereign governments, 9 of which performed several debt exchanges in a row -- either one after the other, or with several years in between the exchanges. Most recent were the debt exchanges announced by Belize and by Jamaica in February 2013.[3] Belize's 2013 exchange follows a previous debt exchange in February 2007; similarly, Jamaica's exchange follows a previous bond exchange in February 2010.

In Exhibit 1, we measure the length of time it took to negotiate each bond exchange. For each one, we note the date of:

» The initial announcement of the intent to restructure by the government. In some cases, this coincided with the date of missed payment on the debt instrument; in other cases, this coincided with the announcement of the first debt offer.

» The start of negotiations with creditors. In some cases, this was the date of the first exchange offer by the government.

» The formal announcement of the final exchange offer.

» The distressed exchange date, which is generally the date of closing of the exchange.

We find that contrary to widespread concerns, sovereign bond restructurings have generally been resolved quickly and without severe creditor coordination problems. On average, the exchanges closed 10 months after the government announcement of the intention to restructure and 7 months after the start of negotiations with creditors. The average exchange closed within 2 months of the launching of the final exchange offer.[4]

---

[3]  See Belize Debt Restructuring Fails to Resolve Credit Challenges, Belize debt restructuring: 2007 vs 2012, and Moody's downgrades Jamaica's government debt rating to Caa3, outlook stable.

[4]  Evidence presented in Benjamin and Wright (2009) suggests that restructurings of commercial loans have taken much longer to resolve, almost 8 years on average in their sample of foreign debt restructurings over the 1980-2004 period. Further, evidence presented in Trebesch (2008) (covering a different sample over the 1980-2006 period) also suggests that the average restructuring time was the shortest for the post-1998 period, during which bond debt was the main lending vehicle. Our findings are in line with Bi, Chamon and Zettelmeyer (2011), who develop a theoretical model to show why coordination failures have been rare in the recent decade.

EXHIBIT 1

## Sovereign Bond Exchanges Since 1997

| Initial Default Date | Country (NR = not rated at the time) | Distressed Exchange Details | Announcement of Restructuring (or Missed Payment) | Start of Negotiations/ First Offer | Final Exchange Offer | Distressed Exchange Date | Time to Closing of Exchange (Months) | | | In Default During the Bond Exchange? |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | From Initial Default | From Announcement | From Start of Negotiations | |
| Aug-1998 | Russia | LC debt (GKO and OFZ) | Aug-98 | Aug-98 | Mar-99 | May-1999 | 10 | 10 | 10 | yes |
| | Russia | FC debt (MIN FIN III) | May-99 | Nov-99 | Jan-00 | Feb-2000 | 19 | 10 | 4 | yes |
| | Russia | FC debt (PRIN and IAN) | May-99 | May-99 | Jan-00 | Aug-2000 | 25 | 21 | 16 | yes |
| Sep-1998 | Ukraine | LC T-bills held domestically | Aug-98 | Aug-98 | Aug-98 | Sep-1998 | n.a. | 2 | 2 | no |
| | Ukraine | LC T-bills held by non-residents | Aug-98 | Sep-98 | Sep-98 | Sep-1998 | n.a. | 1 | 1 | no |
| | Ukraine | FC Chase-Manhattan loan | Aug-98 | Aug-98 | Sep-98 | Oct-1998 | n.a. | 3 | 3 | no |
| | Ukraine | FC ING bond and Merrill Lynch bond | May-99 | May-99 | Jul-99 | Aug-1999 | 12 | 4 | 4 | yes |
| | Ukraine | FC Eurobonds | Jan-00 | Jan-00 | Feb-00 | Mar-2000 | 19 | 3 | 3 | yes |
| Dec-1999 | Pakistan | Eurobonds | Nov-99 | Nov-99 | Nov-99 | Dec-1999 | 1 | 1 | 1 | no |
| Aug-1999 | Ecuador | External debt | Aug-99 | Jul-00 | Jul-00 | Aug-2000 | 13 | 13 | 3 | yes |
| | Ecuador | FC domestic bonds | Sep-99 | Aug-00 | Aug-00 | Aug-2000 | 12 | 12 | 1 | yes |
| Mar-2000 | Cote d'Ivoire (NR) | Brady bonds | Apr-08 | Apr-08 | Apr-10 | Apr-2010 | 122 | 25 | 25 | yes |
| Nov-2001 | Argentina | External debt | Nov-01 | Nov-01 | Nov-01 | Nov-2001 | 1 | 1 | 1 | no |
| | Argentina | External debt | Nov-01 | Sep-03 | Jan-05 | Feb-2005 | 40 | 40 | 18 | yes |
| Jun-2002 | Moldova | Eurobond | Jun-02 | Jun-02 | Aug-02 | Oct-2002 | 5 | 5 | 5 | yes |
| Jan-2003 | Paraguay (NR) | Domestic debt due in 2003-06 | Oct-03 | Oct-03 | Nov-03 | Jul-2004 | 19 | 10 | 10 | yes |
| May-2003 | Uruguay | LT FC bonds (external and domestic) | Mar-03 | Mar-03 | Apr-03 | May-2003 | n.a. | 3 | 3 | no |
| Jul-2003 | Nicaragua | CENI bonds FC-denom. payable in LC | Jun-03 | Jun-03 | Jul-03 | Jul-2003 | n.a. | 2 | 2 | no |
| | Nicaragua | CENI bonds FC-denom, payable in LC | Apr-08 | Apr-08 | Jun-08 | Jun-2008 | 60 | 3 | 3 | (yes) [1] |
| Jul-2003 | Dominica (NR) | LC bonds (domestic and external) | Dec-03 | Dec-03 | Jun-04 | Jun-2004 | 12 | 7 | 7 | (yes) [2] |
| H2-2004 | Cameroon (NR) | Domestic debt | | | | H1-2005 | 12 | | | yes |
| Dec-2004 | Grenada (NR) | Global bond and domestic debt | Oct-04 | Oct-04 | Sep-05 | Sep-2005 | 12 | 12 | 12 | yes |
| May-2005 | Dominican Rep. | International bonds | Apr-04 | Apr-04 | Apr-05 | May-2005 | n.a. | 14 | 14 | no [3] |
| Dec-2006 | Belize | Private external debt | Aug-06 | Aug-06 | Dec-06 | Feb-2007 | 3 | 7 | 7 | no |
| Jul-2008 | Seychelles (NR) | External debt | Oct-08 | Mar-09 | Dec-09 | Jan-2010 | 19 | 16 | 11 | yes |
| Dec-2008 | Ecuador | Global bonds | Nov-08 | no neg | Apr-09 | May-2009 | 6 | 7 | no neg | yes |
| Feb-2010 | Jamaica | Domestic debt | Jan-10 | Jan-10 | Jan-10 | Feb-2010 | 2 | 2 | 2 | yes |
| Jan-2011 | Cote d'Ivoire (NR) | Treasury bills (short-term) | Jan-11 | Jan-11 | Oct-11 | Dec-2011 | 12 | 12 | 3 | yes |
| | Cote d'Ivoire (NR) | Eurobond coupon | Jan-11 | Jan-11 | Oct-12 | Nov-12 | 23 | 23 | 1 | yes |
| Nov-2011 | St. Kitts and Nevis (NR) | Domestic bonds and external debt | Jun-11 | Jul-11 | Feb-12 | Feb-2012 | 5 | 10 | 9 | yes |
| | St. Kitts and Nevis (NR) | Domestic loans (debt-land swap) | Jul-11 | Jul-11 | Apr-12 | Apr-2012 | 6 | 11 | 10 | yes |
| Mar-2012 | Greece | Greek and foreign law bonds | Jul-11 | Jul-11 | Feb-12 | Mar-2012 | n.a. | 9 | 9 | no |
| Sep-2012 | Belize | 2029 Superbond | Aug-12 | Aug-12 | Feb-13 | Mar-13 | 7 | 8 | 8 | yes |
| Feb-2013 | Jamaica | Domestic debt | Feb-13 | Feb-13 | Feb-13 | Feb-13 | 1 | 1 | 1 | no |
| **Exchange Average** | | | | | | | **18** | **10** | **7** | |

Sources: Moody's, IMF country reports, Sturzenegger and Zettelmeyer (2005), and Diaz-Cassou, Erce-Dominguez and Vazquez-Zamora (2008).

Notes: Time is rounded to the month. [1] Payments suspended due to legal investigation. [2] Bonds under legal dispute. [3] In default on loans.



Further, Exhibit 2 plots the distribution of the time it took to close debt exchanges. We see that 30% of debt exchanges were closed within 2 months of the start of negotiations and over half of exchanges were closed within 4 months. Over 80% of debt restructurings were negotiated in 10 months or less.

EXHIBIT 2
**Time from Start of Negotiations with Creditors to Closing of the Exchange**



*Source: Moody's.*
Note: Based on the data in Exhibit 1.

### Delays were related to parallel restructurings of official debt and commercial loans

Only 4 out of the 34 debt exchanges since 1997 took longer than a year to negotiate: the Dominican Republic's international bonds exchange of 2005 took 14 months, the Russian 2000 foreign debt exchange took 16 months, the Argentinean external debt exchange of 2005 took 18 months, and the Cote d'Ivoire's Brady bonds exchange of 2010 took 25 months. Apart from the case of Argentina, these delays had to do with the restructuring strategy and the parallel restructuring of official sector and commercial loan debt along with the restructuring of the bond instruments.

The delays in the restructuring of Cote d'Ivoire's Brady bonds were related to the country's emergence from war, the parallel restructuring of Paris Club debt, and the need for the country to reach milestones for the enhanced HIPC Initiative that unlocked the forgiveness of official sector debt.

Argentina's debt restructuring was somewhat unique in its unilateral and coercive approach. Russia, on the other hand, took an approach of conducting a specific debt workout for each defaulted type of debt, in effect conducting three consecutive rounds of debt exchanges between May 1999 and August 2000. Both Argentina's 2005 debt exchange and Russia's August 2000 debt exchanges involved very large losses for investors – 71% and 90% respectively, as measured by trading prices.

The Dominican Republic's 2005 exchange of its international bonds proceeded in parallel with the country's restructuring of its official debt and commercial loans. Thus, between April 2004 and October 2005, the Dominican Republic renegotiated its bilateral official debt with Paris Club creditors (involving two agreements), two series of international bonds, and its commercial loans debt with the London Club. The authorities' approach to the debt restructuring was considered transparent and cooperative.

### Restructurings in default took longer to negotiate

As Exhibit 3 shows, the majority of sovereign bond exchanges, 65%, followed a payment default – that is, there was a missed interest or principal payment before or during the debt negotiations. Only in 35% of exchanges was the sovereign current on its debt repayments.

Those debt exchanges accompanied by default took twice as long to negotiate as those not accompanied by default. On average, the time from the start of negotiations with creditors to the closing of the debt exchange was 8 months for exchanges in default and 4 months for exchanges without a payment default.[5]

Limiting the sample to the events of default, on average debt exchanges took 18 months from the initial default event to closing of the exchange.

EXHIBIT 3
**Was the Debt Instrument in Default During the Negotiations of the Debt Exchange?**



Default before negotiations
53%

No default
35%

Default during negotiations
12%

*Source: Moody's.*
Note: Based on the data in Exhibit 1

### Creditor structure appears weakly correlated with the length of negotiations

The vast majority of sovereign bond exchanges were negotiated relatively quickly, despite the fact that half of debt exchanges involved dispersed creditor structures. The vast majority of sovereign bond exchanges included consultations with bondholders and, in most cases, a bondholder committee was formed within a reasonably short timeframe and negotiations over the restructuring were concluded relatively quickly.

In fact, creditor structure appears weakly correlated with the length of negotiations: as Exhibit 4 shows, conditional on creditor structure, debt negotiations took on average 7 months (with standard deviation of 5.5) for exchanges with a dispersed creditor structure and 6 months (with standard deviation of 5.9) for exchanges involving a concentrated creditor structure. Moreover, there were a number of debt exchanges that involved dispersed creditor structure but still closed within 3 months of the start of negotiations.

The number of debt instruments involved in the exchange does not appear to have been decisive either; in fact, the average length of exchanges involving 6 or fewer debt instruments was 8 months, while the average length of exchanges involving multiple debt instruments (from 16 to over 300) was 6 months (Exhibit 4). Sovereign bond exchanges generally aimed to consolidate the number of outstanding instruments, which improved the instruments' trading liquidity.

---

[5]   This result is consistent with findings in Schumacher, Trebesch and Enderlein (2012) that preemptive restructurings without a payment moratorium are associated with a lower risk of litigation.

EXHIBIT 4

**The Average Length of Debt Negotiations Conditional on Creditor Structure and on the Number of Debt Instruments Being Exchanged**



*Source: Moody's.*

Note: Based on the data in Exhibits 1 and 8 and the Appendix. Equal number of observations in each category of creditor structure. 15 exchanges involved 6 or fewer debt instruments and 19 exchanges involved multiple debt instruments.

## The length of negotiations was related to the losses imposed on investors

About half of debt exchanges in our sample involved domestic law bonds and half involved bonds issued under foreign law. Domestic debt exchanges seem on average to have been negotiated more quickly than exchanges involving bonds issued under foreign law. As Exhibit 5 shows, the average length of negotiations for domestic debt exchanges was 5 months (with standard deviation of 3.9), while the average length of negotiations for bonds issued under foreign law was almost 9 months (standard deviation of 6.9).

EXHIBIT 5

**The Average Length of Debt Negotiations Conditional on the Governing Law of the Majority of Bond Instruments**

EXHIBIT 6

**The Time to Negotiate vs. the Loss Imposed on Investors**



*Source: Moody's.*

Note: Based on the data in Exhibits 1 and 8 and the Appendix. 18 exchanges involved local law instruments and 17 exchanges involved instruments issued under foreign law.

Case: 12-105    Document: 952    Page: 33    04/22/2013    914956    239

Finally, as Exhibit 6 illustrates, there is about 40% correlation between the time it took to negotiate a debt exchange and the losses imposed on investors.[6] Further, there appears to be also some correlation between the size of the debt exchange and the time it took to negotiate the restructuring, but this correlation is much weaker at only about 16% (when the size of the debt exchange is measured in terms of percent of country's GDP).

## II. Holdouts have not presented significant problems

Our analysis of the 34 sovereign bond restructurings over the past decade and a half shows that concerns about free rider problems prove exaggerated as well.

### The average creditor participation rate was 95%

Exhibits 7 and 8 show the creditor participation rates realized in each of the sovereign bond exchanges since 1997. The average participation rate was 95% (including the recent 2013 debt exchanges of Belize and Jamaica).

Further, Exhibit 7 plots a histogram of the distribution of participation rates achieved in the various sovereign debt exchanges. We see that all cases but two had a participation rate of 90% or higher. Moreover, 74% of exchanges had a creditor participation rate of 95% or higher.

EXHIBIT 7
**The Distribution of Participation Rates in Sovereign Bond Exchanges Since 1997**



*Source: Moody's.*
Note: Based on the data in Exhibit 8.

In only two cases did holdout creditors represent more than 10% of the value of outstanding bonds. Dominica's debt exchange of June 2004 achieved a 72% participation rate and the exchange offer had to be extended several times because of low participation. Dominica's two bonds had a highly complex structure and were stripped and sold as derivative zero coupon bonds to a wide variety of regional investors. However, discussions with non-participating creditors continued while interest payments at terms of the restructuring were deposited in an escrow account. By 2012, the participation rate in the exchange was close to 100%.

---

[6]  This result is consistent with evidence presented in Schumacher, Trebesch and Enderlein (2012) that larger creditor losses are associated with higher likelihood of litigation against sovereign debtors in US and UK courts.

**EXHIBIT 8**

**Creditor Participation Rates and Legal Features of Sovereign Bond Exchanges Since 1997**

| Initial Default Date | Country (NR = not rated at the time) | Distressed Exchange Date (Main) | Governing Law | Creditor Structure | Participation Rate | Included in Original Bonds? | CACs Used in Exchange? | Included in New Bonds? | Exit Consents Used? |
|---|---|---|---|---|---|---|---|---|---|
| Aug-1998 | Russia | May-1999 | Local law | Dispersed | 95% for residents, 88.5% for non-residents | no | no | no | no |
| | Russia | Feb-2000 | Local law | Dispersed | 90% | no | no | no | no |
| | Russia | Aug-2000 | English law | Dispersed | 99% | yes | no | no | no |
| Sep-1998 | Ukraine | Sep-1998 | Local law | Dispersed | | | | | no |
| | Ukraine | Sep-1998 | Local law | Dispersed | | | | | no |
| | Ukraine | Oct-1998 | Local law | Concentrated | 100% | no | no | no | no |
| | Ukraine | Aug-1999 | | Concentrated | 100% (ING bond) and 50% (other) | no | no | no | no |
| | Ukraine | Mar-2000 | Luxembourg and German law | Concentrated for majority of bonds | 99% | partly | no | yes | no |
| Dec-1999 | Pakistan | Dec-1999 | English law | Concentrated | 99% | yes | no | yes | no |
| Aug-1999 | Ecuador | Aug-2000 | NY law | Concentrated | 97% | yes | no | no | yes |
| | Ecuador | Aug-2000 | Local law | Concentrated | very high | no | no | no | no |
| Mar-2000 | Cote d'Ivoire (NR) | Apr-2010 | NY law | Concentrated | 99.98% | no | no | yes | yes |
| Nov-2001 | Argentina | Nov-2001 | Local law | | very high | no | no | no | no |
| | Argentina | Feb-2005 | 8 governing laws | Dispersed | 76.2% in 2005, plus 69.5% in 2010, totaling 92.6% (96% for domestic bondholders) | partly | no | no | no |
| Jun-2002 | Moldova | Oct-2002 | English law | Concentrated | 96% | yes | yes | yes | n.a. |
| Jan-2003 | Paraguay (NR) | Jul-2004 | Local law | Dispersed | 96% | partly | yes | yes | no |
| May-2003 | Uruguay | May-2003 | Local law most, NY law, English law, and Japanese law | Dispersed | 93% (98.8% domestic and 89.2% non-resident) | partly | yes | yes | yes, voluntary |
| Jul-2003 | Nicaragua | Jul-2003 | Local law | Concentrated | very high | | | | |
| | Nicaragua | Jun-2008 | Local law | Concentrated | very high | yes | | yes | |
| Jul-2003 | Dominica (NR) | Jun-2004 | English law | Dispersed | 72% (by 2012, reached close to 100%) | partly (external bonds) | no | yes | no [1] |
| H2-2004 | Cameroon (NR) | H1-2005 | Local law | Dispersed | | | | | |
| Dec-2004 | Grenada (NR) | Nov-2005 | NY law and local law | Concentrated | 94% (for external) | no | no | yes | no |
| May-2005 | Dominican Rep. | May-2005 | NY law | Dispersed | 97% | no | no | yes | yes |
| Dec-2006 | Belize | Feb-2007 | NY law | Concentrated | 98.1% | yes | yes | yes | no |
| Jul-2008 | Seychelles (NR) | Jan-2010 | English law | Dispersed | 100% | yes | yes | yes | no |
| Dec-2008 | Ecuador | May-2009 | NY law | | 91% | no | yes | n.a. | n.a. |
| Feb-2010 | Jamaica | Feb-2010 | Local law | Concentrated | 99% | no | no | no | no |
| Jan-2011 | Cote d'Ivoire (NR) | Dec-2011 | Local law | Concentrated | 96% | no | no | n.a. | no [2] |
| Nov-2011 | Cote d'Ivoire (NR) | Nov-12 | NY law | | 100% | yes | yes | n.a. | no |
| | St. Kitts and Nevis (NR) | Mar-2012 | Local law | Concentrated | 100% | yes | yes | n.a. | no |
| Nov-2011 | St. Kitts and Nevis (NR) | Apr-2012 | NY law | Concentrated | almost universal | yes | yes | n.a. | no |
| Mar-2012 | Greece | Mar-2012 | Local law and some Foreign law | Dispersed | 96.9% (100% for domestic) | retroactively inserted | yes | yes | n.a. |
| Sep-2012 | Belize | Mar-13 | NY law | Concentrated | 100% (CAC triggered after 86.2% part.) | yes | yes | yes | no |
| Feb-2013 | Jamaica | Feb-13 | Local law | Concentrated | 99% | no | no | yes | no |
| **Exchange Average** | | | | | **95%** | | | | |

Source: Moody's, IMF country reports, Sturzenegger and Zettelmeyer (2005), Díaz-Cassou, Erce-Domínguez and Vázquez-Zamora (2008), and Andritzky (2006).

Notes: [1] Each series of new bonds carried a "mandatory debt management" feature that required Dominica to retire from the market a specified percentage of the original principal amount of that series in each year. [2] Early redemption clause triggered.

The Argentinean debt exchange of February 2005 also garnered a low participation rate initially, of 76.2%. The debt exchange was later re-opened in June 2010 and with the additional participation by investors in 2010, the overall participation rate reached 92.6%.

Further, in August 1999 Ukraine's restructuring of the ING bond gathered full participation but the restructuring of the Merrill Lynch bond drew about 50% participation. However, the remaining part of the Merrill Lynch bond was later restructured as part of the subsequent March 2000 debt exchange, so the cumulative participation rate was higher.

Across all debt exchanges, there appears to be no systematic difference in the creditor participation rates in domestic law versus foreign law exchanges.

## Only one of the 34 sovereign debt exchanges resulted in persistent litigation

From the 34 sovereign bond exchanges, only one case – that of Argentina – resulted in persistent litigation.[7] However, the case of Argentina was and remains unique in its unilateral and coercive approach to the debt restructuring. Only a few other court cases have been filed over the years and they have generally not represented an obstacle to the conclusion of debt exchanges.

In a comprehensive study of creditor litigation, Schumacher, Trebesch and Enderlein (2012) surveyed lawsuits filed against debtor governments in US and UK courts between 1976 and 2010. For our sample of bond defaults since 1997, the survey finds lawsuits filed by 47 different plaintiffs in the case of Argentina after the 2002 default, 1 lawsuit filed in the case of Dominica in 2005, 1 lawsuit filed in the case of Ecuador in 2001 and 1 lawsuit filed in the case of Grenada in 2006, by a commercial bank in the case of Ecuador and by the Export-Import Bank of Taiwan in the case of Dominica and Grenada.

Further, within the broader sample of foreign *bond and loan* defaults since 1976, the survey finds that "runs to the courthouse" are the exception rather than the rule in sovereign debt crises. Apart from Argentina and Peru (whose default involved commercial loans), each of which led to more than 10 lawsuits, the large majority of debt exchanges were implemented without a single legal conflict.[8]

## Approaches to holdout creditors have varied

Sovereigns have taken several approaches to deal with holdout creditors:

» Holdout creditors have been paid in full, as in the cases of Russia, Greece and Ecuador (in 1999).

» Holdout bonds have been exchanged at prevailing market value, as in the case of Cote d'Ivoire in 2011.

» Debts which have not been restructured were no longer serviced, as in the cases of Argentina and Grenada.

» In a few cases, for example in Dominica, holdout bonds were not serviced but as a sign of good faith, the government paid all interest falling due into an escrow account held at the central bank.

---

[7] See Legal Ruling Raises Questions About Argentina's Debt Payments and US Court Ruling on Argentina's Debt Could Have Limited Implications for Sovereign Debt Restructurings.

[8] Conclusions are also supported in Trebesch (2008). Additionally, IIF/EMTA (2009) reviews the experience with litigation in low-income countries, in the context of HIPC and MDRI debt relief initiatives. The review finds that incidents of litigation have been relatively few in number and covered a small share of the outstanding value of restructured sovereign debt. Further, the vast majority of lawsuits were brought by trade creditors, private creditors and state-owned enterprises from non-Paris-Club creditors, not by distressed debt funds.

Thus, countries have dealt with holdout investors in several different ways. Pakistan, for example, remained current on all original obligations up to the debt exchange in order to avoid litigation. Uruguay announced from the beginning that debt service on the old bonds would be continued. Ecuador managed threats of holdouts by settling accelerated claims and continuing to pay debt service. As we discuss below, in a number cases, for example Ukraine and Moldova, a holdout minority was bound into the agreement through majority voting legal clauses.

## III. CACs and Exit Consents Have Played a Significant Role in Bond Exchanges

One of the ways countries have achieved high participation rates in sovereign bond exchanges has been to use CACs and exit consents embedded in the bond contracts.

### CACs

CACs allow a supermajority of creditors to amend the instrument's payment terms and other essential provisions. Thus, CACs allow a supermajority of bondholders to agree to a debt restructuring that is legally binding on all holders of the bond, including those who vote against the restructuring.

In New York law bonds, CACs became popular after 2003, as an alternative to the top-down administered mechanism for sovereign debt restructuring (SDRM) proposed by the IMF at the time.[9] Currently, CACs are commonly included in almost all New York law issuances. The typical threshold for modification of payment terms is a supermajority of 75% of bondholders. CACs originated in English law bonds in 1879.[10] English law bonds at least since the 1990s typically contain "modification clauses", which enable bondholders to approve a restructuring in a vote that binds even dissenting bondholders. Modification clauses in English law bonds require between 18.75% and 75% voting thresholds.[11] Further, bonds issued under domestic law can be restructured by retroactively inserting CACs into the bonds by an act of legislation, as was done in Greece in early 2012.[12]

CACs do have a limitation as they apply to individual bond series. Thus, it is possible for non-participating investors to take blocking positions on individual bond series while a high overall participation rate in the restructuring process is still achieved. Aggregate CACs could address this problem in the future, but they are not yet widely used. Nevertheless, aggregate CAC was first introduced during the restructuring of Uruguay in 2003,[13] and subsequently was adopted by the Dominican Republic, Argentina, and Slovenia (in November 2012).

### Exit consents

An alternative way to impose a debt exchange offer on non-participating investors involves using exit consents.

---

[9]   For more details, see Weidemaier and Gulati (2012) and Bradley and Gulati (2012).

[10]  See Buchheit and Gulati (2002).

[11]  The 18.75% threshold could be reached in the case where a bondholder meeting does not reach a quorum and after a second meeting the quorum is ratcheted down. As Bradley and Gulati (2012) show, most English law bonds issued prior to 2003 have 18.75% voting threshold. Since 2003, while New York law bonds decreased the percentage requirement from 100% to 75%, English law bonds increased the percentage requirement from 18.75% to a range between 18.75% and 75%. The reasons for the change have not been explained.

[12]  See Greece's Successful Bond Exchange Removes Key Uncertainty, but Risk of Default Post-Exchange Remains High. Detailed studies of the Greek debt exchange include Zettelmeyer, Trebesch and Gulati (2012) and Georgakopoulos (2012).

[13]  For more details, see Buchheit and Pam (2004).

Exit consents use the modification clauses in the bond contract that allow a majority group of creditors to change the non-financial terms of the old bonds in an exchange, in a way that impairs the value of the old bonds. While amendments to financial terms may require unanimity, other terms may normally be amended by a majority or supermajority of creditors. Indeed, exit consents can be used in restructurings to create an incentive to all creditors to participate in the exchange through modifying bond provisions such as the waiver of sovereign immunity, financial covenants or listing requirements, or more generally by altering legal features that affect the bond's liquidity or the holder's ability to litigate.[14]

In other words, exit consent is the technique, by which bondholders grant their consent to amend certain terms of the bonds, at the moment of accepting the exchange offer. Because of these amendments, the defaulted bonds subject to the exchange become less attractive in legal and financial terms, forcing a greater number of bondholders to accept the exchange offer. Otherwise, bondholders not accepting the offer are left with bonds which are impaired and not featuring some of the original contractual enhancements.

## Use of CACs in past sovereign restructurings

As Exhibit 8 shows, over 35% of sovereign bond exchanges have used either CACs and/or exit consents as part of the debt exchange process. CACs have been triggered in nine restructurings and exit consents have been used in four exchanges.

CACs were used for the first time during Ukraine's Eurobonds exchange in 2000, then in Moldova in 2002, Uruguay in 2003, and in Belize in 2007. Pakistan did not use the CAC in its English law bonds during the 1999 restructuring. Ukraine took a hybrid approach to the March 2000 debt restructuring: it first invited investors – mainly investment banks and hedge funds – to tender their bonds by granting an irrevocable proxy vote for the restructuring offer; it then called a bondholder meeting, where the proxy votes were automatically cast in favor of modifying the terms of the old bonds.

Moldova used the CACs to amend the terms of payment according to the restructuring offer after an agreement was reached with its major bondholder, who held 78% of the outstanding bonds against a required 75% majority vote threshold in the CACs. Uruguay used the CACs contained in its Samurai bonds, the first use of CACs in Japan. Finally, Belize's government used the CAC embedded in one of its bonds to bind 1.3% of non-complying or non-responding creditors to accept the terms of the exchange, increasing the acceptance rate to 98%. Belize was the first country to use CACs in a debt restructuring under NY law in more than 70 years.[15] (Grenada did not use CACs in its 2005 exchange.)

Since 2007, CACs have been triggered in most bond exchanges that involved bonds with embedded CACs, including the restructurings of the Seychelles, Cote d'Ivoire and St. Kitts. Greece's March 2012 debt exchange incorporated a novel feature as an Act of Parliament retroactively inserted CACs into domestic law bonds prior to the announcement of the debt exchange offer. These CACs were subsequently triggered to achieve a 100% participation rate for domestic law bonds. More recently, Belize's February 2013 debt exchange triggered the CAC in the old bond instrument as 86% majority participation was reached.[16]

---

[14]  For more details, see Buchheit and Gulati (2000).

[15]  For more details, see Buchheit and Karpinski (2007).

[16]  See Belize Debt Restructuring Fails to Resolve Credit Challenges.

### Use of exit consents in sovereign restructurings

Exit consents were used for the first time in Ecuador's restructuring of external debt in August 2000, then in Uruguay in May 2003, the Dominican Republic in May 2005, and the Core d'Ivoire in April 2010. They have most commonly been used to remove the cross-default and cross-acceleration clauses from the old bonds and to lift the listing requirement.

For example, the use of exit consents in Ecuador's 2000 exchange involved an exchange offer that required participating bondholders to also agree to a number of amendments to non-payment terms. These amendments included the deletion of the cross-acceleration clause, the provision that restricted Ecuador from purchasing any of the Brady bonds while a payment default was in progress, the covenant prohibiting Ecuador to seek a further restructuring of Brady bonds, the negative pledge covenant, and the covenant to maintain listing of the defaulted bond on the Luxembourg Stock Exchange.[17]

The scope of exit consents in Uruguay's 2003 exchange was narrower than in Ecuador. Uruguay's exit consents were mainly aimed at avoiding litigation and limiting the possibility of attaching future payments on the new bonds via a court ruling (waiver of sovereign immunity), while also deleting the cross-default and cross-acceleration provisions. Unlike in Ecuador, in Uruguay the participating bondholders could opt out of the exit consents. Argentina's 2005 debt exchange did not use exit consents.[18]

Exit consents have often been used to remove cross-acceleration and cross-default clauses from the old bond contracts because once these clauses are removed, any non-payments or disputes related to the old bonds will no longer trigger default and acceleration on the new bonds. Thus, new bondholders are protected from legal remedies by non-participating creditors. Exit consents have generally withstood legal challenges under New York law as US courts have refused to invalidate exit consents that removed important bondholder rights and protections, including financial covenants, in several corporate restructurings.[19]

## IV. Conclusion

Our findings indicate that creditor coordination and holdouts have been less of a problem in sovereign bond restructurings than commonly believed. Sovereign bond restructurings have generally been resolved quickly, without severe creditor coordination problems and with little litigation, except for Argentina. Holdouts have not presented significant problems and very high levels of participation have been the norm outcome in sovereign bond restructuring offers.

---

[17]   See IMF (2001).

[18]   For more details, see Das, Papaioannou and Trebesch (2012) and Buchheit and Pam (2004).

[19]   Ibid.

## References

Andritzky, Jochen, 2006, Sovereign Default Risk Valuation, Springer, Berlin.

Benjamin, David and Mark L.J. Wright, 2009, Recovery Before Redemption: A Theory of Delays in Sovereign Debt Renegotiations, *State University of New York, Buffalo and University of California, Los Angeles, mimeo,* 8 April 2009.

Bi, Ran, Marcos Chamon and Jeromin Zettelmeyer, 2011, The Problem that Wasn't: Coordination Failures in Sovereign Debt Restructurings, *IMF Working Paper 11/265*, November 2011.

Bradley, Michael H., James D. Cox and Mitu Gulati, 2008, The Marker Reaction to Legal Shocks and Their Antidotes: Lessons from the Sovereign Debt Market, *Duke Law School Faculty Scholarship Series*, Paper 120.

Bradley, Michael and Mitu Gulati, 2012, Collective Action Clauses for the Eurozone: An Empirical Analysis, *Duke Law School Working Paper*, 7 May 2012.

Buchheit, Lee C. and Mitu Gulati, 2000, Exit Consents in Sovereign Bond Exchanges, *UCLA Law Review, vol. 48,* October 2000.

Buchheit, Lee C. and Mitu Gulati, 2002, Sovereign Bonds and the Collective Will, *Emory Law Journal, vol. 51, issue 4,* Fall 2002.

Buchheit, Lee C. and Elizabeth Karpinski, 2007, Belize's Innovations, *Butterworths Journal of International Banking and Financial Law,* May 2007.

Buchheit, Lee C. and Jeremiah S. Pam, 2004, Uruguay's Innovations, *Journal of International Banking Law and Regulation, vol. 19, issue 1.*

Das, Udaibir, Michael Papaioannou and Christoph Trebesch, 2012, Sovereign Debt Restructurings 1950–2010*: Literature Survey*, Data*, and Stylized Facts, *IMF Working Paper 12/203*, August 2012.

Diaz-Cassou, Javier, Aitor Erce-Dominguez and Juan J. Vazquez-Zamora, 2008, Recent Episodes of Sovereign Debt Restructurings. A Case-Study Approach, *Banco de Espana Occasional Paper 0804.*

Georgakopoulos, Nicholas L., 2012, Pyres, Haircuts, and CACs: Lessons from Greco-Multilateralism for Creditors, *Indiana University, Robert H. MsKinney School of Law, mimeo,* 16 May 2012.

International Monetary Fund, 2001, Involving the Private Sector in the Resolution of Financial Crises - Restructuring International Sovereign Bonds, Washington, DC, available at http://www.imf.org/external/pubs/ft/series/03/IPS.pdf, p. 8 and 35.

Institute of International Finance (IIF) / Emerging Markets Trading Association (EMTA), 2009, Creditor Litigation in Low-Income Countries Benefiting from the Enhanced-HIPC and MDRI, June 2009, *Preliminary Analysis.*

Olivares-Caminal, Rodrigo, 2009, Legal Aspects of Sovereign Debt Restructuring, Sweet & Maxwell, London.

Schumacher, Julian, Christoph Trebesch and Henrik Enderlein, 2012, Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010, *mimeo*, 11 December 2012.

Sturzenegger, Federico and Jeromin Zettelmeyer, 2005, Haircuts: Estimating Investor Losses in Sovereign Debt Restructurings, 1998-2005, *IMF Working Paper 05/137*, July 2005.

Trebesch, Christoph, 2008, Delays in Sovereign Debt Restructurings. Should We Really Blame the Creditors?, *Free University of Berlin, mimeo*, July 2008.

Weidemaier, Mark C. and Gulati, Mitu, 2012, A People's History of Collective Action Clauses, *University of North Carolina Legal Studies Research Paper No. 2172302, 7 November 2012.*

Zettelmeyer, Jeromin, Trebesch, Christoph and Gulati, Mitu, 2012, The Greek Debt Exchange: An Autopsy, *EBRD and CERP, University of Munich and CESIfo, and Duke University, mimeo*, 11 September 2012.

MOODY'S INVESTORS SERVICE

## Moody's Related Research

Special Comments:

» US Court Ruling on Argentina's Debt Could Have Limited Implications for Sovereign Debt Restructurings, December 2012 (147881)

» Legal Ruling Raises Questions About Argentina's Debt Payments, November 2012 (147437)

» Sovereign Defaults Series: Sovereign Debt Restructurings Provide Liquidity Relief But Often Do Not Reduce Debt Levels, November 2012 (146909)

» Sovereign Defaults Series: Investor Losses in Modern-Era Sovereign Bond Restructurings, August 2012 (144129)

» Sovereign Default and Recovery Rates, 1983-2012H1, July 2012 (144320)

» The Causes of Sovereign Defaults: Ability to Manage Crises Not Merely Determined by Debt Levels, November 2010 (127952)

» Market Use of Sovereign Ratings, September 2010 (127353)

» Sovereign Defaults and Interference: Perspectives on Government Risks, August 2008 (110114)

» How To Sue A Sovereign: The Case Of Peru, November 2000 (61737)

» Sovereign Debt: What Happens If A Sovereign Defaults, July 2000 (57753)

Recent Sovereign Restructurings:

» Belize Debt Restructuring Fails to Resolve Credit Challenges, March 2013 (151586)

» Belize debt restructuring: 2007 vs 2012, October 2012 (145828)

» Moody's downgrades Jamaica's government debt rating to Caa3, outlook stable, March 2013

» Greece's Successful Bond Exchange Removes Key Uncertainty, but Risk of Default Post-Exchange Remains High, March 2012 (140541)

To access any of these reports, click on the entry above. Note that these references are current as of the date of publication of this report and that more recent reports may be available. All research may not be available to all clients.

Rate this Research »

# Appendix: Sovereign Bond Exchanges Since 1997 - Debt Exchange Details and Investor Losses

| Initial Default Date | Country (NR = not rated at the time) | Distressed Exchange Details: Old Instruments | New Instruments | Debt in Exchange: In US$bn | In % of Total Debt | In % of GDP | Loss (%): Nominal Haircut [1] | Loss as Measured by Trading Prices or NPV of Cash Flows (*) |
|---|---|---|---|---|---|---|---|---|
| Aug-1998 | Russia | LC debt (GKO and OFZ) | multiple | multiple | 8.3 | 4.5 | 3.1 | 29[2] | 46 res, 62 non-res, deval. 95* |
| | Russia | FC debt (MIN FIN III) | 1 | 2 | 1.3 | 0.7 | 0.7 | | 75 |
| | Russia | FC debt (PRIN and IAN) | 2 | 2 | 29.1 | 16.4 | 16.3 | 36 | 90 |
| Sep-1998 | Ukraine | LC T-bills held domestically | multiple | multiple | 4.5 | 30.0 | 9.0 | 34 | 18* |
| | Ukraine | LC T-bills held by non-residents | | 2 | 0.4 | 2.8 | 0.8 | | 59* |
| | Ukraine | FC Chase-Manhattan loan | 1 | 1 | 0.1 | 0.7 | 0.2 | | 31* |
| | Ukraine | FC ING bond and Merrill Lynch bond | 2 | 1 | 0.4 | 2.0 | 1.0 | | 38* |
| Dec-1999 | Ukraine | FC Eurobonds | 4 | 2 | 1.6 | 8.3 | 5.1 | 5 | 31 |
| | Pakistan | Eurobonds | 3 | 1 | 0.6 | 1.2 | 0.9 | | 48 |
| Aug-1999 | Ecuador | External debt | 6 | 2 | 7.0 | 49.5 | 41.5 | 40 | 56 |
| | Ecuador | FC domestic bonds | multiple | multiple | | | | | 9* |
| Mar-2000 | Cote d'Ivoire (NR) | Brady bonds | 6 | 1 | 2.8 | 18.7 | 12.4 | 20 | 82 |
| Nov-2001 | Argentina | Domestic debt | 50 | multiple | 64.4 | 49.6 | 22.6 | | 83 |
| | Argentina | External debt | 152 | 11 | 79.7 | 41.7 | 52.0 | 66 | 71 |
| Jun-2002 | Moldova | Eurobond | 1 | 1 | 0.04 | 3.2 | 2.7 | | 40 |
| Jan-2003 | Paraguay (NR) | Domestic debt due in 2003-06 | multiple | multiple | 0.1 | 6.5 | 2.6 | | 8* |
| May-2003 | Uruguay | LT FC bonds (external and domestic) | 65 | 73 | 5.4 | 56.8 | 39.6 | | 34 |
| Jul-2003 | Nicaragua | CENI bonds FC-denom, payable in LC | multiple | multiple | 0.3 | 6.1 | 5.4 | | 83 |
| Jul-2003 | Nicaragua | CENI bonds FC-denom. payable in LC | multiple | multiple | 0.3 | 12.5 | 5.4 | | 51* |
| Jul-2003 | Dominica (NR) | LC bonds (domestic and external) | multiple, 2 external bonds | 3 | 0.1 | 44.5 | 42.4 | 30 | 53* |
| H2-2004 | Cameroon (NR) | Domestic debt | multiple | multiple | 1.0 | 10.5 | 6.5 | | n.a. |
| Dec-2004 | Grenada (NR) | Global bond and domestic debt | 16 bonds | multiple | 0.3 | 65.1 | 48.9 | | 35 |
| Dec-2008 | Ecuador | Global bonds | 2 | n.a. (cash buyback) | 3.2 | 25.3 | 5.9 | 65 | 72 |
| Jul-2008 | Seychelles (NR) | External debt | 1 | 1 | 0.3 | 29.6 | 36.8 | 50 | 70 |
| Dec-2006 | Belize | Private external debt | 6 | 1 | 0.5 | 51.6 | 45.8 | | 24 |
| May-2005 | Dominican Rep. | International bonds | 2 | 2 | 1.1 | 16.7 | 5.1 | 5 | 5 |
| Jan-2011 | Cote d'Ivoire (NR) | Eurobond coupon | 1 | n.a. (cash repayments) | 0.1 | 0.6 | 0.4 | | 25 |
| Feb-2010 | Jamaica | Treasury bills (short-term) | 350 | 23 | 7.9 | 56.5 | 63.7 | 10 | 10 |
| Jan-2011 | St. Kitts and Nevis (NR) | Domestic bonds and external debt | 2 | n.a. (debt-land swap) | 0.3 | 30.3 | 46.6 | 50 | 62* |
| Nov-2011 | St. Kitts and Nevis (NR) | Domestic loans (debt-land swap) | multiple | n.a. (debt-land swap) | 0.1 | 12.8 | 19.7 | | n.a. |
| Mar-2012 | Greece | Greek and foreign law bonds | multiple | 23 | 273.4 | 55.2 | 94.2 | 54 | 76 |
| Sep-2012 | Belize | 2029 Superbond | 1 | 1 | 0.5 | 47.3 | 35.3 | 10 | 35 |
| Feb-2013 | Jamaica | Domestic debt | multiple | 1 | 9.1 | 53.8 | 63.0 | | 12 |
| **Exchange Average** | | | | 15 | 25 | 23 | | 44 |

Sources: Moody's, IMF country reports, and Sturzenegger and Zettelmeyer (2005).
Notes: [1] Nominal haircut shown if new instruments had different haircuts. [2] Holders of GKOs or OFZs had their scheduled payments discounted to 19 August 1998 at the rate of 50% per annum. Based on the resulting adjusted nominal claims, they then received a package of cash and new securities.

Report Number: 150162

| Author | | Editor |
|---|---|---|
| Elena Duggar | | Robert Cox |

Production Specialist

Wing Chan

© 2013 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

**CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.**

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

For Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail clients. It would be dangerous for retail clients to make any investment decision based on MOODY'S credit rating. If in doubt you should contact your financial or other professional adviser.



# EXHIBIT B

1            In The United States Court of Appeals

2                    For the Second Circuit

3    _____

4    NML Capital, LTD., Aurelius Capital Master,

5    LTD., ACP Master, LTD., Blue Angel Capital I LLC,

6    Aurelius Opportunities Fund II, LLC, Pablo Alberto

7    Varela, Lila Ines Burgueno, Mirta Susana Dieguez,

8    Maria Evangelina Carballo, Leandro Daniel Pomilio,

9    Susana Aquerreta, Maria Elena Corral, Teresa Munoz

10   De Corral, Norma Elsa Lavorato, Carmen Irma Lavorato,

11   Cesar Ruben Vazquez, Norma Haydee Gines, Marta Azucena Vazquez,

12   Olifant Fund, LTD.,

13                    Plaintiffs-Appellees

14

15   -v.-

16

17   Republic of Argentina,

18                    Defendant-Appellant

19   _____

20

21       ON APPEAL FROM THE UNITED STATES DISTRICT COURT

22          FOR THE SOUTHERN DISTRICT OF NEW YORK

23

24

25

26

```
 1  APPEARANCES:

 2

 3  Jonathan I. Blackman, Esq., -        The Republic of Argentina

 4  Cleary Gottlieb Steen & Hamilton LLP Defendant/Appellant

 5  City Place House

 6  55 Basinghall Street

 7  London, EC2V 5EH

 8  England

 9

10  James Christopher Martin            The Bank of New York Mellon, as

11  Reed Smith LLP                      Indenture

12  Reed Smith Centre                   Trustee,

13  225 5th Avenue                      Appellant

14  Pittsburgh, PA 15222

15

16  David Boies, Esq.,                  Exchange Bondholder Group,

17  Boies, Schiller & Flexner LLP       Appellant

18  333 Main Street

19  Armonk, NY 10504

20

21  Theodore B. Olson, Esq.,            NML Capital, Ltd.

22  Gibson, Dunn & Crutcher LLP         Plaintiff - Appellee

23  1050 Connecticut Avenue, NW

24  Washington, DC 20036

25

26
```

1   **Judge Pooler**: The subject before us today is the

2   November 21st order of the District Court. Uh, though it doesn't

3   appear yet on our CMECF. This panel has rejected the request

4   for rehearing. Um, it'll---the order will be filed later today.

5   Um, with that, we'll begin with the appellants, who are the

6   Republic of Argentina.

7   **Jonathan Blackman**: Good afternoon. May it please the court,

8   Jonathan Blackman representing the Republic of Argentina. The

9   court remanded to have the District Court address two critical

10  remedial issues so that you could then, uh, determine the merits

11  of the remedy. And the District Court's determination of both

12  of those issues was erroneous. The two issues are very much

13  related. The District Court's version of ratable payments is an

14  order to pay the full amount of plaintiff's monetary claims.

15  And the unprecedented injunctions are concededly a device to

16  enforce that payment. However we label them, their orders to pay in money--

17  **Judge Pooler**: Did---did anyone---uh, uh, suggest an

18  alternative distribution of the payments to the District Judge?

19  **Jonathan Blackman**: Well, it---we---we are suggesting on this

20  appeal a definition of ratable payments that we believe would be

21  more consonant with and indeed---

22  **Judge Raggi**: But that's not the question.

23  Was---was a different rate of payment suggested to the District

24  Judge? Because your adversary said that that was not the case.

 1   **Jonathan Blackman**: No. We had very little time to do anything

 2   before the District Judge. We had three days between the

 3   receipt of the plaintiff's brief and the date that was set for

 4   the following of our brief. Uh, there was never a hearing. Uh,

 5   there was a scheduling conference on November 9.

 6   **Judge Raggi**: That---that would suggest that we

 7   would expect the record to indicate that you requested more time

 8   from the District Judge in order to propose an alternative rate.

 9   **Jonathan Blackman**: We---

10   **Judge Raggi**: And I didn't see that.

11   **Jonathan Blackman**: Well, there---there is a letter that we

12   sent actually after this court's October 26th decision came

13   down, uh, uh, asking for a conference with the---and---and

14   proposing, uh, a schedule for addressing these issues which we

15   view---and I hope you---as complex issues, and issues that would

16   require in some cases the taking of evidence and certainly---and

17   instead what we got was the District Judge who was being more or less---

18   **Judge Raggi**: Well, let's deal with what the

19   District Judge did. The rate that the District Judge set, which

20   is full payment, is based on the conclusion that, having been in

21   default, Argentina triggered the acceleration provision of the

22   original bonds. And so what would be improper about the judge

23   saying that when you have to pay your obligations, you have to

1    pay the full obligation, um, existing as of this time? Because

2    that's effectively what the judge did.

3    **Jonathan Blackman**: Well, ratable payments, I think, we

4    believe---and I think you believed---you believed that was a

5    separate obligation from the payment obligation, which clearly

6    is for the full amount of accelerated principal and interest.

7    Ratable payments, uh, you remanded because you wanted

8    clarification of what that meant. And you gave two examples.

9    One was the example of every time a single interest payment is

10   made under restructured debt to pay 100% of what was due and

11   owing on the unrestructured debt. The other example that was

12   given was an example that if the total amount paid on the

13   restructured debt would be a percentage of the total of that,

14   then that similar percentage would be paid on the unrestructured

15   debt. And the formula we've proposed, which we think is

16   actually the only one that is truly an equal treatment, is a

17   formula that takes, as the baseline, the defaulted debt---that's

18   where we started---and says the exchange bond holders, Mr.

19   Boies's clients, are getting on a given interest payment a

20   fraction of the original amount they were owed on the, uh,

21   unrestructured debt. And that same fractions of the

22   unrestructured debt should be the ratable payment. That would

23   satisfy ratable payment.

24   **Judge Parker**: But in---in terms of the December

1  payment that was due, what---do the math for me. What would

2  that be?

3  **Jonathan Blackman**: Well, we---we---the---the record, I don't

4  think, reflects what our formula would have yielded, uh, so

5  [00:05:00]

6  I can't. It's one of the things that we really didn't get a

7  chance to do in the hasty way the District Judge proceeded. But

8  it would be a fairly small percentage, because you start with

9  the unrestructured debt.  70% of that, uh, has been, uh, uh,

10  part of the haircut.  And then the interest

11  payment on that restructured debt is of course---

12  **Judge Pooler**: Why would you start with the

13  unrestructured debt? Why wouldn't you start with the, uh,

14  settled debt? It would be a larger percentage.

15  **Jonathan Blackman**: Well, because the---the whole---the---the

16  party asserting the pari passu rights is saying that I should be

17  treated the same as the restructured debt. And the restructured

18  debt, in a default situation, has already been substantially

19  scaled back. So it---we do it---

20  **Judge Pooler**: Correct.

21  **Jonathan Blackman**: --as apples and oranges to say that because

22  the exchange bond holders are getting, uh, X, which

23  represents an interest payment on an already heavily discounted

24  amount, uh, that the plaintiff hold-outs should therefore get

1   the full amount of their claim.

2   **Judge Raggi**: But that overlooks the point that I made

3   to you before and I don't think you've addressed, which is,

4   what is owed to each party under its bond instrument as of the

5   next payment date? And as I understand it, the District Court

6   concluded---and this is based on judgments entered in other

7   actions---that the original bond holders are due their full

8   amount, due to Argentina's defaults. Whereas the exchange bond

9   holders, on whom you have made current payments, are ent---are

10  entitled to whatever the---the---the monthly or quarterly

11  payment is. But that each must be paid the amount due now. If

12  you hadn't defaulted, you'd be paying Argentina a fraction of

13  what you---they---uh, or, I'm sorry, Argentina would be paying

14  the original bond holders a fraction of their debt.

15  **Jonathan Blackman**: But---but we did default.  And I think

16  there's one of two ways---

17  **Judge Raggi**: But that---that does not inure to

18  your benefit.

19  **Jonathan Blackman**: It doesn't inure our benefit, but it does

20  drive the definition of equal treatment in the default context.

21  Otherwise what Your Honor is really saying is this:  that

22  we---if there's a default---and the default was certainly caused

23  by, you know, lots of circumstances beyond Argentina's control,

24  the debtor only has two choices.  It can stay in default

1  forever, which no one would want, and they would have more

2  judgments, not fewer. Or, if it restructures, uh, the

3  restructuring, uh, becomes impossible because of the first mover

4  problem. None of Mr. Boies's clients would've agreed to take

5  this quite dramatic haircut if they knew that after some period

6  of time, Mr. Olson's clients could say, "Well, we didn't

7  restructure. We want 100%, and moreover"---this gets to the

8  injunction point---"we can prevent you from getting, uh, your

9  discounted amount, uh, unless we get paid in full."

10 Why would we not--- [OVERLAY]

11 **Judge Raggi**: Well, that's---that's something that

12 we're speculating about because the exchange bond holders have

13 received regular payments, whereas the original bond holders

14 have received nothing, as I understand it, for what is it?

15 Eleven years?

16 **Jonathan Blackman**: That's correct. But what we're saying is

17 equal treatment. And again, the court---you---I---I remember

18 you, Judge Raggi, in the discussion talked about two sets of

19 obligations: the obligation to pay---which has never been

20 disputed, and the obligation to afford equal treatment. Well,

21 what---so we have to decide what equal treatment means. Now, if

22 equal treatment means that anyone who doesn't go into the

23 restructuring gets 100% and the people who do go into the

24 restructuring get a much smaller fraction, maybe 10% or 1% on an

1   interest payment, that doesn't sound to us like equal treatment.

2   It sounds like giving them a much better deal.

3   **Judge Pooler**: Counsel.

4   **Jonathan Blackman**: How---

5   **Judge Pooler**: How could we be sure, if we agreed

6   with you on a percentage, that it would be paid?

7   Jonathan Blackman: Well, I think we've made it clear, and I

8   will repeat fervently to this court that if the court would

9   determine that what I'm suggesting is the proper definition of,

10  uh, equal treatment, uh, in the, uh, system of separation of

11  powers that Argentina has, my clients, who are the executive,

12  would go to the Congress and---and seek legislation to

13  accomplish precisely this result. If---if we didn't, the court

14  obviously would retain jurisdiction.

15  **Judge Raggi**: What about if we ordered something

16  different? What if, for instance, we ordered that you make

17  Argentina---uh, you make the original bond holders current?

18  What---what would they have been paid over these eleven years?

19  And then you can start paying them on a monthly basis. Is---is

20  Argentina representing to us that you'd abide by

21  [00:10:00]

22  that kind of an order as well?

23  **Jonathan Blackman**: I have no instructions beyond what I've

1  given you, but I can say that that also would---would hardly be

2  equal treatment. Because they would be getting current---or

3  rather, past due payments on a much larger amount than Mr.

4  Boies's clients.

5  **Judge Raggi:**  They hold a bond that entitles them

6  to that.

7  **Jonathan Blackman**: I know, but---but this gets back to the

8  fundamental issue there. The determination of equal treatment,

9  as opposed to the injunction, seems to be essentially

10  illegal. What is the, uh, the measure of damages? Which is a

11  legal question. We are basically, uh, having to decide what is

12  the measure of damages for breaches---breach of the pari passu

13  clause? And the measure of damages is uh, not, uh, to pay one

14  person in full when someone else is being paid a fraction,

15  but---

16  **Judge Raggi**: I'm not sure I see that point. We're

17  not avoiding damages for a breach of this. The District Court

18  was enforcing the pari passu clause.

19  **Jonathan Blackman**: That gets us to the injunction, which we

20  think is---is inappropriate under any circumstance.

21  **Judge Parker**: Well, before, before you get to the injunction,

22  though, I want to be sure that I understand what your theory of,

23  uh, equal treatment or ratable payment would yield. Let's say

24  the exchange bond holders, um, are getting, um, at the next, uh,

Case: 12-105   Document: 952   Page: 56   04/22/2013   914956   239

1   scheduled payment time their coupon interest, whatever it might

2   be. And ratable treatment would require what payment to the

3   original holders?

4   **Jonathan Blackman**:  It---it would require you to take

5   whatever that coupon is, uh, and compare it to the amount of the

6   unrestructured debt originally held by the exchange bond holder.

7   And whatever that percentage is, would then be applied to, uh,

8   the amount of, uh, uh, the, uh, uh, unrestructured debt held by

9   Mr. Olson's clients. And we would be more than happy, uh, to go

10   back to the District Court if you were to g---go back

11   and---and---and work out that math, which is one of the things

12   we would have done had we had more time to do it, uh, uh, last

13   November. We didn't have that opportunity. But that is what

14   Argentina wants very much to do, because---to get to the

15   injunction. What we don't want to have happen is a situation

16   where nobody benefits.  The effect of these, uh, injunctions,

17   uh, is that nobody gets paid, uh, because, uh, um, Argentina is

18   not going to go beyond what its very firmly stated public policy

19   is, uh, and give what it views as a preference to anybody.  If

20   it had done that, it could never have done this deal in the

21   first place.

22   **Judge Parker**: And---and what's---uh, uh,

23   articulate that public policy for me again.

24   **Jonathan Blackman**: The public policy, which is not at all

1   unique to Argentina, is inter-creditor equity. You start off

2   with an insolvency situation, but an insolvency situation where

3   there is no bankruptcy.  But the principal that informs

4   debt restructuring is the same principal that does inform

5   bankruptcy law, which is inter-creditor equity.  You don't

6   prefer one creditor to another, and if there's going to be a

7   haircut, everyone has to take the haircut.

8   **Judge Raggi**: So that I understand that, are you

9   basically telling us that you will pay the original bond holders

10  the same amount you pay the exchange bond holders, going

11  forward. That's---that's what you're offering to give?

12  **Judge Pooler**: Not the same amount, the same percentage.

13  **Jonathan Blackman**:  Not the same fraction, the same

14  percentage.

15  **Judge Raggi**: Same percentage.  Okay. Um, and

16  you're also telling us that despite the District Court's order

17  and despite the possibility that we might affirm it, you would

18  not obey any order other than the one you've just proposed.

19  **Jonathan Blackman**: We---we---uh, public policy is firm on

20  that issue, and I don't want to be---

21  **Judge Raggi**: So the answer is yes? [OVERLAY]

22  **Jonathan Blackman**: Yes, there is---

23  **Judge Raggi**: That you will---you will not obey

24  anything other than what you've just proposed?

1    **Jonathan Blackman**: We---we---we would not voluntarily obey

2    such an order, but I'd like to explain, because that's

3    a---that's a red flag.

4    **Judge Raggi**:  What does that mean, voluntarily

5    obey? I mean, we would issue an order, and---I---I just want to

6    be sure you're telling---you're telling us it wouldn't be

7    obeyed?

8    **Jonathan Blackman**:  I'm telling you it wouldn't be

9    voluntarily obeyed, and that gets me to a fundamental point.

10   And I don't want to wave a red---

11   **Judge Raggi**:  What does voluntarily mean?

12   **Jonathan Blackman**: Please would---

13   **Judge Raggi**: I mean, we're not gonna send out the

14   marshals, you know.

15   **Jonathan Blackman**: Well, that's the point, that's---

16   **Judge Raggi**: Okay, so---

17   **Jonathan Blackman**: You can't send out the marshalls---

18   **Judge Raggi**: --there will be no compliance except

19   basically you're dictating what the court [OVERLAY] would order.

20   **Jonathan Blackman**: We're not trying to dictate.   We're

21   trying to persuade the court to do something which is workable

22   and doesn't create a terrible confrontation. I think there's a

23   lot of cases that say that equity should not order something

1    that is impossible or impracticable, first of all.  And

2    secondly, equity should

3    [00:15:00]

4    not order something---

5    **Judge Raggi**: Usually that's not because someone's

6    prepared to be contumacious.

7    **Jonathan Blackman**: Well, it's also not really applied to the

8    sovereign context. With all respect, I think this court---and I

9    heard you just say you denied our rehearing, so we have limited

10   recourse except, perhaps, you know, to another court. Uh, the

11   Sovereign Immunities Act is designed to avoid these kinds of

12   incredibly difficult and contentious and---if you

13   will---contumacious confrontations, because it limits execution

14   and enforcement to things that the court can do. You can send

15   the marshal to a bank account in the United States. Argentina

16   doesn't have to cooperate. You can send the marshal to seize

17   securities. That's happened in a case. You can attach property

18   here. But you can't---of course you can't send the marshal to

19   Buenos Aires. And that is the problem. NML said itself---and

20   this is a very important thing in the record at 8.2.10, they

21   called the pari passu clause, their words, "an enhanced judgment

22   enforcement mechanism." Well, if it is that, we would

23   respectfully submit that you should take a rethink at your

24   decision about the FSIA because Section 1609 through 1611

1   occupied the field for judgment enforcement devices. And

2   Congress never could possibly have contemplated sending the

3   marshal to Buenos Aires. That gets us to the problem of the

4   injunctions. These injunctions---

5   **Judge Raggi**: But I---I wouldn't have thought that

6   was the ground on which we'd argue this because the vast

7   majority of our court orders do not require that action.

8   **Jonathan I. Blackman**: Well, but that---

9   **Judge Raggi**: The parties who submit to the

10  jurisdiction of the court generally obey the orders of the

11  court.

12  **Jonathan Blackman**: But with---with a sovereign though,

13  Congress understood that you would have judgments---I'm not

14  talking about orders now---but judgments, that would not be

15  satisfied. That's why we have three sections.

16  **Judge Raggi**: But---but we're not rehearing that

17  argument.

18  **Jonathan Blackman**: I know you're not rehearing it, but I'm

19  trying to put it into context. Because I don't want you to get--

20  -feel that my client is being contumacious.  But if a---if

21  a foreign court, if a court in Iran ordered the United States to

22  turn over several billion dollars as damages for injuries that

23  Iran believes it has suffered, I do not think our President and

24  government would say yes.  And, could that be contumacious in

1   the eyes of the Iranian court? Yes. Now, all I'm trying to say

2   is that Argentina has a public policy. It is not going to and

3   cannot prefer Mr. Olsen's clients. It---and---and so if---if

4   that's the---the---the confrontation that the court seeks, uh,

5   through an injunction, that's---that's the court's decision.

6   **Judge Raggi**: Your argument would be appealing, I

7   would think, had Argentina been making any payments to the

8   original debt holders. But you come to us and you make this

9   argument in the context of facing an order that requires you to

10  honor the acceleration clause of that contract. And so I---I

11  don't understand how we are supposed to be persuaded by an

12  argument that you're not going to give them a preference when

13  to-date the court's conclusion is that you have treated them

14  in---as inferiors to other debt holders, which is specifically

15  prescribed by the bond instrument.

16  **Jonathan Blackman**: My response is that there is not a single

17  sovereign debt circumstance in the record, or that I'm aware of,

18  where the, uh, insolvent defaulted debtor simultaneously pays

19  current interest, uh, to the hold-outs, uh, while, uh,

20  restructuring. Because again, no one would enter into that

21  restructuring. Why would they? They're entitled under

22  your---your reading to get paid current interest, and also to

23  accelerate, of course, potentially, if there's something missed,

24  uh, uh, or a violation of the pari passu clause, uh, on their

1  principal. And you have to recognize that they---the realities

2  of the situation, which I said, are very much consistent with

3  how these restructurings are always done. And the idea of

4  intercreditor equity is that you don't---you don't give a

5  preference to hold-outs. They have every legal right to

6  accelerate as they did and to seek to execute as they've done,

7  not only here, but also in foreign countries, to the extent that

8  the law permits. But the fact of unsatisfied judgments is a

9  premise of the provisions of the FSIA. It is not, with all

10 respect, something that---that justifies a unique collection

11 remedy. Any collection remedy has to be limited by the

12 provisions of the statute that

13 [00:20:00]

14 deal with collection remedies, which is 1609, 1610, 1611.

15 **Judge Pooler**: All right. We need to move on.

16 **Jonathan Blackman**: Can I move on to the injunction point?

17 **Judge Pooler**: Uh, you can take another minute.

18 **Jonathan Blackman**: Okay. Mr. Boies, fortunately,

19 and---and---and, uh, uh, Counsel for Bank of New York Mellon are

20 going to address that. But I think the key point is that, given

21 the dialogue we've been having, uh, these injunctions---and I

22 think everyone recognizes---operate solely to coerce third

23 parties. The idea is to put pressure on Argentina to do

24 something that goes beyond the scope of execution under the

1  statute, in order to make it pay in monetary claim, which is the

2  function of execution. And there's a load of law that

3  says---and the judge in England said it best, in the one case

4  that resembles this---Judge Tomlinson, in the case called

5  Kensington vs. Congo. Kensington is another, uh, entity in---in

6  the Elliot family. It's the same party, basically, as we have

7  here. Said, "It would not be proper for me to enter an

8  injunction whose coercive effect is directed at third parties,

9  uh, not ancillary, under Rule 65D, but primary." The primary

10 effect of this injunctions is to coerce completely separate

11 parties who have their own property rights, their own legal

12 interest, in order to make Argentina do something which

13 Argentina is not going to do. Thank you.

14 **Judge Pooler**: Thank you, Counsel. We'll hear next

15 from the Bank of New York Mellon.

16 **James Martin**: Thank you, Your Honors.  James

17 Martin. And---and may it please the court, I am here for

18 non-party appellant Bank of New York Mellon. Let [PH 00:21:43]

19 the distinct, with respect to Bank of New York Mellon, that

20 relates directly to the scope of the injunction and the attempt

21 to enjoin a non-party, which is an extraordinary circumstance in

22 our jurisprudence. The District Court viewed the extension of

23 the injunction to non-party BNY Mellon is necessary to

24 effectuate its injunction, but in taking that step, uh, the

1  court lost sight of the limited function and limited ways in

2  which a non-party can be enjoined under the appropriate legal

3  standard.  And two, when it got to the independent conduct of

4  BNY Mellon in taking whatever steps it would under the

5  indenture, it abandoned principles of due process.

6  **Judge Pooler**: So Bank of New York Mellon can be

7  enjoined from acting in concert with Argentina, if they attempt

8  to avoid the effect of the injunction. Isn't that correct?

9  Whether you're a named or a not, you would be, assuming you were

10  served with notice. You would prohibited from acting in concert

11  with them, to defeat the injunction.

12  **James Martin**: Uh, yes, Your Honor, the standard

13  would be active concert and participation, and that conduct

14  would have to be taken for the purpose of, uh, helping Argentina

15  to evade the injunction. That's the evidence that's missing in

16  this record. Uh, there's no suggestion in this record anywhere

17  that BNY has taken any steps with Argentina to breach the

18  injunction, or that we'll ever do that. Argentina makes the

19  decision on its own, whether or not it's going to make a ratable

20  payment.  After that there are only two steps in the process

21  that relate to BNY Mellon. One is the receipt of a payment,

22  which is passive conduct, not done in concert with Argentina.

23  And the second would be the payment after that to the exchange

24  holders, which under the indenture is independent conduct, and

1  there's no evidence in this record that those payments were made

2  to help further Argentina in evading the injunction. And

3  it's---[OVERLAY]

4  **Judge Raggi**: The injunction, though---

5  **Judge Parker**: Is---is the test---is the test

6  subjective or objective?

7  **James Martin**: Uh, the test would require objective

8  evidence in the record, Your Honor.

9  **Judge Parker**: So why wouldn't the payment satisfy

10  that?

11  **James Martin**: Because the payment itself is not

12  objective evidence of BNY Mellon acting with the purpose of

13  helping Argentina evade the injunction.

14  **Judge Raggi**: But the injunction provides you with

15  certain notice. Namely, that the court has ordered that monies

16  not be paid to the exchange bond holders unless specified monies

17  are also paid to the original bond holders.  And it tells you

18  not to participate in the transfer of monies unless you are

19  given some evidence that the original bond holders are being

20  paid simultaneously. Isn't that what the injunction

21  basically---

22  **James Martin**: Right.

23  **Judge Raggi**: --requires of you? All right.  So

1  since you know the purpose of the court order, unless you get

2  that, um, confirmation that the original bond holders are being

3  paid, for you to go ahead and pay the---pay the, um, the

4  exchange bond

5  [00:25:00]

6  holders knowing that there's such a court order, I don't know

7  how you could argue that it would support anything other than an

8  inference that you're, um, acting in concert with Argentina to

9  evade the injunction.

10 **James Martin**: Uh, Your Honor, I think we need to

11 break that into two pieces.

12 **Judge Raggi**: Please.

13 **James Martin**:  The first is, the standard active concert

14 and participation which involves actions taken with proof that

15 it was done for the purpose of helping the party---that's

16 Argentina, the only person who's enjoined here---breach the

17 injunction.  So knowledge on our part that they have breached

18 the injunction and a payment that follows them doesn't cross

19 that threshold of proof.  Whether it creates an inference or

20 not, it's also perfectly lawful conduct. It doesn't---

21 **Judge Raggi**: You're telling us to look for a

22 requirement beyond concert and participation to require a, um,

23 nefarious *mens rea* on your part?

24 **James Martin**: Right. Now you could start with this

1  court's opinion in the Levin case, which puts knowing assistance

2  in terms of common law and historic aiding and abetting. And in

3  fact, all the jurisprudence under Rule 65D2 does that. It has

4  this plus factor, it has the scienter element. All the

5  cases that have been decided at this court, if you unpack them,

6  when---

7  **Judge Raggi**: You know the common law principle of aiding

8  and abetting which, after all, applies in the criminal law, can

9  actually get you, um, found culpable on less involvement than

10  active concert and participation. The *mens rea* is the critical

11  component of it. I thought here, the statutory requirement of

12  active concert and participation required more substantial

13  involvement but not necessarily the same culpable *mens rea*.

14  **James Martin**:  Your---Your Honor, I think it

15  requires both. I think the historic view of the language was

16  intended to protect against what is an extraordinary event, and

17  that is enjoining a non-party.

18  **Judge Raggi**: I thought here it was that once you

19  get notice, that the court expects that certain conduct be done,

20  that you actively participate or act in concert to evade

21  that, you're stuck.

22  **James Martin**: Yet, that is not the legal standard.

23  That is what the plaintiffs would want the legal standard to

1   be, but there are only two ways an injunction can be directed at

2   BNY Mellon. As a non-party it is rigorous under Rule 65---and

3   there's 80 years of jurisprudence behind this---that absent

4   affirmative evidence that we have taken steps in this case for

5   the purpose of helping the primary violator violate the

6   injunction---evidence that isn't here---you can't use Rule 65D2

7   to reach us. Now, if---

8   **Judge Pooler**: In injunction.

9   **James Martin**: I'm s---right.

10  **Judge Pooler**: Reach you with the injunction.

11  **James Martin**: With the existing injunction.  Now,

12  if---if, Your Honor, the second piece of it is, if everyone in

13  this courtroom believes for some reason---and we certainly

14  don't---that the independent conduct we take that is not linked

15  to the purpose of helping Argentina evade the injunction is, in

16  fact, unlawful, or that something about the payment process is

17  unlawful, as---as the plaintiffs believe and the District Court

18  suggested after notice, then more process is due.  Somebody

19  needs to sue us, they need to make a claim, they need to show

20  that that conduct is, in fact, unlawful.  We get to defend

21  against that claim.  And---and that goes back to the Zenith

22  Radio case, the Alemite case, Judge Hand's opinion. Bringing a

23  third party's independent conduct into the scope of an

1   injunction where their rights have not been adjudicated is not

2   permissible, Your Honor, on the basis of giving them notice. It

3   fundamentally violates the constitution. The result in the

4   Lakeshore case we've cited, in this court's opinion in the

5   Hayman case, uh, the result of---of the, um, uh, a case, um,

6   involving the corporate affiliates in Zenith Radio. None of

7   those cases substantiate that the giving of notice can reach

8   somebody who's connected to a controversy absent affirmative

9   proof, a lawsuit process and defense. The only way to get at a

10  non-party, on the other hand, under Rule 65D2 is with that

11  affirmative higher burden of proof that requires concert of

12  participation in the breach. Your Honor, that evidence is

13  absent in this record. The only---

14  **Judge Pooler**: Do you think Judge Griesa should've taken

15  that evidence?

16  **James Martin**: I think what Judge Griesa should have

17  done is recognize the discipline that exists here as it applies

18  to third

19  [00:30:00]

20  parties. When he didn't have the proof that there was any

21  conduct on the part of BNY Mellon of acting with Argentina for

22  the purpose of violating the injunction, he should have

23  recognized and not made it a part of his order that we could be

24  held in contempt for doing that.

1   **Judge Raggi**: If Arg---if your---if Bank Mellon

2   transfers money to the exchange bond holders after participating

3   in all of this litigation without notice, Argentina has also

4   satisfied its obligations to the original bond holders, with

5   what intent are you operating?

6   **James Martin**: We are operating under the terms of

7   the indenture, Your Honor, which---which provide for that. If

8   someone thinks that that's unlawful, because of the injunction

9   that properly binds Argentina, and that BNY Mellon's independent

10  conduct in making that payment is, in fact, unlawful as the

11  District Judge described, and if he thinks he can enjoin the

12  payment process, he cannot do that on the record he has.  We

13  c---we have to be a party for that purpose. We have to be

14  served, we have to be given the right to plead. They have to

15  meet the affirmative requirements for an injunction, something

16  that they haven't attempted to do. And that's the problem with

17  the record here. You're taking Rule 65D2 and it's very, very

18  elevated burden of proof with respect to non-parties. You're

19  substituting notice for that. And then you're enjoining the

20  whole world, us specifically. This is what Judge Hand said we

21  can't do in the Alemite case, this idea that courts had roving

22  powers to enjoin people who were not parties is not part of our

23  jurisprudence. That's the line we're asking the court to draw.

1   If---if somebody wants to make us a party and let us defend,

2   that's fine. But that isn't the record the court has.

3   **Judge Parker**: But substantively, what arguments

4   would you make that are not already in the record?

5   **James Martin**: Oh, Your Honor, actually first of

6   all, putting that burden on us skews the---the analysis.

7   **Judge Parker**: I didn't put any burden on you; I

8   just asked you a question.

9   **James Martin**: Well, first of all, we'd have to see

10  what arguments the plaintiffs had for enjoining us under

11  elevated burden of proof, that they could succeed against---

12  **Judge Parker**: Well, look, we've got the terms of

13  the indenture. We can all read that. You know what your

14  obligations are under the indenture. Uh, wh---uh, I don't

15  understand, um, you know, what else there is that, uh---put the

16  not insignificant procedural issues aside for a minute, what

17  else is there, uh, that a---that a, uh, a court would need to

18  know with respect to what you were---uh, the role you play in

19  these transactions?

20  **James Martin**: Uh, I---I think that makes my point

21  actually, Your Honor. The role under the indenture is a

22  perfectly lawful one; it's not tortious, it isn't anything.

23  It's the role under the indenture which is ministerial and very

1    specific. If somebody thinks that's a tort, they oughta sue us!

2    **Judge Raggi**: But see, that's---

3    **James Martin**: Tell us what the theory is.

4    **Judge Raggi**: That's the significance of notice.

5    You know, that it's going to the head of the---the money's

6    going to the head of some criminal enterprise, or once you know

7    that it's going to front some other criminal activity, um, and

8    you continue to pay it on behalf of whoever the, uh, criminal

9    mastermind is, you might very well find yourself enjoined. Here

10   there is a different scenario. There is a financial dispute.

11   But the court has issued orders. And once you are apprised that

12   the person entrusting you with money has been subjected to

13   certain conditions for that transfer, for you---for you to go

14   ahead and make the transfer without receiving the proof

15   that---of compliance, it seems to me, makes you complicit.

16   **James Martin**: Your Honor, it doesn't provide a

17   substitute for what Rule 65D2 would require on the one hand.

18   Complicit in an act that has the effect of frustrating

19   a---a---an injunctive order against---

20   **Judge Raggi**: Well, I'll use the language of the

21   rule if you want. That you're in active concert at that point

22   because you know exactly what's going on and you are furthering

23   it.

24   **James Martin**: The---the breach, Your Honor, at that

1  point, would already have occurred. We aren't furthering it.

2  The breach is when Argentina doesn't make the ratable payment.

3  We aren't part of that decision.

4  **Judge Raggi**:  You're the payment---they don't have

5  to pay anything to the original bond holders. As long as they

6  don't pay anything to the exchange bond holders.

7  **James Martin**: That's exactly---

8  **Judge Raggi**: So without paying to the original

9  bond holders, for you to facilitate their payment to the

10 exchange bond holders is active participation in their contempt.

11 **James Martin**: It's not, Your Honor, because the

12 breach has already occurred.  We don't---we're not a part of

13 that decision. On the second step of the analysis, substituting

14 [00:35:00]

15 notice for what Rule 65D2 requires in terms of active concert

16 and participation puts the shoe in the wrong place, or

17 downstream, or where it doesn't belong.  Under the indenture,

18 our conduct is independent. BNY Mellon acts under the indenture

19 pursuant to the terms of the indenture, and Argentina is not

20 involved in that; they're divorced from it. The only way you can

21 make the link between the party's breach of the injunction

22 and BNY Mellon here is proof that we were involved with

23 Argentina purposefully in the decision to evade the injunction.

24 Failing that proof, putting notice in the injunction that that's

1  a bad act or it's wrong doesn't allow the court to use the

2  injunction to reach a third party. After that, what you have to

3  have is service, process, and a claim---what every other party

4  would expect in defending against an injunction. If that

5  independent conduct, Your Honor, is enjoinable in the court's

6  view, it would require that due process protection at a minimum.

7  The Zenith Radio case tells us that; the Lakeshore case tells

8  us that. This court's opinion in Hymen tells us that. And the

9  cases since the Alemite case tell us that. You cannot use an

10  injunction against a party as an omnibus instrument to get at

11  non-parties and coerce them to help accomplish the purpose of

12  the injunction. It's that simple.

13  **Judge Pooler**: All right. That's a good place to

14  stop. You've reserved a minute for rebuttal.

15  **James Martin**: Thank you.

16  **Judge Pooler**: We'll now hear from the exchange bond

17  holder group.

18  **David Boie**s:  Thank you, Your Honor. May it please the court,

19  my name's David Boies and I represent the exchange bond holders.

20  We really have two basic points. First point is that the scope

21  of the injunction is improper because it prevents---it is

22  expressly designed to prevent our clients from accepting and

23  receiving money that is contractually, undisputably, and

24  unconditionally owed them. That injunction was issued in a case

1  in which we were not a party. If we had been a party we---we

2  would've argued that it could not---that relief could not be

3  granted. But we weren't even given an opportunity to defend

4  against an injunction that is designed to prevent us from

5  accepting money that we're contractually owed, that we're owed

6  because we entered into the exchange bonds, uh, as part of a

7  settlement sponsored by this government and other governments to

8  attempt to resolve that financial crisis in Argentina.

9  **Judge Pooler**: What relief do you seek from us,

10  Counsel?

11  **David Boies**:  Um, the---the relief that we seek from you is to

12  be clear that this injunction does not bind us or our trustee.

13  Our trustee, the Bank of New York, is essentially us.

14  They---they don't play any role in this, other than to receive

15  money and distribute it to the bond holders. That's their

16  function. Their function is exactly the same as if we were

17  receiving the money. I think the court would hopefully agree

18  that you could not have an injunction that says, to us, "Don't

19  receive the money." You know, "You must refuse the money that's

20  due you, because only by you refusing that money can we somehow

21  put pressure on Argentina to pay these people."

22  **Judge Raggi**: As I understand the argument against

23  your position---and I want to make sure I do understand it

24  correctly and that you can respond to it, um, the original bond

1  holders assert that any obligations to your clients are subject

2  to the, um, pari passu clause of the, um, the, um, original

3  agreement, which all or some of your clients are familiar with

4  because they were original bond holders at one time, so this is

5  no surprise to them. And that in those circumstances, um, it is

6  within the court's power to condition Argentina's payment on its

7  satisfaction of that earlier obligation. Upon satisfaction,

8  Argentina can certainly pay every penny it owes your client.

9  But without satisfaction of that prior condition, it cannot pay

10 anything to anyone. Why is that not a persuasive reason to

11 maintain the injunction?

12 **David Boies**: I think for two reasons, Your Honor.

13 **Judge Raggi**: Please.

14 **David Boies**: The first is that our clients did not take, um,

15 this---these bonds on condition

16 [00:40:00]

17 that the other bond holders would be play---paid. Quite---quite

18 the contrary. There's nothing in the bond---

19 **Judge Raggi**: No, I understand that that's not part

20 of your clients' agreement but the argument, as I understand it,

21 is your clients knew that Argentina has this preexisting

22 obligation.

23 **David Boies**: Yes.  But---but Your Honor, the fact that they

1  knew that it had a preexisting obligation does not incorporate

2  that obligation into our bonds. Um, there's---I---I---I think

3  there's no precedent or policy that would say that in

4  restructuring bonds, because you know that there are other bonds

5  out there that are not being restructured, you cannot enter into

6  a new lending agreement.

7  **Judge Raggi**: But it could---would be as if one

8  person entered into a contract with a party knowing that that

9  party had other contractual obligations that said, "We will be

10  paid first." When you take a contract with such a person, you

11  know you're at least second or third in line for payment. Here

12  they---they don't have a priority, but they say they have

13  an ob---they have a right to be paid at the same time as you

14  all.

15  **David Boies**: E---except, Your Honor, that, uh, when we

16  take--- we ---if we follow that logic, your logic, to its

17  extreme, what you would say, is nobody could ever lend to a

18  sovereign, when they had bonds that were in default,

19  outstanding. That's not the law; it's never been the law.

20  **Judge Raggi**: That's not really this court's

21  concern. I mean, whatever the market might do, the reality is

22  what it has done here and what, under what kind of contractual

23  obligations.

24  **David Boies**:  That's---that's exactly my point. I---I

1   understand the court's frustration here, all right? You've got

2   Argentina and it hasn't paid its bonds, and there doesn't seem

3   to be any way to get them to pay those bonds.  And what the

4   court is trying to find. it is trying to find, "How can we

5   fashion an order that somehow makes them pay?" And what I'm

6   saying is that there are certain ways that you can do it. There

7   are certain ways that the Congress has said you can't do it.

8   But, what the law---I suggest, and the Constitution is quite

9   clear---is that you can't say to us, "We're going to hold you

10  hostage. We're going to say that you don't have a right to

11  accept your lawfully negotiated contractual payments."

12  Remember, remember, Your Honor, these were bond holders that

13  started off with the same kind of bonds; they exchanged them.

14  And at the time of that exchange, which was sponsored not just

15  by private parties but through governments, because it was

16  important to get it done, but they took---on these obligations.

17  And both sides have agreed in the District Court that we have an

18  unconditional right to that payment. We have an unconditional

19  right to that payment. The suggestion that somehow our right to

20  that payment is conditioned on something else, is nowhere in the

21  record, and there's no evidence to that. The question is, can

22  that unconditional right to be paid---to---for us to be paid,

23  can that be broken?  Can that be blocked?  Can that be

24  prevented? Even for a good purpose. And particularly done in a

1  case in which we're not even a party.  And---and I suggest to

2  you that that's not the case. And---and---and I would also

3  suggest that I heard the conversation about what was ratable and

4  the like; I---I---I think that there is another way to think

5  about this issue, and that is the court's equitable powers.

6  When you're using the powers of equity, what you're trying to do

7  is do that in a way that is fair and reasonable. And---and I

8  suggest to you that it's not fair and reasonable to try to

9  fashion an order---particularly a coercive order---on third

10  parties, the purpose of which is to give one group of people,

11  the hold-out bond holders, much greater return on what they paid

12  than the exchange bond holders. We had pro---we had proposed at

13  the District Court level that they get---that---that the

14  [INDISCERNIBLE]---the judge was going to enter an order, we

15  didn't think it should. The judge was going to enter an order.

16  He entered an order that essentially says, "They get the same

17  return on their original investment as we are getting on our

18  original investment."

19  **Judge Parker**: But what does that mean?

20  **David Boies**:  That---that means, Your Honor, that what---what

21  you would look at, is you would look at, "What would they have

22  gotten if they had exchanged their bonds?" And you fashion an

23  order that says, "Whatever they would've gotten if they would've

24  exchanged their bonds, they ought to get, as long as we're being

1  paid." In other words, we're being paid, um, a certain amount of

2  money, uh, based on our original bonds. And---an

3  equitable order would say, "Okay.

4  [00:45:00]

5  Pari passu, with you being paid that, you get those payments as

6  well." Now, that doesn't give them everything they're entitled

7  to, under the terms---

8  **Judge Pooler**: Counsel, can I assume that you're

9  neutral about Argentina's proposal on percentage of the

10  unreconstructed debt? Are you neutral about that?  Or do you,

11  uh, care?

12  **David Boies**: Well, we---we care that there---that if there's

13  going to be an injunction that, in effect, binds us in terms of

14  what we can receive, that it would be equitable.  And, um,

15   and---

16  **Judge Raggi**: How is it equitable to tell the bond

17  holders who haven't been paid anything for eleven years that

18  what they can now get going forward---not even with any payment

19  for---for all that lapse is what they would've gotten if they

20  had, um, exchanged their bonds? They weren't req---required to

21  exchange their bonds. They've been the victim of a default and

22  you're saying all they should get paid is the exchange bond

23  rate.

1  **David Boies**:  All---all I'm saying, Your Honor, is---is, I'd

2  like to then---to pay the 100 cents on the dollar, or---or I

3  guess it's 300 cents on the dollar with all the defaults and

4  everything, and if they could get that amount of money, uh,

5  I'd---uh, I'd be happy for them. Uh, what I'm saying is---

6  **Judge Raggi**: Not too happy, but okay.

7  **David Boies**: But it's not my money, Your Honor, it's not my

8  client's money. Um, uh, we're---we're innocent parties here,

9  Your Honor. I represent people who did what they thought at the

10  time was the right thing.

11  **Judge Raggi**: Right. I understand that.

12  **David Boies**: Okay? They---they did what the government said we

13  oughta do.

14  **Judge Raggi**: Understand.

15  **David Boies**: And all I'm saying is that what they did shouldn't

16  now count against them. Shouldn't---the court should not now

17  say, "Not only are we going to step in and prevent you from

18  accepting what you are due, but we are going to say that we are

19  going to do that unless and until these other group of creditors

20  get much more than you've gotten!" And I suggest that that is

21  not a proper use of---

22  **Judge Raggi**:  Let me ask you this, um, to the

23  extent your argument is, "Look, our clients are entitled to be

24  paid $100 next pay period, so if we get paid $100, how can we be

1   in contempt of anything? That is money owed to us."  Do you take

2   any position on the court's authority to enjoin everybody else

3   in the chain that gets you that money?

4   **David Boies**:  Uh, maybe not everybody else in the chain.

5   **Judge Raggi**: Your trustees, I know.  You're

6   looking---[OVERLAY]

7   **David Boies**: I trust---

8   **Judge Raggi**: --to him to be accepted.

9   **David Boies**: Got it.

10  **Judge Raggi**: But anything else, do you---do

11  you---you---

12  **David Boies**: People who are not our trustees.

13  **Judge Raggi**:  So if they can get the money to you

14  by putting it directly in your pocket or that of the trustee,

15  your view is, "They're only giving us what we're owed and we

16  shouldn't be in---in contempt for it."

17  **David Boies**: Exactly, Your Honor.

18  **Judge Raggi**: Okay.

19  **David Boies**: If we simply take it---and---and---and my point

20  about the bank in New York is they're---they're us.  They're

21  just a trustee. And when---when they get paid money, it's like

22  paying money to us except you can't pay money to all these

23  individual bond holders; you need a payment system.  Um,

1   and---and---and I think we want to have that payment system, and

2   frankly, I think we want to have that payment system here as

3   opposed to Belgium or the United Kingdom or one of the other

4   places that has identified a different rule. If the court had

5   the kind of injunction that the District Court entered here, it

6   would be unique among---you know, industrialized nations. And,

7   um, and---and what we're really saying is that we're going to

8   prevent the payment system from working the way it's designed to

9   work. We---you need a payment system to get money from

10  individual bond holders.  When it goes to New---Bank of New

11  York, it's like going to us. Analytically, it's---it's exactly

12  the same thing. And all we're saying is that you shouldn't tell

13  us, that "We're gonna put you under threat of criminal contempt for

14  accepting this unconditional money that you're due."

15  **Judge Pooler**: The order doesn't do that.

16  **David Boies**: What?

17  **Judge Pooler**: It doesn't subject the exchange bond

18  holders to criminal contempt for accepting their payment.

19  **David Boies**:  Well, well Your Honor, I---that's not explicit,

20  but it's not explicit the other way either. Um, I mean, for

21  example, um, could we take our bonds, um, uh, and move them out

22  of the United States to Belgium or the United Kingdom and get

23  them paid there? Um, uh, not, I think, under the interpretation

24  that, um, the hold-out bond holders are given. But whether or

1  not that's true, when the Bank of New York is just like us---I mean,

2  for example, let's say the court agrees, hypothetically, that we

3  could not be held in contempt for anything we did with our

4  bonds, uh, that we could not be held in contempt for accepting

5  money or for moving our bonds to someplace where we could get

6  them paid. The Bank of New York is just a---that's---

7  [00:50:00]

8  they're us. They're just a trustee.

9  **Judge Pooler**: So your argument is, they can't be

10  held in contempt either.

11  **David Boies**: Exactly. But for---[OVERLAY]

12  **Judge Raggi**: So, seeing the briefing that suggests

13  otherwise, and I expect we'll hear argument to that effect, do

14  you want to respond to anything that's in the brief as to why

15  Bank of New York should not be viewed only as your trustee, but

16  as playing almost a dual role, here?

17  **David Boies**: Um, I---I'll do it very briefly. And I've saved

18  three minutes for rebuttal.  And if something new comes up

19  I'll---I'll try to address it there.  But, as I read their

20  briefs, what they're saying is that because the Bank of New York

21  gets this money, and it knows that the hold-out bond---bond

22  holders are not going to get paid, they are frustrating the

23  injunction by paying us. And---and I say to the court, there is

24  a sense in which that's true. There's a sense in which it is

1   true, if we accept money, we're frustrating the injunction. I

2   mean, if---if somehow we got on a plane, flew to Argentina, went

3   to the Treasury of Argentina and they paid us out in cash---

4   **Judge Raggi**: But you're owed money. They're not.

5   So that extent---you know, you're designating the trustee,

6   you're designating the agent.  There's a question on how

7   much---how many other people the court is prepared to allow a

8   debtor to, uh, to involve in this whole process.

9   **David Boies**: I---I---I---I agree with that, Your Honor.  But,

10  the thing I would suggest at a minimum, is the court needs to at

11  least allow us to have our trustee act for us. I mean, um, uh,

12  if---if I were---if my children owned bonds, and I held the

13  bonds as their custodian, and I collected the money and gave it

14  to the---to my children, I---I don't think anybody would argue

15  that I ought to be held to be violating the, uh, injunction.

16  The Bank of New York is just acting as a custodian. They're

17  acting here as our trustee. Their only function is to accept

18  money and pay it out, uh, just like a parent to the child.

19  Accepting the money and paying it out. And I---I---I---I don't

20  think that I've seen anything in the briefs that suggests that

21  they have any discretion, that they are playing any role in

22  determining how much they receive. They simply receive whatever

23  it is the Republic gives them. And they simply pay it all out

24  to us. After taking a fee.

1   **Judge Pooler**: What---

2   **David Boies**: And so I think that, while you can make arguments

3   about various people in the chain, particularly people that are

4   acting as the Republic's agent, here, this is our agent.  This

5   is our custodian. Um, this is the person, the institution, that

6   is simply accepting whatever it is the Republic pays, playing no

7   role in whether it's paid or not, no role in how much it's paid,

8   no role in when it's paid. Their only function is, if, as, and

9   when there is a payment for our benefit, to accept it and then

10  distribute it to the people that are entitled to it.

11  And---and---and I---I ask the court to think about whether that

12  isn't just like, in every legally relevant way, us getting it

13  ourselves. Because obviously if we got it ourselves, that

14  couldn't be a problem.

15  **Judge Pooler**: All right, Counsel, thank you.

16  **David Boies**: Thank you very much.

17  **Judge Pooler**:  You've reserved some time for

18  rebuttal as well. Now we'll hear from NML.

19  **Theodore Olson**: Thank you. May it please the court, my name is

20  Theodore Olson on behalf of NML.  The first question that I

21  heard this---this afternoon was, did Argentina have a chance to

22  make any other proposal with respect to the ratable payment

23  provisions. This litigation has been going on for a long time.

24  Judge Griesa held hearing after hearing. They had every

1  opportunity throughout the entire area of this litigation, over

2  and over again, to make whatever---

3  **Judge Pooler**: So the fact that he just gave them

4  three days for briefing, does not speak to---

5  **Theodore Olson**:  Well, that was after many---and---and there

6  was---there was a longer briefing period. They could've asked

7  for more, they could've made a proposal then, they could've made

8  a proposal another time.  But let me just quote one exchange

9  with Judge Griesa with respect to this.  It goes both to whether

10  they had the ability to pay---which they certainly had the

11  ability to pay. Judge Griesa found this, they had ample

12  resources to pay it. You---you found this too, that's been

13  affirmed. At the February 23, 2012 hearing, uh, this is,

14  um, from the transcript of the hearing. Uh, Judge Griesa said,

15  "I would

16  [00:55:00]

17  very much appreciate a balance sheet." Because we'd been going

18  back and forth about el---uh, Argentina's resources, and we had

19  kept saying, "Argentina has vast amounts of resources to pay

20  this and can pay it," it was never denied. There was no offer of

21  any proof that Argentina would have difficulty paying it or

22  would have a problem with other, um, indebtedness, or anything

23  like that. And so the judge in frustration said, "I would very

1   much appreciate a balance sheet, a current balance sheet, of

2   Argentina. I imagine there is plenty of money there now. This

3   is not 2001.  Obviously if Argentina is poor, and can only pay

4   300 million instead of 600 million"--- and he was just making numbers

5   up hypothetically, "Well, we would be glad to give them time."

6   He was doing everything he possibly could to find out over the

7   course of this long litigation, with or---with respect to what

8   Argentina could do, what it was proposing. And I must say that

9   Argentina never made any proposal except this.  And---and this

10  is very telling.  This is what the President of Argentina said

11  on November 4, 2012, eight days or so after your decision. "Not

12  one dollar to the vulture funds." That is my clients. That is

13  the President of Argentina. "Not one dollar." So as---as---as

14  distinguished from making any proposal with respect to the

15  ratable payment provision, not one dollar. The minister, the

16  Economic Minister of---of Argentina said, uh, "We are never

17  going to pay the vulture funds, uh, and it doesn't matter what

18  the courts of the United States say; we are never going to do

19  that. We will not pay one peso to the vulture funds."

20  **Judge Pooler**: So what we heard, um, Argentina, Mr.

21  Blackman, say that if they found a percentage payment that they

22  thought was fair, they would go to the legislature, the

23  administration, and try to get approval for that payment.

 1   **Theodore Olson**: That's squarely contradicted by the statements

 2   of the President of Argentina, the economic---Economy

 3   Minister of Argentina, and the Ambassador to the United States.

 4   **Judge Pooler**: Well, sometimes politicians say

 5   things and then they change their minds.

 6   **Theodore Olson**: Well, the---they may---[laughter]

 7   **Judge Pooler**: Did you ever hear of that?

 8   **Theodore Olson**: I never heard of anything like that.

 9   [laughter] I think we should take the words of the---that have

10   been repeated over and over again, you heard them again here

11   today. Basically, it's not the policy of Argentina to pay any

12   money to the so-called "hold-out" funds, the funds of

13   the---and---and---and you were quite correct, I submit, in

14   saying that in Footnote 15 of your opinion, they had no

15   responsibility or any obligation to accept the reduced amount

16   under the exchange proposals. Um, the---the equity of the

17   ratable formula---and I think some of your questions touched on

18   this---it is exactly what is owed.  Uh, Mr. Boies said 300

19   cents on the dollar. This is exactly what is owed under the

20   instruments that were drafted and created by Argentina,

21   submitting to the jurisdiction of the United States, waiving

22   sovereign immunity, submitting to the jurisdiction of the court,

23   and putting in an equal payment provision that quite literally

24   squares completely with what Judge Griesa [PH 00:58:24] owes,

1   the acceleration provision, the interest provisions which have

2   already been litigated again. So what my clients are seeking,

3   and what Judge Griesa ordered is, if you're going to pay 100% of

4   what is owed tomorrow to the exchange bond holders, the ratable

5   payment provision or the equal treatment provision requires that

6   you pay the same percentage, 100% of what is owed, to the, um,

7   N---NML and the---and the other bond holders that are here before you--

8   **Judge Raggi**: Which effectively means that your

9   client only needs to get one payment out of this, if they pay

10  100%. Then you're done. Is that what you're saying?

11  **Theodore Olson**:  Well, that is what is required by the

12  agreement.

13  **Judge Raggi**: Okay.

14  **Theodore Olson**: That is required by the agreement, it's required by

15  the injunction.  Argentina can pay it.  There's no question

16  about that. Um---

17  **Judge Pooler**: There's no evidence of that. Is there?

18  **Theodore Olson**: Pardon me?

19  **Judge Pooler**: There's no evidence to---the---the District

20  Court didn't take evidence on the ability to pay.

21  **Theodore Olson**: It---it was---there was---it was repeated

22  references to the amount of the reserves of Argentina, there

23  was---the ev---judge made every effort to find out whether

24  Argentina had any defense to---

1 **Judge Pooler**: And they never disputed the fact that they

2 could pay?

3 **Theodore Olson**: No. And---and they've now come in with certain

4 numbers. In fact, um, the exchange with Judge Griesa over and

5 over again with respect to this. Um, um, Counsel for the---for

6 Argentina said, um, at---at---during the hearing, now that we're

7 hearing, and now what we're hearing, something a number 43 billion dollars in the

8 briefs, which is not explained, which never came up before. Uh,

9 we're talking---this case has involved 1.---approximately 1.4

10 billion dollars. There is some other litigation, but

11 [01:00:00]

12 the numbers that Argentina makes up routinely and changes as

13 they go along, um, in response to Judge Griesa's question, the

14 number was six billion dollars.  Um, that was during that

15 hearing of February 23, 2012.  The numbers just get made up.

16 This case is about 1.4 billion dollars. Now, to put that in

17 perspective, Argentina paid 2 billion dollars---more than what

18 you're talking about today---in 2011, to the exchange bond

19 holders.  In December of last year, three months ago, it paid

20 3.2 billion dollars.

21 **Judge Raggi**:  But as you said, they haven't

22 disputed their ability to pay. So just as a matter of

23 construction, you're saying we can't find the District Judge to

1   have abused discretion in finding that equal payment meant:

2   find out what's owed to each party and whatever percentage

3   you're going to pay the exchange bond holders of what is owed to

4   them, you have to pay that percentage of what is owed to the

5   original bond holders at the same time. And since you owed by

6   the---by virtue of the acceleration clause, every penny plus

7   whatever, that has to be all paid in the first payment.

8   That's---that's what you're saying.

9   **Theodore Olson**: Prec---precisely. That's what---

10  **Judge Raggi**:  Okay. Now we have these arguments

11  that the injunction reaches other parties it shouldn't reach

12  and, you know, has all these other defects. Why don't you talk

13  to us about that.

14  **Judge Pooler**: And not the exchange bond holders are innocent victims.

15  **Theodore Olson**: Yes. Yes. Yes.

16  **Judge Pooler**: Why should they---

17  **Theodore Olson**: Well, they're not---in the first place, this

18  litigation over the equal treatment provision has been going on

19  in the Federal District Court of this city since 2004. So

20  everyone knew about the equal treatment provision and what

21  various different interpretations might mean.  Secondly,

22  and---and some of the exchange bond holders were participants in

23  earlier litigation with respect to this subject. Secondly, I

24  heard---I think---Mr. Boies say, or maybe the bank say, they

1   didn't know. They didn't know that they might how---somehow be

2   subject to an order like Judge Griesa issued. The prospectus in

3   2004---this is the---December of 2004, and it's Appendix 466,

4   "Argentina's payments to holders of new debt securities issued

5   pursuant to an exchange offer may be attached, enjoined, or

6   otherwise challenged by bond holders that declined to

7   participate in the offer, or by other creditors of Argentina."

8   In the first place, they knew because of the litigation. Second

9   place, as one of you pointed out, they had held some of these

10  bonds so they knew about these provisions. These provisions had

11  been litigated in Europe before; Argentina itself asked for an

12  advisory opinion with respect to what they meant. This was in

13  the prospectus in the words that I read to you, and not only in

14  2004 but also in 2010 and in the materials letter before you;

15  you know that the exchange bond holders were the ones that

16  agitated for, and persuaded Argentina to enact, the lock law.

17  They took---we're talking a court of equity here. And I heard

18  Mr. Boies talk about the innocent victims, and that's the point

19  of your question. They weren't---I'm not talking about guilt or

20  innocence, I'm talking about their full awareness of the rights

21  of other parties and the fact that their jurisdiction of the

22  United States courts was---had been invoked by Argentina to

23  entice---entice people to borrow money, and it had---and those

24  earlier bonds had these provisions in them.  And because they

1  did not want the original bond holders to get paid anything,

2  they encouraged Argentina to enact the lock law.

3  **Judge Parker**: Do you have a record signed for the

4  contingent that you just made that the, um, exchange bond

5  holders were involved in the passage of the law?

6  **Theodore Olson**: Yes. It's in the---it's in the pro---it's in

7  the, um, um, I'll get it in a minute.

8  **Judge Parker**: Also before you---or you can---

9  **Theodore Olson**: This is by the way, a submission by Argentina to

10  the SEC, I think was on May 18th, it was the---[bkgrnd convers]

11  **Judge Raggi**:  If you could give us a signed copy, it would be helpful.

12  **Theodore Olson**: Yes. JA-850?  **Judge Parker**: 850?

13  **Theodore Olson**:  850. 8-5-0.  And I---I had it here; it's in

14  this pile of papers. I could---I could.

15  **Judge Parker**: Yeah, finish your thought, but, I'd

16  also appreciate your, uh, response to, you know, the Bank of New

17  York's contention that, um, you know, there has to be some sort

18  of hearing to---to, um, uh, uh, uh, a---a proceeding to formally

19  join them and then figure out what's in their minds when they

20  take these payments.

21  **Theodore Olson**: In the first place, I think---one of you

22  mentioned the fact that if this order had said nothing,

23  [01:05:00]

1   the Bank of New York would be bound by the injunction, pursuant

2   to the rules, the law of the United States, Rule 65D2. D2C. As

3   if they participated or were in active concert with the

4   violation of the injunction.  Now, when the---when the

5   injunction, initially issued, Judge Griesa used language, um,

6   that incorporated the---the rules of civil procedure, and you

7   asked him to clarify. I think pursuant to the---the Regal

8   Netware of the---from the United States Supreme Court

9   to---to---to specify who he felt would be participants. He had

10  the in---indenture before him, he had all of the other materials

11  before him. The indenture---it---it doesn't---they're not the

12  same as the bond holders, contrary to what, um, Mr. Boies said.

13  They are the reg---they are the registrar, the indentured

14  trustee and paying agent.  They c---Argentina cannot violate

15  this injunction without the participation of the Bank of New

16  York. About---pardon?

17  **Judge Pooler**: Then you'll disagree with what the exchange

18  bond holders say, is that paying to the Bank of New York Mellon

19  is the same as paying them?

20  **Theodore Olson**: No, it is not. They---and---

21  **Judge Pooler**: Tell me why.

22  **Theodore Olson**: I---I mean, well, let me add, uh, another point

23  with respect to what Mr. Bond---uh, Boies said. No one is

24  asking, uh, an injunction preventing them from accepting money.

1  You---that term was---that phrase was used again and again by

2  Mr. Boies. The in---

3  **Judge Raggi**: But no one's enjoined except Argentina.

4  **Theodore Olson**: Argen, Argen,that's correct. Argen---

5  now, it's conceivable---I suppose you could come up

6  with a circumstance under which bond holders got together with

7  Argentina and decided to move all this to Portugal or whatever

8  it might do. And the injunction is---specifically says you

9  cannot change the method of payment pursuant to these bonds.

10  But the injunction cannot be violated. Um, Bank of New York is

11  saying that the injunction, the---the payment is over with as

12  soon as the check or money order or transfer, wire transfer

13  comes from Argentina to the---its bank with respect to the---the

14  indenture, performing the duties under the indenture, that the

15  violation is over. Um, that's not true. 'Cause---because what

16  happens, the equal treatment provision, as you asked, Judge Raggi,

17  um, involves payment obligations.  And---and the---and---and

18  the---that's not completed until various different

19  steps---Argentina can't do it by itself. It doesn't know who

20  owns beneficial interest in these bonds. It has to use a series

21  of things, and the judge looked at, in response to this court's

22  order, properly, um, I think, articulated in order to void

23  unwitting contempt. That's the language of the United States

24  Supreme Court. So please specify, so that people will know

1   whether they---the judge believes, at least. Now, they have a

2   right to defend themselves in a [PH] contemporacy, and

3   there---no one's taking that away.  And---and what the purpose

4   of your order, I submit, was to clear up the mis---um, business

5   of intermediary banks, which the judge specifically did by

6   exempting intermediary banks, and then giving any---any entity

7   who thinks it's an inter---interm---intermediary bank to come in

8   and get this clarified. But then what he also did was clarify

9   with respect to active concert and participation by looking at

10  the instruments, seeing what it would take to complete the

11  violation of the decree which he issued, which is only reviewed

12  for abusive discretion, and whether it's fair and equitable under

13  the totality of the circumstances including what you all call

14  "continual violation of the rights of the original bond

15  holders."  Taking all those things into consideration, looking

16  at all of the ins---int---entities that would need to have

17  notice, um, with respect to what they might be doing, if they're

18  complicit with Argentina in fulfilling the violation of the

19  injunction, he identified what he thought under the circumstances,

20  in response to this court's request, exactly what he thought the

21  partici---who the participants would be.  And that's what he

22  did. Now---

23  **Judge Parker**: Well, what about the practical

24  problems that have been raised, uh, you know, in

1    the---specifically in the, uh, Amicus brief from the

2    clearinghouse about the clearing systems?

3    **Theodore Olson**: I---I---I think that those practical problems

4    don't exist. The intermediary banks know, uh, that they're

5    interme--intermediary banks. Um, and they are specifically

6    exempt. If there's any doubt about that, they can go to Judge

7    Griesa, and he will clarify it. With respect---the injunction

8    only applies---and Rule 65 would require this even if the judge

9    hadn't spelled it out---if you're in active concert or

10   participation with Argentina, then

11   [01:10:00]

12   you will be---you are bound by the injunction itself. The

13   injunction doesn't go to the bank or any---anybody else, unless

14   you are the paymaster or driving the getaway car, or acting in

15   some way, ful---, to fulfill the violation of the obligations of

16   the courts of the United States. Now---

17   **Judge Pooler**: Okay. What about the Bank of New York's argument

18   that, as you say, they have more tasks to perform. Uh, they're

19   entitled to notice and an opportunity to be heard, before they

20   are---

21   **Theodore Olson**:  They can't be held in contempt, unless they

22   have---they---they're going to have notice of this injunction.

23   If they do these things, which I don't think they will do. Um,

24   and the Higgins case from this court earlier and other cases

1   since then, says that it's the law of the Circuit you will assume

2   compliance with the decrees of this court, and the District

3   Court that you've just affirmed, so that---so that there will be

4   compliance. Um, and there will not---not be any violation or in

5   any contempt proceeding against the Bank of New York unless

6   there's a violation. If Argentina sends the funds without the

7   certificate that the judge required, they are on notice that if

8   they take those funds and transfer them to the other---

9   the other banks that are involved and mentioned in the

10  indenture, and get it to the bond holders, they are violating

11  the injunction. Now---

12  **Judge Raggi**: So my understanding is that your view is,

13  Judge Griesa and the entity such as the Bank of New York, notice

14  of the injunction against Argentina.  If they told them that

15  they would be entitled to notice that Argentina had complied

16  with the payment obligation before they were asked to transfer

17  any money to the exchange bond holders, and then if they go

18  ahead and transfer money without all that, they would be

19  entitled to the notice and opportunity we heard that would

20  receive any adjudication that they were in contempt.

21  **Theodore Olson**: Yes.

22  **Judge Raggi**: Okay.

23  **Theodore Olson**: Precisely. Now, I think it's a very important

24  point that---Mr. Boies made the point that my clients and Judge

1  Griesa are somehow holding the exchange bond holders hostage.

2  The hostage holding is being done by Argentina.  Argentina is

3  not only specifically saying that it won't pay the original bond

4  holders, but they're also saying they're not going to pay the

5  exchange bond holders. They'll---the concerns that the exchange

6  bond holders have can only arise if Argentina violates the

7  injunction as affirmed by this court. They have an obligation,

8  nothing in Judge---

9  **Judge Raggi**: Or if it complies with the injunction by not paying

10 any money.

11 **Theodore Olson**: It---it can do that, but it will then be

12 violating the obligations, contractual obligations---

13 **Judge Raggi**: Right, but not the injunction.

14 **Theodore Olson**: Without---well, that's---that's correct.

15 **Judge Raggi**: You would have defaults on all the bonds.

16 **Theodore Olson**:  That's right. But it would be Argentina's

17 doing.  Be---and Argentina has a long history of defaulting on

18 obligations; it goes back a couple hundred years.  This court

19 has repeatedly referred to it over litigation. So Argentina has

20 plenty of practice in defaulting on obligations.

21 **Judge Raggi**: When are the next payments due?

22 **Theodore Olson**:  There's a payment due in the middle of the

23 year. Um---March 31. And it's 300 and---182 million dollars.

24 And then there's another---

1   **Judge Raggi**: To the exchange bond.

2   **Theodore Olson**: Correct. Um, I think it's very important that

3   what's happening here, is Argentina saying, "We will continue to

4   default on our obligations, to stick it to the people that we

5   borrowed money from invoking the laws of the United States,

6   that---and---and the---and---and the courts of the United

7   States. Uh, and we will not only do that but we will violate

8   other obligations to other people to force this court to back

9   down, from the lawful decision of the courts of the United States

10  with respect to the continued default by Argentina."  The

11  court---and the court cannot give in to that. Um, this is a

12  lawful obligation of Argentina. It has been defying it for

13  years. This court has affirmed that the equal treatment

14  provision means what Judge Griesa determined that it meant.

15  This court has affirmed that there's been a breach of the equal

16  treatment provision.  This court has decided and affirmed that

17  an equitable remedy is appropriate in the form of the ratable

18  payment provision. Is the ratable payment provision equitable

19  and appropriate? Argentina can afford to pay it. It is what's

20  owed.  It's equal.  It's a literal interpretation.  It's

21  consistent with the fact that the exchange bond holders

22  imposed---helped participate in the imp---imposition of the lock

23  law, which is a part of the violation itself, because they don't

24  want others to receive payments.

1  [01:15:00]

2  And the court must assume that Argentina, notwithstanding these

3  statements---I---I take your point that they may change their

4  mind; I hope they do. Everyone here, I think, hopes that

5  Argentina will repudiate or change its mind with respect to the

6  statements its officials have made that they don't care what the

7  courts of the United States do, they're going to keep doing what

8  they're doing anyway.  I submit that its the law of this

9  circuit---and the Higgins case and other cases, that Argentina

10 will comply, and must comply and must be assumed to comply, and

11 then all of this will be unnecessary.

12 **Judge Pooler**: Counsel, what about the argument, the allegation

13 in one of the briefs that NML purchased credit default swaps,

14 allowing it to profit if Argentina refuses to make ratable

15 payments, and instead defaults, so that they win in any event.

16 **Theodore Olson**:  I think that, in---A, I don't think---I don't

17 know that that's true. I---I---I'm informed that it isn't true.

18 But I---if it was true, it would be utterly irrelevant.

19 This is a marketplace, um, and I assume that if---you are not

20 going to---or the---the---whoever made that statement, assertion

21 in the brief, is not making---taking the position that someone

22 can't buy an insurance policy with respect to obligations and---

23 **Judge Pooler**:  No. They also suggest that Elliot

1  Associates, NML's parent, holds a seat on the entity that will

2  decide if Argentina's failure to pay, constitutes a default on

3  the exchange bond, um, and um, therefore there is---

4  **Theodore Olson**: I think that's another piece of litigation.

5  **Judge Pooler**:  --pretty severe conflict of

6  interest.

7  **Theodore Olson**: Well, I think that's not part of the decision,

8  yes or no, to affirm the decision below.  It wasn't in a---a

9  part of the record---

10  **Judge Pooler**: Shall we remand to the District Court to consider

11  this?

12  **Theodore Olson**: No, I think it's utterly unnecessary. What's

13  before you now, you affirmed the fact that there's been a

14  provision, a breach of a provision and an equitable decree. And

15  the decree itself---irrespective of any little thing that people

16  are throwing up and hoping it will stick to the wall, um,

17  that's what---what's involved here. Was the District Judge

18  within his dis---right discretion, uh, which are the words in

19  your decision, from October 26th, to enter an equitable decree?

20  The equitable decree perfectly fits, um, the obligations that

21  Argentina undertook, with respect to what, um, the bank said

22  with respect to the, um, Judge Hand's decision with respect to

23  what participation might be. Um, the Alemite decision, knowingly

24  assist and helping to bring about a forbidden act. That's from

1  Alemite. And Judge Hand also said, "Applies to one who takes

2  part in violation of the injunction of which he has notice."

3  That's---

4  **Judge Raggi**: Is it premature, deciding what conduct would be,

5  uh, would satisfy the rule, or is this something that

6  would be decided when and if there's a contempt proceeding?

7  **Theodore Olson**:  That's---that's when the imposition of

8  sanctions would occur and all the rights are available at that

9  time.

10  **Judge Raggi**: What's your position on whether you're

11  receiving money by the exchange holders, if it's paid without

12  paying money to you--your clients simultaneously, whether that

13  would be a violation of the um

14  **Theodore Olson**: When--

15  **Judge Raggi**: active concert and participation

16  prohibitions.

17  **Theodore Olson**:  Standing alone, no.  Um, and as I did say at

18  the beginning, I can envision circumstances when people might

19  get together with Argentina to violate the provision that says

20  you can't change the payment mechanism, and do various different

21  things to make this come about. But, contrary to what Mr. Boies

22  said, accepting the money, receiving the money, doesn't violate

23  the injunction. No one is attempting to enjoin that and the

24  injunction on its face--I think you asked this in a question-- and on

1   its face doesn't cover that contingency at all. Um, now--

2   **Judge Pooler**: So if they can manage to find a way to pay the

3   exchange bond holders without violating the injunction, they

4   could be paid.

5   **Judge Raggi**: Or Argentina would be in violation.

6   **Theodore Olson**: Argentina would be, but --the recipient of

7   the money would not be--

8   **Judge Pooler**: Not the--not the rec--

9   **Theodore Olson**: --in violation.

10  **Judge Pooler**: Or any intermediary.

11  **Theodore Olson**: Well, intermediary banks are--

12  **Judge Pooler**:  No, I was really talking about Bank of New York

13  Mellon.

14  **Theodore Olson**: That would be something that--the set of facts

15  that's--that's why we have the further proceeding with respect

16  to contempt.  I mean, I can't envision, you can't envision,

17  Judge Griesa can't envision, the acts that might constitute

18  acting in concert with. But we are talking about intelligent,

19  sophisticated parties, with sophisticated, intelligent,

20  experienced lawyers. Um, and--and this is a matter that has been

21  going on for a long period of time.  What we are now--what

22  we're now at face with, is, Argentina threatening this court with

23  contumacious--and

24  [01:20:00]

1  not gonna comply with the order if it's--if it's what--if you

2  affirm what Judge Griesa did, I've heard today, I think I heard,

3  Counsel for Argentina saying they are not going to comply with

4  the order.  That is threatening this court, and all the courts

5  of the United States, that the laws of the United States mean

6  nothing to Argentina. The laws of the United States that

7  Argentina evoked, invoked, to receive funds to induce people to

8  lend money to them. Now, I submit--and I said this to Judge

9  Griesa--far be it from me to say this to Argentina, but

10  Argentina would be vastly better off, on the long term in the

11  financial markets of the world, and the standing of the world

12  community, if it started to obey its obligations, to live up to

13  its commitments, to obey the orders of the courts of the United

14  States. That would be--that's up to Argentina, but it would be

15  vastly in Argentina's best interest. The--what we're talking

16  about today is an effort by Judge Griesa, who had a--a--what I

17  thought was an infinite amount of patience; the number of

18  hearings, the amount of letters that he received, letter briefs,

19  briefs, respondent--reply briefs. All of those things, all of

20  this process that took place, it's been an enormous amount of

21  process.  And no one's rights are affected except the Republic

22  of Argentina who made these commitments, violated these

23  commitments, and now threatens to violate court orders, and

1   those in active concert or participation with--which is another

2   provision of the laws of the United States.  So what Judge

3   Griesa did, and what we're asking you to affirm, confirm, is

4   a--an equitable provision well within his broad authority.

5   Argentina has the ability to live up to this commitment and this

6   litigation can finally be over. And if Argentina does, as this

7   court must presume, comply with the decisions of this court, and

8   the courts of the United States, we'll be done.

9   **Judge Pooler**: Thank you, Counsel.

10  **Theodore Olson**: Thank you.

11  **Judge Pooler**: Mr. Blackman, you have two minutes for rebuttal.

12  But no one's hoped that you--

13  **Jonathan Blackman**:  Thank you, Your Honor, in advance. Uh, the

14  order in fact provides that the participants, as defined in the

15  order, are bound by it and prohibited from aiding and abetting.

16  And it specifically defines the participants to include the Bank

17  of New York, all of the European clearing systems, uh, the

18  Depository Trust Company, even--even the registered holders of

19  the bonds. Mr. Boies's clients are the beneficial owners, but

20  the registered holders are actually uh, enjoined here. So this

21  notion that somehow we can wait for contempt, these parties are

22  listed and effect is being enjoined without ever having been

23  joined or given an opportunity.

24  **Judge Raggi**: What are they enjoined from? **Jonathan I. Blackman**: They are enjoined, uh, from

25  aiding and abetting a violation of the order. And we've just heard that—

1    **Judge Raggi**: Basically stating Rule 65.

2    **Jonathan Blackman**:  Yes, but Mr.--uh, Mr. Olson's view of that

3    is that anything they do to get money to Mr. Boies's clients is

4    violation. So let's be frank here. The purpose--

5    **Judge Raggi**: But that would be a matter for Litigation under the _____ Court.

6    **Jonathan Blackman**: Oh, but let's--what is the purpose of

7    this?

8    **Judge Raggi**: When we issued the order.

9    **Jonathan Blackman**: What?

10   **Judge Raggi**: When we issued the order--requesting the

11   District Judge to identify the Parties, it wasn't to

12   limit their rights, but rather give them notice that they could

13   indeed be subject to umm,--some kind of action under this, under

14   this, uh, injunction, and therefore to, um, afford them the

15   opportunity to be heard in the court. It wasn't--it wasn't to

16   provide less process, it was to provide more. What--what do you

17   think is wrong with that?

18   **Jonathan Blackman**: Well, what I think is wrong is that the

19   entire intent of this--and we just heard it again--is to prevent

20   these parties, on fear of contempt from making a payment that Mr.

21   Olson also conceded Mr. Boies's clients are entitled to get, and

22   Judge Griesa himself said, quote, "There is no suggestion of

23   interfering with what the exchange bond"--

24   **Judge Raggi**: Wouldn't it, they be in the same position, if without our order,

1  once Argentina was enjoined, Mr. Olson had gone around serving

2  everybody in the--in the, um, chain, with--with the notice that

3  Argentina was subject to this limitation, and then when they pay,

4  hauling them into court then and invoking Rule 65. How--how

5  would they--how would they were they in any worse position if

6  that happened?

7  **Jonathan Blackman**: Well, in that case they've already done

8  something which he views as being in contempt of a court order.

9  So they're in a lot worse situation, and the entire clearing and

10  payment system, which is the fu--supposed to function

11  automatically and without hindrance, is now being held up while

12  [01:25:00]

13  everyone is litigating [OVERLAY] whether they're in contempt or

14  not.

15  **Judge Raggi**: Well that gets to the heart of whether

16  you're being held up, as you put it.  But for purposes of Rule

17  65 and its application, and trying to understand why anything

18  the District Court did, puts any of these parties in worse

19  position than if he hadn't done anything?

20  Jonathan I. Blackman: Because they're faced with--with the

21  extreme chilling effect as financial institutions, of being told

22  that you may decide after the fact, that they're in contempt.

23  **Judge Parker**: Well--

1   **Jonathan Blackman**: That's why they're asking you to--to make it

2   clear that they are not subject to this order, and that Rule 65

3   doesn't reach the kinds of activities that they perform. But

4   if there's any doubt about it, let's remand and hear about those

5   activities. Mr. Olson was very quick to say we don't need a

6   remand to look at his clients' equities.  Well, we--we do want

7   to have a remand, uh, to look at other people's equities.  And

8   we also want to have a remand to look at--

9   **Judge Parker**: But let me ask--

10  **Jonathan Blackman**: --to look at this question of ability--

11  **Judge Parker**: --let me ask Judge Raggi's question

12  in a slightly different way. Let's pose that Judge Griesa's

13  order had no mention of the Bank of New York. Do you think--but

14  the Bank of New York had actual knowledge, uh, of the injunction

15  running to your client. Do you think the Bank of New York under

16  those circumstances would be free to process the payment?

17  **Jonathan Blackman**: Absolutely. Absolutely. Because they're

18  not aiding and abetting anything. But why are they listed? Why

19  did Mr. Olson--these--these--these names don't come out of the

20  head of Judge Griesa.  They come out of the head of Mr. Olson,

21  in order to prevent payment to anyone.  And why? He told you

22  why!  This is a judgment enforcement device.  Let's put our

23  cards on the table, here. This is not about equal treatment.

24  This is about forcing my client to pay his client an amount

1   that, by the way, he hasn't even reduced to judgment--I'll skip

2   over that.  Let's assume he did it. It's to, as he says, end

3   this litigation by paying him--how? By holding up the prospect

4   that otherwise there will be no one paid.

5   **Judge Raggi**: If all our cards are on the table,

6   what's Argentina's interest in any of this? There's no doubt

7   that the injunction applied to you. If we were to hear these

8   arguments from Counsel for the Bank of New York for the exchange

9   bond holders, I could understand it. But, why is Argentina

10  arguing about it? Who would be liable after you--you, um,

11  violate the injunction?

12  **Jonathan Blackman**: I think--I think you did hear from them, and

13  you'll hear from Mr. Boies again.

14  **Judge Raggi**: Well, what is Argentina's interest--

15  **Jonathan Blackman**: Argentina's interest is--

16  **Judge Raggi**: --what's going to happen if you

17  violate the injunction?

18  **Jonathan Blackman**: We--Argentina's interest is quite simple. We

19  are very interested in servicing our performing debt.

20  **Judge Raggi**:  But you are enjoined.  I mean if you

21  want to argue to us why you shouldn't be enjoined, that's one

22  matter.

23  **Jonathan Blackman**: I'm--I am about to do that.

24  **Judge Raggi**: But if you are arguing on rebuttal,

1  why parties who would follow your contempt, shouldn't be

2  enjoined--

3  **Jonathan Blackman**: I--I argued last time and I would be

4  delighted to argue again why we shouldn't be enjoined. We

5  shouldn't be enjoined from doing something which helps somebody

6  else and doesn't hurt him. We shouldn't be enjoined because

7  under basic equitable principles you're supposed to look at

8  effect on third parties.  And we have an interest in paying

9  those third parties.  Of course we do.  We don't want to unravel

10 the settlements we did. We--

11 **Judge Pooler**: Now subject to a judgment.

12 **Jonathan Blackman**: I--I understand that. But--

13 **Judge Pooler**: And you're in a court that says that you have to pay the

14 original bond.

15 **Jonathan Blackman**: Yeah, but--but--and they have to--

16 **Judge Raggi**: --and they may not want to obey that,

17 but that's not a reason not to enter an injunction that is

18 intended to enforce that order.

19 **Jonathan Blackman**: Okay, but now you've just--with all respect,

20 agreed with me that this is an enforcement of a judgment which

21 is--I would respectfully say--

22 **Judge Raggi**: The judgment that this court entered

23 on--on the construction of the original contracts equal

24 obligation provision.

1  **Jonathan Blackman**: But--but--but we know, and we've just heard

2  again that the whole purpose of this is to get him to pay his

3  monetary claims. And what the Supreme Court said in the Great

4  West case, I can't say it any better, is, "An injunction to

5  compel payment of money past due under a contract or specific

6  performance of a past due monetary obligation was typically not

7  available in equity." That's what we're talking about here!

8  We're talking about an injunction to get us to pay a monetary

9  claim because the normal means, the means that Congress allows

10 under the Foreign Sovereign Immunities Act are not doing it in a

11 way that--

12 **Judge Raggi**: And do you want to tell us why we

13 shouldn't view this as not normal? This scenario that we've been

14 experiencing?

15 **Jonathan Blackman**: Because, Your Honor, with all respect--I

16 know you say a lot of time's gone by--every case that Your

17 Honors have ever decided or that your colleagues have ever

18 decided, under the execution provisions of the Foreign Sovereign

19 Immunities Act involves unpaid judgments.

20 **Judge Raggi**: Right. We're back to an argument--

21 **Jonathan Blackman**: And all I can say is, that is in our

22 respectful submission, the law. But if even if it weren't, you

23 have to look at the effect of injunctions on third parties. And

24 the effect of

1  [01:30:00]

2  these injunctions, if they stand, is in fact, to prevent Mr.

3  Boies's clients--who everyone here apparently agrees, have a right to

4  be paid--not be paid. That doesn't help us, it hurts them, and

5  it doesn't help Mr. Olson's client either.  Because the idea

6  that these injunctions can coerce Argentina to pay his clients

7  is just not gonna happen.

8  **Judge Raggi**: Are you representing that the net

9  result of--of--um, of the injunction will be that you will not

10  pay the exchange bond holders?

11  **Jonathan Blackman**: The result of these present injunctions, we

12  can't pay.  The way the injunctions stand, the money can't get

13  to the exchange bond holders.

14  **Judge Raggi**:  Oh no.  It can get to the exchange

15  bond holders if you will obey the injunction.

16  **Jonathan Blackman**: We're not paying him. That's right.

17  **Judge Raggi**: Right. So you're not going to pay

18  them, and that means you're also not going to pay the exchange

19  bond holders.

20  **Jonathan Blackman**: By--by definition--

21  **Judge Raggi**: So the reason not to grant this

22  injunction is because Argentina will default.

 1   **Jonathan Blackman**:  The--the court, if you want to put it that

 2   way, would be forcing a non-payment. And then, I said earlier,

 3   we settled through Argentina.

 4   **Judge Raggi**: Who's enforcing a non-payment,

 5   Counselor?

 6   **Jonathan Blackman**: You are--

 7   **Judge Raggi**: You're deciding you won't pay.

 8   You're representing that to us now.

 9   **Jonathan Blackman**: You're--you're giving us a [PH 01:31:10]

10   Hobson's choice, which we cannot fulfill in the way that you would

11   like, and he would like. That is the reality. I represent a

12   government, and governments--with all respect, and I know Your

13   Honor has spent your career as a public servant in government,

14   cannot be told to do certain things that fundamentally violate

15   their principles. And when my client agreed to submit to the

16   jurisdiction of the US courts, it agreed to, within the limits of

17   the Foreign Sovereign Immunities Act and US law. And we submit

18   that neither permit these kinds of injunctions. If there were,

19   we would see loads of examples of it. I said this before. Pari

20   passu clause has been around for a hundred years. Where are the

21   injunctions providing the kinds of relief that are being sought

22   here. People have defaulted on debt governed by pari passu

23   clauses all the time! This is just a unique remedy, and why do

24   we have the unique remedy? We've heard again the appeal to

1   impatience. The judge is impatient. This litigation has been

2   going on. But again, I'm sorry, execution is difficult. And I

3   want to go back to the question of adequacy of resources,

4   because there's been a lot bandied about. There's nothing in

5   record whatsoever on that.

6   **Judge Pooler**: Did you offer any?

7   **Jonathan Blackman**: Well--pardon me?

8   **Judge Pooler**: Did you offer any evidence?

9   **Jonathan Blackman**:  We--up until the--this court's decision

10  of October 26, we frankly thought the issue was irrelevant.

11  Your decision made it irrelevant. In the three days--first of

12  all, we asked for more time. You can read the transcript. My

13  partner, Mr. [PH 01:32:42] Boccuzzi asked for more time than

14  three days. He didn't get it. We did at that time say that we

15  thought equal treatment, what would mean the terms of the

16  exchange offer, we didn't spell it out as we've done then. And

17  if you look at Mr. Boies's clients' brief at Footnote 27, you

18  will see sourced references--everything sourced--to things in

19  the public record about Argentina's other financial obligations.

20  And it's not just a matter of saying there's 40 billion dollars

21  of reserves and 1-1/2 billion dollars of Mr. Olson's claims.

22  Unpaid debt alone--unpaid debt alone--people who have the

23  benefit of exactly the same pari passu clause, now totals about

24  ten billion dollars. That is now in this record. Okay?

1  **Judge Pooler**: That's not--

2  **Jonathan Blackman**: As well as other obligations.

3  **Judge Pooler**: That's not the exchange bond holders' debt?

4  That's other debt?

5  **Jonathan Blackman**:  That's other--no, that's the--that's

6  the--the debt of the unre--the people holding the old debt!

7  **Judge Raggi**: But when parties like your client who

8  are not sovereign, um, find themselves in this situation,

9  usually there's some good faith by either putting monies in

10  escrow that are in a--in the amount that you say you'll spend--

11  you'll pay, or putting something forward.  I mean, it is

12  just more than curious that there's noth--no offer like that,

13  there's--there's only a, if--if our terms are agreed to we will

14  go to our legislature, otherwise there's nothing. And I'm not

15  sure why--why you think that you have an appeal to equity in,

16  um, a more than decade long default circumstance with no effort

17  made to--to show how you'll pay a penny.

18  **Jonathan Blackman**: Okay. But re--remember, we did show good

19  faith. We did two exchange offers. 92% of the debt was

20  satisfied.

21  **Judge Raggi**: They were not obliged to accept them,

22  and--

23  **Jonathan Blackman**: Of course they weren't--

24  **Judge Raggi**: --we still have an existing contract. So.

1   **Jonathan Blackman**: Okay, and we have to meet it. So we--so

2   the question is, what do we do with that? We've made a proposal

3   to deal with that, at least from the standpoint of pari passu,

4   which is to give them--and Judge Parker, we would elaborate

5   on--on, you know, the examples that were given if we had a

6   remand of exactly what the right percentage, and what the

7   dollars and cents result of that would be. Uh,

8   [01:35:00]

9   that we could propose to our legislature.  Do we have, at this

10  point, can I offer a more elaborate plan? I can't.  I don't

11  have those instruction.  I--I'm--I'm here speaking, you know,

12  for the--the current position of the government. What I can

13  say, though, is that, uh, the government is constrained by the

14  idea that it can't make, you know, what is really a better deal,

15  much as the court would like us to do it. Because we--we--we

16  sort of made a commitment to the--to Mr. Boies's clients that we

17  wouldn't do that. And by the way, the provision that--that Mr.

18  Olson referred to of--

19  **Judge Raggi**: Are you--are you alluding to a

20  contract obligation?

21  **Jonathan Blackman**: No, and here's--here's what actually--

22  **Judge Raggi**: But when you said that you'd made an

23  obligation--you were obligated to support this contract.

24  **Jonathan Blackman**: No, no, we made--we made--everyone who

1  does this, sovereign debt restructuring, understands that you're

2  not gonna prefer somebody. That was the commitment I meant.

3  There's no contract. But we do actually say, you asked the

4  question, Judge Parker about what's on page A-850.  It says,

5  quote, "Creditors also insisted that Argentina heed their

6  inter-creditor concerns as a condition of their participation in

7  the 2005 debt exchange. Argentina received feedback from many

8  creditors which stated they would not participate in the 2005

9  debt exchange, absent legal reassurance that hold out creditors

10 would not be able to receive more advantageous terms in the

11 future." That first of all led to the inclusion of a clause in

12 the terms of the new bonds, which gave tendering bond holders

13 certain rights of first refusal on future offers. And then it

14 says, "after the exchange was launched, certain creditors

15 expressed strong concern that this right of first refusal clause

16 did not provide sufficient protection to tendering bond holders

17 that Argentina might, at a later date, strike a more favorable

18 deal with hold out creditors.  In an effort to reassure them,"

19 we passed the Lock law. So it's not a case that--

20 **Judge Parker**: So what Mr. Olson said was correct.

21 **Jonathan Blackman**: No, he's misstating it a bit.

22 [laughter] They--no, wait, it's important. They expressed a

23 concern--

24 **Judge Parker**:  He quoted what you just--

1  **Jonathan Blackman**:  No, they expressed a concern, and

2  Argentina, uh, attempted to meet it. They didn't tell us pass

3  the statute, there's no evidence in the record. The only

4  evidence in the record is what I just read.  But the point is,

5  we did make a commitment that we wouldn't prefer his clients.

6  It's a--

7  **Judge Raggi**: After you made a commitment to the original

8  bond holders that they would always be paid on an equal basis

9  instead of subsequent debt.

10  **Jonathan Blackman**: But we--but we then--but we thought that

11  we were in default, Judge Raggi. We didn't sell these bonds

12  intending to go into default. No one--

13  **Judge Raggi**: Yes, but the litigation in front of this

14  court is to hold you to, uh, to the obligations you made with

15  that agreement.

16  **Jonathan Blackman**: And the question now--the question now is

17  one of, what is the equitable remedy? First of all, what is the

18  definition of equal treatment? We've talked about that. We're

19  prepared to do that.  And secondly, what is the equitable

20  remedy? And I don't think anyone has identified on this side of

21  the table a single case where an equitable remedy consists of

22  preventing someone from paying a just debt as a way of coercing

23  payment of another debt. There isn't such a case. The only

24  common law judge who's ever talked about this before now was the

1  judge in the Kensington case who said, "it is a not a proper

2  exercise of my equitable discretion to issue an injunction that

3  essentially"--

4  **Judge Raggi**: Well, you know, if there weren't sovereign

5  concerns--

6  **Jonathan Blackman**: What?

7  **Judge Raggi**: If there weren't sovereign concerns, a court

8  might very well tell a debtor that it was to pay the money into

9  the court and the court would distribute it. Now, the court is

10 not empowered to do that, so it has--it has taken this step.

11 But in--if you want to argue to us that it doesn't achieve

12 equity, equity would've involved that kind of a payment and

13 disbursement under supervision of the court. So I'm not sure

14 that you can argue that what's--what's--the--the net result of

15 what's happening here is going to be "inequitable."

16 **Jonathan Blackman**: Well, I can because in your non-sovereign

17 hypothesis, we would have all been in bankruptcy and everyone

18 would have had to have taken the same traction, and no one could

19 be suing us for injunctions or anything else.

20 **Judge Pooler**: That is, there wouldn't be hold outs.

21 **Jonathan Blackman**: What? And there couldn't be hold outs,

22 exactly right. The whole point of this--and I'm not criticizing

23 his clients--the whole point of their strategy is that there's

24 no bankruptcy. Bankruptcy of course is an equitable remedy,

1   ultimately.  Bankruptcy comes from principles of equity and

2   every person who's ever done a bankruptcy case knows that

3   equality is equity, that's the maxim meaning everyone gets

4   treated equally, okay? So we're not--we don't have the ability

5   to go into bankruptcy. A combination of sovereign immunity and

6   the voluntary debt restructuring that we've been doing is the

7   best equivalent that exists in today's world.

8   [01:40:00]

9   And we did enter into a deal; we made the deal available to

10   everyone to treat them on the same basis so everyone gets the

11   same haircut. Because we can't force them, he has the right to

12   litigate. But it is not equitable for him to say then, "Well,

13   we're gonna end the whole process. We're gonna go back to that

14   60 billion dollars of debt that you restructured, now that's not

15   going to be paid either and we're gonna have--it's now been

16   reduced to 24 billion--we're gonna have 24 billion dollars of

17   claims from Mr. Boies and his clients. They're not gonna sit

18   idly, are they? I mean, you're gonna make it worse. You know,

19   the Hippocratic thing, "Do no harm," if you're a physician.

20   Well, I beg you as judges of equity, do no harm. You're not

21   helping him, you're only hurting them, you're hurting the

22   payment system, you're hurting the public interest in allowing

23   these kinds of voluntary sovereign debt restructures to go

24   forward. You're hurting New York, which people are looking at

1   and saying, "You know, my next sovereign debt is going to be

2   governed by English law where I have Justice Tomlinson, says

3   he's not going to issue this kind of injunction." You have

4   Argentina itself, which wants to pay the debt that it did

5   restructure and not to be prevented from paying that, which is

6   the consequence of the injunctions you're facing! I know it's

7   not easy. I know my client doesn't appeal to you. I know

8   certainly as judges that you wish this saga would come to an

9   end. But this is not the--this is not the end. I was gonna say

10  this is not the way to end it. It's not the end. It's not the

11  end. Whatever--the order that you affirm here, if that's what

12  you're minded to do, will not end anything. It will just mean

13  we'll have more litigation. We'll have pari passu litigation

14  from all of the other hold outs, and we'll also have litigation

15  from Mr. Boies's clients. We'll have a worse situation. Judge

16  Griesa's docket will quadruple, or more. And poor Judge Griesa.

17  I feel for him. I think--the first time I saw Judge Griesa, we

18  were still in this building, that's how long ago it was.

19  And--

20  **Judge Raggi**: It was a long afternoon.

21  **Jonathan Blackman**: What? Okay. I'm sorry. But I hope you

22  appreciate how much--how important this is, Your Honors. And I

23  beg you to not have your impatience with my client kind of, you

24  know, trample on--on what really are the equitable and legal

1  principles here. But--

2  **Judge Pooler**:  Thank you Counsel. Mr. Martin? You have one

3  minute. [laughter] What's the likelihood of that?

4  **James Martin**: Thank you, Your Honor. Um, this is

5  not a routine application of Rule 65D2 by any stretch when the

6  payment process in its entirety is enjoined in this case. Uh,

7  what we've done is in fact dispense with the--

8  **Judge Raggi**: Why do you say that that's the scope of the

9  injunction? The injunction is directed to Argentina.  I mean,

10  if--if you're subsequently charged with acting in concert or

11  participation, you'll--you'll be heard in a--in a contempt

12  proceeding. But no--nothing is enjoined specifically.  It's

13  that you're told that you could be held accountable if you

14  participate or act in concert.

15  **James Martin**: I think that point is, Your Honor,

16  that we expressly under the opinion and order are brought within

17  the terms of the injunction and were told that if we participate

18  in the payment process by making a ratable payment--

19  **Judge Raggi**:  Would you rather not have been told and

20  found yourself hauled in on a Rule 65 motion after you did it?

21  **James Martin**: No, actually, Your Honor, that's

22  exactly the point.  Let's divide Rule 65 and an order directed

23  at a non-party, which is us, from what due process would

24  independently require regarding the conduct of a third party.

1   Now, in the Rule 652D's side, what you have to have to enjoin a

2   third party, which is an extraordinary act, is proof that we

3   acted with Argentina to breach the injunction. And the with

4   means that we participated in a decision process to violate it.

5   That proof has been dispensed with, in this order and in this

6   case, and that is reason enough to vacate the decision.

7   **Judge Parker**: Let me ask you the same question

8   that I asked Mr. Blackman a minute ago. Let's assume that the

9   clarified order didn't mention the Bank of New York, and the

10  Bank of New York wasn't mentioned.  Do you think--that the Bank

11  of New York had actual knowledge of the existence and terms of

12  the injunction reach--uh, reaching Argentina. Do you think the

13  bank would've been free under those circumstances to process the

14  payment?

15  **James Martin**: Yes. I do, Your Honor, for two

16  reasons. First, if the bank is a non-party to the litigation,

17  the only way that notice itself would furnish a way to get at

18  the bank is if there is proof under Rule 65

19  [01:45:00]

20  D2 not just of notice, but that we affirmatively acted with

21  Argentina to carry out the breach. Absent that, Rule 65D2 can't

22  be the vehicle to enjoin us. You can't eliminate the with from

23  Rule 65D2. Now, take the next thing, Your Honor.  Somebody

1  wants to enjoin us because they think this payment is

2  independently unlawful, and our independent conduct is now wrong

3  because we know of the injunction and nevertheless, we have

4  acted. Not in concert or participation, but independently.

5  There, this injunctive order cannot sweep us up. That's Regal

6  Netware, that's Alemite, and that's the problem. In that

7  situation, if you want to enjoin the independent conduct of a

8  third party--Your Honor, we're not talking about a contempt

9  hearing. As the Zenith Radio case makes clear, Alemite makes

10  clear, Regal Netware makes clear, in that situation, to bring

11  the extraordinary power of an injunction on us we need process,

12  we need service, we need proof. They need to set--

13  **Judge Raggi**: And why isn't that what you get in a

14  contempt proceeding?

15  **James Martin**: Because in the contempt proceeding,

16  the burden would be on us to say, "We haven't engaged in

17  contemptuous conduct."  That eliminates what due process

18  requires because the first step of due process would be proof by

19  NML that for some reason, under some claim, our independent

20  conduct is enjoinable. That would require the elevated burden of

21  proof that goes along with granting injunctive relief.

22  They've never even tried to do that!

23  **Judge Raggi**: But section 65D2 says that the persons who

1  were bound include other persons who are in active concert or

2  participation with anyone described in Part A or B. Now, the

3  order is directed at Argentina, but you would be bound by it

4  because you--you acted in active concert or participation. Once

5  you--once Argent--once the, um, bond holders think you have,

6  they institute an application for contempt and you have all the

7  process that--that the courts can afford.

8  **James Martin**: Two things, Your Honor.  The court

9  has already made clear in this order that participation in the

10 payment process without the requisite evidence in Rule 65D2,

11 that is simply making a payment with notice that Argentina has

12 violated the injunction is sufficient for contempt. That is not

13 sufficient--

14 **Judge Raggi**: And if they try to hold you in contempt on

15 that ground and you have--and you can--you can challenge that,

16 and then you can appeal it. Ideally, Argentina is never in

17 contempt, you are never put in that position, and this becomes a

18 non-issue.

19 **James Martin**: Your Honor, at--with all due respect,

20 again, that shifts the inquiry at that point where it doesn't

21 belong. They have gotten too much and gone too far.  If only

22 our independent--

23 **Judge Raggi**: I just don't understand how this section

1  even applies except when people are in active concert or

2  participation, which means after they've done it.

3  **James Martin**: And the court has held that if we are

4  involved in the payment process, simply based on the awareness

5  that we have received an uncertified payment from Argentina,

6  that will be sufficient. In order to enjoin that independent

7  conduct, we are not talking about a contempt proceeding anymore.

8  Due process requires service, process. They have to meet the

9  requirements and the elevated requirements for injunctive

10  relief. There is 80 years of jurisprudence behind this. It

11  started with Judge Hand's opinion in Alemite, the Supreme Court

12  affirmed that view in Chase National, it did it in Regal

13  Netware, it did it in Zenith Radio.

14  **Judge Parker**: Are--are you seriously arguing

15  that a bank that knows the--uh, the terms of this injunction,

16  uh, and knows, uh, uh, the existence of--of--of--of the

17  proceedings, even though it's following my hypothetical who

18  wasn't named, could, uh, uh, could--could--could process and

19  make these payments and not, uh, run itself up against the Rule

20  65 language about, uh, acting in concert?

21  **James Martin**: Yes, Your Honor, I am.

22  **Judge Parker**: It strikes me as--you know, it--uh,

23  that--that advice of that sort to a--a--a client would be

24  somewhat, uh, reckless. [laughter]

1  **James Martin**: The--the injunctive decree itself,

2  Your Honor, to reach a nonparty is an extraordinary event.  It

3  is very much the exception, not the rule. And the rule--

4  **Judge Parker**: I think you're mixing apples and

5  oranges. You're--the--

6  [01:50:00]

7  the, uh, uh, uh, line of questioning that we are pursuing

8  is--is, uh, you know, the terms of Rule 65, which as Judge Raggi

9  says, uh, um, uh, addresses people who were not parties,

10  entities who are not necessarily uh, uh, uh, parties to the

11  underlying initial proceedings.

12 **James Martin**:  Yes.  But the purpose of an

13 injunction that is aimed at a non-party, Your Honor, under Rule

14 65D2, it can only do it if there is proof that they are aligned

15 with the party itself and the breach. Because only the party

16 that is Argentina is enjoined. And it's that alignment that is

17 addressed by rule 65D2, and it's that alignment--

18 **Judge Parker**: Seems to me in the indenture

19 there's a lot of evidence of alignment.

20 **James Martin**: There is--

21 **Judge Parker**: There's arguments that you could

22 make to the contrary, but, uh, uh...

23 **James Martin**: The evidence under the indenture and

1  how we carry out our conduct under the indenture, doesn't

2  require us to be in active concert and participation with

3  Argentina in breaching this injunction. That's where the gap is

4  in the proof.  That's where the required proof has been

5  dispensed with.  The language in the rule is aimed at

6  non-parties, but only when non-parties have acted in a manner

7  that affirmatively assists the party in breaching the injunction

8  with the purpose of breaching the injunction. That's the proof

9  that's missing.

10  **Judge Raggi**: What the court has done is basically

11  said, "Don't take their money unless they give you proof that

12  they've, um, met the obligation of the injunction."  Now,

13  there's nothing in your indenture that is at odds with that, as

14  I understand it.

15  **James Martin**: No, but the problem with that, Your

16  Honor--

17  **Judge Raggi**: So to that extent, why isn't it

18  entirely appropriate for the court to say to you, "Take their

19  money, but only on this condition?"

20  **James Martin**:  Because at that point, Your Honor,

21  the exigencies of the case, in order to drive a remedy and

22  Argentina's compliance, would have dispensed with what Rule

23  65D2C requires to reach my client, and would have abandoned due

24  process.

1   **Judge Raggi**: I share Judge Parker's concern. I

2   mean, a court has told you that it has a party in front of it

3   who needs an order like this in order to be brought in

4   compliance with the court's, uh, action--uh, the court's order.

5   And it's told you that as a result of that, they're gonna ask

6   that you not take their money unless you get certain--certain

7   obligations. And you--you go ahead and take it anyway, and go

8   ahead and process it, and you don't think you could be held as

9   having been--with all that notice and advice as to what--what is

10  going on, to have acted in, um, concert and participation with

11  the contumacious party?

12  **James Martin**: I don't think so, Your Honor, and I

13  don't think there's a case that would come close to saying that.

14  **Judge Raggi**: You may want to think about that argument.

15  **James Martin**: Uh, uh, what would happen in that

16  case, Your Honor is the injunctive decree would become the

17  source of [PH] bona right in a remedy against my client, and

18  that would go too far. Uh, if you look at this court's cases,

19  if you look at the cases that have been cited by NML, you won't

20  see one case that applies Rule 65D2 without affirmative conduct

21  by the person to be enjoined assisting the wrongdoer in the

22  breach and acting solely for that purpose.

23  **Judge Raggi**: Well, that's why when you do it, you

24  would have the opportunity to be heard at a contempt proceeding.

1  When you take the money and transfer it on, in violation of--of

2  the injunction. Okay.

3  **James Martin**: Thank you, Your Honor.

4  **Judge Pooler**: Thank you, Counsel. Mr. Boies? You have

5  three minutes for rebuttal.

6  **David Boies**: Thank you, Your Honor, and I'll try not to talk

7  three times as long as he did. We make the point in our brief,

8  and I made the point earlier, that you cannot under the law or

9  under the constitution interfere with our private contractual

10 rights in order to enforce the private contractual rights of

11 somebody else. Um, there are a lot of cases that say that.

12 There are no cases that say the other. Uh, the only two cases

13 that have ever really directly confronted this question are the

14 Belgian case and the, uh, English case. We don't have an

15 American case--

16 **Judge Raggi**: If you don't have a contract right to

17 a priority payment over the original bond holders, and so the

18 court is basically guaranteeing the original bond holders their

19 contractual right to equal treatment with other--other, um, bond

20 holders.  So as long as that happens, you--you have your

21 contract rights against Argentina, but I'm not sure the court is

22 in any way violating your rights or--or affecting them.

23 **David Boies**: Well, let--

24 [01:55:00]

1   let me tell you why I--I--I think the court is, Your Honor.

2   Because, um--and--and the way you put it, I think, to the Bank

3   of New York Counsel was--was very clear, okay? But the order of

4   saying is, as you say, you're saying to the Bank of New York,

5   "Don't take the money unless you have assurances that they--the

6   Republic--is also fulfilling their obligations to Mr. Olson's

7   clients." And you could not have a clearer illustration of the

8   court saying, "I'm going to prevent the exchange bond holders

9   from having their payments unless they can demonstrate that the

10  hold out bond holders are being paid in full."

11  **Judge Raggi**: Well, the other way of looking at it

12  is, Argentina is not going to be able to pay except by treating

13  its bond hol--treating, uh, the original bond holders as well as

14  any other bond holders who--that it pays.

15  **David Boies**:  But that's why I say, Your Honor, what you're

16  doing is you are saying to my client, you're saying, "Don't take

17  the money. Don't take the money you're due, because Mr. Olson's

18  clients are not"--

19  **Judge Raggi**:  That's different. Mr. Olson has

20  agreed that if they could get the money to you without it

21  involving third parties, that your client's receipt, by itself

22  could not be viewed as contempt.

23  **David Boies**: And I think that that concession necessarily means

24  that when the Bank of New York as our trustee takes the money,

1   they're in the same position. I don't think, under Rule 65 or

2   under any other precedent, you can find a situation in which you

3   can make a principled or policy distinction between the trustee

4   taking it for us, and us taking it ourselves. I think when Mr.

5   Olson makes that concession--and I think he has to--I think he

6   necessarily concedes that the Bank of New York, at least, as our

7   trustee, can take that money and pay it to us. Because they're

8   not facilitating, they're not aiding and abetting, any more than

9   we are when we take it. Both of us by accepting the money to

10  some extent can be seen as doing something that is accomplishing

11  a result, which is we're getting paid and they're not.

12  **Judge Raggi**: Mr. Olson suggests that the Bank of

13  New York wears multiple hats here. Do you want to respond to

14  that?

15  **David Boies**: Sure. Your Honor, the multiple hats he identifies

16  are just the hats that are necessary to perform their function

17  as our trustee to distribute the money. What--what does he talk

18  about? He talks about, "Well, they have to have a record of all

19  the bond holders." Of course they do, 'cause they got--have to

20  know who to pay. They've got to keep track of the payments,

21  they've got to keep track of the--of the--the place where the

22  money is gonna go. They've gotta keep track of the money that

23  comes in. All of that is simply the ministerial acts of

24  performing their function of paying us.

1  **Judge Raggi**: May I ask, and you may or may not

2  know this: does the Bank of New York--does it profit only from

3  what your client pays it? Or is it also paid by Argentina?

4  **David Boies**:  I believe it's only--um, uh, from--from us,

5  because I think that we're the--they're our trustee.  But

6  I--I--I can't represent that I know that.  I can find that out

7  in a second by asking their Counsel a question, that's how I'm

8  doing it. I will repeat. [laughter] Uh, they receive money,

9  um, uh, solely for the benefit of exchange bond holders, that

10  is, our clients.  There is a--a contract that allows them to

11  take fees out of the money that they, uh, receive, uh,

12  that's--those fees are for the function that they have of

13  collecting, keeping track of the money, and paying it to us.

14  **Judge Pooler**: And they receive no money from Argentina?

15  **David Boies**: Well, all of the money comes from Argentina.

16  **Judge Pooler**: But no money specifically.

17  **Judge Parker**: So this contract--this contract permits you to

18  deduct--when you get paid by--when the money comes up from

19  Argentina, uh, correct me if I'm wrong, but this contract, uh,

20  prohibits--uh, per--permits you to, uh, deduct a fee before the

21  payments are processed.

22  **David Boies**: I think that is the economic result, Your Honor.

23  **Judge Raggi**: Let me make sure I understand. So,

1   does Argentina pay the Bank of New York only the bond payment

2   that's due and then your fee--your fee to them, comes out of

3   that, so you get less than the bond payment due? Or, does

4   Argentina pay them more, and that's where the fee comes from?

5   **David Boies**: I--I'll

6   [02:00:00]

7   get back to you in a second. [laughter] Your Honor, they pay

8   more.

9   **Judge Raggi**: It pays more?

10   **David Boies**: To--to--um, to get--

11   **Judge Raggi**: Then it's Argentina's agent as well

12   as your client's.

13   **David Boies**: Uh, Your Honor, I would respectfully suggest that

14   lots of times in dealing with our--an obligation to us, somebody

15   will perform functions that will require somebody else to pay.

16   That happens all the time.

17   **Judge Raggi**: That may be. But the point is,

18   Argentina is not just paying your agent the money it owes you.

19   It's paying more than that, in order for that person to serve

20   this function. And at that point, I think your argument on

21   behalf of the Bank of New York, as opposed to just on behalf of

22   your own client, has--has a--a bit of an obstacle in it.

23   **David Boies**:  If it were--if it were an obstacle, Your Honor,

24   um, they would at least be able to pay us, um, what we're

1  entitled to. In other words, I actually don't think it's an

2  obstacle because I think it is--I mean--you often--

3  **Judge Raggi**: See, at that point you are

4  participating with Argentina in getting you that money, and

5  indeed Argentina is paying them to help you get that money.

6  **David Boies**: But--but that's because--

7  **Judge Raggi**:  It's a more difficult question

8  whether the District Court can--can enjoin that.

9  **David Boies**:  But they are--they are--the Bank of New York is

10  not an agent of, um, uh--

11  **Judge Raggi**: Argentina? I used the term loosely.

12  I wasn't making a finding under New York law.

13  **David Boies**:  I mean, and--and--and I think, I think Judge

14  Griesa may even have--have said that.

15  **Judge Raggi**: In any event.

16  **David Boies**:  But--but even if there was an issue with respect

17  to these fees, that would not affect our right to get our

18  payment. I mean, um, amounts of the fees here are trivial

19  compared to the amount of money.

20  **Judge Raggi**: Again, I don't think there's any

21  question about once the money lands in your hands, that not

22  being contempt. But what the Bank of New York is now doing is a

23  different question. You've gotten it explained for us.

24  Anything else?

 1  **David Boies**: Yes.

 2  **Judge Raggi**: I mean, I'm--I'm surprised that, you

 3  know, you're arguing for the Bank of New York.

 4  **David Boies**: I'm not really arguing for them, I was just trying

 5  to answer the ques--question.  From--from my client's

 6  standpoint, all we really want to do is, we don't want to have

 7  our private contractual rights interfered with in order to

 8  implement the private contractual rights of Mr. Olson's clients.

 9  Um, uh, we think that's impermissible under New York law, we

10  think it's impermissible under Federal Constitution. Um, you

11  can't take private property, you can't take private contracts

12  for a private purpose. Uh, even if you could take it for a

13  public purpose, there has to be compensation.  But you can't

14  take it for a private purpose at all. And can I urge the court

15  not to, uh, say, "We don't have to decide this issue now." If

16  you allow Judge Griesa's injunction to exist unclarified,

17  everybody in this courtroom knows what's going to happen. Heard

18  from the public's counsel, I think everybody knows. The

19  payment's not going to get to us, that's going to create a

20  default.  A default is going to destroy the value of those

21  bonds. Billions of dollars of bonds held by innocent people is

22  going to be destroyed, and it's going to be destroyed before the

23  contempt hearing. Because once that default--if the Bank of New

24  York doesn't pay it--and after listening to what you've said to

1   the Bank of New York Counsel, I guarantee you the Bank of New

2   York is probably not going to pay it without clarification now,

3   because they know that they are exposed.  That's going to

4   happen, and there's going to be a default of the exchange bonds.

5   That's going to be terrible for the Republic, that's not my

6   problem. It's going to be terrible for my clients, because

7   everybody that holds these exchange bonds is going to

8   immediately see this thing go down. And, Your Honor, with

9   respect to the issue of a credit default swaps that, um, uh,

10  have--have, I believe, been taken out, that is an important

11  equitable question. Because, uh, if what has happened here is,

12  you've got these credit default swaps that are gonna--they're

13  gonna profit from this default, what you have is you have a

14  situation, uh, in which the effort and--and I know it's a good

15  faith effort--the effort to make Argentina fulfill its legal

16  obligations will have resulted in terrible damage to innocent

17  parties. Now, we don't think that that's permissible under the

18  [02:05:00]

19  law, but even if it is permissible under the law, we don't think

20  that's equitable conduct.

21  **Judge Raggi**: But the concern I have, Mr. Boies, and help

22  me out with this, is that the argument reduces to: "Because

23  Argentina has breached its agree--ob--its obligation to the

24  original bond holders, not with respect even to payment, with

1  respect to the equal payment clause, don't do anything to try

2  and get them to comply with it, Judge, because then they're

3  going to turn around and breach their obligation to us." It

4  hardly seems appropriate for a court to not, um, enforce one of

5  its orders, because the party will breach another of its

6  obligations. The law will deal with that, not--not giving that

7  party get--letting that party off the hook from its legal

8  obligations.

9  **David Boies**: Your--Your--Your Honor, I'd say two things about

10 that.

11 **Judge Raggi**: Yep.

12 **David Boies**: First, uh, I--I would say that in terms of

13 requiring them--Argentina to breach their obligations to us, I

14 would say that that is something that ought to be taken into

15 account in terms of, uh, fashioning an equitable remedy. But

16 there's a more basic issue here, and that is, whatever order you

17 direct to Argentina, it needs to be clear that you're not saying

18 to us or our trustee, "Don't take the money." That's what's

19 important. Because if you say--and I think Your Honor was

20 exactly right, the natural interpretation of what's happened

21 here is the New--that our trustee is being told, "Don't take the

22 money that's due the exchange bond holders." And that destroys

23 our private contractual rights in order to benefit somebody

24 else, it does it the moment we get to that payment date, if this

1  injunction is in effect. Because you heard the Republic say

2  they're not gonna pay; everybody in the c--courtroom knows that,

3  I think. They are then going to put their bonds in default

4  because the Bank of New York is being told, "Don't take the

5  money."

6  **Judge Pooler**: But you understand that the District Court

7  felt it had no alternative to get Argentina to obey its order,

8  since it doesn't obey orders.

9  **David Boies**: Your Honor, I understand that. And the District

10 Court may very well be right about that. Um, but I would say two

11 things:  first, it's not going to get them paid.  All it's

12 going to do is create a second default.  Second, you

13 can't--there's no case that says you can, but all sorts of cases

14 that say you can't, that you can't say, "We're gonna prevent the

15 compliance with a legal obligation, in order to induce--I won't

16 use the word coerce, I'll just--I mean, just make them comply

17 with another legal obligation. That is taking our private

18 contractual right away from us in order to achieve the private

19 purpose of protecting Mr. Olson's clients.

20 **Judge Raggi**: The problem I have with that is we--we--we

21 have no interest in your clients' obligations. The obligation

22 we're enforcing is a contract one owed to the original bond

23 holders that their debts will be paid on the same basis as other

24 debts that Argentina would incur.

1   **David Boies**:  And--and if--and--and that, I think, must lead

2   you, coupled with the concession that it's okay for us to take

3   the money--that must lead you to the conclusion that you would

4   enjoin Argentina, you would have an injunction that says to

5   Argentina, "You must pay both, and if you don't pay both, you're

6   in contempt." But not say to us or to our trustee, "Don't take

7   the money." Because if they are violating their obligation to

8   Mr. Olson's clients, that does not mean that we are to suffer.

9   We have an independent contractual right.  And I--and I go

10  back--and I--I go back to the fact that we didn't just go out

11  and enter into these exchange bonds voluntarily. I mean, we did

12  agree to it. But this was something that we were in--we had--we

13  held the

14  [02:10:00]

15  defaulted bonds. Our government said, other governments said,

16  "We've gotta solve this problem." I'm not saying that the

17  Republic doesn't owe them money. I'm not even saying that they

18  don't owe them 300 cents on the dollar, if that's what the

19  instruments say. What I'm saying is that--is there's nothing in

20  the law that justifies tying their performance of our

21  obligations to fulfilling those obligations. And second, it is

22  terribly inequitable to enter an injunction that says, "You, the

23  exchange bond holders, can't get paid interest on your exchange

24  bonds, which have already had a big haircut, until they get not

1  just face value, not just interest, but multiple of face value

2  plus all of their interest."

3  **Judge Raggi**: Why is that? Argentina could have avoided

4  that by maintaining payments on the debt.

5  **David Boies**: No.

6  **Judge Raggi**: They defaulted, and they've been in default

7  for eleven years while your clients have been receiving their

8  payments.

9  **David Boies**: I--I--I'm not comparing the Republic--

10 **Judge Raggi**: But you're saying it's inequitable, and I'm

11 trying to understand why you think that's inequitable.

12 **David Boies**: It's inequitable comparing us to them. In other

13 words, it would be equitable--I think it still would have the

14 other defects--but it would be equitable if the court were to

15 say, "Don't pay the exchange bond holders any more money until

16 you've paid, at least caught up the, uh, hold out bond holders

17 and then pay them proportionally.

18 **Judge Parker**: What does caught up mean?

19 **David Boies**: Uh, uh, I think the point that was made was that,

20 uh, for some years the exchange bond holders have been getting

21 payments--

22 **Judge Parker**: Right.

23 **David Boies**: --that these people haven't, and I think the idea,

24 if you're trying to fashion equitable remedy, is that what you

1  would do is you would say, uh, "Let's treat both of these groups

2  the same."

3  **Judge Raggi**: No, that wasn't what I meant--are you

4  suggesting that they--that Argentina has not proposed to bring

5  them current on the debt owed to them under the--the original

6  bond. Not--not to pay them what you--the reduced amount that the

7  exchange bond holders agreed to, but the amount that would be

8  due up until now, and then pay them quarterly or semiannual

9  payments.

10  **David Boies**: No.

11  **Judge Raggi**:  But that hasn't even been proposed.

12  **David Boies**:  I--I understand that, Your Honor. And--and I

13  didn't mean--I didn't--if I, um, was heard to say--suggesting

14  you'd said something different, I didn't mean to. What I meant

15  to be saying was that the question had been posed as to, we'd

16  been getting something and they haven't been. And what I was

17  saying is my position that I could understand from an equity

18  standpoint saying, "Let's bring them both equal." What I can't

19  understand from an equitable standpoint is saying, "They get

20  three, four times the face value; we get a fraction of the face

21  value, and then we only get interest." That's not equitable.

22  **Judge Pooler**: So are you arguing that under the pari passu

23  clause that the, um, non-exchange bond holders, the original

1  bond holders, are now being treated better than the exchange

2  bond holders?

3  **David Boies**: I--I think they are being treated considerably

4  better, Your Honor. And--and my argument--

5  **Judge Pooler**: They've gotten nothing in all these years.

6  **David Boies**: And they've had nothing. Uh, but, I mean, if--if

7  it's inequitable for them to get nothing, it's equally

8  inequ--inequitable for them to get six or eight times what we

9  got.

10  **Judge Raggi**: But that's based on what was lent

11  originally. Your--they have a contract that they have

12  maintained, you changed your contract. And both of you, you

13  know, assessed the situation. We're just here to enforce the

14  contracts, not to--not to rewrite them.

15  **David Boies**: And--and--and on that basis, Your Honor, I've got

16  no issue, um, if what you do, is you issue a money judgment for

17  them--

18  **Judge Raggi**: There is a money judgment for them, as I

19  understand it.

20  **David Boies**: Okay. I think maybe not on these bonds.

21  But--but--but this is the equivalent of a money judgment issue

22  on these bonds.  And if you--if you do that, if you simply

23  direct what you're doing to them, I'm not trying to protect the

24  Republic against Mr. Olson's clients. What I'm trying to do is

1  protect my clients, that are really innocent parties here. And

2  I--I actually think public-spirited private parties. But at

3  least innocent parties, from, uh, suffering a second loss after

4  they've already taken their haircut.  And I'm not saying that

5  the Republic doesn't owe them the money. I'm not saying it

6  doesn't owe them 300 cents on the dollar. I'm not saying that

7  you shouldn't give them a judgment for that amount of money.

8  What I'm saying, is you should not say to my clients, which I

9  know you're not now--and you

10  [02:15:00]

11  should not say to my clients' trustee, "Do not take the money."

12  Because when you do that by force of law, you have taken my

13  clients' unconditional, undisputed right to that money and you

14  have, I think eliminated it, certainly infringed it. And you've

15  done it for the purpose--the express purpose--of implementing

16  somebody else's private contractual rights. And that is

17  something that I cannot emphasize strongly enough. There aren't

18  any cases that talk about doing that. There are cases that say,

19  "Sure, sometimes you have an injunction that affects other

20  people's rights," but not where you're saying, "I'm going to

21  explicitly, purposefully, say to the trustee for a party, 'Don't

22  take money that's due you.'" And the only reason you're saying

23  "Don't take money that's due you" is in order to implement

24  somebody else's contractual rights.

1  **Judge Parker**: But isn't--wasn't this anticipated

2  when your clients bought their bonds?

3  **David Boies**: Uh, no--

4  **Judge Parker**: Wasn't this--wasn't this rehearsed

5  in the offering documents?

6  **David Boies**: Uh, well, first--first of all, uh, I think Mr.

7  Olson inadvertently misspoke when he said the interference

8  language was in both the 2005 and the 2009 or 2010. If you

9  compare Appendix 466 with Appendix 991, uh, which are the two

10 different exchange offers, I--I think you'll see that it's not

11 in the 2010. At least I couldn't find it, and I think those are

12 the copies of the pages. But even if--even if--

13 **Judge Raggi**: Was the lock law in place at that

14 point?

15 **David Boies**: Uh, no, the law--the law--

16 **Judge Raggi**: In 2010?

17 **David Boies**: It--it--well, it--I think it came into effect in

18 connection with the 2010. It was not in effect--

19 **Judge Raggi**: Right. But--but my concern is, I

20 have less concern for the 2010 bond holders. They knew at that

21 point that Argentina was, uh, in def--in defiance of its

22 obligations and taking all kinds of steps to, uh, to, uh,

23 a--avoid payments to the, uh, to the original bond holders.

24 David Boies: That--that is true, Your Honor, but that would've

1  suggested that the interference language would've been in 2010

2  and not in 2005, which I think --is--is, at least as I've looked

3  at the documents, critical.

4  **Judge Raggi**: But neither document, in any event,

5  gives your client a priority right to payment. And that's what it seems,

6  that's what they've enjoyed over these years.

7  **David Boies**: They have--it's not a question of--they don't have

8  a priority right, they don't have a secondary right.  They're

9  not ahead; they're not behind.

10  **Judge Raggi**:  Right.  And that's all that this

11  court ordered, was that they--they have to be treated--the

12  payments have to be--comply with eq--equal--equal, um, payment

13  obligation of the original bond.

14  **David Boies**: Can I put it this way, Your Honor? They have a

15  separate right.  It's not before, it's not after.  It's

16  separate.  And their--their right to their money is separate

17  from Mr. Olson's clients.  And what I'm saying is, you don't

18  have the power, you don' have the right, and I also think it's

19  not equitable to say, "Okay, we're going to burden your separate

20  contractual right, in order to help Mr. Olson's client"--

21  **Judge Pooler**: So your argument is that the mistake the

22  District Court made was in connecting these two sets of

23  payments?

1  **David Boies**: I--I think that's right, Your Honor. Um, if--if

2  this had simply been the kind of order that you see in every

3  other case which simply says--in these default cases--it simply

4  says to the defaulter, "Pay, and if you don't pay, this is

5  what's going to happen to you," I wouldn't be here. My clients

6  wouldn't be here.

7  **Judge Raggi**: But whenever anybody contracts with a party,

8  you always take subject to the fact that he may have given

9  priorities or these kind of equal payment obligations to

10  others--so I'm not sure they are--they can be delinked.

11  **David Boies**:  No, but Your Honor, um, if--if you look at

12  history, all this litigation, you just look at the history of

13  all these kinds of cases, you see three cases--one in England,

14  one in Belgium, and one here, in which a, uh, order is issued

15  expressly going to third parties, expressly going to third

16  parties like the Bank of New York, saying "Don't accept money.

17  Don't transfer on money, in order to implement one of these

18  ratable or pari passu or priority clauses."  Belgium decided

19  that was an inappropriate order, England decided that. This

20  court is now confronted with that issue. Uh, I suggest to you

21  those are

22  [02:20:00]

1  well-reasoned opinions. But I suggest to you even more

2  important, under the laws of the United States, under the

3  Constitution of the United States, you can't directly, purposely

4  burden one contractual right in order to implement another

5  contractual right.

6  **Judge Pooler**: All right. Thank you.

7  **David Boies**: Thank you.

8  **Judge Pooler**: Thank you kindly, thank you all. And--um, that

9  concludes the only case on our agenda today. So I'll ask the

10  clerk to adjourn court.

11  **Clerk**: Court has been adjourned.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

1

## A

**abandoned** 18:11
81:20
**abetting** 21:4,10
59:16,24 62:15
85:1
**abide** 9:13
**ability** 40:10,11
43:15 44:16 59:5
62:7 73:13
**able** 70:22 84:6
87:14
**absent** 22:3 23:6,11
70:21 77:2
**Absolutely** 62:14
62:14
**abused** 44:18
**abusive** 49:23
**accelerate** 16:7, 14
**accelerated** 5:3
**acceleration** 4:20
15:19 42:21 44:23
**accept** 31:22 38:3
38:19 39:10 42:11
69:9 99:16
**accepted** 35:14
**accepting** 28:13,20
34:25 36:18,22
37:7 38:21 39:7
48:12 49:17 57:1
85:2
**accomplish** 9:6
28:2
**accomplishing** 85:3
**account** 14:1 91:1
**accountable** 75:20
**achieve** 72:21 92:3
**ACP** 1:5
**act** 13:22 21:22
26:11 27:17 38:13
56:4 65:4,13 67:7
75:21 76:8
**acted** 76:9 77:1,8
78:6 81:3 82:6
**acting** 18:13,16
19:17 20:11 23:19
38:18,19 39:5

50:24 57:21 75:17
79:20 82:18
**action** 14:17 60:13
81:25
**actions** 7:2 20:17
**active** 18:19 20:16
21:12,14 26:14
27:2,7 40:13
47:16 49:20 50:19
56:19 59:1 78:3,6
79:1 80:24
**actively** 21:22
**activities** 61:25
62:2
**activity** 25:25
**acts** 27:10 57:20
85:16
**actual** 62:11 76:17
**add** 48:10
**address** 3:9 17:3
37:22
**addressed** 6:23
80:16
**addresses** 80:8
**addressing** 4:13
**adequacy** 67:17
**adjourn** 100:7
**adjourned** 100:8
**adjudicated** 22:24
**administration**
41:21
**advance** 59:13
**advantageous**
70:22
**adversary** 3:24
**advice** 79:23 82:5
**advisory** 46:3
**affect** 88:6
**affiliates** 23:4
**affirm** 12:6 55:13
58:4 59:3 74:19
**affirmative** 22:4
23:6,9 24:12
82:16
**affirmatively** 77:1
81:4
**affirmed** 40:13

51:12 52:15 53:20
53:22,23 55:18
79:12
**afford** 8:14 54:1
60:14 78:9
**afternoon** 3:7
39:22 75:3
**agenda** 100:6
**agent** 38:8 39:5,5
48:2 87:1,8,24
**agitated** 46:7
**ago** 44:13 75:1
76:14
**agree** 29:7 38:11
90:10 92:21
**agreed** 7:23 8:23
32:3 64:15 67:5,6
69:1 84:14 94:14
**agreement** 29:17
30:9,18 43:7,9
72:1
**agrees** 37:5 65:21
**ahead** 20:6 26:7
52:2 82:3,4 98:11
**aiding** 21:4,9 59:15
59:24 62:15 85:1
**aimed** 80:12 81:2
**Aires** 14:5,13
**Alberto** 1:6
**Alemite** 22:22
24:18 27:25 56:3
56:5 77:10,13
79:11
**aligned** 80:13
**alignment** 80:15,16
80:18
**allegation** 54:19
**allow** 27:17 38:9,13
89:4
**allowing** 54:20
74:6
**allows** 65:3 86:2
**alluding** 70:7
**alternative** 3:18
4:7 91:17
**Ambassador** 41:24
**American** 83:10

**Amicus** 50:11
**amount** 3:14 5:3,9
5:17 6:20,21 7:3,6
8:3 9:19 10:20,23
11:24 12:1 33:10
34:11 42:11 43:17
58:19,20,22 62:21
68:23 88:8 94:13
94:14 96:11
**amounts** 40:19
88:7
**ample** 40:11
**analysis** 25:1 27:5
**Analytically** 36:15
**ancillary** 17:16
**Angel** 1:5
**answer** 12:10 88:18
**anticipated** 97:4
**anybody** 11:9
38:16 50:23 99:7
**anymore** 79:7
**anyway** 54:14 82:3
**appeal** 1:20 3:20
67:14 69:3 74:15
78:18
**appealing** 15:15
**Appeals** 1:1
**appear** 3:3
**APPEARANCES**
2:1
**appellant** 2:13,17
17:25
**appellants** 3:5
**Appellee** 2:22
**Appendix** 45:19
97:12,12
**apples** 6:17 80:3
**application** 61:16
75:12 78:8
**applied** 10:22
13:18 63:3
**applies** 21:10 23:15
50:18 56:5 79:1
82:16
**appreciate** 40:17
40:24 47:6 75:5
**apprised** 26:4

**appropriate** 18:8
53:24 54:1 81:15
90:15
**approval** 41:21
**approximately**
44:3
**Aquerreta** 1:9
**Arch** 23:23
**area** 40:1
**Argent** 78:7
**Argentina** 1:17 2:3
3:6,8 4:20 7:7,8
9:4,10,13 11:4,7
11:15 14:1 15:11
15:16 17:6,19,20
18:13,20,23,24
19:3,7,18 20:11
20:19 22:15 23:19
23:25 24:6 26:19
27:11,15 28:23
29:11,22 30:10
31:13 38:4,5
39:22 40:19,21,25
41:1,6,7,8,11,14
41:18,23,24 42:7
42:16 43:10,17,19
43:25 44:6,11
45:23 46:2,7,13
46:17,24 48:2,19
48:25 49:6 50:4
50:20 51:15,23,24
52:10,10,14,25
53:2,10,17,19
54:1,8,11,15,20
56:1,23 57:8,9
58:5,8,9,11,12,16
58:24 59:5,6
60:25 61:2 63:5
65:24 66:15,18
70:17,19 71:4,13
74:12 75:16 76:9
76:18 77:2 78:5
78:13,18 79:5
80:15,25 83:16
84:6 85:20 86:6,7
86:11,16,19 87:8
87:18,19,25 90:2

90:10,24 91:3,17
92:9,13,14 93:11
94:11 97:24
**Argentina's** 7:3,18
29:20 33:18 40:18
45:20 52:24 55:7
57:25 58:17 63:2
63:10,11,14 68:8
81:19 87:1
**argue** 14:16 20:10
38:16 63:17,24
72:21,24
**argued** 28:17 63:23
**arguing** 63:5,20
79:14 88:16,17
95:4
**argument** 15:2,15
15:18,21 29:12
30:9 35:5 37:12
37:16 51:3 54:18
65:14 82:10 87:10
90:9 95:9 98:23
**arguments** 24:23
25:5 39:3 45:2
63:4 80:20
**Armonk** 2:19
**articulate** 11:13
**articulated** 49:9
**aside** 25:11
**asked** 25:3 40:6
46:2 47:20 49:3
51:25 57:3 68:1,2
70:15 76:14
**asking** 4:12 24:20
48:12 59:3 61:23
85:24
**assert** 29:15
**asserting** 6:12
**assessed** 95:18
**assist** 56:4
**assistance** 21:3
**assisting** 82:17
**assists** 81:4
**Associates** 55:6
**assume** 33:17
51:10 54:8 55:1
62:23 76:14

**assumed** 54:16
**assuming** 18:15
**assurances** 83:24
**attach** 14:3
**attached** 45:21
**attempt** 18:2,13
28:23
**attempted** 24:13
71:13
**attempting** 57:2
**Aurelius** 1:4,6
**authority** 35:8 59:4
**automatically**
61:10
**available** 56:12
65:1 73:18
**Avenue** 2:13,23
**avoid** 13:22 18:14
98:1
**avoided** 93:11
**avoiding** 10:8
**aware** 16:1
**awareness** 46:11
79:4
**Azucena** 1:11
**A-850** 70:16

**B**
**B** 2:21 78:4
**back** 6:15 9:23
10:25,25 22:21
40:18 53:1,15
65:14 67:17 73:22
86:22 92:19,19
**background** 47:1
**bad** 27:17
**balance** 40:17,24
40:24
**bandied** 67:18
**bank** 2:10 14:1
17:2,22,25 18:1
18:12 23:23 29:3
36:1,14 37:4,9,18
37:23 38:18 45:16
47:6,14 48:3,6,22
48:25 49:18 50:23
51:2,14,22 56:1

57:15 59:17 62:10
62:11,12 76:15,16
76:16,19,22,24
79:15 83:21,23
84:18,24 85:5,19
86:16 87:11,23
88:11,16 89:11,13
89:13 91:14 99:16
**bankruptcy** 11:17
11:19 73:2,9,9,10
73:11,14
**banks** 49:16,17
50:14,15 51:18
57:14
**Barrington** 5:21
10:12 11:12 19:10
19:14 24:23 25:2
25:7 33:4 46:18
46:23 47:2,5 50:9
62:6,8 71:7,11
76:13 79:14,22
80:3,17,20 86:9
94:1,5 97:4,7
**based** 4:19 7:1
33:11 79:4 95:15
**baseline** 5:14
**basic** 28:11 64:2
91:2
**basically** 10:2
11:23 13:7 17:13
20:1 42:7 60:1
81:7 83:13
**Basinghall** 2:6
**basis** 9:12 22:25
71:19 73:19 92:8
95:20
**beg** 74:4 75:6
**beginning** 56:22
**behalf** 26:1 39:21
87:11,11
**Belgian** 83:9
**Belgium** 36:7 37:1
99:14,18
**believe** 3:20 5:1
22:17 85:21 89:22
**believed** 5:1,1
**believes** 15:8 22:13

49:12
**belong** 27:9 78:23
**beneficial** 49:7
59:20
**benefit** 7:13,14
39:10 68:12 86:1
91:9
**benefits** 11:6
**best** 17:10 58:17
73:16
**better** 8:20 58:12
64:23 70:2 95:6,9
**beyond** 7:18 9:16
11:8 17:7 20:25
**big** 93:8
**billion** 15:7 44:1,4
44:8,10,11,14
68:9,10,13 73:23
73:25,25
**Billions** 89:9
**bind** 29:2
**binds** 24:6 33:22
**bit** 71:8 87:12
**Blackman** 2:3 3:7,8
3:19,25 4:8,10,25
5:24 6:11,17 7:10
7:14 8:10,22,25
9:16,23 10:10,19
11:14 12:2,8,11
12:14,21,25 13:3
13:5,8,18 14:18
14:22 15:3,25
16:24 17:1 41:19
59:11,13 60:2,6,9
60:18 61:6,19,23
62:7,14 63:8,11
63:14,19,23 64:7
64:10,14,20 65:9
65:15 66:4,9,13
66:16,21,24 67:21
67:23 68:15,18
69:6,11,14 70:9
70:12 71:8,12,21
72:2,16 73:1,6
75:4 76:14
**blocked** 32:9
**Blue** 1:5

**BNY** 18:5,10,23
19:2,17 22:2
23:19 24:6 27:10
27:14
**Boies** 2:16,17 17:1
28:6,9,10 29:1
30:1,3,12 31:2,11
33:5,21 34:8,14
34:19,22 35:10,13
35:15,18,23,25
36:20,23 37:14,20
38:11 39:3,17
42:14 45:16 46:9
47:25 48:11,14
52:8 56:25 63:9
74:1 82:24 83:1
83:18 84:9,17
85:8,21 86:7,14
86:20,25 87:3,13
87:20,23 88:2,5
88:14,17 90:8,20
90:23 91:19 92:10
93:13,17,20 94:2
94:6,17,19 95:8
95:11,20,25 97:6
97:9,18,20 98:2,9
98:16 99:1,11
100:4
**Boies's** 5:16 7:23
9:20 59:19 60:3
60:21 65:21 68:6
70:4 74:23
**bona** 82:13
**bond** 5:15 6:18,24
7:2,3,9 8:6,7 9:10
9:21 10:15,21
11:23,24 15:24
19:21,22,24 20:5
20:7 23:24 24:1
26:22,23 27:1,2
28:7,10 29:5,14
29:18 30:6,7
31:23 32:21,22
33:25 34:6 36:4
36:14,21 37:3,24
37:24 42:24 43:2
44:12,20,22 45:6

45:14,22 46:6,16
46:19 47:25 48:6
48:11,18 49:25
51:19 52:1,9,11
52:13,14 53:8
54:3 55:8 57:6
60:13,23 63:4
66:3,6,8,12 68:16
70:24 71:3,19
78:7 83:12,13,14
84:2,4,7,7,8 85:12
86:1,16,18 90:11
91:8 92:7 93:7,23
93:24 94:3,13,14
95:5,6,7 97:23
98:1,15
**Bondholder** 2:16
**bonds** 4:21 28:21
30:4,14,16,16
31:5,13,14,24
33:7,9,11 34:4,5
36:25 37:7,8
38:14,15 46:1,15
48:21 49:7 59:19
70:24 71:22 89:9
89:9,16,19 91:13
92:20,24 93:8
95:25 96:2 97:5
**borrow** 46:14
**borrowed** 53:12
**bought** 97:5
**bound** 47:14 50:22
59:15 78:3,5
**breach** 10:3,8
18:23 20:19 23:10
26:17,19 27:4,13
53:22 55:19 76:9
77:2 80:14 82:18
90:14,16,24
**breached** 20:20
90:10
**breaches** 10:3
**breaching** 80:25
81:4,5
**break** 20:14
**brief** 4:2,3 37:17
44:2 50:11 55:3

68:6 83:2
**briefing** 37:15 40:4
40:6
**briefly** 37:20
**briefs** 37:23 38:22
54:19 58:20,21,21
94:11,25
**bring** 56:4 77:14
**Bringing** 22:22
**broad** 59:4
**broken** 32:9
**brought** 75:23
81:24
**Buenos** 14:5,13
**building** 75:1
**burden** 23:9 24:15
25:1,2,6 77:20,24
98:21 100:1
**Burgueno** 1:7
**business** 49:15
**buy** 55:4

---

**C**

**c** 24:10 48:2 91:12
**call** 49:24
**called** 14:7 17:11
**Capital** 1:4,4,5
2:21
**car** 50:24
**Carballo** 1:8
**cards** 62:20 63:1
**care** 33:20,21 54:12
**career** 67:3
**Carmen** 1:10
**carry** 77:2 80:23
**case** 3:24 14:3
17:10,11 21:3
22:4,22,22 23:2,3
23:3 24:18 27:23
27:23,25 28:15
32:11,12 44:3,10
51:9 54:15 61:6
64:23 65:10 71:6
72:7,9,11 73:11
75:13 76:12 77:13
81:18 82:9,12,16
83:9,9,10 91:23

99:3 100:6
**cases** 4:15 13:11
21:7 23:5 27:25
51:9 54:15 82:14
82:15 83:6,7,7
91:23 96:22,22
99:3,13,13
**cash** 38:5
**caught** 93:24 94:1
**cause** 49:2 85:12
**caused** 7:17
**centered** 7:1
**Centre** 2:12
**cents** 34:9,10 42:15
69:20 93:2 96:10
**certain** 19:20 21:21
26:6 31:17,18
33:10 43:22 67:4
70:25 71:1 82:2,2
**certainly** 4:15 7:17
22:13 29:22 40:10
74:16 96:18
**certificate** 51:16
**Cesar** 1:11
**chain** 35:9,10 39:4
61:1
**challenge** 78:17
**challenged** 45:22
**chance** 6:3 39:22
**change** 42:1 48:21
54:9,11 56:24
**changed** 95:17
**changes** 44:6
**charged** 75:17
**Chase** 79:12
**check** 48:24
**child** 3 8:20
**children** 38:14,16
**chilling** 61:20
**choice** 66:25
**choices** 7:19
**Christopher** 2:10
17:23 18:18 19:12
19:16 20:2,13,16
21:2,16,24 22:9
22:11 23:14 24:3
24:25 25:4,15,21

26:9,17,24 27:3
75:11,22 76:3,21
77:19 78:10,21
79:3,21,25 80:11
80:19,22 81:12,17
82:8,11,23
**circuit** 1:2 51:10
54:15
**circumstance**
10:11 16:1 18:3
48:18 69:4
**circumstances** 7:18
29:19 49:24 50:5
56:22 62:13 76:19
**cited** 23:2 82:15
**city** 2:5 45:11
**civil** 47:19
**claim** 6:21 17:8
22:19,21 27:19
65:3 77:23
**claims** 3:14 64:22
68:10 74:1
**clarification** 5:5
89:14
**clarified** 49:19
76:15
**clarify** 47:20 49:19
50:17
**clause** 10:4,9 14:7
15:19 16:8 29:16
44:23 67:10 68:12
70:23 71:2 90:12
95:5
**clauses** 67:13 99:18
**clear** 8:25 29:2
31:20 49:15 61:24
77:13,14,14 78:11
83:22 91:3
**clearer** 84:1
**clearing** 50:12
59:17 61:8
**clearinghouse**
50:12
**clearly** 5:2
**Cleary** 2:4
**clerk** 100:7,8
**client** 15:5 29:22

43:4 62:12,21,21
65:23 67:5 68:20
74:15 75:6 79:23
81:20 82:13 84:10
85:20 87:12 98:7
98:22
**clients** 5:16 7:23,25
9:4,20 10:24
15:12 28:13 29:15
29:17 30:3,9,10
35:5 41:10 42:22
52:8 59:19 60:4
60:21 62:3 65:21
65:24 68:6 70:4
71:16 73:8 74:1
74:23 84:1,12
86:2 88:21 89:18
92:4,6,17 93:15
96:4,5,12,15,17
97:5 98:19 99:5
**client's** 34:15 56:16
84:15 87:22 88:18
**closed** 82:9
**CMECF** 3:3
**coerce** 17:5,17 28:2
65:24 92:1
**coercing** 72:8
**coercive** 17:15
32:19
**colleagues** 65:11
**collected** 38:15
**collecting** 86:5
**collection** 16:18,19
16:22
**combination** 73:14
**come** 15:17 43:22
48:17 49:18 56:25
62:16,17 74:16
**comes** 37:21 48:25
73:10 85:16 86:7
86:11,17,19
**commitment** 59:5
70:4,14 71:16,18
**commitments**
58:15,24,25
**common** 21:4,9
72:10

**community** 58:14
**Company** 59:18
**compare** 10:20
97:12
**compared** 88:8
**comparing** 93:17
93:20
**compel** 64:24
**compensation** 89:1
**complete** 49:21
**completed** 49:5
**completely** 17:17
42:20
**complex** 4:14
**compliance** 13:6
26:8 51:11,13
81:19,25 91:25
**complicit** 26:8,11
50:4
**complied** 51:24
**complies** 52:17
**comply** 54:16,16,16
58:3,5 59:7 90:13
92:1 98:14
**component** 21:13
**conceded** 60:21
**concededly** 3:15
**concedes** 84:24
**conceivable** 48:17
**concern** 31:8 71:2
71:10,12 81:22
90:8 97:22,23
**concerns** 52:13
70:18 72:15,17
**concert** 18:13,16
18:19 19:3 20:11
20:16,25 21:12,14
21:22 23:9 26:14
27:7 47:16 49:20
50:19 56:19 57:21
59:1 75:17,21
77:8 78:3,6 79:1
79:20 80:24 82:6
**concession** 84:17
84:23 92:11
**concluded** 7:1
**concludes** 100:6

**conclusion** 4:19
15:22 92:12
**condition** 29:20,23
30:4 70:18 81:16
**conditioned** 32:6
**conditions** 26:6
**conduct** 18:9,19
19:3,5 20:23
21:21 22:14,20,23
23:19 24:7 27:10
27:21 56:8 76:6
77:6,11,21,24
79:7 80:23 82:16
90:7
**conference** 4:4,12
**confirm** 59:3
**confirmation** 20:5
**conflict** 55:10
**confrontation**
13:10 15:13
**confrontations**
13:24
**confronted** 83:8
99:20
**Congo** 17:12
**Congress** 9:5 14:12
14:23 31:18 65:3
**connected** 23:6
**Connecticut** 2:23
**connecting** 98:24
**connection** 97:21
**consequence** 74:14
**consider** 55:16
**considerably** 95:8
**consideration** 50:1
**consistent** 16:10
54:3
**consists** 72:7
**consonant** 3:21
**constitute** 57:2
**constitutes** 55:7
**constitution** 23:1
31:19 83:4 88:23
99:25
**constrained** 70:1
**construction** 44:17
64:18

**Contemplated**
14:12
**Contemporacy**
49:13
**contempt** 23:22
27:2 35:7,22
36:17,22 37:6,7
37:13 49:10 51:6
51:14 52:4 57:19
59:22 60:20 61:7
61:12,21 63:21
75:18 77:12,18,19
78:8,14,16,19
79:7 82:20 84:16
88:11 89:11 92:15
**contemptuous**
77:21
**contention** 47:7
**contentious** 13:23
**context** 7:15 13:19
15:4,18
**contingency** 57:4
**contingent** 46:19
**continual** 49:25
**continue** 26:1
53:10
**continued** 53:17
**contract** 15:19
30:20,22 64:24
69:12 70:8,15
83:11,16 86:2,9,9
86:12 92:7 95:16
95:17
**contracts** 64:18
88:24 95:19 99:7
**contractual** 30:21
31:9,22 52:20
83:4,5,14 88:20
88:21 91:9 92:3
92:18 96:20 97:3
98:22 100:1,2
**contractually**
28:14,20
**contradicted** 41:22
**contrary** 30:7
47:25 56:25 80:21
**control** 7:18

**controversy** 23:6
**contumacious**
13:17,24 15:5,9
58:1 82:7
**conversation** 32:13
47:1
**convoking** 53:12
**cooperate** 14:2
**copies** 97:15
**corporate** 23:4
**Corral** 1:9,10
**correct** 6:16 8:10
18:14 42:9 48:16
52:22 53:9 71:7
86:11
**correctly** 29:14
**could've** 40:6,7,7
**counsel** 8:21 17:2
17:21 28:25 33:17
39:16 43:24 54:18
58:5 59:9 63:4
75:9 82:24 83:22
85:24 89:6,13
**Counselor** 66:20
**count** 34:23
**countries** 16:15
**couple** 53:1
**coupled** 92:11
**coupon** 10:16,20
**course** 6:7 14:4
16:7 41:5 64:4
69:11 73:9 85:12
**court** 1:1,20 3:2,7,9
3:9 6:25 8:11 9:1
9:1,6 10:8,25 13:7
13:9,19,21,25
14:17,20,21 15:6
15:6,10,13 17:24
18:4,7 19:20 20:4
20:9 21:7,21
22:17 24:20,22
25:12 26:4 27:17
28:9 29:7 31:15
32:3,23 34:23
36:8,9 37:5 38:1,9
38:12 39:12,20
42:18 43:15 45:11

46:8 47:21 49:11
51:9,11,12 52:15
53:1,15,18,18,20
53:22,23 54:8
55:15 57:25 58:6
58:25 59:7,7
60:15 61:3,7,17
64:17,22 66:16
70:3 71:25 72:17
72:19,19,19,23
78:10 79:3,11
81:7,15,23 83:13
83:16,20 84:2
87:22 89:2 90:15
91:16,20 93:22
98:13,24 99:20
100:7,8
**courtroom** 22:13
89:5 91:12
**courts** 24:18 41:16
46:13 51:1 53:13
53:16 54:13 58:6
58:15 59:8 67:6
78:9
**court's** 3:11,13
4:11 12:5 15:14
15:22 21:3 23:2
27:21,24 29:20
31:7,12 32:15
35:8 49:8 50:6
67:23 81:25,25
82:14
**cover** 57:4
**create** 13:10 89:7
91:22
**created** 42:16
**creates** 20:22
**credit** 54:19 89:21
89:24
**creditor** 11:20
**creditors** 35:1
45:23 70:17,20,21
71:1,5
**criminal** 21:10
25:24,25 26:1
36:17,22
**crisis** 28:23

**critical** 3:9 21:12
  98:5
**criticizing** 73:7
**cross** 20:21
**Crutcher** 2:22
**culpable** 21:11,15
**curious** 68:25
**current** 7:4 9:10,18
  16:3,6 40:24
  69:25 94:12
**custodian** 38:15,18
  39:6

**D**

**D** 5:21 10:12 11:12
  19:10,14 24:23
  25:2,7 33:4 46:18
  46:23 47:2,5 50:9
  62:6,8 71:7,11
  76:13 79:14,22
  80:3,17,20 86:9
  94:1,5 97:4,7
**damage** 90:3
**damages** 10:1,3,4,8
  15:7
**Daniel** 1:8
**date** 4:2 6:25 71:4
  91:10
**David** 2:16 28:6,9
  28:10 29:1 30:1,3
  30:12 31:2,11
  33:5,21 34:8,14
  34:19,22 35:10,13
  35:15,18,23,25
  36:20,23 37:14,20
  38:11 39:3,17
  83:1,18 84:9,17
  85:8,21 86:7,14
  86:20,25 87:3,13
  87:20,23 88:2,5
  88:14,17 90:20,23
  91:19 92:10 93:13
  93:17,20 94:2,6
  94:17,19 95:8,11
  95:20,25 97:6,9
  97:18,20 98:2,9
  98:16 99:1,11

100:4
**days** 4:1 40:4 41:9
  67:25 68:3
**DC** 2:24
**De** 1:10
**deal** 4:17 8:20
  11:10 16:22 69:16
  70:2 71:5 73:18
  73:18 90:17
**dealing** 87:4
**debt** 5:7,8,10,12,14
  5:18,19 6:5,7,9,10
  6:13,14 7:9 10:21
  10:23 11:18 15:17
  15:23 16:1 33:19
  45:20 63:15 67:12
  68:11,11,16,17,19
  68:19 69:7 70:13
  70:19,21 71:20
  72:8,9 73:15,23
  74:7,9,12 93:12
  94:12
**debtor** 7:19 16:2
  38:10 72:18
**debts** 92:8,9
**decade** 69:4
**December** 5:21
  44:13 45:19
**decide** 8:15 10:2
  55:7 61:21 89:3
**decided** 21:7 48:19
  53:23 56:10 65:11
  65:12 99:18,19
**deciding** 56:8
  66:22
**decision** 4:11 14:10
  15:14 18:25 26:20
  27:5,15 41:9
  53:16 55:12,13,24
  56:2,3 60:24 61:4
  67:23,25 76:10,12
**decisions** 59:7
**declined** 45:22
**decree** 49:22 55:19
  55:20,24,25 79:25
  82:12
**decrees** 51:11

**deduct** 86:10,12
**default** 4:20 6:14
  7:10,15,17,17,19
  31:5 34:5,10
  53:11,17 54:20
  55:7 66:15 69:4
  71:22,23 89:8,8
  89:11,16,21,24,25
  91:13,22 93:14
  97:24 99:3
**defaulted** 5:14 7:7
  16:2 67:12 92:24
  93:14
**defaulter** 99:4
  **defaulting** 52:25
  53:3
**defaults** 7:3 52:23
  54:21
**defeat** 18:17
**defects** 45:4 93:22
**defend** 22:20 24:21
  28:18 49:13
**Defendant-Appel...**
  1:18
**Defendant/Appel...**
  2:4
**defending** 27:20
**defense** 23:7 43:19
**defiance** 97:24
**defined** 59:14
**defines** 59:16
**definition** 3:20
  7:15 9:2 66:13
  72:4
**defying** 53:19
**delighted** 63:24
**delinked** 99:10
**demonstrate** 84:3
**denied** 13:20 40:20
**Depository** 59:18
**described** 24:8
  78:4
**designating** 38:7,8
**designed** 13:22
  28:13,19 36:12
**despite** 12:5,6
**destroy** 89:8

**destroyed** 89:10,10
**destroys** 91:8
**determination** 3:11
  9:24
**determine** 3:10 9:2
**determined** 53:21
**determining** 3 8:24
**device** 3:15 62:19
**devices** 14:11
**devoid** 49:9
**dialogue** 17:4
**dictate** 13:8
**dictating** 13:7
**Dieguez** 1:7
**different** 3:23 9:9
  26:3 36:8 45:13
  49:5 56:24 62:9
  84:13 88:12 94:21
  97:13
**difficult** 13:23
  67:16 87:21
**difficulty** 40:21
**direct** 91:3 96:3
**directed** 17:15 22:1
  75:16 76:4 78:5
**directly** 18:2 35:20
  83:8 99:25
**dis** 55:23
**disagree** 48:5
**disbursement**
  72:23
**discipline** 23:15
**discounted** 6:19
  8:3
**discretion** 38:23
  44:18 49:23 55:23
  72:12
**discussion** 8:12
**dispense** 75:14
**dispensed** 76:11
  81:2,19
**dispute** 26:3
**disputed** 8:14
  43:20 44:16
**distinct** 18:1
**distinction** 84:21
**distinguished**

41:12
**distribute** 29:5
  39:11 72:19 85:10
**distribution** 3:18
**District** 1:20,21 3:2
  3:9,11,13,18,23
  4:1,7,16,18,18 6:3
  6:25 10:8,25 12:5
  18:4 22:17 24:8
  32:3,23 36:9
  43:14 44:17 45:11
  51:11 55:15,22
  60:11 61:17 87:22
  91:16,19 98:24
**divide** 76:4
**divorced** 27:12
**docket** 74:24
**document** 98:6
**documents** 97:8
  98:5
**doing** 23:22 41:4
  50:3 52:25 54:13
  54:14 63:25 65:4
  73:15 84:10 85:3
  85:25 88:11 96:3
  96:22
**dollar** 34:9,10
  41:10,11,13 42:15
  93:2 96:10
**dollars** 15:7 44:1,4
  44:8,10,11,14
  53:6 68:9,10,13
  69:19 73:23,25
  89:9
**don** 98:20
**doubt** 50:16 62:1
  63:2
**downstream** 27:9
**drafted** 42:16
**dramatic** 7:24
**draw** 24:20
**drive** 7:15 81:18
**driving** 50:24
**dual** 37:19
**due** 5:7,22 7:2,3,6
  9:19 18:11 22:18
  27:22 29:10 34:25

36:18 53:4,5
64:24,25 76:5
77:21,22 78:21
79:8 81:20 84:11
86:17,18 91:8
94:15 97:1,2
**Dunn** 2:22
**duties** 49:1
**D2** 77:1
**D2C** 47:15

**E**

**E** 31:2
**earlier** 29:21 45:15
46:15 51:9 66:18
83:3
**easy** 74:15
**economic** 41:14,23
86:14
**Economy** 41:23
**EC2V** 2:7
**effect** 11:6 17:15,17
18:14 26:11 33:22
37:16 59:22 61:20
64:3 65:17,18
91:11 97:20,21
**effectively** 4:24
43:3
**effectuate** 18:6
**effort** 43:18 58:18
69:4 71:5 90:1,2,2
**eight** 41:9 95:13
**either** 36:24 37:13
65:23 68:22 73:24
**el** 40:18
**elaborate** 69:17,23
**element** 21:6
**Elena** 1:9
**elevated** 24:15 25:6
77:24 79:9
**eleven** 8:9 9:11
34:1 93:15
**eliminate** 77:3
**eliminated** 96:18
**eliminates** 77:21
**Elliot** 17:13 55:5
**Elsa** 1:10

**else's** 96:20 97:3
**emphasize** 96:21
**empowered** 72:20
**enact** 46:7,17
**encouraged** 46:17
**enforce** 3:16 64:13
83:5 90:15 95:18
**enforced** 61:4
**enforcement** 13:25
14:8,11 62:19
64:15
**enforcing** 10:9
66:19 92:7
**engaged** 77:20
**England** 2:8 17:10
99:13,19
**English** 74:10 83:9
**enhanced** 14:7
**enjoin** 18:3 24:8,19
35:8 57:2 76:7
77:3,5,11 79:6
87:22 92:13
**enjoinable** 27:21
77:24
**enjoined** 18:8,13
20:19 26:2 45:21
59:21,22,24 60:25
63:16,17,22,24,25
64:1 75:13,19
80:15 82:17
**enjoining** 21:19
24:16 25:5
**enjoyed** 98:8,8
**enormous** 58:22
**ent** 7:4
**enter** 16:4 17:14
30:17 32:24,25
55:24 64:12 73:18
92:20 93:6
**entered** 28:21
30:20 33:1 64:17
**enterprise** 25:24
**entice** 46:14,14
**entire** 40:1 60:19
61:8
**entirely** 81:15
**entirety** 75:13

**entities** 50:2 80:9
**entitled** 7:5 16:5
33:15 35:5 39:11
51:4,24 52:3
60:21 87:15
**entitles** 9:21
**entity** 17:12 49:17
51:22 55:6
**entrusting** 26:5
**envision** 56:22
57:19,19,20
**eq** 98:14
**equal** 5:13 7:15
8:11,14,15,16,19
9:3,18,24 10:14
42:19,25 44:18
45:10,12 49:3
53:20,22 54:2
62:20 64:18 68:4
71:19 72:4 83:14
90:12 94:25 98:14
98:14 99:9
**equality** 73:12
**equally** 73:13
95:12
**equitable** 32:15
33:23,25 49:23
53:24,25 55:19,24
55:25 59:4 64:2
72:3,5,7,12 73:9
73:21 75:7 89:23
90:7 91:1 93:21
93:22 94:7 95:1,3
98:21
**equities** 62:3,4
**equity** 11:15,19
13:11,13 16:12
32:16 42:12 46:8
65:1 69:3 72:22
72:22 73:10,12
74:4 94:24
**equivalent** 73:16
96:1
**erroneous** 3:12
**escrow** 68:23
**Esq** 2:3,16,21
**essentially** 9:25

29:3 33:1 72:13
**Europe** 46:2
**European** 59:17
**ev** 43:18
**evade** 18:21 19:18
20:12 21:22 22:15
27:15
**Evangelina** 1:8
**event** 21:18 54:22
80:1 88:4 98:6
**everybody** 35:8,10
61:1 89:5,6,19
91:12
**evidence** 4:15
18:21 19:6,13,17
19:24 22:4,6
23:10,13 32:7
43:12,14,15 67:22
71:14,15 78:12
80:18,22
**evoked** 58:9
**exactly** 26:15 29:6
31:11 35:23 36:15
37:14 42:14,15
50:6 68:12 69:19
73:7 76:4 91:6
**example** 5:6,8,9
36:25 37:5
**examples** 5:5 67:9
69:18
**exception** 80:2
**exchange** 2:16 5:15
6:18 7:3 8:6
10:15,21 11:24
19:4,21 20:7
23:24 26:23 27:2
28:7,10,21 31:25
32:22 34:5,6
36:21 40:8 42:12
42:24 43:23 44:12
44:20 45:6,14,21
46:6,19 48:5 52:1
52:9,13,13 53:8
54:3 55:8 56:15
57:6 60:23 63:4
66:3,6,7,11 68:5
68:16 69:7 70:19

70:21 71:1 84:2
86:1 89:16,19
91:8 92:20 93:7,7
93:23 94:3,14
95:6 97:13
**exchanged** 31:24
33:7,9 34:4
**execute** 16:14
**execution** 13:24
17:7,9 65:12
67:16
**executive** 9:4
**exempt** 50:16
**exercise** 72:12
**exigencies** 81:18
**exist** 50:14 89:4
**existence** 76:17
79:16
**existing** 4:23 22:11
69:12
**exists** 23:15 73:16
**expect** 4:6 27:20
37:16
**expects** 21:21
**experienced** 57:23
**experiencing** 65:8
**explain** 12:15
**explained** 44:2
88:12
**explicit** 36:23,24
**explicitly** 96:25
**exposed** 89:15
**express** 96:19
**expressed** 71:2,9
71:12
**expressly** 28:13
75:23 99:15,15
**extension** 18:4
**extent** 16:15 35:5
38:7 81:14 85:3
**extraordinary** 18:3
21:18 76:8 77:15
80:1
**extreme** 31:4 61:20
**eyes** 15:0

**F**

**face** 57:3,4 93:9,9
 95:2,2
**faced** 57:25 61:19
**facilitate** 27:1
**facilitating** 85:1
**facing** 15:18 74:14
**fact** 16:16 21:5
 22:16,20 24:7
 30:12 40:3 43:20
 43:23 46:12 47:12
 54:3 55:18 59:14
 61:21 65:20 75:14
 92:19 99:8
**factor** 21:6
**facts** 57:17
**Failing** 27:16
**failure** 55:7
**fair** 32:17,18 41:20
 49:23
**fairly** 6:4
**faith** 68:22 69:7
 90:2
**familiar** 29:17
**family** 17:13
**far** 58:11 78:23
 82:14
**fashion** 31:16
 32:19 33:7 94:7
**fashioning** 91:1
**favorable** 71:4
**fear** 60:20
**February** 40:13
 44:9
**Federal** 45:11
 88:23
**fee** 39:1 86:13,17
 86:17,19
**feedback** 70:19
**feel** 15:5 74:25
**fees** 86:3,4 88:6,7
**felt** 47:22 91:17
**Female** 48:15
**fervently** 9:1
**fewer** 7:21
**field** 14:11
**figure** 47:9
**file** 64:9

**filed** 3:4
**filing** 47:1
**finally** 59:6
**financial** 26:3
 28:23 58:13 61:20
 68:8
**find** 26:2 31:15,15
 41:4 43:18 44:17
 44:19 57:5 68:21
 84:20 85:23 97:14
**finding** 44:18 88:1
**fine** 24:22
**finish** 47:5
**firm** 12:8
**firmly** 11:8
**first** 7:22 11:11
 13:12 20:16 24:25
 25:4 28:11 30:3
 30:22 39:21 44:24
 45:9,24 47:11
 67:25 70:23,25
 71:2 72:3 74:25
 76:22 77:22 90:23
 91:21 97:9,9
**fits** 55:25
**flag** 12:16
**flew** 38:4
**Flexner** 2:17
**flight** 46:18
**follow** 31:3 63:21
**following** 4:3 79:17
**follows** 20:21
**Footnote** 42:10
 68:6
**forbidden** 56:4
**force** 53:15 73:20
 96:16
**forcing** 62:21 66:17
**foreign** 15:6 16:15
 65:4,12 67:7
**forever** 7:20
**forget** 6:20
**form** 53:24
**formally** 47:8
**formula** 5:12,14,25
 42:13
**forth** 40:18

**fortunately** 17:1
**forward** 11:25 34:2
 68:24 74:8
**found** 21:11 40:11
 40:12 41:19 76:2
**four** 95:2
**fraction** 5:17 7:7,9
 8:18 10:5 12:2
 95:2
**fractions** 5:18
**frank** 60:4
**frankly** 36:6 67:24
**free** 62:13 76:19
**front** 25:25 71:24
 81:23
**frustrating** 26:11
 37:25 38:3
**frustration** 31:12
 40:23
**FSA** 14:10
**FSIA** 16:17
**fu** 61:9
**ful** 50:25
**fulfill** 50:25 66:25
 90:2
**fulfilling** 50:4
 83:25 93:5
**full** 3:14 4:19,23
 5:3 6:21 7:2 8:3
 10:5 46:11 84:4
**function** 17:9 18:7
 29:6,6 38:19 39:9
 61:9 85:9,17 86:4
 87:10
**functions** 87:5
**Fund** 1:6,12
**fundamental** 9:24
 12:22
**fundamentally**
 23:1 67:4
**funds** 41:10,15,17
 42:8,8 51:15,17
 58:9
**furnish** 76:23
**further** 19:7 57:18
**furthering** 26:15
 26:18

**future** 70:23,25

**G**

**g** 10:25
**gap** 80:25
**generally** 14:20
**getaway** 50:24
**getting** 5:16 6:18
 8:2 9:18 10:15
 33:2 39:13 85:4
 87:18 94:3,23
**Gibson** 2:22
**Gines** 1:11
**give** 11:9 15:21
 16:12 32:20 33:15
 41:3 53:18 60:12
 69:17 81:8 96:11
**given** 5:9,16 9:17
 17:3 19:24 24:11
 28:18 37:3 59:23
 69:18 99:8
**gives** 38:25 98:7
**giving** 8:20 22:25
 23:5 35:21 49:17
 66:24 90:17
**glad** 41:3
**go** 8:16,17 9:5
 10:24,25 11:8
 20:6 26:6 41:20
 44:7 50:16,23
 52:1 67:17 69:2
 71:23 73:14,22
 74:7 82:3,3,14
 85:15 89:20 92:18
 92:19,19
**goes** 17:7 22:21
 36:14 40:9 53:1
 77:25
**going** 11:8,20,24
 15:11,21 17:3,20
 18:25 25:23,24,25
 26:15 31:20,21
 32:24,25 33:22
 34:2,24,25 35:1
 36:11,15 37:25
 39:24 40:17 41:15
 41:16 42:23 44:20

**45**:10 51:7 52:12
 54:13 55:2 57:24
 58:5 63:12 66:10
 66:11 67:16 72:25
 73:24 74:9,11
 82:6 84:2,6 89:5,7
 89:7,8,10,10,14
 89:15,16,17,18,19
 90:14 91:13,21,22
 96:24 98:21 99:5
 99:15,15
**gonna** 13:1 36:17
 58:3 65:25 70:14
 73:22,22,24,25
 74:1,2,17 82:1
 85:15 89:24,25
 91:12,24
**good** 3:7 28:4 32:10
 68:22 69:6 90:1
**gotta** 85:15 92:25
**gotten** 33:7,8 34:3
 35:2 78:23 88:12
 95:10
**Gottlieb** 2:4
**governed** 67:12
 74:10
**government** 15:9
 28:22 34:19 67:2
 67:3 69:25 70:1
 92:24
**governments** 28:22
 32:1 67:2 92:24
**grant** 66:14
**granted** 28:18
**granting** 77:25
**Great** 64:23
**greater** 32:21
**Griesa** 23:12,14
 39:25 40:9,11,14
 42:20,23 43:23
 45:18 47:18 50:17
 52:9 53:21 57:20
 58:4,11,18 59:3
 60:22 62:17 74:24
 74:25 88:3
**Griesa's** 44:7 62:9
 74:24 89:4

**ground** 14:16
78:17
**group** 2:16 28:8
32:20 35:1
**groups** 94:8
**guarantee** 89:13
**guaranteeing** 83:13
**guess** 34:10
**guilt** 46:10

**H**

**haircut** 7:24 11:21
11:21 73:20 93:8
96:8
**Hamilton** 2:4
**hand** 23:8 24:17
26:10 56:5
**handed** 36:9
**hands** 88:10
**Hand's** 22:22 56:2
79:11
**happen** 11:5 63:12
65:25 82:11 89:5
89:16 99:5
**happened** 14:3
61:5 89:23 91:6
**happening** 53:10
72:25
**happens** 49:3 83:15
87:6
**happy** 10:24 34:12
34:13
**harm** 74:3,4
**hasty** 6:3
**hats** 85:6,8,9
**hauled** 76:2
**hauling** 61:3
**Haydee** 1:11
**Hayman** 23:3
**head** 25:23,24
62:17,17
**hear** 17:21 28:7
37:16 39:19 42:3
62:1 63:8,9
**heard** 13:20 32:13
39:22 41:18 42:4
42:6 45:16 46:8

51:4 52:3 58:4,4
59:25 60:15,19
64:21 67:14 75:18
82:20 89:5 91:11
94:20
**hearing** 4:3 39:25
39:25 40:13,14
43:25 44:1,9 47:8
77:13 89:11
**hearings** 58:20
**heart** 61:14
**heavily** 6:19
**heed** 70:17
**held** 10:21,23 23:22
37:6,7,13 38:14
38:17 39:25 45:25
51:6 61:10,15
75:20 79:3 82:4
89:9 92:22
**help** 19:7 28:2
65:22,23 87:19
90:8 98:22
**helped** 54:4
**helping** 18:20
19:18 20:18 22:5
22:15 56:4 74:5
**helps** 63:25
**Heritot** 6:6
**Higgins** 51:9 54:15
**higher** 23:9
**hindrance** 61:10
**Hippocratic** 74:3
**historic** 21:4,17
**history** 52:25 99:12
99:12
**hol** 84:7
**hold** 9:21 31:20
70:21 71:5,25
73:5,6 74:22 78:16
84:4 93:24
**holder** 10:21 28:8
**holders** 5:15 6:18
7:2,4,9 8:6,7 9:10
10:15,18 11:23,24
15:17,23 19:5,21
19:22,24 20:5,9
23:24 24:1 26:22

26:23 27:1,2
28:10 29:5,15,18
30:6 31:23 32:21
32:22 34:1 36:4
36:14,22 37:3,25
42:24 43:2 44:13
44:20,22 45:6,14
45:20,22 46:6,16
46:20 47:25 48:6
48:18 50:1 51:19
52:1,9,12,13,14
54:3 56:15 57:6
59:19,20 63:5
66:3,6,8,12 68:16
70:24 71:3,19
78:7 83:12,13,15
84:2,4,7,8 85:12
86:1 90:11 91:8
92:8 93:7,23,24
94:3,14 95:5,6,7
97:23 98:1
**holding** 52:9,10
62:24 68:19
**holds** 55:6 89:19
**hold-out** 32:21
37:3,24 42:8
**hold-outs** 6:20 16:3
16:13
**honor** 7:16 15:19
18:18 19:13 20:13
21:16 22:12,25
23:10 24:4,25
25:16 26:9,17
27:3,21 28:9 30:1
30:12 31:2,23
33:5 34:8,14,16
35:23 36:23 38:11
59:13 65:9 67:3
75:11,22 76:3,21
77:4,12 78:10,21
79:21 80:1,12
81:13,17 82:8,12
82:23 83:1,20
84:9 85:8 86:14
86:22 87:3,13
89:20 90:20 91:5
91:19 94:19 95:9

95:20 98:2,16
99:1,11
**Honors** 17:23
65:11 75:5
**hook** 90:18
**hope** 4:14 54:10
75:4
**hoped** 59:12
**hopefully** 29:7
**hopes** 54:10
**hoping** 55:21
**hostage** 31:21 52:9
52:10
**House** 2:5
**Hoxen's** 66:25
**hundred** 53:1
67:10
**hurt** 64:1
**hurting** 74:5,5,6,8
**hurts** 65:22
**Hymen** 27:24
**hypothesis** 73:2
**hypothetical** 79:17
**hypothetically** 37:5
41:3

**I**

**idea** 16:11 17:6
24:18 65:23 70:2
94:6
**Ideally** 78:18
**identified** 36:8 50:5
72:6
**identifies** 85:8
**identify** 60:11
**idly** 74:2
**II** 1:6
**illegal** 10:1
**illustration** 84:1
**imagine** 40:25
**immediately** 89:20
**Immunities** 13:22
65:4,13 67:7
**immunity** 42:18
73:14
**imp** 54:4
**impatience** 67:15

75:6
**impatient** 67:15
**impermissible**
88:22,23
**implement** 88:21
97:2 99:17 100:1
**implementing**
96:19
**important** 14:6
32:2 52:7 53:9
71:9 75:5 89:22
91:5 99:24
**imposed** 54:4
**imposition** 54:4
56:11
**impossible** 7:22
13:12
**impracticable**
13:12
**improper** 4:21
28:12
**inadvertently**
97:10
**inappropriate**
10:11 99:19
**include** 59:17 78:3
**including** 49:24
**inclusion** 70:23
**incorporate** 30:13
**incorporated** 47:19
**incredibly** 13:23
**incur** 92:9
**indebtedness** 40:22
**indenture** 2:11
18:11 19:5 24:4
25:8,9,16,18 27:9
27:10,11 47:23,24
49:1,1 51:19
80:17,22,23 81:10
**indentured** 48:1
**independent** 18:9
19:5 22:14,23
24:6 27:10,21
77:6,11,23 78:24
79:6 92:18
**independently** 76:6
77:6,8

**indicate** 4:6
**INDISCERNIBLE**
3:16 21:6 32:24
33:12 48:15 56:9
56:10,14,17 57:15
60:5,11 82:10
**indisputably** 28:14
**individual** 36:4,14
**induce** 58:9 91:25
**industrialized**
36:10
**inequ** 95:13
**inequitable** 72:25
93:6,18,19,20
95:12,13
**Ines** 1:7
**inference** 20:11,22
**inferiors** 15:23
**infinite** 58:19
**inform** 11:18
**informed** 54:24
**informs** 11:17
**infringed** 96:18
**initial** 80:10
**initially** 47:18
**injunction** 8:2 9:25
10:10,12 11:5
15:14 16:24 17:15
18:2,5,6,14,17,21
18:24 19:7,9,18
19:19,25 20:12,20
20:21 22:1,6,8,10
22:11,15,24 23:20
24:5,12 27:13,15
27:16,18,20 28:1
28:3,12,15,19
29:2,8,25 33:22
36:9 38:1,3,17
43:10 45:3 47:14
47:17,18 48:3,12
48:20,22,23 50:5
50:17,22,23 51:7
51:20,23 52:15,17
52:21 56:6 57:2,3
57:6 60:14 62:11
63:3,7,13 64:12
64:23 65:2 66:2,8

66:15 72:12 74:11
75:16,16,24 76:9
76:18 77:7,15
78:14 79:15 80:12
80:25 81:4,5,9
82:22 89:4 91:11
92:13 93:6 96:23
**injunctions** 3:15
11:6 14:14,14
17:4,17 65:17,20
65:24 66:4,5 67:8
67:11 73:4 74:14
**injunctive** 26:12
77:9,25 79:9,25
82:12
**injuries** 15:7
**innocence** 46:11
**innocent** 34:15
46:9 89:9 90:3
96:5,7
**inquiry** 78:22
**ins** 50:2
**insertion** 55:2
**insignificant** 25:11
**insisted** 70:17
**insolvency** 11:16
11:16
**insolvent** 16:2
**instance** 9:9
**institute** 78:8
**institution** 39:6
**institutions** 61:20
**instruction** 69:24
**instructions** 9:16
**instrument** 6:24
15:24 28:1
**instruments** 42:16
49:21 93:3
**insurance** 55:4
**int** 50:2
**intelligent** 57:21,22
**intended** 21:18
64:13
**intending** 71:23
**intent** 24:2 60:19
**inter** 49:18
**intercreditor** 16:12

**interest** 5:3,6,16
6:6,19 8:19 10:16
16:3,6 17:19
42:21 49:7 55:10
58:17 63:2,10,11
63:14 64:3 74:6
92:6 93:7,9,10
95:3
**interested** 63:15
**interfere** 83:4
**interfered** 88:20
**interference** 97:10
98:3
**interfering** 60:23
**interm** 49:18
**interme** 50:15
**intermediary** 49:16
49:17,18 50:14,15
57:13,14
**interpretation** 37:2
54:2 91:6
**interpretations**
45:13
**inter-creditor**
11:15,19 70:18
**intimication** 52:4
**inure** 7:12
**inured** 7:14
**invading** 19:7
**investment** 33:2,3
**invoked** 46:13 58:9
**invoking** 61:3
**involve** 38:10
**involved** 11:17
27:12,14 44:3
46:20 51:18 55:22
72:22 79:4
**involvement** 21:11
21:15
**involves** 20:17 49:4
65:13
**involving** 23:4
84:15
**Iran** 15:6,8
**Iranian** 15:10
**Irma** 1:10
**irrelevant** 54:25

67:24,25
**irrespective** 55:20
**issue** 9:24,25 12:9
12:18 32:15 67:24
72:12 74:11 88:5
89:3,21 91:2
95:21,21 96:1
99:20
**issued** 26:4 28:15
45:18,20 47:18
49:22 99:14
**issues** 3:10,12,12
4:13,14,14
25:11
**it'll** 3:4

**J**

**James** 2:10 17:23
17:23 18:18 19:12
19:16 20:2,13,16
21:2,16,24 22:9
22:11 23:14 24:3
24:25 25:4,15,21
26:9,17,24 27:3
75:11,22 76:3,21
77:19 78:10,21
79:3,21,25 80:11
80:19,22 81:12,17
82:8,11,23
**JA-850** 47:1
**join** 47:9
**joined** 59:23
**Jonathan** 2:3 3:7,8
3:19,25 4:8,10,25
5:24 6:11,17 7:10
7:14 8:10,22,25
9:16,23 10:10,19
11:14 12:2,8,11
12:14,21,25 13:3
13:5,8,18 14:18
14:22 15:3,25
16:24 17:1 59:13
60:2,6,9,18 61:6
61:19,23 62:7,14
63:8,11,14,19,23
64:7,10,14,20
65:9,15 66:4,9,13
6:16,21,24 67:21

67:23 68:15,18
69:6,11,14 70:9
70:12 71:8,12,21
72:2,16 73:1,6
75:4
**judge** 3:1,17,18,22
3:24 4:1,5,7,9,16
4:17,18,18,21,24
5:21 6:3,8,16,22
7:12 8:5,12,21,23
9:8,21 10:7,12
11:12,22 12:1,4
12:10,12,17,24
13:1,4,6,16 14:15
14:19 15:1,15
16:23,25 17:10,11
17:21 18:12 19:9
19:10,14,19 20:3
20:15,24 21:9,20
22:8,10,22 23:12
23:12,14,23 24:8
24:17,23 25:2,7
25:20,22 26:13,21
26:25 28:4,7,24
29:12 30:2,8,19
31:7 32:24,25
33:4,17,25 34:13
34:18,21 35:4,11
35:14,16,19,24
36:19,21 37:12,15
38:6 39:2,16,18
39:25 40:3,9,11
40:14,23 41:18,25
42:3,20,23 43:3,8
43:12,14,18,20,23
44:7,15,17 45:2,6
45:8,18 46:18,23
47:2,5,18 48:5,9
49:3,8,12,16 50:9
50:16,18 51:2,16
51:21,22 52:6,8
52:16,17,21,23
53:4,8,21 54:18
55:5,10,15,22
56:2,5,8,14,19
57:5,8,11,13,15
57:20 58:4,10,18

59:2,9,11 60:1,5,8
60:10,11,22,24
61:14,22 62:6,8,8
62:9,17 63:1,10
63:12,16,20 64:6
64:8,11,17 65:6
65:14 66:1,7,10
66:14,19,22 67:15
67:20,22 68:14,16
68:20 69:9,12,17
70:7,10,16 71:7
71:11,18,22,24
72:10,11,14,17
73:5 74:23,24,25
75:3,9,15 76:1,13
77:17 78:2,16,25
79:11,14,22 80:3
80:7,17,20 81:7
81:14,22,22 82:10
82:19,24 83:11
84:5,13 85:5,18
86:6,8,9,15,24
87:1,7,17,21,25
88:2,4,9,15 89:4
90:8,13,22 91:16
92:5 93:11,14,18
94:1,5,10,18 95:4
95:10,15,23 97:4
97:7,16,19,22
98:6,12,23 99:7
100:3,5
**judges** 74:4,16
**judgment** 14:7,11
62:19,22 64:6,16
64:17 95:21,23
96:1,11
**judgments** 7:1,21
14:23,24 16:16
65:13
**jurisdiction** 9:7
14:20 42:17,18
46:12 67:6
**jurisprudence** 18:4
21:5 22:3 24:20
79:10
**Justice** 74:10
**justifies** 16:18 93:4

---
**K**
---
**keep** 54:13 85:13
85:14,15
**keeping** 86:5
**Kensington** 17:12
17:12 72:11
**kept** 40:19
**key** 17:3
**kind** 9:15 31:9,24
36:9 60:13 72:22
74:11 75:6 99:2,9
**kindly** 100:5
**kinds** 13:22 61:25
67:8,11 74:7
97:25 99:13
**Kingdom** 36:7 37:1
**knew** 7:24 30:10,13
45:12,24 46:1
97:23
**know** 7:18 9:23
13:2,21 15:3 20:4
20:9 25:8,10,13
25:23,24 26:15
29:9 30:16,23
35:11 36:10 38:7
45:4,17,17 46:6
47:6,7 49:6,11
50:10,14 54:24
64:20 65:10 67:2
69:18,24 70:2
72:14 74:2,9,14
74:15,15 75:7
77:7 79:22 80:7
85:13,19,23 88:16
89:15 90:1 95:18
96:13
**knowing** 20:9 21:3
30:20
**knowingly** 56:3
**knowledge** 20:20
62:11 76:17
**knows** 37:24 73:11
79:15,16 89:5,6
91:12

---
**L**
---
**label** 3:16

**Lakeshore** 23:2
27:23
**lands** 88:10
**language** 21:17
26:13 47:18 49:10
79:19 81:2 97:11
98:3
**lapse** 34:3
**larger** 6:10 9:19
**laughter** 42:2,5
71:9 75:10 79:24
85:25 86:22
**launched** 71:1
**Lavorato** 1:10,10
**law** 11:19 16:16
17:9 21:4,9,10
31:6,6,19 46:7,17
46:20 47:15 51:10
54:14 65:16 67:7
71:6 72:10 74:10
83:3 88:1,22 90:6
90:6,17 93:4
96:16 97:16,18,18
**lawful** 20:23 25:17
53:16,19
**lawfully** 31:22
**laws** 53:12 58:7,8
59:2 99:24
**lawsuit** 23:7
**lawyers** 57:23
**lead** 92:10,12
**Leandro** 1:8
**led** 70:23
**legal** 10:2 16:13
17:18 18:8 21:24
21:25 70:21 75:7
90:2,18 91:25
92:2
**legally** 39:13
**legislation** 9:5
**legislature** 41:20
69:2,22
**lend** 31:4 58:10
**lending** 30:18
**lends** 13:24
**lent** 95:15
**letter** 4:10 46:5

58:20
**letters** 58:20
**letting** 90:18
**let's** 4:17 10:14
37:5 60:4,6 62:1,9
62:19,23 76:4,14
94:8,25
**level** 32:23
**Levin** 21:3
**liable** 63:6
**likelihood** 75:10
**Lila** 1:7
**limit** 60:12
**limitation** 61:2
**limited** 13:20 16:19
18:7,7
**limits** 67:6
**line** 24:20 30:23
80:6
**link** 27:13
**linked** 22:14
**listed** 59:22 62:15
**listening** 89:12
**literal** 54:2
**literally** 42:19
**litigate** 73:21
**litigated** 42:22 46:2
**litigating** 61:12
**litigation** 23:25
39:24 40:1 41:5
44:4 45:10,15,24
53:2 55:9 59:6
62:24 67:15 71:24
74:21,21,22 76:22
99:12
**little** 3:25 55:20
**live** 58:14 59:5
**LLC** 1:5,6
**LLP** 2:4,11,17,22
**load** 17:9
**loads** 67:9
**lock** 46:7,17 54:4
71:6 97:16
**logic** 31:3,3
**London** 2:7
**long** 26:22 33:9
39:24 41:5 52:25

57:24 58:12 69:4
75:1,3 83:2,15
**longer** 40:6
**look** 20:24 25:7
33:6,6 35:5 62:3,4
62:5,7 64:2 65:17
68:6 82:14,15
99:11,12
**looked** 49:8 98:5
**looking** 35:12
49:20 50:1 74:8
84:5
**loosely** 87:25
**loss** 96:7
**lost** 18:7
**lot** 13:11 61:8
65:10 67:18 80:18
83:6
lots 7:18 87:4

---
**M**
---
**m** 13:5
**Main** 2:18
**maintain** 29:25
**maintained** 95:17
**maintaining** 93:12
**majority** 14:17
**making** 15:16 24:7
41:2,12 55:3
60:20 75:25 78:13
88:1
**manage** 57:5
**manner** 81:3
**March** 53:6
**Maria** 1:8,9
**market** 31:8
**marketplace** 55:1
**markets** 58:13
**marshal** 14:1,2,4
14:13
**marshals** 13:2
**Marta** 1:11
**Martin** 2:10 17:23
17:24 18:18 19:12
19:16 20:2,13,16
21:2,16,24 22:9
22:11 23:14 24:3

24:25 25:4,15,21
26:9,17,24 27:3
75:9,11,22 76:3
76:21 77:19 78:10
78:21 79:3,21,25
80:11,19,22 81:12
81:17 82:8,11,23
**Master** 1:4,5
**mastermind** 26:2
**materials** 46:5
47:23
**math** 5:22 11:1
**matter** 41:15 44:16
57:23 63:18 68:9
**maxim** 73:12
**mean** 12:17,18,24
13:1 31:8 33:4
36:24 37:4 38:4
38:13 45:13 48:10
57:19 58:7 68:4
68:24 74:2,20
75:16 81:23 87:16
88:2,7,15 92:1,17
92:20 94:1,20,21
95:11
**meaning** 73:12
**means** 8:15,16 33:5
43:3 53:21 65:3,3
66:11 76:10 79:2
84:17
**meant** 5:5 44:18
46:3 53:21 70:14
94:10,21
**measure** 10:1,3,4
**mechanism** 14:8
56:24
**meet** 24:12 69:14
71:13 79:8
**Mellon** 2:10 17:2
17:22,25 18:1,5
18:10,12 19:2,17
22:2 23:19,23
27:10,14 48:6
57:16
**Mellon's** 24:6
**mens** 21:1,12,15
**mention** 62:10

76:15
**mentioned** 47:12
51:18 76:16
**merits** 3:10 61:1
**met** 81:9
**method** 48:21
**middle** 53:5
**million** 41:2,2 53:6
**mind** 54:10,11
**minded** 74:20
**minds** 42:1 47:9
**minimum** 27:22
38:12
**minister** 41:13,14
41:24
**ministerial** 25:18
85:16
**minute** 16:25 25:11
28:5 46:22 75:10
76:14
**minutes** 37:21
59:11 82:25
**Mirta** 1:7
**mis** 49:15
**missed** 16:7
**missing** 18:21
**misspoke** 97:10
**misstating** 71:8
**mistake** 98:23
**mixing** 80:3
**moment** 91:10
**monetary** 3:14
17:8 64:22,25
65:2
**money** 23:24 26:5
28:14,20 29:5,7,9
29:9,10 33:11
34:11,14,15 35:7
35:9,19 36:2,3,3
36:13,18 37:8,24
38:3,6,15,20,21
40:25 42:8 46:14
48:12,24 52:1,2
52:18 53:12 56:15
56:16 57:1,1,10
58:10 60:3 64:24
66:5 72:18 81:8

81:16 82:2,21
83:24 84:11,11,14
84:18,25 85:2,10
85:15,15,25 86:3
86:5,6,7,8,10 87:8
87:18,19 88:8,10
91:4,8,15 92:12
92:16 93:1,23
95:21,23 96:1,9
96:11,15,17 97:1
97:2 98:18 99:16
99:17
**money's** 25:23
**monies** 19:20,21,23
68:22
**monthly** 7:5 9:12
**months** 44:13
**motion** 76:2
**move** 16:23,24
36:25 48:19
**mover** 7:22
**moving** 37:8
**multiple** 85:6,8 93:9
**Munoz** 1:9

**N**

N 43:2
**name** 39:20
**named** 18:15 79:17
**names** 62:16
**name's** 28:10
**National** 79:12
**nations** 36:10
**natural** 91:6
**necessarily** 21:15
80:9 84:17,24
**necessary** 18:5
85:9
**need** 16:23 20:13
22:19,19 25:12
36:4,13 50:2 62:2
77:15,16,16,16
**needs** 22:19 38:12
43:4 81:24 91:3
**nefarious** 21:1
**negotiated** 31:22

**neither** 67:8 98:6
**net** 66:1 72:24
**Netware** 47:21
79:13
**Network** 77:10,14
**neutral** 33:18,19
**never** 4:3 8:13
11:10 14:12 31:6
40:20 41:7,14,16
42:4 43:20 44:2
78:1,18,19
**nevertheless** 77:7
**new** 1:21 2:10 17:2
17:22,25 18:1,12
29:3 30:18 36:1
36:14,14 37:4,9
37:18,21,23 38:18
45:20 47:6,14
48:3,6,22 51:2,14
51:22 57:16 59:17
62:10,11,12 70:24
74:8 76:15,16,17
83:22,23 84:18,24
85:6,19 86:16
87:11,23 88:1,11
88:16,22 89:11,13
89:13 91:7,14
99:16
**NML** 1:4 2:21 14:5
39:19,21 43:2
54:19 77:23 82:15
**NML's** 55:6
**nonparty** 80:1
**non**-exchange 95:5
**non**-issue 78:20
**non**-parties 24:15
28:2 81:3,3
**non**-party 17:25
18:3,5,8 21:19
22:2 23:8 76:5,22
80:12
**non**-payment
66:17,19
non-sovereign 73:1
**Norma** 1:10,11
**normal** 65:3,7
**noth** 68:25

**notice** 18:16 19:20
21:21 22:18,25
23:5,25 24:16
25:22 27:7,16
50:3 51:4,7,16,22
51:24 52:3 56:6
60:12 76:23 77:1
78:13 82:5
**notion** 59:21
**notwithstanding**
54:8
**November** 3:2 4:4
11:3 41:9
**number** 44:1,8
58:19
**numbers** 41:2
43:23 44:6,9
**NW** 2:23
**NY** 2:19

**O**

**ob** 30:25 90:10
**obey** 12:7,12,14,18
14:20 58:14,15
64:11 66:8 91:17
91:18
**obeyed** 12:20,22
**objective** 19:11,12
19:17
**obligated** 70:11
**obligation** 4:23 5:2
5:2 8:13,14 29:21
30:11,13,14 42:11
51:25 52:15 53:19
64:19,25 70:11
81:9 87:4 90:10
90:14 91:25 92:2
92:6,16 98:15
**obligations** 4:22
8:13 24:1 25:9
29:15 30:21 31:10
32:2 49:4 50:25
52:20,20 53:1,3
53:11,15 55:4,25
58:14 68:8,15
71:25 82:3 83:25
90:3,17,19,24

92:6 93:5,5 97:25
99:9
**obliged** 69:9
**obstacle** 87:12,13
87:16
**obviously** 9:7 39:14
41:1
**occupied** 14:11
**occur** 56:12
**occurred** 26:18
27:4
**October** 4:11 55:24
67:24
**oddly** 65:21
**odds** 81:10
**offer** 40:20 45:21
45:23 67:20,22
68:5,25 69:23
**offering** 11:25 97:8
**offers** 69:7 70:25
97:13
**officials** 54:12
**oh** 24:25 44:1 60:6
66:7
**okay** 12:2,4 13:4
17:1 33:12 34:13
34:19 35:24 43:8
45:2 51:2 52:6
64:14 68:13 69:6
69:14 73:13 75:4
75:9 82:22 83:22
92:11 95:25 98:21
**Olifant** 1:12
**Olsen's** 15:12
**Olson** 2:21 39:20
39:21 40:5 41:22
42:2,4 43:6,9,13
43:16,22 45:1,7,9
46:21,24 47:3,11
48:8,10,16 50:13
51:6 52:5,7,19,22
52:24 53:5,9
54:23 55:9,12,17
56:11,18,21 57:9
57:12,14,17 59:10
60:21,25 62:2,16
62:17 70:6 71:7

84:13,23 85:5
97:10
**Olson's** 7:25 10:24
60:2 65:23 68:10
83:25 84:11 88:21
92:4,17 96:4
98:19,22
**once** 21:20 25:23
25:24 26:4 60:25
78:6,7,7 88:10
89:11
**ones** 46:6
**one's** 49:14 58:23
59:12
**onobus** 28:1
**operate** 17:5
**operating** 24:2,3
**opinion** 21:3 22:22
23:2 27:24 42:10
46:3 75:23 79:11
**opinions** 99:23
**Opportunities** 1:6
**opportunity** 11:3
28:18 40:1 51:4
52:3 59:23 60:15
82:20
**opposed** 9:25 36:7
87:11
**oranges** 6:17 80:4
**order** 3:2,4,14 4:7
9:15 12:5,7,15,18
13:7,11,15 15:18
17:8,19 20:4,9
23:21 26:12 31:16
32:19,19,24,25
33:1,8,12 36:19
45:18 47:12 48:24
49:9,15 58:3,6
59:14,15,25 60:8
60:10,24 61:7,24
62:10,18 64:13
74:19 75:23 76:4
76:11,15 77:9
78:5,11 79:6
81:18,24,24,25
83:5,22 87:9
88:20 91:2,9,17

91:25 92:3 97:2
98:22 99:2,14,17
99:19 100:1
**ordered** 9:8,9 15:6
19:20 42:23 98:13
**orders** 14:17,20,24
26:4 58:15,25
90:16 91:18
**original** 4:21 5:17
7:2,9 8:7 9:10
10:18 11:23 15:17
19:22,24 20:5
24:1 26:22,25
29:14,16,18 33:2
33:3,11 44:22
46:16 49:25 52:11
64:9,18 71:18
83:12,13 84:7
90:11 92:7 94:12
95:5 98:1,15
**originally** 10:21
95:16
**ought** 33:9 38:17
90:25
**oughta** 25:19 34:20
**outcome** 82:9
**outs** 73:5,6 74:22
**outstanding** 31:6
**OVERLAY** 8:4
12:10,23 13:7
19:8 35:12 37:14
61:12 94:10
**overlooks** 6:22
**owe** 44:22 93:1,2
96:9,10
**owed** 5:17 6:24
28:15,20,20 35:7
35:21 38:6 42:14
42:15,24 43:1
44:19,20,21 54:2
92:7 94:12
**owes** 29:22 42:20
87:8
**owing** 5:8
**owned** 38:14
**owners** 59:20
**owns** 49:7

_____
**P**
**PA** 2:14
**Pablo** 1:6
**page** 70:16
**pages** 97:15
**paid** 5:9,11 7:6 8:3
8:24 9:11 10:5
11:7 16:6 19:21
19:22,25 20:6
30:6,22,25 31:13
32:8,8,21 33:10
33:10,14 34:1,6,9
35:6,6 36:2 37:2,9
37:25 38:5 39:8,8
39:9 44:11,13,24
46:16 56:15 57:7
62:25 65:22,22
71:19 73:24 84:4
85:4,20 86:10
91:21 92:8 93:7
93:24
**painlessly** 56:16
**Pakutsi** 68:2
**panel** 3:3
**papers** 47:4
**pardon** 43:13 48:4
67:21
**parent** 38:20 55:6
**pari** 6:12 10:3,9
14:7 16:8 29:16
33:14 67:9,12
68:12 69:16 74:21
95:4 99:18
**Parker** 5:21 10:12
11:12 19:10,14
24:23 25:2,7 33:4
46:18,23 47:2,5
50:9 62:6,8 69:17
70:16 71:7,11
76:13 79:14,22
80:3,17,20 86:9
94:1,5 97:4,7
**Parker's** 81:22
**part** 6:6 20:20 21:1
23:19,21 24:19
26:20 27:4 28:21
30:8 54:5 55:12

55:14 56:6 78:4
**partici** 50:7
**participants** 45:14
47:22 50:7 59:14
59:16
**participate** 19:23
21:22 45:23 54:4
70:20 75:21,24
**participated** 47:16
76:10
**participating** 23:24
87:18
**participation** 18:19
20:17,25 21:12,14
23:10 27:2,8 48:3
49:20 50:20 56:3
56:19 59:17 76:18
75:18 77:8 78:4,6
78:11 79:2 80:24
82:6
**particularly** 32:10
32:19 39:4
**parties** 14:19 17:6
17:15,18 23:18
24:19 32:1,20
34:15 45:3 46:12
57:22 59:22 60:20
61:17 63:21 64:3
64:4 65:17 68:20
80:8,9 84:15 90:4
96:5,6,7 99:15,16
**partner** 68:2
**party** 6:12,24 17:13
20:18 24:10,21
27:18,19 28:1,16
28:16 30:20,21
32:11 44:19 76:6
76:8 77:12 80:14
80:14 81:4,23
82:7 90:16,18,18
96:25 99:7
**party's** 22:23 27:13
**pass** 71:13
**passage** 46:20
**passed** 71:6
**passive** 19:3
**passu** 6:12 10:3,9

Case: 12-105    Document: 952    Page: 164    04/22/2013    914956    239

14:7 16:8 29:16
33:14 67:10,12
68:12 69:16 74:21
95:4 99:18
**patience** 58:19
**pay** 3:14 4:22,23
5:7 8:13 10:4
11:23,24 17:8
20:6,6 26:1,22,23
29:11,22,23 31:14
31:16 35:6 36:3
38:20,25 40:10,11
40:12,19,20 41:1
41:15,17 42:7,23
43:1,4,10,15,21
44:16,20,21 52:11
52:12 54:1 55:7
57:5 61:2 62:21
64:8,21 65:2,24
66:3,5,10,11,22
68:24 69:5 72:18
74:12 84:6,25
85:13 86:16,19,22
87:5,14 89:12,14
91:12 92:14,14
93:23,25 94:13,15
99:4,4
**paying** 7:7,8 9:12
26:25 36:3 38:1
38:21 40:21 48:2
48:6,7 52:18
56:16 62:24 64:3
66:9 72:8 74:13
85:17 86:5 87:8,9
87:19
**paymaster** 50:24
**payment** 3:16,23
4:19 5:2,6,16,19
5:20,22 6:7,19,25
7:6 8:19 10:14,16
10:17 19:1,2,4,14
19:16 20:21 22:16
24:7,9 26:19,21
27:1 29:20 30:23
32:4,5,6 33:14
34:2 36:4,5,6,12
36:13,22 39:10,23

41:13,19,21 42:19
42:25 43:4 44:18
44:24 48:21,23
49:4 51:25 53:5
53:25,25 56:24
60:20 61:9 62:13
62:18 64:24 72:9
72:22 74:6 75:13
75:25,25 76:20
77:5 78:12,13
79:4,5 83:12
86:16,18 88:7
90:11,12 91:10
98:7,14 99:9
**payments** 3:13,18
3:20 4:25 5:4 7:4
8:7 9:19 15:16
19:6 31:22 45:20
47:10 53:4 54:6
54:21 79:19 84:3
85:13 86:13 93:12
93:16 94:4,16
98:1,14,25
**payment's** 89:7
**pays** 16:2 39:7 84:8
85:20 86:24
**penny** 29:22 44:23
69:5
**people** 8:17 24:19
29:11 32:20 34:16
35:18 38:9 39:4,4
39:11 46:14 49:11
53:11,15 55:20
56:22 58:9 67:12
68:11,19 74:8
79:1 80:8 89:9
94:6
**people's** 62:4 96:24
**percentage** 5:10,11
6:4,10 8:24 10:22
12:1,3,4 33:18
41:19 43:1 44:19
44:21 69:19
**perfectly** 20:23
25:17 55:25
**perform** 51:3 61:25
85:9 87:5

**performance** 64:25
93:4
**performing** 49:1
63:15 85:17
**period** 7:24 35:6
40:6 57:24
**permissible** 22:25
90:4,6
**permit** 67:8
**permits** 16:16
86:10,12
**person** 10:5 20:19
26:5 30:20,22
39:6 73:11 82:17
87:9
**persons** 78:2,3
**perspective** 44:11
**persuade** 13:9
**persuaded** 15:20
46:7
**persuasive** 29:24
peso 41:17
**PH** 6:6 17:25 28:1
42:20 49:13 52:4
56:16 66:24 68:2
82:13
**phrase** 48:13
**physician** 74:3
**piece** 22:12 55:9
**pieces** 20:14
**pile** 47:4
**Pittsburgh** 2:14
place 2:5 11:11
27:8 28:4 45:9,24
45:25 47:11 58:22
85:14 97:16
**places** 36:8
**plaintiff** 2:22 6:20
**plaintiffs** 21:25
22:17 25:5
**Plaintiffs**-Appell…
1:13
**plaintiff's** 3:14 4:2
**plan** 69:23
**plane** 38:4
**play** 25:13 29:4
30:6

**playing** 37:19
38:23 39:7
**plead** 24:11
**please** 3:7 12:25
17:24 20:15 28:9
30:2 39:20 49:11
**plenty** 40:25 53:3
**plus** 21:6 44:23
93:10
**pocket** 35:20
**point** 6:22 8:2 10:7
12:22 13:3 16:24
17:3 25:15 26:14
26:18 28:11 31:11
35:25 46:9 48:10
52:8,8 54:9 69:23
71:15 73:7,8
75:22 76:4 78:22
81:17 83:2,3 87:7
87:10,17 94:2
97:24
**pointed** 45:25
**points** 28:11
policy 11:8,13,14
12:8 15:11 30:15
42:7 55:4 84:21
**politicians** 41:25
**Pomilio** 1:8
**Pooler**
3:1-6, 17-18
6:8-10, 16
8:21, 23-24
12:1
16:23, 25
17:21-22
18: 12-17
22:8, 10
23:12-13
28:4-5, 7-8, 24-25
33: 17-20
36:19, 21-22
37:12-13
39:2, 16, 18-19
40:3-4
41:18-21, 25
42:1, 3
43:12, 14-15, 20-21

45:6, 8
48:5-7, 9
51:2-5, 21-25
52:1-4
54:18-22
55:5-8, 10, 15-16
56:8-10
57:5-7, 11, 13, 15-16
59:9, 11-12
64:6, 8-9
67:20, 22
68:14, 16-17
73:5
82:24-25
86:6, 8
91:16-18
95:4-7, 10
98:23-25
100:3, 5-7
**poor** 41:1 74:24
**Portugal** 48:19
**pose** 62:9
**posed** 94:22
**position** 29:13 35:8
55:3 61:18 69:25
78:19 84:19 94:24
**possibility** 12:6
**possibly** 14:12 41:4
**potentially** 16:7
**power** 29:20 77:15
98:20
**powers** 9:4 24:19
32:15,16
**practical** 50:9,13
**practice** 53:3
**Prec** 45:1
**precedent** 30:15
84:20
**precisely** 9:6 45:1
52:7
**preexisting** 30:10
30:13
**prefer** 11:20 15:12
70:14 71:16
**preference** 11:9

15:21 16:13
**premise** 16:17
**prepared** 13:17
38:9 72:5
**prescribed** 15:24
**present** 66:4
**president** 15:8 41:8
41:11,23
**pressure** 17:6
29:11
**presume** 59:7
**pretty** 55:10
**prevent** 8:2 28:13
28:19 34:24 36:12
60:19 62:18 65:20
84:2 91:24
**prevented** 32:10
74:13
**preventing** 48:12
72:8
**prevents** 28:12
**primary** 17:16,16
22:5
**principal** 5:3 11:17
11:18 16:9
**principle** 21:9
**principled** 84:21
**principles** 18:11
64:2 67:5 73:10
75:8
**prior** 29:23 30:24
**priorities** 99:9
**priority** 83:12 98:7
98:10 99:18
**private** 32:1 83:4,5
88:20,21,24,24,25
89:2 91:9 92:2,3
96:6,20
**pro** 32:22 46:21
**probably** 89:14
**problem** 7:23 14:5
14:13 24:13 39:15
40:22 77:10 81:12
89:18 92:5,25
**problems** 50:10,13
**procedurals** 25:11
**procedure** 47:19

**proceeded** 6:3
**proceeding** 47:8
51:14 57:18 75:19
77:18,19 79:7
82:20
**proceedings** 79:16
80:10
**process** 18:11 19:1
22:16,18 23:7
24:9 27:19,22
38:10 58:22,23
60:16 62:13 73:22
75:13,25 76:5,10
76:19 77:15,21,22
78:9,12 79:4,8,8
79:18 81:21 82:4
**processed** 86:13
**profit** 54:20 85:19
89:25
**prohibited** 18:16
59:15
**prohibitions** 56:20
**prohibits** 86:12
**proof** 20:17,22 23:7
23:9,18 24:15
25:6 26:7 27:14
27:16 40:21 76:11
76:24 77:16,22,25
80:13 81:1,1,5,8
**proper** 9:2 17:14
35:3 72:11
**properly** 24:6 49:9
**property** 14:3
17:18 88:24
**proportionally**
93:25
**proposal** 33:18
39:23 40:7,8 41:7
41:12 69:15
**proposals** 42:12
**propose** 4:7 69:22
**proposed** 5:12 12:7
12:13 32:22 94:11
94:18
**proposing** 4:13
41:6
**prospect** 62:24

**prospectus** 45:18
46:4
**protect** 21:18 96:3
96:5
**protecting** 92:4
**protection** 27:22
71:3
**provide** 24:4 26:9
60:16,16 71:3
**provides** 19:19
59:14
**providing** 67:11
**provision** 4:20
41:13 42:19,21,25
42:25 45:10,12
49:3 53:21,23,25
53:25 55:19,19
56:23 59:2 64:19
70:5,8
**provisions** 16:17
16:20 39:24 42:21
46:1,1,15 65:12
**prudence** 76:8
**public** 11:8,13,14
12:8 15:11 67:3
68:8 74:6 89:1
**public's** 89:6
**public-spirited**
96:6
**purchased** 54:19
**purpose** 18:20
19:17 20:4,18
22:5,15 23:20
24:10 28:2 32:10
32:20 49:14 60:4
60:6 64:21 80:11
81:5 82:18 88:25
89:1,2 92:4 96:19
96:19
**purposefully** 27:15
96:25
**purposely** 99:25
**purposes** 61:15
**pursuant** 27:11
45:21 47:14,20
48:21
**pursuing** 80:6

**put** 15:4 17:6 25:2
25:10 29:11 36:17
44:10 61:15 62:19
63:3 66:16 78:19
83:21 91:13 98:16
61:17
**puts** 21:3 27:8
61:17
**putting** 25:1 27:16
35:20 42:19 68:22
68:24

**Q**

**quadruple** 74:24
**quarterly** 7:5 94:15
**ques** 88:18
**question** 3:22 10:2
25:3 32:7 38:8
39:21 43:10 44:7
46:10 57:3 62:7,8
67:17 69:15 70:16
72:2,2 76:13 83:8
85:24 87:21 88:10
88:12,18 89:23
94:22 98:9
**questioning** 80:6
**questions** 42:13
**quick** 62:2
**quite** 7:24 30:6,6
31:19 40:8 42:9
42:19 63:14
**quote** 60:22 70:17
**quoted** 71:11

**R**

**Radio** 22:22 23:4
27:23 77:13 79:13
**Raggi**
3:22-24
4:5-7, 9, 17-24
6:22-25
7:1-9, 12-13
8:5-9
9: 8-15, 21-22
10: 7-9
11:22-25
12:4-7, 10, 12-13, 17-
20, 24
13:1-2, 4, 6-7, 16-17
14:15-17, 19-21
15:1-2, 15-24
19: 9, 19-25
20:3-12, 15, 24-25
21: 1, 9-15, 20-23

23:23-25
24:1-2
25: 20, 22-25
26:1-8, 13-16, 21-
23, 25
27:1-2
29:12-25
30:2, 8-11, 19-25;
26:1, 7-10
33:25
34:1-7, 13, 18, 21
35:4-9, 11-12, 14,
16-17, 19-22, 24
37:15-19
38:6-10
43:3-5, 8,
44:15-25
45:2-5
48: 15
52:6, 17-18, 21, 23
53:4, 8
56:14-17, 19-20
57:8
60:1, 5, 8, 10-17,
24-25
61:1-5, 14-18
63:1-7, 10, 12-13,
16-18, 20-22
64:11-13, 17-19
65:6-8, 14
66:1-3, 7-8, 10-12,
14-15, 19-20, 22-23
68:20-25
69:1-5, 9-10. 12-13
70:7-8, 10-11
71:18-20, 24-25
72:1, 14-15, 17-25
75:3, 9-10, 15-21
76:1-2
77:17-18
78:2-9, 16-20, 25
79:1-2
81:7-11,14-16, 22-25
82:1-7, 10, 19-22
83:11-17
84:5-8, 13-16
85:5-7, 18-20
86:15-19, 24
87:1-2, 7-12, 17-19,
21-22, 25
88:1, 4, 9-13, 15-16
90:8-19, 22

92:5-9
93:11-12, 14-16, 18-1
94:10-16, 18
95:15-19, 23-24
97:16-17, 19, 22-25
98:1, 6-8, 12-15
99:7-10
**Raggi's** 62:8
**raised** 50:10
**ratable** 3:13 4:25
5:4,19,20 10:14
10:17 18:25 26:19
32:13 39:23 41:13
42:13,24 53:24,25
54:21 75:25 99:18
**rate** 3:23 4:7,18
34:7
**rational** 8:4
**rea** 21:1,12,15
**reach** 22:7,10 23:5
27:18 45:3 61:25
76:18 80:1 81:20
**reaches** 45:3
**reaching** 76:18
**read** 25:8 37:22
46:4 68:1 71:15
**reading** 16:6
**realities** 16:9
**reality** 31:8 67:1
**really** 6:2 7:16
13:18 28:11 31:7
36:11 70:2 75:7
83:8 88:17,19
96:5
**reason** 22:13 29:24
64:12 66:14 76:12
77:23 97:1
**reasonable** 32:17
32:18
**reasons** 30:1 76:22
**reassurance** 70:21
**reassure** 71:5
**rebuttal** 28:5 37:21
39:19 59:12 63:20
82:25
**rec** 57:11
**receipt** 4:2 19:2
84:15
**receive** 29:4,9

33:23 38:24,24
52:4 54:6 58:9
70:22 85:25 86:3
86:6
**received** 8:7,8
58:20 70:19 79:5
**receiving** 26:7
28:14 29:7 56:15
57:1 93:15
**recipient** 57:9
**reckless** 79:24
**recognize** 16:9
**recognized** 23:15
23:21
**recognizes** 17:5
**record** 4:6 5:24
14:6 16:1 18:22
18:22 19:6,13
23:11 24:9,14,22
24:24 32:7 46:18
55:14 67:19 68:8
68:13 71:14,15
85:11
**recourse** 13:21
**red** 12:16
**reduced** 42:11
62:22 73:25 94:13
**reduces** 90:9
**Reed** 2:11,12
**Reena** 12:1 23:12
43:12,14,20 45:6
45:8 48:5,9 51:2
53:4,8 54:18 55:5
55:10,15 57:5,11
57:13,15 59:9,11
67:20,22 68:14,16
71:18,24 72:14,17
73:5 75:9,15 76:1
77:17 78:2,16,25
82:24 86:6,8 90:8
90:22 91:16 92:5
93:11,14,18 94:10
94:18 95:4,10,23
98:23 99:7 100:3
100:5
**references** 43:17
68:7

**referred** 53:2 70:6
**reflects** 5:25
**refusal** 70:25 71:2
**refuse** 29:9
**refuses** 54:20
**refusing** 29:10
**reg** 48:1
**Regal** 47:20 77:9
77:14 79:12
**regarding** 76:6
**registered** 59:19,20
**registrar** 48:1
**regular** 8:7
**rehearing** 3:4
13:20 15:1,3
**rehearsed** 97:7
**rejected** 3:3
**relate** 19:2
**related** 3:13
**relates** 18:2
**relevant** 39:13
**relief** 28:17,24 29:1
67:11 77:25 79:10
**remand** 55:15 62:1
62:3,4,5 69:19
**remanded** 3:9 5:4
**remedial** 3:10
**remedies** 16:22
**remedy** 3:11 16:19
16:19 53:24 67:13
67:14 72:3,6,7
73:9 81:18 82:13
91:1 94:7
**remember** 8:11
31:23,23 69:6
**repeat** 9:1 60:8
85:25
**repeated** 42:6
43:16
**repeatedly** 53:2
**reply** 58:21
**represent** 28:10
34:16 67:1 85:23
**representing** 3:8
9:13 66:1,23
**represents** 6:19
**Republic** 1:17 2:3

3:6,8 38:25 39:7
58:23 83:25 89:17
91:11 93:1,17
96:4,9
**Republic's** 39:5
**repudiate** 54:11
**req** 34:4
**request** 3:3 50:6
**requested** 4:6
**requesting** 60:10
**require** 4:15 10:17
10:19 14:17 19:12
20:25 26:10 27:22
50:18 76:6 77:24
80:24 87:5
**required** 21:14
34:4 43:6,9,9
51:16 81:1
**requirement**
20:25 21:13
**requirements**
24:12 79:9,9
**requires** 15:18 20:3
21:17 23:9 27:7
42:25 77:22 79:8
81:20
**requiring** 90:24
**requisite** 78:12
**resembles** 17:11
**reserved** 28:5
39:18
**reserves** 43:17
68:10
**resolve** 28:23
**resources** 40:12,18
40:19 67:17
**respect** 13:19 16:18
18:1 24:15 25:13
39:23 40:9 41:5
41:12 43:24 45:15
46:3 48:11,25
49:20 50:3,17
53:17 54:11 55:4
56:1,2,2 57:18
64:15 65:9 67:2
78:21 88:5 89:21
90:11,12

**respectful** 65:16
**respectfully** 14:9
64:16 87:3
**respond** 29:14
37:17 85:6
**respondent** 58:21
**response** 15:25
44:7 47:6 49:8
50:6
**responsibility**
42:11
**restructure** 8:1
74:13
**restructured** 5:7
5:10 6:7,13,13
30:17 73:23
**restructures** 7:21
74:7
**restructuring** 7:22
8:17,18 11:18
16:4,5 30:16
70:13 73:15
**restructurings**
16:11
**result** 9:6 23:1,3
66:2,4 69:20
72:24 82:1 85:4
86:14
**resulted** 90:3
**retain** 9:7
**rethink** 14:9
**return** 32:21 33:2
**reviewed** 49:22
**rewrite** 95:19
**right** 16:13,23 20:2
20:3 21:2 22:9
24:11 28:4 30:25
31:12,21 32:4,5,5
32:8 34:17,18
39:16 49:13 52:24
55:23 65:14,21
66:9,10 69:19
71:2 73:7,20
82:13 83:11,14
88:6 91:6,20 92:3
92:18 94:5 96:17
97:22 98:7,10,10

98:12,17,18,20,22
99:1 100:1,2,3
**rights** 6:12 17:18
22:24 46:11 49:25
56:12 58:23 60:12
70:25 83:5,5,16
83:17 88:20,21
91:9 96:20,24
97:3
**rigorous** 22:2
**role** 25:13,16,18
29:4 37:19 38:23
39:8,8,9
**Rosemary** 3:1,17
3:22 4:5,9,17 6:8
6:16,22 7:12 8:5
8:21,23 9:8,21
10:7 11:22 12:4
12:10,12,17,24
13:1,4,6,16 14:15
14:19 15:1,15
16:23,25 17:21
18:12 19:9,19
20:3,15,24 21:9
21:20 22:8,10
23:23 25:20,22
26:13,21,25 28:4
28:7,24 29:12
30:2,8,19 31:7
33:17,25 34:13,18
34:21 35:4,11,14
35:16,19,24 36:19
36:21 37:12,15
38:6 39:2,16,18
40:3 41:18,25
42:3 43:3,8 44:15
45:2 51:21 52:6
52:17,21,23 56:8
56:14,19 57:8
60:1,5,8,10,24
61:14,22 63:1,10
63:12,16,20 64:6
64:8,11,17 65:6
65:14 66:1,7,10
66:14,19,22 68:20
69:9,12 70:7,10
75:3 81:7,14,22

82:10,19 83:11
84:5,13 85:5,18
86:15,24 87:1,7
87:17,21,25 88:4
88:9,15 95:15
97:16,19,22 98:6
98:12
**routine** 75:12
**routinely** 44:6
**roving** 24:18
**Ruben** 1:11
**rule** 17:16 21:5
22:2,6 23:8 24:14
26:10,14 27:7
36:8 47:15 50:18
60:1 61:3,15,24
75:12 76:2,4,7,24
77:2,4 78:12
79:19 80:2,2,7,12
80:16 81:2,19
82:16 84:19
**rules** 47:15,19
**run** 79:19
**running** 62:12

**S**

**s** 3:1,17,22 4:5,9,17
6:8,16,22 7:12 8:5
8:21,23 9:8,21
10:7 11:22 12:4
12:10,12,17,24
13:1,4,6,16 14:15
14:19 15:1,15
16:23,25 17:21
18:12 19:9,19
20:3,15,24 21:9
21:20 22:8,9,10
23:23 25:20,22
26:13,21,25 28:4
28:7,24 29:12
30:2,8,19 31:7
33:17,25 34:13,18
34:21 35:4,11,14
35:16,19,24 36:19
36:21 37:12,15
38:6 39:2,16,18
40:3 41:18,25

42:3 43:3,8 44:15
45:2 51:21 52:6
52:17,21,23 56:8
56:14,19 57:8
60:1,5,8,10,24
61:14,22 63:1,10
63:12,16,20 64:6
64:8,11,17 65:6
65:14 66:1,7,10
66:14,19,22 68:20
69:9,12 70:7,10
75:3 81:7,14,22
82:10,19 83:11
84:5,13 85:5,18
86:15,24 87:1,7
87:17,21,25 88:4
88:9,15 95:15
97:16,19,22 98:6
98:12
**saga** 74:16
**sanctions** 56:12
**satisfaction** 29:21
29:21,23
**satisfied** 14:25 24:1
56:9 69:8
**satisfy** 5:20 19:14
**raved** 37:20
**saw** 68:4 74:25
**saying** 4:22 6:12
7:16 8:10 31:17
34:6,8,12,22
36:11,16 37:23
40:19 42:10 43:5
44:17,25 48:23
52:11,12 53:10
58:5 68:9 74:9
83:23,23 84:2,10
84:10 91:3 92:25
93:1,3,18 94:22
94:24,25 95:1
96:8,9,10,12,24
97:1 98:19 99:16
**says** 5:15 17:10
29:8 33:1,8 48:20
51:10 56:23 62:23
64:8 70:16 71:1
74:10 78:2 80:8

91:23 92:13 93:6
99:3,4
**scaled** 6:15
**scenario** 26:3 65:7
**schedule** 4:13
**scheduled** 10:16
**scheduling** 4:4
**Schiller** 2:17
**scope** 17:7 18:2
22:23 28:11 75:15
**seat** 55:6
**SEC** 46:25
**second** 1:2 19:4
22:12 27:5 30:23
45:24 85:24 86:22
91:22,22 93:5 96:7
**secondary** 98:10
**secondly** 13:13
45:13,15 72:5
**section** 14:10 78:2
78:25
**sections** 14:25
**securities** 14:3
45:20
**see** 4:9 10:7 25:4,20
67:9 68:7 82:16
87:17 89:20 97:13
99:2,13
**seeing** 37:15 49:21
**seek** 9:5 16:14
28:24 29:1
**seeking** 42:22
**seeks** 15:13
**seen** 38:22 85:3
**seize** 14:2
**sell** 71:22
**semiannual** 94:15
**send** 13:1,5,25 14:2
14:4 51:22
**sending** 14:12
**sends** 51:15
**sense** 38:2,2
**sent** 4:11
**separate** 5:2 17:17
98:17,18,18,21
**separation** 9:3

**series** 49:7
**seriously** 79:14
**servant** 67:3
**serve** 87:9
**served** 18:16 24:11
**service** 27:19 77:16
79:8
**servicing** 63:23
**serving** 60:25
**set** 4:2,18 57:17
77:16
**sets** 8:12 98:24
**settled** 6:10 66:18
**settlement** 28:22
**settlements** 64:5
**severe** 55:10
**share** 81:22
**sheet** 40:17,24,24
**shifts** 78:22
**shoe** 27:8
**should've** 23:12
**show** 22:19 69:5,6
**side** 72:6 76:7
**sides** 32:3
**sight** 18:7
**significance** 25:22
**similar** 5:11
**simply** 35:25 38:24
38:25 39:7 78:13
79:4 85:16 96:2
99:2,3,3
**simultaneously**
16:2 19:25
**single** 5:6 15:25
72:7
**sit** 74:1
**situation** 6:14 11:5
11:16,16 16:10
61:8 68:21 74:23
77:11,14 84:20
90:1 95:18
**six** 44:8 95:13
**skews** 25:1
**skip** 62:22
**slightly** 62:9
**small** 6:4

smaller 8:18
Smith 2:11,12
solely 17:5 82:18
    86:1
solve 92:25
somebody 22:18
    23:6 24:21 25:19
    63:25 70:14 77:4
    83:6 87:4,5 91:9
    96:20 97:3
someone's 13:16
someplace 37:8
somewhat 79:24
son 56:16
soon 48:24
sophisticated 57:22
    57:22
sorry 7:8 67:16 75:4
sort 47:7 70:4
    79:23
sorts 91:23
sound 8:19
sounds 8:20
source 82:13
sourced 68:7,7
SOUTHERN 1:21
sovereign 13:19,22
    14:22 16:1 31:5
    42:18 65:4,12
    67:7 68:21 70:13
    72:14,17 73:14
    74:7,9
so-called 42:8
speaking 69:24
speaks 40:4
specific 25:19
    64:24 86:8
specifically 15:23
    24:17 48:20 49:16
    50:11,15 52:11
    59:16 75:19
specified 19:21
specify 47:22 49:11
speculating 8:6
spell 68:5
spelled 50:19

spend 68:24
spent 67:3
    sponsored 28:22
    31:25
squarely 41:22
squares 42:20
stand 65:20 66:5
standard 18:9,18
    20:16 21:24,25
standing 56:21
    58:13 75:1
standpoint 69:16
    88:19 94:25 95:1
start 6:4,8,9 9:12
    11:15 21:2
started 5:15 31:24
    58:14 79:11
stated 11:8 70:20
statement 55:2
statements 41:22
    54:9,12
States 1:1,20 14:1
    15:6 37:1 41:16
    41:24 42:17 46:13
    47:15,21 49:10
    51:1 53:12,14,16
    54:13 58:7,7,8,16
    59:2,8 99:24,25
stating 60:1
statute 16:20 17:8
    71:14
statutory 21:13
stay 7:19
Steen 2:4
step 18:6 27:5
    34:24 72:20 77:22
steps 18:10,23 19:1
    22:4 49:6 97:25
stick 53:11 55:21
stop 28:5
strategy 73:8
Street 2:6,18
stretch 75:12
strike 71:4
strikes 79:22
strong 71:2
strongly 96:21

stuck 21:23
subject 3:1 29:15
    36:21 45:15,18
    60:13 61:2,24
    64:6 99:8
subjected 26:5
subjective 19:11
submission 46:24
    65:16
submit 14:9,19
    42:9 49:15 54:14
    58:10 67:5,7
    submitting 42:17
    42:18
subsequent 71:20
subsequently 75:17
substantial 21:14
substantially 6:14
substantiate 23:5
substantively 24:23
substitute 26:10
substituting 24:16
    27:5
succeed 25:6
sue 22:19 25:19
suffer 92:17
suffered 15:8
suffering 96:7
sufficient 71:3
    78:14,15 79:6
suggest 3:17 4:5
    31:19 32:11,13,18
    35:2 38:12 55:5
    87:3 99:20,23
suggested 3:23
    22:18 98:3
suggesting 3:19 9:2
    94:11,20
suggestion 18:22
    32:5 60:22
suggests 37:15
    38:22 85:5
suing 73:4
supervision 72:23
support 20:10
suppose 48:17
supposed 15:20

61:9 64:2
Supreme 47:21
    49:11 64:22 79:11
sure 8:23 10:7,13
    12:19 29:13 69:3
    72:23 83:16 85:8
    86:15 96:23 99:10
surprise 29:19
surprised 88:15
Susana 1:7,9
swaps 54:20 89:21
    89:24
sweep 77:9
system 9:3 36:4,5,6
    36:12,13 61:9 74:6
systems 50:12
    59:18

T

table 62:20 63:1
    72:7
take 7:23 10:19
    11:21 14:9 16:25
    22:14 30:3,22
    31:3 35:7,25
    36:25 42:5 43:15
    47:10 49:21 51:17
    54:9 77:4 81:8,15
    82:2,3,21 83:24
    84:10,11,25 85:2
    86:3 88:24,24,25
    89:2 91:4,7,14
    92:11,15 96:15
    97:1,2 99:8
taken 18:20,23
    20:17 22:4 23:12
    72:20 73:3 89:22
    90:25 96:8,16
takes 5:14 56:5
    84:18
talk 45:4 46:9 83:1
    85:10 96:22
talked 8:12 72:4,10
talking 14:24 44:3
    44:12 46:8,10,11
    57:15,21 58:17

65:1,2 77:12 79:7
talks 85:11
tasks 51:3
tell 25:21 27:25
    33:25 36:16 48:9
    65:6 71:13 72:18
    83:20
telling 11:23 12:5
    12:19,19,21 20:24
    41:8
tells 19:22 27:23,23
    27:24
ten 68:13
tendering 70:24
    71:3
Teresa 1:9
term 48:13 58:12
    87:25
terms 5:21 21:4
    24:3 25:7 27:7,11
    33:16,22 68:4
    69:1 70:22,24
    75:24 76:17 79:15
    80:7 90:23 91:1
terrible 13:10
    89:17,18 90:3
terribly 93:6
test 19:10,10,12
thank 17:20,21,23
    28:6,9 39:16,17
    39:20 59:9,10,13
    75:11 82:23,24
    83:1 100:3,4,5,5
Theodore 2:21
    39:20,21 40:5
    41:22 42:2,4 43:6
    43:9,13,16,22
    45:1,7,9 46:21,24
    47:3,11 48:8,10
    48:16 50:13 51:6
    52:5,7,19,22,24
    53:5,9 54:23 55:9
    55:12,17 56:11,18
    56:21 57:9,12,14
    57:17 59:10
theory 10:13 25:21
thing 14:6 34:17

36:16 38:12 55:20 74:3 77:4 89:20
**things** 6:2 11:1 13:25 42:1 49:8 50:1 51:8 56:25 58:21 67:4 68:7 78:10 90:20 91:21
**think** 4:25 5:1,12 5:25 6:23 7:10 8:25 10:11 13:10 13:19 15:8,16 17:3,5 20:13 21:16,17 23:12,14 25:15 29:7 30:1 30:14 32:14,14,25 36:5,6 37:2 38:16 38:22 39:3,12 42:5,13 45:16 46:25 47:11,20 49:9 50:13 51:8 52:7 53:9 54:10 54:23,23 55:9,12 55:17 57:3 58:4 60:17,18 62:10,12 63:8,8 69:3 72:6 74:25 75:22 76:16 76:18 77:5 78:7 80:3 82:4,8,9 83:20,21 84:17,19 84:22,23,23 85:22 86:14 87:10,15,16 88:2,2,9,22,23 89:6 90:4,6 91:5 91:13 92:10 93:19 93:21 94:2,6 95:8 95:25 96:6,18 97:9,13,14,20 98:4,20 99:1
**thinks** 24:5,8 25:19 49:18
**third** 17:5,15 22:23 23:16 27:18 30:23 32:19 64:3,4 65:17 76:6,8 77:12 84:15 99:15 99:15
**thought** 14:15

21:13,20 34:16 41:20 47:5 50:5,6 58:19 67:24 71:21
**threat** 36:17
**threatening** 57:25 58:6
**threatens** 58:25
**three** 4:1 14:25 37:21 40:4 44:13 67:25 68:3 82:25 83:2 95:2 99:13
**threshold** 20:22
**throwing** 55:21
**time** 3:25 4:6,23 5:6 7:25 10:16 11:2 29:18 30:25 31:25 34:17 39:18 39:24 40:8 41:3 44:22 56:13 57:24 63:23 67:13 68:1 68:2,3 74:25 87:6 97:17
**times** 83:2 87:4 95:2,13
**time's** 65:10
**today** 3:1,4 42:7 44:12 58:4,18 100:6
**today's** 73:16
**told** 51:23 61:20 62:18 67:4 75:20 75:24 76:1 81:23 82:1 91:7,14
**Tomlinson** 17:11 74:10
**tomorrow** 42:24
**top** 41:23
**tort** 25:19
**tortious** 25:17
**total** 5:9,10
**totality** 49:24
**totals** 68:12
**touched** 42:13
**to-date** 15:22
**track** 85:13,14,15 86:5
**traction** 73:3

**trample** 75:7
**transactions** 25:14
**transcript** 40:14 68:1
**transfer** 19:23 26:6 26:7 48:24,24 51:17,25 52:2 82:21 99:17
**transfers** 23:24
**Treasury** 38:5
**treat** 73:19 94:8
**treated** 6:13 15:22 73:13 95:6,8 98:13
**treating** 84:6,7
**treatment** 5:13 7:15 8:11,14,15 8:16,19 9:3,18,24 10:14,17 42:25 45:10,12 49:3 53:20,23 62:20 68:4 72:4 83:14
**tried** 78:1
**triggered** 4:20
**trivial** 88:7
**true** 37:4 38:2,3 49:2 54:24,25,25 98:2
**truly** 5:13
**trust** 35:13 59:18
**trustee** 2:12 29:2,3 35:20 36:2 37:11 37:18 38:7,13,19 48:2 84:18,21,25 85:10,22 91:4,7 92:15 96:15,25
**trustees** 35:11,18
**try** 32:18 37:22 41:21 78:16 83:1 90:12
**trying** 13:8,9 15:4 15:10 31:15,15 32:16 61:16 88:17 93:19 94:7 96:3,4
**turn** 15:7 90:14
**two** 3:9,12 5:5 7:11 7:19 8:12 18:9

19:1 20:14 22:1 28:11 30:1 59:11 69:7 76:21 78:10 83:7 90:20 91:21 97:12 98:24
**tying** 93:4
**typically** 64:25

**U**

**uh** 3:2,10,17,17 4:3 4:3,12,12,13 5:4 5:17,25 6:5,5,5,9 6:18,20,20 7:8,21 7:22 8:2,3 9:3,3,3 9:10 10:1,2,4,4,14 10:15,20,22,23,23 10:23,23,24 11:2 11:2,6,7,7,7,9,12 11:12 12:8 13:21 15:13 16:2,3,3,3,8 16:8,8,25 17:2,2,4 17:12,16 18:6,18 18:20,22 19:12 20:13 23:3,3 25:9 25:9,10,12,12,13 25:15 26:1 28:21 31:2 33:11,20 34:11,12,12,15 35:10 36:25 37:2 37:7 38:10,13,17 38:20 40:13,14,18 41:14,15 42:14 44:2 47:6,8,8,8 48:10,11,12 50:10 50:11,14 51:3 53:14 55:23 59:13 59:18,20,24 60:2 60:14 62:4,11 69:20 70:1 71:13 71:25 75:13 76:18 79:15,15,16,16,18 79:18,19,20,22,24 80:6,6,6,7,8,8,9,9 80:9,21,21 81:25 81:25 82:11,11,14 83:7,9 84:7 85:21 85:25 86:1,3,3,11

86:12,12,12 87:3 87:24 88:22,25 89:3,21,23 90:1 90:23 91:1 93:24 94:2,2,3,8 95:11 96:7 97:6,9,9,12 97:18,24,25,25 98:1 99:14,20
**ultimately** 73:10
**um** 3:4,5 4:23 10:15,15 11:7 12:4 20:5,6,11,25 21:11 23:3,3 25:10,25 29:1,14 29:16,16,16,19 30:3,14 33:10,23 34:4,15 35:4 36:4 36:11,24,25,25 37:2,3,20 38:13 39:6 40:14,22 41:18 42:12 43:1 43:11,23,24,24,25 44:7,8 46:19,22 46:22 47:7,8,18 47:25 48:22 49:2 49:4,9,15 50:3,15 51:8,13 53:6,9,18 55:1,8,8,21,25 56:1,2,3,21 57:4 57:23 60:14 61:1 63:6 66:2 68:21 69:4 75:11 78:7 80:8 81:9 82:6 83:6,14,21 85:21 86:1,25 87:14,14 87:24 88:7,22,23 89:21 90:15 91:20 94:20 95:5,21 98:14 99:1,11 100:5
**uncertified** 79:5
**unclarified** 89:4
**unconditional** 32:4 32:4,8 36:18 96:17
**unconditionally** 28:15

**underlying** 80:10
**understand** 6:25
  8:8 10:13 11:22
  15:20 25:10 29:12
  29:13 30:8,9
  31:12 34:18,21
  51:21 61:16 63:5
  64:7 78:25 81:11
  86:15 91:16,19
  93:19 94:19,24
  95:1,24
**understands** 70:13
**understood** 14:23
**undertook** 56:1
**undisputed** 96:17
**unique** 11:15 16:18
  36:10 67:13,14
**United** 1:1,20 14:1
  15:6 36:7 37:1,1
  41:16,24 42:17
  46:13 47:15,21
  49:10 51:1 53:12
  53:13,16 54:13
  58:7,7,8,15 59:2,8
  99:24,25
**unlawful** 22:16,17
  22:20 24:5,7 77:6
**unnecessary** 54:17
  55:17
**unpack** 21:7
**unpaid** 65:13 68:11
  68:11
**unprecedented**
  3:15
**unravel** 64:4
**unre** 68:19
**unreconstructed**
  33:19
**unrestructured** 5:8
  5:11,18,19 6:5,9
  10:21,23
**unsatisfied** 16:16
**unwitting** 49:10
**up-filed** 47:1
**urge** 89:2
**use** 22:6 26:13
  27:17,25 35:3

49:7 92:1
**usually** 13:16 68:22
**utterly** 54:25 55:17

---

**V**

**v**1:15
**vacate** 76:12
**value** 89:8 93:9,9
  95:2,3
**Varela** 1:7
**various** 39:4 45:13
  49:5 56:24
**vast** 14:16 40:19
**vastly** 58:12,17
**Vazquez** 1:11,12
**vehicle** 77:3
**version** 3:13 59:4
**victim** 34:5
**victims** 46:9
**view** 4:14 21:17
  27:22 35:21 51:21
  60:2 65:7 79:12
**viewed** 18:4 37:18
  84:16
**views** 11:9 61:7
**violate** 22:5 48:2
  53:14 56:23 57:1
  58:25 63:6,13
  67:4 76:10
**violated** 48:22
  58:24 78:14
**violates** 23:1 52:14
**violating** 23:20
  38:17 51:19 52:20
  57:6 83:17 92:16
**violation** 16:8
  47:17 49:2,22,25
  50:4,25 51:13,15
  54:5 56:6,17 57:8
  57:12 59:24 60:4
  82:21
**violator** 22:5
**virtue** 44:23
**voluntarily** 12:14
  12:17,22,24 92:20
**voluntary** 73:15
  74:7

**vs** 17:12
**vulture** 41:10,15,17

---

**W**

**wait** 12:23 59:21
**waiving** 42:17
**wall** 55:21
**want** 7:20 8:1
  10:13 11:5 12:9
  12:18,23 15:4
  21:25 26:14 29:13
  36:5,6 37:17
  46:16 54:6 62:3,5
  63:17 64:4,11
  65:6 66:16 67:17
  72:21 77:11 85:6
  88:19,19
**wanted** 5:4
**wants** 11:4 24:21
  74:12 77:5
**Washington** 2:24
**wasn't** 55:13 60:11
  60:15,15 65:16
  76:16 79:17 88:1
  94:10 97:4,7,7
**way** 6:3 23:7 27:12
  31:14 32:14,17
  36:12,24 39:13
  46:24 50:25 57:5
  62:9,22 65:5 66:5
  66:17,25 70:5
  72:8 74:18 76:23
  76:23 83:17,21
  84:5 98:16
**ways** 18:7 22:1
  31:17,18
**wears** 85:6
**well**-reasoned
  99:23
**went** 38:4
**weren't** 28:18 34:4
  46:10 69:11
  72:14 72:17
**West** 64:23
**we'11** 3:5 17:21
  18:24 28:7 37:16
  39:19 59:8 74:21

74:21,22,23
**we're** 8:6,10 10:7
  13:1,8,8 15:1
  24:20 27:4 28:20
  28:20 31:20,21
  32:11 33:9,10
  34:15,15 35:21
  36:11,11,16,17
  38:3 43:25 44:3
  46:8 57:25 58:17
  59:3 65:1,2,14
  66:9 72:4 73:13
  73:22,22,24,25
  77:12 85:4,22
  87:14 91:24 92:7
  95:18 98:21
**we've** 5:12 8:25
  17:4 23:2 25:7
  59:25 64:20 65:7
  67:14 68:5 69:15
  72:4 73:15 75:14
  92:25
**wh** 25:9
**whatsoever** 67:19
**win** 54:21
**wire** 48:24
**wish** 74:16
**word** 92:1
**words** 14:7 33:10
  42:5 46:4 55:23
  87:15 93:21
**work** 11:1 36:13
  63:4
**workable** 13:9
**working** 36:12
**world** 24:17 58:13
  58:13 73:16
**worse** 61:8,17 74:2
  74:23
**wouldn't** 6:9 12:19
  12:21 14:15 19:14
  70:5 71:16 73:5
  99:5,6
**would've** 7:23
  28:17 33:8,8 34:3
  72:22 76:19 98:2
  98:3

**writeable** 3:20
**wrong** 27:8,17
  60:17,18 77:6
  86:11
**wrongdoer** 82:17

---

**X**

**X** 6:18

---

**Y**

**Yeah** 21:24 64:10
  71:8
**year** 44:13 53:6
**years** 8:9 9:11 22:3
  34:1 53:1,20
  67:10 79:10 93:15
  94:3 95:10 98:8
**Yep** 90:22
**yield** 10:14
**yielded** 5:25
**York** 1:21 2:10
  17:2,22,25 18:1
  18:12 29:3 36:1
  36:15 37:4,9,18
  37:23 38:18 47:14
  48:4,6,22 51:14
  51:22 57:16 59:17
  62:10,11,12 74:8
  76:15,16,17 83:22
  83:23 84:18,24
  85:6,19 86:16
  87:11,23 88:1,11
  88:16,22 89:12,13
  89:14 91:14 99:16
**York's** 47:7 51:2

---

**Z**

**Zenith** 22:21 23:4
  27:23 77:13 79:13

---

**$**

**$100** 35:6,6

---

**0**

**00:05:00** 6:1
**00:05:19** 6:6
**00:10:00** 9:14
**00:15:00** 13:14

**00:20:00** 16:21
**00:21:43** 17:25
**00:25:00** 20:8
**00:30:00** 23:17
**00:35:00** 27:6
**00:40:00** 30:5
**00:45:00** 33:13
**00:50:00** 37:10
**00:55:00** 40:16
**00:58:24** 42:20
**01:00:00** 44:5
**01:05:00** 47:13
**01:10:00** 50:21
**01:15:00** 54:7
**01:20:00** 58:2
**01:25:00** 61:11
**01:30:00** 65:19
**01:31:10** 66:24
**01:32:42** 68:2
**01:35:00** 69:21
**01:40:00** 73:17
**01:45:00** 76:25
**01:50:00** 80:5
**01:55:00** 83:19
**02:00:00** 86:21
**02:05:00** 90:5
**02:10:00** 92:23
**02:15:00** 96:14
**02:20:00** 99:22

**1**

**1** 44:3 48:15 68:10
**1%** 8:18
**1.4** 44:3,10
**10%** 8:18
**100** 34:9
**100%** 5:7 8:1,17
  42:23 43:1,5
**1050** 2:23
**10504** 2:19
**15** 42:10
**15222** 2:14
**1609** 14:10 16:22
**1610** 16:22
**1611** 14:10 16:22
**18th** 46:25
**182** 53:6

**2**

**2** 44:11
**2001** 41:1
**20036** 2:24
**2004** 45:11,19,19
  46:5
**2005** 70:19,20
  97:11 98:4
**2009** 97:11
**2010** 46:5 97:11,14
  97:19,21,23 98:3
**2011** 44:12
**2012** 40:13 41:9
  44:9
**21st** 3:2
**225** 2:13
**23** 40:13 44:9
**24** 73:25,25
**26** 55:24 67:24
**26th** 4:11
**27** 68:6

**3**

**3.2** 44:14
**300** 34:10 41:2
  42:14 53:6 93:2
  96:10
**31** 53:6
**333** 2:18

**4**

**4** 41:9
**40** 68:9
**43** 44:1
**466** 45:19 97:12

**5**

**5EH** 2:7
**5th** 2:13
**55** 2:6

**6**

**60** 73:23
**600** 41:2
**65** 22:2 50:18 60:1
  61:3,16,25 76:2,4
  76:24 79:19 80:7
  84:19

**65D** 17:16 **65D2** 21:5
  22:6
  23:8 24:14 26:10
  27:7 47:15 75:12
  77:2,4 78:2,12
  80:13,16 82:16
**65D2C** 81:20
**652D's** 76:7

**7**

**70%** 6:5

**8**

**8-5-0** 47:3
**8.2.10** 14:6
**80** 22:3 79:10
**850** 47:2,3

**9**

**9th** 4:4
**92%** 69:7
**991** 97:12

# EXHIBIT C

Case: 12-105          Document: 95          Page: 173          07/22/2013          914956          239

# Bloomberg

# Argentina Offers One-Sixth of Court-Ordered Bond Payment

*By Bob Van Voris - Mar 30, 2013*

[Argentina](#), which defaulted on a record $95 billion in sovereign debt in 2001, proposed giving holders of $1.3 billion of the repudiated bonds about one-sixth of what a New York judge has said they're entitled to receive.

The country's filing of the proposed plan yesterday, less than an hour before a midnight deadline, paves the way for the U.S. Court of Appeals in New York to rule in a case in which a group of creditors, led by Elliott Management Corp.'s NML Capital Ltd., seeks to force the South American nation to pay after more than a decade of legal fighting.

Argentina said it proposes two possibilities for bondholders to exchange their defaulted debt for new bonds. Argentine officials will submit a bill to their nation's Congress to provide for the plan to be implemented, the government said in a 22-page letter filed in court.

"Argentina's proposal accounts for past-due amounts to bring the debt current, provides for a fair return going forward, and also gives an upside in the form of annual payments if Argentina's economy grows," the country's lawyers said in the letter. "The proposal fulfills the court's dual objectives to satisfy the pari passu clause: non-discrimination in payment priority and equal treatment among bondholders."

## NML Recovery

According to Argentina, the payment formula set by a New York judge that the country is challenging in the appeal, would pay NML Capital $720 million. That compares with an estimated value of $120.6 million for NML under one of the payment alternatives it is proposing, the so-called discount option.

In its letter, Argentina estimates that NML paid $48.7 million for the bonds in 2008.

"The formula adopted by the district court would cause great harm to the exchange bondholders while giving plaintiffs a return that is exorbitant on its face," Argentina said in the letter.

In 2005 and 2010, Argentina offered its creditors new bonds, at a deep discount. About 91 percent of

Case: 12-105    Document: 95    Page: 174    04/11/2013    914956    239

bondholders agreed to the debt restructuring. NML and other holdouts have tried to use U.S. courts to enforce their rights under the original bond agreements.

Argentina's top leaders previously vowed never to pay the "vulture" investors, many of which bought the distressed bonds in hopes of turning a profit. Argentina's legislature in 2005 passed a so-called lock law barring payment on the defaulted bonds.

A decision forcing Argentina to pay defaulted bondholders immediately would expose the nation to $43 billion in additional claims it can't pay and trigger a new default, the government has said.

## Par Option

Under Argentina's proposal, a so-called par option would give bondholders new bonds due in 2038 in a nominal face amount equal to the amount of their defaulted debt, plus unpaid interest up to the end of 2001. The par bonds would pay interest that rises from 2.5 percent to 5.25 percent a year over the life of the bonds. They would also receive a one-time cash payment to compensate for interest they would have earned if the bonds had been issued on Dec. 31, 2003, according to the letter.

The holders would receive additional payments when the Argentine gross domestic product growth exceeds about 3 percent a year, the government said in the letter.

The discount option would give bondholders discount bonds due in 2033, that would be less than the defaulted amount, with an 8.28 percent annual rate and an increase in principal over time. They would be compensated for past due interest on those bonds with new bonds due in 2017 that pay 8.75 percent annually, according to the letter.

The holders would also receive GDP-tied payments, according to the proposal.

## No Better Terms

Argentina said its proposal wouldn't allow the plaintiffs in the lawsuit to force it to offer payment on better terms than those received by bondholders who agreed to the debt restructurings.

Eugenio Bruno, an attorney at the Buenos Aires law firm Estudio Garrido, said in an e-mail that Argentina's proposal is similar to past debt-restructuring offers by the country that have been rejected by NML and the other holdouts.

If the government were to offer a better deal, it would trigger provisions allowing holders of the exchange bonds to take advantage of more favorable terms offered to the holdouts, he said.

Bruno represents Alfonso Prat-Gay, a former governor of Argentina's central bank, who submitted a

Case: 12-105    Document: 530    Page: 175    04/11/2013    914956    239

brief in the case supporting his country's effort to overturn the ruling. Bruno said he also advises exchange bondholders and holdouts who aren't involved in litigation.

# Court Order

In November, U.S. District Judge Thomas Griesa in Manhattan said Argentina must pay the entire $1.3 billion claimed by the creditors in the lawsuit whenever it made any payment on its restructured debt. The issue was argued in front of the appeals court on Feb. 27.

On March 1, the appeals court ordered Argentina to provide a suggested formula for paying the creditors, led by NML Capital, which refused to take the restructured bonds at a deep discount.

Argentina's lawyer, in the Feb. 27 hearing, "appeared to propose" an alternative to the payment formula devised by Griesa, according to the appeals court. The three-judge panel gave Argentina a final chance to influence its decision. The judges said they may ask the creditors to file a response before they issue a ruling.

# Court's Requirements

The judges said Argentina must tell them how and when it proposes to make current its payments on the defaulted bonds and the rate it proposes to pay. The panel also sought assurances that Argentina's government would take the necessary actions to make the payments.

The panel said March 26 that it won't grant a full-court reconsideration of its ruling in a related appeal. In that decision, the court barred Argentina from treating restructured- debt holders more favorably than holders of the repudiated debt.

The lower court case is NML Capital Ltd. v. Republic of Argentina, 08-06978, U.S. District Court, Southern District of New York (Manhattan). The appeal is NML Capital Ltd. v. Republic of Argentina, 12-00105, U.S. Court of Appeals for the Second Circuit (New York).

To contact the reporter on this story: Bob Van Voris in New York at rvanvoris@bloomberg.net

To contact the editor responsible for this story: Michael Hytha at mhytha@bloomberg.net

®2013 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT D

# FINANCIAL TIMES

Welcome to FT.com, the global source of business news and analysis. **Register now** to receive 8 free articles per month.

March 31, 2013 5:13 pm

# Argentina hints at payment rerouting

By Jude Webber in Buenos Aires

Argentina has tacitly admitted it will seek to reroute payment on its US restructured debt abroad if, as is widely expected, a US appeals court rejects its Easter proposal to resurrect a bond swap for holdout creditors.

Amado Boudou, the vice-president, told a news conference Argentina would seek a "mechanism" to meet its commitments to creditors who exchanged defaulted debt for new bonds in 2005 and 2010. He said that "under any condition, in any instance, whatever the [court] result … one way or another, Argentina is going to pay". He gave no details.

Failure to do so could spark a technical default – a nightmare scenario for a country struggling to live within its means after defaulting on nearly $100bn in 2001, and a serious defeat for Cristina Fernández, Argentina's president, who sees honouring the country's debts as a cornerstone of economic policy.

Hernán Lorenzino, the economy minister, dismissed talk of default as a "fallacy" and an "invention" by speculators and Mr Boudou said it would be a "judicial absurdity to blockade payments by a country that has the capacity and willingness to pay".

But Marcelo Etchebarne, an Argentine lawyer following the case closely, did not expect the Second Circuit Court of Appeal to endorse Argentina's plan to pay holdout creditors only on the same terms as two previous debt swaps.

"The 2010 offer was more punitive than the 2005 and this 2013 offer is more punitive than the 2010. From a legal perspective the court cannot 'cram down' the plaintiffs … [this proposal] will most likely be rejected by the court after letting plaintiffs offer a response."

Argentina's dilemma stems from a ruling last year by Judge Thomas Griesa in New York who found the country had breached the pari passu or equal treatment clause in its defaulted bonds and ordered it to pay $1.33bn to holdouts led by Elliott, a fund which has been crusading for years through the courts seeking to collect in full.

The order prompted fears that sovereign restructurings would be hamstrung in future. Indeed, Axel Kicillof, th[e] suit is not happening on Mars in the year 3000" but at a time of international debt crisis.

To give his order teeth, Judge Griesa barred anyone from helping Argentina evade it, including the exchange b[...] – something Vladimir Werning at JPMorgan says could hamper any Argentine "Plan B".

"This might be seen as feasible to many observers if it is assumed that a vote to change payment terms in the [...] necessary proportion of bondholders) and crams down all holders to accept the payment elsewhere," he said in [...] may still face difficulties as long as the intermediaries are affected by the order to not assist the process."

Argentina criticises Elliott as a "vulture fund" that picked up bonds at practically a fifth of face value after the default and says paying it would be unfair to creditors who took steep haircuts to swap more than 92 per cent of the debt in default.

While Elliott has not commented publicly, no one expects it to entertain a swap it has already rejected twice. Nonetheless, Sean O'Shea, a lawyer for exchange bondholders, expressed the hope "that the plaintiffs will finally … accept this fair and equitable offer and put this difficult period to rest".

Eugenio Bruno, an Argentine lawyer and debt specialist at law firm Garrido, who is advising exchange bondholders, investment banks and holdouts that want an exchange, said the Second Circuit knew Argentina, under its so-called "lock law", was barred from making a better offer to holdouts.

"The court of appeals is or should be aware of these limitations. That's why I hope the [order to spell out a payment proposal] was not some kind of 'judicial ambush' - requiring something that they knew Argentina is prevented from offering …" he said. "Argentina could complain before the US Supreme Court if the appeal court rejects the Argentine payment proposal."

Indeed, one way or another, Mr Lorenzino acknowledged that Argentina "understands an approach to the Supreme Court will happen".

---

You may be interested in

| | |
|---|---|
| Understand the proper role of courts | Primetime battle for Iran's airwaves |
| Fernández feels political pressure | The donors behind 'Bellini, Botticelli, Titian' |
| BP fails to block 'absurd' spill payments | Words on the Wisden Cricketers' Almanack |
| Climate change poses air turbulence risk | Need for corporate philanthropy in achieving MDGs |
| The most ill-conceived reform of immigration law in US history | The Cape's crusaders |

Case: 12-105     Document: 39-2     Page: 178     04/22/2013     914956     239

Thatcher risks highlighting Cameron's fragility

Cerberus turns up heat in row with Seibu

Kerry urges Turkey-Israel to restore ties

Hopes of thaw as Peña Nieto heads to China

Ex-FSA adviser Jeremy Bennett to be head of Nomura Europe

Thirteen years on, the MDG values are as imperative as ever

White confirmed to head SEC

Alligator farm bites back in claims fight

BP in key hearing on gulf oil spill costs

Boeing hopes 787 closer to flying again

Printed from: http://www.ft.com/cms/s/0/6ccc360e-99f0-11e2-83ca-00144feabdc0.html

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

© THE FINANCIAL TIMES LTD 2013 FT and 'Financial Times' are trademarks of The Financial Times Ltd.

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

NML CAPITAL, LTD.,

                      Plaintiff,

           - against -

THE REPUBLIC OF ARGENTINA,

                    Defendant.

-----------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/5/2012

No. 08 Civ. 6978 (TPG)
No. 09 Civ. 1707 (TPG)
No. 09 Civ. 1708 (TPG)

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER, LTD.,

                    Plaintiffs,

           - against -

THE REPUBLIC OF ARGENTINA,

                    Defendant.

No. 09 Civ. 8757 (TPG)
No. 09 Civ. 10620 (TPG)

-----------------------------------------------------------------x

AURELIUS OPPORTUNITIES FUND II, LLC
and AURELIUS CAPITAL MASTER, LTD.,

                    Plaintiffs,

           - against -

THE REPUBLIC OF ARGENTINA,

                    Defendant.

No. 10 Civ. 1602 (TPG)
No. 10 Civ. 3507 (TPG)

*(captions continue on following pages)*

-----------------------------------------------------------------x

## ~~[PROPOSED]~~ ORDER PURSUANT TO FRCP 62(C)

```
-------------------------------------------------------------- x
AURELIUS CAPITAL MASTER, LTD. and        :
AURELIUS OPPORTUNITIES FUND II, LLC,      :
                                          :   No. 10 Civ. 3970 (TPG)
                         Plaintiffs,      :   No. 10 Civ. 8339 (TPG)
                                          :
          - against -                     :
                                          :
THE REPUBLIC OF ARGENTINA,                :
                                          :
                         Defendant.       :
                                          :
-------------------------------------------------------------- x
                                          :
BLUE ANGEL CAPITAL I LLC,                 :
                                          :   No. 10 Civ. 4101 (TPG)
                         Plaintiff,       :   No. 10 Civ. 4782 (TPG)
                                          :
          - against -                     :
                                          :
THE REPUBLIC OF ARGENTINA,                :
                                          :
                         Defendant.       :
-------------------------------------------------------------- x
                                          :
PABLO ALBERTO VARELA, et al.,             :
                                          :   No. 10 Civ. 5338 (TPG)
                         Plaintiffs,      :
                                          :
          - against -                     :
                                          :
THE REPUBLIC OF ARGENTINA,                :
                                          :
                         Defendant.       :
                                          :
-------------------------------------------------------------- x
```

```
---------------------------------------------------------------- x
                                                         :
OLIFANT FUND, LTD.,                                      :
                                                         :     No. 10 Civ. 9587 (TPG)
                                  Plaintiff,             :
                                                         :
                                                         :
              - against -                                :
                                                         :
THE REPUBLIC OF ARGENTINA,                               :
                                                         :
                                  Defendant.             :
                                                         :
----------------------------------------------------------------x
```

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this

Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the

Republic is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs'

Bonds at least equally with all the Republic's other present and future unsecured and

unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court

granted partial summary judgment to Plaintiffs on their claims that the Republic has breached,

and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things,

"ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to

satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned

actions (the "February 23, 2012 Orders"), this Court granted Plaintiffs' motion for equitable

---

[1] The "Exchange Bonds" refer to bonds or other securities issued by the Republic
pursuant to its 2005 and 2010 exchange offers.

relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

And WHEREAS the Republic intends to appeal the February 23, 2012 Orders and all underlying and/or associated orders to the U.S. Court of Appeals for the Second Circuit, and has moved for a stay of the February 23, 2012 Orders during the pendency of such appeal,

It is HEREBY ORDERED that:

1.     Pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, the effect of the February 23, 2012 Orders is stayed until the U.S. Court of Appeals for the Second Circuit has issued its mandate disposing of the Republic's appeal of the February 23, 2012 Orders.

2.     To secure Plaintiffs' rights during the pendency of the Republic's appeals of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

3.     With consent of the Plaintiffs and on terms agreeable to the parties, the Republic shall file a motion in the Second Circuit requesting that the court of appeals accord the Republic's forthcoming appeal of the February 23, 2012 Orders expedited treatment in accordance with a schedule agreed upon by the parties.

---

[2]  The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

2

4.     This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

Dated:   New York, New York
         March  5 , 2012

Thomas P. Griesa
U.S. District Judge

3

# EXHIBIT F

# Chaco Día Por Día

14 November 2012

Jorge Argüello lectured at the Casa de las Culturas

## "We will pay every installment that falls due religiously, but not the vulture funds"

**Introduced by Governor Jorge Capitanich, the Argentine ambassador to the United States of America offered a detailed view of the national financial recovery and criticized the speculators who make a profit from countries in crisis.**

Governor Jorge Capitanich was the host and introduced the lecture on the "X-ray of the vulture funds" given by the Argentine ambassador to the United States, Jorge Argüello, Tuesday night in the Casa de las Culturas Auditorium. For his part, the lecturer railed against the group of "those who speculate with countries in crisis" and predicted that "soon the Frigate Libertad, seized in a Ghanaian port by a judge from that country at the request of the vulture funds, will return to Argentina."

First, the provincial governor introduced the lecturer. "It is an honor to welcome a person who has had such an outstanding career as Jorge (Argüello) [to talk about] a subject of concern to all Argentineans," he said. He added that "the Argentine ambassador to the United States has enjoyed a long career, having also been permanent representative to the United Nations (UN), a deputy to the national [congress], and chairman of the Foreign Affairs Committee, among other things."

Under the title "X-ray of the Vulture Funds. Implications for Bilateral Relations," Argüello discussed and analyzed relations between Argentina and the United States, explaining a complex reality, contributing to building greater civic responsibility.

Argüello: "Vultures … are very rich speculators"

Before his speech, the Argentine ambassador to the United States defined the vulture funds as "very rich speculators who buy debt bonds of countries with dying economies … vultures."

Describing the vulture funds' methodology, he said that "they buy paper or bonds that have a face value of 100, but they get them for 12. Then they immediately seek, anywhere in the world, a court that will rule in their favor and file a lawsuit to collect that 100 plus late interest."

Argüello noted that the methodology has already been used in the Congo and Peru, has been tried in Brazil and Argentina, and is currently being used in Greece, Spain, and several other countries. "It's a circumstance that we have to be careful of all over the world, and so Argentina is alerting the G-20 to this maneuver and encouraging discussion about these funds," he said.

"We will pay every installment that falls due religiously"

Argüello noted that, at the start of the economic recovery initiated under the Néstor Kirchner

administration, in 2005, Argentina implemented a debt swap as a result of the default – inability to pay its debt – in 2001. Later, under the Cristina Fernández de Kirchner administration, it completed the swap in 2010.

Then the swap of 93 percent of the 2001 defaulted debt was effected, "but 7 percent did not participate in the swap, simply because they didn't want to," Argüello recalled.

That percentage of creditors, i.e., the 7 percent, consists precisely of the vulture funds. "They didn't want to participate, clearly because it is not the nature of their business, since they do not buy at 12 in order to settle for 30, but rather they buy at 12 in order to collect 100 plus late interest, clearly a vulture interest," the ambassador asserted.

The most important thing that is happening on the world scene is "religiously paying every installment on all the paper that came out of the 2005 and 2010 swaps. That gives Argentina prestige and the predictability it needs to grow strong and fight this usurious extortion by the vulture fund speculators," he said.

"We will not pay vulture funds and the frigate will come home"

As for the situation of the Frigate Libertad, seized in a Ghanaian port by a judge from that country at the request of a creditor, Argüello was emphatic: "we will not pay a peso to the vulture funds, simply because they have no right whatsoever and they are trying to extort with maneuvers and actions, such as the attempt to have a warship seized," he added.

As for the situation at the world level, he stressed that Argentina enjoys the support of most countries around the world. "Everyone is taking a reading against the vulture funds' interests, [realizing] that it's becoming increasingly clear that they are very powerful people with a lot of money and ability to take [legal] action. To the point that what they can't get in Argentina with one judge, they get, for example, with a judge in Ghana."

"We are conducting a campaign to raise awareness all over the world, and it's in that context that we are now in Resistance[1]," he explained.

Finally, he said that the Argentine ship's return is just a matter of time. "We are working in all the necessary world forums, not just to free the Frigate but also to mount a strong attack on those vulture funds and their methodologies. These same vulture funds that were flying over Argentina and Africa yesterday are now doing the same thing in Greece and Spain. So the precedent of how the Argentine debt renegotiation is resolved will be fundamental for future debt negotiations anywhere in the world," he concluded.

---

[1] Resistencia is the name of the neighborhood where Casa de las Culturas is located.

Juris Services International
Translation Studio
23 Normandy Terrace
Bronxville, NY 10708
Tel: 212 759-5400 Fax: 212 401-8125

## CERTIFICATE OF ACCURACY

State of New York          )
Village of Bronxville    : ss.:
County of Westchester   )

This is to certify that the attached translation from SPANISH into ENGLISH of the document entitled/described below is a true and accurate rendition of the original Spanish document:

14 Noviembre 2012

Jorge Argüello disertó en la Casa de las Culturas

# "Pagamos religiosamente todos los vencimientos, no a fondos buitres"

**Presentado por el gobernador, Jorge Capitanich, el embajador argentino en EEUU brindó un detallado panorama de la recuperación financiera nacional y criticó a los especuladores que lucran con los países en crisis.**
*El gobernador Jorge Capitanich fue el anfitrión y presentador de la disertación sobre la*

precedente que deje el modo en que se resuelva la renegociación de la deuda Argentina va a ser fundamental para las futuras negociaciones de deudas en el mundo", finalizó.

John E. Considine
President

Date: 18 NOV. 22

14 Noviembre 2012

Jorge Argüello disertó en la Casa de las Culturas

# "Pagamos religiosamente todos los vencimientos, no a fondos buitres"

**Presentado por el gobernador, Jorge Capitanich, el embajador argentino en EEUU brindó un detallado panorama de la recuperación financiera nacional y criticó a los especuladores que lucran con los países en crisis.**

El gobernador Jorge Capitanich fue el anfitrión y presentador de la disertación sobre la "Radiografía de los fondos buitres" realizada por el embajador argentino en Estados Unidos, Jorge Argüello, en la noche de este martes en el Salón Auditorio de la Casa de las Culturas. Por su parte, el disertante, hostigó contra el grupo de personas "especuladoras con los países en crisis", al tiempo que vaticinó que "en poco tiempo la Fragata Libertad, embargada en un puerto de Ghana por un juez de ese país a instancia de los fondos buitres, volverá al país".

En primer turno, el mandatario provincial fue el presentador del disertante. "Es un honor poder recibir a una persona de enorme trayectoria como lo es Jorge (Argüello) en una temática que nos atañe a todos los argentinos", señaló. Así, recordó que "el embajador argentino en Estados Unidos, cuenta con una extensa trayectoria porque además fue el representante permanente ante las Naciones Unidas (ONU); diputado nacional y presidente de la Comisión de Relaciones Exteriores, entre otros varios cargos".

Bajo el título "Radiografía de los Fondos Buitres. Implicancias en la Relación Bilateral", Argüello hizo un tratamiento y análisis de las relaciones entre Argentina y Estados Unidos que contribuyó a comprender una realidad compleja, aportando a la construcción de una ciudadanía más plena.

Argüello: "Son señores muy ricos y especuladores… buitres"

Antes de su alocución, el embajador argentino en Estados Unidos definió a los fondos buitres como "señores muy ricos y especuladores que se dedican a comprar bonos de las deudas de los países que tienen economías agonizantes…buitres".

A la hora de graficar la metodología de los fondos buitres señaló que "compran un papel o bono que, tiene un valor nominal de 100 pero lo adquieren en 12. Inmediatamente después de eso, buscan en cualquier lugar del mundo, un tribunal que les resulte favorable e inician un juicio para cobrar aquellos 100 más los intereses por mora".

Argüello recordó que la metodología ya se usó en el Congo, en Perú, lo han intentado hacer en Brasil, en Argentina, lo hacen actualmente en Grecia, en España y varios países más. "Es un fenómeno del que todos nos tenemos que cuidar en el mundo, y es por eso que Argentina está alertando esta maniobra en el mismo seno del G-20 y promoviendo una discusión con relación a estos fondos", señaló.

"Pagamos religiosamente todos los vencimientos"

Respecto de la situación nacional, Argüello recordó que la Argentina, a partir de la recuperación económica iniciada bajo la Presidencia de Néstor Kirchner, en 2005 impulsó un canje de la deuda, producida por el default – imposibilidad de pagar su deuda- de 2001. Luego, ya bajo la gestión de la Presidenta Cristina Fernández de Kirchner completó el canje en 2010.
Por entonces, se concretó el canje del 93 por ciento de aquella deuda que había entrado en default en 2001, "pero hay un 7 por ciento que no entró en el mismo y es simplemente porque no quiso", recordó Argüello.

Ese porcentaje de acreedores, es decir el 7 por ciento, es justamente el que conforman los denominados fondos buitres. "Ellos no quisieron ingresar, claramente porque no es la naturaleza de sus negocios porque ellos no compran a 12 para arreglar por 30, sino que adquieren a 12 para cobrar 100 y sumar a esa cifra los intereses de la mora, claramente un interés buitre", sentenció el embajador.

La cosa más importante que se viene realizando en el panorama mundial es "pagar religiosamente cada vencimiento de cada papel que surgió de los canjes de 2005 y 2010. Eso le da prestigio a la Argentina y le da la previsibilidad necesaria para lograr la fortaleza y resistir esta extorsión usuraria de los especuladores de los fondos buitres", señaló.

"No vamos a pagar a fondos buitres y la fragata volverá"

Respecto a la situación de la Fragata Libertad, embargada en un puerto de Ghana por un juez de ese país, a instancias de un acreedor, Argüello fue contundente: "no le vamos a pagar un peso a los fondos buitres, simplemente porque no tienen derecho alguno y están tratando de extorsionar con maniobras y acciones como el intento de embargo de un buque de guerra", señaló.

Sobre el panorama a nivel mundial destacó que Argentina cuenta con el apoyo de la mayoría de los países del mundo. "Todos van tomando una lectura en contra de los intereses de los fondos buitres, que está cada vez más claro que son personas muy poderosas que tienen mucho dinero y capacidad de acción. Al punto que lo que no pueden conseguir en Argentina con un juez, lo consiguen por ejemplo con un juez en Ghana".

"Estamos llevando adelante una campaña de concienciación en todo el mundo, y en ese marco es que hoy estamos en Resistencia", explicó.

Por último, adelantó que el regreso del buque argentino es cuestión de tiempo. "Estamos trabajando en todos los foros necesarios y del mundo, no sólo para liberar la Fragata sino además para atacar con plenitud a esos fondos buitres y sus metodologías. Estos mismos fondos buitres que ayer sobrevolaban Argentina y África, hoy lo hacen en Grecia y en España. Por eso es que el precedente que deje el modo en que se resuelva la renegociación de la deuda Argentina va a ser fundamental para las futuras negociaciones de deudas en el mundo", finalizó.

# EXHIBIT G

**LA PRENSA (DyN):**
**"For Nielsen, the reopening of the swap is not a good alternative"**
*"The sense of the Lock Law was to send a message to the international financial community that Argentina wouldn't reopen the swap. But in no way does it meddle in potential judicial rulings. What it does prevent is court settlements," explained the former finance secretary.*

Guillermo Nielsen, former finance secretary and the main architect of the 2005 debt restructuring, argued that an offer to reopen the swap in order to reach an agreement with the holdouts that are suing in the United States is not a good alternative, and he suggested that the best strategy is to get a "judicial ruling" because responding to the decision does not involve a violation of the Lock Law.

"The sense of the Lock Law was to send a message to the international financial community that **Argentina wouldn't reopen the swap. But in no way does it meddle in potential judicial rulings.** What it does prevent is court settlements," explained the former finance secretary.

In an interview with DyN, Nielsen argued that "Faced with this scenario, the best solution is to obtain a court decision, because in that way a decision cannot be extended to the entire restructured debt."

"What's needed, and from my point of view it's achievable, is to obtain a decision, because regardless of the result a decision would not affect the rest of the debt. Any settlement would roll back all the debt," explained the economist.

Nielsen emphasized that "it's very important not to talk about reopening. Reopening is when somebody wants to attract the investor community, and that's not relevant here. What's relevant is what the three judges think."

On Friday, March 29, Argentina has to present to the Court of Appeals in New York a proposal for payment of US$1.3 billion pursuant to a judgment handed down by lower court judge Thomas Griesa and upheld by the appellate court.

With respect to the proposal, the ex-diplomat felt that "there are different variants" and noted that "basically, what is needed is to give the judges a basis for believing that what the holdouts are receiving is reasonable."

In that sense, it was said to be closer to offering a "Par bond at 30 years." "This would mean respecting the face value of the bond – or US$1.33 billion – but paying it over several decades would lessen the current value," he added.

He added that "if the offer is accepted, the instrument would have very low liquidity, which is a way to punish the holdouts because there will be no markets for trading it." However, he admitted that "the situation is open" and remarked that "what's fascinating in this case is that no rules can be set for the judges. The judges will use their discretion."



Juris Services International
Translation Studio
23 Normandy Terrace
Bronxville, NY 10708
Tel: 212 759-5400 Fax: 212 401-8125

## CERTIFICATE OF ACCURACY

State of New York )
Village of Bronxville : ss.:
County of Westchester )

This is to certify that the attached translation from SPANISH into ENGLISH of the document entitled/described below is a true and accurate rendition of the original Spanish document:

*La Prensa (DnY)*
### Para Nielsen la reapertura del canje no es una buena alternativa
*"El sentido de la Ley Cerrojo era enviar un mensaje a la comunidad financiera internacional de que la Argentina no iba a reabrir el canje pero de ninguna manera se mete con eventuales fallos judiciales. Lo que sí impide es hacer acuerdos judiciales", explicó el ex secretario de Finanzas.*

Lunes, 25 de marzo de 2013

............................................................................................................

Además, señaló que "si se acepta, sería un título de muy baja liquidez, lo cuál es una forma de castigar a los holdouts porque no tendrán mercados para 'trader'" No obstante, admitió que "la situación está abierta" y remarcó que "lo que tiene de fascinante este caso es que a los jueces no se le puede poner reglas. Los jueces harán los que le parece".

John E. Considine
President

Date: 14 APRIL 2013

Case: 12-105     Document: 552     Page: 194     04/22/2013     914796     239



Economía

Sugirió que la mejor estrategia es conseguir un "fallo judicial"

## Para Nielsen la reapertura del canje no es una buena alternativa

"El sentido de la Ley Cerrojo era enviar un mensaje a la comunidad financiera internacional de que la Argentina no iba a reabrir el canje pero de ninguna manera se mete con eventuales fallos judiciales. Lo que sí impide es hacer acuerdos judiciales", explicó el ex secretario de Finanzas.



El ex secretario de Finanzas y principal funcionario en la reestructuración de la deuda en 2005, Guillermo Nielsen, sostuvo que no es una buena alternativa ofrecer la reapertura del canje para alcanzar un acuerdo con los holdouts que litigan en Estados Unidos y sugirió que la mejor estrategia es conseguir un "fallo judicial" porque responder a la sentencia no implica violar la Ley Cerrojo.

"El sentido de la Ley Cerrojo era enviar un mensaje a la comunidad financiera internacional de que la Argentina no iba a reabrir el canje pero de ninguna manera se mete con eventuales fallos judiciales. Lo que sí impide es hacer acuerdos judiciales", explicó el ex secretario de Finanzas.

Nielsen, en diálogo con DyN, sostuvo que "frente a este escenario, lo más oportuno es lograr una sentencia judicial porque de esta forma un fallo no puede hacerse extensivo a toda la deuda reestructurada".

"Hay que lograr y, desde mi punto de vista es algo manejable, que esto sea un sentencia porque cualquiera sea el resultado no derrama sobre el resto de la deuda. Cualquier acuerdo retrotraería toda la deuda", explicó el economista.

Nielsen subrayó que "es muy importante no hablar de reapertura. Reapertura es cuando alguien quiere atraer a la comunidad inversora y eso acá no es relevante. Relevantes es lo que van a opinar los tres jueces".

La Argentina debe presentar el viernes 29 a la Corte de Apelaciones de Nueva York una propuesta de pago de 1.330 millones de dólares para cumplir una sentencia de primera instancia del juez Thomas Griesa que había sido ratificada por esa Cámara.

Sobre esa propuesta, el ex diplomático evaluó que "hay distintas variantes" y precisó que "básicamente lo que se necesita

Case: 12-105    Document: 332    Page: 195    04/22/2013    914898    239

es darle pie a los jueces para que consideren que lo que están recibiendo los holdouts es razonable".

En ese sentido, se pronunció más cerca de ofertar un "bono par a 30 años de plazo". "Esto implicaría que uno respeta el valor facial del bono -o sea los 1.330 millones de dólares- pero al pagarlo en varias décadas el valor presente disminuye", agregó.

Además, señaló que "si se acepta, sería un título de muy baja liquidez, lo cuál es una forma de castigar a los holdouts porque no tendrán mercados para 'trader'" No obstante, admitió que "la situación está abierta" y remarcó que "lo que tiene de fascinante este caso es que a los jueces no se le puede poner reglas. Los jueces harán los que le parece".

La Prensa Digital - All rights reserved - Una publicación de La Prensa, fundada el 18 de Octubre de 1869



# EXHIBIT H

AP Argentina defends payment plan; analysts trash it

Advertisement





# The Big Story
## Argentina defends payment plan; analysts trash it

By MICHAEL WARREN
— Apr. 1 6:41 PM EDT

Home » Argentina » Argentina defends payment plan; analysts trash it

BUENOS AIRES, Argentina (AP) — Argentine officials say their plan for paying $1.4 billion in defaulted debt is fully within the spirit of U.S. court rulings.

But Wall Street analysts say the offer looks nothing like the letter of the law as the appellate court sees it. They say the mix of new bonds to be paid out over the next 25 years boils down to just one-sixth of what Argentina was told to hand over in cash.

Many experts looking over the weekend at what President Cristina Fernandez's government filed with the court at midnight Friday said a new default by Argentina is now much more likely.

And some are predicting that if Argentina loses, it will try to reroute its debt payments from New York's banks, rather than submit to U.S. justice.

Fernandez and her economic team are proud of Argentina's long climb back from a world record debt default in 2001, and determined to keep the plaintiffs, and what they call their "vulture funds," from getting a better deal than what the other 92 percent of Argentina's defaulted debt holders accepted in 2005 and 2010 in exchange for the unpaid paper.

Those new bonds had a much lower face value at first, providing relief to Argentina in much the same way a bankruptcy proceeding writes off bad debts and ensures that all creditors are paid more or less equally. It has taken years, but these bondholders have gradually begun to recover most of what they lost more than a decade ago.

Rather than accept this bankruptcy scenario, about 8 percent of the debt holders refused to accept the bond swaps. Led by billionaire Paul Singer, they went to court instead, demanding payment in full for a plain and simple breach of contract. After a decade of litigation, they won. Now it's all about getting paid.

U.S. District Judge Thomas Griesa would block Argentina's regular payments to the 92 percent if U.S. banks don't ensure that the country hasn't already repaid the plaintiffs an equal amount in capital, interest and penalties.

If upheld, that would force Argentina into default in June, if it doesn't pay the plaintiffs their first installments totaling nearly $250 million, equal to what it must pay the exchange bondholders that month.

Vice President Amado Boudou said Saturday that "it would be a judicial absurdity to block payments by a country that has the capacity and willingness to pay."

Boudou added that "one way or another, Argentina will pay" the exchange bondholders no matter what the courts say.

That suggests Argentina might try a long-shot scheme of routing its payments through some other country, even though the exchange bonds are denominated in dollars and promised under New York law, analyst Daniel Kerner said.

"It suggests that it is highly unlikely that the government will comply with any court ruling that mandates full payment," Kerner said.

While the appeals court does not have a deadline, it could issue a ruling anytime in the next few weeks.

Argentina's shaky economy hangs in the balance. The government argued that if the plantiffs win the $43 billion would immediately come due, draining all the country's foreign reserves. Such a victory would enable NML Capital Ltd., a hedge fund owned by billionaire Paul Singer, to walk away with a profit of 1,380 percent, the government complained.

JP Morgan analyst Vladimir Werning predicted that the appellate judges would have little sympathy for such arguments. He also predicted that Argentina will lose and try to reroute its current payments through some other country — a complicated endeavor that U.S. courts could potentially block.

Argentina had some defenders on Monday. A coalition of church groups known as the Jubilee USA Network, which lobbies for foreign debt reduction, said the "payment plan protects the integrity of deals made with other debt holders, but most importantly it ensures that these holdout hedge funds can't take further advantage of the poor in developing countries."

But they appeared to be in the minority.

Arturo Porzecanski, an expert on Latin American emerging markets at American University, said Argentina should simply pay what it owes.

Instead, the government is offering no "explicit or implicit commitment to make anybody whole for the tremendous losses previously sustained," he said. "The plaintiffs are merely given yet another chance to be paid mainly in highly risky, long-term IOUs the little money that Argentina wants to pay them."

## Tags

Government and politics, North America, Latin America and Caribbean, United States, Business, South America, General news, Argentina, Legal proceedings, Law and order

## Comments

# EXHIBIT I

# Capital Markets Monitor

April 2013



IIF

INSTITUTE OF INTERNATIONAL FINANCE

*CONFIDENTIAL*

## Highlights

### Cyprus and Argentina: Implications for Creditor Rights

■ Events in Cyprus and Argentina over the past month may not have had a direct and large economic impact immediately, but could help shape market expectation and behavior in future cases of financial crisis resolution.

■ In particular, ***decisions made in these country cases could have important implications for creditor rights and legal certainty which are the foundation of credit markets.***

The *Capital Markets Monitor* and other IIF publications are available on the Institute's website: **http://www.iif.com**

Questions or comments regarding this publication may be addressed to:

Hung Tran — +1.202.682.7449
htran@iif.com

Sonja Gibbs — +1.202.857.3325
sgibbs@iif.com

Elif Aksoy — +1.202.857.3647
zaksoy@iif.com

Fiona Nguyen — +1.202.682.7443
fnguyen@iif.com

Thilo Schweizer — +1.202.682.7450
tschweizer@iif.com

Emre Tiftik — +1.202.857.3321
etiftik@iif.com

## Contents

Key issues of the month ................................................................. 2

Special Feature I: Update on "shadow banking" activities ................ 6

Special Feature II: Collateral transformation .................................. 7

Special Feature III: Japan's 2006 QE exit strategy ......................... 9

Asset performance in perspective .................................................. 10

Sovereign debt markets ................................................................ 11

Bank health monitor ..................................................................... 13

U.S. Flow of Funds Q4 2012 ......................................................... 15

Interbank market strains ................................................................ 16

Credit markets .............................................................................. 17

Emerging markets .......................................................................... 18

Emerging markets: Focus on EM Europe ........................................ 19

Emerging markets: Focus on China ................................................ 20

Equity markets .............................................................................. 21

Currency trends ............................................................................. 22

Commodities ................................................................................. 23

Mutual fund flows ......................................................................... 24

Issuance ....................................................................................... 25

Glossary ....................................................................................... 26

To receive email notification each month of the publication of the *CMM*, please send an email to notices@iif.com with "Include on CMM distribution" in the subject line.

Data cutoff date: April 1, 2013

Copyright 2013. The Institute of International Finance, Inc. All rights reserved. The contents of this report may be neither reproduced nor distributed in whole or in part outside the membership without the prior written approval of the Institute of International Finance, Inc.

Case: 12-105     Document: 952     Page: 201     04/22/2013     914956     239

# Key Issues of the Month:
# Cyprus and Argentina: Implications for Creditor Rights

Events in Cyprus and Argentina over the past month may not have had a direct and large economic impact immediately, but could help shape market expectation and behavior in future cases of financial crisis resolution. In particular, *decisions made in these country cases could have important implications for creditor rights and legal certainty—which are the foundation of credit markets*.

**From Deauville to Nicosia**

While the EU Summit in Deauville (October 2010) launched the concept of "Private Sector Involvement" (PSI) in sovereign debt restructuring as part of an adjustment program to crisis countries in the Euro Area, the Cyprus package included the bailing in of bank creditors and depositors as part of a rescue effort. This marked the first time in the context of Euro Area sovereign/bank debt crisis resolution that bank senior creditors and depositors have been haircut, in an ad hoc manner—and well ahead of the finalization of the EU Directive on the Recovery and Resolution of Financial Institutions.

Going forward, it looks like burden-sharing from the private sector in rescue efforts could materialize in the context of either sovereign debt restructuring or bank resolution, or both. In the absence of an established legal framework, or at least explicit policy statements by the Eurogroup about the criteria and procedure to decide on how burden sharing is done, *market participants could be left to assume that the process might have been driven opportunistically: go where the money is*. Certainly this could have been the case in Cyprus, where both bond yields (Chart 1) and deposit flows reflect these uncertainties.

Domestic law Cypriot government bonds (totaling €2.5 billion plus €1.9 billion of recapitalization bonds) are mostly held by Cypriot banks—haircutting these bonds would only worsen the banks' situation (Chart 2). Cyprus also has a €3.8 billion Euro Medium Term Notes (EMTN) program under English law, which contain strong Collective Action Clauses (CACs)--hence not easy to restructure. On the other hand, the two distressed banks (Laiki and Bank of Cyprus) have about €45.8 billion in deposits (over two-thirds of total Cypriot bank deposits—Charts 3 and 4), €0.5 billion in subordinated convertible debt and €0.1 billion senior debt--presenting a more tempting target.

In any event, the authorities in the Euro Area need to quickly establish the legal framework for bank resolution and avoid the ad hoc process seen so far—this has undermined the legal certainty which has been a characteristic of mature financial markets. Sovereign debt restructuring, presumably, will be undertaken if necessary in the context of CACs having been included in Euro Area sovereign bonds being issued since the beginning of this year.



**Cyprus: Government Bond Yields**
**1** *percent, 7-year maturity*

Source: Bloomberg



**Cyprus: Composition of General Government Debt**
**2** *EUR billion*

Treasury Bills
Domestic Loans
Foreign Loans
EMTN
Domestic Bonds

Recapitalisation bonds

Source: Ministry of Finance, Cyprus



**Cyprus: Bank Deposits**
**3** *EUR billion, latest data February 2013*

Nonresident
Resident

Source: Central bank of Cyprus



# Key Issues of the Month, continued

**Setting Precedents**

Under the overall requirement stated above, the Cyprus deal has set several precedents that would shape market expectation and behavior going forward.

First, while the final deal (protecting insured deposits, observing the seniority ranking of creditors and imposing losses only on uninsured depositors and creditors of restructured banks and not setting a levy on all deposits—except for an increase in the existing levy on all bank deposits from 0.11% to 0.15%—was better structured than the original decision, the fact that Cyprus had to impose extensive controls on capital movements and banking transactions was very instructive. *The combination of a wealth shock and extensive disruptions to banking and payment transactions would lead to a much sharper GDP decline this year*—more like 10-15% (with further sharp declines in subsequent years) instead of the 3.5% projected for 2013 by the Troika under the provisional Memorandum of Understanding of November 2012. This would boost Cyprus' public debt/GDP ratio well beyond 100% by 2020 (Chart 5), illustrating the futility of forcing other components of an adjustment program to meet an arbitrary and static target such as 100% of GDP (although aiming for a sustainable debt burden is of course a important and necessary objective).

*The rationale for bailing in creditors in bank resolution to protect tax payers also rings hollow in this case as many tax payers are depositors and all will suffer greatly from the deeper and longer recession.* There should be a clear distinction in the discussion between resolving financial institutions in normal circumstances—where the overall banking system is still healthy and the financial system can absorb the losses arising from a few institutions—and during a systemic crisis when most if not all of the banking system is under stress and imposing losses on creditors may fuel panic and necessitate capital and banking controls which could inflict extensive economic damage.

Second, *an important factor driving the decision to bail in depositors is the effort on the part of core countries in the Euro Area to provide only the minimum financial assistance needed to crisis countries—and not without burden sharing from the private sector.* Such an approach, reinforced by numerous official statements in recent weeks, suggests that various measures announced by the Eurogroup since last summer—with the important goal of breaking the vicious linkage between weak sovereign and bank balance sheets—will not make much progress going forward. Instead of mutualization of bank liability in case of need, it has become bailing in bank creditors and depositors. Such concerns could exacerbate the current outflow of deposits from troubled countries (Chart 6), adding to bank funding strains.

Concretely, it is *becoming clear that the ESM will not be authorized to make direct recapitalization to banks suf-*



**Cyprus: Breakdown of Nonresident Bank Deposits**
*EUR billion*

Source: Central bank of Cyprus



**Cyprus General Government Gross Debt**
*percent of GDP*

Source: European Commission, IIF projections



**Euro Area: Bank Deposits**
*percent, y/y*

Source: ECB



# Key Issues of the Month, continued

*fering losses from legacy assets* (which is at the core of the present crisis) and in any event will require burden sharing and even sovereign guarantees to provide recapitalization to banks in the future after those banks undergo rigorous supervision by the ECB. And while preparations for the Single Supervisory Mechanism at the ECB will go ahead to meet the deadline of being operational by the middle of 2014, joint back-up funding for any pan-European deposit insurance schemes and resolution authorities is unlikely to make much headway. Indeed, Finance Minister Schaeuble reportedly said that deposit insurance scheme is only as good as the solvency of the sovereign.

In other words, *liability for potential banking losses remains national and not mutualized within the Euro Area*. To the extent that expectation of such mutualization of potential national banking losses and/or recapitalization burdens has played a role in the improvement of sovereign debt markets, realization to the contrary may test currently benign market sentiment—particularly given the scale of the banking industry in the Euro Area (Chart 7).

Third, bank creditors and depositors (Chart 8) are consequently more exposed than investors in sovereign debt to burden sharing in rescue packages for countries in crisis. Bondholders enjoy a degree of protection as governments don't like to reinforce the message that there is credit risk attached to sovereign debt in the Euro Area. In any event, should a sovereign debt restructuring become unavoidable there is a procedure in CACs for bondholders to be consulted and to decide by majority voting to accept a restructuring deal. At present, bank creditors and uninsured depositors face a high level of legal uncertainty in the absence of clear resolution provisions. Consequently, *weak banks in weak countries will continue to face funding and market pressures* (Chart 9), *contributing to the ongoing decline in bank lending to non-financial borrowers in problem countries* (Chart 10, next page). This would prolong the recession/slow growth in many Euro Area countries, which is becoming a key risk going forward.

## Argentina: fundamental flaw of an unenforceable claim market

As requested by the U.S. Appeals Court for the Second Circuit, Argentina has submitted its proposal for repayment to the holdout investors in its defaulted/restructured bonds. The proposal is identical to earlier offers made by Argentina and rejected by holdout investors. As such, it is likely that the Appeal Court will reject Argentina's proposal and would make a ruling, after receiving holdout investors' responses by April 22, on whether to reaffirm the District Court's payment instruction (Argentina is to pay $1.3 billion to holdout investors and until it does, cannot pay exchange bond holders; other third parties should not assist Argentina in evading this instruction).

**7** Euro Area:  Bank Assets Relative to GDP
*multiples of GDP*



Source: ECB, Eurostat

**8** Euro Area:  Bank Deposits Relative to GDP
*total deposits, multiples of GDP*



Source: ECB, Eurostat

**9** "Weak" vs. "Strong"  EU  Bank  CDS Spreads
*bps*



Source: Bloomberg, IIF calculations



# Key Issues of the Month, continued

Argentina could react by requesting a hearing by the US Supreme Court (which is unlikely to take a case arising from a State commercial law) and/or change the applicable law and jurisdiction of the bonds to re-engineer payment to exchange bondholders in Argentina (not easy and requiring a 75% majority in CAC voting). The last option would be to default on the exchange bonds, not a very good outcome from many perspectives. These uncertainties are reflected in particular in the sharply elevated yields of Argentinian dollar bonds issued under New York law (Chart 11).

Given the implications of this case to the international sovereign debt market, it is important to put it in the right historical context. Basically, *Argentina finds itself in the present messy situation because of its own behavior, evidenced by more than a decade of unilateral treatment of its creditors*. Since private sector creditors and investors can not afford to wait forever, many (but not all including thousands of retail investors) have been compelled to accept Argentina's exchange offers in 2005 and 2010. Official bilateral creditors in the Paris Club on the other hand have consistently rejected Argentina's restructuring offers. Moreover, Argentina has disregarded its international treaty obligations including to the IMF and the World Bank. Fortunately, this has been a very rare case in the recent history of sovereign debt restructuring. In every other case of the eleven sovereign debt restructuring episodes in recent times, the sovereign debtor has been able to negotiate with private creditors for a mutually acceptable restructuring deal on a fairly timely and orderly basis (Chart 12).

These experiences, both negative (a sovereign debtor being in messy litigation and excluded from international capital markets for more than a decade) and positive (every other sovereign debtor who seeks to negotiate with private creditors has been able to restructure its debt efficiently), should *serve to incentivize both sovereign debtor and private creditors to rely on voluntary and good-faith negotiation as the framework for orderly sovereign debt restructuring--as recommended by the* [Principles for Stable Capital Flows and Fair Debt Restructuring](#).

By the same argument, current discussions and efforts to improve the framework for sovereign debt restructuring, either via a statutory/legal approach or by clarifying the pari passu language in bond contracts--particularly the equal ranking of payment obligations clause--should *take care not to condone unilateral actions by the sovereign debtor and to weaken further creditor rights, particularly the right to seek redress in a court of law*. Doing so would bring to the fore the essentially unenforceable nature of claims on a sovereign debtor, elevating the uncertainty, risk and costs in sovereign debt markets to the detriment of all participants in global financial markets.

**10** 

Bank Credit to Private Sector
*percent, y/y*

Source: ECB

**11** 

Argentina: Dollar Bond Yields
*percent , weekly averages*

Source: Bloomberg, IIF calculations

**12**

Selected Sovereign Debt Restructurings of Private Held Debt

| | Public Debt | | | | |
|---|---|---|---|---|---|
| | Outst. prior to exchange | Eligible | Tendered | Participation | Holdouts |
| | $ billion | $ billion | $ billion | % | $ billion |
| Argentina, Feb 2005 | 171.0 | 81.80 | 62.20 | 76.0 | 19.60 |
| Belize, Feb 2007 | 1.1 | 0.55 | 0.55 | 98.1 | 0.01 |
| Cameroon, Aug 2003 | 8.1 | 1.10 | 0.87 | 80.0 | 0.24 |
| Dominican Rep., Jul-Oct 2005 | 5.1 | 1.25 | 1.21 | 97.0 | 0.03 |
| Greece, Mar 2011 | 462.0 | 271.72 | 260.00 | 95.7 | 11.72 |
| Indonesia, Sep 2002 | 128.8 | 1.30 | -- | -- | -- |
| Jamaica, Feb 2013 | 19.2 | 11.00 | 10.89 | 99.0 | 0.11 |
| Iraq, Jan 2006 | 111.8 | 17.60 | 16.90 | 96.0 | 0.70 |
| Serbia-Montenegro, Mar 2005 | 15.5 | 2.80 | -- | -- | -- |
| St. Kitts and Nevis, Mar 2011 | 1.3 | 0.15 | 0.15 | 96.8 | 0.00 |
| Uruguay, May 2003 | 14.4 | 5.35 | 4.98 | 93.0 | 0.37 |

Source: NBS, Bloomberg



# Special Feature I: Update on "Shadow Banking" Activities
*Progress has been made in addressing risks, but "shadow banking" remains under scrutiny*

### "Shadow banking" activities: benefits and risks

The term "shadow banking" is often used to refer to the activities of a variety of non-bank financial institutions and transaction patterns—providing alternative sources of funding and liquidity—that surged in the run-up to the financial crisis (Chart 1). In the U.S. and Euro Area, the size of these activities is very significant relative to the size of their financial systems; in other places, including the UK, Korea, China and Brazil, post-crisis growth has been rapid (Chart 2). *While the rise of "shadow banking" has often been seen as an expression of regulatory arbitrage, it is widely acknowledged that these activities can provide significant benefits* by increasing efficiency, diversification and mitigation of risks and providing increased liquidity and funding. But "shadow banking" can also be a source of systemic risk, especially if there are significant bank-like functions (e.g. transformation of maturity, credit, and liquidity) and when interconnectedness with the traditional banking system is strong.

### Rise and fall—and rise?—of U.S. "shadow banking" activities

In the course of the recent financial crisis "shadow banking" activities in the U.S.—perhaps better defined as an asset-based wholesale funding system (see the February 2011 CMM, *Understanding the 'Shadow Banking' System*) declined significantly. Overall the sector shrank from a peak of $20.87 trillion reached in Q1 2007 to $14.7 trillion at present—a drop of almost 30%. However, recent data indicate that in the U.S. this development may have come to a halt and that the declining trend is bottoming out. The deleveraging of U.S. consumers and the demise of subprime mortgage lending have resulted in an improvement in credit quality, helping spur a modest recovery in the issuance of asset backed securities (ABS) in 2012. Mortgage-backed securities (MBS) have benefitted from the gradually improving outlook for the U.S. housing market and the Fed's purchases under QE3. Money market funds (MMFs), which had experienced a 34% decline in AUM from $3.76 trillion (Q4 2008) to $2.47 trillion (Q2 2012) recently saw a slight increase to $2.65 trillion (Q4 2012). This is an important development, not least as MMFs are a key component of the asset-based wholesale funding system, providing direct funding for banks' short-term liabilities and investing in asset-backed commercial paper (ABCP).

### Progress on addressing potential systemic risks

Although smaller than before the crisis, the "shadow banking" system remains under scrutiny by regulators and policymakers, as noted in the Moscow G20 communiqué. However, *many of the problems of securitization of certain asset classes before the crisis have been corrected by changes in the market and post-crisis regulatory reforms*. These changes include regulations that align incentives of originators/sponsors with those of investors through risk retention requirements ("skin in the game"), greater disclosures, improvements in origination standards and ratings methodologies, etc. Although a balanced solution for the complex situation of MMFs remains elusive, it is an important goal. Finally, ongoing international initiatives—e.g. those of the Basel Committee and Financial Stability Board—need to be coordinated to assure sound regulation that allows non-bank finance to grow, especially in the Euro Area.



**1** Assets of Non-Bank Financial Intermediaries*
*USD trillions, 20 jurisdictions & Euro Area*                    *% of GDP*

Source: FSB *20 jurisdictions and Euro Area

Source: Federal Reserve, U.S. Flow of Funds

**2** Assets of Non-Bank Financial Intermediaries
*percent, share in total national financial systems*

U.S.
Euro area
U.K.
Japan
Korea
Hong Kong
Brazil
Singapore
China
Switzerland
India
Canada
Australia

■ 2011
■ 2005

Source: FSB

Source: Federal Reserve, U.S. Flow of Funds



**3** U.S. "Shadow Banking" System
*USD billions*

■ Money market mutual funds
■ ABS issuers
■ Agency- & GSE-backed sec.
■ GSE
■ Funding corp. net sec. loaned
■ Repo
■ Commercial paper

Source: U.S. Flow of Funds, Datastream

**Elif Aksoy**
1-202-857-3647
zaksoy@iif.com



# Special Feature II: Collateral Transformation

*A persistent shortage of high-quality collateral has led to efforts to "transform" lower-rated securities…*

Collateral transformation—via collateral swaps (brokered by banks between two counterparties for a fee) is not a new phenomenon. However, with many factors contributing to the shortage of high-quality collateral—including mandated centralized clearing of derivatives; new margin regulations for uncleared derivatives; likely restrictions on rehypothecation; market demand for better-quality collateral and more secured transactions; and the need for substantial amounts of unencumbered liquid assets for the Basel III Liquidity Coverage Ratio (LCR)—demand for collateral swaps has risen and is expected to rise further.

**Behind the rising demand for collateral swaps**

Collateral swaps can be used by market participants to obtain higher-quality collateral to post to central counterparties (CCPs) for derivatives trades (Chart 1) or to raise funds in the repo market. They differ from traditional repo, reverse repo and securities lending transactions in that they have different maturities and can involve lower quality, larger and more complex assets.

Changes in the regulatory environment, including revisions to the LCR have increase demand for high-quality collateral, in turn increasing demand for collateral swaps. Recent analysis from the European Banking Authority suggest that EU banks would have a €380 billion shortfall to comply with revised LCR rules as of June 2012. Regulatory mandates for centralized clearing add to this demand, while even governments are now encouraged to offer counterparties collateral on derivatives trades. Favorable treatment of collateral swaps under Solvency II could also encourage more supply. Recent IMF-led research documents a slowdown the re-use of pledged collateral (rehypothecation), meaning that fresh high-quality collateral is needed. Collectively, such factors—against a backdrop of more market demand for secured transactions—could contribute to a rapid increase in collateral transformation activity.

**Potential risks associated with collateral swaps**

Collateral swaps are typically done privately. While some observers note that they are effectively short-term secured lending and thus subject to existing capital and liquidity rules, many analysts argue that collateral swaps are not transparent—hence difficult to regulate. Regulators worry that risk management frameworks may not be adequate to deal with these transactions. Collateral swaps have been also criticized for simply "kicking risk down the collateral transformation chain" rather than mitigating risks related to a potential decrease in collateral value. The process also adds additional interlinkages and counterparty exposures among large financial and non-financial firms, and can also add complexity and risk in a regulatory context that requires more secured transactions when asset encumbrance is already high; the ECB reports that at mid-2012 banks had €2.5 trillion of collateral with the Eurosystem, up from €1.1 trillion in 2007.

**Interest in collateral swaps is on the rise**

According to a March 2013 U.S. Federal Reserve Senior Credit Officer Opinion Survey, around 80% of respondents noted that the net volume of their collateral transformation transactions was unchanged during 2012 (Chart 2). Moreover, only around 25% of respondents reported current activity to source high-

**1** Collateral Transformation: An Example



**2** Volume of Collateral Transformation Transactions
*percent of respondents*

**3** Interest in Collateral Transformation
*% of respondents having discussions with clients about prospective transactions*



Case: 12-105    Document: 952    Page: 207    04/22/2013    914956    239

**Elif Aksoy**
1-202-857-3647
zaksoy@iif.com



# Special Feature II:  Collateral Transformation (cont.)

## … resulting in concerns about potential systemic risks associated with the practice.

quality collateral for clients covered in the survey. However, about 30-60% of respondents noted frequent/some discussion of prospective transactions with clients. Gauging interest in trades allowing clients to provide high-quality collateral, some 20% of respondents reported some activity by dealers, pension plans and insurance companies. However, some 25-50% of respondents referenced some/frequent discussion of prospective transactions with all client types. Overall, hedge funds and insurance companies appear more likely to be engaged in discussions about sourcing high-quality collateral. For other client types levels of interest appear more balanced between sourcing and providing (Chart 3).

**Central clearing spurs demand for high-quality collateral**

Beginning this year, derivatives transactions will be required by many global regulators to be cleared at central counterparties (CCPs) which demand margins in the form of high-quality assets or cash. The benefits of netting derivative positions will also be reduced as trades are cleared through CCPs, sparking further demand for high quality collateral. According to a Bank of England study, additional margin requirements for credit default swaps could total $70-140 billion while those for interest rate derivatives could be $50-300 billion, depending on netting efficiencies (Chart 4 and 5). BCBS and IOSCO estimate $9-12 trillion for the whole $638 trillion derivatives market.

**Collateral swaps are a good source of revenue for dealers...**

Banks and other financial firms—which can use collateral swaps to raise cash in repo markets—are also a source of demand.  Revenue from this source could potentially offset costs to securities dealers from central clearing requirements. Major U.S. investment banks are reportedly increasing provision of collateral swaps; recent estimates suggest that provision of collateral management services for clients currently generates some $11 billion in annual revenue for dealers. Collateral management is clearly identified as an industry growth area.

**...and receive favorable treatment under Solvency II**

Although prior to the crisis pension funds and asset managers were the typical lenders of high-quality assets, insurance companies have been increasingly entering this market in the hopes of increasing the yield on their existing high-quality assets (An estimated 30% of insurance company assets consist of sovereign bonds). Some analysts estimate that under Solvency II, capital charges for collateral swaps are lower than even those for corporate credit and covered bonds, creating incentives for insurers to enter into collateral swaps (Chart 6).

**May help central securities depositories (CSDs) & custodians**

Like banks, CSDs and custodians are also looking to offset revenue loss amidst low interest rates and settlement volumes due to lower trading activity. Some CSDs and custodians already generate significant supplemental income via tri-party repo transactions; they could thus be well placed to play a significant role in collateral transformation. According to a recent study, 15% of collateral available to financial institutions is currently idle, costing the industry €4 billion a year. Active management of this collateral by CSDs and custodians could enhance returns or at least reduce the cost of carry.



**4** Interest Rate Swaps Initial Margin
*USD billion*

Legend: Pre-OTC Reform / Post-OTC Reform

Netting Efficiency: 95%, 96%, 97%, 98%, 99%

Source: Bank of England



**5** Credit Default Swap Initial Margin
*USD billions*

Legend: Pre-OTC reform / Post-OTC reform

Netting Efficiency: 90%, 91%, 92%, 93%, 94%, 95%

Source: Bank of England



**6** Solvency II Capital Charge vs. Return on Capital
*percent*

Categories: AAA structured credit, Equity, Direct property, Single A credit, AAA covered bond, Res. mortgages, Collateral swaps

Legend: Return on capital / Capital charge

Source: Quantitative Impacts Study, Dynamic Credit Partners Europe, Euromoney

**Emre Tiftik**
1-202-857-3321
etiftik@iif.com



# Special Feature III: Japan's 2006 QE Exit Strategy

*The success of the BoJ's exit strategy was mostly attributable to its clear communication on exit.*

With the U.S. economy improving, markets have shifted their focus on the exit from QE, particularly how it can be managed successfully. In this context, Japan's exit from QE in 2006 provides useful information on the potential impact of exit strategies on financial markets.

Following a period of zero interest rate policy (ZIRP) during February 1999–August 2000, the BoJ introduced QE in March 2001. Under this program, the BoJ enlarged its current account balance—a measure of deposits/reserves placed by financial firms with the BoJ—by purchasing a significant amount of JGBs while maintaining interest rates at virtually zero (Chart 1). As inflation began to emerge, the BoJ announced an end to QE on March 9, 2006 and reduced excess reserves significantly over just a few months. The first rate hike came in July 2006, four months after the exit decision.

Most assessments generally consider Japan's exit strategy a success, as it did not result in significant disruption in financial markets. The impact of the abrupt reduction of central bank excess reserves on JGB yields was muted. The yield on two-year JGBs increased by less than 35 basis points between March 9 and December 31. Moreover, after an initial decline the stock market recovered ground and yen depreciation continued until the onset of the U.S. subprime crisis, when the yen gained somewhat of a safe-haven status (Chart 2). The success of the BoJ's exit strategy was mostly attributable to:

- **The BoJ's credible communications on exit:** The BoJ made it clear that it would maintain its QE policy until core CPI increased to 0% (or greater) and remained there over several months, while at the same time BoJ board members began to forecast above-zero core CPI.

- **The *flexibility* of the exit strategy:** Financial markets were very concerned that the BoJ would start to sell a large amount of JGBs to reduce its balance sheet. However, taking account of market conditions, the BoJ reduced its balance sheet in an orderly fashion through adjustments in short-term money market operations without an immediate reduction of its JGB holdings. Indeed, the BoJ continued its regular purchases of these securities.

- **Market confidence about the adequacy of exit management tools:** New types of market operations were introduced to absorb excess liquidity, such as issuing central bank bills and paying interest on bank reserves.

Japan's experience suggests that the Fed could potentially end QE without leading to significant financial market disruptions. That said, however, completing the exit could be more challenging for the Fed given the significantly larger scale of QE program undertaken by the BoJ (Chart 3). Indeed, the increase in the Fed's balance sheet was rapid compared with that of the BoJ. Thus, the Fed could choose to exit from QE more slowly than the BoJ. Many observers suggest that the Fed's QE "pattern" (up fast, down slow) could in fact be opposite to that followed by the BoJ (up slow, down fast).

**BoJ's Current Account Balance**



Source: BoJ

**BoJ's QE Exit and Exchange Rate**



Source: Datastream and Bloomberg

**Central Bank Balance Sheets: Total Assets**



Source: Datastream



# Asset Performance in Perspective

*While risk assets have remained relatively resilient in recent weeks, uncertainty related to Cyprus and the Italian elections—along with weaker macro data, notably from Europe—have dented investor appetite for some asset classes.*



**1 Annual Returns for Selected Asset Classes**
*percent, 2013 ytd returns*

* GSCI; total returns. ** MSCI; total returns. *** Credit Suisse; total returns. ¹ Loan Performance, ytd. ² Moody's/REAL, ytd. ³ DXY index ****weighted avg of GIPS sov. bond price changes

Crude oil surged 5% in March, helped by expectations of higher demand from Asia and the U.S.; U.S. housing prices are now in positive territory year-to-date.



**2 Annual Bond Returns***
*percent, 2013 returns*

* Ranked by 2012 total returns; global corporate and U.S. Treasuries: Bank of America/Merrill Lynch indices; EM sovereign (EMBIG) and EM corporate (CEMBI Broad): JP Morgan indices.

After the Cyprus bailout, modest inflows returned to safe-haven sovereign bonds; however, the appeal of most high-yield bond categories appears little diminished.



**3 Emerging Market Equity and Sovereign Bond Returns**
*2013 returns, percent*

Red and blue, vertical lines are sov. Bonds and EM equity benchmarks respectively.

■ Sovereign bonds*
■ Equities**

* EMBIG index total returns. ** MSCI index total returns in USD-terms.

After starting 2013 on an optimistic note, EM equities are down year-to-date; concerns about currency risk as well as uncertainty regarding events in Europe have hurt.



**4 Change in Value of the U.S. Dollar**
*percent, 2013 ytd*

USD depreciation        USD appreciation

The euro is down over 5% from 2013 highs, amidst concerns about Cyprus, political uncertainty in Italy, and disappointing macro data.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan and IIF calculations, unless otherwise noted.

Case: 12-105   Document: 952   Page: 210   04/22/2013   914956   239



# Sovereign Debt Markets I Focus on Europe

*Concern about potential ripple effects from events in Cyprus are reflected in market perceptions of Euro Area sovereign and bank creditworthiness.*

**1** **Selected Euro Area 10yr Government Bond Spreads**
*bps,*



*\*7-years maturity*

While strains in Cyprus, unsurprisingly, put upward pressure on Cypriot and Greek bond yields...

**2** **Selected Euro Area Socvereign CDS Spreads**
*5-year CDS spreads, bps*



...market concerns about potential ripple effects were reflected in the CDS spreads of other Euro Area countries...

**3** **Europe: Sovereign, Financial & Corporate CDS Spreads**
*basis points, iTraxx WE SovX and IG corporate CDS*



...and of European banks more broadly.

**4** **Euro Area Bailouts**
*EUR billion and percent of GDP (in 2012)*



Source: European Commission, Eurostat

Aid for Cyprus, while small in absolute terms, is very large relative to the size of its economy.

**5** **Cyprus: General Government Balance and Debt**
*percent of GDP*



Source: European Commission

The sharp decline now seen in Cyprus' GDP—some 10-15% rather than the 3.5% projected for 2013 by the Troika, and more to come—will put upward pressure on the debt-to-GDP ratio.

**6** **Projected Change in Age-Related Spending, 2010-2050**
*percent of GDP*



New 2013 projections from S&P underscore that by 2050, long-term care, health care, and pension spending will add significantly to government expenditures.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 211    04/22/2013    914956    239



# Sovereign Debt Markets II
# U.S. and International

*Strains in European prompted flows to safe-haven bonds; Japanese bond yields also fell as the BoJ announced bold measures to fight deflation.*

**1** U.S. Treasury Yields
*percent*



While generally positive economic signals in late 2012 and early 2013 had put some upward pressure on U.S. bond yields, recent events in Europe prompted flows to Treasuries...

**2** U.S., German, U.K., & Japanese 10yr Gov't Bond Yields
*percent*



…and other "safe-haven" government bonds.

**3** S&P Sovereign Rating Upgrades and Downgrades
*number*



The clear trend in post-crisis sovereign ratings is of downgrades for investment-grade mature market countries, and on net, upgrades for high-yield emerging market countries.

**4** Gap between U.S. and Japanese 30-year Bond Yields
*percent*                                    *bps*



The decline in JGB yields has accelerated in the past month, as new Governor Kuroda has stated that the BoJ will adopt bold measures to achieve the target of 2% inflation within 2 years.

**5** 5-year Breakeven Inflation Rates 5 Years Forward
*percent, 5-day moving average*



While inflation expectations remain steady in the U.S. and have declined in recent weeks in the Euro Area, they stand at their highest since mid-2010 in the UK.

**6** Primary Dealer Positions Coupon and Repo Index
*'000 contracts*                                    *index*



*Treasuries of 3 years or less maturities

After the end of Operation Twist in December, U.S. primary dealers' holdings of short-term Treasuries fell sharply, reflecting high demand for these safe-haven securities.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105     Document: 952     Page: 212     04/22/2013     914956     239

# Bank Health Monitor I: International Banks

*European bank shares have declined markedly over the past month as events in Cyprus undermined confidence and prompted concerns about contagion.*

**1** **International Banks: Equity Market Returns**
*MSCI indices (USD returns), end-2006= 100*



Renewed strains in the Euro Area have driven bank equity prices sharply lower. The impact of recent events in Cyprus on EM and U.S. banks has been more muted.

**2** **U.S., European, and Japanese Banks Price-to-Book Ratio,** *MSCI indices*



In the Euro Area, the bank price-to-book ratio remains near historical lows, suggesting that the cost of issuing bank debt in the Euro Area remains very high relative to G4 peers.

**3** **European Bank CDS Spreads**
*basis points, 5-year CDS*



The CDS spreads of large European banks have widened since the announcement of the initial proposal for a Cyprus bailout on March 16.

**4** **Cross-border Claims\* on All Countries**
*percent, yoy*



Source: BIS; IIF calculations. *Cross-border claims by sector, immediate borrower basis (consolidated claims).

Cross-border banking flows remain limited, although bank funding conditions improved slightly during the second half of 2012.

**5** **Global Bank Divestiture, Jan 2007 - Dec 2012**
*USD billions*



Source: WSJ, MGI

As a part of the deleveraging process, large banks have significantly divested foreign operations since the start of the 2008 financial crisis.

**6** **Bank Lending to Private, Nonfinancial Sector**
*year-on-year percent change*



* Commercial bank C&I, consumer and real estate loans. ** M4 lending to private, nonfinancial corporations and to individuals. *** MFI loans to "other euro area residents".

Bank lending to the private sector remains robust in the U.S. while it continues to weaken in the Euro Area and U.K. despite ultra-easy monetary policy.

---

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 213    04/22/2013    914956    239



# Bank Health Monitor II
# European Banks

*Unfolding events in Cyprus, against the backdrop of continued concerns about the health of bank balance sheets, are weighing on the European banking sector.*

**1** **CDS Spreads of EU Banks by Rating**
*bps*



While A- or higher-rated bank CDS spreads are trading only modestly above pre-crisis levels, lower-rated banks are trading at multiples of pre-crisis levels.

**2** **GIIPS: Interbank Deposits by Origin**
*EUR trillions*



Banks in Greece, Ireland, Italy, Portugal and Spain have been losing cross-border deposits, which have been replaced by domestic deposits…

**3** **French Banks' Deposit Composition**
*EUR trillions*



…A similar trend is observable in France for non-EU cross-border deposits…

**4** **German Banks' Deposit Composition**
*EUR trillions*



…bot not in Germany.

**5** **Euro Area Nonperforming Loans**
*percent of total loans and debt*



The weak economic performance of the Euro Area has translated into higher levels of NPLs in some countries.

**6** **Slovenia: Nonperforming Loans and Core Tier 1 Ratios**
*percent*



As non-performing loans continue to weigh on bank capital levels in Slovenia, efforts to recapitalize the banking sector may be a key focus in 2013.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 214    04/22/2013    914956    239



# U.S. Flow of Funds Q4 2012

*Debt levels of U.S. financials and households continued to fall in 2012, while non-financial corporate debt levels increased. Household wealth has recovered to its highest level since 2007.*

**1  U.S. Nongovernment Domestic Debt**
*percent of GDP*



\* Includes corporate, nonfarm and farm business debt.

Unlike those of the financial sector, debt levels of the non-financial corporate sector continued to rise in Q4 2012 (though due in part to refinancing and maturity extensions).

**2  Quarterly Change in the Assets of U.S. Households**
*USD trillions*



Helped by higher bond and equity prices, U.S. household assets increased by $5.5 trillion in 2012.

**3  U.S. Housing Market Metrics**
*USD trillions*



Source: U.S. Flow of Funds

With tentative signs of recovery in the housing market, household net worth in real estate improved in 2012.

**4  U.S. Households Net Borrowing**
*USD billions*



U.S. consumer credit rose more than $200 billion in Q4 2012—the highest increase since 2008.

**5  U.S. Bank Liabilities: "Shadow" v. Traditional Banking**
*USD trillions*



Source: Federal Reserve of New York, U.S. Flow of Funds

Liabilities of "shadow banks" continued to decline in Q4 2012, dropping below the liabilities of traditional banks.

**6  Holdings of Cash and Other Liquid Assets\***
*percent of GDP*                          *percent of GDP*



\* Each sector's holdings of (1) foreign deposits, (2) checkable deposits and currency, (3) time and savings deposits, and (4) money market fund shares.

Cash accumulation by U.S. non-financial corporates has slowed in recent years although corporate cash remains at historically high levels.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 215    04/22/2013    914956    239



# Interbank Market Strains

*After improving significantly during the second half of 2012 and early 2013, conditions in European short-term and dollar funding markets have deteriorated slightly in recent weeks.*

**1 Term Interbank Market**
*3-month Libor/Euribor less overnight index swaps, bps*



Uncertainty about the impact of events in Cyprus, and the Italian elections, have prompted a slight deterioration in conditions in European short-term...

**2 One-year Cross-currency Basis Swaps\***
*bps*



\* Swap rate reflects the premium/discount paid on non-U.S. dollar interest rate.
\*\* 6m Euribor/3m USD Libor. \*\*\* 3m GBP Libor/3m USD Libor.

...and dollar funding markets. However, the expectation of continued support from the ECB has helped limit the damage.

**3 Emergency Liquidity Assistance**
*EUR billions*



Reflecting an improvement in funding conditions in late 2012 and early 2013, banks' reliance on the ECB's Emergency Liquidity Assistance has declined.

**4 Liquidity Surplus and Eonia**
*EUR billions, 20-day mav*



Excess liquidity has also declined rapidly in recent months, due to LTRO repayments and less ECB borrowing. However, the impact on short-term rates has been muted.

**5 One Month GC Rates for Selected Euro Area Countries**
*percent*



After months of being at negative levels, amidst high demand for Bunds, German general collateral rates have edged up into positive territory this year.

**6 Maturity Analysis of European Repo Market**
*percent*



The share of repo transactions with more than one year to maturity fell sharply in 2012, suggesting this form of longer-term financing has been partially replaced by 3-year LTROs.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105     Document: 952     Page: 216     04/22/2013     914956     239



## Credit Markets

*Prices of U.S. high-yield corporate bonds and leveraged loans are over 60% and 30% higher than pre-crises peaks; high-yield default rates remain very low.*

**1  High Yield Corporate Bond Spreads**
*bps, option-adjusted spreads*



Source: Merrill Lynch

High-yield corporate bond spreads have ticked up in recent weeks, particularly in Europe, although they remain at multi-year lows.

**2  U.S. Leveraged Loan and HY Corporate Bond Returns**
*index levels*



U.S. high-yield corporate bonds and leveraged loans are 63% and 34% higher than their pre-crisis peaks respectively, while global equities have still not regained pre-crisis levels.

**3  Global High-yield Default Rates**
*percent*



Source: S&P

Global high-yield default rates generally remained at low levels in 2012, except default rates for bonds CCC+ and lower.

**4  Share of High Yield Corporate Issuers in Europe**
*percent*



Source: S&P

The share of high-yield issuers in total issuance rose from below 4% pre-crisis to 11-12% in 2012.

**5  Global Structured Finance: Change in Credit Quality**
*Average number of notches changed by S&P*



Transactions collateralized by auto and corporate debt constituted a large percentage of positive ratings actions in 2012. However CMBS and RMBS ratings continued to deteriorate.

**6  U.S. Consumer Debt Delinquencies**
*percent of balance 90+ days*



The delinquency rate for U.S. student loans continued to increase in last quarter of 2012.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Capital Markets Monitor
April 2013                                    18                                    

# Emerging Markets I
*In recent months emerging market equities have been weaker, while the EMBIG spread has widened modestly.*

**1 Emerging Market Equity Indices by Region**
*MSCI indices (USD returns), end-2011 = 100*



Emerging market equities have been weak across the regions in recent weeks, hurt by perceptions of higher risk in Europe.

**2 Emerging Market Sovereign Bond (EMBIG) Spreads**
*percent*                                                    *bps*



Similarly, rising yields on EM hard-currency bonds, coupled with a decline in Treasury yields, have left he EMBIG spread some 20-30 basis points higher in recent weeks.

**3 Composition of Projected EM Age-Related Spending**
*percent of GDP, 2010 - 2050*



Source: S&P

Among emerging markets studied in recent S&P research , Turkey and Brazil are projected to have highest levels of age-related spending in 2050.

**4 Annual Corporate Defaults by Number of Issuers**
*number of issuers*                                    *number of issuers*



Defaults among EM corporate issuers accounted for about 30% of global corporate defaults by issuer count – the highest in the 16 years.

**5 Average Upgrade/Downgrade Since 2007***
*notches*



Source: Ratins agencies, FT. *countries weighted by size of bond market

Sovereigns in Latin America and EM Asia have gained 1-2 notches on average, in contrast to those in developed Europe which have suffered downgrades.

**6 Top and Bottom Upgrades and Downgrades**
*avg change in rating (notches), since 2007*



Source: FT, rating agencies

Among emerging markets sampled, Uruguay and Bolivia have been upgraded more than 3 notches whereas Hungary and Egypt have been downgraded more than 4 notches.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 218    04/22/2013    914956    239



# Emerging Markets II: Focus on EM Europe

*After slowing during much of 2012, the pace of lending in Turkey and Poland has edged up slightly in recent months; loan growth in both Russia and Turkey remains very strong.*

**1** **Turkish Banks: Lending**
*percent, yoy*



Source: Turkish Banking Regulations and Supervision Agency

Although bank lending growth in Turkey slowed during much of 2012, it has edged up slightly in year-on-year terms in recent months, and remains quite strong.

**2** **Turkish Banks: Non-Performing Loans**
*percent of total loans*



Source: Turkish Banking Regulation and Supervision Agency

Reported non-performing loan ratios remain around 3% for Turkish banks.

**3** **Polish Banks: Lending**
*percent, yoy*



Source: National Bank of Poland

Bank lending growth in Poland has decelerated substantially since late 2011, but has improved slightly in recent months.

**4** **Polish Banks: Impaired Loans**
*percent of total loans*



Source: National Bank of Poland

Although the impaired loan ratio for Polish consumer lending has hovered near 7-8% in recent years, for non-financial corporates this ratio has been increasing—currently near 12%.

**5** **Russian Banks: Lending**
*percent, yoy*



Source: Central Bank of Russia

Although bank lending growth in Russia has slowed since late 2012, it still remains very high —13% and 34% year-over-year for corporate and retail bank lending respectively.

**6** **Russian Banks: Non-performing Loans**
*percent of total loans*



Source: Central Bank of Russia

Reported non-performing loan ratios remain near 4-5% for Russian banks, down from post-crisis peaks.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 219    04/22/2013    914956    239



## Emerging Markets III: Focus on China

*Strong credit growth is supporting real estate prices and cross-border acquisitions in China; Chinese banks' reported non-performing loan ratios remain at historically low levels.*

**1 Chinese Total Social Financing**
*RMB trillion*



Source: NBS, IIF calculations, Bloomberg

Chinese total social financing, a measure of credit from bank and non-bank sources, reached almost RMB 100 trillion in February.

**2 Chinese Residential Real Estate Prices**
*percent, yoy growth rate*



After declining through last year on year-over-year terms, Chinese real estate prices across the country have risen year to date.

**3 Chinese Local Gov't Investment Vehicles: Bond Issuance**
*CNY billions*



Source: Barclays

Chinese banks also make loans to local government financing vehicles, which have been issuing an increasing amount of debt to finance infrastructure projects.

**4 Chinese Bank Non-Performing Loan Ratios**
*percent*

Source: PBOC

Chinese banks' non-performing loan ratios as reported by the CBRC are at historically low levels.

**5 Chinese Cross-Border Bank Acquisitions**
*USD billions*



Source: Dealogic

Chinese banks have increased overseas acquisitions as they look to expand in emerging markets.

**6 Renminbi Appreciation Against U.S. Dollar**
*percent*




The Chinese renminbi has appreciated 0.6% year to date—a much stronger pace than last year, approaching that of 2011, when the RMB gained nearly 5%.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 220    04/22/2013    914956    239



# Equity Markets

*Although both U.S. and European equities started 2013 on a strong note, European equities have been hit by political and policy uncertainties. Gains in U.S. equities have been supported by strong U.S. corporate profits.*

**1** **Global Equities: Developed and Emerging Markets**
*MSCI indices (USD returns), end-2009 = 100*



Emerging market equities have significantly underperformed mature market equities year to date.

**2** **U.S. vs. Euro Area Equities**
*MSCI indices (USD returns), end-2009 = 100*



Although both U.S. and European equities started 2013 on a strong note, European equities have been hurt by economic and political uncertainty.

**3** **S&P 500 vs. U.S. Corporate Profits**
*index*                                    *USD billions*



Gains in U.S. equities have been be supported by strong U.S. corporate profits…

**4** **Dividends and Buybacks at S&P 500 Companies**
*USD billions          dividends &buybacks as % of net income*



...although U.S. corporates have been using their profits in part for dividends and share buybacks rather than investment.

**5** **U.S. and European IPO Indices**
*index, track performance during the first year following IPO*



In tandem with increased IPO activity, U.S. IPO shares have performed well year to date; however, the same has not been true for European IPO shares.

**6** **Margin Debt and S&P 500 Index**
*billions                                        index*



The use of margin debt, or loans to buy stocks, has reached its highest level since its 2007 peak—a traditional signal of investor optimism.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 221    04/22/2013    914956    239



# Currency Trends

*The euro and sterling have lost ground in recent weeks, while the yen has depreciated markedly against the dollar. The Brazilian central bank intervened to weaken the real.*

**1   Net Euro Short Positions vs. Trade-Weighted Euro**
*Contracts, '000s                    Nominal index, 2000=100*



After moving back into positive territory in late 2012 and early 2013, net euro short positions have turned negative; the trade-weighted euro has lost over 3.5% since early February.

**2   Sterling vs. the Euro Area Economic Surprise Index**
*index                                                        EUR/GBP*



Sterling's performance against the euro has been tending to track developments in the Euro Area economy.

**3   Value of Dollar-Denominated Assets in Japanese Mutual Funds vs. Japanese Exchange Rate**
*Yen trillions                                          JPY/USD*



Source: Investment Trusts Association Japan

As the yen continues to depreciate, Japanese investors have begun to buy more dollar-denominated assets at the expense of yen-denominated assets.

**4   Selected Emerging European Currencies**
*index, end-Dec 2011 = 100, vis-a-vis EUR*



The forint has declined sharply against the euro this year, due in part to the decision to cut policy rates; in contrast the zloty has been steady and the lira has appreciated.

**5   Selected Latin American Currencies**
*index, end-Dec 2011 = 100, vi-a-vis USD*



After a steep climb in early 2013, the Brazilian real weakened following central bank intervention in March; encouraging U.S. macro data supported the Mexican peso.

**6   Egyptian Pound: Exchange Rate and FX Reserves**
*EGP per USD                                     billions of USD*



The Egyptian pound has declined 10% against the dollar since November; Egypt's FX reserves dipped to $13.5 billion in February.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Capital Markets Monitor 

April 2013                                23

# Commodities

*The early 2013 rally in commodity prices has proved short-lived compared with those of previous years. One of the reasons for this may be strong growth in the supply of some commodities.*

**1  Commodity Spot Price Comparisons**
*index, rebased end of previous year = 100*



The rally in commodity prices early in 2013 has proved short-lived compared with those of previous years.

**2  U.S. Stock Prices vs. Commodity Prices**
*index*                                          *GSCI index*



Hurt by signs of weakness in some macroeconomic indicators, notably from Europe, commodity prices have been underperforming U.S. equities.

**3  Supply Growth in Selected Commodities**
*percent, yoy*



Source: Barclays

A number of major commodities have seen significant growth in supply both in 2012 and in 2013 year-to-date (with corn a notable exception this year).

**4  Commodity Flows by Sector**
*USD billions, 3 months mav*



Source: Barclays

Precious metals funds saw sharp outflows in February, driven mainly by weak gold prices.

**5  Gold Prices in Different Currencies**
*index, rebased end-2011 = 100*



Although gold prices have decreased more than 10% since late 2012, gold prices in yen have risen by 9%.

**6  Oil and Natural Gas Prices**
*USD per barrel*                                 *USD per Btu*



Low prices for U.S. natural gas relative to oil provide a strong incentive to substitute more natural gas.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 223    04/22/2013    914956    239



# Mutual Fund Flows

*Mutual funds across the board started 2013 on a strong footing, although the pace of inflows has slowed in recent weeks.*

**1  U.S. Money Market Mutual Fund Assets**
*USD billions*



Source: ICI

U.S. money market funds saw inflows in January, due in part to the expiration of Transaction Account Guarantee Program.

**2  U.S. Equity Mutual Fund Flows vs. S&P 500 Index**
*USD billions*                              *S&P index*



Despite strong U.S. equity performance U.S. equity fund flows have remained subdued.

**3  U.S. Municipal Bond Flows**
*USD millions, 8-week mav*



Source: ICI

U.S. municipal bond funds have had fairly consistent inflows during most of 2012 and 2013, following sharp outflows in 2011 when concerns about municipal budgets ran high.

**4  Developed Europe Equity Fund Flows**
*USD billions, from dedicated funds, 6wk mav smoothed*



In tandem with the weakness in European equity markets, European equity funds have seen a sharp decline in inflows in recent weeks.

**5  Emerging Market Funds: Debt and Equity Net Flows**
*USD billions, FI includes hard and local currency funds*



EM equity and bond funds saw inflows of around $42 billion and $18 billion year to date. However the pace of inflows slowed in February and March...

**6  Emerging Market Regional Equity Fund Flows**
*USD billions, from dedicated funds, 3wk mav smoothed*



...driven mainly by the slowdown in flows to dedicated Emerging Asia funds.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.

Case: 12-105    Document: 952    Page: 224    04/22/2013    914956    239



# Issuance

*The first quarter of 2013 saw an even higher level of high-yield corporate bond issuance than previous quarters; other sectors also saw strong issuance. After several weak years, global IPOs started 2013 on a high note as well.*

**1 Global Corporate Bond Issuance***



First quarter of 2013 saw a record level of high-yield corporate bond issuance—even higher than high levels seen in previous quarters.

**2 Global IPO Volumes**



After several weak years, global IPOs started 2013 on a strong footing.

**3 U.S., U.K. and Euro Area Bank Bond Issuance**



U.S. and European Bank bond issuance started 2013 fast; Q1 2013 issuance was higher than those of previous quarters.

**4 European Hybrid Issuance Volume**



*data to March 8, 2013. Source: Standard & Poor's

Issuance of European hybrid corporate debt in surged this year with €8.2 billion, already topping the €5.2 billion in volume for all of 2012.

**5 GIIPS Sovereign Bond Issuance**



Total sovereign bond issuance in Greece, Italy, Ireland, Portugal and Spain amounted to highest level since Europe's crisis erupted.

**6 Emerging Markets Corporate Bond Issuance**



Emerging market corporate bond issuance kept its strong pace also in first quarter of 2013.

Source for all data is Bloomberg LP, Datastream, J.P. Morgan, Thomson Reuters and IIF calculations, unless otherwise noted.



# Glossary

**ABX.HE** – Index representing aggregate performance of a basket of credit default swaps on subprime residential mortgage-backed securities (RMBS). The composition is scheduled to change every six months and include a new set of 20 subprime RMBS deals closed in the prior six months. [www.markit.com]

**Asset-backed commercial paper** (ABCP) – Commercial paper (CP) whose principal and interest payments are derived from cash flows from an underlying pool of assets. In the event that CP cannot be reissued in order to repay maturing CP, a backstop liquidity facility is typically drawn upon to provide cash to repay investors.

**Asset-backed securiti**es (ABS) – Bonds or notes backed by pools of financial assets. Examples of such assets include residential mortgages (RMBS), commercial mortgages (CMBS), credit card receivables, trade receivables, student loans, and auto loans.

**Auction rate security** (ARS) – Securities with usually long-term maturities where the interest or dividend rate resets periodically to the rate produced in an auction. The frequency of periodic auctions varies, with common reset periods being daily, 7 days, 28 days, 35 days, 49 days and six months. [www.sifma.org]

**Breakeven inflation rate** – The rate of inflation that would give an investor the same return at maturity on a nominal security and a treasury inflation-protected security. [see Federal Reserve's *The TIPS Yield Curve and Inflation Compensation*.]

**CMBX** – Index representing aggregate performance of a basket of credit default swaps on commercial mortgage-backed securities (CMBS). The composition is scheduled to change every six months and include a new set of 25 CMBS deals closed in the prior six months. [www.markit.com]

**Conforming mortgage** – Residential mortgage that meets the eligibility requirements for purchase by Fannie Mae or Freddie Mac (US mortgage government sponsored enterprises). The limit for one-unit properties was $417,000 in 2007, but recent legislation has raised this limit in many locations at least through the end of 2008. [www.ofheo.gov]

**Constant proportion debt obligation** (CPDO) – An investment vehicle backed by an investment in an index of debt securities—commonly the sale of credit protection on credit default swap indices such as CDX or iTraxx. Two specific characteristics of CPDOs: (1) they cease investing when their profits are sufficient to ensure return of principal and coupon to their investors; and (2) the further a CPDO is from achieving its profit goal the more leverage it employs.

**Credit default swap** (CDS) – A type of credit derivative contract whereby the protection seller agrees to pay the protection buyer the settlement amount upon the occurrence of certain credit events (e.g., bankruptcy). In exchange for this protection, the protection buyer pays the protection seller a premium. The premium is usually quoted in basis points per notional value of the contract—one basis point on a credit default swap on debt with a $10 million notional value is equal $1,000 per year.

**LCDX** – Index with 100 equally-weighted underlying single-name loan-only credit default swaps (LCDS). The default swaps each reference an entity whose loans trade in the secondary leveraged loan market and in the LCDS market. [www.markit.com]

**LevX senior** – Index of the 35 most liquid 1st lien credit agreements traded in the European Leveraged Loan CDS market. [www.markit.com]

**LevX subordinated** – Index of the 35 most liquid 2nd and 3rd lien credit agreements traded in the European Leveraged Loan CDS market. [www.markit.com]

**Jumbo mortgage** – A conventional single-family mortgage with an original balance above the conforming loan limit (see "conforming mortgage"). [www.ofheo.gov]

**Overnight index swap** (OIS) – A fixed/floating interest rate swap with the floating leg tied to a published index of a daily overnight rate reference (e.g, effective federal funds rate). Terms generally range from one week to two years. The two parties agree to exchange at maturity, on the agreed notional amount, the difference between interest accrued at the agreed fixed rate and interest accrued through geometric averaging of the floating index rate.

**Stop-out rate** – The lowest accepted interest rate in a term auction facility auction (see "term auction facility").

**Term auction facility** (TAF) – A credit facility of the US Federal Reserve that allows a depository institution to place a bid for an advance from its local Federal Reserve Bank at an interest rate that is determined as the result of an auction. The TAF will auction term funds of approximately one-month maturity. All depository institutions eligible to borrow at the discount window are eligible to participate in TAF auctions, and all TAF credit must be fully collateralized. [www.federalreserve.gov]

**Variable interest entity** (VIE) – Formerly known as special purpose vehicles, VIEs are leveraged off-balance sheet vehicles that generally hold financial assets, including loans or receivables, real estate or other property, and fund themselves by selling short-term debt backed by the financial assets they hold. Structured investment vehicles (SIVs) are one type of VIE.

# EXHIBIT J



# COUNTRY UPDATE

  

TRENDS | ANALYSIS | IDEAS

April 1, 2013

# Argentina Economic Update

**BONY: Agent Or Trustee?**

The government of Argentina presented the long-awaited offer to the holdout community last week. The offer came more or less in line with market expectations, or at least in line with what "should" have been expected by the markets. According to the text presented to the New York Appeals Court, Argentina will offer holdout investors the capacity to exchange their bonds for 2038 Par bonds if they hold bonds with nominal value below €50,000, and will offer discount bonds (2033) for the remainder of the bondholders. The past due interest will be paid in cash for par bond holders and through 2017 Global bonds for the discount bond option. In both cases the offer carries a GDP-warrant. Bottom-line, the government decided to stick to its guns and offered holdouts very much the same thing that it offered to the participants in the 2010 debt exchange. The new offer has, in our view, little chance of making a difference on the future decision of the appeals court.

**Alberto J. Bernal**
Head of Research and Partner
abernal@bulltick.com
+1 786.871.3743

We are hearing that Buenos Aires has advanced materially in an eventual "Plan B". There is one very clear fact here. Argentina WILL NOT pay the holdout community with reserves and in a lump sum, as Judge Griesa's ruling orders. In our view, Plan B will include jurisdiction change (Buenos Aires and perhaps Italy?), a reopening of the swap for holdout investors that are not included in the group that is currently litigating with Argentina, and perhaps even a buyback offer for NY-law debt (that would then be in default following an eventual adverse decision from the NY Court system).

*In terms of our recommendations, we reiterate our view that the current quandary between Argentina and the NY courts will only INCREASE the willingness of the Fernandez de Kirchner administration to pay the public debt.* We think those bonds under the purview of Buenos Aires law (Bonar 13's, Boden 15's, Bonar 17's, just to present some examples) remain quite safe and we continue to argue that NY-Law provincial debt remains safe, even that of the Province of Buenos Aires. Mark-to-market risk will obviously come into play once the decision from the Appeals Court hits, of course, assuming that the Appeals Court decides to the BONY in the injunction. We reiterate that we continue to think that the declaration of a technical default will not generate severe macroeconomic problems in Argentina because the country has been living in financial autarky for years.



**An Offer That Came In Line With What "Should" Have Been Expected**

The government of Argentina presented the long-awaited offer to the holdout community last week. The offer came more or less in line with market expectations, or at least in line with what "should" have been expected by the markets. According to the text presented to the New York Appeals Court, Argentina will offer holdout investors the capacity to exchange their bonds for 2038 Par bonds if they hold bonds with nominal value below €50,000, and will offer discount bonds (2033) for the remainder of the bondholders. The past due interest will be paid in cash for par bond holders and through 2017 Global bonds for the discount bond option. In both cases the offer carries a GDP-warrant. Bottom-line, the government decided to *stick to its guns* and offered holdouts very much the same thing that it offered to the participants in the 2010 debt exchange. The new offer has, in our view, little chance of making a difference on the future decision of the appeals court.

**VENEZUELA--5-Year Spread Versus Argentina (In bps). Sources: Bloomberg, Bulltick Capital Markets**



**In fairness, the reality is that Argentina did not have many alternative options to offer because of the "lock-law" and because of the covenants of the 2005 restructured bonds, which prohibit the government of Argentina from offering holdout investors better terms than those offered to investors who participated in the debt restructuring deal offered.** Also of relevance, Argentina included in the letter to the Court the view that offering holdout investors better terms than those who restructured would have violated the *pari-passu* right of holders of restructured debt. Argentina's lawyers argued that the Republic would never agree to pay "speculators" abnormal profits and stated, *"agreeing to Judge Griesa's solution would cause great harm to the exchange bondholders while giving plaintiffs a return that is exorbitant on its face, and even more so when one takes into account the estimated purchase price of the majority of plaintiffs' debt…..for example, for NML, which purchased its beneficial interest in the bonds for $48.7 million, the rate of return would be 80.2% per annum, and 1,380% in total."*

The relevant questions going forward: (1) Will the Bank of New York (BONY) remain hostage to this situation, meaning that the bank is seen as an agent of the government and not as a trustee to performing bondholders? If the appeals court upholds the decision of Judge Griesa "as is", then the holders of performing debt would be logistically impaired from being paid in the future –worse case scenario. (2) Will ISDA declare an event of default ex-post the declaration of an eventual technical default by the rating agencies? And (3) if so, will Euro-denominated debt holders accelerate their payments? On this point, we doubt that such will be the case. Why? Because if holders accelerate, they will NOT get paid, and if they don't accelerate, they will most likely continue to be paid interest on their bonds. (4) Will Argentina go to the Supreme Court? The Republic will most likely study that appeal possibility, but ONLY if an appeal does not oblige Argentina to deposit in an escrow account the size of the pending award.

We are hearing that Buenos Aires has advanced materially in an eventual "Plan B". There is one very clear fact here. Argentina WILL NOT pay the holdout community with reserves and in a lump sum, as Judge Griesa's ruling

orders. In our view, Plan B will include jurisdiction change (Buenos Aires and perhaps Italy?), a reopening of the swap for holdout investors that are not included in the group that is currently litigating with Argentina, and perhaps even a buyback offer for NY-law debt (that would then be in default following an eventual adverse decision from the NY Court system).



**ARGENTINA--Histogram Of Hypothetical USD Warrant Prices (Y-Axis, Number Of Observations). Source: Bulltick Capital Markets**

**In terms of our recommendations, we reiterate our view that the current quandary between Argentina and the NY courts will only INCREASE the willingness of the Fernandez de Kirchner administration to pay the public debt.** We think those bonds under the purview of Buenos Aires law (Bonar 13's, Boden 15's, Bonar 17's, just to present some examples) remain quite safe and we continue to argue that NY-Law provincial debt remains safe, even that of the Province of Buenos Aires. Mark-to-market risk will obviously come into play once the decision from the Appeals Court hits, of course, assuming that the Appeals Court decides to the BONY in the injunction. **We reiterate that we continue to think that the declaration of a technical default will not generate severe macroeconomic problems in Argentina because the country has been living in financial autarky for years.**

# ABOUT US & CONTACTS

**About Bulltick Capital Markets**

Bulltick Capital Markets is a full-service investment bank specialized in Latin America. The firm offers a variety of diversified financial products and services with local know-how and international expertise. Its client base is comprised of established financial institutions and qualified investors in Latin America, as well as of the international financial community with investment interests in the region. Bulltick is headquartered in the United States, with offices in Miami, Mexico City, and Bogota.

**Our Research Resources**

With Bulltick's vast Latin American in-roads, resources and networks, our research team is strategically positioned to provide value-added research on local and regional companies, markets and industries. With analysts in the region, along with management road shows, we are able to track the pulse of the leading markets in Latin America. We make it our business to know the business of the region, so we can help our clients manage volatility with in-depth coverage of macroeconomic leading sectors and market-moving events.

| Alberto Bernal | +1 305 533-1541 | abernal@bulltick.com | Macro Economic Strategy |
|---|---|---|---|
| Kathryn Rooney Vera | +1 305 533-1541 | krooney@bulltick.com | Macro Economic Strategy |
| Jose E. Costa | +1 305 533-1541 | jcosta@bulltick.com | Sales & Trading |
| Klaus Spielkamp | +1 305 533-1541 | klaus@bulltick.com | Fixed Income Sales |
| Rodrigo Covian | +1 305 533-1541 | rcovian@bulltick.com | Fixed Income Sales |
| Victor Gutierrez | +1 305 533-1541 | vmgutierrez@bulltick.com | Fixed Income Sales |
| Adolfo Lazaro | +1 305 533-1541 | alazaro@bulltick.com | Equity Trading |
| Eduardo Saenger | +1 305 533-1541 | esaenger@bulltick.com | Head Sales Trader |
| Jorge Obieta | +1 305 533-1541 | jobieta@bulltick.com | Sales & Trading |
| Fernando Tizon | +1 305 533-1541 | ftizon@bulltick.com | FX Spot & Derivatives Desk |
| Deborah Ausina | +1 305 533-1541 | dausina@bulltick.com | FX Spot & Derivatives Desk |
| Carlos Daniel Ruiz | +571 317 9638 | cdruiz@bulltick.com | Head Representative of Bulltick Colombia |
| Laura Morales | +571 317 9638 | lmorales@bulltick.com | Representative of Bulltick Colombia |
| Alejandro Creixell | +52 (55) 5246 7020 | acreixell@bulltick.com | Managing Partner |
| Erwin Starke | +52 (55) 5246 7020 | estarke@bulltick.com | Head of Capital Markets Mexico |

**ANALYST CERTIFICATION**

The analyst(s) primarily responsible for the preparation of this report hereby certify that all the views expressed herein accurately reflect their personal views only. The analyst(s) also certify that no part of their compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.

**IMPORTANT DISCLOSURES**

Principal/Agency Trading:
Bulltick and its affiliated entities, employees, officers, and directors may deal on a principal and/or agency basis in transactions involving currencies, markets, sectors and/or securities referred to herein (or related derivatives or other instruments related thereto), including in transactions which may be contrary to any recommendations contained herein.
The Firm's Analysts may interact with sales and trading personnel in the ordinary course of business. Such sales and trading personnel may trade and/or have proprietary positions in the securities (or in related derivatives) that are the subject of this report, and the Firm's interest may conflict with the interests of investors in those instruments.

Analyst Compensation:
The costs and expenses of research, including the compensation of the analyst(s) that prepared this report, are paid out of the Firm's total revenues, a portion of which are generated by fixed income division and investment banking activities.

Conflict Management:
Fixed income personnel report to the head of fixed Income and are not subject to the direct or indirect supervision or control of any other Firm department (or members of such department).

**OTHER DISCLAIMERS**

Bulltick and its subsidiaries, affiliates, shareholders, directors, officers, employees, and licensors ("The Bulltick Parties") will not be liable (individually, jointly, or severally) to you or any other person as a result of your access, reception, or use of the information contained in this document for indirect, consequential, special, incidental, punitive, or exemplary damages, including, without limitation, lost profits, lost savings, and lost revenues (collectively, the "Excluded Damages"), whether or not characterized in negligence, tort, contract, or other theory of liability. The information contained in this document has been obtained from sources believed to be reliable, although its accuracy and completeness cannot be guaranteed. All opinions, projections and estimates constitute the judgment of the author as of the date of the report and these, plus any other information contained herein, are subject to change without notice. Prices and availability of financial instruments mentioned are also subject to change without notice.

Bulltick and its affiliated companies have not taken any steps to ensure that the recommendations referred to in this report are suitable for any particular investor. The Report is for informational purposes only and is not intended as an offer or solicitation for the purchase or sale of any financial product. Securities and financial products mentioned in the report are subject to investment risks, including the possible loss of the principal amount invested.

The financial instruments mentioned in this document may not be eligible for sale in some countries. The Report is not to be construed as providing investment services in any jurisdiction where the provision of such services would be illegal.

Investing in non-US securities or markets, may entail additional risks. Securities of non-US issuers may not be registered with, and may not be subject to the reporting requirements of the US Securities and Exchange Commission. There may be limited information available on foreign securities or markets. Foreign companies are generally not subject to uniform audit and reporting standards, practices, and requirements comparable to those in the US. Investments in foreign markets may be less liquid and their prices more volatile than those comparable in US. In addition, exchange rate movements may have an adverse effect on the value of an investment in a foreign market.

The information contained in the report is privileged and confidential and intended solely for the recipients who have been specifically authorized to receive it and it may not be further distributed. Bulltick and its affiliates accept no liability whatsoever for the actions of third parties. Should you receive this message by error you are hereby notified that any disclosure, reproduction, distribution, or use of this message is strictly prohibited.

The Report may provide the addresses of, or contain hyperlinks to, websites, except to the extent to which the Report refers to website material of Bulltick, the Firm takes no responsibility for, and makes no representation or warranties whatsoever as to, the data and information contained therein. Such address or hyperlink is provided solely for your convenience and information and the content of the linked site does not in any way form part of this document. Accessing such website or following such link through the Report or the website of Bulltick shall be at your own risk and Bulltick shall have no liability arising out of, or in connection with, and such reference website.

# EXHIBIT K

*Ambito Financiero*

## Proper and timely payment is promised (where is still being looked at)

Monday, October 29, 2012

By Guillermo Laborda

The ruling by the U.S. Court of Appeals for the Second Circuit will be history.  Now, the government is faced with different paths, each one of them with forks that lead to unknowns.  This is because of the repercussions in the financial markets, as well as the legal consequences, not to mention relations with the U.S.  It doesn't seem to be a rose garden up ahead, more like the end of a chess match.

It's clear that the government will not negotiate with vulture funds.  "While I am president, they can keep the frigate, but nobody will end up with the liberty, sovereignty and dignity of this country," said Cristina exactly one week ago in the Bicentennial Museum.  One less path to analyze.  Whatever measure the government takes, it will never negotiate a payment scheme with the holders of the debt that is still in default.

It is now Thomas Griesa's turn.  He has to determine the formula that is applied to prorate the payments that Argentina makes to the holders of instruments arising from the 2005 and 2010 debt swaps, as well as to the holders of bonds still in default (mostly the vulture funds NML, Aurelius, among others).  Argentina won't act yet, since Griesa's decision will automatically go to the Court of Appeals "for more consideration ... without the need of a new appeal."  This process could take a couple of months.  For this reason it is said that the ruling of the American court is not finished and is lacking a part.  It also remains to be analyzed, as the last paragraph of Friday's ruling states (see full text at www.ambito.com), what it will mean for third parties, like the banks, the custodial agents for the bonds.

It is not clear whether the injunction is in force.  Logic would say it isn't in force because there isn't certainty on how it would be applied.  For this reason, the government believes that the 2012 payments are not affected by what was decided last Friday.  The  definitive path will be known when the government appeals the finished ruling, complete with the payment formula from Griesa, to the U.S. Supreme Court:  it's almost impossible for a federal decision to be reversed when the first and second levels agreed.  But also, the American [high] court agrees to hear only  a small number of cases. The almost certain outcome: there will be no decision favorable to Argentina from a superior court.  At most, the process will be dragged out.

One factor that makes what was decided on Friday relevant is that the American court made its decision in spite of the fact that the American Government, through the Treasury Department, recommended an opposite ruling.  The U.S. position was that if pro rata payments (pari passu) were required on the bonds still in default after Argentina's 2005 and 2010 debt exchanges, this was going to cause the failure of all the debt restructurings in the markets, including Greece and others that may come.   The response from the appeals court was blunt: collective action clauses

are used now (decisions by the majority obligate 100% of the bondholders) and moreover, the exchanges of Greece, Portugal or Spain are not under New York law.

It's a reflection of how totally fed up those courts are with Argentina's position, as carried out by the lawyers of the firm of Cleary, Gottlieb, Steen & Hamilton. This extends to the very representatives of that New York firm, specifically Jonathan Blackman, one of its partners. This could be seen in the transcripts of the hearings four months ago.

Is it time to change the team captain or law firm? This possibility is ruled out, although the Cleary firm showed several signs of having underestimated this "pari passu" claim, assigning a very low probability to a ruling against Argentina. As an example of this, the firm didn't even request transcripts of the presentations against Argentina at the hearing in Thomas Griesa's court, and, even more significantly, gave no indication that it was familiar with the judge's thinking on the matter.

Is it time to retreat on the 'deadbolt law'? This law expressly makes it clear that not one penny will be paid to the holders of bonds in default, unless it is modified. That's not going to change either. It's already too late. It was an element that the Court of Appeals took as a basis for its decision by showing that Argentina was never even going to negotiate with creditors or vulture funds. The same was stated in the prospectuses of the two debt swaps. Paradoxically, that 'deadbolt law' was enacted in part to get greater adherence to the offers to the bondholders in 2005, by Roberto Lavagna, and in 2010, under an implicit threat: "Accept this offer or never collect" (in addition, this law retained errors, like authorizing indexed bonds or including banks in the swap, like the last minute participation of Merrill Lynch in 2005).

Could the place of payment change? The statement on page 12 of Friday's decision is very blunt. It prevents Argentina from "altering the processes or specific mechanisms of transfers by which payments are made on the bonds arising from the debt swap." To defy a court order of this kind wouldn't come free. Perhaps there would be a swap of bonds as an alternative for those who now hold the new bonds whose place of payment is a city where the decisions of U.S. courts cannot be enforced. But that would take Argentina down other complex paths, with the necessity of achieving majorities in those exchanges. Also, certainly Nicola Stock, a representative of bondholders, will seek the application of "pari passu" in Europe, based on what happened on Friday. Open conclusion.

What will the risk rating agencies do? It is possible that they would lower the ratings because of the probability that there will be changes in the terms of issuance of the bonds, such as the locations of payment. This path has already been traveled several times, and has always led downward. Is it possible to make payment directly in Buenos Aires? It's an open scenario, with costs in regard to listing of the bonds. The local market is not the same as foreign markets, especially with the current restrictions on foreign exchange. They could authorize transfers abroad, given that the provisions of Central Bank of the Argentine Republic include the scenario of those dollars already being outside the country. But again, the situation has changed from what it was before Friday.

For now, the ball is in Griesa's court.  The government is only now preparing alternative payment schemes including seeking protection that is 100% legal so that they can make them abroad,  including to Argentine bondholders.  Nothing will be the same after Friday the 26th.



Juris Services International
Translation Studio
23 Normandy Terrace
Bronxville, NY 10708
Tel: 212 759-5400 Fax: 212 401-8125

## CERTIFICATE OF ACCURACY

State of New York    )
Village of Bronxville    : ss.: Bronxville
County of Westchester    )

This is to certify that the attached translation from SPANISH into ENGLISH of the
document entitled/described below is a true and accurate rendition of the original Spanish
document:

*Ambito Financiero*
**Prometen pago en tiempo y forma (se busca dónde)**

Lunes, 29 de octubre 2012

Por Guillermo Laborda

El fallo de la Cámara de Apelaciones de los EE.UU. para el Segundo Circuito quedará en la
..............................................................................................................................
alternativos de pago buscando incluso blindajes al 100% en lo legal para que puedan hacerse
en el exterior, incluso a tenedores argentinos. Igual nada será lo mismo tras el viernes 26.

John E. Considine
President

Sworn to before me on this
5 day of November 2012

[signature and stamp of notary public]

SHIFIERA S SURUJBALLI
Notary Public - State of New York
NO. 01SU6224863
Qualified in Westchester County
My Commission Expires 01-19-20.

*Ambito Financiero*

# Prometen pago en tiempo y forma (se busca dónde)

Lunes, 29 de octubre 2012

Por Guillermo Laborda

El fallo de la Cámara de Apelaciones de los EE.UU. para el Segundo Circuito quedará en la historia. Ahora, el Gobierno quedó frente a senderos, cada uno de ellos con bifurcaciones que llevan a dimensiones desconocidas. Esto es, tanto por sus repercusiones en los mercados financieros, como las consecuencias jurídicas, pasando, en el medio, por las relaciones con los EE.UU. No aparenta ser un jardín lo que está delante; más sería el final de una partida de ajedrez.

Está claro que el Gobierno no negociará con fondos buitre. «Mientras yo sea presidenta, se podrán quedar con la fragata, pero con la libertad, la soberanía de la dignidad de este país, no se va a quedar nadie», dijo Cristina hace exactamente una semana en el Museo del Bicentenario. Un sendero menos para el análisis. El Gobierno puede tomar cualquier medida, pero no negociará jamás un esquema de pagos con los tenedores de la deuda aún en default.

El turno ahora es de Thomas Griesa. Debe determinar la fórmula que se aplique para prorratear los pagos que haga la Argentina a los tenedores de papeles surgidos de los canjes de deuda de 2005 y 2010 también con los tenedores de títulos aún en default (mayormente los fondos buitre NML, Aurelius, entre otros). No entrará en acción la Argentina aún, dado que esa decisión de Griesa automáticamente se dirige a la Cámara de Apelaciones «para mayores consideraciones ... sin necesidad de una nueva apelación». Este proceso podría demorar un par de meses. Por ello se señala que la sentencia del tribunal norteamericano no es completa y falta una parte. También resta analizar, como señala el último párrafo del fallo del viernes (ver texto completo en [www.ambito.com](http://www.ambito.com)), las implicancias sobre terceros, como ser bancos, agentes custodias de bonos.

No queda claro que la medida cautelar esté vigente. Lo lógico es que no esté vigente porque hay falta de certeza sobre cómo es su aplicación. Por ello en el Gobierno estiman que los pagos de 2012 no están afectados por lo decidido el viernes último. Un sendero con destino final cierto es el que se abrirá cuando el Gobierno apele el fallo completo -ya con la fórmula de Griesa de pago- a la Corte Suprema de los EE.UU.; es casi imposible que se revierta una decisión federal en la que primera y segunda instancia coinciden. Pero además, la Corte norteamericana sólo en una ínfima cantidad de casos se le solicita su participación. Final casi seguro: no habrá sentencia superior a favor de la Argentina. A lo sumo, dilatar plazos.

Uno de los factores que hacen relevante lo decidido el viernes es que la Justicia norteamericana adoptó su decisión por más que el Gobierno norteamericano, a través del Departamento del Tesoro, recomendaba lo contrario. La posición de EE.UU. era que si se obligaba a que pagos de bonos tras el canje de deuda de la Argentina en 2005 y 2010 se hagan a prorrata («pari passu») con los tenedores de papeles aún en default, ello iba a hacer fracasar todas las reestructuraciones de deuda en los mercados, incluso Grecia y las que puedan sobrevenir. La respuesta de la

Cámara de Apelaciones fue contundente: ahora se hacen con cláusulas de acción colectiva (lo que decide la mayoría obliga al 100% de los tenedores) y además, los canjes de Grecia, Portugal o España no se hacen bajo ley de Nueva York.

Es reflejo todo del hartazgo en esos tribunales de la posición argentina realizada a través de los abogados del estudio Cleary, Gottlieb, Steen & Hamilton. Incluso ese hartazgo se da contra los mismos representantes de ese bufete neoyorquino, puntualmente Jonathan Blackman, uno de sus socios. Ello puede comprobarse en las transcripciones de las audiencias de hace cuatro meses.

¿Es tiempo de cambiar de DT o de abogados? Esta posibilidad está descartada, aunque el estudio Cleary haya dado varias muestras de haber subestimado esta presentación reclamando «pari passu», dando una mínima probabilidad de ocurrencia a un fallo contra la Argentina. Valga como muestra que ni siquiera desde el estudio se habrían pedido transcripciones de las presentaciones de las posiciones contra la Argentina ante el tribunal de Thomas Griesa y, más importante aún, haber conocido el pensamiento del juez al respecto.

¿Es tiempo de dar marcha atrás con la «ley cerrojo»? Esta norma expresamente deja claro que no se va a pagar, salvo que se la modifique, ni un centavo a los tenedores de bonos en default. Tampoco se la va a cambiar. Ya es tarde. Fue un elemento que la Cámara de Apelaciones tomó como base de su sentencia al ser muestra de que la Argentina nunca iba a ni siquiera negociar con acreedores o fondos buitre. Lo mismo se expresaba en los prospectos de los dos canjes de la deuda. Paradójicamente esa «ley cerrojo» se hizo en parte para lograr más adhesión en las ofertas a bonistas en 2005, de Roberto Lavagna, y 2010, bajo la amenaza implícita: «Aceptas esta oferta o no se cobra nunca» (además en esa ley se salvaron errores, como habilitar bonos indexados o incluir bancos en el canje, como fue la participación a último momento en 2005 de Merrill Lynch).

¿Se puede cambiar el lugar de pago? Es muy contundente lo que se incluye en la página 12 de la sentencia del viernes. Se previene a la Argentina de «alterar los procesos o mecanismos de transferencias específicos por los cuales efectúa pagos en los bonos surgidos del canje de la deuda». Desafiar una orden judicial de este tipo no será gratis. Quizás pueda darse un canje de títulos como alternativa a los que hoy tienen los bonos nuevos que tengan como domicilio de pago una ciudad blindada a las decisiones de la Justicia norteamericana. Pero allí se ingresa en otros senderos complejos, con necesidad de conseguir mayorías en esos canjes. Además, seguramente Nicola Stock, representante de bonistas, a raíz de lo sucedido el viernes, pedirá en Europa una aplicación del «pari passu». Final abierto.

¿Qué harán calificadoras de riesgo? Puede que bajen calificaciones ante la probabilidad de que haya cambios en las condiciones de emisión de papeles como los domicilios de pago. Este camino ya fue varias veces recorrido, y siempre hacia abajo. ¿Es posible el pago en Buenos Aires directamente? Es un escenario abierto, con costos en lo que respecta a cotizaciones de los papeles. No es lo mismo la plaza local que el exterior y más con las restricciones cambiarias existentes. Pueden habilitarse transferencias al exterior, dado que el BCRA ya tiene en sus previsiones que esos dólares ya estaban fuera del país. Pero de nuevo, no es igual a lo existente antes del viernes.

Por lo pronto, Griesa tiene la palabra. El Gobierno sólo en estas jornadas prepara esquemas alternativos de pago buscando incluso blindajes al 100% en lo legal para que puedan hacerse en el exterior, incluso a tenedores argentinos. Igual nada será lo mismo tras el viernes 26.