12-105(L)
NML Capital, Ltd. v. Republic of Argentina

1          UNITED STATES COURT OF APPEALS
2                FOR THE SECOND CIRCUIT
3          _____

4
5                   August Term, 2012
6
7    (Argued: February 27, 2013          Decided: August 23, 2013)
8
9    Docket Nos. 12-105(L), 12-109 (CON), 12-111 (CON), 12-157 (CON), 12-158 (CON), 12-163
10   (CON), 12-164 (CON), 12-170 (CON), 12-176 (CON), 12-185 (CON), 12-189 (CON), 12-214
11   (CON), 12-909 (CON), 12-914 (CON), 12-916 (CON), 12-919 (CON), 12-920 (CON), 12-923
12   (CON), 12-924 (CON), 12-926 (CON), 12-939 (CON), 12-943 (CON), 12-951 (CON), 12-968
13        (CON), 12-971 (CON), 12-4694 (CON), 12-4829 (CON), 12-4865 (CON)*
14          _____

15
16     NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL
17   CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES
18     BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL
19   POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA
20   ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES,
21            MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,
22
23                                          *Plaintiffs-Appellees*,
24
25                          v.
26
27              THE REPUBLIC OF ARGENTINA,
28
29                                          *Defendant-Appellant*,
30
31   THE BANK OF NEW YORK MELLON, as Indenture Trustee, EXCHANGE BONDHOLDER GROUP,
32                FINTECH ADVISORY INC.,
33
34                                          *Non-Party Appellants*,
35

_____

     * Appeals numbered 12-105, 12-109, 12-111, 12-157, 12-158, 12-163, 12-164, 12-170,
12-176, 12-185, 12-189, and 12-214 were dismissed as of October 26, 2012.  Appeals numbered
12-909, 12-914, 12-916, 12-919, 12-920, 12-923, 12-924, 12-926, 12-939, 12-943, 12-951,
12-968, 12-971, 12-4829 are decided by this opinion.  Appeals numbered 12-4694 and 12-4865
are dismissed by this opinion.

                             1

EURO BONDHOLDERS, ICE CANYON LLC,

*Intervenors.*

Before: POOLER, B.D. PARKER, and RAGGI, *Circuit Judges*.

_____

Defendant-Appellant the Republic of Argentina, Non-Party Appellants, and Intervenors appeal from amended orders issued by the United States District Court for the Southern District of New York (Griesa, *J.*).  The amendments explain certain aspects of those orders which were designed to remedy Argentina's breach of a promise to pay bondholders after a 2001 default on its sovereign debt.  We hold that the district court did not abuse its discretion in issuing the orders.

AFFIRMED.

_____

THEODORE B. OLSON (Matthew D. McGill, Jason J. Mendro, *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, D.C.; Robert A. Cohen, Eric C. Kirsch, Dechert LLP, New York, N.Y., *for Plaintiff-Appellee NML Capital, Ltd*.

Leonard F. Lesser, Simon Lesser, P.C., New York, N.Y., *for Plaintiff-Appellee Olifant Fund, Ltd*.

Michael C. Spencer, Milberg LLP, New York, N.Y., *for Plaintiffs-Appellees Pablo Alberto Varela, et al.*

Edward A. Friedman, Daniel B. Rapport, Friedman Kaplan Seiler & Adelman LLP, New York, N.Y.; Roy T. Englert, Jr., Mark T. Stancil, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C., *for Plaintiffs-Appellees Aurelius Capital Master, Ltd., ACP Master, Ltd., Blue Angel Capital I LLC,* and *Aurelius Opportunities Master Fund II, LLC*.

JONATHAN I. BLACKMAN (Carmine D. Boccuzzi, Ezequiel Sanchez-Herrera, Sara A. Sanchez, Michael M. Brennan, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, N.Y., *for Defendant-Appellant the Republic of Argentina*.

2

JAMES C. MARTIN (Colin E. Wrabley, *on the brief*),
    Reed Smith LLP, Pittsburg, Penn.; Eric A Schaffer,
    Reed Smith LLP, New York, N.Y., *for Non-Party*
    *Appellant The Bank of New York Mellon, as*
    *Indenture Trustee.*

DAVID BOIES (David A. Barrett, Nicholas A. Gravante,
    Jr., Steven I. Froot, *on the brief*), Boies, Schiller &
    Flexner LLP, New York, N.Y.; Sean F. O'Shea,
    Michael E. Petrella, Daniel M. Hibshoosh, O'Shea
    Partners LLP, New York, N.Y., *for Non-Party*
    *Appellants the Exchange Bondholder Group.*

William F. Dahill, Wollmuth Maher & Deutsch LLP,
    New York, N.Y., *for Non-Party Appellant Fintech*
    *Advisory Inc.*

Christopher J. Clark, Craig A. Batchelor, Michael E.
    Bern, Latham & Watkins, LLP, New York, N.Y.,
    *for Intervenors Euro Bondholders.*

Bruce Bennett, James O. Johnston, Beong-Soo Kim,
    Jones Day, Los Angeles, Cal.; Meir Feder, Jones
    Day, New York, N.Y., *for Intervenor ICE Canyon*
    *LLC.*

David W. Rivkin, Suzanne M. Grosso, Debevoise &
    Plimpton LLP, New York, N.Y., *for Amicus Curiae*
    *EM Ltd., in support of Plaintiffs-Appellees.*

Ronald Mann, Esq., New York, N.Y., *Amicus Curiae*
    *pro se, in support of Plaintiffs-Appellees.*

Jack L. Goldsmith III, Cambridge, Mass.; Judd B.
    Grossman, Grossman LLP, New York, N.Y., *for*
    *Amici Curiae Montreux Partners, L.P. and Wilton*
    *Capital, in support of Plaintiffs-Appellees.*

Richard A. Samp, Cory L. Andrews, Washington Legal
    Foundation, Washington, D.C., *for Amicus Curiae*
    *the Washington Legal Foundation, in support of*
    *Plaintiffs-Appellees.*

1        Kevin S. Reed, Quinn Emanuel Urquhart & Sullivan,
2          LLP, New York, N.Y., *for Amicus Curiae Prof.*
3          *Kenneth W. Dam, in support of Plaintiffs-Appellees.*
4
5        Anthony J. Costantini, Rudolph J. Di Massa, Jr., Suzan
6          Jo, Mary C. Pennisi, Duane Morris LLP, New York,
7          N.Y., *for Duane Morris Individual Plaintiffs-*
8          *Appellees.*
9
10       Paul Saltzman, Joseph R. Alexander, The Clearing
11         House Association L.L.C., New York, N.Y.; H.
12         Rodgin Cohen, Michael M. Wiseman, Sergio J.
13         Galvis, Joseph E. Neuhaus, Michael J. Ushkow,
14         Jared P. Roscoe, Sullivan & Cromwell LLP, New
15         York, N.Y., *for Amicus Curiae The Clearing House*
16         *Association L.L.C., in support of Defendant-*
17         *Appellant.*
18
19       Eugenio A. Bruno, Estudio Garrido, Buenos Aires,
20         Argentina; M. Darren Traub, Akerman Senterfitt,
21         LLP, New York, N.Y. *for Amicus Curiae Alfonso*
22         *Prat-Gay, in support of Defendant-Appellant.*
23
24       Edward Scarvalone, Doar Rieck Kaley & Mack, New
25         York, N.Y., *for Amicus Curiae Prof. Anne Krueger,*
26         *in support of Defendant-Appellant.*
27
28       Paul T. Shoemaker, Greenfield Stein & Senior LLP,
29         New York, N.Y., *for Amicus Curiae Euroclear*
30         *Bank SA/NV, in support of Defendant-Appellant.*
31
32       Marco E. Schnabl, Timothy G. Nelson, Skadden, Arps,
33         Slate, Meagher & Flom LLP, New York, N.Y., *for*
34         *Amicus Curiae Puente Hnos. Sociedad de Bolsa*
35         *S.A., in support of Defendant-Appellant.*
36
37       Matthew D. Ingber, Chrisopher J. Houpt, Mayer Brown
38         LLP, New York, N.Y.; Charles A. Rothfeld, Paul
39         W. Hughes, Mayer Brown LLP, Washington, D.C.,
40         *for Amicus Curiae the American Bankers*
41         *Association, in support of Non-Party Appellant The*
42         *Bank of New York Mellon.*
43
44

BARRINGTON D. PARKER, *Circuit Judge*:

This is a contract case in which the Republic of Argentina refuses to pay certain holders of sovereign bonds issued under a 1994 Fiscal Agency Agreement (hereinafter, the "FAA" and the "FAA Bonds"). In order to enhance the marketability of the bonds, Argentina made a series of promises to the purchasers. Argentina promised periodic interest payments. Argentina promised that the bonds would be governed by New York law. Argentina promised that, in the event of default, unpaid interest and principal would become due in full. Argentina promised that any disputes concerning the bonds could be adjudicated in the courts of New York. Argentina promised that each bond would be transferrable and payable to the transferee, regardless of whether it was a university endowment, a so-called "vulture fund," or a widow or an orphan. Finally, Argentina promised to treat the FAA Bonds at least equally with its other external indebtedness. As we have held, by defaulting on the Bonds, enacting legislation specifically forbidding future payment on them, and continuing to pay interest on subsequently issued debt, Argentina breached its promise of equal treatment. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) (*NML I*).

Specifically, in October 2012, we affirmed injunctions issued by the district court intended to remedy Argentina's breach of the equal treatment obligation in the FAA. *See id.* Our opinion chronicled pertinent aspects of Argentina's fiscal history and the factual background of this case, *see id.* at 251-57, familiarity with which is assumed.[1] Those injunctions, fashioned

---

[1] For a more comprehensive narrative of Argentina's long history of defaulting on its debts, see Judge José Cabranes's opinion in *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007).

1    by the Hon. Thomas P. Griesa, directed that whenever Argentina pays on the bonds or other

2    obligations that it issued in 2005 or 2010 exchange offers (the "Exchange Bonds"), the Republic

3    must also make a "ratable payment" to plaintiffs who hold defaulted FAA Bonds.  We remanded,

4    however, for the district court to clarify the injunctions' payment formula and effects on third

5    parties and intermediary banks, and retained jurisdiction pursuant to *United States v. Jacobson*,

6    15 F.3d 19 (2d Cir. 1994).

7          On November 21, 2012, the district court issued amended injunctions with the

8    clarifications we requested,[2] as well as an opinion explaining them, which are challenged on this

9    appeal by Argentina as well as by non-party appellants and intervenors.  *See NML Capital, Ltd.*

10    *v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895786 (S.D.N.Y. Nov. 21, 2012)

11    (*NML II*).  Recognizing the unusual nature of this litigation and the importance to Argentina of

12    the issues presented, following oral argument, we invited Argentina to propose to the appellees

13    an alternative payment formula and schedule for the outstanding bonds to which it was prepared

14    to commit.  Instead, the proposal submitted by Argentina ignored the outstanding bonds and

15    proposed an entirely new set of substitute bonds.[3]  In sum, no productive proposals have been

16    forthcoming.  To the contrary, notwithstanding its commitment to resolving disputes involving

17    the FAA in New York courts under New York law, at the February 27, 2013 oral argument,

---

[2] *See NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895784 (S.D.N.Y. Nov. 21, 2012); *Aurelius Capital Master, Ltd. & ACP Master, Ltd. v. Republic of Argentina*, No. 09 Civ. 8757 (TPG), Dkt. No. 312 (S.D.N.Y. Nov. 26, 2012); *Olifant Fund, Ltd. v. Republic of Argentina*, No. 10 Civ. 9587, Dkt. No. 40 (S.D.N.Y. Nov. 26, 2012); *Varela v. Republic of Argentina*, No. 10 Civ. 5338, Dkt. No. 64 (S.D.N.Y. Nov. 26, 2012).  We refer to these collectively as the "amended injunctions."

[3] *See* Dkt. No. 935 (Argentina's Proposal of March 29, 2013); *see also* Dkt. No. 950 (Appellees' April 22, 2013 Response to Argentina's Proposal).

1  counsel for Argentina told the panel that it "would not voluntarily obey" the district court's

2  injunctions, even if those injunctions were upheld by this Court.  Moreover, Argentina's officials

3  have publicly and repeatedly announced their intention to defy any rulings of this Court and the

4  district court with which they disagree.[4]  It is within this context that we review the amended

5  injunctions for abuse of discretion and, finding none, we affirm.[5]  However, in view of the nature

6  of the issues presented, we will stay enforcement of the injunctions pending resolution of a

7  timely petition to the Supreme Court for a writ of *certiorari*.[6]

8      In its opinion, the district court first explained that its "ratable payment" requirement

9  meant that whenever Argentina pays a percentage of what is due on the Exchange Bonds, it must

10  pay plaintiffs the same percentage of what is then due on the FAA Bonds.  *Id.* at *2.  Under the

11  express terms of the FAA, as negotiated and agreed to by Argentina, the amount currently due on

---

[4] Argentine President Cristina Fernández de Kirchner is quoted as announcing that Argentina will pay on the Exchange Bonds "but not one dollar to the 'vulture funds,'" referring to FAA Bondholders such as plaintiff NML Capital, Ltd.  Argentina to Blast 'Vulture Funds' at the G20 Ministerial Meeting in Mexico, MercoPress, Nov. 4, 2012, Supp. App. 391.  The Republic's Economy Minister Hernan Lorenzino is quoted as echoing that "Argentina isn't going to change its position of not paying vulture funds . . . . We will continue to follow that policy despite any ruling that could come out of any jurisdiction, in this case New York."  Ken Parks & Charles Roth, Argentina Grapples with Credit-Rating Challenges, Wall St. J., Oct. 31, 2012, Supp. App. 395.  In a speech apparently posted to a presidential website, President Kirchner criticized the "justice system" overseen by this Court, stating that it "evidently is unaware of its own legislation."  Supp. App. 553.

[5] *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 142 (2d Cir. 2011).  A district court abuses its discretion when it bases a ruling "on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions."  *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks omitted).

[6] Apparently, Argentina filed a petition for *certiorari* in this matter on June 24, 2013, notwithstanding that, as of that date, no final order had yet issued in this case.  *See* Supreme Court Dkt. 12-1494.

the FAA Bonds, as a consequence of its default, is the outstanding principal and accrued interest. *See id.*; *NML I* at 254 n.7; *see also* Appellant Argentina 2012 Br. at 26 ("[T]he contractually agreed upon remedy [for default] is acceleration of principal, an action already taken by these plaintiffs."). Thus, as the district court explained, if Argentina pays Exchange Bondholders 100% of what has come due on their bonds at a given time, it must also pay plaintiffs 100% of the roughly $1.33 billion of principal and accrued interest that they are currently due. *See NML II* at *3.

Second, the district court explained how its injunctions would prevent third parties from assisting Argentina in evading the injunctions. Though the amended (and original) injunctions directly bind only Argentina, the district court correctly explained that, through the automatic operation of Federal Rule of Civil Procedure 65(d), they also bind Argentina's "agents" and "other persons who are in active concert or participation" with Argentina. *See id.* at *4; Fed. R. Civ. P. 65(d)(2). Those bound under the operation of Rule 65(d) would include certain entities involved in the system through which Argentina pays Exchange Bondholders. As the district court stated:

> Argentina transfers funds to the Bank of New York Mellon ("BNY"), which is the indenture trustee in a Trust Indenture of 2005. Presumably there is a similar indenture for the 2010 exchange offer. BNY then forwards the funds to the "registered owner" of the Exchange Bonds. There are two registered owners for the 2005 and 2010 Exchange Bonds. One is Cede & Co. and the other is the Bank of New York Depositary ("BNY Depositary"). Cede and BNY Depositary transfer the funds to a "clearing system" such as the Depository Trust Company ("DTC"). The funds are then deposited into financial institutions, apparently banks, which then transfer the funds to their customers who are the beneficial interest holders of the bonds.

*NML II* at *5. Of these, the amended injunctions cover Argentina, the indenture trustee(s), the registered owners, and the clearing systems. *See id.* The amended injunctions explicitly exempt

8

1    intermediary banks, which enjoy protection under Article 4A of New York's Uniform

2    Commercial Code (U.C.C.), and financial institutions receiving funds from the DTC.  *See id.*

3        In accordance with our October 2012 opinion, the litigation then returned to our Court.

4    Argentina has challenged certain aspects of the amended injunctions, and appeals have also

5    followed from other entities: a group of Exchange Bondholders, styling themselves as the

6    Exchange Bondholder Group ("EBG"); the Bank of New York Mellon ("BNY"), indenture

7    trustee to Exchange Bondholders; and Fintech Advisory Inc., a holder of Exchange Bonds.  We

8    further received briefing (but no notices of appeal) from two intervenors: a group of bondholders

9    calling themselves the Euro Bondholders, and ICE Canyon LLC, a holder of GDP-linked

10   securities issued by Argentina.

11                              **APPELLATE STANDING**

12        Neither BNY, EBG, Fintech, Euro Bondholders, nor ICE Canyon intervened below, but

13   each seeks to participate here as a non-party.  As a general rule, only parties may appeal, but we

14   have recognized non-party appellate standing in two situations: where the non-party is bound by

15   the judgment and where the non-party has an interest plausibly affected by the judgment.  *See*

16   *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 77-78 (2d Cir.

17   2006).

18        The amended injunctions provide that BNY, as a participant in the payment process of

19   the Exchange Bonds, "shall be bound by the terms of this ORDER as provided by [Federal Rule

20   of Civil Procedure] 65(d)(2)."  2012 WL 5895784, at *2.  Accordingly, BNY has standing to

21   appeal.  *See NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 175

22   n.1 (2d Cir. 2011) (holding that non-party Banco Central de la República Argentina had standing

9

1    to challenge attachment and execution order).  In contrast, EBG, Fintech, Euro Bondholders, and

2    ICE Canyon are not bound by the amended injunctions.  They are creditors, and, as such, their

3    interests are not plausibly affected by the injunctions because a creditor's interest in getting paid

4    is not cognizably affected by an order for a debtor to pay a different creditor.  *Cf. Dish Network*

5    *Corp. v. DBSD N. Am., Inc.*, 634 F.3d 79, 90 (2d Cir. 2010); *Evanston Ins. Co. v. Fred A. Tucker*

6    *& Co., Inc.*, 872 F.2d 278, 280 (9th Cir. 1989).  If Argentina defaults on its obligations to them,

7    they retain their rights to sue.  And, as discussed below, their interests are not cognizably

8    affected in any other way.  Consequently, EBG, Fintech, Euro Bondholders, and ICE Canyon

9    have no appellate standing, and the appeals from EBG and Fintech are hereby dismissed.  (Euro

10    Bondholders and ICE Canyon did not file appeals of their own.)

11        At the same time, their arguments are not lost because they requested that, in the event

12    they were not deemed appellants, the court consider their arguments as coming from *amici*

13    *curiae*.  Because Argentina contends in its own appeal that the amended injunctions should be

14    vacated because, among other reasons, they are inequitable to Exchange Bondholders, we will

15    consider the arguments of EBG, Fintech, Euro Bondholders, and ICE Canyon as arguments from

16    *amici curiae* in support of Argentina.  *See* Fed. R. App. P. 29(a).[7]

17

18

19

---

[7] Judge Pooler disagrees with the majority decision to dismiss the appeals of EBG, Fintech, Euro Bondholders, and ICE Canyon.   However, as the arguments of the dismissed appellants are treated as made by *amici*, and as the status of the non-appellants matters little to the outcome here, Judge Pooler has agreed to note her disagreement for the record in this footnote, rather than dissent.

**DISCUSSION**

1        Argentina advances a litany of reasons as to why the amended injunctions unjustly injure

itself, the Exchange Bondholders, participants in the Exchange Bond payment system, and the

public.  None of the alleged injuries leads us to find an abuse of the district court's discretion.

**I.**      **Alleged Injuries to Argentina**

Argentina argues that the amended injunctions unjustly injure it in two ways.  First,

Argentina argues that the amended injunctions violate the Foreign Sovereign Immunities Act

("FSIA") by forcing Argentina to use resources that the statute protects.  As discussed in our

October opinion, the original injunctions—and now the amended injunctions—do not violate the

FSIA because "[t]hey do not attach, arrest, or execute upon any property" as proscribed by the

statute.[8]  *NML I* at 262-63.  Rather, the injunctions allow Argentina to pay its FAA debts with

whatever resources it likes.  Absent further guidance from the Supreme Court, we remain

convinced that the amended injunctions are consistent with the FSIA.

Second, Argentina argues that the injunctions' ratable payment remedy is inequitable

because it calls for plaintiffs to receive their full principal and all accrued interest when

---

[8] As we noted,

[a]n "attachment" is the "seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment."  Black's Law Dictionary 123 (9th ed.2009); *see also* 6 Am. Jur. 2d Attachment and Garnishment § 1.  An arrest is "[a] seizure or forcible restraint."  Black's Law Dictionary 124 (9th ed. 2009).  "Execution" is "an act of dominion over specific property by an authorized officer of the court . . . which results in the creation of a legal right to subject the debtor's interest in the property to the satisfaction of the debt of his or her judgment creditor."  30 Am. Jur. 2d Executions § 177; *see also* Black's Law Dictionary (9th ed. 2009) ("Judicial enforcement of a money judgment, usu. by seizing and selling the judgment debtor's property.").

*NML I* at 262 n.13.

11

1    Exchange Bondholders receive even a single installment of interest on their bonds.  However,

2    the undisputed reason that plaintiffs are entitled immediately to 100% of the principal and

3    interest on their debt is that the FAA guarantees acceleration of principal and interest in the

4    event of default.  *See NML I* at 254 n.7; *NML II* at *4.  As the district court concluded, the

5    amount currently owed to plaintiffs by Argentina as a result of its persistent defaults is the

6    accelerated principal plus interest.  We believe that it is equitable for one creditor to receive what

7    it bargained for, and is therefore entitled to, even if other creditors, when receiving what they

8    bargained for, do not receive the same thing.  The reason is obvious: the first creditor is

9    differently situated from other creditors in terms of what is currently due to it under its contract.

10   *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 344 (2d Cir. 2005).

11   Because the district court's decision does no more than hold Argentina to its contractual

12   obligation of equal treatment, we see no abuse of discretion.

13        Argentina adds that the amended injunctions are invalid because a district court may not

14   issue an injunctive "remedy [that] was historically unavailable from a court of equity."  *Grupo*

15   *Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).  However,

16   English chancery courts traditionally had power to issue injunctions and order specific

17   performance when no effective remedy was available at law.  *See* 11A Charles Alan Wright &

18   Arthur R. Miller, Federal Practice and Procedure § 2944 (2d ed. 1994).  As we explained in our

19   October 2012 opinion, the plaintiffs have no adequate remedy at law because the Republic has

20   made clear its intention to defy any money judgment issued by this Court.  *See NML I* at 261-62.

21   Moreover, Argentina has gone considerably farther by passing legislation, the Lock Law,

22   specifically barring payments to FAA bondholders.  And it is unremarkable that a court

12

1 empowered to afford equitable relief may also direct the timing of that relief.  Here, that timing

2 requires that it occur before or when Argentina next pays the Exchange Bondholders.

## II.    Alleged Injuries to Exchange Bondholders

4       Invoking the proposition that equitable relief is inappropriate where it would cause

5 unreasonable hardship or loss to third persons, *see Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales*

6 *Corp.*, 992 F.2d 430, 436 (2d Cir. 1993), Argentina, EBG, and Fintech argue that the amended

7 injunctions are inequitable to Exchange Bondholders.[9]  But this case presents no conflict with

8 that proposition.  EBG argues, notwithstanding our affirmance of the district court's finding that

9 Argentina has the financial wherewithal to pay all of its obligations, *see NML I* at 256, 263, that

10 the amended injunctions will harm Exchange Bondholders because Argentina "has declared

11 publicly that it has no intention of ever paying holdout bondholders like NML" and, as a result,

12 neither plaintiffs nor Exchange Bondholders will be paid if the amended injunctions stand.

13 Appellant EBG Br. 2.

---

[9] Intervenor ICE Canyon urges that the amended injunctions should not apply to euro-denominated GDP-linked securities that Argentina issued in its 2005 and 2010 exchanges.  The gist of ICE Canyon's argument is that the amended injunctions require payment to plaintiffs whenever Argentina pays on the Exchange *Bonds*, not when it pays on GDP-linked securities which yield revenue only if the Republic's GDP grows.  By their terms, however, the amended (and original) injunctions require payment to plaintiffs whenever Argentina pays on "Exchange Bonds," defined as including both bonds *and "other obligations"* issued in the exchange offers. 2012 WL 5895784, at *2 (emphasis added).  The inclusion of other obligations like GDP-linked securities is unsurprising, given that the FAA required that the FAA Bonds be treated at least equally with all "obligations (other than the [FAA Bonds]) for borrowed money or evidenced by securities, debentures, notes or other similar instruments denominated or payable, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic. . . ." J.A. 171.  The euro-denominated GDP-linked securities fit this description because they are "obligations . . . evidenced by securities . . . denominated . . . in a currency other than the lawful currency of the Republic."  Accordingly, we see no need to clarify the amended injunctions, and we consider the term Exchange Bonds to include the euro-denominated GDP-linked securities.

13

1    This type of harm—harm threatened to third parties by a party subject to an injunction

2    who avows not to obey it—does not make an otherwise lawful injunction "inequitable."  We are

3    unwilling to permit Argentina's threats to punish third parties to dictate the availability or terms

4    of relief under Rule 65.  *See Reynolds v. Int'l Amateur Athletic Fed'n*, 505 U.S. 1301, 1302

5    (1992) (Stevens, *J.*, in chambers).  Argentina's contention that the amended injunctions are

6    unfair to Exchange Bondholders is all the less persuasive because, before accepting the exchange

7    offers, they were expressly warned by Argentina in the accompanying prospectus that there

8    could be "no assurance" that litigation over the FAA Bonds would not "interfere with payments"

9    under the Exchange Bonds.  J.A. 466.  Under these circumstances, we conclude that the amended

10   injunctions have no inequitable effect on Exchange Bondholders and find no abuse of

11   discretion.[10]

12

13

---

[10] The remaining arguments pertaining to Exchange Bondholder interests are similarly without merit.  Exchange Bondholders have suffered no denial of procedural due process because there is no right to process for non-parties in their position.  *See Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund*, 582 F.3d 30, 42 (1st Cir. 2009) ("Impact and legal rights are not the same thing.  A decision in a contract dispute or antitrust case can have drastic effects on suppliers, stockholders, employees and customers of the company that loses the case; no one thinks the Constitution requires all of them to be parties.").  EBG's substantive due process and Takings Clause arguments fail because the amended injunctions do not deprive Exchange Bondholders of any property.  And lastly, non-parties—even those whose enjoyment of contractual rights may be affected by a judicial decision—are not necessary parties for Rule 19 joinder if they can protect their rights in subsequent litigation.  *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 386 (2d Cir. 2006).  Here, Exchange Bondholders will be affected if, after we affirm the amended injunctions, Argentina decides to default on the Exchange Bonds, but Exchange Bondholders would then be able to sue over that default.  Accordingly, we find no abuse of discretion in the amended injunctions with respect to the Exchange Bondholders' rights.

1    **III.    Alleged Injuries to Participants in the Exchange Bond Payment System**

2    Argentina, BNY, Euro Bondholders, and ICE Canyon raise additional issues concerning

3    the amended injunctions and their effects on the international financial system through which

4    Argentina pays Exchange Bondholders.  The arguments include that (1) the district court lacks

5    personal jurisdiction over payment system participants and therefore cannot bind them with the

6    amended injunctions, (2) the amended injunctions cannot apply extraterritorially, (3) payment

7    system participants are improperly bound because they were denied due process, and (4) the

8    amended injunctions' application to financial system participants would violate the U.C.C.'s

9    protections for intermediary banks.  None of these arguments, numerous as they are, has merit.[11]

10    First, BNY and Euro Bondholders argue that the district court erred by purporting to

11    enjoin payment system participants over which it lacks personal jurisdiction.  But the district

12    court has issued injunctions against no one except Argentina.  Every injunction issued by a

13    district court automatically forbids others—who are not directly enjoined but who act "in active

14    concert or participation" with an enjoined party—from assisting in a violation of the injunction.

15    *See* Fed. R. Civ. P. 65(d).  In any event, the Supreme Court has expressed its expectation that,

16    when questions arise as to who is bound by an injunction though operation of Rule 65, district

17    courts will not "withhold a clarification in the light of a concrete situation."  *Regal Knitwear Co.*

---

[11] We also note that some payment system participants, ostensibly concerned about being sued for obeying the injunctions, apparently enjoy the protection of exculpatory clauses in their contracts.  *See e.g.*, Trust Indenture of June 2, 2005, §5.2(xvi), Supp. App. 662 ("[BNY] will not be liable to any person if prevented or delayed in performing any of its obligations . . . by reason of any present or future law applicable to it, by any governmental or regulatory authority or by any circumstance beyond its control . . . .").

1   *v. N.L.R.B.*, 324 U.S. 9, 15 (1945).  The doors of the district court obviously remain open for

2   such applications.

3       The amended injunctions simply provide notice to payment system participants that they

4   could become liable through Rule 65 if they assist Argentina in violating the district court's

5   orders.  Since the amended injunctions do not directly enjoin payment system participants, it is

6   irrelevant whether the district court has personal jurisdiction over them.  And of course, "[t]here

7   will be no adjudication of liability against a [non-party] without affording it a full opportunity at

8   a hearing, after adequate notice, to present evidence." *Golden State Bottling Co., Inc. v.*

9   *N.L.R.B.*, 414 U.S. 168, 180 (1973).  In such a hearing, before any finding of liability or sanction

10   against a non-party, questions of personal jurisdiction may be properly raised.  But, at this point,

11   they are premature.  Similarly, payment system participants have not been deprived of due

12   process because, if and when they are summoned to answer for assisting in a violation of the

13   district court's injunctions, they will be entitled to notice and the right to be heard.  *See id.* at

14   181.

15       Euro Bondholders and ICE Canyon next argue that the amended injunctions are improper

16   or at a minimum violate comity where they extraterritorially enjoin payment systems that deliver

17   funds to Exchange Bondholders.  But a "federal court sitting as a court of equity having personal

18   jurisdiction over a party [here, Argentina] has power to enjoin him from committing acts

19   elsewhere." *Bano v. Union Carbide*, 361 F.3d 696, 716 (2d Cir. 2004) (internal quotation marks

20   omitted).  And federal courts can enjoin conduct that "has or is intended to have a substantial

21   effect within the United States." *United States v. Davis*, 767 F.2d 1025, 1036 (2d Cir. 1985).

16

1        The district court put forward sufficient reasons for binding Argentina's conduct,

2    regardless of whether that conduct occurs here or abroad.  *See NML II* at \*4 (noting that if

3    Argentina is able to pay Exchange Bondholders while avoiding its obligations to plaintiffs, "the

4    Injunctions will be entirely for naught"); *see also* Oral Arg. Tr. Nov. 9, 2012, 16:16-18, Supp.

5    App. 461 ("[T]he Republic has done everything possible to prevent those judgments that have

6    been entered [against it] from being enforced.").  And the district court has articulated good

7    reasons that the amended injunctions must reach the process by which Argentina pays Exchange

8    Bondholders.  *See NML II* at \*4 (noting that, to prevent Argentina from avoiding its obligations

9    to plaintiffs, "it is necessary that the *process* for making payments on the Exchange Bonds be

10    covered"); *id.* at \*5 (explaining that "if Argentina attempts to make payments . . . contrary to

11    law," then "third parties should properly be held responsible for making sure that their actions

12    are not steps to carry out a law violation").  The amended injunctions do not directly enjoin any

13    foreign entities other than Argentina.  By naming certain foreign payment system participants

14    (such as Clearstream Banking S.A., Euroclear Bank S.A./N.V., and Bank of New York

15    (Luxembourg) S.A), the district court was, again, simply recognizing the automatic operation of

16    Rule 65.

17        If ICE Canyon and the Euro Bondholders are correct in stating that the payment process

18    for their securities takes place entirely outside the United States, then the district court misstated

19    that, with the possible exception of Argentina's initial transfer of funds to BNY, the Exchange

20    Bond payment "process, without question takes place in the United States."  *NML II* at \*5 n.2.

21    But this possible misstatement is of no moment because, again, the amended injunctions enjoin

22    no one but Argentina, a party that has voluntarily submitted to the jurisdiction of the district

17

1    court.  If others in active concert or participation with Argentina are outside the jurisdiction or

2    reach of the district court, they may assert as much if and when they are summoned to that court

3    for having assisted Argentina in violating United States law.

4         Argentina and Fintech further argue that the amended injunctions violate Article 4A of

5    the U.C.C., which was enacted to provide a comprehensive framework that defines the rights and

6    obligations arising from wire transfers.  *See Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper*

7    *Co.*, 609 F.3d 111, 118 (2d Cir. 2010).  Two sections of that article are at issue: § 502,

8    concerning creditor process, and § 503, requiring "proper cause" before a party to a fund transfer

9    (but not an intermediary bank) may be enjoined.

10        Section 502(1) defines creditor process as a "levy, attachment, garnishment, notice of

11   lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with

12   respect to an account."  Within the context of electronic funds transfers ("EFTs"), § 502 requires

13   that creditor process must be served on the bank of the EFT beneficiary who owes a debt to the

14   creditor.  N.Y. U.C.C. § 4-A-502(4).  The Republic argues that the district court impermissibly

15   skirts § 502's bar to creditor process except against a beneficiary's bank because the amended

16   injunctions purport to affect multiple banks and other financial institutions in active concert and

17   participation with Argentina.

18        Section 502 is not controlling because the amended injunctions do not constitute, or give

19   rise to, "creditor process," essentially defined in the statute as a levy or attachment.  The cases

20   cited by Argentina are inapposite because they deal with attachments, and as we have seen, none

21   has occurred here.  *See Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 70

18

1    (2d Cir. 2009); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 124 (2d

2    Cir. 2009).

3          Section 503, however, does apply.  It provides that only "[f]or proper cause" may a court

4    restrain (i) a person from issuing a payment order to initiate a funds transfer, (ii) an
5    [EFT] originator's bank from executing the payment order of the originator, or (iii)
6    the [EFT] beneficiary's bank from releasing funds to the beneficiary or the
7    beneficiary from withdrawing the funds.  A court may not otherwise restrain a person
8    from issuing a payment order, paying or receiving payment of a payment order, or
9    otherwise acting with respect to a funds transfer.
10
11    N.Y. U.C.C. § 4-A-503.  This section "is designed to prevent interruption of a funds transfer

12    after it has been set in motion," and "[i]n particular, intermediary banks are protected" from

13    injunctions that would disrupt an EFT.  *Id.* § 4-A-503 cmt.

14          Argentina argues that plaintiffs purport to have cause for an injunction only with respect

15    to Argentina, and therefore any transfers not involving Argentina cannot be enjoined.  But as

16    discussed above, the district court explained why it had good cause to issue injunctions that

17    cover Argentina as well as the Exchange Bond payment system.  *See NML II* at *4-5.  Moreover,

18    taking into account § 503's ban on injunctions against intermediary banks, the district court

19    expressly excluded intermediary banks from the scope of the amended injunctions.  Nonetheless,

20    Fintech argues that BNY, BNY's paying agents, and DTC all act as intermediary banks and are

21    all bound by the amended injunctions.  We need not determine now what entities may or may not

22    act as intermediary banks in an EFT that violates the amended injunctions.  Whether or not an

23    institution has assisted Argentina in a payment transaction solely in the capacity of an

24    intermediary bank will be a question for future proceedings.

25          We note, however, that the record does not support Fintech's assertions.  BNY does not

26    route funds transfers originated by Argentina to Exchange Bondholders.  Rather, BNY accepts

19

1    funds as a beneficiary of Argentina's EFT and then initiates new EFTs as directed by its

2    indenture.  *See* Supp. App. 529, 535, 537, 628-759; *see also* Appellant Argentina Br. 35

3    ("[BNY] initiates its *separate* funds transfer to distribute payment . . . .") (emphasis in original).

4    It is noteworthy that neither Argentina nor BNY argue that BNY is an intermediary bank.

5          Similarly, the clearing systems such as DTC and Euroclear appear from the record and

6    from their own representations to be other than intermediary banks.  DTC does not route wire

7    transfers but accepts funds that it then allocates "only to the [participant banks and brokerage

8    houses] who have deposited the respective securities with DTC."  Supp. App. 1289-90.

9    Euroclear receives "payments from paying agents" and then "credits such amounts to its account

10   holders."  *Amicus* Euroclear Br. 3.  These are not the functions of an intermediary bank under

11   § 503.  *See In re Contichem LPG*, No. 99 Civ. 10493, 1999 WL 977364, at *2 n.2 (S.D.N.Y. Oct.

12   27, 1999) (McKenna, *J.*), *aff'd sub nom. ContiChem LPG v. Parsons Shipping Co., Ltd.*, 229

13   F.3d 426 (2d Cir. 2000) (explaining that a bank was "not an intermediary bank for purposes of

14   U.C.C. § 4-A-503 because it did not transfer by wire, or attempt to transfer by wire, the funds in

15   question, but simply, as a receiving bank, credited them to [its customer]").

16   **IV.    Alleged Injuries to the Public Interest**

17         In our October opinion, we considered the dire predictions from Argentina that enforcing

18   the commitments it made in the FAA would have cataclysmic repercussions in the capital

19   markets and the global economy, and we explained why we disagreed.  *See NML I* at 263.  On

20   this appeal, Argentina essentially recycles those arguments.  We are mindful of the fact that

21   courts of equity should pay particular regard to the public consequences of any injunction.  *See*

22   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  However, what the

20

1    consequences predicted by Argentina have in common is that they are speculative, hyperbolic,

2    and almost entirely of the Republic's own making.  None of the arguments demonstrates an

3    abuse of the district court's discretion.

4         The district court found that Argentina now "has the financial wherewithal to meet its

5    commitment of providing equal treatment to [plaintiffs] and [Exchange Bondholders]."  2012

6    WL 5895784, at *1.  However, Argentina and the Euro Bondholders warn that Argentina may

7    not be able to pay or that paying will cause problems in the Argentine economy, which could

8    affect the global economy.  But as we observed in our last opinion, other than this speculation,

9    "Argentina makes no real argument that, to avoid defaulting on its other debt, it cannot afford to

10   service the defaulted debt, and it certainly fails to demonstrate that the district court's finding to

11   the contrary was clearly erroneous."  *NML I* at 263.  Moreover, and perhaps more critically,

12   Argentina failed to present the district court with any record evidence to support its assertions.

13        Argentina and *amici* next assert that, by forcing financial institutions and clearing

14   systems to scour all of their transactions for payments to Exchange Bondholders, the amended

15   injunctions will delay many unrelated payments to third parties.  But the financial institutions in

16   question are already called on to navigate U.S. laws forbidding participation in various

17   international transactions.  *See, e.g.*, 31 C.F.R. § 560.206 (forbidding trade by U.S. persons,

18   including financial institutions, with Iran); 31 C.F.R. § 560.208 (forbidding dealings between

19   foreign persons engaged in trade with Iran and U.S. persons); *United States v. HSBC Bank USA,*

20   *N.A.*, No. 12 Crim. 763, 2013 WL 3306161, at *8 (E.D.N.Y. July 1, 2013) (approving settlement

21   of criminal charges against bank for violations of U.S. law that allowed money laundering by

22   drug traffickers); U.S. Dep't of Treasury, Settlement Agreement, MUL-488066, *available at*

21

1  http://www.treasury.gov/resource-center/sanctions/ofac-enforcement/documents/08182010.pdf

2  (settling allegations that a foreign bank violated U.S. prohibitions on payments to Cuba, Iran,

3  Burma, and Sudan).[12]  Indeed, the record in this case appears to belie those concerns and

4  suggests that payment system participants know when Exchange Bond payments are to arrive,

5  because each is identified by a unique code assigned to a particular Exchange Bond.  *See* Supp.

6  App. 1290.  In this context, we view Argentina's concerns as speculative.  In any event, a district

7  court always retains the power to adjust the terms of an injunction as unforeseen problems or

8  complexities involving entities such as the clearing systems present themselves.  *See United*

9  *States v. Diapulse Corp. of Am.*, 514 F.2d 1097, 1098 (2d Cir. 1975).

10          Also unpersuasive is Argentina's warning that we should vacate the injunctions because

11  future plaintiffs may "move against multilateral and official sector entities" like the IMF.

12  Appellant Argentina Br. 47.  As we have observed, this case presents no claim that payments to

13  the IMF would violate the FAA.  *NML I* at 260.  A court addressing such a claim in the future

14  will have to decide whether to entertain it or whether to agree with the appellees that

15  subordination of "obligations to commercial unsecured creditors beneath obligations to

16  multilateral institutions like the IMF would *not* violate the Equal Treatment Provision for the

17  simple reason that commercial creditors never were nor could be on equal footing with the

18  multilateral organizations."  *Id.*  Speculation that a future plaintiff might attempt recovery

19  affecting the IMF simply provides no reason to withhold relief here.

---

[12] We have never been presented with the question whether U.S. sanctions legally apply to non-U.S. persons or institutions, and we do not answer that question today.  We merely note that both foreign and domestic financial institutions are already required to police their own transactions in order to avoid violations of potentially applicable United States laws and regulations.

1        Next, Argentina and various *amici* assert that the amended injunctions will imperil future

2    sovereign debt restructurings.  They argue essentially that success by holdout creditors in this

3    case will encourage other bondholders to refuse future exchange offers from other sovereigns.

4    They warn that rather than submitting to restructuring, bondholders will hold out for the

5    possibility of full recovery on their bonds at a later time, in turn causing second- and third-order

6    effects detrimental to the global economy and especially to developing countries.  *See generally*

7    *Amicus* Anne Krueger Br. 11-16.

8        But this case is an exceptional one with little apparent bearing on transactions that can be

9    expected in the future.  Our decision here does not control the interpretation of all *pari passu*

10   clauses or the obligations of other sovereign debtors under *pari passu* clauses in other debt

11   instruments.  As we explicitly stated in our last opinion, we have not held that a sovereign debtor

12   breaches its *pari passu* clause every time it pays one creditor and not another, or even every time

13   it enacts a law disparately affecting a creditor's rights.  *See NML I* at 264 n.16.  We simply

14   affirm the district court's conclusion that Argentina's extraordinary behavior was a violation of

15   the particular *pari passu* clause found in the FAA.  *Id.*

16       We further observed that cases like this one are unlikely to occur in the future because

17   Argentina has been a uniquely recalcitrant debtor[13] and because newer bonds almost universally

18   include collective action clauses ("CACs") which permit a super-majority of bondholders to

_____

[13] *See also* Robin Wigglesworth & Jude Webber, An Unforgiven Debt, Fin. Times, Nov. 28, 2012 (characterizing Argentina as an "outlier in the history of sovereign restructurings"); Hung Q. Tran, The Role of Markets in Sovereign Debt Crisis Detection, Prevention and Resolution, Remarks at Bank of International Settlements Seminar, Sovereign Risk: A World Without Risk-Free Assets?, Jan. 8, 2013 ("Argentina . . . remain[s] a unique example of a sovereign debtor pursuing a unilateral and coercive approach to debt restructuring . . . .").

1    impose a restructuring on potential holdouts.  *See NML I* at 264.  Argentina and *amici* respond

2    that, even with CACs, enough bondholders may nonetheless be motivated to refuse

3    restructurings and hold out for full payment—or that holdouts could buy up enough bonds of a

4    single series to defeat restructuring of that series.  But a restructuring failure on one series would

5    still allow restructuring of the remainder of a sovereign's debt.  And, as one *amicus* notes, "if

6    transaction costs and other procedural inefficiencies are sufficient to block a super-majority of

7    creditors from voting in favor of a proposed restructuring, the proposed restructuring is likely to

8    fail under any circumstances."  *Amicus* Kenneth W. Dam Br. 14 n.5.

9        Ultimately, though, our role is not to craft a resolution that will solve all the problems

10   that might arise in hypothetical future litigation involving other bonds and other nations.  The

11   particular language of the FAA's *pari passu* clause dictated a certain result in this case, but

12   going forward, sovereigns and lenders are free to devise various mechanisms to avoid holdout

13   litigation if that is what they wish to do.  They may also draft different *pari passu* clauses that

14   support the goal of avoiding holdout creditors.  If, in the future, parties intend to bar preferential

15   payment, they may adopt language like that included in the FAA.  If they mean only that

16   subsequently issued securities may not explicitly declare subordination of the earlier bonds, they

17   are free to say so.  But none of this establishes why the plaintiffs should be barred from

18   vindicating their rights under the FAA.

19       For the same reason, we do not believe the outcome of this case threatens to steer bond

20   issuers away from the New York marketplace.  On the contrary, our decision affirms a

21   proposition essential to the integrity of the capital markets: borrowers and lenders may, under

22   New York law, negotiate mutually agreeable terms for their transactions, but they will be held to

24

1    those terms.  We believe that the interest—one widely shared in the financial community—in

2    maintaining New York's status as one of the foremost commercial centers is advanced by

3    requiring debtors, including foreign debtors, to pay their debts.  *See Weltover, Inc. v. Republic of*

4    *Argentina*, 941 F.2d 145, 153 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (1992).

5    **CONCLUSION**

6         For the foregoing reasons, we AFFIRM the district court's orders as amended.[14]  The

7    appeals from Exchange Bondholder Group, No. 12-4694, and from Fintech Advisory Inc., No.

8    12-4865, are hereby dismissed.  Enforcement of the amended injunctions shall be stayed pending

9    the resolution by the Supreme Court of a timely petition for a writ of *certiorari*.

10

---

[14] The orders affirmed here are listed in footnote 2 of this opinion.