# 12-105-cv(L)

**12-109-cv (CON), 12-111-cv (CON), 12-157-cv (CON), 12-158-cv (CON),
12-163-cv (CON), 12-164-cv (CON), 12-170-cv (CON), 12-176-cv (CON),
12-185-cv (CON), 12-189-cv (CON), 12-214-cv (CON), 12-909-cv (CON),
12-914-cv (CON), 12-916-cv (CON), 12-919-cv (CON), 12-920-cv (CON),
12-923-cv (CON), 12-924-cv (CON), 12-926-cv (CON), 12-939-cv (CON),
12-943-cv (CON), 12-951-cv (CON), 12-968-cv (CON), 12-971-cv (CON),
12-4694-cv (CON), 12-4829-cv (CON), 12-4865-cv (CON)**

## United States Court of Appeals

*for the*

## Second Circuit

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,

*Plaintiffs-Appellees,*

— v. —

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant,*

*(Caption Continued on Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**PETITION FOR PANEL REHEARING AND REHEARING EN BANC OF
DEFENDANT-APPELLANT THE REPUBLIC OF ARGENTINA**

*Of Counsel:*
Jonathan I. Blackman
Carmine D. Boccuzzi
Michael M. Brennan

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for Defendant-Appellant*
One Liberty Plaza
New York, New York 10006
(212) 225-2000

ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees,*

THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE, EXCHANGE BONDHOLDER GROUP, FINTECH ADVISORY INC.,

*Non-Party Appellants,*

EURO BONDHOLDERS, ICE CANYON LLC,

*Intervenors.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

RULE 35(b) STATEMENT ................................................................................. 1

REASONS FOR GRANTING REHEARING .................................................... 2

    A.    The Panel's Interpretation Of The Pari Passu Clause Is Wrong .......... 2

    B.    The Decision Contravenes The FSIA ................................................. 7

    C.    The Panel Exceeded Its Equitable Powers ........................................ 11

CONCLUSION ................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*,
757 F.2d 516 (2d Cir. 1985)................................................................................ 3

*Am. Tobacco Co. v. Patterson*,
456 U.S. 63 (1982)........................................................................................ 10

*Atwood Turnkey Drilling v. Petroleo Brasileiro, S.A.*,
875 F.2d 1174 (5th Cir. 1989) ..................................................................... 9-10

*Autotech Techs. LP v. Integral Research & Dev. Corp.*,
499 F.3d 737 (7th Cir. 2007) ....................................................................... 8, 14

*Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*,
327 F.3d 197 (2d Cir. 2003)............................................................................ 10

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)........................................................................................ 13

*Conn. Bank of Comm. v. Republic of Congo*,
309 F.3d 240 (5th Cir. 2002) ......................................................................... 14

*De Letelier v. Republic of Chile*,
748 F.2d 790 (2d Cir. 1984)............................................................................ 13

*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*,
637 F.3d 373 (D.C. Cir. 2011)......................................................................... 14

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002)................................................................................... 12-13

*In re Bernard L. Madoff Inv. Sec. LLC. v. JP Morgan Chase & Co.*,
721 F.3d 54 (2d Cir. 2013).............................................................................. 15

*Janvey v. Libyan Inv. Auth.*,
478 F. App'x 233 (5th Cir. 2012) ................................................................... 10

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993)......................................................................................... 7

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992).................................................................. 12

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
132 S. Ct. 2566 (2012)............................................................. 14

*Newmont Mines, Ltd. v. Hanover Ins. Co.*,
784 F.2d 127 (2d Cir. 1986)...................................................... 5

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) .......................................... 8, 13-14

*Rubin v. Islamic Republic of Iran*,
637 F.3d 783 (7th Cir. 2011) .................................................... 15

*S&S Machinery Co. v. Masinexportimport*,
706 F.2d 411 (2d Cir. 1983).............................................. *passim*

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)............................................. 1, 3, 4

*Wal-Mart Stores, Inc. v. Wells*,
213 F.3d 398 (7th Cir. 2000) .................................................... 12

*Walters v. Indus. & Commercial Bank of China, Ltd.*,
651 F.3d 280 (2d Cir. 2011)........................................................ 8

**Rules and Statutes**

28 U.S.C. § 1609 ...................................................................... 1, 8

28 U.S.C. § 1610 ........................................................................... 1

28 U.S.C. § 1610(a) ................................................................. 1, 8

28 U.S.C. § 1610(b) ................................................................. 1, 8

28 U.S.C. § 1611 ........................................................................... 1

N.Y.C.P.L.R § 5225(a) .................................................................. 9

**Other Authorities**

Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: Eight Centuries of Financial Folly* (2009) ............................................................... 5

IMF, *Sovereign Debt Restructuring – Recent Developments and Implications for the Fund's Legal and Policy Framework*, Apr. 26, 2013, *available at* http://www.imf.org/external/np/pp/eng/2013/042613.pdf............................. 6-7

Joshua Goodman, *IMF Should Ask U.S. to Review Argentina Case: Lagarde,* Bloomberg, Jul. 20, 2013 ............................................................... 7

P. Singer & J. Newman, *Myths and Realities*, Latin Finance, Sept. 1, 2005...................................................................................................... 3

# RULE 35(b) STATEMENT

The panel's August 23, 2013 decision (the "Decision" or "Dec.") affirmed injunctive relief (the "Amended Injunctions") that further broadened the pari passu injunctions the panel affirmed on October 26, 2012 ("Oct. Dec."). The Decision makes grave legal errors that magnify the error of the panel's previous unprecedented holdings. The Amended Injunctions not only enjoin a sovereign from making payments in its own country to holders of its restructured debt – essentially nullifying the effect of two restructurings *approved* by this Court – but also disable the Trustee for that debt and other participants in the international financial system, many, like Euroclear, located outside the United States, from processing payments under threat of contempt. No U.S. court has ever issued such an order.

The Decision rests on an ad hoc interpretation of the boilerplate pari passu clause in the Republic's debt documentation that defies commercial reasonableness, will exacerbate future sovereign debt crises, and conflicts with this Court's ruling in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982), that boilerplate terms should be construed in a consistent manner that reflects market understanding. It defies the property immunities set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1609–1611 ("FSIA"), and this Court's decision in *S&S Machinery Co. v.*

*Masinexportimport*, 706 F.2d 411 (2d Cir. 1983), by restraining property that is immune from U.S. court process, and awards relief by an injunction to pay "hold out" debt that exceeds the equitable powers of U.S. courts and overrides Congressional intent. It has caused consternation in the private and public sectors – including among Argentina's officials, who have expressed grave concern that payment of the nation's debt not be disrupted. The panel rejected this concern as "defiance," but it is the reaction any state would have to such a prospect.

## REASONS FOR GRANTING REHEARING

### A.    The Panel's Interpretation Of The Pari Passu Clause Is Wrong

In affirming the Amended Injunctions – which order the Republic to pay plaintiffs "100% of the principal and interest" on their defaulted debt as a condition to the Republic making a single interest payment on more than $24 billion of restructured debt – the panel held that it did "no more than hold Argentina to its contractual obligation of equal treatment." Dec. at 12. According to the panel, it did *not* hold that "a sovereign debtor breaches its pari passu clause every time it pays one creditor and not another" *or* "even every time it enacts a law disparately affecting a creditor's rights." Dec. at 23. The panel nevertheless concluded that this "particular" clause was violated by Argentina's "extraordinary behavior" – a conclusory label for the length of Argentina's default and the existence of Argentina's so-called "Lock Law," a law the Argentine Senate just voted to suspend

2

indefinitely.[1]  *Id.*  This attempt to distinguish this case from other cases in which a sovereign "pays one creditor and not another," Dec. at 23, is result-oriented decision-making, not the principled and consistent interpretation of the boilerplate pari passu clause required by *Sharon Steel*: the clear language of that provision is not modified by the length of any restructuring process (or the number of times a sovereign has defaulted in the past), and the passage of legislation is immaterial to the fact that holdout debt is not being paid, which is essential to any voluntary debt restructuring.  *See Sharon Steel*, 691 F.2d at 1039 (boilerplate to be interpreted to avoid the creation of "enduring uncertainties . . . [that] would decrease the value of all debenture issues and greatly impair the efficient working of capital markets").

The panel sought to limit the breadth of its Decision to the purportedly unique instance of Argentina, stating that the "certain result in this case" was "dictated" by the "particular language of the FAA's *pari passu* clause," and suggesting that other pari passu clauses with slightly different language may mean something else.  Dec. at 24.  But nothing in the boilerplate clause "dictated" the panel's interpretation in

---

[1] Even when in effect, the Lock Law could not have affected plaintiffs' contractual rights – as NML's principals have publicly acknowledged, "*notwithstanding [the Lock Law]*, bonds not tendered into Argentina's recent debt exchange represent legitimate, enforceable obligations of Argentina."  P. Singer & J. Newman, *Myths and Realities*, Latin Finance, at 111, Sept. 2005 (emphasis added); *see also Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985) (foreign-state directives ineffective to affect right to payment under N.Y. law-governed debt instruments).  The panel held that the exchange bondholders suffered no injury because "[i]f Argentina defaults on its obligations to them, *they retain their rights to sue*."  Dec. at 10 (emphasis added).  The panel ignored that the exact same reasoning applies to plaintiffs.

3

affirming the district court's unprecedented ratable payment remedy.  Indeed, the

October Decision acknowledged that even plaintiffs did not argue that the clause

"*requir[es]* ratable payment."  Oct. Dec. at 14 n.10 (emphasis added).  The panel's

ruling, which does not set forth a standard for violation of the pari passu clause

beyond saying that Argentina did it, thus leaves lower courts with two equally

improper options in future litigation (already being brought against other countries)

over the meaning of such clauses in New York-law sovereign debt (of which there is

an estimated $403 billion outstanding): either to "interpret" the clause to require

ratable payment and the remedy created here – with disastrous effects on sovereign

and private sector debt restructurings – *or* engage in standardless ad hoc

adjudication, contrary to this Court's directive in *Sharon Steel*.  691 F.2d at 1048;

US *Amicus* Brief at 5, Dkt. #238 ("US Br.").

     The panel's erroneous affirmance of the district court's specific performance

remedy – which necessarily must be tied to the purported intent of the parties –

reads the clause to prohibit a foreign state (or any other borrower) from voluntarily

restructuring its debts without unanimous consent.  With no bankruptcy law for

countries, the Decision prevents the state from paying even discounted interest to

those creditors who agree to restructure and take a "haircut" on their defaulted debt,

unless the state pays full principal and interest on any debt that holds out from the

restructuring.[2]  In addition to being inconsistent with market understanding and the

policies of, *inter alia*, the U.S. and IMF, this interpretation fails under basic

principles of New York law requiring contracts to be interpreted so as to avoid

commercially unreasonable results that the contracting parties could never have

intended.  *Newmont Mines, Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir.

1986) (contracts "should be examined in light of the business purposes sought to be

achieved by the parties").

Given the history of foreign state defaults (which have involved and will in

the future involve many states besides Argentina[3]), *no* foreign state borrower *or*

lender (and particularly not Argentina or its creditors) would ever have agreed to a

provision that prevents any restructuring from being implemented without

unanimous consent, by permitting any holdout to block payments on restructured

debt unless holdouts are paid in full.  No sovereign would subject itself to the

possibility of being forced into default on restructured debt by a single holdout, and

no creditor would enter into such a restructuring if it knew that any holdout could

disrupt his or her payment.  Although the panel sought to minimize these concerns

---

[2] Thus, in the absence of the Court's stay, Argentina would be enjoined from
making a $164 million interest payment due at the end of September on its par
bonds unless it paid plaintiffs an amount they claim to be over $1.4 billion.

[3] *See* Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: Eight
Centuries of Financial Folly* xxvi-xxvii (2009) (sovereign debt crises and banking
crises "have histories that span centuries and cut across regions. Sovereign debt
crises were once commonplace among the now advanced economies that appear to
have 'graduated' from periodic bouts of government insolvency.").

"going forward" by stating that future deals could eliminate the pari passu clause, Dec. at 24, that is no more than an acknowledgment that the panel's "interpretation" of the provision renders it unworkable.  It also ignores that pari passu clauses "functionally similar or identical" to Argentina's are "widespread" in sovereign bonds.  Reply Br. at 28; *see also* JA-1574 (*NML's* purported expert finding that over 50% of sovereign bonds include pari passu clause language similar to Argentina's).

The market and commentators have recognized that the panel's efforts to cabin its holding are not convincing, and have explained the Decision's deleterious consequences.  *See e.g.*, U.S. *En Banc Amicus* Br. at 1-5, Dkt. #653; Anne Krueger *Amicus* Br. at 17-18, Dkt. #778 (panel's pari passu construction will "reduce prospects for growth in developing countries, increase the costs to creditors and debtors of debt resolution, harm the international sovereign debt market, and reduce the ability of the private international capital market to enhance the growth of developing countries"); IMF, *Sovereign Debt Restructuring – Recent Developments and Implications for the Fund's Legal and Policy Framework*, at 31, Apr. 26, 2013 (ruling "risk[s] undermining the sovereign debt restructuring process" because it discourages creditors from participating in voluntary restructurings and "increase[s] the risk that holdouts will multiply . . . due to inter-creditor equity concerns").[4]

---

[4] In recognition of the significant repercussions for the international financial community of the panel's October Decision, the Republic of France has submitted

(continued . . .)

Rehearing is necessary to correct the panel's errors and prevent these predictions from becoming a reality.

**B.     The Decision Contravenes The FSIA**

The panel has now resolved any ambiguity concerning the nature of the relief awarded and confirmed that the Amended Injunctions are a device that compels the Republic to pay to plaintiffs 100% of the accelerated principal and interest on their defaulted debt, *i.e.*, *money damages*, with property that is immune from legal remedies under the FSIA, by enjoining the Republic's use of equally immune property within its own borders unless it makes that payment. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) ("[M]oney damages are, of course, the classic form of *legal* relief."). This use of equitable powers to compel the pre-judgment transfer of immune property to pay a money damages claim contravenes this Court's reading of the FSIA in *S&S Machinery*, which holds – consistent with Fifth Circuit precedent and the clear intent of Congress – that courts may not use "any other means to effect the same result" as an execution device unless an exception to the FSIA's property immunities applies. 706 F.2d at 418. The Decision makes the Second Circuit an outlier among both the U.S. courts of appeals and the legal

---

an *amicus* brief in support of the Republic's pending petition for a writ of *certiorari*. *See also* Joshua Goodman, *IMF Should Ask U.S. to Review Argentina Case: Lagarde*, Bloomberg, Jul. 20, 2013.

regimes of the broader international community, thus harming U.S. foreign relations.  US Br. at 28-29.

Under the FSIA, foreign-state property is "immune from attachment arrest and execution," even where a state is subject to jurisdiction, unless it is located *in the United States* and used here for a commercial activity.  *See* 28 U.S.C. §§ 1609, 1610(a), 1610(b); *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) (rejecting extraterritorial restraint:  "We would need some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction."); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1131-32 (9th Cir. 2010) (foreign state's property located in France immune because it was not located in the United States).  Courts have consistently interpreted the reference in Section 1609 to "attachment arrest and execution" to mean that the FSIA's property immunities apply to *all legal remedies*, whether *in rem* or *in personam*, designed to secure or satisfy money judgments.  *See, e.g.*, *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 283 (2d Cir. 2011) (affirming denial of *in personam* turnover order as violative of § 1610).

The Amended Injunctions have both the effect and the expressed intention of flouting the FSIA's execution immunities by restraining the Republic's use of property upon which plaintiffs cannot execute, in order to compel the Republic to pay plaintiffs' alleged money damages with funds from its Treasury upon which

plaintiffs are likewise barred from executing.  *See* Dec. at 12.  The panel was candid in noting at argument that the Amended Injunctions were designed to circumvent the FSIA's protections, stating that "if there weren't sovereign concerns, a court might very well tell a debtor that it was to pay the money into the court and the court would distribute it," but "*the Court is not empowered to do that, so it has taken this step*" of enjoining payments to the exchange bondholders to coerce the same forbidden result.  Feb. 27, 2013 Hr'g Tr. at 87:3-7 (emphasis added).

The panel tried to square its ruling with the FSIA by reasoning that the Amended Injunctions do not "attach, arrest, or execute upon any property," but instead "allow Argentina to pay its FAA debts with whatever resources it likes." Dec. at 11; *see also* Oct. Dec. at 24-25 (injunctions "do not operate as attachments" because they "can be complied with without the court's ever exercising dominion over sovereign property").  But this *ipse dixit* standard ignores this Court's instruction to focus on the practical "result" of the Amended Injunctions, which is to restrain the Republic's use of its funds in order to compel the Republic to pay plaintiffs' monetary claims in full – *i.e.*, the same result accomplished by a "turnover" order.  *See* N.Y.C.P.L.R. § 5225(a) (turnovers direct debtor on pain of contempt to directly pay creditor money "sufficient to satisfy the judgment"); *S&S Mach. Co.*, 706 F.2d at 418 (FSIA prohibits "any other means to effect the same result" as improper enforcement devices); *see also Atwood Turnkey Drilling v.*

9

*Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1177 (5th Cir. 1989) (FSIA applies where the "purpose of [an] injunction is to secure the payment of a judgment"); *Janvey v. Libyan Inv. Auth.*, 478 F. App'x 233, 236 (5th Cir. 2012).

The panel's formalistic distinction between remedies in aid of execution and contract-based equitable remedies compelling payment of the *same money damages* would permit courts to "eviscerate [the FSIA's] protections" by entering restraints that function as enforcement devices, even where no attachable property exists. *S&S Mach.*, 706 F.2d at 418. The Decision itself belies this false distinction, as the panel held that the purported harm justifying this "equitable" relief is the non-payment of plaintiffs' future money *judgments* – not any irreparable harm from the Republic's purported breach of the pari passu clause. *See* Dec. at 12. Congress cannot have intended that prior to obtaining a judgment contract-based money damages be enforceable by equitable orders directed to *all* of a foreign state's property, but that once those *same* damages are reduced to judgment *all* property then becomes presumptively immune from enforcement remedies. *See Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."); *Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 327 F.3d 197, 203 (2d Cir. 2003) ("Our interpretation must comport with the statute's primary purpose and not lead to anomalous or unreasonable results.").

10

In any event, the panel was wrong even under its incorrect FSIA formulation: the Injunctions *do* subject the Republic's immune property to the "control" of the court – they function as restraining orders that dissolve only if the Republic complies with related turnover orders.  The panel's assertion that the Orders do not implicate the FSIA because they "allow" the Republic to comply with them with whatever immune funds it likes misses the point.  Dec. at 11.  *All* such resources are immune from enforcement remedies – a result that is not changed by the fact that Argentina is subject to jurisdiction in U.S. courts – and whether the Republic complies with the Amended Injunctions by paying everyone or by paying no one, the Orders subject its property to the "control" of the court because in each case – in aid of enforcing a monetary claim – they compel the Republic to use its immune property within its own territorial borders in a particular manner.[5]

## C.    The Panel Exceeded Its Equitable Powers

The panel further erred when it reached the unprecedented conclusion that the limited remedy at law that Congress afforded U.S. litigants under the FSIA is inadequate, and thus justifies equitable relief designed to coerce a foreign state into

---

[5] The court's "dominion" over the funds used to pay exchange bondholders is patent from the fact that the Amended Injunctions are intended to force entities in the funds transfer chain to freeze any funds on pain of facing contempt proceedings.  By giving third-party participants in the international payment system the cold comfort of contesting the Amended Injunctions' application to them in a contempt proceeding, the panel ensured that any funds would not as a practical matter reach the exchange bondholders, despite its statement that "nothing in the Injunctions suggests that plaintiffs would 'execute upon' any funds . . . held in trust for the exchange bondholders."  Oct. Dec. at 25 n.14.

paying contract-based money damages under threat of contempt. Dec. at 12. The Decision's circular reasoning – that a sovereign's invocation of its statutory immunities enables a court to grant relief intended to circumvent those very immunities – contravenes Congressional intent as it has been unanimously interpreted by five separate courts of appeals (including this Court), and represents an improper, and seismic, shift in the enforcement of sovereign debt under U.S. law. Under the panel's ruling, whenever a court determines that, in its view, a foreign state's debts have gone unsatisfied for long enough, it can simply order the sovereign to "specifically perform" its promise to pay, thus nullifying Congress's policy choice to leave judgment satisfaction to the discretion of foreign states.

The Supreme Court has long recognized the fundamental doctrine of equity jurisprudence that injunctive relief is unavailable where there is an adequate remedy at law. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Because a "claim for money due and owing under a contract is quintessentially an action at law" for which a judgment is an adequate remedy, *Wal-Mart Stores, Inc. v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000), courts may not grant injunctive relief "to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation," except in the "rare cases" where a judgment would be inadequate because "future losses [are] incalculable or would be greater than the sum awarded." *Great-West Life &*

12

*Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210-11 (2002); *see also Bowen v. Massachusetts*, 487 U.S. 879, 925 (1988) (Scalia, J., dissenting) ("[E]ven though a plaintiff may often prefer a judicial order enjoining a harmful act or omission before it occurs, damages after the fact are considered an 'adequate remedy' in all but the most extraordinary cases.").

The remedy at law that Congress gave to U.S. plaintiffs in civil actions against foreign states is limited by the FSIA's broad property immunities, which significantly restrict the ability for plaintiffs to satisfy their judgments. Far from being an "extraordinary" circumstance warranting equitable relief, a sovereign's non-payment of judgments was specifically contemplated by Congress when it afforded sovereign property blanket immunity from execution, subject to a few explicit statutory exceptions. As this Court, as well as the Fifth, Seventh, Ninth and D.C. Circuits have all recognized, the FSIA reflects a deliberate congressional choice to create a right *without a remedy* when – as here – a sovereign is subject to U.S. jurisdiction, but its property is immune from judgment execution. In such circumstances creditors must rely on a sovereign to *voluntarily* pay any judgments against it. *De Letelier v. Republic of Chile*, 748 F.2d 790, 798 (2d Cir. 1984) (FSIA contemplates rights "without a remedy" at law); *Peterson*, 627 F.3d at 1128 ("Congress fully intended to create rights without remedies, aware that plaintiffs would often have to rely on foreign states to voluntarily comply with U.S. court

13

judgments."); *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 377 (D.C. Cir. 2011) ("The FSIA is a rather unusual statute that explicitly contemplates that a court may have jurisdiction over an action against a foreign state and yet be unable to enforce its judgment unless the foreign state holds certain kinds of property subject to execution."); *Conn. Bank of Comm. v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002) (under restrictive theory of sovereign immunity, if "a plaintiff successfully obtained a final judgment against a foreign sovereign, he still had to rely on the foreign state to pay the judgment voluntarily"); *Autotech Techs. LP*, 499 F.3d at 749 (same).

The panel's holding that plaintiffs' remedy at law under the FSIA is inadequate because the Republic will purportedly not pay plaintiffs' future judgments contravenes this entire line of authority and its consistent interpretation of Congressional intent.[6]  The panel further erred in using this ruling to grant equitable relief intended to coerce the Republic into paying plaintiffs the very same money damages that the panel presumed would be uncollectible if reduced to judgment.  Courts cannot use their remedial powers to override the intent of Congress.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2607 (2012)

---

[6] The panel's suggestion that, beyond the fact of non-payment, Argentine legislation that purportedly barred payments to plaintiffs further renders their legal remedy inadequate, Dec. at 12, conflicts with this authority for the same reasons.

("[The] touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.").

Plaintiffs have been vigorously pursuing attachment and execution of the Republic's allegedly commercial property in the United States.  October Dec. at 9 n.5.  *That* is the remedy at law that Congress provided to plaintiffs when it enacted the FSIA, and it cannot be circumvented by a grant of broader relief on purported equitable grounds because it has not led to the satisfaction of plaintiffs' judgments.  *In re Bernard L. Madoff Inv. Sec. LLC. v. JP Morgan Chase & Co.*, 721 F.3d 54, 58 (2d Cir. 2013) ("[E]quity has its limits; it may fill certain gaps in a statute, but it should not be used to enlarge substantive rights and powers.").  The FSIA's immunity framework imposes costs on U.S. litigants, but Congress has determined that foreign policy considerations outweigh those burdens, and courts *must* adhere to that decision.  *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 798-99 (7th Cir. 2011) ("The FSIA embodies a judgment that our nation's foreign-policy interests justify this particular allocation of legal burdens and benefits.").  The Republic cited *Great-West Life's* limits on equitable relief in its briefs and again at argument, but the Decision fails to address it at all.

## CONCLUSION

The Court should grant the Republic's petition.

15

Dated: New York, New York           Respectfully submitted,
      September 6, 2013

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:         /s/ Carmine Boccuzzi
                                
Jonathan I. Blackman (jblackman@cgsh.com)
Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

*Of counsel*:                                  One Liberty Plaza
Michael M. Brennan                   New York, New York 10006
                                   (212) 225-2000

*Attorneys for the Republic of Argentina*

16

ADDENDUM

12-105(L)
NML Capital, Ltd. v. Republic of Argentina

1                          UNITED STATES COURT OF APPEALS
2                             FOR THE SECOND CIRCUIT
3                       _____
4
5                              August Term, 2012
6
7          (Argued: February 27, 2013               Decided: August 23, 2013)
8
9    Docket Nos. 12-105(L), 12-109 (CON), 12-111 (CON), 12-157 (CON), 12-158 (CON), 12-163
10    (CON), 12-164 (CON), 12-170 (CON), 12-176 (CON), 12-185 (CON), 12-189 (CON), 12-214
11    (CON), 12-909 (CON), 12-914 (CON), 12-916 (CON), 12-919 (CON), 12-920 (CON), 12-923
12    (CON), 12-924 (CON), 12-926 (CON), 12-939 (CON), 12-943 (CON), 12-951 (CON), 12-968
13          (CON), 12-971 (CON), 12-4694 (CON), 12-4829 (CON), 12-4865 (CON)[*]
14                       _____
15
16       NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL
17    CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES
18      BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL
19    POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA
20   ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES,
21             MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,
22
23                                           *Plaintiffs-Appellees*,
24
25                             v.
26
27                     THE REPUBLIC OF ARGENTINA,
28
29                                   *Defendant-Appellant*,
30
31    THE BANK OF NEW YORK MELLON, as Indenture Trustee, EXCHANGE BONDHOLDER GROUP,
32                        FINTECH ADVISORY INC.,
33
34                                      *Non-Party Appellants*,
35

          _____

        [*] Appeals numbered 12-105, 12-109, 12-111, 12-157, 12-158, 12-163, 12-164, 12-170,
12-176, 12-185, 12-189, and 12-214 were dismissed as of October 26, 2012. Appeals numbered
12-909, 12-914, 12-916, 12-919, 12-920, 12-923, 12-924, 12-926, 12-939, 12-943, 12-951,
12-968, 12-971, 12-4829 are decided by this opinion. Appeals numbered 12-4694 and 12-4865
are dismissed by this opinion.

                          1

EURO BONDHOLDERS, ICE CANYON LLC,

*Intervenors*.

Before: POOLER, B.D. PARKER, and RAGGI, *Circuit Judges*.

———————————

Defendant-Appellant the Republic of Argentina, Non-Party Appellants, and Intervenors appeal from amended orders issued by the United States District Court for the Southern District of New York (Griesa, *J*.). The amendments explain certain aspects of those orders which were designed to remedy Argentina's breach of a promise to pay bondholders after a 2001 default on its sovereign debt. We hold that the district court did not abuse its discretion in issuing the orders.

AFFIRMED.

———————————

THEODORE B. OLSON (Matthew D. McGill, Jason J. Mendro, *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, D.C.; Robert A. Cohen, Eric C. Kirsch, Dechert LLP, New York, N.Y., *for Plaintiff-Appellee NML Capital, Ltd*.

Leonard F. Lesser, Simon Lesser, P.C., New York, N.Y., *for Plaintiff-Appellee Olifant Fund, Ltd*.

Michael C. Spencer, Milberg LLP, New York, N.Y., *for Plaintiffs-Appellees Pablo Alberto Varela, et al*.

Edward A. Friedman, Daniel B. Rapport, Friedman Kaplan Seiler & Adelman LLP, New York, N.Y.; Roy T. Englert, Jr., Mark T. Stancil, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C., *for Plaintiffs-Appellees Aurelius Capital Master, Ltd., ACP Master, Ltd., Blue Angel Capital I LLC,* and *Aurelius Opportunities Master Fund II, LLC*.

JONATHAN I. BLACKMAN (Carmine D. Boccuzzi, Ezequiel Sanchez-Herrera, Sara A. Sanchez, Michael M. Brennan, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, N.Y., *for Defendant-Appellant the Republic of Argentina*.

JAMES C. MARTIN (Colin E. Wrabley, *on the brief*),
   Reed Smith LLP, Pittsburg, Penn.; Eric A Schaffer,
   Reed Smith LLP, New York, N.Y., *for Non-Party*
   *Appellant The Bank of New York Mellon, as*
   *Indenture Trustee.*

DAVID BOIES (David A. Barrett, Nicholas A. Gravante,
   Jr., Steven I. Froot, *on the brief*), Boies, Schiller &
   Flexner LLP, New York, N.Y.; Sean F. O'Shea,
   Michael E. Petrella, Daniel M. Hibshoosh, O'Shea
   Partners LLP, New York, N.Y., *for Non-Party*
   *Appellants the Exchange Bondholder Group.*

William F. Dahill, Wollmuth Maher & Deutsch LLP,
   New York, N.Y., *for Non-Party Appellant Fintech*
   *Advisory Inc.*

Christopher J. Clark, Craig A. Batchelor, Michael E.
   Bern, Latham & Watkins, LLP, New York, N.Y.,
   *for Intervenors Euro Bondholders.*

Bruce Bennett, James O. Johnston, Beong-Soo Kim,
   Jones Day, Los Angeles, Cal.; Meir Feder, Jones
   Day, New York, N.Y., *for Intervenor ICE Canyon*
   *LLC.*

David W. Rivkin, Suzanne M. Grosso, Debevoise &
   Plimpton LLP, New York, N.Y., *for Amicus Curiae*
   *EM Ltd., in support of Plaintiffs-Appellees.*

Ronald Mann, Esq., New York, N.Y., *Amicus Curiae*
   *pro se*, *in support of Plaintiffs-Appellees.*

Jack L. Goldsmith III, Cambridge, Mass.; Judd B.
   Grossman, Grossman LLP, New York, N.Y., *for*
   *Amici Curiae Montreux Partners, L.P. and Wilton*
   *Capital, in support of Plaintiffs-Appellees.*

Richard A. Samp, Cory L. Andrews, Washington Legal
   Foundation, Washington, D.C., *for Amicus Curiae*
   *the Washington Legal Foundation, in support of*
   *Plaintiffs-Appellees.*

3

Case: 12-105    Document: 480-1    Page: 27    09/26/2013    1045396    28

1    Kevin S. Reed, Quinn Emanuel Urquhart & Sullivan,
2        LLP, New York, N.Y., *for Amicus Curiae Prof.*
3        *Kenneth W. Dam, in support of Plaintiffs-Appellees*.
4
5    Anthony J. Costantini, Rudolph J. Di Massa, Jr., Suzan
6        Jo, Mary C. Pennisi, Duane Morris LLP, New York,
7        N.Y., *for Duane Morris Individual Plaintiffs-*
8        *Appellees*.
9
10   Paul Saltzman, Joseph R. Alexander, The Clearing
11       House Association L.L.C., New York, N.Y.; H.
12       Rodgin Cohen, Michael M. Wiseman, Sergio J.
13       Galvis, Joseph E. Neuhaus, Michael J. Ushkow,
14       Jared P. Roscoe, Sullivan & Cromwell LLP, New
15       York, N.Y., *for Amicus Curiae The Clearing House*
16       *Association L.L.C., in support of Defendant-*
17       *Appellant*.
18
19   Eugenio A. Bruno, Estudio Garrido, Buenos Aires,
20       Argentina; M. Darren Traub, Akerman Senterfitt,
21       LLP, New York, N.Y. *for Amicus Curiae Alfonso*
22       *Prat-Gay, in support of Defendant-Appellant*.
23
24   Edward Scarvalone, Doar Rieck Kaley & Mack, New
25       York, N.Y., *for Amicus Curiae Prof. Anne Krueger,*
26       *in support of Defendant-Appellant*.
27
28   Paul T. Shoemaker, Greenfield Stein & Senior LLP,
29       New York, N.Y., *for Amicus Curiae Euroclear*
30       *Bank SA/NV, in support of Defendant-Appellant*.
31
32   Marco E. Schnabl, Timothy G. Nelson, Skadden, Arps,
33       Slate, Meagher & Flom LLP, New York, N.Y., *for*
34       *Amicus Curiae Puente Hnos. Sociedad de Bolsa*
35       *S.A., in support of Defendant-Appellant*.
36
37   Matthew D. Ingber, Chrisopher J. Houpt, Mayer Brown
38       LLP, New York, N.Y.; Charles A. Rothfeld, Paul
39       W. Hughes, Mayer Brown LLP, Washington, D.C.,
40       *for Amicus Curiae the American Bankers*
41       *Association, in support of Non-Party Appellant The*
42       *Bank of New York Mellon*.
43
44

4

1  _____

2  BARRINGTON D. PARKER, *Circuit Judge*:

3        This is a contract case in which the Republic of Argentina refuses to pay certain holders

4  of sovereign bonds issued under a 1994 Fiscal Agency Agreement (hereinafter, the "FAA" and

5  the "FAA Bonds").  In order to enhance the marketability of the bonds, Argentina made a series

6  of promises to the purchasers.  Argentina promised periodic interest payments.  Argentina

7  promised that the bonds would be governed by New York law.  Argentina promised that, in the

8  event of default, unpaid interest and principal would become due in full.  Argentina promised

9  that any disputes concerning the bonds could be adjudicated in the courts of New York.

10  Argentina promised that each bond would be transferrable and payable to the transferee,

11  regardless of whether it was a university endowment, a so-called "vulture fund," or a widow or

12  an orphan.  Finally, Argentina promised to treat the FAA Bonds at least equally with its other

13  external indebtedness.  As we have held, by defaulting on the Bonds, enacting legislation

14  specifically forbidding future payment on them, and continuing to pay interest on subsequently

15  issued debt, Argentina breached its promise of equal treatment.  *See NML Capital, Ltd. v.*

16  *Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) (*NML I*).

17        Specifically, in October 2012, we affirmed injunctions issued by the district court

18  intended to remedy Argentina's breach of the equal treatment obligation in the FAA.  *See id.*

19  Our opinion chronicled pertinent aspects of Argentina's fiscal history and the factual background

20  of this case, *see id.* at 251-57, familiarity with which is assumed.[1]  Those injunctions, fashioned

_____

        [1] For a more comprehensive narrative of Argentina's long history of defaulting on its debts, see Judge José Cabranes's opinion in *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007).

5

1    by the Hon. Thomas P. Griesa, directed that whenever Argentina pays on the bonds or other

2    obligations that it issued in 2005 or 2010 exchange offers (the "Exchange Bonds"), the Republic

3    must also make a "ratable payment" to plaintiffs who hold defaulted FAA Bonds.  We remanded,

4    however, for the district court to clarify the injunctions' payment formula and effects on third

5    parties and intermediary banks, and retained jurisdiction pursuant to *United States v. Jacobson*,

6    15 F.3d 19 (2d Cir. 1994).

7            On November 21, 2012, the district court issued amended injunctions with the

8    clarifications we requested,[2] as well as an opinion explaining them, which are challenged on this

9    appeal by Argentina as well as by non-party appellants and intervenors.  *See NML Capital, Ltd.*

10   *v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895786 (S.D.N.Y. Nov. 21, 2012)

11   (*NML II*).  Recognizing the unusual nature of this litigation and the importance to Argentina of

12   the issues presented, following oral argument, we invited Argentina to propose to the appellees

13   an alternative payment formula and schedule for the outstanding bonds to which it was prepared

14   to commit.  Instead, the proposal submitted by Argentina ignored the outstanding bonds and

15   proposed an entirely new set of substitute bonds.[3]  In sum, no productive proposals have been

16   forthcoming.  To the contrary, notwithstanding its commitment to resolving disputes involving

17   the FAA in New York courts under New York law, at the February 27, 2013 oral argument,

---

[2] *See NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895784 (S.D.N.Y. Nov. 21, 2012); *Aurelius Capital Master, Ltd. & ACP Master, Ltd. v. Republic of Argentina*, No. 09 Civ. 8757 (TPG), Dkt. No. 312 (S.D.N.Y. Nov. 26, 2012); *Olifant Fund, Ltd. v. Republic of Argentina*, No. 10 Civ. 9587, Dkt. No. 40 (S.D.N.Y. Nov. 26, 2012); *Varela v. Republic of Argentina*, No. 10 Civ. 5338, Dkt. No. 64 (S.D.N.Y. Nov. 26, 2012).  We refer to these collectively as the "amended injunctions."

[3] *See* Dkt. No. 935 (Argentina's Proposal of March 29, 2013); *see also* Dkt. No. 950 (Appellees' April 22, 2013 Response to Argentina's Proposal).

6

1    counsel for Argentina told the panel that it "would not voluntarily obey" the district court's

2    injunctions, even if those injunctions were upheld by this Court.  Moreover, Argentina's officials

3    have publicly and repeatedly announced their intention to defy any rulings of this Court and the

4    district court with which they disagree.[4]  It is within this context that we review the amended

5    injunctions for abuse of discretion and, finding none, we affirm.[5]  However, in view of the nature

6    of the issues presented, we will stay enforcement of the injunctions pending resolution of a

7    timely petition to the Supreme Court for a writ of *certiorari*.[6]

8          In its opinion, the district court first explained that its "ratable payment" requirement

9    meant that whenever Argentina pays a percentage of what is due on the Exchange Bonds, it must

10   pay plaintiffs the same percentage of what is then due on the FAA Bonds.  *Id.* at *2.  Under the

11   express terms of the FAA, as negotiated and agreed to by Argentina, the amount currently due on

---

[4] Argentine President Cristina Fernández de Kirchner is quoted as announcing that Argentina will pay on the Exchange Bonds "but not one dollar to the 'vulture funds,'" referring to FAA Bondholders such as plaintiff NML Capital, Ltd.  Argentina to Blast 'Vulture Funds' at the G20 Ministerial Meeting in Mexico, MercoPress, Nov. 4, 2012, Supp. App. 391.  The Republic's Economy Minister Hernan Lorenzino is quoted as echoing that "Argentina isn't going to change its position of not paying vulture funds . . . . We will continue to follow that policy despite any ruling that could come out of any jurisdiction, in this case New York."  Ken Parks & Charles Roth, Argentina Grapples with Credit-Rating Challenges, Wall St. J., Oct. 31, 2012, Supp. App. 395.  In a speech apparently posted to a presidential website, President Kirchner criticized the "justice system" overseen by this Court, stating that it "evidently is unaware of its own legislation."  Supp. App. 553.

[5] *See City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 142 (2d Cir. 2011).  A district court abuses its discretion when it bases a ruling "on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions."  *Sims v. Blot,* 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks omitted).

[6] Apparently, Argentina filed a petition for *certiorari* in this matter on June 24, 2013, notwithstanding that, as of that date, no final order had yet issued in this case.  *See* Supreme Court Dkt. 12-1494.

1    the FAA Bonds, as a consequence of its default, is the outstanding principal and accrued interest.

2    *See id.*; *NML I* at 254 n.7; *see also* Appellant Argentina 2012 Br. at 26 ("[T]he contractually

3    agreed upon remedy [for default] is acceleration of principal, an action already taken by these

4    plaintiffs.").  Thus, as the district court explained, if Argentina pays Exchange Bondholders

5    100% of what has come due on their bonds at a given time, it must also pay plaintiffs 100% of

6    the roughly $1.33 billion of principal and accrued interest that they are currently due.  *See NML*

7    *II* at *3.

8          Second, the district court explained how its injunctions would prevent third parties from

9    assisting Argentina in evading the injunctions.  Though the amended (and original) injunctions

10   directly bind only Argentina, the district court correctly explained that, through the automatic

11   operation of Federal Rule of Civil Procedure 65(d), they also bind Argentina's "agents" and

12   "other persons who are in active concert or participation" with Argentina.  *See id.* at *4; Fed. R.

13   Civ. P. 65(d)(2).  Those bound under the operation of  Rule 65(d) would include certain entities

14   involved in the system through which Argentina pays Exchange Bondholders.  As the district

15   court stated:

16          Argentina transfers funds to the Bank of New York Mellon ("BNY"), which is the
17          indenture trustee in a Trust Indenture of 2005.  Presumably there is a similar
18          indenture for the 2010 exchange offer.  BNY then forwards the funds to the
19          "registered owner" of the Exchange Bonds.  There are two registered owners for the
20          2005 and 2010 Exchange Bonds.  One is Cede & Co. and the other is the Bank of
21          New York Depositary ("BNY Depositary").  Cede and BNY Depositary transfer the
22          funds to a "clearing system" such as the Depository Trust Company ("DTC").  The
23          funds are then deposited into financial institutions, apparently banks, which then
24          transfer the funds to their customers who are the beneficial interest holders of the
25          bonds.
26
27   *NML II* at *5.  Of these, the amended injunctions cover Argentina, the indenture trustee(s), the

28   registered owners, and the clearing systems.  *See id.*  The amended injunctions explicitly exempt

8

1    intermediary banks, which enjoy protection under Article 4A of New York's Uniform

2    Commercial Code (U.C.C.), and financial institutions receiving funds from the DTC.  *See id.*

3         In accordance with our October 2012 opinion, the litigation then returned to our Court.

4    Argentina has challenged certain aspects of the amended injunctions, and appeals have also

5    followed from other entities: a group of Exchange Bondholders, styling themselves as the

6    Exchange Bondholder Group ("EBG"); the Bank of New York Mellon ("BNY"), indenture

7    trustee to Exchange Bondholders; and Fintech Advisory Inc., a holder of Exchange Bonds.  We

8    further received briefing (but no notices of appeal) from two intervenors: a group of bondholders

9    calling themselves the Euro Bondholders, and ICE Canyon LLC, a holder of GDP-linked

10   securities issued by Argentina.

11                          **APPELLATE STANDING**

12        Neither BNY, EBG, Fintech, Euro Bondholders, nor ICE Canyon intervened below, but

13   each seeks to participate here as a non-party.  As a general rule, only parties may appeal, but we

14   have recognized non-party appellate standing in two situations: where the non-party is bound by

15   the judgment and where the non-party has an interest plausibly affected by the judgment.  *See*

16   *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 77-78 (2d Cir.

17   2006).

18        The amended injunctions provide that BNY, as a participant in the payment process of

19   the Exchange Bonds, "shall be bound by the terms of this ORDER as provided by [Federal Rule

20   of Civil Procedure] 65(d)(2)."  2012 WL 5895784, at *2.  Accordingly, BNY has standing to

21   appeal.  *See NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 175

22   n.1 (2d Cir. 2011) (holding that non-party Banco Central de la República Argentina had standing

9

1    to challenge attachment and execution order).  In contrast, EBG, Fintech, Euro Bondholders, and

2    ICE Canyon are not bound by the amended injunctions.  They are creditors, and, as such, their

3    interests are not plausibly affected by the injunctions because a creditor's interest in getting paid

4    is not cognizably affected by an order for a debtor to pay a different creditor.  *Cf. Dish Network*

5    *Corp. v. DBSD N. Am., Inc.*, 634 F.3d 79, 90 (2d Cir. 2010); *Evanston Ins. Co. v. Fred A. Tucker*

6    *& Co., Inc.*, 872 F.2d 278, 280 (9th Cir. 1989).  If Argentina defaults on its obligations to them,

7    they retain their rights to sue.  And, as discussed below, their interests are not cognizably

8    affected in any other way.  Consequently, EBG, Fintech, Euro Bondholders, and ICE Canyon

9    have no appellate standing, and the appeals from EBG and Fintech are hereby dismissed.  (Euro

10    Bondholders and ICE Canyon did not file appeals of their own.)

11        At the same time, their arguments are not lost because they requested that, in the event

12    they were not deemed appellants, the court consider their arguments as coming from *amici*

13    *curiae*.  Because Argentina contends in its own appeal that the amended injunctions should be

14    vacated because, among other reasons, they are inequitable to Exchange Bondholders, we will

15    consider the arguments of EBG, Fintech, Euro Bondholders, and ICE Canyon as arguments from

16    *amici curiae* in support of Argentina.  *See* Fed. R. App. P. 29(a).[7]

17

18

19

---

[7] Judge Pooler disagrees with the majority decision to dismiss the appeals of EBG, Fintech, Euro Bondholders, and ICE Canyon.  However, as the arguments of the dismissed appellants are treated as made by *amici*, and as the status of the non-appellants matters little to the outcome here, Judge Pooler has agreed to note her disagreement for the record in this footnote, rather than dissent.

10

1                                   **DISCUSSION**

2              Argentina advances a litany of reasons as to why the amended injunctions unjustly injure

3    itself, the Exchange Bondholders, participants in the Exchange Bond payment system, and the

4    public.  None of the alleged injuries leads us to find an abuse of the district court's discretion.

5    **I.        Alleged Injuries to Argentina**

6              Argentina argues that the amended injunctions unjustly injure it in two ways.  First,

7    Argentina argues that the amended injunctions violate the Foreign Sovereign Immunities Act

8    ("FSIA") by forcing Argentina to use resources that the statute protects.  As discussed in our

9    October opinion, the original injunctions—and now the amended injunctions—do not violate the

10   FSIA because "[t]hey do not attach, arrest, or execute upon any property" as proscribed by the

11   statute.[8]  *NML I* at 262-63.  Rather, the injunctions allow Argentina to pay its FAA debts with

12   whatever resources it likes.  Absent further guidance from the Supreme Court, we remain

13   convinced that the amended injunctions are consistent with the FSIA.

14             Second, Argentina argues that the injunctions' ratable payment remedy is inequitable

15   because it calls for plaintiffs to receive their full principal and all accrued interest when

---

[8] As we noted,

[a]n "attachment" is the "seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment."  Black's Law Dictionary 123 (9th ed.2009); *see also* 6 Am. Jur. 2d Attachment and Garnishment § 1.  An arrest is "[a] seizure or forcible restraint."  Black's Law Dictionary 124 (9th ed. 2009).  "Execution" is "an act of dominion over specific property by an authorized officer of the court . . . which results in the creation of a legal right to subject the debtor's interest in the property to the satisfaction of the debt of his or her judgment creditor."  30 Am. Jur. 2d Executions § 177; *see also* Black's Law Dictionary (9th ed. 2009) ("Judicial enforcement of a money judgment, usu. by seizing and selling the judgment debtor's property.").

*NML I* at 262 n.13.

11

1    Exchange Bondholders receive even a single installment of interest on their bonds.  However,

2    the undisputed reason that plaintiffs are entitled immediately to 100% of the principal and

3    interest on their debt is that the FAA guarantees acceleration of principal and interest in the

4    event of default.  *See NML I* at 254 n.7; *NML II* at *4.  As the district court concluded, the

5    amount currently owed to plaintiffs by Argentina as a result of its persistent defaults is the

6    accelerated principal plus interest.  We believe that it is equitable for one creditor to receive what

7    it bargained for, and is therefore entitled to, even if other creditors, when receiving what they

8    bargained for, do not receive the same thing.  The reason is obvious: the first creditor is

9    differently situated from other creditors in terms of what is currently due to it under its contract.

10   *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 344 (2d Cir. 2005).

11   Because the district court's decision does no more than hold Argentina to its contractual

12   obligation of equal treatment, we see no abuse of discretion.

13        Argentina adds that the amended injunctions are invalid because a district court may not

14   issue an injunctive "remedy [that] was historically unavailable from a court of equity."  *Grupo*

15   *Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).  However,

16   English chancery courts traditionally had power to issue injunctions and order specific

17   performance when no effective remedy was available at law.  *See* 11A Charles Alan Wright &

18   Arthur R. Miller, Federal Practice and Procedure § 2944 (2d ed. 1994).  As we explained in our

19   October 2012 opinion, the plaintiffs have no adequate remedy at law because the Republic has

20   made clear its intention to defy any money judgment issued by this Court.  *See NML I* at 261-62.

21   Moreover, Argentina has gone considerably farther by passing legislation, the Lock Law,

22   specifically barring payments to FAA bondholders.  And it is unremarkable that a court

12

1    empowered to afford equitable relief may also direct the timing of that relief.  Here, that timing

2    requires that it occur before or when Argentina next pays the Exchange Bondholders.

3    II.    **Alleged Injuries to Exchange Bondholders**

4    Invoking the proposition that equitable relief is inappropriate where it would cause

5    unreasonable hardship or loss to third persons, *see Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales*

6    *Corp.*, 992 F.2d 430, 436 (2d Cir. 1993), Argentina, EBG, and Fintech argue that the amended

7    injunctions are inequitable to Exchange Bondholders.[9]  But this case presents no conflict with

8    that proposition.  EBG argues, notwithstanding our affirmance of the district court's finding that

9    Argentina has the financial wherewithal to pay all of its obligations, *see NML I* at 256, 263, that

10    the amended injunctions will harm Exchange Bondholders because Argentina "has declared

11    publicly that it has no intention of ever paying holdout bondholders like NML" and, as a result,

12    neither plaintiffs nor Exchange Bondholders will be paid if the amended injunctions stand.

13    Appellant EBG Br. 2.

---

[9] Intervenor ICE Canyon urges that the amended injunctions should not apply to euro-denominated GDP-linked securities that Argentina issued in its 2005 and 2010 exchanges.  The gist of ICE Canyon's argument is that the amended injunctions require payment to plaintiffs whenever Argentina pays on the Exchange *Bonds*, not when it pays on GDP-linked securities which yield revenue only if the Republic's GDP grows.  By their terms, however, the amended (and original) injunctions require payment to plaintiffs whenever Argentina pays on "Exchange Bonds," defined as including both bonds *and "other obligations"* issued in the exchange offers. 2012 WL 5895784, at *2 (emphasis added).  The inclusion of other obligations like GDP-linked securities is unsurprising, given that the FAA required that the FAA Bonds be treated at least equally with all "obligations (other than the [FAA Bonds]) for borrowed money or evidenced by securities, debentures, notes or other similar instruments denominated or payable, or which at the option of the holder thereof may be payable, in a currency other than the lawful currency of the Republic. . . ." J.A. 171.  The euro-denominated GDP-linked securities fit this description because they are "obligations . . . evidenced by securities . . . denominated . . . in a currency other than the lawful currency of the Republic."  Accordingly, we see no need to clarify the amended injunctions, and we consider the term Exchange Bonds to include the euro-denominated GDP-linked securities.

1    This type of harm—harm threatened to third parties by a party subject to an injunction

2    who avows not to obey it—does not make an otherwise lawful injunction "inequitable."  We are

3    unwilling to permit Argentina's threats to punish third parties to dictate the availability or terms

4    of relief under Rule 65.  *See Reynolds v. Int'l Amateur Athletic Fed'n*, 505 U.S. 1301, 1302

5    (1992) (Stevens, *J.*, in chambers).  Argentina's contention that the amended injunctions are

6    unfair to Exchange Bondholders is all the less persuasive because, before accepting the exchange

7    offers, they were expressly warned by Argentina in the accompanying prospectus that there

8    could be "no assurance" that litigation over the FAA Bonds would not "interfere with payments"

9    under the Exchange Bonds.  J.A. 466.  Under these circumstances, we conclude that the amended

10    injunctions have no inequitable effect on Exchange Bondholders and find no abuse of

11    discretion.[10]

12

13

---

[10] The remaining arguments pertaining to Exchange Bondholder interests are similarly without merit.  Exchange Bondholders have suffered no denial of procedural due process because there is no right to process for non-parties in their position.  *See Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund*, 582 F.3d 30, 42 (1st Cir. 2009) ("Impact and legal rights are not the same thing.  A decision in a contract dispute or antitrust case can have drastic effects on suppliers, stockholders, employees and customers of the company that loses the case; no one thinks the Constitution requires all of them to be parties.").  EBG's substantive due process and Takings Clause arguments fail because the amended injunctions do not deprive Exchange Bondholders of any property.  And lastly, non-parties—even those whose enjoyment of contractual rights may be affected by a judicial decision—are not necessary parties for Rule 19 joinder if they can protect their rights in subsequent litigation.  *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 386 (2d Cir. 2006).  Here, Exchange Bondholders will be affected if, after we affirm the amended injunctions, Argentina decides to default on the Exchange Bonds, but Exchange Bondholders would then be able to sue over that default.  Accordingly, we find no abuse of discretion in the amended injunctions with respect to the Exchange Bondholders' rights.

1    **III.    Alleged Injuries to Participants in the Exchange Bond Payment System**

2         Argentina, BNY, Euro Bondholders, and ICE Canyon raise additional issues concerning

3    the amended injunctions and their effects on the international financial system through which

4    Argentina pays Exchange Bondholders.  The arguments include that (1) the district court lacks

5    personal jurisdiction over payment system participants and therefore cannot bind them with the

6    amended injunctions, (2) the amended injunctions cannot apply extraterritorially, (3) payment

7    system participants are improperly bound because they were denied due process, and (4) the

8    amended injunctions' application to financial system participants would violate the U.C.C.'s

9    protections for intermediary banks.  None of these arguments, numerous as they are, has merit.[11]

10        First, BNY and Euro Bondholders argue that the district court erred by purporting to

11   enjoin payment system participants over which it lacks personal jurisdiction.  But the district

12   court has issued injunctions against no one except Argentina.  Every injunction issued by a

13   district court automatically forbids others—who are not directly enjoined but who act "in active

14   concert or participation" with an enjoined party—from assisting in a violation of the injunction.

15   *See* Fed. R. Civ. P. 65(d).  In any event, the Supreme Court has expressed its expectation that,

16   when questions arise as to who is bound by an injunction though operation of Rule 65, district

17   courts will not "withhold a clarification in the light of a concrete situation."  *Regal Knitwear Co.*

---

[11] We also note that some payment system participants, ostensibly concerned about being sued for obeying the injunctions, apparently enjoy the protection of exculpatory clauses in their contracts.  *See e.g.*, Trust Indenture of June 2, 2005, §5.2(xvi), Supp. App. 662 ("[BNY] will not be liable to any person if prevented or delayed in performing any of its obligations . . . by reason of any present or future law applicable to it, by any governmental or regulatory authority or by any circumstance beyond its control . . . .").

15

1   *v. N.L.R.B.*, 324 U.S. 9, 15 (1945).  The doors of the district court obviously remain open for

2   such applications.

3       The amended injunctions simply provide notice to payment system participants that they

4   could become liable through Rule 65 if they assist Argentina in violating the district court's

5   orders.  Since the amended injunctions do not directly enjoin payment system participants, it is

6   irrelevant whether the district court has personal jurisdiction over them.  And of course, "[t]here

7   will be no adjudication of liability against a [non-party] without affording it a full opportunity at

8   a hearing, after adequate notice, to present evidence."  *Golden State Bottling Co., Inc. v.*

9   *N.L.R.B.*, 414 U.S. 168, 180 (1973).  In such a hearing, before any finding of liability or sanction

10  against a non-party, questions of personal jurisdiction may be properly raised.  But, at this point,

11  they are premature.  Similarly, payment system participants have not been deprived of due

12  process because, if and when they are summoned to answer for assisting in a violation of the

13  district court's injunctions, they will be entitled to notice and the right to be heard.  *See id.* at

14  181.

15      Euro Bondholders and ICE Canyon next argue that the amended injunctions are improper

16  or at a minimum violate comity where they extraterritorially enjoin payment systems that deliver

17  funds to Exchange Bondholders.  But a "federal court sitting as a court of equity having personal

18  jurisdiction over a party [here, Argentina] has power to enjoin him from committing acts

19  elsewhere."  *Bano v. Union Carbide*, 361 F.3d 696, 716 (2d Cir. 2004) (internal quotation marks

20  omitted).  And federal courts can enjoin conduct that "has or is intended to have a substantial

21  effect within the United States."  *United States v. Davis*, 767 F.2d 1025, 1036 (2d Cir. 1985).

16

1    The district court put forward sufficient reasons for binding Argentina's conduct,

2    regardless of whether that conduct occurs here or abroad.  *See NML II* at *4 (noting that if

3    Argentina is able to pay Exchange Bondholders while avoiding its obligations to plaintiffs, "the

4    Injunctions will be entirely for naught"); *see also* Oral Arg. Tr. Nov. 9, 2012, 16:16-18, Supp.

5    App. 461 ("[T]he Republic has done everything possible to prevent those judgments that have

6    been entered [against it] from being enforced.").  And the district court has articulated good

7    reasons that the amended injunctions must reach the process by which Argentina pays Exchange

8    Bondholders.  *See NML II* at *4 (noting that, to prevent Argentina from avoiding its obligations

9    to plaintiffs, "it is necessary that the *process* for making payments on the Exchange Bonds be

10    covered"); *id.* at *5 (explaining that "if Argentina attempts to make payments . . . contrary to

11    law," then "third parties should properly be held responsible for making sure that their actions

12    are not steps to carry out a law violation").  The amended injunctions do not directly enjoin any

13    foreign entities other than Argentina.  By naming certain foreign payment system participants

14    (such as Clearstream Banking S.A., Euroclear Bank S.A./N.V., and Bank of New York

15    (Luxembourg) S.A), the district court was, again, simply recognizing the automatic operation of

16    Rule 65.

17    If ICE Canyon and the Euro Bondholders are correct in stating that the payment process

18    for their securities takes place entirely outside the United States, then the district court misstated

19    that, with the possible exception of Argentina's initial transfer of funds to BNY, the Exchange

20    Bond payment "process, without question takes place in the United States."  *NML II* at *5 n.2.

21    But this possible misstatement is of no moment because, again, the amended injunctions enjoin

22    no one but Argentina, a party that has voluntarily submitted to the jurisdiction of the district

17

1    court.  If others in active concert or participation with Argentina are outside the jurisdiction or

2    reach of the district court, they may assert as much if and when they are summoned to that court

3    for having assisted Argentina in violating United States law.

4         Argentina and Fintech further argue that the amended injunctions violate Article 4A of

5    the U.C.C., which was enacted to provide a comprehensive framework that defines the rights and

6    obligations arising from wire transfers.  *See Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper

7    Co.*, 609 F.3d 111, 118 (2d Cir. 2010).  Two sections of that article are at issue: § 502,

8    concerning creditor process, and § 503, requiring "proper cause" before a party to a fund transfer

9    (but not an intermediary bank) may be enjoined.

10        Section 502(1) defines creditor process as a "levy, attachment, garnishment, notice of

11   lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with

12   respect to an account."  Within the context of electronic funds transfers ("EFTs"), § 502 requires

13   that creditor process must be served on the bank of the EFT beneficiary who owes a debt to the

14   creditor.  N.Y. U.C.C. § 4-A-502(4).  The Republic argues that the district court impermissibly

15   skirts § 502's bar to creditor process except against a beneficiary's bank because the amended

16   injunctions purport to affect multiple banks and other financial institutions in active concert and

17   participation with Argentina.

18        Section 502 is not controlling because the amended injunctions do not constitute, or give

19   rise to, "creditor process," essentially defined in the statute as a levy or attachment.  The cases

20   cited by Argentina are inapposite because they deal with attachments, and as we have seen, none

21   has occurred here.  *See Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 70

18

1   (2d Cir. 2009); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 124 (2d

2   Cir. 2009).

3        Section 503, however, does apply. It provides that only "[f]or proper cause" may a court

> 4   restrain (i) a person from issuing a payment order to initiate a funds transfer, (ii) an
> 5   [EFT] originator's bank from executing the payment order of the originator, or (iii)
> 6   the [EFT] beneficiary's bank from releasing funds to the beneficiary or the
> 7   beneficiary from withdrawing the funds. A court may not otherwise restrain a person
> 8   from issuing a payment order, paying or receiving payment of a payment order, or
> 9   otherwise acting with respect to a funds transfer.
> 10

11   N.Y. U.C.C. § 4-A-503. This section "is designed to prevent interruption of a funds transfer

12   after it has been set in motion," and "[i]n particular, intermediary banks are protected" from

13   injunctions that would disrupt an EFT. *Id.* § 4-A-503 cmt.

14        Argentina argues that plaintiffs purport to have cause for an injunction only with respect

15   to Argentina, and therefore any transfers not involving Argentina cannot be enjoined. But as

16   discussed above, the district court explained why it had good cause to issue injunctions that

17   cover Argentina as well as the Exchange Bond payment system. *See NML II* at *4-5. Moreover,

18   taking into account § 503's ban on injunctions against intermediary banks, the district court

19   expressly excluded intermediary banks from the scope of the amended injunctions. Nonetheless,

20   Fintech argues that BNY, BNY's paying agents, and DTC all act as intermediary banks and are

21   all bound by the amended injunctions. We need not determine now what entities may or may not

22   act as intermediary banks in an EFT that violates the amended injunctions. Whether or not an

23   institution has assisted Argentina in a payment transaction solely in the capacity of an

24   intermediary bank will be a question for future proceedings.

25        We note, however, that the record does not support Fintech's assertions. BNY does not

26   route funds transfers originated by Argentina to Exchange Bondholders. Rather, BNY accepts

19

1    funds as a beneficiary of Argentina's EFT and then initiates new EFTs as directed by its

2    indenture. *See* Supp. App. 529, 535, 537, 628-759; *see also* Appellant Argentina Br. 35

3    ("[BNY] initiates its *separate* funds transfer to distribute payment . . . .") (emphasis in original).

4    It is noteworthy that neither Argentina nor BNY argue that BNY is an intermediary bank.

5            Similarly, the clearing systems such as DTC and Euroclear appear from the record and

6    from their own representations to be other than intermediary banks. DTC does not route wire

7    transfers but accepts funds that it then allocates "only to the [participant banks and brokerage

8    houses] who have deposited the respective securities with DTC." Supp. App. 1289-90.

9    Euroclear receives "payments from paying agents" and then "credits such amounts to its account

10   holders." *Amicus* Euroclear Br. 3. These are not the functions of an intermediary bank under

11   § 503. *See In re Contichem LPG*, No. 99 Civ. 10493, 1999 WL 977364, at *2 n.2 (S.D.N.Y. Oct.

12   27, 1999) (McKenna, *J.*), *aff'd sub nom. ContiChem LPG v. Parsons Shipping Co., Ltd.*, 229

13   F.3d 426 (2d Cir. 2000) (explaining that a bank was "not an intermediary bank for purposes of

14   U.C.C. § 4-A-503 because it did not transfer by wire, or attempt to transfer by wire, the funds in

15   question, but simply, as a receiving bank, credited them to [its customer]").

16   **IV.   Alleged Injuries to the Public Interest**

17           In our October opinion, we considered the dire predictions from Argentina that enforcing

18   the commitments it made in the FAA would have cataclysmic repercussions in the capital

19   markets and the global economy, and we explained why we disagreed. *See NML I* at 263. On

20   this appeal, Argentina essentially recycles those arguments. We are mindful of the fact that

21   courts of equity should pay particular regard to the public consequences of any injunction. *See*

22   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). However, what the

20

1    consequences predicted by Argentina have in common is that they are speculative, hyperbolic,

2    and almost entirely of the Republic's own making.  None of the arguments demonstrates an

3    abuse of the district court's discretion.

4            The district court found that Argentina now "has the financial wherewithal to meet its

5    commitment of providing equal treatment to [plaintiffs] and [Exchange Bondholders]."  2012

6    WL 5895784, at *1.  However, Argentina and the Euro Bondholders warn that Argentina may

7    not be able to pay or that paying will cause problems in the Argentine economy, which could

8    affect the global economy.  But as we observed in our last opinion, other than this speculation,

9    "Argentina makes no real argument that, to avoid defaulting on its other debt, it cannot afford to

10   service the defaulted debt, and it certainly fails to demonstrate that the district court's finding to

11   the contrary was clearly erroneous."  *NML I* at 263.  Moreover, and perhaps more critically,

12   Argentina failed to present the district court with any record evidence to support its assertions.

13           Argentina and *amici* next assert that, by forcing financial institutions and clearing

14   systems to scour all of their transactions for payments to Exchange Bondholders, the amended

15   injunctions will delay many unrelated payments to third parties.  But the financial institutions in

16   question are already called on to navigate U.S. laws forbidding participation in various

17   international transactions.  *See, e.g.*, 31 C.F.R. § 560.206 (forbidding trade by U.S. persons,

18   including financial institutions, with Iran); 31 C.F.R. § 560.208 (forbidding dealings between

19   foreign persons engaged in trade with Iran and U.S. persons); *United States v. HSBC Bank USA,*

20   *N.A.*, No. 12 Crim. 763, 2013 WL 3306161, at *8 (E.D.N.Y. July 1, 2013) (approving settlement

21   of criminal charges against bank for violations of U.S. law that allowed money laundering by

22   drug traffickers); U.S. Dep't of Treasury, Settlement Agreement, MUL-488066, *available at*

1    http://www.treasury.gov/resource-center/sanctions/ofac-enforcement/documents/08182010.pdf

2    (settling allegations that a foreign bank violated U.S. prohibitions on payments to Cuba, Iran,

3    Burma, and Sudan).[12]  Indeed, the record in this case appears to belie those concerns and

4    suggests that payment system participants know when Exchange Bond payments are to arrive,

5    because each is identified by a unique code assigned to a particular Exchange Bond.  *See* Supp.

6    App. 1290.  In this context, we view Argentina's concerns as speculative.  In any event, a district

7    court always retains the power to adjust the terms of an injunction as unforeseen problems or

8    complexities involving entities such as the clearing systems present themselves.  *See United*

9    *States v. Diapulse Corp. of Am.*, 514 F.2d 1097, 1098 (2d Cir. 1975).

10           Also unpersuasive is Argentina's warning that we should vacate the injunctions because

11   future plaintiffs may "move against multilateral and official sector entities" like the IMF.

12   Appellant Argentina Br. 47.  As we have observed, this case presents no claim that payments to

13   the IMF would violate the FAA.  *NML I* at 260.  A court addressing such a claim in the future

14   will have to decide whether to entertain it or whether to agree with the appellees that

15   subordination of "obligations to commercial unsecured creditors beneath obligations to

16   multilateral institutions like the IMF would *not* violate the Equal Treatment Provision for the

17   simple reason that commercial creditors never were nor could be on equal footing with the

18   multilateral organizations."  *Id.*  Speculation that a future plaintiff might attempt recovery

19   affecting the IMF simply provides no reason to withhold relief here.

---

[12] We have never been presented with the question whether U.S. sanctions legally apply to non-U.S. persons or institutions, and we do not answer that question today.  We merely note that both foreign and domestic financial institutions are already required to police their own transactions in order to avoid violations of potentially applicable United States laws and regulations.

22

1	Next, Argentina and various *amici* assert that the amended injunctions will imperil future

2	sovereign debt restructurings.  They argue essentially that success by holdout creditors in this

3	case will encourage other bondholders to refuse future exchange offers from other sovereigns.

4	They warn that rather than submitting to restructuring, bondholders will hold out for the

5	possibility of full recovery on their bonds at a later time, in turn causing second- and third-order

6	effects detrimental to the global economy and especially to developing countries.  *See generally*

7	*Amicus* Anne Krueger Br. 11-16.

8	But this case is an exceptional one with little apparent bearing on transactions that can be

9	expected in the future.  Our decision here does not control the interpretation of all *pari passu*

10	clauses or the obligations of other sovereign debtors under *pari passu* clauses in other debt

11	instruments.  As we explicitly stated in our last opinion, we have not held that a sovereign debtor

12	breaches its *pari passu* clause every time it pays one creditor and not another, or even every time

13	it enacts a law disparately affecting a creditor's rights.  *See NML I* at 264 n.16.  We simply

14	affirm the district court's conclusion that Argentina's extraordinary behavior was a violation of

15	the particular *pari passu* clause found in the FAA.  *Id.*

16	We further observed that cases like this one are unlikely to occur in the future because

17	Argentina has been a uniquely recalcitrant debtor[13] and because newer bonds almost universally

18	include collective action clauses ("CACs") which permit a super-majority of bondholders to

---

[13] *See also* Robin Wigglesworth & Jude Webber, An Unforgiven Debt, Fin. Times, Nov. 28, 2012 (characterizing Argentina as an "outlier in the history of sovereign restructurings"); Hung Q. Tran, The Role of Markets in Sovereign Debt Crisis Detection, Prevention and Resolution, Remarks at Bank of International Settlements Seminar, Sovereign Risk: A World Without Risk-Free Assets?, Jan. 8, 2013 ("Argentina . . . remain[s] a unique example of a sovereign debtor pursuing a unilateral and coercive approach to debt restructuring . . . .").

impose a restructuring on potential holdouts. *See NML I* at 264. Argentina and *amici* respond

that, even with CACs, enough bondholders may nonetheless be motivated to refuse

restructurings and hold out for full payment—or that holdouts could buy up enough bonds of a

single series to defeat restructuring of that series. But a restructuring failure on one series would

still allow restructuring of the remainder of a sovereign's debt. And, as one *amicus* notes, "if

transaction costs and other procedural inefficiencies are sufficient to block a super-majority of

creditors from voting in favor of a proposed restructuring, the proposed restructuring is likely to

fail under any circumstances." *Amicus* Kenneth W. Dam Br. 14 n.5.

        Ultimately, though, our role is not to craft a resolution that will solve all the problems

that might arise in hypothetical future litigation involving other bonds and other nations. The

particular language of the FAA's *pari passu* clause dictated a certain result in this case, but

going forward, sovereigns and lenders are free to devise various mechanisms to avoid holdout

litigation if that is what they wish to do. They may also draft different *pari passu* clauses that

support the goal of avoiding holdout creditors. If, in the future, parties intend to bar preferential

payment, they may adopt language like that included in the FAA. If they mean only that

subsequently issued securities may not explicitly declare subordination of the earlier bonds, they

are free to say so. But none of this establishes why the plaintiffs should be barred from

vindicating their rights under the FAA.

        For the same reason, we do not believe the outcome of this case threatens to steer bond

issuers away from the New York marketplace. On the contrary, our decision affirms a

proposition essential to the integrity of the capital markets: borrowers and lenders may, under

New York law, negotiate mutually agreeable terms for their transactions, but they will be held to

24

1    those terms.  We believe that the interest—one widely shared in the financial community—in

2    maintaining New York's status as one of the foremost commercial centers is advanced by

3    requiring debtors, including foreign debtors, to pay their debts.  *See Weltover, Inc. v. Republic of*

4    *Argentina*, 941 F.2d 145, 153 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (1992).

5    **CONCLUSION**

6          For the foregoing reasons, we AFFIRM the district court's orders as amended.[14]  The

7    appeals from Exchange Bondholder Group, No. 12-4694, and from Fintech Advisory Inc., No.

8    12-4865, are hereby dismissed.  Enforcement of the amended injunctions shall be stayed pending

9    the resolution by the Supreme Court of a timely petition for a writ of *certiorari*.

10

---

[14] The orders affirmed here are listed in footnote 2 of this opinion.