## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
**Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

**Docket Number(s)**: 12-105(L)                    Caption [use short title]

**Motion for:** Motion to Vacate the Stay                    NML Capital Ltd. v. Republic of Argentina

Set forth below precise, complete statement of relief sought:

To lift the stay pending resolution of timely petition

for writ of certiorari issued as part of August 23,

2013 Opinion.


**MOVING PARTY:** NML Capital Ltd., et al.                    **OPPOSING PARTY:** Republic of Argentina

☑ Plaintiff          ☐ Defendant
☐ Appellant/Petitioner     ☑ Appellee/Respondent

**MOVING ATTORNEY:** Theodore B. Olson          **OPPOSING ATTORNEY:** Jonathan I. Blackman

[name of attorney, with firm, address, phone number and e-mail]

Gibson Dunn & Crutcher LLP              Cleary Gottlieb Steen & Hamilton LLP
1050 Connecticut Avenue, NW              One Liberty Plaza
Washington, D.C. 20036                  New York, N.Y. 10006
(202) 955-8500, tolson@gibsondunn.com    (212) 225-2000, jblackman@cgsh.com

Court-Judge/Agency appealed from: U.S. District Court for the Southern District of New York

**Please check appropriate boxes:**

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain):_____

Has request for relief been made below?                    ☐ Yes ☐ No
Has this relief been previously sought in this Court?      ☐ Yes ☐ No
Requested return date and explanation of emergency:_____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

Is oral argument on motion requested?    ☑ Yes ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☑ Yes ☐ No  If yes, enter date: Oral Argument was held on February 27, 2013

**Signature of Moving Attorney:**
/s/ Theodore B. Olson    **Date:** 10/15/2013    Service by: ☑ CM/ECF    ☐ Other [Attach proof of service]

---

### ORDER

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED  DENIED**.

**FOR THE COURT:**
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____    By: _____

**Form T-1080** (rev. 7-12)

# 12-105(L)

12-109 (CON), 12-111 (CON), 12-157 (CON), 12-158 (CON), 12-163 (CON),
12-164 (CON), 12-170 (CON), 12-176 (CON), 12-185 (CON), 12-189 (CON),
12-214 (CON), 12-909 (CON), 12-914 (CON), 12-916 (CON), 12-919 (CON),
12-920 (CON), 12-923 (CON), 12-924 (CON), 12-926 (CON), 12-939 (CON),
12-943 (CON), 12-951 (CON), 12-968 (CON), 12-971 (CON), 12-4694 (CON),
12-4829 (CON), 12-4865 (CON)

## In the United States Court of Appeals
## for the Second Circuit

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE
ANGEL CAPITAL I LLC, AURELIUS OPPORTUNITIES FUND II, LLC, PABLO ALBERTO
VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA
CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA
CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA
LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA
VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees*,

-v.-

REPUBLIC OF ARGENTINA,

*Defendant-Appellant*,

(*Caption Continued on Inside Cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPELLEES' MOTION TO VACATE THE STAY**

(*Appearances on Inside Cover*)

THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE, EXCHANGE BONDHOLDER GROUP, FINTECH ADVISORY INC.,

*Non-Party Appellants*,

EURO BONDHOLDERS, ICE CANYON LLC, EURO BONDHOLDERS

*Intervenors.*

Robert A. Cohen
Eric C. Kirsch
DECHERT LLP
1095 Avenue of the Americas
New York, N.Y. 10036
(212) 698-3500

Theodore B. Olson
Matthew D. McGill
Jason J. Mendro
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500

*Counsel for Plaintiff-Appellee NML Capital, Ltd.*

Edward A. Friedman
Daniel B. Rapport
FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, N.Y. 10036
(212) 833-1100

Roy T. Englert, Jr.
Mark T. Stancil
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 775-4500

*Counsel for Plaintiffs-Appellees Aurelius Entities and Blue Angel Capital I LLC*

Leonard F. Lesser
SIMON LESSER, P.C.
420 Lexington Avenue
New York, N.Y.10170
(212) 599-5455
*Counsel for Plaintiff-Appellee Olifant Fund, Ltd.*

Michael C. Spencer
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10019
(212) 594-5300
*Counsel for Plaintiffs-Appellees Pablo Alberto Varela et al.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

BACKGROUND ...................................................................................4

STANDARD FOR VACATING A STAY.................................................9

ARGUMENT .....................................................................................10

    A.    There Can Be No "Good Cause" For A Stay Given Argentina's
    Vow To Evade The Amended Injunction .............................................11

        1.    Argentina's Declared Intent To Evade The Injunction
            Forecloses An Equitable Stay In Its Favor...............................11

        2.    Vacating The Stay Will Not Subject Argentina To Any
            Legally Cognizable Harm .........................................................14

        3.    A Further Stay Would Harm Appellees And Undermine
            The Public Interest ...................................................................15

    B.    The Supreme Court Is Unlikely To Grant Argentina's
    Successive *Certiorari* Petition .........................................................16

CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
  875 F.2d 1174 (5th Cir. 1989)................................................................18

*Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner
  Restoration, Inc.*,
  384 F.3d 911 (7th Cir. 2004).................................................................19

*Certain Named & Unnamed Non-Citizen Children & Their Parents v. Texas*,
  448 U.S. 1327 (1980) ..........................................................................10

*Commodity Futures Trading Comm'n v. British Am. Commodity Options Corp.*,
  434 U.S. 1316 (1977) ..........................................................................10

*Great-West Life & Annuity Insurance Co. v. Knudson*,
  534 U.S. 204 (2002) ...................................................................... 17, 18

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ............................................................................17

*Janvey v. Libyan Inv. Auth.*,
  478 F. App'x 233 (5th Cir. 2012)..........................................................18

*John Doe I v. Miller*,
  418 F.3d 950 (8th Cir. 2005) ..................................................................9

*Martin v. Dist. of Columbia Court of Appeals*,
  506 U.S. 1 (1992) ...............................................................................20

*McBride v. CSX Transp., Inc.*,
  611 F.3d 316 (7th Cir. 2010) ..................................................................9

*Michigan v. Long*,
  463 U.S. 1032 (1983) ..........................................................................17

*Motorola Credit Corp. v. Uzan*,
  561 F.3d 123 (2d Cir. 2009) ........................................................... 11, 12

**Table of Authorities**
**(Continued)**

*Nara v. Frank*,
  494 F.3d 1132 (3d Cir. 2007) ................................................................. 10, 16, 20

*NML Capital, Ltd. v. Republic of Argentina*,
  699 F.3d 246 (2d Cir. 2012) ................................................................. 5, 12, 14, 19

*NML Capital, Ltd. v. Republic of Argentina*,
  727 F.3d 230 (2d Cir. 2013) ......................................................... 6, 10, 11, 16, 19

*Phoenix Consulting Inc. v. Republic of Angola*,
  172 F.3d 920 (table), 1998 WL 794854 (D.C. Cir. 1998) ................................. 18

*Republic of Argentina v. NML Capital, Ltd.*,
  No. 12-1494, 2013 WL 3211846 (U.S. Oct. 7, 2013) ...................................... 17

*Sussman v. Jenkins*,
  642 F.3d 532 (7th Cir. 2011) ............................................................................. 14

*Wisniewski v. United States*,
  353 U.S. 901 (1957) .......................................................................................... 18

**Rules**

Fed R. App. P. 41 ................................................................................................. 9

## PRELIMINARY STATEMENT

On August 23, 2013, this Court affirmed the district court's amended Injunction, which requires Argentina to remedy its ongoing breach of the Equal Treatment Provision by ranking its payment obligations on the FAA Bonds at least equally with its obligations on the Exchange Bonds.  The next business day, Argentine President Cristina Fernández de Kirchner delivered a nationally-televised address in which she articulated an audacious plan to nullify this Court's decision. Under this plan, Argentina would permit Exchange Bonds to be traded for new bonds that are identical, except that they would be paid exclusively in Argentina. As President Kirchner candidly admitted, this "important" change is designed "to avoid potential embargoes," which is to say, to impede the ability of the courts of the United States to enforce the Injunction that this Court affirmed.

Appellees promptly responded by asking the district court to find that President Kirchner's announced plan would violate a prior order of the court, to which Argentina had agreed in order to secure a stay pending appeal.  That order, issued by the district court on March 5, 2012 ("the Anti-Evasion Order"), prohibits Argentina, while an appeal is pending, from "tak[ing] any action to evade the directives of the [Injunction,] . . . render [it] ineffective . . . , or diminish the Court's ability to supervise compliance with" it—including "altering or amending" the mechanism used to pay the Exchange Bondholders.  Appellees further asked the

district court to require Argentina to disclose any communications regarding Argentina's implementation of this plan.  On October 3, the district court found that "the Republic does not deny [Appellees'] factual allegations" and declared that the announced plan—and "any step towards implementing" that plan—would violate the Anti-Evasion Order.  The district court recognized that President Kirchner's announcement "presents a new problem that goes beyond the circumstances known as of the time of" the district court's prior Anti-Evasion Order.  The district court therefore ordered Argentina to produce information regarding this scheme by Thursday, October 10.  On Friday, October 11, counsel for Argentina sent a letter to Appellees stating that "the Republic has informed me that it has no plans to violate the Anti-Evasion [Order] and accordingly does not have documents responsive to paragraph 4 of the October 3 order."  Ex. A.[1]  Counsel's letter did not mention, much less disclaim, the scheme that President Kirchner announced.

Throughout this litigation, Appellees have cautioned—and presented evidence suggesting—that Argentina would exploit any stay of the Injunction to manufacture a workaround of the type that President Kirchner has now detailed.  At every turn, despite Appellees' evidence, Argentina met these warnings with promises that it would not design an evasion scheme because *any* "actions" toward ac-

---

[1]     All exhibits cited are contained in the Declaration of Matthew D. McGill.

2

complishing that scheme would violate the Anti-Evasion Order to which Argentina consented in order to secure the stay. Indeed, Argentina submitted a sworn declaration, promising that it would not take any "actions" to violate the Anti-Evasion Order. Perhaps because of these promises, this Court exercised its equitable discretion to continue its stay of the Injunction through the resolution of Argentina's petition for Supreme Court review.

The equitable calculus has fundamentally changed. While Argentina previously promised that it would not devise a scheme to nullify the Injunction during the stay, Argentina's President has now committed, in the most public manner possible, to do exactly that. She even explained *how* Argentina intends to evade the Injunction, and the district court has confirmed that the plan would violate the Anti-Evasion Order that has been in place since the Injunction was first stayed. This goes well beyond the defiant statement by Argentina's counsel in oral argument before this Court that Argentina will "not voluntarily obey" the district court's Injunction, not even after affirmance by this Court and not even after a denial of relief by the Supreme Court.

In light of President Kirchner's speech and Argentina's telling failure to disavow the scheme that speech announced, the *only* reasonable inference that can be drawn from Argentina's conduct is that it *is* now preparing to implement that evasion scheme. Continuing the stay would only afford Argentina additional time to

3

finalize its stated goal of rendering the Injunction and this Court's and the district court's careful adjudication of this matter ineffectual.

This Court should not permit Argentina to exploit a stay to achieve its aim of evading the Injunction. A stay is quintessentially equitable relief, and Argentina has renounced any claim to equitable consideration through its blatant disregard for the rule of law. The stay should be vacated.

## BACKGROUND

On February 23, 2012, the district court entered the Injunction, ordering Argentina to specifically perform its obligations under the Equal Treatment Provision. Ex. B. Argentina appealed, and the district court issued a stay pending appeal. Ex. C ¶ 1. The district court paired the stay with the Anti-Evasion Order, which prohibits Argentina from "tak[ing] any action to evade the directives of the [Injunction,] . . . render [it] ineffective . . . , or diminish the Court's ability to supervise compliance with" it—including "altering or amending" the mechanism used to pay the Exchange Bondholders. *Id.* ¶ 2.

On October 26, 2012, this Court affirmed the district court's decisions: "(1) granting summary judgment to plaintiffs on their claims for breach of the Equal Treatment Provision and (2) ordering Argentina to make 'Ratable Payments' to plaintiffs concurrent with or in advance of its payments to holders of the 2005 and 2010 restructured debt." *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d

246, 265 (2d Cir. 2012) (hereinafter the "October 26 Decision").  This Court further ordered a limited remand to clarify two narrow issues: "the operation of the [Injunction's] payment formula and the Injunction's application to third parties." *Id.*

On November 21, 2012, the district court entered orders in response to this Court's remand instructions and issued an amended version of the Injunction.  Exs. D, E.  The district court also lifted the stay of the Injunction as amended, citing the "extraordinary circumstance" of Argentine officials publicly declaring that Argentina never would abide by the Injunction.  Ex. F at 2.

Five days later, Argentina asked this Court to reinstate the stay, unequivocally denying that Argentina would use a stay to design a means of evading the Injunction by moving the payments to Exchange Bondholders outside the territorial jurisdiction of the U.S. courts.  D.E. 518, at 11-12.  Argentina emphasized that it remained bound by the Anti-Evasion Order, claiming that "*nothing has changed* and *nothing will change* with respect to how the exchange bondholders are paid." *Id.* at 11 (emphases in original).  Argentina also trumpeted its declaration, submitted to the district court by Francisco Guillermo Eggers, the National Director of the National Bureau of Public Credit of the Ministry of Economy, attesting that Argentina "*has complied, is complying, and will comply*" with the Anti-Evasion Order. *Id.* (quoting Ex. G ¶ 4) (emphasis added by Argentina).  Argentina stated that this

declaration was a "clear[] refutation of plaintiffs' allegation that the Republic is currently devising schemes to evade the injunctions." *Id.* at 11-12.

In view of these representations, this Court reinstated the stay (D.E. 490), and denied Appellees' motion to modify the stay to require Argentina to post a bond (D.E. 533). With the stay in place, Argentina continued to violate the Equal Treatment Provision, paying more than $4 billion on the Exchange Bonds since the stay was reinstated, without paying anything to Appellees.

On February 27, 2013, this Court heard argument on Argentina's objections to the Injunction as clarified and amended on remand. Argentina's counsel declared to the Court that Argentina would not "voluntarily obey" the district court's amended Injunction. Tr. of Feb. 27, 2013 Oral Argument 13:1-2 (D.E. 950, Ex. B).

On August 23, 2013, this Court affirmed the amended Injunction. *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013) (hereinafter the "August 23 Decision"). This Court rejected Argentina's assertions that "enforcing the commitments it made . . . would have cataclysmic repercussions in the capital markets and the global economy," reasoning that they are "speculative, hyperbolic, and almost entirely of the Republic's own making." *Id.* at 246. Yet this Court extended its stay of the Injunction "pending the resolution by the Supreme Court of a timely petition for a writ of certiorari." *Id.* at 248.

No sooner had this Court announced its decision than Argentina made clear that it *would* evade the Injunction, contradicting the statements its lawyers and officials had made in court filings when seeking the stay, including the Eggers Declaration.  On August 26, 2013, President Kirchner announced in a televised national address that Argentina will implement a "debt swap," in which Exchange Bondholders could trade their bonds for bonds with materially identical terms, but which would be paid in Argentina instead of New York.  She explained that her Government made the "important decision[]" to implement this debt swap in order "to avoid potential embargoes."  Ex. H.  As *Bloomberg News* reported, this newly announced plan is intended to "circumvent[] the U.S. court ruling."  Ex. I.  The *Los Angeles Times* made the same point, explaining that "[j]ust days after a U.S. appeals court ruled that Argentina must pay a small group of bond investors more than $1.3 billion, the country's president laid out a debt-swapping plan designed to get around the decision entirely."  Ex. J.  Since President Kirchner's speech, Argentina's Minister of Economy has clarified that this so-called debt swap would not need legislative approval.  Exs. K, L.

On August 30, Appellees wrote a letter to the district court explaining that President Kirchner had articulated a plan "through which [Argentina] will attempt to evade" the Injunction; that "Argentina's planned exchange offer—and any steps taken to consummate it (or any other transaction having a similar effect)—are in

direct violation of the [Anti-Evasion] Order"; and that "Argentina has in effect repudiated the Declaration of Francisco Guillermo Eggers" promising compliance with the Anti-Evasion Order.  Ex. M.  Appellees sent another letter to the district court on September 11 reemphasizing Argentina's evident intent to defy the Anti-Evasion Order and asking the district court to require that Argentina produce discovery regarding the scheme President Kirchner had publicly disclosed.  Ex. N.

On September 19, Argentina responded with a conclusory, two-sentence letter, which neither addressed President Kirchner's speech nor denied that Argentina had repudiated its commitment to obey the Anti-Evasion Order.  Instead, Argentina baldly asserted that Appellees "provide no basis" for relief.  Ex. O.

On October 3, 2013, the district court issued an opinion explaining "that counsel for the Republic does not deny the factual allegations in plaintiffs' September 11, 2013 letter."  Ex. P.  The district court entered an order that clarified that the Anti-Evasion Order prohibited "(i) the implementation of the plan to allow Exchange Bonds to be exchanged for securities or similar instruments payable in Argentina, which was announced by President Kirchner in her speech of August 26, 2013, (ii) implementation of any functionally equivalent or reasonably similar plan, or (iii) any step towards implementing (including without limitation the formulation or design of) such a plan or a functionally equivalent or reasonably similar plan."  Ex. Q at 7 ("the October 3 Order").  The district court also ordered Ar-

8

gentina to disclose—within five business days—the "existence and content of any communications between" Argentina (or those acting on its behalf) and certain entities that would be the essential players in any implementation of Argentina's evasive scheme. *Id.* On Friday, October 11, Argentina sent a conclusory letter to Appellees stating that it "has no plans to violate the Anti-Evasion [Order] and accordingly does not have documents responsive" to the district court's October 3 Order. Ex. A. Argentina did not acknowledge the district court's finding that President Kirchner's speech announced just such an evasion plan.

On October 7, 2013, the Supreme Court denied Argentina's petition for a writ of *certiorari*, which sought to challenge this Court's October 26 Decision, notwithstanding Argentina's request that the Court hold the petition until Argentina filed a successive *certiorari* petition challenging the August 23 Decision.

## STANDARD FOR VACATING A STAY

A stay pending a petition for a writ of *certiorari* should be permitted only where two conditions are met. First, the petitioner must show that "there is good cause for a stay" (Fed R. App. P. 41(d)(2)(A)), because, for example, it would be irreparably harmed and the equities favor a stay (*McBride v. CSX Transp., Inc.*, 611 F.3d 316, 318 (7th Cir. 2010) (Ripple, J., in chambers); *John Doe I v. Miller*, 418 F.3d 950, 953 (8th Cir. 2005)). Second, the petitioner must show that the *certiorari* petition "present[s] a substantial question" (Fed R. App. P. 41(d)(2)(A)),

with "a reasonable probability that the Supreme Court will grant *certiorari*; [and] a reasonable possibility that at least five Justices would vote to reverse this Court's judgment" (*Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007)).    These same standards are "equally applicable when considering an application to vacate a stay."  *Certain Named & Unnamed Non-Citizen Children & Their Parents v. Texas*, 448 U.S. 1327, 1330 (1980) (Powell, J., in chambers); *see also Commodity Futures Trading Comm'n v. British Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977) (Marshall, J., in chambers).

## ARGUMENT

This Court has "stay[ed] enforcement of the injunctions pending resolution of a timely petition to the Supreme Court for a writ of *certiorari*."  August 23 Decision, 727 F.3d at 238.  Appellees respectfully submit that this stay should be vacated in light of Argentina's announcement that it is actively scheming to evade the Injunction; the district court's confirmation that the announced plan would violate the Anti-Evasion Order; Argentina's blithe insistence that, despite its own announcement, it "has no plans to violate the Anti-Evasion [Order]" (Ex. A); and the Supreme Court's denial of Argentina's meritless *certiorari* petition from the October 26 Decision.

### A.     There Can Be No "Good Cause" For A Stay Given Argentina's Vow To Evade The Amended Injunction

#### 1.     Argentina's Declared Intent To Evade The Injunction Forecloses An Equitable Stay In Its Favor

The law "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (quotation marks omitted). When a party "time and again deploy[s] [its] lawyers to raise legal roadblocks to the enforcement of the judgment . . . [,] persistently endeavor[s] to evade the lawful jurisdiction of the District Court and undermine its careful and determined work," "refus[es] to comply with the District Court's lawful orders," and "decline[s] the proffered alternative of posting a bond," that party is not entitled to "equitable relief." *Id.* at 127-29 (quotation marks omitted).

A litigant could hardly do more than Argentina has done in this case to demonstrate bad faith.  As this Court noted in its August 23 opinion, Argentina's counsel vowed in open court that Argentina will "not voluntarily obey" a court order with which it disagrees.  August 23 Decision, 727 F.3d at 238.  And although the manner and means of Argentina's planned defiance were left unspecified at that time, after President Kirchner's announcement, this threat is now explicit:  Argentina *will* seek to evade the Injunction.  President Kirchner even explained *how* Argentina intends to achieve that evasion.  Argentina will open a new bond ex-

11

change, which will replace the current Exchange Bonds with identical bonds that will be paid out of Argentina. *See supra* at 7. As President Kirchner made crystal clear in her speech, the goal of this plan is to permit Argentina to violate the Injunction by paying on the Exchange Bonds, timely and in full, while paying nothing to Appellees. Notably, Argentina's Minister of Economy has declared that President Kirchner's evasive scheme would not need legislative approval, meaning that the scheme may already be ready to deploy on a turnkey basis. Exs. K, L.

Such disregard for the rule of law is the paradigmatic case of "bad faith relative to the matter in which [the party] seeks relief," which forecloses a party from eligibility for an equitable stay. *Motorola*, 561 F.3d at 129 (quotation marks omitted). Indeed, it is hard to imagine a more flagrant example of unclean hands than a party seeking a stay pending further appeal of an order, while at the same time publicly announcing a plan to evade the order on appeal. Such malfeasance should never be rewarded with a stay, and it certainly should not be tolerated in this case, where Argentina raised billions of dollars in the credit markets by voluntarily consenting to the jurisdiction of the courts of the United States, and promising to abide by those courts' decisions. *See* October 26 Decision, 699 F.3d at 263.

President Kirchner's speech also undermines the premise upon which the stay was originally granted: that Argentina would not exploit any stay as an opportunity to circumvent the Injunction and, thus, this Court's jurisdiction. When the

district court first issued the stay, it simultaneously issued the Anti-Evasion Order, so that Argentina could not design a scheme to evade the Injunction.  *See* Ex. C ¶ 1-2.  After the district court lifted the stay, this Court reinstated it based upon Argentina's sworn declaration that Argentina "*has complied, is complying, and will comply*" with the Anti-Evasion Order.  D.E. 518, at 11-12 (quoting Ex. G ¶ 4) (emphasis added by Argentina)).  President Kirchner's announcement confirms beyond all doubt that Argentina's assurances were false, and that Argentina is breaching—and will continue to breach—the Anti-Evasion Order by "tak[ing]" "action[s]" to "diminish the Court's ability to supervise compliance" with the Injunction. Ex. C ¶ 2. As the district court found, Argentina "does not deny" Appellees' allegations regarding President Kirchner's speech (Ex. P), including that the speech is—in effect—a repudiation of Argentina's promise to comply with the Anti-Evasion Order.  And the district court confirmed in the October 3 Order that President Kirchner's announced plan constitutes a violation of the Anti-Evasion Order, as does "any step towards implementing" that plan.  Ex. Q ¶ 3.

Incredibly, Argentina did not produce a single document in response to the district court's order.  Instead, Argentina's lawyers submitted a two-sentence letter asserting that Argentina "has no plans to violate the Anti-Evasion [Order]." Ex. A. That assertion is transparently false—disproven by President Kirchner's own televised address, which detailed just such a plan, and her Economy Minister's state-

ment that this plan does not require any action by the legislature to further imple-

ment.  Ex. K.  Argentina's response also simply ignored the disclosure obligations

imposed by the district court's October 3 order.  That Argentina remains so utterly

unconcerned with compliance with the orders of the district court demonstrates yet

further that Argentina has no equitable claim to a stay of those orders.

### 2. Vacating The Stay Will Not Subject Argentina To Any Legally Cognizable Harm

The Injunction "direct[s] Argentina to comply with its contractual obliga-

tions not to alter the rank of its payment obligations."  October 26 Decision, 699

F.3d at 262.  Requiring Argentina to abide by these contractual obligations would

not subject it to any legally cognizable harm, and certainly not any irreparable

harm.  That is reason enough to dissolve the stay.  *See, e.g.*, *Sussman v. Jenkins*,

642 F.3d 532, 537 (7th Cir. 2011) (Ripple, J., in chambers) (denying stay where

petitioner could not show that it would suffer irreparable injury absent a stay).  As

this Court has explained, the Injunction permits Argentina to choose to "pay all

amounts owed to its exchange bondholders provided it does the same for its de-

faulted bondholders," to pay each half, or to pay neither anything.  October 26 De-

cision, 699 F.3d at 263.  Should Argentina choose to pay all of its debts, it has

"sufficient funds, including over $40 billion in foreign currency reserves, to pay

plaintiffs the judgments they are due."  *Id.*  Just this past December, Argentina paid

more than $3 billion to the Exchange Bondholders, amply demonstrating its ability

to pay the $1.4 billion at issue in this case. And given that Argentina's next payment under the Exchange Bonds is not due until December, Argentina has ample time to organize the required ratable payment to Appellees. The stay has allowed Argentina to indulge its desire not to pay what it owes and can afford to pay. Ending that indulgence cannot possibly cause Argentina legally cognizable harm.

### 3. A Further Stay Would Harm Appellees And Undermine The Public Interest

Further staying the Injunction will harm Appellees by allowing Argentina additional time to implement its plot—detailed in President Kirchner's address—to reroute Exchange Bond payments through new agents beyond the jurisdiction of the U.S. courts. Executing that scheme of evasion will be a complex endeavor, involving billions of dollars of Exchange Bonds and requiring the cooperation of numerous financial institutions and sophisticated investors. Accordingly, Argentina has made transparent that it intends to drag out the appellate process for as long as possible—perhaps into 2015. *See* Ex. R (explaining how Argentina "expects to win time with a parallel legal process" in order to "stretch out, in the worst of cases, the possibility of losing the lawsuit for one more year"); Ex. S (reporting that Argentina's "legal strategy seeks to gain time"). If this Court maintains the stay, Argentine officials undoubtedly will spend the additional months afforded by the stay to finalize their scheme to nullify this Court's opinions and the Injunction they

15

affirmed.  This would impose on Appellees the very harm that the Injunction and Anti-Evasion Order were designed to prevent.

For similar reasons, the stay will undermine the public interest.  This Court already has held that the public interest weighs in favor of the Injunction because requiring debtors to comply with their contractual obligations is "essential to the integrity of the capital markets."  August 23 Decision, 727 F.3d at 248.  Indeed, "New York's status as one of the foremost commercial centers" relies on the premise that "borrowers and lenders may, under New York law, negotiate mutually agreeable terms for their transactions, but they will be held to those terms."  *Id.* Maintaining the stay of the Injunction will give Argentina more time to complete its evasive plan, which would undermine the public interest and the rule of law.

### B.    The Supreme Court Is Unlikely To Grant Argentina's Successive *Certiorari* Petition

The stay also should be vacated because there is little chance that four justices would vote to review this case, and because it is highly unlikely that five justices would vote to reverse this Court's judgment, which is entirely correct.  *See Nara*, 494 F.3d at 1133.  Argentina previously filed a petition for a writ of *certiorari* before the Supreme Court, seeking review of the October 26 Decision on two questions: (1) whether the Injunction complies with FSIA, and (2) whether the district court exceeded "the permissible scope of a federal court's equitable powers" under the Supreme Court's decisions in *Great-West Life & Annuity Insurance Co.*

16

*v. Knudson*, 534 U.S. 204 (2002), and *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).  Petition for a Writ of Certiorari, at i, 19, 28 ("Cert. Pet.").  On October 7, 2013, the Supreme Court denied that petition, notwithstanding Argentina's request that the Court hold the petition until Argentina files a petition challenging this Court's August 23 Decision.  *Republic of Argentina v. NML Capital, Ltd.*, No. 12-1494, 2013 WL 3211846 (U.S. Oct. 7, 2013) ("The petition for a writ of certiorari is denied.  Justice Sotomayor took no part in the consideration or decision of this petition."); *see also* Reply Br. in Support of Petition for a Writ of Certiorari, at 2.

If Argentina files a second *certiorari* petition, it can be expected to meet with the same result: denial.  Argentina's petition for rehearing *en banc* from this Court's August 23 Decision echoes the same two questions that Argentina raised in the *certiorari* petition that has now been denied (D.E. 1008), signaling that it likely will raise those same questions again in its forthcoming petition for *certiorari*.[2]

The Supreme Court is highly unlikely to grant review on Argentina's question concerning the FSIA.  In its *certiorari* petition, Argentina argued that there is

---

[2]    The only other question that Argentina's latest rehearing petition raises is the meaning of the Equal Treatment Provision (*id.* at 2-6), a state-law question the Court would not review (*see Michigan v. Long*, 463 U.S. 1032, 1040 (1983)).

a division of authority as to when an order styled an "injunction" actually is a prohibited "attachment" under the FSIA. Cert. Pet. 23-25. Argentina failed to substantiate this asserted circuit split. The *only* precedential out-of-circuit decision that Argentina relied upon (*id.* at 23)—*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989)—did not address the issue. And the nonprecedential opinions Argentina invoked (Cert. Pet. 23)—*Janvey v. Libyan Inv. Auth.*, 478 F. App'x 233 (5th Cir. 2012) (per curiam); *Phoenix Consulting Inc. v. Republic of Angola*, 172 F.3d 920 (table), 1998 WL 794854 (D.C. Cir. 1998) (unsigned)—involved freeze orders direct at specific sovereign accounts, rather than an injunction that does not require a court to take dominion over any sovereign assets. Argentina also relied extensively upon other Second Circuit decisions (Cert. Pet. 23-24, 26), but an alleged intra-circuit conflict is not a basis for Supreme Court review (*Wisniewski v. United States*, 353 U.S. 901, 902 (1957) (per curiam)).

Argentina similarly failed to show that the courts of appeals are divided on its second question presented: whether the district court exceeded its equitable authority under *Great-West Life* and *Grupo Mexicano*. Before its latest petition for rehearing, Argentina never even cited *Great-West Life* in any of its briefs before this Court. In any event, that case dealt with when a court can require a party to pay "money past due under a contract" in the ERISA context (534 U.S. at 210-11), and has no application to the Injunction here, which requires Argentina to abide by

18

its promise of equal treatment and can be complied with without paying anyone (October 26 Decision, 699 F.3d at 262-63).  As for *Grupo Mexicano*, this Court rejected Argentina's argument by explaining that "English chancery courts traditionally had power to issue injunctions and order specific performance when no effective remedy was available at law" (August 23 Decision, 727 F.3d at 241), and Argentina can point to no court of appeals authority to the contrary.

Ultimately, as this Court explained, "this case is an exceptional one" that is unlikely to recur, in part "because Argentina has been a uniquely recalcitrant debtor."  August 23 Decision, 727 F.3d at 247.  That assessment, which Argentina has failed to refute in its rehearing or *certiorari* petitions, may suggest a reason why the Supreme Court denied Argentina's *certiorari* petition rather than holding it until Argentina files a second petition.  Argentina's failure to demonstrate any division of authority likewise is reason enough to vacate the stay.  *See Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc.*, 384 F.3d 911, 912 (7th Cir. 2004) (Ripple, J., in chambers) (denying a stay because the applicant "cannot show a split between the circuits").[3]

---

[3]    And even in the unlikely event that the Supreme Court granted review on either of Argentina's questions, the Court could be expected to affirm this Court's decisions in all respects, for the same reasons cogently stated in this

[Footnote continued on next page]

19

Finally, the Supreme Court is also unlikely to grant review because of Argentina's announced scheme to evade the Injunction. The Supreme Court has explained that "[a] part of the Court's responsibility is to see that [its] resources are allocated in a way that promotes the interests of justice." *Martin v. Dist. of Columbia Court of Appeals*, 506 U.S. 1, 3 (1992) (per curiam) (quotation marks omitted). In their opposition to Argentina's *certiorari* petition, Appellees pointed to President Kirchner's articulation of Argentina's evasion scheme as a key reason why the Supreme Court should deny the petition, arguing that "[i]t would not promote justice to render a decision that would be disregarded unless it is rendered in the petitioner's favor." Brief in Opposition to Petition for a Writ of Certiorari, at 29-30. In its reply brief, Argentina did not address President Kirchner's speech or Appellees' argument that the scheme that the speech announced should counsel strongly against Supreme Court review. The Court thereafter denied Argentina's *certiorari* petition. The very same reasoning would, of course, apply to any successive *certiorari* petition that Argentina would file in this case.

## CONCLUSION

For the foregoing reasons, this Court should vacate the stay.

---

[Footnote continued from previous page]

Court's October 26 and August 23 Decisions. This provides an additional reason to vacate the stay. *See Nara*, 494 F.3d at 1133.

Dated:   October 15, 2013                    Respectfully submitted,

                                             By:   /s/ Theodore B. Olson

Robert A. Cohen                              Theodore B. Olson
(robert.cohen@dechert.com)                   (tolson@gibsondunn.com)
Eric. C. Kirsch                              Matthew D. McGill
(eric.kirsch@dechert.com)                    (mmcgill@gibsondunn.com)
DECHERT LLP                                  Jason J. Mendro
1095 Avenue of the Americas                  (jmendro@gibsondunn.com)
New York, N.Y. 10036-6796                    GIBSON, DUNN & CRUTCHER LLP
(212) 698-3500                               1050 Connecticut Avenue, N.W.
                                             Washington, D.C. 20036-5306
                                             (202) 955-8500

*Counsel for Plaintiff-Appellee NML Capital, Ltd.*

Edward A. Friedman                           Roy T. Englert, Jr.
(efriedman@fklaw.com)                        (renglert@robbinsrussell.com)
Daniel B. Rapport                            Mark T. Stancil
(drapport@fklaw.com)                         (mstancil@robbinsrussell.com)
FRIEDMAN KAPLAN SEILER &                     ROBBINS, RUSSELL, ENGLERT,
ADELMAN LLP                                  ORSECK, UNTEREINER &
7 Times Square                               SAUBER LLP
New York, N.Y. 10036                         1801 K Street, N.W.
(212) 833-1100                               Washington, D.C. 20006
                                             (202) 775-4500

*Counsel for Plaintiffs-Appellees Aurelius Entities and Blue Angel Capital I LLC*

Leonard F. Lesser                            Michael C. Spencer
(llesser@simonlesser.com)                    (mspencer@milberg.com)
SIMON LESSER, P.C.                           MILBERG LLP
420 Lexington Avenue                         One Pennsylvania Plaza
New York, N.Y.10170                          New York, N.Y. 10019
(212) 599-5455                               (212) 594-5300

*Counsel  for Plaintiff-Appellee Olifant*        *Counsel for Plaintiffs-Appellees Pablo*
*Fund, Ltd.*                                     *Alberto Varela et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
--------------------------------------------------------x

NML CAPITAL, LTD., ET AL.                         12-105-cv(L)

          Plaintiffs-Appellees,

    v.

THE REPUBLIC OF ARGENTINA,

          Defendant-Appellant.
--------------------------------------------------------x

## DECLARATION OF MATTHEW D. MCGILL

Pursuant to 28 U.S.C. Section 1746, Matthew D. McGill declares as follows:

1.    I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, counsel to Plaintiff NML Capital, Ltd., and am resident in the firm's Washington, D.C. office.

2.    I respectfully submit this declaration to put before this Court certain facts and documents related to the Appellees' Motion to Vacate the Stay, dated October 15, 2013.

3.    Attached to this declaration as Exhibits A - S are true and correct copies of the following documents:

Ex.     Document

A.     Carmine D. Boccuzzi, Letter to Robert A. Cohen, dated October 11, 2013;

B.     Specific Performance Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Feb. 23, 2012);

C.     Order Pursuant to FRCP 62(c), *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Mar. 5, 2012);

D.     Remand Opinion, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 21, 2012);

E.     Amended February 23, 2012 Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 21, 2012);

F.     Stay Opinion, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 21, 2012);

G.     Declaration of Francisco Guillermo Eggers, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 16, 2012);

H.     Cristina Fernández de Kirchner, "Debt exchange reopening project: Speech by the President to the nation," dated August 26, 2013, with an English translation;

I.     Camila Russo, "Argentina Plans New York-Buenos Aires Bond Swap," *Bloomberg*, dated August 27, 2013;

J.     Ken Bensinger, "Argentina to defy U.S. court with bond plan," *L.A. Times*, dated August 28, 2013;

K.     "The change of jurisdiction didn't appear in the bill and generates doubts," *Clarin*, dated August 29, 2013, with an English translation;

L.     Noella Barral Grigera, "Vultures: the government admits that an adverse ruling in the Court will send the country into default," *El Cronista*, dated August 29, 2013, with an English translation;

M.     Robert A. Cohen, Letter to The Honorable Thomas P. Griesa, dated August 30, 2013;

N.     Robert A. Cohen, Letter to The Honorable Thomas P. Griesa, dated September 11, 2013;

O.     Carmine D. Boccuzzi, Letter to The Honorable Thomas P. Griesa, dated September 19, 2013;

P.     Opinion, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Oct. 3, 2013);

Q.     Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Oct. 3, 2013);

R.     Esteban Rafele, "Holdouts: the U.S. Court sets a date and Argentina bets on gaining another year," *El Cronista*, dated September 12, 2013, with an English translation;

S.     "To gain time, the government asked New York Court for another review," *El Cronista*, dated September 9, 2013, with an English translation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:       October 15, 2013
             Washington, D.C.

                                        _____
                                               Matthew D. McGill

# EXHIBIT A

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW

FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG

BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

Writer's Direct Dial  +1 212 225 2508
E-Mail  cboccuzzi@cgsh.com

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
WILLIAM F. GORIN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
DONALD A. STERN
CRAIG B. BROD
SHELDON H. ALSTER
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
JOHN PALENBERG
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
JANET L. FISHER
DAVID L. SUGERMAN
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL H. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
FILIP MOERMAN

PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI JR
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN

ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
JONATHAN S. KOLODNER
HUGH C. CONROY JR
KATHLEEN M. EMBERGER
WALLACE L. LARSON JR
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
RESIDENT COUNSEL

October 11, 2013

BY EMAIL

Robert A. Cohen
Dechert LLP
30 Rockefeller Plaza
New York, New York 10012

Re: *NML Capital, Ltd. v. The Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09 Civ. 1707 (TPG) and 09 Civ. 1708 (TPG); and related cases

Dear Robert:

I write on behalf of the Republic of Argentina (the "Republic") in connection with the Court's Order of October 3, 2013 (the "October 3 Order"), which compels the Republic to disclose communications with certain third parties concerning any alleged plans to violate the Anti-Evasion Injunction. *See* October 3 Order ¶ 4. As we discussed this morning, the Republic has informed me that it has no plans to violate the Anti-Evasion Injunction and accordingly does not have documents responsive to paragraph 4 of the October 3 Order.

Very truly yours,

Carmine D. Boccuzzi

cc: Counsel of Record (by e-mail)

# EXHIBIT B

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/23/12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

NML CAPITAL, LTD.                              08 Civ. 6978 (TPG)
                                               09 Civ. 1707 (TPG)
                    Plaintiff,                 09 Civ. 1708 (TPG)

          v.

REPUBLIC OF ARGENTINA,

                    Defendant.
-------------------------------------------------------x

## [PROPOSED] ORDER

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.     It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

    a.  Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

    b.  There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear— indeed, it has codified in Law 26,017 and Law 26,547—its intention to defy any money judgment issued by this Court.

    c.  The balance of the equities strongly supports this Order in light of the clear text of Paragraph 1(c) of the FAA and the Republic's repeated failures to make required payments to NML.  In the absence of the equitable relief provided by this Order, the Republic will continue to violate Paragraph 1(c) with impunity, thus subjecting NML to harm.  On the other hand, the Order requires of the Republic only that which it

2

promised NML and similarly situated creditors to induce those creditors to
purchase the Republic's bonds. Because the Republic has the financial
wherewithal to meet its commitment of providing equal treatment to both
NML (and similarly situated creditors) and those owed under the terms of
the Exchange Bonds, it is equitable to require it to do so. Indeed,
equitable relief is particularly appropriate here, given that the Republic has
engaged in an unprecedented, systematic scheme of making payments on
other external indebtedness, after repudiating its payment obligations to
NML, in direct violation of its contractual commitment set forth in
Paragraph 1(c) of the FAA.

d. The public interest of enforcing contracts and upholding the rule of law
will be served by the issuance of this Order, particularly here, where
creditors of the Republic have no recourse to bankruptcy regimes to
protect their interests and must rely upon courts to enforce contractual
promises. No less than any other entity entering into a commercial
transaction, there is a strong public interest in holding the Republic to its
contractual obligations.

2. The Republic accordingly is permanently ORDERED to specifically perform its
obligations to NML under Paragraph 1(c) of the FAA as follows:

a. Whenever the Republic pays any amount due under terms of the bonds or
other obligations issued pursuant to the Republic's 2005 or 2010
Exchange Offers, or any subsequent exchange of or substitution for the

3

2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" (as defined below) to NML.

b.  Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.  Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d.  The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e.  Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all parties involved, directly or indirectly, in advising upon, preparing, processing, or facilitating any payment on the Exchange Bonds (collectively, "Agents and Participants"), with a copy to counsel for NML. Such Agents and Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and

4

prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f.      Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Agents and Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.      NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.      The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval of the Court;

5. This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated: Feb. 23, 2012

Thomas P. Griesa

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

NML CAPITAL, LTD.,

                          Plaintiff,     :

                   - against -     :

THE REPUBLIC OF ARGENTINA,

                   Defendant.   :

**No. 08 Civ. 6978 (TPG)**
**No. 09 Civ. 1707 (TPG)**
**No. 09 Civ. 1708 (TPG)**

--------------------------------------------------------------x

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER, LTD.,

                      Plaintiffs,   :

                   - against -    :

THE REPUBLIC OF ARGENTINA,

                   Defendant.   :

**No. 09 Civ. 8757 (TPG)**
**No. 09 Civ. 10620 (TPG)**

--------------------------------------------------------------x

AURELIUS OPPORTUNITIES FUND II, LLC
and AURELIUS CAPITAL MASTER, LTD.,

                      Plaintiffs,   :

                   - against -    :

THE REPUBLIC OF ARGENTINA,

                   Defendant.   :

**No. 10 Civ. 1602 (TPG)**
**No. 10 Civ. 3507 (TPG)**

*(captions continue on following pages)*

--------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/5/2012

## ~~[PROPOSED]~~ ORDER PURSUANT TO FRCP 62(C)

```
------------------------------------------------------------ x
AURELIUS CAPITAL MASTER, LTD. and          :
AURELIUS OPPORTUNITIES FUND II, LLC,        :
                                            :   No. 10 Civ. 3970 (TPG)
                              Plaintiffs,   :   No. 10 Civ. 8339 (TPG)
                                            :
              - against -                   :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                              Defendant.    :
                                            :
------------------------------------------------------------ x
                                            :
BLUE ANGEL CAPITAL I LLC,                   :
                                            :   No. 10 Civ. 4101 (TPG)
                              Plaintiff,    :   No. 10 Civ. 4782 (TPG)
                                            :
              - against -                   :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                              Defendant.    :
------------------------------------------------------------ x
                                            :
PABLO ALBERTO VARELA, et al.,               :
                                            :   No. 10 Civ. 5338 (TPG)
                              Plaintiffs,   :
                                            :
              - against -                   :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                              Defendant.    :
                                            :
------------------------------------------------------------ x
```

```
----------------------------------------------------------------- x
                                                         :
OLIFANT FUND, LTD.,                                      :
                                                         :      No. 10 Civ. 9587 (TPG)
                                    Plaintiff,           :
                                                         :
            - against -                                  :
                                                         :
THE REPUBLIC OF ARGENTINA,                               :
                                                         :
                                    Defendant.           :
                                                         :
-----------------------------------------------------------------x
```

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23, 2012 Orders"), this Court granted Plaintiffs' motion for equitable

---

[1] The "Exchange Bonds" refer to bonds or other securities issued by the Republic pursuant to its 2005 and 2010 exchange offers.

relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of

Civil Procedure and the Court's inherent equitable powers.[2]

And WHEREAS the Republic intends to appeal the February 23, 2012 Orders and

all underlying and/or associated orders to the U.S. Court of Appeals for the Second Circuit, and

has moved for a stay of the February 23, 2012 Orders during the pendency of such appeal,

It is HEREBY ORDERED that:

1.      Pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, the effect

of the February 23, 2012 Orders is stayed until the U.S. Court of Appeals for the Second Circuit

has issued its mandate disposing of the Republic's appeal of the February 23, 2012 Orders.

2.      To secure Plaintiffs' rights during the pendency of the Republic's appeals

of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not

during the pendency of the appeal to the Second Circuit take any action to evade the directives of

the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event

they are affirmed, or diminish the Court's ability to supervise compliance with the February 23,

2012 Orders in the event they are affirmed, including without limitation, altering or amending

the processes or specific transfer mechanisms by which it makes payments on the Exchange

Bonds, without prior approval of the Court.

3.      With consent of the Plaintiffs and on terms agreeable to the parties, the

Republic shall file a motion in the Second Circuit requesting that the court of appeals accord the

Republic's forthcoming appeal of the February 23, 2012 Orders expedited treatment in

accordance with a schedule agreed upon by the parties.

---

[2] The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

4.      This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

Dated:   New York, New York
         March _5_, 2012

                                              Thomas P. Griesa
                                              U.S. District Judge

3

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x
                               :

NML CAPITAL, LTD.,            :

                               :         **OPINION**

                     Plaintiff,     :

                               :    08 Civ. 6978 (TPG)

          – against –      :    09 Civ. 1707 (TPG)

                               :    09 Civ. 1708 (TPG)

REPUBLIC OF ARGENTINA,   :

                               :

                   Defendants.   :

                               :
---------------------------------------------x

      On October 26, 2012, the Court of Appeals handed down an opinion affirming certain injunctions entered by the District Court.  These injunctions were designed to remedy Argentina's breach of the *Pari Passu* Clause, including the "Equal Treatment Provision," contained in the contractual provisions of the Fiscal Agency Agreement Bonds ("FAA Bonds") at issue in this litigation.  This breach resulted from the fact that Argentina had issued new debt pursuant to exchange offers in 2005 and 2010 ("Exchange Bonds"), and was making the payments required on this new debt, but had declared that it would make no payments to those still holding the FAA Bonds.  It is of note that the Court of Appeals affirmed the finding of the District Court that, although there had originally been a default on the FAA Bonds because of a well-known financial crisis, currently Argentina is able to make the payments on both the FAA Bonds owned by plaintiffs and the Exchange Bonds.

1

An essential part of the ruling of the Court of Appeals was to affirm the injunctive relief fashioned by the District Court.  It ruled that Argentina must make appropriate payments to plaintiffs on their FAA Bonds concurrent with or in advance of any payments to holders of the 2005 and 2010 Exchange Bonds. However, the Court of Appeals remanded, directing that the District Court clarify precisely how the payment formula, regarding payments to plaintiffs, is intended to operate.  Also, the Court of Appeals directed a more precise determination as to how the injunctions would apply to third parties, including intermediary banks.

On remand, the court has not only received briefs from plaintiffs and Argentina, but has also received briefs and letters from exchange bondholders, parties responsible for handling the payment process to these bondholders, and the Federal Reserve Bank.  The court has considered these materials without requiring formal interventions.

Payment Formula

The injunctions affirmed by the Court of Appeals are contained in an Order of the District Court dated February 23, 2012, which contains a number of injunction provisions and which is referred to by the Court of Appeals as the "Injunctions."  Paragraph two of the Injunctions provides:

> The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

2

a.  Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" (as defined below) to NML.

b.  Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.  Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

The Court of Appeals stated that it is unable to discern from the record precisely how this formula is intended to operate, and further stated:

> It could be read to mean that if, for example, Argentina owed the holders of restructured debt $100,000 in interest and paid 100% of that amount then it would be required to pay the plaintiffs 100% of the accelerated principal and all accrued interest.  Or it could be read to mean that, if such a $100,000 payment to the exchange bondholders represented 1% of the principal and interest outstanding on the restructured debt, then Argentina must pay plaintiffs 1% of the amount owed to them.
> The following discussion is intended to provide the clarification requested by the Court of Appeals.

Although the provisions of the February 23, 2012 Injunctions regarding the "Ratable Payment" are phrased in a somewhat complicated manner, the actual meaning is quite straightforward.  The obligation to plaintiffs under the February 23, 2012 Injunctions accrues whenever Argentina "pays any amount due" under the terms of the Exchange Bonds.  The next time this will occur will be in December 2012, when Argentina is scheduled to make interest payments

3

on the Exchange Bonds of about $3.14 billion: $42 million on December 2, $3 billion on December 15, and $100 million on December 31.  When this occurs, Argentina will be required to make a "Ratable Payment" to plaintiffs.  Assuming that Argentina pays 100% of what is then due on the Exchange Bonds, this is the "Payment Percentage" referred to in paragraph 2(b).  Argentina would be required to pay 100% "multiplied by the <u>total amount currently due</u>" to plaintiffs.  There is no question about what is "currently due" to plaintiffs.  The amount that is currently due is the amount of the unpaid principal, the due date of which has been accelerated, and accrued interest.[1]  The total of these amounts due to plaintiffs is approximately $1.33 billion.  Thus, at some time in December 2012, when Argentina makes the interest payments on the Exchange Bonds, amounting to a total of about $3.14 billion, Argentina will be required to pay plaintiffs approximately $1.33 billion.

This is in accord with the first hypothetical situation posed in the Court of Appeals' opinion, describing the situation in which Argentina owes the holders of restructured debt $100,000 in interest and pays 100% of that amount, resulting in the requirement to pay plaintiffs 100% of the accelerated principal plus all accrued interest.

---

[1] Although judgments have been entered in other related cases, the cases before the court in this matter are ones where judgment has not been entered.  <u>See</u> Transcript of Oral Argument at 26-27, <u>NML Capital v. The Republic of Argentina</u>, (February 23, 2012) (03 Civ. 8845).

The second hypothetical situation posed by the Court of Appeals, resulting in Argentina paying plaintiffs 1% of the amount owed to them, is based on a misinterpretation of the relevant language of the Injunctions. The second hypothetical assumes a $100,000 payment to the Exchange bondholders, representing 1% of the total "principal and interest outstanding on the restructured debt," most of which is payable in the future. But the obligation of Argentina under the payment formula in the Injunctions arises when Argentina "pays any amount due" to the exchange bondholders. In the present case, this would next occur when Argentina pays the interest due on the Exchange Bonds in December 2012. Also, the Payment Percentage is calculated on the basis of "the amount actually paid or which the Republic intends to pay," as a percentage of "the total amount then due." None of this relevant language refers to any calculation based upon the total amount of principal and interest outstanding on the restructured debt, including large amounts of principal and interest to be paid into the future.

To recapitulate, the Ratable Payment provisions in the Injunctions, as correctly interpreted and as intended by the court, would be currently applied as follows. In December 2012, there are interest payments of approximately $3.14 billion due on the Exchange Bonds. Presumably, Argentina intends to pay 100% of what is owed. There are currently debts owed to plaintiffs by Argentina of approximately $1.33 billion. It should be emphasized that these are debts currently owed, not debts spaced out over future periods of time. In

5

order to comply with the terms of the Injunctions, Argentina must pay plaintiffs 100% of that $1.33 billion concurrently with or in advance of the payments on the Exchange Bonds.

This result is not only in accordance with the payment formula provisions of the Injunctions, it is consistent with the *Pari Passu* Clause and its Equal Treatment Provision.  In saying this, the court recognizes that the debt now owed to the exchange bondholders is of a <u>different amount</u> and of a <u>different nature</u> from what is owed to plaintiffs.  What is owed in December 2012 to exchange bondholders are interest payments, which are part of a series which will go on being paid until the maturity of the Exchange Bonds.  The debt owed to plaintiffs is accelerated principal plus accrued interest.  But it is obvious that a *Pari Passu* Clause does not require that the debts in question be in the same amount or of the same nature.  What is required is that the obligations under the various debts are complied with to the same extent, rather than having the obligations on one debt honored and the obligations on the other debt repudiated, as has occurred in the present case.

Of course, what is being done here is not literally to carry out the *Pari Passu* Clause, as would be done in a normal commercial situation, but to provide a remedy for Argentina's violation of the Clause.  <u>NML Capital v. The Republic of Argentina</u>, No. 12-105(L), at 19 n.10 (2d Cir. Oct. 26, 2012)(hereinafter "Opinion").  Yet, the remedy must bear some reasonable relation to the *Pari Passu* Clause in order to be a sensible remedy.  One

6

definition of *pari passu* in Black's Law Dictionary (8th ed. 2004) is "proportionally," obviously referring to the use of the same proportion in paying down two kinds of debts. This is clearly reflected in the Ratable Payment provisions in the Injunctions, as correctly interpreted. These provisions properly start with the fact that if 100% of what is <u>currently due</u> to the exchange bondholders <u>is paid</u>, then 100% of what is currently due to plaintiffs must also be paid. The payment to plaintiffs must surely relate to a debt actually due to them. And this leads to the problem which this court finds in the second hypothetical posed by the Court of Appeals. There is simply no debt owed to plaintiffs on terms providing for payments of 1% of some sum of money, spaced out over 100 installments of 1% each. The second hypothetical of the Court of Appeals would involve a radical departure from the payment formula in the Injunctions and from the *Pari Passu* Clause.

Again, there is no suggestion of interfering with what the exchange bondholders are due to be paid. The question raised by the Court of Appeals relates solely to how much plaintiffs are to be paid at the time exchange bondholders are paid. But the fact is that the amount owed to plaintiffs by Argentina is the accelerated principal plus accrued interest. Argentina owes this and owes it now. No one has suggested any basis in contract or in policy why Argentina deserves to have payment of the amount due to plaintiffs spread over some period of time.

7

Moreover, and this is most important, to apply the second hypothetical of the Court of Appeals and spread payment to plaintiffs over a period of time, would be a far cry from a proper remedy for the flagrant and intentional contract violations committed by Argentina.

Argentina and certain exchange bondholders argue that it is unjust for them to be receiving thirty cents on the dollar by virtue of the Exchange Bonds, while plaintiffs receive full payment pursuant to the court rulings. The Court of Appeals essentially answered this argument (Opinion at 26 n.15). However, some further discussion is in order.

In accepting the exchange offers of thirty cents on the dollar, the exchange bondholders bargained for certainty and the avoidance of the burden and risk of litigating their rights on the FAA Bonds. However, they knew full well that other owners of FAA Bonds were seeking to obtain full payment of the amounts due on such bonds through persisting in the litigation. Indeed, the exchange bondholders were able to watch year after year while plaintiffs in the litigation pursued methods of recovery against Argentina which were largely unsuccessful. However, decisions have now been handed down by the District Court and the Court of Appeals based on the *Pari Passu* Clause, which give promise of providing plaintiffs with full recovery of the amounts due to them on their FAA Bonds. This is hardly an injustice. The exchange bondholders made the choice not to pursue the route which plaintiffs have pursued. Moreover, it is hardly an injustice to have legal rulings which, at long last, mean that

8

Argentina must pay the debts which it owes. After ten years of litigation this is a just result.

Third Parties

It is the intention of the court to properly apply Rule 65(d) of the Federal Rules of Civil Procedure. This Rule provides that an injunction binds the parties, the parties' agents, and other persons who are in active concert or participation with the parties or their agents. It is further provided that an injunction binds these people only if they receive actual notice of the injunction.

The issue arises because of the need to ensure enforcement of the Injunctions' requirement that payments are to be made on the Exchange Bonds only if appropriate payments are made concurrently or in advance to plaintiffs. The Court of Appeals noted that the District Court was invoking Rule 65(d), "Anticipating that Argentina would refuse to comply with the Injunctions and in order to facilitate payment." It goes without saying that if Argentina is able to make the payments on the Exchange Bonds without making the payments to plaintiffs, the District Court and Court of Appeals' rulings and the Injunctions will be entirely for naught. To avoid this, it is necessary that the process for making payments on the Exchange Bonds be covered by the Injunctions, and that the parties participating in that process be so covered.

9

The February 23, 2012 Injunctions contain a provision prohibiting Argentina from taking any action to evade the directives of the Injunctions and further prohibiting Argentina from altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval of the court.

The process and the parties involved in making payments on the Exchange Bonds are as follows. Argentina transfers funds to the Bank of New York Mellon ("BNY"), which is the indenture trustee in a Trust Indenture of 2005.[2] Presumably there is a similar indenture for the 2010 exchange offer. BNY then forwards the funds to the "registered owner" of the Exchange Bonds. There are two registered owners for the 2005 and 2010 Exchange Bonds. One is Cede & Co. and the other is the Bank of New York Depositary ("BNY Depositary"). Cede and BNY Depositary transfer the funds to a "clearing system" such as the Depository Trust Company ("DTC"). The funds are then deposited into financial institutions, apparently banks, which then transfer the funds to their customers who are the beneficial interest holders of the bonds.

Plaintiffs assert that under Rule 65(d), the Injunctions should bind Argentina, the indenture trustee, the registered owners, and the clearing system, whoever they are. It is probably true that these parties are not all

---

[2] There is apparently a dispute as to whether this payment takes place in Argentina or the United States. However, BNY is surely a United States entity. The rest of the process, without question takes place in the United States.

10

agents of Argentina, but they surely are "in active concert or participation" with Argentina in processing the payments from Argentina to the exchange bondholders.

There is a problem under Article 4A of the U.C.C. about including intermediary banks. But plaintiffs address this in seeking a carve-out in the Injunctions for such intermediary banks. Plaintiffs are also not requesting that the financial institutions receiving funds from the DTC be bound by the Injunctions.

It would appear that plaintiffs have requested that a reasonable set of parties be bound by the Injunctions, and this is in compliance with Rule 65(d).

BNY, and to some extent others on the above list, object to any application of Rule 65(d) to them. Particularly BNY strenuously asserts that it has duties as indenture trustee, and these duties should be the beginning and the end of its responsibilities.

These arguments miss the point. If Argentina complies with the rulings of the Court of Appeals, there will be no problem about funds destined for exchange bondholders being deposited with BNY and going up the chain until they arrive in the hands of such bondholders. But if Argentina attempts to make payments to the exchange bondholders, contrary to the ruling of the Court of Appeals and thus contrary to law, this would not involve the normal and proper situation dealt with by BNY under the indenture, and dealt with by

11

others in the chain.  Under these circumstances, these third parties should properly be held responsible for making sure that their actions are not steps to carry out a law violation, and they should avoid taking such steps.

The Order

Since the Court of Appeals has essentially affirmed the February 23, 2012 Order containing the Injunctions, that Order will remain in effect, subject to the following qualifications.  In paragraph 2a, there will be an appropriate reference to the definitions contained in the current opinion, which does not change the relevant wording but further defines it.

The court believes that plaintiffs properly recommend specific wording listing the parties bound by the Order under Rule 65(d).  Accordingly, that listing will be included.

Dated:  New York, New York
      November 21, 2012

Thomas P. Griesa
U. S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
FILED: 11/21/12

12

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------x
                                             :
NML CAPITAL, LTD.,                           :
                                             :          ORDER
                     Plaintiff,              :
                                             :      08 Civ. 6978 (TPG)
         – against –                         :      09 Civ. 1707 (TPG)
                                             :      09 Civ. 1708 (TPG)
REPUBLIC OF ARGENTINA,                       :
                                             :
                     Defendants.             :
                                             :
---------------------------------------------x
```

## AMENDED FEBRUARY 23, 2012 ORDER

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.    It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

> a. Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

> b. There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear – indeed, it has codified in Law 26,017 and Law

2

26,547 – its intention to defy any money judgment issued by
this Court.

c. The balance of the equities strongly supports this Order in light
of the clear text of Paragraph 1(c) of the FAA and the Republic's
repeated failures to make required payments to NML.  In the
absence of the equitable relief provided by this Order, the
Republic will continue to violate Paragraph 1(c) with impunity,
thus subjecting NML to harm.  On the other hand, the Order
requires of the Republic only that which it promised NML and
similarly situated creditors to induce those creditors to
purchase the Republic's bonds.  Because the Republic has the
financial wherewithal to meet its commitment of providing equal
treatment to both NML (and similarly situated creditors) and
those owed under the terms of the Exchange Bonds, it is
equitable to require it to do so.  Indeed, equitable relief is
particularly appropriate here, given that the Republic has
engaged in an unprecedented, systematic scheme of making
payments on other external indebtedness, after repudiating its
payment obligations to NML, in direct violation of its
contractual commitment set forth in Paragraph 1(c) of the FAA.

d. The public interest of enforcing contracts and upholding the
rule of law will be served by the issuance of this Order,
particularly here, where creditors of the Republic have no

3

recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises. No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2.   The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

    a.   Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML (as defined below and as further defined in the Court's Opinion of November 21, 2012).

    b.   Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

    c.   Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic

intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d. The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e. Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f. "Participants" refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York);

(2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees; (3) the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System); (4) trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A. and The Bank of New York Mellon (including but not limited to the Bank of New York Mellon (London)); and (5) attorneys and other agents engaged by any of the foregoing or the Republic in connection with their obligations under the Exchange Bonds.

g. Nothing in this ORDER shall be construed to extend to the conduct or actions of a third party acting solely in its capacity as an "intermediary bank," under Article 4A of the U.C.C. and N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in connection with the Exchange Bonds.

h. Any non-party that has received proper notice of this ORDER, pursuant to Rule 65(d)(2), and that requires clarification as to

6

its duties, if any, under this ORDR may make an application to this Court, with notice to the Republic and NML. Such clarification will be promptly provided.

    i.  Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.    NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.    The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court;

5.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated:  New York, New York
        November, 21 2012

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
#:
DATE FILED: 11/21/12

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------x
                                            :

NML CAPITAL, LTD.,                  :

                            :          **OPINION**

                 Plaintiff,     :

                            :    08 Civ. 6978 (TPG)

        – against –      :    09 Civ. 1707 (TPG)

                            :    09 Civ. 1708 (TPG)

REPUBLIC OF ARGENTINA,     :

                            :

             Defendants.    :

                            :
----------------------------------------------x

On March 5, 2012, this court signed an order staying the effect of the February 23, 2012 Order pending Argentina's appeal. Specifically, the stay was to remain in effect until the Court of Appeals issued its mandate disposing of Argentina's appeal. However, the March 5, 2012 Order contained the following provision in paragraph 2:

> 2. To secure Plaintiffs' rights during the pendency of the Republic's appeals of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

Finally, the concluding paragraph 4 of the March 5, 2012 Order provided:

> 4. This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and account

1

for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

The February 23, 2012 Order was affirmed by the Court of Appeals on October 26, 2012, subject to a remand to the District Court for clarification on two specified questions. The District Court is this day filing an opinion responding to the questions raised by the Court of Appeals. The matter will now return to the Court of Appeals to deal with the District Court's responses to the questions posed. After that, there will be a final ruling by the Court of Appeals. However, it should be made clear that the questions posed to the District Court did not affect the basic ruling of the Court of Appeals that there can be no payments by Argentina to exchange bondholders without an appropriate payment to plaintiffs.

Under these circumstances, the District Court would ordinarily leave the March 5, 2012 Stay in effect until the Court of Appeals has finished its work. However, an extraordinary circumstance has arisen, which clearly demands judicial action, and that action can only be taken now by the District Court, where the case now resides.

From the moment of the October 26, 2012 Court of Appeals' decision, the highest officials in Argentina have declared that Argentina would pay the exchange bondholders but would not pay one dollar to holders of the original FAA Bonds. President Cristina Kirchner made such a statement. The Minister

2

of Economy, Lorenzino, declared that despite any ruling to come out of any jurisdiction, Argentina would not pay the FAA bondholders.

On November 9, 2012, the court met with counsel and asked the attorney for Argentina if the press reports of the above statements were correct. In response, the attorney turned to other subjects, meaning that the press reports were not denied. At the November 9, 2012 meeting, the court reminded all concerned that Argentina is subject to the jurisdiction of the federal courts in New York, to which Argentina has consented. For the past ten years Argentina has repeatedly submitted matters to the District Court and the Court of Appeals, and received what was undoubtedly fair treatment, since Argentina prevailed in most matters. The court went on to urge that the Argentine government should back away from these ill-advised threats to defy the current court rulings, and that any defiance of the rulings of the courts would not only be illegal but would represent the worst kind of irresponsibility in dealing with the judiciary.

This did not stop the highest Argentine officials who have continued to the present time their inflammatory declarations that the court rulings will not be obeyed.

These statements are a violation of paragraph 2 of the March 5, 2012 Stay Order. In that paragraph, Argentina is prohibited, during the appeal, from taking any action to evade the February 23, 2012 Order in the event it is affirmed, and is further prohibited from taking any action to diminish the

3

court's ability to supervise compliance with the February 23, 2012 Order in the event of affirmance.  Pursuant to paragraph 4 of the Stay Order, the Court retains jurisdiction to deal with materially changed circumstances, including any failure by Argentina to abide by paragraph 2.

It could be argued that the statements of the high Argentine officials do not literally constitute the kind of "action" referred to in paragraph 2.  But the essential issue goes beyond this.

Surely an extraordinary circumstance of the most serious nature arises from continuous declarations by the President of Argentina and cabinet officers, that Argentina will not honor or carry out the current rulings of the District Court and Court of Appeals in the litigation to which Argentina is a party.

It is the view of the District Court that these threats of defiance cannot go by unheeded, and that action is called for.

After due consideration, the court has resolved that the following steps should be taken.  The court believes that the Order regarding Ratable Payments should be put into effect at the earliest possible time.  The less time Argentina is given to devise means for evasion, the more assurance there is against such evasion.  Therefore, the provision in the March 5, 2012 Order staying the carrying out of the February 23, 2012 Order is vacated and it is directed that the February 23, 2012 Order, as now somewhat modified, is to be

carried out forthwith. This means that the February 23, 2012 Order will be applicable to the interest payments made to exchange bondholders in December 2012. In order to avoid confusion and to give some reasonable time to arrange mechanics, the court specifies that the precise interest payment involved will be that of December 15, 2012. Counsel for Argentina is directed to consult with counsel for plaintiffs in order to arrive at the exact amount to be paid to plaintiffs and other mechanics.

Since the Court of Appeals has not finally spoken on the subject of the calculation of the payment to plaintiffs, such payment is to be made into an escrow account, so that any adjustments required by the final Court of Appeals' ruling can be made. The court will consult with counsel about the proper party or institution to hold the escrow account.

Copies of this opinion, together with copies of the Amended February 23, 2012 Order, such amendment to be dated as of this date, will be promptly provided to the parties involved in payments to exchange bondholders, who will be on notice that the December 15, 2012 interest payments due to exchange bondholders cannot be made unless Argentina certifies that it is making the appropriate payment for the benefit of plaintiffs to the escrow account, either in advance of or concurrent with any payment to exchange bondholders.

The Amended February 23, 2012 Order is being issued today.  It will be called "Amended February 23, 2012 Order," and will be dated today, November 21, 2012.

Dated:  New York, New York
        November 21, 2012

_____
Thomas P. Griesa
U. S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/21/12

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
                                                              :
NML CAPITAL, LTD.,                                            :
                                                              :     08 Civ. 6978 (TPG)
                                        Plaintiff,            :     09 Civ. 1707 (TPG)
                                                              :     09 Civ. 1708 (TPG)
                  - against -                                 :
                                                              :
THE REPUBLIC OF ARGENTINA,                                    :
                                                              :
                                        Defendant.            :
                                                              :
------------------------------------------------------------------------ X
AURELIUS CAPITAL MASTER, LTD. and                             :
ACP MASTER, LTD.,                                             :
                                                              :     09 Civ. 8757 (TPG)
                                        Plaintiffs,           :     09 Civ. 10620 (TPG)
                                                              :
                  - against -                                 :
                                                              :
THE REPUBLIC OF ARGENTINA,                                    :
                                                              :
                                        Defendant.            :
                                                              :
------------------------------------------------------------------------ X
AURELIUS OPPORTUNITIES FUND II, LLC                           :
and AURELIUS CAPITAL MASTER, LTD.,                            :     10 Civ. 1602 (TPG)
                                                              :     10 Civ. 3507 (TPG)
                                        Plaintiffs,           :     10 Civ. 3970 (TPG)
                                                              :     10 Civ. 8339 (TPG)
                  - against -                                 :
                                                              :
THE REPUBLIC OF ARGENTINA,                                    :
                                                              :
                                        Defendant.            :
------------------------------------------------------------------------ X   *(captions continue on following pages)*

## DECLARATION OF FRANCISCO GUILLERMO EGGERS

```
---------------------------------------------------- X
BLUE ANGEL CAPITAL I LLC,                            :
                                                     :
                            Plaintiff,               :    10 Civ. 4101 (TPG)
                                                     :    10 Civ. 4782 (TPG)
             - against -                             :
                                                     :
THE REPUBLIC OF ARGENTINA,                           :
                                                     :
                            Defendant.               :
                                                     :
----------------------------------------------------X
OLIFANT FUND, LTD.,                                  :
                                                     :
                            Plaintiff,               :    10 Civ. 9587 (TPG)
                                                     :
             - against -                             :
                                                     :
THE REPUBLIC OF ARGENTINA,                           :
                                                     :
                            Defendant.               :
                                                     :
----------------------------------------------------X
PABLO ALBERTO VARELA, et al.,                        :
                                                     :
                            Plaintiffs,              :    10 Civ. 5338 (TPG)
                                                     :
             - against -                             :
                                                     :
THE REPUBLIC OF ARGENTINA,                           :
                                                     :
                            Defendant.               :
----------------------------------------------------X
```

## DECLARATION OF FRANCISCO GUILLERMO EGGERS

Pursuant to 28 U.S.C. § 1746, Francisco Guillermo Eggers declares as follows:

     1.      I am the National Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance of the Republic of Argentina (the "Republic").

     2.      I am familiar with the facts of this case and submit this declaration on behalf of the Republic and in support of the Memorandum of the Republic in Response to Plaintiffs' Brief on Remand.

     3.      During the November 9, 2012 conference before the Court, the Court read the following provision of the Order dated March 5, 2012 (the "March 5 Stay Order") into the record: "[t]o secure Plaintiffs' rights during the pendency of the Republic's appeals of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court" (March 5 Stay Order ¶ 2).

     4.      As requested by the Court, on behalf of the Republic, I confirm that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order as set forth above in paragraph 3.

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed on November 16, 2012, in Buenos Aires, Argentina.

Francisco Guillermo Eggers

2

# EXHIBIT H

# Debt exchange reopening project: Speech by the President broadcast to the nation

Good evening to everyone; last Friday the Appeals Chamber of New York City confirmed the ruling of Judge Griesa, in favor of the vulture funds that are so well known by the Argentine people, since they were the ones that seized last year the Libertad frigate in the Republic of Ghana, for which we had to turn to International Law and Courts in order to recover one of Argentina's symbols with no cost to the public purse. Other seizures had been previously imposed over Tango 01, embassies and other funds. However, what we want to talk about and inform you of today is not only to the national public opinion and the inhabitants of the Argentine Republic, but also to all bond holders who have trusted in Argentina - who represent 93 % of all bondholder – is that the ruling from this Court in reality ignores this agreement, 93% of which we have accomplished or at least minimized it, so I also believe that - in our humble opinion - it ignores the sovereign immunity that debt restructuring has, and which was achieved first in 2005 and then in 2010, because as provided by the National Constitution of Argentina, negotiating foreign debt is a specific power of the National Congress, which may be only agreed upon with its approval.

In any case it is worth remembering what is at the origin of all this; although it seems too distant, December 31, 2001, the date on which Argentina defaulted by exactly 81,836 billion dollars, is not that long ago. I repeat: On December 31, 2001 Argentina, our country, defaulted on 81,836 billion dollars worth of bonds.

The source of this was 49%, namely 40,363 billion which was issued by the Government Administration between the years 1989 and 1999; the remaining 51%, that is 41,473 billion, was issued by the Administration between the year 1999 and the time on which the default was declared.

It should also be recalled that in 2003 President Kirchner recognized and faced this debt problem, that in reality emerged on March 24, 1976, when the country began accumulating more and more debt, creating a constant "financial bicycle" which was aggravated during the convertibility and finally imploded on December 31, 2001.

President Kirchner had a radically different idea from what had been supported up until then. Until then, the motto of permanent indebtedness, if there was such a thing, was: pay in order to grow. He said that it was the exact opposite; that we needed to grow in order to be able to pay. Well, he was not trying to be smart; he

was simply observing what had happened in Argentina over the last 30 or 40 years, and the conclusion was always the same: we would not be able to pay if we didn't grow, and on the contrary, we were paying with more debt that represented a very severe restriction on the Argentine economy in terms of educational, cultural, infrastructure, social, health, work creation and production. As we all know, when Néstor took office Argentina had 25% unemployment rate, closed industries and the situation we all remember.

I remember that he, at the first UN Assembly he attended, in September 2003, forcefully addressed the foreign debt issue and insisted that the world had to understand that it should allow the Argentine economy to grow so it that it would be able to pay. He used a phrase that I will never forget: "we must be allowed to grow in order to be able to pay, because the dead do not pay their debts." That was the moment in which he inverted the logic of paying in order to grow, for that of growing in order to pay.

Since 2003 and up to this date large payments have been made, following two rounds of restructuring: in 2005, in March 2005 debt was restructured during the presidency of Néstor Kirchner. I remember well that negotiation was difficult and long, and at a given point the first bank that intervened as negotiator and eventual fiduciary, Wachovia, withdrew in the middle of the process, causing a severe crisis at a time in which the former Minister of Economy offered his resignation to President Kirchner because it seemed that he had failed on his attempt to restructure the debt, to which Kirchner said: "let's be confident and let's move on." The decision was made to appoint the Bank of New York, known in the financial industry as BoNY, as negotiator initially and ultimately as fiduciary. Finally that first exchange took place, in which very few trusted and even less put their money, but in which Néstor had placed great hope, ended up restructuring 76% of the sovereign debt, with the most important principal reduction in living memory. In order to understand the importance this principal reduction had on Argentina's subsequent growth, it can be quantified over 79 billion pesos.

In order for one to understand how much this represents: it is equal to the total Universal Assignment per child, it is equivalent to more than 2,000 schools built over this 10 year period in the Argentine Republic, and it is equivalent to all dwellings and their respective infrastructures, all social housing built between since 2003. This represents the magnitude and importance of this action.

What was the argument for this principal reduction? Over the entire period it was in debt Argentina was paying outrageous interest rates in dollars; while the entire

world was paying one or two percent interest rates, we were paying double-digit rates. The main argument for this principal reduction was that whoever goes to a place paying an exorbitant interest rate, paid nowhere else in the world, is, logically, aware of the risk taken by placing its assets there. Because of this we said that there should be shared risks between a country that had wagered on a "financial belly," and on the other hand, those who knew that it was impossible to get their money back with that kind of interest.

This is when the holdout problem began, consisting – let's say – of those who had not participated in the first exchange. Although all countries have some form of bankruptcy law, our country has one under which it is enough that 66% of all creditors agree upon for a judge to approve the bankruptcy or its proceedings, which is a figure similar to that in the United States, and in this initial agreement we obtained 76% agreement. However, the holdout problem continued. It was logical, since many people did not believe in an Argentina that had never paid its debt. We also wanted to contribute and show even more goodwill by creating what was called the Growth Coupon, under which if Argentina grew its creditors would receive even larger returns, produced by their decision of going along with and going into partnership with the Argentine growth.

Then in 2010, during my presidency, we reopened the exchange and reached record numbers of debt restructuring acceptance, which is the 93% to whom we owe. More confidence had developed: not only have we paid debt issued in foreign currency, but also debt issued in national currency; we also paid foreign debt to the Bank of New York, as well as internal debt to the country, with which we achieved this 93%, which was a great achievement by the Minister of Economy at the time, who, along with his team, traveled all over the world. However our current Minister of Economy, Dr. Lorenzino, also brought in many other bondholders, from Italy and Japan, that were smaller and had been left out of the first exchange. We achieved – I repeat – this figure of 93%.

Therefore, I consider that the ruling from the Appeals Chamber of New York is somewhat unfair to Argentina. It is based on an argument from the "Financial Times" and says that he rules against us because Argentina is a "recalcitrant debtor." Between 2003 and 2012 Argentina, this country considered a recalcitrant debtor, has paid 173,733 billion dollars. I repeat: since 2003 we have paid 173,733 billion dollars. 41,044 billion dollars have been paid within the national public sector, between different bodies of the national public sector who lend to each other for infrastructure financing, and for everything else that makes the State work. We have paid 81,487 billion dollars to the private sector (foreign and

national bondholders, in dollars) and multilateral credit entities, among them the International Monetary Fund, when we settled repaid some of our debt in 2006, to the Inter-American Development Bank for the loans it granted us, the World Bank, to Corporación Argentina de Fomento, 51,201 billion dollars, for a total of 173,733 billion dollars.

Let's say that we are more than recalcitrant debtors, we are serial payers. Furthermore on the plus side, we have done this with legitimate resources - resources obtained from commercial administration, and by better management of State resources, without accessing capital markets. I think this just like we were entered into the Guinness Book of Records as the largest sovereign debt that ever defaulted on, we should also be entered as the country that has paid the most, since we have complied with all of our obligations over the past ten years, without accessing capital markets.

For this reason, I think it is important that all Argentines be aware of our efforts and that the whole world is made aware of all that we have achieved. When Kirchner took office, the debt of all Argentines, in dollars, was approximately 150% of GDP; today, all our debt before national or foreign creditors is a little less than 10% of GDP. This means that we have brought it down from 150% of GDP to a little less than 10% of GDP.

And in a few more days we will pay 2 billion dollars in cash for BONAR 7; on September 12 to be precise. This is a national legislation bond which will also be paid by the local Clearing House, although most bondholders collect their returns overseas from local branches of foreign banks that pay their headquarters or affiliates wherever their international creditors are located, since it is easier for most of them as they are located outside of the country.

From this moment, namely September 12, the liabilities of Argentina in foreign currencies, either Euros or dollars, will be 8,3% of GDP.

It should also be remember that this is one of the lowest debt ratios among developed countries - not to mention among the other countries in the region.

It should also be remember that our Government is a serial payer and not a serial debtor, since debt was accumulated by previous administrations, who were also those that defaulted. This has allowed the Argentine people, and this Administration, to grow and thus be able to pay its debt.

Now, regarding this ruling... I was listening today to some comments that I would

consider short-sighted, as they mentioned that "in reality, the ruling will just have immediate effects as it will be appealed and ultimately will be decided by the Supreme Court of the United States in 2014 or 2015."

This really does not sound very serious; it is irresponsible from a good government to believe that 2014, 2015 or the short term is any solution to a problem. We do believe that problems must be resolved not only in the short term, but also in the mid and long term.

For this reason, the decision... we have made decisions because of this and because as a country, we cannot condone having the sword of Damocles hanging over our neck say that at any moment someone will take a decision, that the 2005 and 2010 exchanges will collapse, that our creditors will not pay and that our country will go back to 2001 levels. This is the only thing we will not allow, at least for as long as I am President.

For that reason, the first decision that we have taken is to ask God to enlighten the Supreme Court of the United States because, in reality, we really would be faced with a case that would not only tear down one of the most important debt restructuring plans in living memory, but it would also invalidate other debt plans. You also have to bear in mind that these vulture funds only amount to 0,45%.

To be clear: 93% of Argentina's creditors settled; 7% did not settle, but they are merely judging the vulture funds in New York and they have obtained this ruling for 0,45% of the total debt. Bonds that were bought recently in 2008, when they had already been defaulted on, were worth very little and if what they intend takes place, the profit in dollars would be a little over 1,300%, something which really lacks logic and common sense. I think that one does not have to be an expert in law and economics to realize that this way, not only the Republic of Argentina, but the entire country would melt down. In particular, at times when several of the developed countries of the First World are also restructuring their debt.

For this reason, the decision taken by the Supreme Court of Justice of the United States would not only have an impact on Argentina, but it would also have an impact throughout the International financial world. It is not in vain that several "amicus curiae" have been presented to the Court, who is not exactly a friend of Argentina; it is sufficient to recall the former Director of the International Monetary Fund, Anne Krueger, and several administration funds that also have interests and have presented, the Government of the Republic of France, who we

also thank for their presentation before the Supreme Court of the United States.

Yet, as they were informed and as we cannot have the Sword of Damocles hanging over our heads, we have taken two more decisions, in addition to the near spiritual and near earthly of entrusting ourselves to God and the Supreme Court of the United States: firstly, tomorrow, we will send a new proposed Law to the Argentine Parliament, which in view of the Constitution and article 75, is the only body qualified to decide on Argentina's external debt. The Executive Power will always act as a negotiator, as a delegate, but ultimately the agreements must pass through the Parliament to be approved or rejected, and this proposed Law will consist of, specifically, opening the debt exchange for the third time for the 7% that has not entered. Once again, we want to demonstrate the Republic of Argentina's profound will to honor its commitments.

Today we cannot because we would be in breach of the law of our country that already established the 93% and closed the second exchange in 2010. Nevertheless I reiterate that we are going to propose a Law to Parliament precisely so that the 7% has the ability to enter, the possibility to enter and, then to receive payment under the same conditions as the rest of the creditors.

However, we have also taken the decision to safeguard those who have put their trust in the Republic: the 93% of the bondholders who have trusted Argentina and have been paid, some since 2005 and others since 2010. This would involve replacing the bonds with the same currency, under the same terms, by simply changing the place of payment to avoid potential embargoes that the funds could suffer because we have already suffered embargoes in the past.

To be clear: those who hold Argentine bonds, the 93%, will be issued with similar bonds instead, in foreign currency and under the same terms, but they will simply be paid here in the Republic of Argentina in the Securities Depository.

As we have already paid, for one to have an idea of the certainty and legal security that this signifies, the BODEN 12, which were the bonds that Argentina issued to pay all those that were trapped by the bank freeze, when they could not withdraw deposits from the banks; the Argentine Government, with bonds issued by Argentine Law and paid here at the Securities Depository in Argentina, has already totally canceled this debt that amounted to 19,600 million dollars.

Argentina paid the total amount of savings confiscated from Argentineans and non-Argentineans. In other words, those of other nationalities and foreigners, of 19,600

million dollars with bonds issued through local legislation and paid here in the Republic of Argentina under the terms and in the currency that have been stipulated.

Furthermore in a few days times, or on September 12 to be precise, as I mentioned a few moments ago, we will pay another bond also issued, the BONAR 7, 2,000 million dollars, also issued through local legislation and paid here at the Securities Depository of the Republic of Argentina, in such a way as we have already paid thousands of millions of dollars of bonds issued through local legislation and paid here in Argentina.

Therefore, this certainty and legal security not only demonstrate our commitment to facing our obligations that Argentina as a State has committed to, although not through our government, but also fundamentally to those objectives, concrete facts, that we have demonstrated by paying bonds issued here in Argentina.

The fundamental duty of this is not a commitment of payment. I know that here there are some sectors that say that we should not pay anything, the absolute minimum, because it would be unreasonable. Yet it is important to remember that the Republic of Argentina has 40 million inhabitants to which the Government authorities are responsible in terms of guaranteeing growth in Argentina within a framework of legal security and facing up to its obligations.

For this reason, today I wanted to address not only the 40 million Argentineans, but also those who have put their trust in us, private domestic and foreign investors, and who have formed part of the 93% that accepted bonds from Argentina with a growth coupon that has been paid regularly, and also the rest of the International financial world and specifically the authorities of the United States and, fundamentally, its Court, because in fact we would be inflicting serious damage indeed on legal security, on trust, on confidence that debt restructuring must have at a very difficult time globally regarding financial matters.

It appears to us that only 1,45% that entered in 2008 with junk bonds, bought for very little, today aim to spoil what we have achieved in terms of debt restructuring, growth, payment, and contribution to the world, because ultimately it is a contribution from Argentina to the legal certainty of the world and to the confidence of those who put their trust in Argentina. I think it is important that we have that contact and that we can say these things.

Finally, to those who often tell us that we like to talk about the past and that the

past is gone, I think that last Friday, Friday of last week, it was conclusively confirmed that the past, particularly in economics, is always just round the corner. It is enough for someone to make a mistake or for someone to have other interests that are not those representing the interests of 40 million Argentineans, for the things that we have worked so hard to achieve over the last few years to be ultimately undermined.

When we sometimes say things about the past it is not in the spirit of monitoring, in the spirit of accusing or placing greater value on what we have done, but quite the opposite; we are trying to avoid repeating the mistakes that we Argentineans have made, and I also include myself here despite not having formed part of any indebting government. However I am part of Argentina and I feel as responsible as the 40 million Argentineans, but also the most responsible as they have elected me to lead the fate of this country.

For this reason, I wanted to briefly comment on these two important decisions, of the reopening of a third debt exchanging law. I hope that as we say here in Argentina, it will be third time lucky and we can finally incorporate this 7%.

It is also a call for reason and common sense that 0,45 %, who acquired bonds at such a low price, cannot put in jeopardy 93% of the creditors along with the figures that we have paid and we will keep on paying and, fundamentally, the possibilities of Argentina's further growth to generate employment, provide health care and education and at the same time, to face up to our obligations.

For these reasons, today I wanted to address the people of Argentina and also, fundamentally, those who have believed in Argentina, who have backed us, that continue to do so, because we are all at the forefront of the ship and fundamentally we have to steer it safely to port and we also believe, we have firm hopes, that common sense will prevail over the formidable lobby that we have seen over recent days where 0,45% is able to impose of its will on the 93%.

I am also a lawyer and I know that this decidedly affects equality between the parties; I know that it affect fairness; I know that it affects legal security; I know that it affects certainty that the economic and financial relations must have in the world and, therefore, we request that with the same responsibility with which we have acted over the last 10 years, with punctual payments of all our commitments for the first time in our history, we also request responsibility from those who hold this decision in their hands.

In any case, we also state that Argentina will not violate its own laws and will specifically enable the participation of the Argentine Parliament in a matter as important as this, as we did in 2005 and 2010, which has enabled us to experience growth and face up to our commitments.

Thank you for listening and good night to you all.



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Mariela Lopez, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the attached documents from Spanish to English:

**Palabras de la Presidenta -Proyecto de reapertura del canje dc la deuda**

Mariela Lopez

Sworn to before me this
August 27, 2013

Signature, Notary Public

RYAN ALEXANDER DROST
Notary Public - State of New York
No. 01DR6262048
Qualified in NEW YORK County
My Commission Expires MAY 21, 2016

Stamp, Notary Public

# Proyecto de reapertura del canje de la deuda: Palabras de la Presidenta por Cadena Nacional

Muy buenas tardes a todos y a todas: el día viernes pasado, la Cámara de Apelaciones, de la Ciudad de Nueva York, confirmó el fallo del juez Griesa, que la da la razón a los fondos buitres que ya son conocidos por los argentinos, porque fueron precisamente los que embargaron, el año pasado, la Fragata Libertad, en la República de Ghana, y por la cual tuvimos que recurrir al Derecho Internacional y también a tribunales internacionales, para obtener sin ninguna relación por parte del erario público, la restitución de uno de los símbolos de la Argentina. Antes habían existido algunos otros embargos sobre el Tango 01, sobre embajadas, sobre otros fondos. Pero en realidad lo que queremos hablar, hoy, y dar a conocer no solamente a la opinión pública nacional, a los habitantes de la República Argentina, sino también a aquellos tenedores de bonos, que han confiado en la Argentina - el 93 por ciento de los tenedores de bonos – es que en realidad este fallo de la Cámara de Apelaciones ignora este acuerdo, que hemos logrado con el 93 por ciento, o por lo menos lo minimiza y también creo que – a nuestro humilde criterio – ignora la inmunidad soberana que tiene la reestructuración de la deuda, que se logró, primero, en el 2005, y luego, en el 2010, porque, como marca la Constitución Nacional Argentina, la negociación de la deuda externa es facultad expresa del Congreso de la Nación y solamente puede realizarse bajo su autorización.

De cualquier modo es bueno recordar, un poco, el origen de todo esto porque si bien pareciera que estuviera muy lejos, el 31 de diciembre de 2001, no está tan lejos y fue allí donde la Argentina defaulteó exactamente 81.836 millones de dólares. Vuelvo a repetir: 31 de diciembre de 2001, la Argentina, nuestro país defaultea la deuda de bonos por 81.836 millones de dólares.

El origen de esto era un 49 por ciento, esto es 40.363 millones habían sido contraídos durante la administración gubernamental, que tuvo lugar entre los años 1989 y 1999; el 51 por ciento restante, que es 41.473 millones fue contraído por la administración que tuvo su origen entre los años 1999 y el momento de declararse el default.

Bueno es también saber que cuando, en el año 2003, el Presidente Kirchner asume encara precisamente este problema de la deuda, que en realidad es un problema que proviene desde el 24 de marzo de 1976, cuando el país comienza a endeudarse

cada vez más y hacer permanentemente una bicicleta financiera se ve agravado durante la convertibilidad y, finalmente, implosiona ese 31 de diciembre del año 2001.

El Presidente Kirchner tuvo una idea totalmente opuesta a la que se venía sosteniendo hasta ese momento. Hasta ese momento en el endeudamiento permanente el lema, si se puede decir, era: pagar para crecer. Él sostenía que era a la inversa, que necesitábamos crecer para pagar. Bueno, no era que lo hacía de inteligente, simplemente él observaba lo que había pasado en la Argentina durante las últimas treinta o cuarenta décadas y la conclusión se daba por sí misma: no se podía pagar si no se crecía, al contrario, se pagaba con más deuda y cada vez la deuda era mayor y constituía una severísima restricción a la economía argentina en lo educativo, en lo cultural, en infraestructura, en lo social, en la salud, en la generación de la producción del trabajo. Bueno de una Argentina que - como todos sabemos – cuando Néstor asumió tenía un 25 por ciento de desocupados, industrias cerradas y una situación que todos recordamos.

Me acuerdo que él, en la Asamblea de la ONU, en la primera asamblea que le tocó asistir, que fue en septiembre del año 2003, encaró decididamente este tema de la deuda externa y sostuvo que era necesario que el mundo comprendiera que era preciso que nos dejaran crecer a la economía argentina para poder pagar. Sostuvo una frase que no me voy a olvidar nunca más, dijo: "es necesario que nos dejen crecer para poder pagar, porque los muertos no pagan las deudas". Y bueno, a partir de allí, invirtió la lógica de pagar para crecer, por la crecer para pagar.

Y precisamente desde el año 2003 a la fecha se hicieron importantes pagos, basados en dos reestructuraciones: en el año 2005, en marzo de 2005 se reestructura la deuda en la presidencia de Néstor Kirchner. Recuerdo muy bien que fue una negociación dura, larga, en un momento dado el primer banco que intervino como negociador y eventual fiduciario: el Wachovia, se retira en medio de la negociación provocando una severa crisis que fue en un momento en que el entonces ministro de Economía, le ofreció la renuncia al Presidente Kirchner porque parecía que había fracasado el intento de reestructurar la deuda y Kirchner dijo: "tengamos confianza, sigamos adelante", y se decidió tomar como negociador y luego posterior fiduciario al Banco de Nueva York, normalmente conocido en la jerga financiera como BoNY. Finalmente ese primer canje en el que muy pocos confiaban y en el que muy pocos apostaban, pero que Néstor tenía una gran esperanza terminó reestructurando el 76 por ciento de la deuda soberana, con la quita más importante que se recuerde en la historia. Quita que para medir la

importancia que tuvo, en el crecimiento posterior de la Argentina la podemos cuantificar en más de 79.000 millones de pesos.

Y para que ustedes tengan una idea de lo que representa es la totalidad de la Asignación Universal por Hijo, es la totalidad de las más de 2.000 escuelas que se construyeron – en estos 10 años – en la República Argentina y es todas las viviendas y sus respectivas infraestructuras, todos los planes sociales de viviendas que se construyeron entre el 2003 y la fecha. Esto marca la envergadura de la importancia.

¿Cuál fue el argumento para la quita? Durante el momento de endeudamiento, en realidad, la Argentina pagaba tasas exorbitantes en dólares, en todo el mundo las tasas eran del uno, del dos por ciento y acá se pagaban tasas de dos dígitos. El argumento central para esa quita fue que quien sabe que va a un lugar donde están pagando una tasa exorbitante que se no paga en ninguna parte del mundo es lógico que conoce el riesgo que asume al colocar su fondo. Por eso dijimos que debían ser riesgos compartidos entre un país que había apostado a un timba financiera y también, del otro lado, a los que sabían que era imposible que alguien les devolviera ese dinero con esos intereses.

Ahí surgió el problema de los holdouts, que era – digamos – los que no habían entrado en este primer canje. Si bien todos los países tienen una ley de quiebra, nuestro país la tiene y basta con que el 66 por ciento de los acreedores esté de acuerdo para que el juez apruebe la quiebra, o el concurso de quiebra y también es una cifra similar en los Estados Unidos, en este primer acuerdo conseguimos un 76 por ciento. Pero siguió el problema de los holdouts. Era lógico porque había mucha gente que no creía en esta Argentina que nunca había pagado las deudas. Nosotros, inclusive, habríamos querido participar y demostrar aún más buena fe creando lo que se denominó el Cupón de Crecimiento, de modo tal que si la Argentina crecía los acreedores iban a recibir más dinero producto de acompañar y de asociarse al crecimiento de esa Argentina.

Luego, durante mi presidencia, en el año 2010, volvimos a abrir el canje y de ahí llegamos a una cifra récord de aceptación de reestructuración de deuda, que es el 93 por ciento a quienes les debíamos. Ya había más confianza, se había pagado deuda no solamente emitida en ley extranjera, sino también emitida en ley nacional; se había pagado deuda en el Banco de Nueva York; se había pagado deuda, aquí en el país, con lo cual logramos este 93 por ciento, una tarea también muy buena que se dio en ese momento, a través del entonces ministro de

3

Economía, que recorrió, junto a su equipo, todo el mundo. Pero el actual ministro de Economía, también el Doctor Lorenzino, para precisamente incorporar a muchos bonistas italianos, japoneses, que eran más pequeños y que habían quedado fuera del primer canje. Llegamos – repito – a esta cifra de 93 por ciento.

El fallo de la Cámara de Apelaciones de Nueva York creo que es un poco injusto con la Argentina. Toma un argumento del "Financial Times" y dice que nos condena porque la Argentina es "un deudor recalcitrante". La Argentina ha pagado, entre el año 2003 y el año 2012, este país al que califican como deudor recalcitrante 173.733 millones de dólares. Vuelvo a repetirlo: desde el año 2003 a la fecha, hemos pagado 173.733 millones de dólares. 41.044 millones de dólares es dentro del propio sector público nacional, entre distintos organismos del sector público nacional, que se prestan entre sí para financiamiento, para infraestructura, en fin para lo que hace al funcionamiento del Estado; 81.487 millones de dólares hemos pagado al sector privado (extranjero y nacional, en dólares, tenedores de bonos) y a los organismos multilaterales de crédito, entre ellos al Fondo Monetario Internacional, cuando nos desendeudamos, en el año 2006, al Banco Interamericano de Desarrollo por los préstamos que nos ha dado, al Banco Mundial, a la Corporación Argentina de Fomento, 51.201 millones de dólares; en total, 173.733 millones de dólares.

Digamos que más que deudores recalcitrantes somos pagadores seriales. Pero, además, con un aditamento: esto lo hemos hecho absolutamente con recursos genuinos, con recursos que hemos logrados a partir de la administración de comercio, y a partir de la mejor administración de los recursos del Estado, sin acceder al mercado de capitales. Creo que así como fuimos el país que entró en el Guinness por ser la deuda soberana más importante que se ha defaulteado creo que también debemos estar en el Guinness de los países que más hemos pagado, que más hemos cumplido con nuestras obligaciones en los últimos diez años, sin acceso al mercado de capitales.

Por eso me parece importante que todos los argentinos sepamos el esfuerzo que hemos hecho y también el mundo tenga conocimiento del esfuerzo que hemos hecho. Hoy, la deuda de los argentinos en dólares, que cuando Kirchner asumió representaba algo así como el 150 por ciento aproximadamente del PBI, ha pasado a representar en moneda extranjera, ya sea que se le deba a privados nacionales o extranjeros, algo menos del 10 por ciento del PBI. O sea, del 150 del PBI, hemos pasado a algo menos del 10 por ciento del PBI.

Y en pocos días más, vamos a pagar el BONAR 7, vamos a pagar 2.000 millones de dólares cash, exactamente el día 12 de septiembre. Este es un bono en legislación nacional que se paga también aquí en la Caja de Valores pero que la mayoría se cobra en el extranjero porque la mayoría son tenedores extranjeros que lo hacen muy fácilmente, con filiales locales de bancos extranjeros pagan a sus otra casas matrices o filiales en el lugar donde están los acreedores internacionales y de esa manera se salda la deuda.

A partir de ese momento la Argentina, o sea, a partir del 12 de septiembre, la Argentina va a pasar a deber en moneda extranjera, euro o dólares, 8,3 por ciento de su PBI.

Bueno también es recordar que esto es una ratio de deuda que es de las más bajas de los países desarrollados y ni qué hablar de los países de la región.

Bueno también es recordar que nuestro Gobierno es un pagador serial pero no es un endeudador serial, porque la deuda se tomó durante otras gestiones y también se defaulteó durante otras gestiones. Y esto nos ha permitido a los argentinos, esta administración, crecer y precisamente poder pagar la deuda.

Ahora bien, este fallo...Yo escuchaba algunos comentarios hoy sobre este fallo que me atrevo a calificar un poco de cortoplacistas porque el fallo...dicen, bueno, "en realidad es un fallo que recién podrá tener efectos porque va a ser apelado y tendrá que decidir la Corte Suprema de los Estados Unidos en el año 2014 o 2015".

Realmente, no parece demasiado serio, no hay responsabilidad, me parece de un buen gobierno, de una buena gobernanza creer que el 2014 o el 2015 o el corto plazo son una solución para los problemas. Nosotros creemos que los problemas deben resolverse, no solamente en el corto plazo, sino en el mediano y en el largo plazo.

Por eso, la decisión...hemos tomados decisiones en virtud de esto porque no podemos tener como país una Espada de Damocles sobre nuestro cuello diciendo que en cualquier momento alguien va a tomar una decisión, se van a caer los canjes del año 2005, 2010, los acreedores nuestros no van a pagar y el país va a volver al 2001. Esto es lo único que no vamos a permitir por lo menos mientras yo sea Presidenta.

Por eso, la primera decisión que hemos tomado, bueno, es pedirle a Dios que

ilumine a la Corte Suprema de los Estados Unidos porque, en realidad, estaríamos realmente ante un caso que, no solamente tiraría abajo una de las reestructuraciones de deuda más importantes de las que se tenga memoria, sino que también invalidaría otras reestructuraciones de deuda. Porque téngase en cuenta que estos fondos buitres solo representan el 0,45 por ciento.

Para tenerlo claro: el 93 por ciento de los acreedores de Argentina, arregló; un 7 por ciento no arregló, pero solamente están haciendo juicio en Nueva York y han obtenido esta sentencia, fondos buitre por el 0,45 por ciento del total de la deuda. Bonos que fueron comprados recién en el 2008, cuando ya habían sido defaulteados, valían muy poco y si se le hace lugar a lo que ellos pretenden, la ganancia en dólares sería de algo más del 1.300 por ciento, algo que realmente carece de lógica, de sentido común. Creo que no hace falta ser un experto en Derecho o en Economía para darse cuenta que de esta manera solamente funde la República Argentina, sino que fundiría el país. Sobre todo, en momentos en los cuales numerosos países desarrollados del primer mundo, están también reestructurando sus deudas.

Por eso, la decisión que tome la Suprema Corte de Justicia de los Estados Unidos, no solamente influiría en la Argentina, sino influiría en todo el mundo financiero internacionales. No en vano se han presentado numerosos "amicus curiae" frente a la Corte, que no son precisamente amigos de la Argentina, baste recordar a la exdirectora del Fondo Monetario Internacional, Anne Krueger, también a numerosos fondos de administración que también tienen intereses y se han presentado, al gobierno de la República de Francia, a quien agradecemos también su presentación ante la Corte Suprema de los Estados Unidos.

Pero también, como les decía y como no podemos tener una Espada de Damocles sobre nuestras cabezas, hemos tomado 2 decisiones más además de esta casi espiritual y casi terrenal de encomendarnos a Dios y a la Corte Suprema de los Estados Unidos: en primer lugar, en el día de mañana, vamos a enviar un nuevo proyecto de Ley al Parlamento argentino, que por imperio de la Constitución y del artículo 75 es el único capacitado para decidir sobre la deuda externa argentina, el Poder Ejecutivo actúa siempre como negociador, como delegado pero finalmente los acuerdos deben pasar por el Parlamento para ser aprobados o rechazados, y este proyecto de Ley va a consistir, precisamente, en abrir por tercera vez el canje de deuda para ese 7 por ciento que no ha ingresado. Queremos una vez más, demostrar la profunda vocación de hacer frente a los compromisos que tiene la

República Argentina.

Hoy no lo podemos hacer porque estaríamos violando la propia ley de nuestro país que estableció ya en el 93 por ciento y cerró el segundo canje en el año 2010. Pero vamos a enviar, reitero, un proyecto de Ley al Parlamento para que, precisamente, ese 7 por ciento tenga la capacidad de ingresar, la posibilidad de ingresar y, bueno, y cobrar en paridad de condiciones con el resto de los acreedores.

Pero también hemos tomado una decisión para salvaguarda de quienes han confiado en la República, el 93 por ciento de los tenedores de bonos que han confiado en Argentina y que vienen cobrando, algunos del año 2005 y otros del año 2010. Y es, precisamente, hace un reemplazo de títulos por la misma moneda, por los mismos plazos nada más que cambiando el lugar de pago para evitar eventuales embargos que pudieran sufrir los fondos porque ya hemos sufrido embargos anteriores.

Para ser claros: los que tienen bonos argentinos, el 93 por ciento, vamos a reemplazar esos títulos, esos bonos por bonos similares, por moneda extranjera, por los mismos plazos, únicamente que serán pagaderos aquí en la República Argentina en la Caja de Valores.

Como ya hemos pagado, para que ustedes tengan una idea de la certeza y de la seguridad jurídica que esto significa, los BODEN 12, que fueron precisamente los bonos que Argentina emitió para pagarles a todos aquellos que habían atrapados por el corralito, se acuerdan cuando no pudieron sacar los depósitos de los bancos, el Gobierno argentino, con bonos emitidos por ley argentina y pagaderos aquí en la Caja de Valores en la Argentina, ya ha cancelado totalmente esa deuda que fue de 19.600 millones de dólares.

La Argentina pagó la totalidad de los ahorros confiscados de argentinos y de no argentinos, o sea, de nacionales y de extranjeros, por 19.600 millones de dólares con títulos emitidos con legislación local y pagada aquí en la República Argentina en los plazos y en la moneda que habían sido estipulados.

Y en unos días más, para ser más precisos el día 12 de septiembre, como les decía hace unos instantes, vamos a pagar otro bono también emitido que es el BONAR 7, 2.000 millones de dólares, también emitidos en legislación local y pagaderos aquí en la Caja de Valores de la República Argentina, de modo tal que ya hemos pagado miles de millones de dólares de títulos emitidos con legislación local y pagaderos

7

aquí en la Argentina.

Por lo tanto, la certeza y la seguridad jurídica, no solamente emana de nuestra convicción en cuanto a hacer frente a las obligaciones a las que la Argentina como Estado se había comprometido, aunque no haya sido nuestro gobierno, sino fundamentalmente también a los hechos objetivos, concretos que ya hemos protagonizado pagando títulos emitidos aquí en la Argentina.

Y el deber fundamental de esto, no es una vocación de pago, yo sé que por allí hay algunos sectores que dicen que no habría que pagar nada, mínimos, absolutamente, porque sería disparatado. Pero bueno es recordar que la República Argentina tiene además 40 millones de habitantes que exigen responsabilidad por parte de las autoridades del Gobierno y poder seguir garantizando el crecimiento de Argentina en un marco de seguridad jurídica y de hacerse cargo de las obligaciones.

Por eso, quería hoy dirigirme, no solamente a los 40 millones de argentinos, sino también a todos aquellos que han confiado, nacionales o extranjeros privados, y han formado parte de ese 93 por ciento que aceptó bonos de Argentina con cupón de crecimiento que ha venido pagando regularmente, dirigirme también al resto del mundo financiero internacional y específicamente a las autoridades de Estados Unidos y, fundamentalmente, a su Corte, porque en realidad, estaríamos infligiendo un seguro daño sí a la seguridad jurídica, sí al trust, a la confianza que se tienen que tener en la reestructuración de deuda en un momento muy difícil de todo el mundo en materia financiera.

Nos parece realmente que solo un 1,45 por ciento que ingresó en el 2008 con bonos basura, comprados por muy poco dinero, hoy pretenda malograr lo que hemos logrado en materia de reestructuración de deuda, de crecimiento, de pago, de aporte al mundo, porque en definitiva es un aporte de la Argentina a la certidumbre jurídica del mundo y a la confianza de quienes confiaron en la Argentina, me parece que es importante que podamos tener este contacto y poder decir estas cosas.

Finalmente, para los que muchas veces nos dicen que nos gusta hablar del pasado y creen que el pasado ya pasó, yo creo que este viernes pasado, el viernes de la semana pasada, se ha comprobado definitivamente que el pasado y sobre todo en Economía, siempre está a la vuelta de la esquina. Que basta que alguien cometa una equivocación o que alguien tenga otros intereses que no sean la de representar los intereses de los 40 millones de argentinos, para que las cosas que tanto nos han

costado lograr en estos últimos años, finalmente se malogren.

Estas cosas que a veces decimos sobre el pasado, no es con el ánimo de fiscalizar, con el ánimo de acusar o de poner en mayor valor lo que nosotros hemos hecho, sino por el contrario, tratar de evitar volver a cometer los errores que hemos cometido los argentinos, miren, me involucro yo también a pesar de no haber formado parte en ningún gobierno endeudador, pero sí formo parte de la Argentina y me siento tan responsable como los 40 millones de argentinos, pero la más responsable porque me han elegido para conducir los destinos del país.

Por eso, quería en síntesis, comentarles estas dos decisiones importantes, la de la reapertura de una tercera ley de canje. Espero que como decimos aquí en la Argentina, la tercera sea la vencida y podamos finalmente incorporar a ese 7 por ciento.

También un llamado a la razonabilidad y al sentido común que no puede ser que un 0,45 por ciento, que adquirió bonos a tan bajo precio, pueda poner en juego al 93 por ciento de los acreedores y con las cifras que hemos pagado y que tendremos que seguir pagando y, fundamentalmente, las posibilidades de seguir creciendo en la Argentina para generar trabajo, para dar salud, educación y al mismo tiempo, para hacer frente a nuestras obligaciones.

Por esos motivos es que quería hoy comunicarme con el conjunto del pueblo argentino y también fundamentalmente, con quienes han creído en la Argentina, han apostado por ella, que sigan haciéndolo porque estamos al frente de la nave y fundamentalmente la vamos a conducir a buen puerto y creemos también, tenemos fuertes esperanzas, de que el sentido común impere por sobre el lobby formidable que hemos visto en estos días donde un 0,45 por ciento se pueda imponer sobre la voluntad de un 93 por ciento.

Soy abogado al mismo tiempo y sé que esto afecta decididamente la igualdad entre las partes; sé que afecta la equidad; sé que afecta la seguridad jurídica; sé que afecta la certeza que deben tener las relaciones económicas y financieras el mundo y, por eso, solicitamos que con la misma responsabilidad que hemos actuado en estos 10 años, pagando puntualmente todo lo que nos habíamos comprometido por primera vez en nuestra historia, también pedimos responsabilidad a los que tengan la decisión en sus manos.

De cualquier manera, también decir que la Argentina no va a violar sus propias

9

leyes y va a, precisamente, darle participación al Parlamento argentino en un tema tan importante como este, como también se lo hemos dado en el año 2005 y 2010, que nos ha permitido tener un crecimiento y hacer frente a nuestros compromisos.

Muchas gracias por escuchar y buenas noches a todos y a todas.

# EXHIBIT I

Case: 12-105    Document: 1020    Page: 103    10/15/2013    1066054    183

# Bloomberg

# Argentina Plans New York-Buenos Aires Bond Swap

By Camila Russo - Aug 27, 2013

Argentina is offering to swap holders of New York-law bonds into debt governed by local legislation as investors shift into the notes after a U.S. court sided with creditors seeking full repayment on claims from the nation's record default in 2001.

The move comes after the Aug. 23 ruling, which prompted dollar-denominated local law bonds due 2017 to rally and yield 3.95 percentage points less than similar-maturity notes issued under New York rules yesterday. The gap grew to within 0.11 percentage point of the record 4.06 percentage point difference April 3. At 11.85 percent, the local-law debt yielded twice the emerging-market average, according to JPMorgan Chase & Co.

Faced with the prospect of paying the holdout creditors in full or risking a second default in 12 years, President Cristina Fernandez de Kirchner said in a national address yesterday she will offer a third swap at the same terms to owners of defaulted debt who rejected previous exchanges, as well as to holders of the restructured notes. The proposal is aimed at circumventing the U.S. court ruling without reneging on payments to the New York-law bondholders.

"There was always the expectation that if Argentina couldn't win in court, it would find anther way to get its way, for example, by re-routing payments," Diego Ferro, co-chief investment officer at Greylock Capital Management, which oversees $500 million in emerging-market debt including restructured Argentine bonds, said in a telephone interview. "It's a predictable patch solution that in the end guarantees that dollar debt will be paid."

## Bonds Fall

Greylock hasn't decided whether it'll accept the debt swap into local law, Ferro said.

Argentina's proposal trigged declines in the local-law bonds today. The dollar securities due 2017 fell the most in four months, plunging 2.88 cents to 85.26 cents on the dollar at 2:09 p.m. in New York. Dollar notes due 2017 sold under New York law tumbled 1.73 cents to 78.43 cents on the dollar.

The appeals court on Aug. 23 said it would delay the effect of its ruling until the U.S. Supreme Court decides whether to review the case, which may not come until the first quarter of 2014, according to law firm Shearman & Sterling LLP. The stay would be lifted if the Supreme Court doesn't take the case putting subsequent bond payments in jeopardy of default since Argentina has said it won't obey the court orders to pay creditors Fernandez has dubbed "vultures."

## 'Serial Payers'

The debt swap would be offered into local law debt in the same terms and currency as original bonds, according to Fernandez.

"Instead of recalcitrant debtors, we are serial payers," Fernandez, 60, said in her speech, adding that the country has paid about $174 billion in debt since 2003. "The ruling ignored the country's accords reached with 93 percent of holders of defaulted debt."

She also said the ruling invalidates future debt restructurings and asked God to "illuminate" the U.S. high court.

The changing of jurisdiction on performing debt governed by international law will be voluntary and dependent on the outcome of the nation's request for the Supreme Court to take their case, a government official, who isn't authorized to speak publicly about the plans, said in an interview. The re-opening of the swap is intended to show the Supreme Court the nation's willingness to pay, he said.

## 'Most Pragmatic'

The Supreme Court grants only one percent of about 8,000 petitions it receives every year.

"This is the most pragmatic thing they could have done," said Alberto Bernal, head of fixed-income research at Bulltick Capital Markets in Miami. "It's good news for bonds because it shows total willingness to pay, even if Argentina is trying to circumvent U.S. courts."

Banks from Credit Suisse Group AG to Barclays Plc say that investors should buy local-law bonds, which are exempt from the court orders, as default risk for debt sold abroad increases after Argentina's appeal was rejected.

"We recommend only the shortest local-law bonds in Argentina," said Daniel Chodos, a strategist at Credit Suisse, said in a telephone interview from New York, referring to dollar notes due 2013 and 2015. "The ruling states that the order is for the exchange bonds, which were sold under foreign law, so local law bonds shouldn't be involved."

Case: 12-105     Document: 1020     Page: 105     10/15/2013     1066054     183

## 'Right Mind'

Investors will probably switch to the 2015 bonds after the government pays $2 billion of principal on the 2013 bonds next month, giving the longer notes additional support, Chodos said.

"Nobody in their right mind would resign New York protection for Argentine law," Jorge Piedrahita, chief executive officer of Torino Capital LLC in New York, said in an e-mail. "Payments would be easily embargoed by Elliott and there's the risk of having to get the money out of Argentina."

Argentina in 2001 defaulted on a record $95 billion of foreign debt. Holders of about 91 percent of the bonds agreed to take new exchange bonds in 2005 and 2010, at about 30 cents on the dollar. Creditors including billionaire Paul Singer's Elliott Management Corp. have rejected the swaps.

Fernandez last week reassured bond investors that she won't change terms on securities sold under Argentine legislation after the central bank set aside $2.3 billion for debt payments this year, of which $2 billion are for local law.

## 'Important Message'

"It's an important message to the international community because we are paying local-law maturities," she said in an Aug. 21 speech. "We haven't changed the terms in local law debt in 10 years and won't start to."

Argentina's vow to continue paying performing bonds regardless of the court ruling had spurred speculation the government will change legislation of its New York-law exchange bonds to a jurisdiction outside the U.S.

The extra yield investors demand to own Argentine bonds over U.S. Treasuries widened 33 basis points, or 0.33 percentage point, to 1,108 basis points today, according to JPMorgan Chase & Co. data.

Argentina's five-year credit default swaps, contracts insuring the nation's debt against non-payment, rose 265 basis points to 2,745 basis points at 2 p.m. New York time, according to data compiled by CMA Ltd. The peso fell 0.2 percent to 5.6427.

## 'Pesofication' Risk

Still, the fastest decline in central bank reserves since 2001 is spurring concern Argentina will pay its local law bonds in pesos, a process known as "pesofication." The fair value of Argentine

Case: 12-105    Document: 1020    Page: 106    10/15/2013    1066054    183

government bonds due 2015, called Boden 15, is 87.2 cents per dollar, compared with yesterday's price of 95.15, according to an Aug. 9 Citigroup Inc. report.

Argentina has $15.3 billion of dollar debt due by the end of 2015 including interest, compared with $36.9 billion of reserves as of yesterday. Reserves are on track to fall to $25 billion by the end of 2015, according to Citigroup.

South America's second biggest economy will have enough foreign currency funds to continue making payments on dollar bonds in the next three years, Barclays Plc analyst Sebastian Vargas said in a telephone interview from New York.

"We're keeping our market weight position and reiterating our recommendation to buy Boden 15," Vargas said. "Instead of pesofying you could simply not even pay a dime and kick the payments five years down the road. Why would you pesofy? Instead of pesofying you would simply forcibly restructure debt, but that is not in the cards."

To contact the reporter on this story: Camila Russo in New York at crusso15@bloomberg.net

To contact the editors responsible for this story: David Papadopoulos at papadopoulos@bloomberg.net; Michael Tsang at mtsang1@bloomberg.net

©2013 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT J



2 of 6 DOCUMENTS

Copyright 2013 Los Angeles Times
All Rights Reserved
Los Angeles Times

August 28, 2013 Wednesday
Home Edition

**SECTION:** BUSINESS; Business Desk; Part B; Pg. 2

**LENGTH:** 728 words

**HEADLINE:** Argentina to defy U.S. court with bond plan;
President Fernandez proposes a swap with new debt issued out of her country.

**BYLINE:** Ken Bensinger

**BODY:**

Just days after a U.S. appeals court ruled that Argentina must pay a small group of bond investors more than $1.3 billion, the country's president laid out a debt-swapping plan designed to get around the decision entirely.

The move was the latest bizarre twist in the long-fought dispute over the nation's unpaid debts, a battle that has involved a seized warship and a profusion of public vitriol while capturing the attention of the international finance community.

The defiant new proposal, disclosed late Monday on national television by President Cristina Fernandez de Kirchner, may mark a turning point in the matter because it could accelerate the slow-moving legal process in the U.S. and push the South American nation into technical default.

In a wide-ranging address, Fernandez said she would ask the country's legislature to pass a law offering holders of the nation's bonds the chance to swap them for new bonds issued out of Argentina instead of New York.

The idea, she said, was "to avoid any barriers to payment because we have suffered such barriers before."

The proposal flies in the face of an unfavorable ruling Friday by the U.S. 2nd Circuit Court of Appeals in New York.

That case stems from Argentina's 2001 default on nearly $100 billion in sovereign debt. The nation settled with investors holding about 93% of the bonds by swapping the securities out for discounted ones issued in 2005 and 2010.

But holders of the remaining 7% refused the deals, and some, led by hedge funds Elliott Management and Aurelius Capital Management, sued in federal court in New York.

Argentina to defy U.S. court with bond plan; President Fernandez proposes a swap with new debt issued out of her country. Los Angeles Times August 28, 2013 Wednesday

Last year, a district judge found that Argentina had violated its debt contracts and must pay the holdouts face value plus interest or it couldn't pay anyone, including those who agreed to the swap.

Friday's ruling, by a three-judge panel, upheld that decision and barred Argentina's bank in New York from processing any payments to bondholders without also including the holdouts.

Fernandez has vowed publicly never to pay the holdout investors more than those who settled.

Under the proposal she outlined in her televised address, Argentina would offer all bondholders a chance to swap their securities issued in the U.S. for new bonds issued in Argentina under the same terms as those in the renegotiated bonds.

Her plan could engender more trouble with U.S. courts, as the circuit court judges explicitly warned Argentina against attempting to find another forum to pay its creditors as a way to dodge the ruling.

The 2nd Circuit also issued a temporary stay on its ruling, pending a U.S. Supreme Court review of a prior decision in the case. But Argentina's announcement could prompt the appeals court to lift the stay.

In that event, Argentina could be faced with a difficult choice: pay all the bondholders or default on the exchange bonds as well. For bondholders, the new proposal by Fernandez presents a dilemma.

Although investors generally prefer the legal protections offered by U.S.-issued bonds, Argentina's pledge never to pay the holdouts, and the recent court ruling, may give them a dire choice: roll the dice in Argentina or get nothing in New York.

Fernandez, who expressed hope that the case would still be resolved in the U.S. legal system, prayed that "God shine down on the United States Supreme Court."

She also portrayed the situation as a matter of fairness. She said that those holdouts who sued Argentina represented just 0.45% of the original bonds and that they shouldn't determine the fate of the vast majority of investors who accepted the exchange.

Elliott has not disclosed its holdings or the price it paid to acquire them in the secondary market. The hedge fund specializes in buying distressed debt at a discount and then suing for full value.

Last fall, for instance, it and other holdouts successfully petitioned a court in Ghana to seize an Argentine military ship, but the boat was eventually released.

Fernandez's speech, which lasted about half an hour and included a history of the country's borrowing habits that blamed prior administrations for Argentina's financial woes, was followed by a barrage of more than 40 blasts from the president's Twitter account, @CFKArgentina.

"This past Friday we have proven definitively that history is always just around the corner, particularly when it comes to economics," one tweet reads.

--

ken.bensinger@latimes.com

**LOAD-DATE:** August 28, 2013

# EXHIBIT K

*Clarin*

## The change of jurisdiction didn't appear in the bill and generates doubts

*It is to elude a ruling of the U.S. judges and pay the bondholders here*

Thursday, August 29, 2013

The announcement that there would be a proposal for a change of jurisdiction of all those bondholders that entered the exchanges I and II – to give them paper with Argentine jurisdiction in replacement of what they have, with jurisdiction in New York or London – did not appear in the bill that the government sent to Congress.

Minister Hernán Lorenzino said that it was not an issue that needed congressional approval and that the Executive could put it into effect when it believed it convenient.

What is clear is that the announcement has turned into the most debated point among experts, over the unexpected consequences that it could have.

The main risk is that the judges of the United States interpret that the change now suggested by Argentina is a ruse to evade a decision in favor of the vulture funds.

Analysts agree that the New York judges might now accept a demand from the vulture funds to lift the stay that allowed Argentina until now to buy time and avoid paying the sentence set by Judge Griesa and upheld by the court of appeals.

The stay remains in force after last Friday's ruling, only because the judges of the appellate court left the responsibility of closing the case or keeping it open to the US Supreme Court, which already received the appeal by the Argentine government to review the two rulings that were already issued in favor of the vulture funds.

The risks that the change of jurisdiction entails were outlined by various experts.

Miguel Kiguel and Hernán Lacunza agreed that this is an operation that is not so easy to implement.

"The institutions that provide the service of receiving funds from the government can be observed by the courts of the United States", warned Kiguel. "There are funds that by statute, even if they wanted to, are unable to accept the change in legislation," Lacunza said.

"There is talk of jumping the fence and changing the jurisdiction to avoid the impact of a ruling that is already known to be adverse. It is giving a hand to someone who is drowning", asserted José Luis Espert.

1

"To change the place of payment to Buenos Aires will be extremely complex in the middle of a currency clamp, and of difficulty in transferring hard currency. Argentina will never be able to issue a government bond abroad if continues escaping negotiation over the debt," warned economist Jorge Todesca.

As one sees, a difficult panorama from whatever side you look at it.

**DEBORAH A. GREEN**
**TRANSLATOR**
**4-74 48TH AVENUE**
**LONG ISLAND CITY, NY 11109**


## AFFIDAVIT OF ACCURACY


**STATE OF NEW YORK    )**
**CITY OF NEW YORK    :**
**COUNTY OF NEW YORK )**


DEBORAH A GREEN, being duly sworn, deposes and says:

That she is a translator of the English and Spanish languages and is fully conversant with said languages.

That on or about the 9th day of October 2013, she made the annexed English-language translation of the document described below:

*Clarín*: "El cambio de jurisdicción en el proyecto y genera dudas"

That to the best of her knowledge and belief, said translation is a true and correct English rendering of the original document in Spanish.

Deborah A. Green

**SWORN TO BEFORE ME THIS**
**9th DAY OF OCTOBER 2013**

**NOTARY PUBLIC**

ROSELLE LEVIGNE
Notary Public - State of New York
NO. 01LE6189094
Qualified in Nassau County
My Commission Expires 6/23/16

*Clarin*

## El cambio de jurisdicción no apareció en el proyecto y genera dudas

*Es para eludir una sentencia de los jueces de EE.UU. y pagarles acá a los bonistas.*

Jueves, 29 de agosto de 2013

El anuncio de que se propondrá un cambio de jurisdicción a todos aquellos bonistas que entraron a los canjes I y II –para darles un papel con jurisdicción argentina en reemplazo del que tienen, con jurisdicción de Nueva York o Londres–, no apareció en el proyecto que el Gobierno envió al Congreso.

El ministro Hernán Lorenzino dijo que no era un tema que necesite aprobación parlamentaria, y que el Ejecutivo lo puede hacer efectivo cuando lo crea conveniente.

Lo cierto es que el anuncio se ha convertido en el punto más discutido entre especialistas, por las consecuencias inesperadas que podría tener.

El principal riesgo, es que los jueces de Estados Unidos interpreten que el cambio por ahora sugerido por la Argentina es un ardid para evadir una sentencia a favor de los fondos buitre.

Analistas coinciden en que los jueces de Nueva York tal vez podrían ahora aceptar un reclamo de los fondos buitre de que se levante la cautelar (stay) que le permitió hasta ahora a la Argentina ganar tiempo y evitar el pago de la sentencia que fijó el juez Griesa y ratificó la corte de apelaciones.

La cautelar sigue vigente después del fallo del viernes pasado, justamente porque los jueces de segunda instancia dejaron la responsabilidad de cerrar el caso o mantenerlo abierto a la Corte

1

Suprema de los Estados Unidos, que ya recibió una apelación por parte del gobierno Argentino para que revierta los dos fallos que ya se emitieron a favor de los fondos buitre.

Los riesgos que acarrea el cambio de jurisdicción fuero remarcados por diversos especialistas.

Miguel Kiguel y Hernán Lacunza coincidieron en que es una operación no tan sencilla de implementar.

"Las instituciones que se presten a recibir los fondos del Gobierno pueden ser observadas por la justicia de Estados Unidos", advirtió Kiguel. "Hay fondos que por estatuto, aunque quisieran, no pueden aceptar el cambio de legislación ", observó Lacunza.

"Se habla de saltar el cerco y cambiar la jurisdicción para evitar el impacto de un fallo que ya se sabe que es adverso. Se trata de un manotazo de ahogado", cuestionó José Luis Espert.

"Cambiar el lugar de pago a Buenos Aires va a ser sumamente complejo en medio de un cepo cambiario, y de dificultades para transferir divisas. Argentina nunca va a poder emitir un título público en el exterior si sigue escapando a una negociación por la deuda", alertó el economista Jorge Todesca.

Como se ve, un panorama difícil por donde se lo mire.

# EXHIBIT L

*El Cronista*

# Vultures: the government admits that an adverse ruling in the Court will send the country into default

*Exchange: Economy vice minister, who asked the U.S. courts "to let us continue paying", called the paper in the hands of the vulture funds 'painted cardboard'*

Thursday, August 29, 2013

NOELIA BARRAL GRIGERA Buenos Aires

Economy Vice Minister Axel Kicillof admitted yesterday to the Senate that an adverse ruling of the Supreme Court of the United States would force Argentina to go into default again, because the Government would only pay the vulture funds under the same conditions of debt restructuring that those who already entered the swap obtained. "They are tipping us into a default, because they are tipping us into non-payment," acknowledged the official.

"They demand that we pay to vulture funds so that later all the others come in to sue.  We are asking the U.S courts to let us continue paying the exchange bonds. (Otherwise) they tip us into a default. They tip us into a failure to pay", explained Kicillof.  Also, with regard to the debt paper in the hands of the vulture funds, he warned: "Today, they are painted cardboard to us".

For the economic team, a court backing for NML Capital (of Paul Singer) and Dart Management (of Kenneth Dart), the two most important vulture funds, would provoke the immediate reaction of the rest of the holdouts that have still not accepted the restructuring, in addition to the claims from the bondholders who did enter the exchange, to get full payment on the debt. "To settle, as some say, with the vulture funds would imply immediate consequences for Argentina," Economy Minister Hernán Lorenzino clarified before the senators.

Officials defended Argentina's strategy towards the bondholders for three hours at the plenary of the Budget and Economy committees in the Senate. "We want to make it clear. This is not in any

1

way an attempt to evade the U.S. judiciary, but to demonstrate that Argentina still has the willingness to pay", the minister said, who also admitted that an adverse ruling "would affect the whole renegotiation, the US$28 billion which is being paid today."

In addition, Lorenzino stressed that the option for the bondholders who accepted the debt restructuring, to collect in Argentina, will be voluntary and that it was not contemplated in the bill because the Economy Ministry is empowered to make that decision without going through Congress. "We will pay them where we can pay", completed Kicillof.

Argentina will leave the debt exchange – the third one launched in less than a decade -- open indefinitely, which can be interpreted as a search for better relations with the United States federal courts that criticized the way in which it handled its exit from the US$100 billion default that it entered into in 2001.

Críticism

The officials were severely reprimanded by UCR Senator Ernesto Sanz, who accused them in a loud voice of being "inefficient", "cowards" and "responsible for having done things badly". "They come here to put a pretty little face on and make themselves out to be respectable, and when they leave they get up on a podium.  Cowards and hypocrites! We speak with vehemence, and face to face", the senator from Mendoza said. Faced with the ferocity of his words, the head of the pro-government block, Miguel Pichetto, interrupted him to warn him that the exchange "has nothing to do with internal discourse".

"It is that Kicillof exhausts us a little with so much down-the-line and going back to the past," retorted another Radical, Gerardo Morales, who also demanded to know the fees for the lawyers who are carrying out the Argentine strategy in the United States.   Information that Lorenzino promised to send to him.

**DEBORAH A. GREEN**
**TRANSLATOR**
**4-74 48TH AVENUE**
**LONG ISLAND CITY, NY 11109**

## AFFIDAVIT OF ACCURACY

**STATE OF NEW YORK**    )
**CITY OF NEW YORK**     :
**COUNTY OF NEW YORK** )

DEBORAH A GREEN, being duly sworn, deposes and says:

That she is a translator of the English and Spanish languages and is fully conversant with said languages.

That on or about the 9th day of October 2013, she made the annexed English-language translation of the document described below:

*El Cronista*: "Buitres: el Gobierno admite que un fallo adverso en la Corte envía al país al default"

That to the best of her knowledge and belief, said translation is a true and correct English rendering of the original document in Spanish.

_Deborah A. Green_

Deborah A. Green

SWORN TO BEFORE ME THIS
9th DAY OF OCTOBER 2013

_Roselle Levigne_

NOTARY PUBLIC

ROSELLE LEVIGNE
Notary Public - State of New York
NO. 01LE6189094
Qualified in Nassau County
My Commission Expires 6/23/16

*El Cronista*

## Buitres: el Gobierno admite que un fallo adverso en la Corte envía al país al default

*Canje: viceministro de Economía, que pidió a los tribunales de EE.UU. "que nos dejen seguir pagando", calificó a los papeles en poder de los fondos buitre como cartón pintado*

Jueves, 29 de agosto de 2013

NOELIA BARRAL GRIGERA Buenos Aires

El viceministro de Economía, Axel Kicillof, admitió ayer ante el Senado que un fallo adverso de la Corte Suprema de Estados Unidos obligaría a la Argentina a entrar nuevamente en default porque el Gobierno solo les pagará a los fondos buitre si es en las mismas condiciones de reestructuración de la deuda que obtuvieron quienes ya entraron al canje. "Nos vuelcan a un default, porque nos vuelcan a un no pago", reconoció el funcionario.

"Nos reclaman que les paguemos a los fondos buitre para que después vengan todos los otros a reclamar. Le pedimos a los tribunales de EE.UU. que nos dejen seguir pagando los bonos del canje. (De lo contrario) nos vuelcan a un default. Nos vuelcan a un no pago", explicó Kicillof. Además, sobre los papeles en poder de los fondos buitre advirtió: "Hoy para nosotros son cartón pintado".

Para el equipo económico, un aval judicial a NML Capital (de Paul Singer) y Dart Management (de Kenneth Dart), los dos fondos buitre más importantes, provocaría la reacción inmediata del resto de los holdouts que aún no aceptó la reestructuración, además del reclamo de los bonistas que sí entraron al canje para lograr el pago total de la deuda. "Arreglar, como dicen algunos, con los fondos buitre le traería consecuencias inmediatas a la Argentina", aclaró a su vez el ministro de Economía, Hernán Lorenzino, ante los senadores.

1

Los funcionarios defendieron la estrategia de la Argentina frente a los bonistas durante tres horas en el plenario de las comisiones de Presupuesto y Economía en el Senado. "Queremos que quede claro. Este no es de ninguna manera un intento de evadir a la Justicia de EE.UU. sino de demostrar que la Argentina mantiene la voluntad de pago", definió el ministro, que también admitió que un fallo adverso "afectaría a toda la renegociación, a los u$s 28.000 millones que hoy se están pagando".

Además, Lorenzino subrayó que la opción para que los bonistas que aceptaron la reestructuración de la deuda cobren en la Argentina será voluntaria y que no está contemplada en el proyecto de ley porque el Ministerio de Economía está facultado para tomar esa decisión sin pasar por el Congreso. "Los pagaremos donde podamos pagar", completó Kicillof.

La Argentina dejará abierto por tiempo indefinido el tercer canje de deuda que lanzará en menos de una década, lo que puede ser interpretado como una búsqueda de mejorar las relaciones con las cortes federales estadounidenses que criticaron la forma en que manejó su salida del default de u$s 100.000 millones en la que entró el 2001.

Críticas

Los funcionarios fueron duramente increpados por el senador radical Ernesto Sanz, quien los acusó a los gritos de ser "ineficientes", "cobardes" y "responsables de haber hecho las cosas mal". "Vienen acá a poner carita linda y hacerse los respetuosos y cuando se van se suben a una tribuna. ¡Cobardes e hipócritas! Nosotros hablamos con vehemencia y cara a cara", cuestionó el mendocino. Ante la fiereza de sus palabras, el titular del bloque oficialista, Miguel Pichetto, lo interrumpió para advertirle que el canje "no tiene nada que ver con el discurso interno".

"Es que Kicillof nos agota un poco con tanta bajada de línea y vuelta al pasado", retrucó otro radical, Gerardo Morales, que además reclamó conocer los honorarios de los abogados que llevan adelante la estrategia argentina en EE.UU. Un dato que Lorenzino prometió enviarle.

# EXHIBIT M

# Dechert
## LLP

1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com


**ROBERT A. COHEN**

robert.cohen@dechert.com
+1 212 698 3501 Direct
+1 212 314 0001 Fax

August 30, 2013

**VIA HAND DELIVERY**

Honorable Thomas P. Griesa
Daniel Patrick Moynihan
  United States Courthouse
500 Pearl St., Room 1630
New York, NY 10007-1312

Re: *NML Capital, Ltd. v. the Republic of Argentina*, Nos. 08 Civ. 6978 (TPG); 09 Civ. 1707
(TPG); 09 Civ. 1708 (TPG); *Olifant Fund, Ltd. v. the Republic of Argentina*, No. 10 Civ.
9587 (TPG); *Pablo Alberto Varela v. the Republic of Argentina*, No. 10 Civ. 5338 (TPG);
*Aurelius Capital Master, Ltd. v. the Republic of Argentina*, Nos. 09 Civ. 8757 (TPG),
09 Civ. 10620 (TPG), 10 Civ. 3970 (TPG), 10 Civ. 8339 (TPG); *Aurelius Opportunities
Fund II, LLC v. the Republic of Argentina*, Nos. 10 Civ. 1602 (TPG), 10 Civ. 3507 (TPG);
*Blue Angel Capital I LLC v. the Republic of Argentina*, Nos. 10 Civ. 4101 (TPG), 10 Civ.
4782 (TPG).

Dear Judge Griesa:

We represent plaintiff NML Capital, Ltd. ("NML"), and write on behalf of NML and plaintiffs
Olifant Fund, Ltd., Pablo Alberto Varela, *et al.*, Aurelius Capital Master, Ltd., Aurelius
Opportunities Fund II, LLC, ACP Master, Ltd., and Blue Angel Capital I LLC (collectively, the
"Plaintiffs") about a plan announced by Argentine President Cristina Fernández de Kirchner
through which the Republic of Argentina ("Argentina") will attempt to evade the Court's
"Amended February 23 Order," dated November 21, 2012, which was entered in each of the
above-referenced actions.  Plaintiffs previously requested a conference on August 29 to seek
relief relating to this scheme, but requested that the conference be cancelled to reach a consensual
form of proposed order with Argentina.

Plaintiffs and Argentina have agreed to a small portion of the relief that Plaintiffs are seeking: a
declaration that the Court's March 5, 2012 injunction ("the March 5 Order") against Argentina
"tak[ing] any action to evade the directives of the February 23, 2012 Orders in the event they are
affirmed, render[ing] them ineffective in the event they are affirmed, or diminish[ing] the Court's
ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed,
including without limitation, altering or amending the processes or specific transfer mechanisms
by which it makes payments on the Exchange Bonds, without prior approval of the Court" has
been and remains continuously in full force and effect.  Plaintiffs intend to advise the Court of the

15021770

**Dechert**
LLP

Honorable Thomas P. Griesa
August 30, 2013
Page 2

results of the parties' further discussions and to seek relief if the parties cannot agree on a proposed order in the immediate future.

On Friday, August 23, 2013, the United States Court of Appeals for the Second Circuit affirmed the Amended February 23 Orders. In reaching that conclusion, the Second Circuit upheld this Court's Orders in every respect, while rejecting Argentina's "dire predictions" as "speculative, hyperbolic, and almost entirely of the Republic's own making." *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, 2013 WL 4487563, at *8 (2d Cir. 2013). It also noted Argentina's "extraordinary behavior" as a "uniquely recalcitrant debtor." *Id.* at 10. On the following Monday, August 26, the president of Argentina held a prime time televised speech to criticize the August 23 ruling, arguing that Argentina "cannot condone having the sword of Damocles hanging over our neck." In that address, she also announced a plan to authorize a transaction in which holders of the bonds issued in the 2005 and 2010 debt exchanges (the "Exchange Bonds") could exchange those bonds for "similar bonds instead, in foreign currency and under the same terms, but they will simply be paid here in the Republic of Argentina in the Securities Depository." She said:

> We have also taken the decision to safeguard … the 93% of the bondholders who have trusted Argentina and have been paid …by simply changing the place of payment to avoid potential embargoes that the funds could suffer because we have already suffered embargoes in the past. To be clear: those who hold Argentine bonds, the 93%, will be issued with similar bonds instead, in foreign currency and under the same terms, they will simply be paid here in the Republic of Argentina.

The Argentine Minister of Economy, Hernán Lorenzino, later commented that he did not believe that such a plan required the approval of the Argentine Congress, and that the Argentine Executive could put such a plan in place whenever it found it convenient to do so. *The change of jurisdiction didn't appear in the bill and generates doubts*, CLARIN, August 29, 2013.

Argentina thus has unambiguously announced the means by which it will give effect to its repeated threats not to obey the Amended February 23 Orders—threats which were repeated by its counsel, Cleary Gottlieb, at argument before the Second Circuit. *See NML Capital, Ltd.*, 2013 WL 4487563, at *1 ("[N]otwithstanding its commitment to resolving disputes involving the FAA in New York courts under New York law, at the February 27, 2013 oral argument, counsel for Argentina told the panel that it '*would not voluntarily obey*' the district court's injunctions, even if those injunctions were upheld by this Court." (emphasis added)). Argentina is plainly attempting to replace the current payment mechanism under the Exchange Bonds —which channels payments through New York—with a payment mechanism located exclusively in

**Dechert**
LLP

Honorable Thomas P. Griesa
August 30, 2013
Page 3

Argentina. Its stated goal is to make the payments to those bondholders immune from this Court's jurisdiction.

The press has widely reported what was made clear in the Argentine president's speech: Argentina's intent in conducting this exchange is to evade the Amended February 23 Orders. *See, e.g.,* Ken Bensinger, *To dodge U.S. court ruling, Argentina plans bond exchange*, LOS ANGELES TIMES, Aug. 27, 2013 ("Just days after a U.S. appeals court said it must pay bond investors more than $1.3 billion, Argentina has announced a debt-swapping plan to end-run the decision entirely."); Camila Russo, *Argentina Plans New York-Buenos Aires Bond Swap*, BLOOMBERG, Aug. 27, 2013 ("The proposal is aimed at circumventing the U.S. court ruling without reneging on payments to the New York-law bondholders."); Taos Turner, *Argentina's GDP Warrants Tank On News of Debt Swap*, WALL ST. J., Aug. 27, 2013 ("A move by Argentina's government to try to pay creditors by circumventing U.S. court orders sent most of the country's debt prices plunging on Tuesday.").

Argentina's planned exchange offer—and any steps taken to consummate it (or any other transaction having a similar effect)—are in direct violation of the March 5 Order, in which the Court granted a stay pending appeal and prohibited Argentina from "tak[ing] any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, ***including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds***, without prior approval of the Court" (emphasis added).[1]

Indeed, Argentina has in effect repudiated the Declaration of Francisco Guillermo Eggers, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order." Notably, Argentina submitted this declaration at this Court's specific request, in order to ensure that the anti-evasion aspect of the March 5 Order would be "complied with," notwithstanding "statements to the press" to the contrary by Argentine officials. Hr'g Tr. 22:15-23:15, No. 08 Civ. 6978 (S.D.N.Y. Nov. 9, 2012).

Plaintiffs intend to continue discussing with Argentina the remaining relief that they are seeking, and Plaintiffs intend to advise the Court regarding the results of those discussions as soon as possible.

---

[1]   Although the Court vacated the "provision in the March 5, 2012 Order staying the carrying out of the February 23, 2012 Orders" in its "Order Concerning The March 5, 2012 Order," dated November 21, 2012, there is no question that the Court left in place its injunction prohibiting Argentina from changing its payment mechanism.

# Dechert
#### LLP

Honorable Thomas P. Griesa
August 30, 2013
Page 4


Respectfully submitted,

*Robert A. Cohen /g.s.*

Robert A. Cohen

Enclosures

cc:    Carmine D. Boccuzzi, Jr., Esq. (by email)
Edward A. Friedman, Esq. (by email)
Robert D. Carroll, Esq. (by email)
Michael C. Spencer, Esq. (by email)

# EXHIBIT N

# Dechert
LLP

1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**ROBERT A. COHEN**

robert.cohen@dechert.com
+1 212 698 3501 Direct
+1 212 314 0001 Fax

September 11, 2013

**VIA HAND DELIVERY**

Honorable Thomas P. Griesa
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Room 1630
New York, NY 10007-1312

Re: *NML Capital, Ltd. v. the Republic of Argentina*, Nos. 08 Civ. 6978 (TPG); 09 Civ. 1707
(TPG); 09 Civ. 1708 (TPG); *Olifant Fund, Ltd. v. the Republic of Argentina*, No. 10 Civ.
9587 (TPG); *Pablo Alberto Varela v. the Republic of Argentina*, No. 10 Civ. 5338 (TPG);
*Aurelius Capital Master, Ltd. v. the Republic of Argentina*, Nos. 09 Civ. 8757 (TPG),
09 Civ. 10620 (TPG), 10 Civ. 3970 (TPG), 10 Civ. 8339 (TPG); *Aurelius Opportunities
Fund II, LLC v. the Republic of Argentina*, Nos. 10 Civ. 1602 (TPG), 10 Civ. 3507 (TPG);
*Blue Angel Capital I LLC v. the Republic of Argentina*, Nos. 10 Civ. 4101 (TPG), 10 Civ.
4782 (TPG).

Dear Judge Griesa:

We represent plaintiff NML Capital, Ltd. ("NML"), and write on behalf of NML and plaintiffs
Aurelius Capital Master, Ltd., Aurelius Opportunities Fund II, LLC, ACP Master, Ltd., Blue
Angel Capital I LLC, Olifant Fund, Ltd., and Pablo Alberto Varela, *et al.* (collectively, the
"Plaintiffs") to respectfully request that the Court enter the proposed order enclosed as Exhibit A,
to which defendant the Republic of Argentina ("Argentina") has already consented in part and
which relates to the Court's "Amended February 23 Order," dated November 21, 2012, which
was entered in each of the above-referenced actions.

On August 30, 2013, Plaintiffs wrote to the Court to advise that three days after the Second
Circuit affirmed Your Honor's November 21st "Equal Treatment" (pari passu) decision,
Argentine President Cristina Fernández de Kirchner announced in a nationally televised address a
plan in which holders of the securities issued in Argentina's 2005 and 2010 debt exchanges (the
"Exchange Bonds") could exchange those securities for "bonds instead, in foreign currency and
under the same terms, but they will simply be paid here in the Republic of Argentina in the
Securities Depository."

As Plaintiffs described in greater detail in their August 30 letter, Argentina's plan would
constitute—if any steps were taken towards implementing it—an unambiguous violation of the
Court's March 5, 2012 injunction ("the March 5 Order") against Argentina "tak[ing] any action to
evade the directives of the February 23, 2012 Orders in the event they are affirmed, render[ing]

15030817



them ineffective in the event they are affirmed, or diminish[ing] the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, *including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds*, without prior approval of the Court" (the "Anti-Evasion Injunction") (emphasis added). Moreover, it would constitute a repudiation of the Declaration of Francisco Guillermo Eggers, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

The Argentine President's televised announcement of a specific mechanism to evade the Amended February 23 Orders makes clear that the Republic does not feel constrained by the March 5 Order or the Eggers Declaration. Plaintiffs seek additional relief to ensure that the Amended February 23 Orders will be enforceable and effective when all appellate proceedings have concluded or the stay is otherwise lifted. In an effort to resolve these serious questions, Plaintiffs consulted with Carmine D. Boccuzzi, Jr., Esq. of Cleary Gottlieb Steen & Hamilton LLP, counsel for Argentina, regarding whether Argentina would agree to measures to ensure its compliance with the Anti-Evasion Injunction.

On August 29, 2013, Plaintiffs sent a proposed order to counsel for Argentina, which was identical to the proposed order that accompanies this letter except for minor changes to Paragraphs 3 and 4. Plaintiffs sought the Republic's agreement to four forms of relief: (1) a declaration that the Anti-Evasion Injunction has been and remains in effect; (2) an order clarifying that the Anti-Evasion Injunction will remain in effect during the pendency of a petition for a writ of certiorari and any subsequent proceedings; (3) a declaration clarifying that the plan announced by the Argentine President would, if any steps were taken towards implementing, violate the Anti-Evasion Injunction; and (4) limited discovery regarding plans (including the plan announced by the Argentine President) to evade the Amended February 23 Orders.

On September 10, 2013, counsel for Argentina informed Plaintiffs that Argentina would agree to the entry of only a limited portion of Plaintiffs' proposed order. Argentina objects to the third and fourth points described above, which are the new and necessary points designed to address Argentina's freshly announced evasion plan and similar types of plans in the future: a declaration regarding the fact that Argentina's plan would violate the Anti-Evasion Injunction and discovery to determine what Argentina is doing to implement its plans to evade the Amended February 23 Orders. Argentina also proposed the deletion of two "WHEREAS" clauses and the words "attempt to" in two places in paragraph 2 of Plaintiff's proposed order: A true and correct copy of the email from Argentina's counsel is attached hereto as Exhibit B.

Each of the three points to which Argentina objects would materially aid Plaintiffs in preventing Argentina from formulating, designing, or implementing its scheme to evade the Amended



Honorable Thomas P. Griesa
September 11, 2013
Page 3

February 23 Orders. First, the declaratory relief sought by Plaintiffs would remove any doubt that the plan proposed by the Argentine President—to change the place of payment of the Exchange Bonds through an additional exchange offer—would violate the Anti-Evasion Injunction. Such a clarification would render frivolous any argument from Argentina or non-parties in active concert with it that such an exchange somehow would not violate the Anti-Evasion Injunction.

Second, the discovery sought from Argentina would enable Plaintiffs to determine if (and to what extent) Argentina has already violated the Anti-Evasion Injunction by taking steps to design and implement the President's plan, and to identify any non-parties acting in active concert with Argentina in implementing its plan, or any other plan to evade the Anti-Evasion Injunction, thereby enabling Plaintiffs to ensure that each such non-party is given actual notice of the Anti-Evasion Injunction and is thereby discouraged from aiding Argentina.

Finally, inclusion of the words "attempt to" in the clarification of the preliminary injunction would make plain that Argentina and its agents are prohibited from attempting to evade the injunction or render it ineffective. While plaintiffs believe that such conduct is already prohibited by the March 5 Order, disturbingly Argentina apparently believes otherwise. The additional language proposed by plaintiffs would make clear that Argentina and its agents violate this Court's order not only if they are *successful* in evading it or rendering it effective; their taking any steps toward doing so—*viz.* their efforts towards and planning of attempts to evade—just as clearly violate the order.

For these reasons, Plaintiffs respectfully request that the Court enter the proposed order enclosed as Exhibit A. If the Court wishes to have argument regarding the proposed order, Plaintiffs respectfully request that such a hearing be scheduled for the next date available on the Court's calendar.

Respectfully submitted,

Robert A. Cohen

Enclosures

cc:   Carmine D. Boccuzzi, Jr., Esq. (by email)
      Edward A. Friedman, Esq. (by email)
      Robert D. Carroll, Esq. (by email)
      Michael C. Spencer, Esq. (by email)

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x
                           :

NML CAPITAL, LTD.,            :     08 Civ. 6978 (TPG)
                           :     09 Civ. 1707 (TPG)
        Plaintiff,      :     09 Civ. 1708 (TPG)
                           :

           v.            :

THE REPUBLIC OF ARGENTINA,  :

        Defendant.     :
                           :
------------------------------------------------ x
                           :

AURELIUS CAPITAL MASTER, LTD. and :     09 Civ. 8757 (TPG)
ACP MASTER, LTD.,        :     09 Civ. 10620 (TPG)
                           :
        Plaintiffs,     :

           v.            :

THE REPUBLIC OF ARGENTINA,  :

        Defendant.     :
                           :
------------------------------------------------ x
                           :

AURELIUS OPPORTUNITIES FUND II, LLC :
and AURELIUS CAPITAL MASTER, LTD., :    10 Civ. 1602 (TPG)
                           :     10 Civ. 3507 (TPG)
        Plaintiffs,     :

           v.            :

THE REPUBLIC OF ARGENTINA,  :

        Defendant.     :
                           :    **(captions continued on next page)**
------------------------------------------------ x

**[PROPOSED] ORDER**

15019832

```
-----------------------------------------        :
AURELIUS CAPITAL MASTER, LTD. and               :
AURELIUS OPPORTUNITIES FUND II,                  :     10 Civ. 3970 (TPG)
LLC,                                             :     10 Civ. 8339 (TPG)
                                                 :
         Plaintiffs,                             :
                                                 :
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              x
-----------------------------------------
BLUE ANGEL CAPITAL I LLC,                        :
                                                 :
         Plaintiff,                              :     10 Civ. 4101 (TPG)
                                                 :     10 Civ. 4782 (TPG)
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              :
-----------------------------------------        x
OLIFANT FUND, LTD.,                              :
                                                 :
         Plaintiff,                              :     10 Civ. 9587 (TPG)
                                                 :
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              :
-----------------------------------------        x
PABLO ALBERTO VARELA, et al.,                    :
                                                 :
         Plaintiff,                              :     10 Civ. 5338 (TPG)
                                                 :
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              :
-----------------------------------------        x
```

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic of Argentina (the "Republic") is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23 Orders"), this Court granted Plaintiffs' motions for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

WHEREAS, in an Order dated March 5, 2012 (the "March 5 Order"), the Court stayed the February 23 Orders pending appeal, and also enjoined the Republic as follows (the "Anti-Evasion Injunction"):

> [T]he Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the

---

[1]     The term "Exchange Bonds," as in the Amended February 23 Orders, refers to the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future.

[2]     The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

3

Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

...

This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

WHEREAS, in an Opinion dated October 26, 2012 (the "October 26 Opinion"), the United States Court of Appeals for the Second Circuit affirmed the February 23, 2012 Orders in part and remanded in part "for such proceedings as are necessary to address the operation of the payment formula and the Injunctions' application to third parties and intermediary banks."

WHEREAS, following this Court's request for an affidavit ensuring that the Anti-Evasion Injunction would be complied with notwithstanding contrary statements to the press, the Republic submitted the Declaration of Francisco Guillermo Eggers, the Republic's Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

WHEREAS, the Court resolved the issues remanded for clarification by the Second Circuit in an Opinion, dated November 21, 2012 and an "Amended February 23 Order," dated November 21, 2012, entered in each of the above-referenced actions.

WHEREAS, in an "Order Concerning The March 5, 2012 Order," dated November 21, 2012, the Court vacated the clause staying enforcement of its injunction pending appeal, but left in place its injunction prohibiting Argentina from taking any action to evade the injunction.

4

WHEREAS, in an Order dated November 28, 2012, the Second Circuit ordered "that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of [the Second Circuit]," but did not stay the March 5 Order.

WHEREAS, on June 24, 2013, the Republic filed a petition for a writ of certiorari with respect to the October 26 Opinion.

WHEREAS, in an Opinion dated August 23, 2013 (the "August 23 Opinion"), the Second Circuit affirmed the Amended February 23 Orders, but stayed enforcement of the Amended February 23 Orders pending the resolution of a petition for a writ of certiorari.

WHEREAS, the August 23, 2013 opinion noted that "Argentina's officials have publicly and repeatedly announced their intention to defy any rulings of this Court and the district court with which they disagree." *NML Capital, Ltd. v. Republic of Argentina,* No. 12-105, 2013 WL 4487563, at *1 (2d Cir. Aug. 23, 2013).

AND WHEREAS, on August 26, 2013, the President of Argentina, Cristina Fernández de Kirchner, announced in a nationally-televised address that the Republic will establish procedures allowing holders of Exchange Bonds to replace these instruments with nearly identical instruments that are payable within the Republic, in an apparent attempt to evade the directives of the Amended February 23 Orders.

**IT IS HEREBY**:

1.      DECLARED that the Anti-Evasion Injunction of the March 5 Order has been and remains continuously in full force and effect.

2.      ORDERED that the Republic shall not—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic—take any action to attempt to evade the purposes and directives of the

5

Amended February 23 Orders, attempt to render those Orders ineffective, or attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court. This paragraph shall remain in effect during the pendency of any petition to the United States Supreme Court for a writ of certiorari with respect to the October 26 Opinion or the August 23 Opinion, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand, unless a further order of the Court states otherwise.

3.  DECLARED that for the avoidance of doubt (i) the implementation of the plan to allow Exchange Bonds to be exchanged for securities or similar instruments payable in Argentina, which was announced by President Fernández de Kirchner in her speech of August 26, 2013, (ii) implementation of any functionally equivalent or reasonably similar plan, or (iii) any step towards implementing (including without limitation the formulation or design of) such a plan or a functionally equivalent or reasonably similar plan, each would violate the Anti-Evasion Injunction of the March 5 Order and Paragraph 2 of this ORDER.

4.  ORDERED that with respect to any plan or proposal that may have the purpose, effect or intent, either directly or indirectly, of violating the Anti-Evasion Injunction or Paragraph 2 of this ORDER, including without limitation the measures described in Paragraph 3 of this ORDER, or which may be deemed by a reasonable person to have such purpose, effect or intent, the Republic shall disclose to Plaintiffs, within five business days of the entry of this ORDER, the existence and content of any communications between the Republic (or any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic) and: (i) any holders of beneficial interests in the Exchange Bonds or any

6

registered owners of the Exchange Bonds; (ii) any trustee, indenture trustee, paying agent, trustee paying agent, transfer agent, or any agent under the relevant indenture and global notes for the Exchange Bonds; (iii) any registrar, clearing corporations and systems, operators of clearing systems, settlement agents, depositary, depositary participant or custodian for the Exchange Bonds; (iv) any banking, financial, trust or custodial institution and any coordinator, manager, solicitation agent, tender or exchange agent, or financial advisor; (v) any United States or international regulator or government entity; or (vi) any agent, representative, or other person acting on behalf of the persons identified in parts (i), (ii), (iii), (iv), or (v) of this paragraph. For the avoidance of doubt, this disclosure shall include the identity of all parties to the communication, the date and nature of the communication, a detailed description of the content of the communication, and any documents or records constituting or associated with the communication (including without limitation any e-mails, attachments, facsimile transmissions, or other written materials). To the extent that any such communications come into existence after the date of this ORDER, such communications shall be disclosed to the Court and to Plaintiffs' respective counsel within five business days of the sending or receipt of such communications.

5.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by the terms of the ORDER.

Dated: New York, New York
       September ___, 2013


_____
Thomas P. Griesa
U.S. District Judge

7

Exhibit B

**Kirsch, Eric**

| | |
|---|---|
| **From:** | Boccuzzi Jr., Carmine D. [cboccuzzi@cgsh.com] |
| **Sent:** | Tuesday, September 10, 2013 11:52 AM |
| **To:** | 'Rapport, Daniel B.'; Boccuzzi Jr., Carmine D. |
| **Cc:** | Friedman, Edward A.; Cohen, Robert; Kirsch, Eric; 'Spencer, Michael'; 'gsnitow@skhmlaw.com' (gsnitow@skhmlaw.com); 'Carroll, Robert D' (RCarroll@goodwinprocter.com); Sanchez Herrera, Ezequiel; Brennan, Michael M. |
| **Subject:** | RE:  NML Capital, Ltd. et al. v. the Republic of Argentina |
| **Attachments:** | Revised draft proposed order.doc; Blackline 9-10.pdf |

Dear Dan – Following up on your email of Sunday I attach our comments to plaintiffs' proposed order.  I am available to discuss.

Carmine D. Boccuzzi, Jr.
Cleary Gottlieb Steen & Hamilton LLP
Assistant: trusso@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2508 | f: +1 212 225 3999
www.clearygottlieb.com | cboccuzzi@cgsh.com

**From:** Rapport, Daniel B. [mailto:drapport@fklaw.com]
**Sent:** Sunday, September 08, 2013 1:10 PM
**To:** Boccuzzi Jr., Carmine D.
**Cc:** Friedman, Edward A.; robert.cohen@dechert.com; Kirsch, Eric (Eric.Kirsch@dechert.com); 'Spencer, Michael'; 'gsnitow@skhmlaw.com' (gsnitow@skhmlaw.com); 'Carroll, Robert D' (RCarroll@goodwinprocter.com); Sanchez Herrera, Ezequiel
**Subject:** RE: NML Capital, Ltd. et al. v. the Republic of Argentina

Carmine --

We are disappointed that we did not receive last week the Republic's response to our proposed order, as you had promised.  We understand that you hope to provide a response by Tuesday.  Please provide a response -- identifying what provisions the Republic will and will not agree to, and any specific drafting changes the Republic is proposing -- by noon on Tuesday; if we do not receive such a response by then, we will take appropriate steps to seek Court intervention.

Best,

Dan

**From:** Boccuzzi Jr., Carmine D. [mailto:cboccuzzi@cgsh.com]
**Sent:** Friday, August 30, 2013 11:01 AM
**To:** Cohen, Robert; Friedman, Edward A.
**Cc:** Kirsch, Eric; Sanchez Herrera, Ezequiel
**Subject:** RE: NML Capital, Ltd. et al. v. the Republic of Argentina

Ed and Robert:

I write in follow up to the call that Ed, Ezequiel and I just had this morning with Ed and in response to Robert's email which Robert sent to us last night at 8:01 pm, demanding a response by this morning.  The Republic objects to the arbitrary deadline.  There is no emergency of any kind as you well know.  Indeed, on Thursday morning at 12:39 am Eric wrote to inform me that plaintiffs intended to adjourn the "emergency" hearing they had scheduled with the Court for yesterday at noon (plaintiffs then in fact adjourned the hearing).

1

In any event we can confirm my statement on the call with Ed that the Republic understands as accurate the declaratory statement in Paragraph 1 of your proposed order. As to the remainder of the 7-page proposed order you sent to us last night at 8:01 pm we are reviewing it, and consulting with our client, and reserving all objections and defenses, will respond to you next week.

Regards, Carmine

Carmine D. Boccuzzi, Jr.
Cleary Gottlieb Steen & Hamilton LLP
Assistant: trusso@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2508 | f: +1 212 225 3999
www.clearygottlieb.com | cboccuzzi@cgsh.com

**From:** Cohen, Robert [mailto:robert.cohen@dechert.com]
**Sent:** Thursday, August 29, 2013 8:01 PM
**To:** Boccuzzi Jr., Carmine D.
**Cc:** Kirsch, Eric
**Subject:** NML Capital, Ltd. et al. v. the Republic of Argentina

Carmine,

Attached is the proposed order concerning equal treatment-related issues. Please let us know if your client will consent to its entry. In particular, please let us know as soon as possible if the Republic believes that the declaratory statement in numbered Paragraph 1 is accurate. If the Republic cannot respond with respect to Paragraph 1 by 11:00 a.m. tomorrow, we will ask the Court to hear us as soon as possible, including tomorrow afternoon.

Regards,

Robert A. Cohen
Partner
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Direct: +1 (212) 698-3501
Fax: +1 (212) 314-0001
Cell: +1 (215) 715-5000
Email: robert.cohen@dechert.com
www.dechert.com

This e-mail is from Dechert LLP, a law firm, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any attachments. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the
intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and
its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x
                            :

NML CAPITAL, LTD.,                :    08 Civ. 6978 (TPG)
                            :    09 Civ. 1707 (TPG)
          Plaintiff,         :    09 Civ. 1708 (TPG)
                            :

            v.               :

THE REPUBLIC OF ARGENTINA,    :

          Defendant.       :
                            :
------------------------------------------------ x
                            :

AURELIUS CAPITAL MASTER, LTD. and  :    09 Civ. 8757 (TPG)
ACP MASTER, LTD.,         :    09 Civ. 10620 (TPG)
                            :
          Plaintiffs,       :

            v.               :

THE REPUBLIC OF ARGENTINA,    :

          Defendant.       :
------------------------------------------------ x
                            :

AURELIUS OPPORTUNITIES FUND II, LLC :
and AURELIUS CAPITAL MASTER, LTD.,  :    10 Civ. 1602 (TPG)
                            :    10 Civ. 3507 (TPG)
          Plaintiffs,       :

            v.               :

THE REPUBLIC OF ARGENTINA,    :

          Defendant.       :    **(captions continued on next page)**
------------------------------------------------ x

**[PROPOSED] ORDER**

15019832

```
---------------------------------------  :
AURELIUS CAPITAL MASTER, LTD. and         :
AURELIUS OPPORTUNITIES FUND II,           :    10 Civ. 3970 (TPG)
LLC,                                      :    10 Civ. 8339 (TPG)
                                          :
          Plaintiffs,                     :
                                          :
     v.                                   :
                                          :
THE REPUBLIC OF ARGENTINA,                :
                                          :
          Defendant.                      :
-----------------------------------------  x
BLUE ANGEL CAPITAL I LLC,                 :
                                          :
          Plaintiff,                      :    10 Civ. 4101 (TPG)
                                          :    10 Civ. 4782 (TPG)
     v.                                   :
                                          :
THE REPUBLIC OF ARGENTINA,                :
                                          :
          Defendant.                      :
-----------------------------------------  x
OLIFANT FUND, LTD.,                       :
                                          :
          Plaintiff,                      :    10 Civ. 9587 (TPG)
                                          :
     v.                                   :
                                          :
THE REPUBLIC OF ARGENTINA,                :
                                          :
          Defendant.                      :
-----------------------------------------  x
PABLO ALBERTO VARELA, et al.,             :
                                          :
          Plaintiff,                      :    10 Civ. 5338 (TPG)
                                          :
     v.                                   :
                                          :
THE REPUBLIC OF ARGENTINA,                :
                                          :
          Defendant.                      :
-----------------------------------------  x
```

2

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic of Argentina (the "Republic") is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23 Orders"), this Court granted Plaintiffs' motions for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

WHEREAS, in an Order dated March 5, 2012 (the "March 5 Order"), the Court stayed the February 23 Orders pending appeal, and also enjoined the Republic as follows (the "Anti-Evasion Injunction"):

> [T]he Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the

---

[1]    The term "Exchange Bonds," as in the Amended February 23 Orders, refers to the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future.

[2]    The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

...

This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

WHEREAS, in an Opinion dated October 26, 2012 (the "October 26 Opinion"), the United States Court of Appeals for the Second Circuit affirmed the February 23, 2012 Orders in part and remanded in part "for such proceedings as are necessary to address the operation of the payment formula and the Injunctions' application to third parties and intermediary banks."

WHEREAS, following this Court's request for an affidavit ensuring that the Anti-Evasion Injunction would be complied with notwithstanding contrary statements to the press, the Republic submitted the Declaration of Francisco Guillermo Eggers, the Republic's Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

WHEREAS, the Court resolved the issues remanded for clarification by the Second Circuit in an Opinion, dated November 21, 2012 and an "Amended February 23 Order," dated November 21, 2012, entered in each of the above-referenced actions.

WHEREAS, in an "Order Concerning The March 5, 2012 Order," dated November 21, 2012, the Court vacated the clause staying enforcement of its injunction pending appeal, but left in place its injunction prohibiting Argentina from taking any action to evade the injunction.

WHEREAS, in an Order dated November 28, 2012, the Second Circuit ordered "that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of [the Second Circuit]," but did not stay the March 5 Order.

WHEREAS, on June 24, 2013, the Republic filed a petition for a writ of certiorari with respect to the October 26 Opinion.

WHEREAS, in an Opinion dated August 23, 2013 (the "August 23 Opinion"), the Second Circuit affirmed the Amended February 23 Orders, but stayed enforcement of the Amended February 23 Orders pending the resolution of a petition for a writ of certiorari.

**IT IS HEREBY**:

1.      DECLARED that the Anti-Evasion Injunction of the March 5 Order has been and remains continuously in full force and effect.

2.      ORDERED that the Republic shall not—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic—take any action to evade the purposes and directives of the Amended February 23 Orders, render those Orders ineffective, or attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court. This paragraph shall remain in effect during the pendency of any petition to the United States Supreme Court for a writ of certiorari with respect to the October 26 Opinion or the August 23 Opinion, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand, unless a further order of the Court states otherwise.

3.      This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by the terms of the ORDER.

Dated: New York, New York
      August ___, 2013

                                     _____
                                     Thomas P. Griesa
                                     U.S. District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

NML CAPITAL, LTD.,                               :        08 Civ. 6978 (TPG)
                                                 :        09 Civ. 1707 (TPG)
                          Plaintiff,             :        09 Civ. 1708 (TPG)
                                                 :
              v.                                 :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
                          Defendant.             :
                                                 :
-------------------------------------------------------x

AURELIUS CAPITAL MASTER, LTD. and                :
ACP MASTER, LTD.,                                :        09 Civ. 8757 (TPG)
                                                 :        09 Civ. 10620 (TPG)
                          Plaintiffs,            :
                                                 :
              v.                                 :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
                          Defendant.             :
                                                 :
-------------------------------------------------------x

AURELIUS OPPORTUNITIES FUND II, LLC              :
and AURELIUS CAPITAL MASTER, LTD.,               :        10 Civ. 1602 (TPG)
                                                 :        10 Civ. 3507 (TPG)
                          Plaintiffs,            :
                                                 :
              v.                                 :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
                          Defendant.             :
                                                 :        **(captions continued on next page)**
-------------------------------------------------------x

**[PROPOSED] ORDER**

15019832

------------------------------------------
AURELIUS CAPITAL MASTER, LTD. and      :
AURELIUS OPPORTUNITIES FUND II,        :     10 Civ. 3970 (TPG)
LLC,                                   :     10 Civ. 8339 (TPG)
                                       :
     Plaintiffs,                      :
                                       :
v.                                     :
                                       :
THE REPUBLIC OF ARGENTINA,             :
                                       :
     Defendant.                       x
------------------------------------------
BLUE ANGEL CAPITAL I LLC,              :
                                       :
     Plaintiff,                       :     10 Civ. 4101 (TPG)
                                       :     10 Civ. 4782 (TPG)
v.                                     :
                                       :
THE REPUBLIC OF ARGENTINA,             :
                                       :
     Defendant.                       x
------------------------------------------
OLIFANT FUND, LTD.,                    :
                                       :
     Plaintiff,                       :     10 Civ. 9587 (TPG)
                                       :
v.                                     :
                                       :
THE REPUBLIC OF ARGENTINA,             :
                                       :
     Defendant.                       x
------------------------------------------
PABLO ALBERTO VARELA, et al.,          :
                                       :
     Plaintiff,                       :     10 Civ. 5338 (TPG)
                                       :
v.                                     :
                                       :
THE REPUBLIC OF ARGENTINA,             :
                                       :
     Defendant.                       x
------------------------------------------

2

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic of Argentina (the "Republic") is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23 Orders"), this Court granted Plaintiffs' motions for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

WHEREAS, in an Order dated March 5, 2012 (the "March 5 Order"), the Court stayed the February 23 Orders pending appeal, and also enjoined the Republic as follows (the "Anti-Evasion Injunction"):

> [T]he Republic shall not during the pendency of the appeal to the
> Second Circuit take any action to evade the directives of the

---

[1]    The term "Exchange Bonds," as in the Amended February 23 Orders, refers to the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future.

[2]    The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

3

February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

. . .

This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

WHEREAS, in an Opinion dated October 26, 2012 (the "October 26 Opinion"), the United States Court of Appeals for the Second Circuit affirmed the February 23, 2012 Orders in part and remanded in part "for such proceedings as are necessary to address the operation of the payment formula and the Injunctions' application to third parties and intermediary banks."

WHEREAS, following this Court's request for an affidavit ensuring that the Anti-Evasion Injunction would be complied with notwithstanding contrary statements to the press, the Republic submitted the Declaration of Francisco Guillermo Eggers, the Republic's Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

WHEREAS, the Court resolved the issues remanded for clarification by the Second Circuit in an Opinion, dated November 21, 2012 and an "Amended February 23 Order," dated November 21, 2012, entered in each of the above-referenced actions.

WHEREAS, in an "Order Concerning The March 5, 2012 Order," dated November 21, 2012, the Court vacated the clause staying enforcement of its injunction pending appeal, but left in place its injunction prohibiting Argentina from taking any action to evade the injunction.

4

WHEREAS, in an Order dated November 28, 2012, the Second Circuit ordered "that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of [the Second Circuit]," but did not stay the March 5 Order.

WHEREAS, on June 24, 2013, the Republic filed a petition for a writ of certiorari with respect to the October 26 Opinion.

WHEREAS, in an Opinion dated August 23, 2013 (the "August 23 Opinion"), the Second Circuit affirmed the Amended February 23 Orders, but stayed enforcement of the Amended February 23 Orders pending the resolution of a petition for a writ of certiorari.

~~WHEREAS, the August 23, 2013 opinion noted that "Argentina's officials have publicly and repeatedly announced their intention to defy any rulings of this Court and the district court with which they disagree." *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, 2013 WL 4487563, at \*1 (2d Cir. Aug. 23, 2013).~~

~~AND WHEREAS, on August 26, 2013, the President of Argentina, Cristina Fernández de Kirchner, announced in a nationally-televised address that the Republic will establish procedures allowing holders of Exchange Bonds to replace these instruments with nearly identical instruments that are payable within the Republic, in an apparent attempt to evade the directives of the Amended February 23 Orders.~~

**IT IS HEREBY**:

1.    DECLARED that the Anti-Evasion Injunction of the March 5 Order has been and remains continuously in full force and effect.

2.    ORDERED that the Republic shall not—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic—take any action ~~to attempt~~ to evade the purposes and directives of the

5

Amended February 23 Orders, ~~attempt to~~ render those Orders ineffective, or attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court. This paragraph shall remain in effect during the pendency of any petition to the United States Supreme Court for a writ of certiorari with respect to the October 26 Opinion or the August 23 Opinion, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand, unless a further order of the Court states otherwise.

3.    ~~DECLARED that for the avoidance of doubt (i) the implementation of the plan to allow Exchange Bonds to be exchanged for securities or similar instruments payable in Argentina, which was announced by President Fernández de Kirchner in her speech of August 26, 2013, (ii) implementation of any functionally equivalent or reasonably similar plan, or (iii) any step towards implementing such a plan or a functionally equivalent or reasonably similar plan, each would violate the Anti-Evasion Injunction of the March 5 Order and Paragraph 2 of this ORDER.~~

4.    ~~ORDERED that with respect to any plan or proposal that may have the purpose, effect or intent, either direct or indirectly, of violating the Anti-Evasion Injunction or Paragraph 2 of this ORDER, including without limitation the measures described in Paragraph 3 of this ORDER, or which may be deemed by a reasonable person to have such purpose, effect or intent, the Republic shall disclose to Plaintiffs, within five business days of the entry of this ORDER, the existence and content of any communications between the Republic (or any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic) and: (i) any holders of beneficial interests in the Exchange Bonds or any registered~~

6

~~owners of the Exchange Bonds; (ii) any trustee, indenture trustee, paying agent, trustee paying agent, transfer agent, or any agent under the relevant indenture and global notes for the Exchange Bonds; (iii) any registrar, clearing corporations and systems, operators of clearing systems, settlement agents, depositary, depositary participant or custodian for the Exchange Bonds; (iv) any banking, financial, trust or custodial institution and any coordinator, manager, solicitation agent, tender or exchange agent, or financial advisor; (v) any United States or international regulator or government entity; or (vi) any agent, representative, or other person acting on behalf of the persons identified in parts (i), (ii), (iii), (iv), or (v) of this paragraph.  To the extent that any such communications come into existence after the date of this ORDER, such communications shall be disclosed to the Court and to Plaintiffs' respective counsel within five business days of the sending or receipt of such communications.~~

~~5.~~3.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by the terms of the ORDER.

Dated: New York, New York
       August ___, 2013

_____
                                  Thomas P. Griesa
                                  U.S. District Judge

7

# EXHIBIT O

CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

Writer's Direct Dial  +1 212 225 2508
E-Mail:  cboccuzzi@cgsh.com

LAURENT ALPERT
VICTOR I LEWKOW
LESLIE N SILVERMAN
ROBERT L TORTORIELLO
LEE C BUCHHEIT
JAMES M PEASLEE
ALAN L BELLER
THOMAS J MOLONEY
JONATHAN I BLACKMAN
WILLIAM P GORIN
MICHAEL L RYAN
ROBERT P DAVIS
YARON Z REICH
RICHARD S LINCER
JAIME A EL KOURY
STEVEN G HOROWITZ
JAMES A DUNCAN
STEVEN M LOEB
DONALD A STERN
CRAIG B BROD
SHELDON H ALSTER
MITCHELL A LOWENTHAL
EDWARD J ROSEN
JOHN PALENBERG
LAWRENCE B FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E AUSTIN
SETH GROSSHANDLER
WILLIAM A GROLL
JANET L FISHER
DAVID I SUGERMAN
HOWARD S ZELBO
DAVID E BROUSKY
MICHAEL R LAZERWITZ
ARTHUR H KOHN
RICHARD J COOPER
JEFFREY S LEWIS
FILIP MOERMAN

PAUL J SHIM
STEVEN L WILNER
ERIKA W NIJENHUIS
LINDSEE P GRANFIELD
ANDRÉS DE LA CRUZ
DAVID C LOPEZ
CARMEN A CORRALES
JAMES L BROMLEY
MICHAEL A GERSTENZANG
LEWIS J LIMAN
LEV L DASSIN
NEIL Q WHORISKEY
JORGE U JUANTORENA
MICHAEL D WEINBERGER
DAVID LEINWAND
JEFFREY A ROSENTHAL
ETHAN A KLINGSBERG
MICHAEL J VOLKOVITSCH
MICHAEL D DAYAN
CARMINE D BOCCUZZI JR
JEFFREY D KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J RAYMOND
LEONARD C JACOBY
SANDRA L FLOW
FRANCISCO L CESTERO
FRANCESCA L ODELL
WILLIAM L MCRAE
JASON FACTOR
MARGARET S PEPONIS
LISA M SCHWEITZER
JUAN G GIRALDEZ
DUANE MCLAUGHLIN
BREON S PEACE
MEREDITH E KOTLER
CHANTAL E KORDULA
BENET J O'REILLY
DAVID AMAN

ADAM F FLEISHER
SEAN A O'NEAL
GLENN P MCGRORY
MATTHEW P SALERNO
MICHAEL J ALBANO
VICTOR L HOU
ROGER A COOPER
AMY R SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A BAREFOOT
PAMELA L MARCOGLIESE
RESIDENT PARTNERS

SANDRA M ROCKS
S DOUGLAS BORISKY
JUDITH KASSEL
DAVID E WEBB
PENELOPE L CHRISTOPHOROU
BOAZ S MORAG
MARY E ALCOCK
DAVID H HERRINGTON
HEIDE H ILGENFRITZ
JONATHAN S KOLODNER
HUGH C CONROY JR
KATHLEEN M EMBERGER
WALLACE L LARSON, JR
JAMES D SMALL
AVRAM E LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K GRANNIS
GRANT M BINDER
MEYER H FEDIDA
RESIDENT COUNSEL

September 19, 2013

BY HAND

Honorable Thomas P. Griesa
United States District Court for
the Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG),
09 Civ. 1707 (TPG) and 09 Civ. 1708 (TPG); and related cases

Dear Judge Griesa:

I write on behalf of the Republic of Argentina (the "Republic") in response to plaintiffs' letter of September 11, 2013.  The Republic objects to plaintiffs' enclosed proposed Order to the extent it goes beyond the plain language of the March 5 Order, the scope of which is sufficient to protect the interests of all parties until the Supreme Court of the United States disposes of the case.  *See NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, 2013 WL 4487563, at *1, *11.  Plaintiffs provide no basis for the broader relief they now seek.

Respectfully submitted

Carmine D. Boccuzzi

cc: Counsel of record (by email)

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10 3 2013
```

------------------------------------x
                                    :
NML CAPITAL, LTD.,                  :
                    Plaintiff,      :
                                    :     08 Civ. 6978 (TPG)
        – against –                 :     09 Civ. 1707 (TPG)
                                    :     09 Civ. 1708 (TPG)
THE REPUBLIC OF ARGENTINA,          :
                                    :
                    Defendant.      :
------------------------------------x
                                    :
AURELIUS CAPITAL MASTER, LTD. and   :
ACP MASTER, LTD.,                   :
                                    :     09 Civ. 8757 (TPG)
                    Plaintiffs,     :     09 Civ. 10620 (TPG)
                                    :
        – against –                 :
                                    :
THE REPUBLIC OF ARGENTINA,          :
                                    :
                    Defendant.      :
------------------------------------x
                                    :
AURELIUS OPPORTUNITIES FUND II,     :
LLC and AURELIUS CAPITAL MASTER,    :
LTD.,                               :     10 Civ. 1602 (TPG)
                                    :     10 Civ. 3507 (TPG)
                    Plaintiffs,     :     10 Civ. 3970 (TPG)
                                    :     10 Civ. 8339 (TPG)
        – against –                 :
                                    :
THE REPUBLIC OF ARGENTINA,          :
                                    :     **(captions continued on
                    Defendant.      :        next page)**
                                    :
------------------------------------x

1

```
-----------------------------------------x
                                         :
BLUE ANGEL CAPITAL I LLC,                :
                                         :
                    Plaintiff,           :        10 Civ. 4101 (TPG)
                                         :        10 Civ. 4782 (TPG)
            – against –                  :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                    Defendant.           :
                                         :
-----------------------------------------x
                                         :
OLIFANT FUND, LTD.,                      :
                                         :
                    Plaintiff,           :        10 Civ. 9587 (TPG)
                                         :
            – against –                  :
                                         :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                    Defendant.           :
                                         :
-----------------------------------------x
                                         :
PABLO ALBERTO VARELA, et al.,            :
                                         :
                    Plaintiffs,          :        10 Civ. 5338 (TPG)
                                         :
            – against –                  :
                                         :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                    Defendant.           :
                                         :
-----------------------------------------x
```

2

## OPINION

On September 11, 2013, counsel for NML Capital, Ltd. and certain other plaintiffs wrote to the court with factual allegations, which counsel asserted would violate a previous order of this court dated March 5, 2012. Plaintiffs submitted a proposed order designed to remedy the problems described in the September 11, 2013 letter.

Counsel for the Republic of Argentina (the "Republic") submitted a brief letter to the court dated September 19, 2013, objecting to plaintiffs' proposed order "to the extent it goes beyond the plain language of the March 5 order." The Republic's counsel concludes by stating that "plaintiffs provide no basis for the broader relief they now seek."

The significant point is that counsel for the Republic does not deny the factual allegations in plaintiffs' September 11, 2013 letter. In fact, there is a new problem that goes beyond the circumstances known as of the time of the March 5, 2012 order. Plaintiffs are surely within their rights to seek a remedy for this new problem. They do so in appropriate provisions in the proposed order.

The court will sign the proposed order.

SO ORDERED.

Dated: New York, New York
      October 3, 2013

                                          Thomas P. Griesa
                                          U. S. District Judge

# EXHIBIT Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/3/2013

NML CAPITAL, LTD.,              :       08 Civ. 6978 (TPG)
                               :       09 Civ. 1707 (TPG)
                Plaintiff,     :       09 Civ. 1708 (TPG)
                               :
        v.                     :
                               :
THE REPUBLIC OF ARGENTINA,     :
                               :
                Defendant.     :
                               :
-------------------------------------------------------- x
                               :
AURELIUS CAPITAL MASTER, LTD. and  :
ACP MASTER, LTD.,              :       09 Civ. 8757 (TPG)
                               :       09 Civ. 10620 (TPG)
                Plaintiffs,    :
                               :
        v.                     :
                               :
THE REPUBLIC OF ARGENTINA,     :
                               :
                Defendant.     :
                               :
-------------------------------------------------------- x
                               :
AURELIUS OPPORTUNITIES FUND II, LLC  :
and AURELIUS CAPITAL MASTER, LTD.,   :   10 Civ. 1602 (TPG)
                               :       10 Civ. 3507 (TPG)
                Plaintiffs,    :
                               :
        v.                     :
                               :
THE REPUBLIC OF ARGENTINA,     :
                               :
                Defendant.     :
                               :       **(captions continued on next page)**
-------------------------------------------------------- x

## [~~PROPOSED~~] ORDER

15019832

```
------------------------------------------------------     :
AURELIUS CAPITAL MASTER, LTD. and               :
AURELIUS OPPORTUNITIES FUND II,                  :      10 Civ. 3970 (TPG)
LLC,                                             :      10 Civ. 8339 (TPG)
                                                 :
         Plaintiffs,                             :
                                                 :
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              :   x
------------------------------------------------------
BLUE ANGEL CAPITAL I LLC,                        :
                                                 :
         Plaintiff,                              :      10 Civ. 4101 (TPG)
                                                 :      10 Civ. 4782 (TPG)
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              :
-------------------------------------------------- x
OLIFANT FUND, LTD.,                              :
                                                 :
         Plaintiff,                              :      10 Civ. 9587 (TPG)
                                                 :
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              :
-------------------------------------------------- x
PABLO ALBERTO VARELA, et al.,                    :
                                                 :
         Plaintiff,                              :      10 Civ. 5338 (TPG)
                                                 :
v.                                               :
                                                 :
THE REPUBLIC OF ARGENTINA,                       :
                                                 :
         Defendant.                              :
-------------------------------------------------- x
```

2

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic of Argentina (the "Republic") is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23 Orders"), this Court granted Plaintiffs' motions for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

WHEREAS, in an Order dated March 5, 2012 (the "March 5 Order"), the Court stayed the February 23 Orders pending appeal, and also enjoined the Republic as follows (the "Anti-Evasion Injunction"):

> [T]he Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the

---

[1]    The term "Exchange Bonds," as in the Amended February 23 Orders, refers to the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future.

[2]    The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

3

Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

...

This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

WHEREAS, in an Opinion dated October 26, 2012 (the "October 26 Opinion"), the United States Court of Appeals for the Second Circuit affirmed the February 23, 2012 Orders in part and remanded in part "for such proceedings as are necessary to address the operation of the payment formula and the Injunctions' application to third parties and intermediary banks."

WHEREAS, following this Court's request for an affidavit ensuring that the Anti-Evasion Injunction would be complied with notwithstanding contrary statements to the press, the Republic submitted the Declaration of Francisco Guillermo Eggers, the Republic's Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

WHEREAS, the Court resolved the issues remanded for clarification by the Second Circuit in an Opinion, dated November 21, 2012 and an "Amended February 23 Order," dated November 21, 2012, entered in each of the above-referenced actions.

WHEREAS, in an "Order Concerning The March 5, 2012 Order," dated November 21, 2012, the Court vacated the clause staying enforcement of its injunction pending appeal, but left in place its injunction prohibiting Argentina from taking any action to evade the injunction.

4

WHEREAS, in an Order dated November 28, 2012, the Second Circuit ordered "that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of [the Second Circuit]," but did not stay the March 5 Order.

WHEREAS, on June 24, 2013, the Republic filed a petition for a writ of certiorari with respect to the October 26 Opinion.

WHEREAS, in an Opinion dated August 23, 2013 (the "August 23 Opinion"), the Second Circuit affirmed the Amended February 23 Orders, but stayed enforcement of the Amended February 23 Orders pending the resolution of a petition for a writ of certiorari.

WHEREAS, the August 23, 2013 opinion noted that "Argentina's officials have publicly and repeatedly announced their intention to defy any rulings of this Court and the district court with which they disagree." *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, 2013 WL 4487563, at *1 (2d Cir. Aug. 23, 2013).

AND WHEREAS, on August 26, 2013, the President of Argentina, Cristina Fernández de Kirchner, announced in a nationally-televised address that the Republic will establish procedures allowing holders of Exchange Bonds to replace these instruments with nearly identical instruments that are payable within the Republic, in an apparent attempt to evade the directives of the Amended February 23 Orders.

**IT IS HEREBY**:

1.      DECLARED that the Anti-Evasion Injunction of the March 5 Order has been and remains continuously in full force and effect.

2.      ORDERED that the Republic shall not—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic—take any action to attempt to evade the purposes and directives of the

Amended February 23 Orders, attempt to render those Orders ineffective, or attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court. This paragraph shall remain in effect during the pendency of any petition to the United States Supreme Court for a writ of certiorari with respect to the October 26 Opinion or the August 23 Opinion, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand, unless a further order of the Court states otherwise.

3.    DECLARED that for the avoidance of doubt (i) the implementation of the plan to allow Exchange Bonds to be exchanged for securities or similar instruments payable in Argentina, which was announced by President Fernández de Kirchner in her speech of August 26, 2013, (ii) implementation of any functionally equivalent or reasonably similar plan, or (iii) any step towards implementing (including without limitation the formulation or design of) such a plan or a functionally equivalent or reasonably similar plan, each would violate the Anti-Evasion Injunction of the March 5 Order and Paragraph 2 of this ORDER.

4.    ORDERED that with respect to any plan or proposal that may have the purpose, effect or intent, either directly or indirectly, of violating the Anti-Evasion Injunction or Paragraph 2 of this ORDER, including without limitation the measures described in Paragraph 3 of this ORDER, or which may be deemed by a reasonable person to have such purpose, effect or intent, the Republic shall disclose to Plaintiffs, within five business days of the entry of this ORDER, the existence and content of any communications between the Republic (or any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic) and: (i) any holders of beneficial interests in the Exchange Bonds or any

registered owners of the Exchange Bonds; (ii) any trustee, indenture trustee, paying agent, trustee

paying agent, transfer agent, or any agent under the relevant indenture and global notes for the

Exchange Bonds; (iii) any registrar, clearing corporations and systems, operators of clearing

systems, settlement agents, depositary, depositary participant or custodian for the Exchange

Bonds; (iv) any banking, financial, trust or custodial institution and any coordinator, manager,

solicitation agent, tender or exchange agent, or financial advisor; (v) any United States or

international regulator or government entity; or (vi) any agent, representative, or other person

acting on behalf of the persons identified in parts (i), (ii), (iii), (iv), or (v) of this paragraph. For

the avoidance of doubt, this disclosure shall include the identity of all parties to the

communication, the date and nature of the communication, a detailed description of the content

of the communication, and any documents or records constituting or associated with the

communication (including without limitation any e-mails, attachments, facsimile transmissions,

or other written materials). To the extent that any such communications come into existence

after the date of this ORDER, such communications shall be disclosed to the Court and to

Plaintiffs' respective counsel within five business days of the sending or receipt of such

communications.

5.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on

notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable

purposes and to account for materially changed circumstances, including any failure by the

Republic to abide by the terms of the ORDER.

Dated: New York, New York
       September ____, 2013
       Oct. 3, 2013

_____
          Thomas P. Griesa
          U.S. District Judge

7

# EXHIBIT R

*El Cronista*

## Holdouts: the U.S. Court sets a date and Argentina bets on gaining another year

*On that day it will begin to analyze the first recourse of the state against the decision in favor of the vulture funds.  The government is betting on delaying the case with another pending appeal*

Thursday, September 12, 2013

ESTEBAN RAFELE Buenos Aires

On Monday the 30th, the United States Supreme Court will begin to decide the fate of Argentina in the legal process that will mark the destiny of the foreign debt. That day, the Court will start to analyze if it will take the appeal that the country filed against the ruling that orders it to treat creditors with defaulted bonds in the same manner as those who renegotiated their bonds.

The government, meanwhile, expects to win time with a parallel legal process, by which it is betting that the Court must go back to intervening for another phase of the case. That would stretch out, in the worst of cases, the possibility of losing the lawsuit for one more year and would guarantee payment on normalized debt abroad over most of 2014.

It happens that the lawsuit between the magnate Paul Singer's "vulture" fund NML Capital, and the country is divided into two sections. In the first, the Court of Appeals upheld the interpretation of the theory of "*pari passu*" or equal treatment wielded by the holders of defaulted bonds, and ordered the country to pay them in the same way it pays the rest of the creditors. In the second, the appeals court confirmed the form of payment devised by Judge Thomas Griesa and ordered the country to pay 100% of the claim (US$1.5 billion) at once and to retain that money from performing debt payments.

The Supreme Court must now decide whether it will take up the first segment of the lawsuit. It will do so on September 30, in a private hearing. The process can take days or weeks. It is highly

1

unlikely that it will dispose of the case on the same day, since it concerns a sovereign country, experts clarified.

 Official sources pointed out that this decision would not imply the lifting of the stay, meaning Argentina should not yet have to pay the ruling against it.  In its ruling, the Court of Appeals of New York [sic] decided to "stay the enforcement of the injunctions pending a timely petition of certiorari to the Supreme Court" of that country, filed by Argentina. That, according to the interpretation of those in the Executive, means that the stay will be effective until the second tranche of the ruling arrives at the Supreme Court. Other experts believe that statement can have several meanings and they were not strict in this regard.

Argentina on Friday appealed the Appellate Court's adverse ruling of August 23, and asked that the same court hold a review (by the plenary of its 13 members) on the ruling. That process could take weeks and experts assume the country's petition will be rejected.  But then, the government, represented by the New York firm of Cleary Gottlieb, will have 90 more days to appeal to the Supreme Court again. Until then, they understand in the Executive, the stay remains in place. And, as the U.S. Supreme Court decides what cases it will take once a year, the Government expects to pass through the best part of 2014 with a stay which will allow it to continue paying bonds from the swap without inconveniences.

The government yesterday ratified this strategy in a brief presented to the Supreme Court to reply to the petition from the holdouts that the highest Court reject the case. In this filing, Argentina gave notice of its intention to raise a second petition for *certiorari* if the *en banc* appeal is denied. This, according to the legal deadlines, would take place in February.

Other experts considered that this strategy is wrong and that the country should ask the Supreme Court to join both causes now.

Scenarios

According to official sources and experts in this type of litigation, the U.S. Supreme Court can reject the Argentine case - which would be a bad precedent for the second appeal - it could accept it, or it could request an opinion from the Solicitor General of the government of Barack

2

Obama. It could also wait for the second appeal to follow its course, in order to join the cases together.


"The publication of the agenda of the Supreme Court, where the treatment of a set of *certioraris* is decided, among them Argentina's, is in line with the timing that we anticipated with regard to all remaining instances in the judicial process and, consequently, to the timing of the duration of the stay", said Finance Secretary Adrián Cosentino.

**DEBORAH A. GREEN**
**TRANSLATOR**
**4-74 48TH AVENUE**
**LONG ISLAND CITY, NY 11109**


## AFFIDAVIT OF ACCURACY


**STATE OF NEW YORK** )
**CITY OF NEW YORK** :
**COUNTY OF NEW YORK** )


DEBORAH A GREEN, being duly sworn, deposes and says:

That she is a translator of the English and Spanish languages and is fully conversant with said languages.

That on or about the 9th day of October 2013, she made the annexed English-language translation of the document described below:

*El Cronista:* "Holdouts: la Corte de EE.UU. puso fecha y la Argentina apuesta a ganar otro año"

That to the best of her knowledge and belief, said translation is a true and correct English rendering of the original document in Spanish.

Deborah A. Green

SWORN TO BEFORE ME THIS
9th DAY OF OCTOBER 2013

NOTARY PUBLIC

**ROSELLE LEVIGNE**
**Notary Public - State of New York**
**NO. 01LE6189094**
**Qualified in Nassau County**
**My Commission Expires** 6/23/18

*El Cronista*

## Holdouts: la Corte de EE.UU. puso fecha y la Argentina apuesta a ganar otro año

*Empezará a analizar ese día el primer recurso del Estado contra la sentencia a favor de los fondos buitre. El Gobierno apuesta a dilatar el caso con otra apelación pendiente*

jueves, 12 de septiembre de 2013

ESTEBAN RAFELE Buenos Aires

El próximo lunes 30, la Corte Suprema de Estados Unidos comenzará a definir la suerte de la Argentina en el proceso judicial que marcará el destino de la deuda externa. Ese día, el tribunal comenzará a analizar si atenderá la apelación que hizo el país al fallo que lo obliga a tratar a los acreedores con bonos en default de la misma forma que a aquellos que renegociaron sus bonos.

El Gobierno, en tanto, espera ganar tiempo con un proceso legal paralelo, por el cual apuesta a que la Corte deba volver a intervenir por otra fase de la causa. Eso estiraría, en el peor de los casos, la posibilidad de perder el juicio un año más y garantizaría los pagos de deuda regularizada en el exterior durante buena parte de 2014.

Ocurre que el litigio legal entre el fondo "buitre″ NML Capital, del magnate Paul Singer, y el país se divide en dos tramos. En el primero, la Corte de Apelaciones convalidó la interpretación de la teoría del "pari passu″ o tratamiento igualitario esgrimida por los tenedores de bonos en default y obligó al país a pagarles como hace con el resto de los acreedores. En el segundo, Apelaciones confirmó la forma de pago que ideó el juez Thomas Griesa y conminó al país a abonar el 100% de la demanda (u$s 1.500 millones) de una vez y a retener ese dinero de los pagos de deuda regularizada.

La Corte Suprema deberá ahora decidir si acepta tratar el primer tramo de la demanda. Será el 30 de septiembre, en una audiencia privada. El proceso puede durar días o semanas. Es muy poco

probable que el mismo día deseche el caso, debido a que se trata de un país soberano, aclararon expertos.

Fuentes oficiales indicaron que esta definición no signficará el levantamiento de la medida cautelar o stay, que hace que la Argentina no deba todavía pagar la sentencia contraria. En su fallo, la Corte de Apelaciones de Nueva York dictaminó "suspender la ejecución de las medidas por el oportuno pedido de certiorari a la Corte Suprema" de ese país efectuado por el país. Eso, interpretaron en el Ejecutivo, significa que la medida cautelar estará vigente hasta que el segundo tramo del fallo llegue a la Corte Suprema. Otros expertos creen que esa oración puede tener varios significados y no fueron terminantes al respecto.

La Argentina apeló el viernes la sentencia contraria de Apelaciones del 23 de agosto pasado y pidió que la misma Cámara revisara en banc (por el plenario de trece miembros) el fallo. Ese proceso podría demorar semanas y expertos descuentan que la petición del país será rechazada. Pero luego, el Gobierno, patrocinado por el estudio neoyorquino Cleary Gottlieb, tendrá 90 días más para volver a apelar a la Corte Suprema. Hasta entonces, entienden en el Ejecutivo, la cautelar quedará vigente. Y, como la Corte Suprema estadounidense define qué casos tomará una vez al año, en el Gobierno esperan pasar buena parte de 2014 con una cautelar que le permita seguir pagando los bonos del canje sin inconvenientes.

El Gobierno ratificó ayer esta estrategia en un escrito que presentó ante la Corte Suprema para replicar el pedido de los holdouts de que el máximo tribunal rechace el caso. En esa presentación, la Argentina advirtió su intención de elevar un segundo pedido de certiorari si la apelación en banc es denegada. Esto, de acuerdo a los plazos legales, ocurriría en febrero.

Otros expertos consideran que esta estrategia es equivocada y que el país debería pedir a la Corte Suprema que ya unifique ambas causas.

Escenarios

Según fuentes oficiales y expertos en este tipo de litigios, la Corte Suprema estadounidense puede rechazar el caso argentino -lo que sería un pésimo precedente para la segunda apelación-, puede aceptarlo o puede pedir una opinión al procurador (general solicitor) del gobierno de

Barack Obama. También podría esperar a que la segunda apelación siguiera su curso para unificar las causas.

"La publicación de agenda de la Suprema Corte, donde se define el tratamiento de un conjunto de certioraris, entre ellos el de Argentina, está en línea con los tiempos que preveíamos en referencia a todas las instancias que quedan del proceso judicial y, consecuentemente, a los tiempos de vigencia del stay″, dijo el secretario de Finanzas, Adrián Cosentino.

# EXHIBIT S

*El Cronista*

## To gain time, the government asked New York Court for another review

*It asked for a plenary review by the Court of Appeals and said that the ruling against it "commits serious errors." A denial is assumed, but it's a first step before the Supreme Court.*

Monday, September 9, 2013

On Friday at the last minute for the procedural deadline, Argentina asked for the plenary of the Court of Appeals in New York to review the ruling that a panel of that court issued in favor of the holdouts which orders the country to pay US$1.5 billion on defaulted bonds. The Executive said that the ruling which orders payment to be made with the money from renegotiated debt, "commits serious legal errors" and "defies what is commercially responsible."

The government asked for *en banc* review (by the Court of Appeals' thirteen members) of the ruling that a panel of the Court issued on August 23, which upheld without ifs or buts what the lower court judge, Thomas Griesa, ordered. The court said that the country has to pay Paul Singer's NML Capital, Blue Angel and Aurelius 100% of the claim under the *pari passu* or equal treatment clause. The court ordered Bank of New York to retain money from the regular debt payments if the government doesn't honor the ruling, which remained stayed.

The legal strategy seeks to gain time. The government is assuming that the *en banc* review will be rejected and that, afterwards, the appeal will arrive at the Supreme Court. According to statistics from the Federal Council of Attorneys cited by Reuters, between 2001 and 2010, an *en banc* appeal was accepted in only 0.03% of cases. An official source estimated that it will be weeks until a verdict is received, and, then there are another 60 days to appeal to the highest court. The government would be assured of the next debt payment, at the end of September, for US$164 million. Meanwhile, Economy Minister Hernán Lorenzino is preparing the reopening of the swap, the last Argentine offer. It is expected that this week, the House of Deputies will give final approval to the suspension of the Lock Law which allows for the third debt swap.

So, the first part of the ruling in favor of the "vulture" funds is awaiting decision of the U.S. Supreme Court, which must decide if it accepts the case or not. On that occasion, the *en banc* review was denied. Now, the government, led by the law firm of Cleary Gottlieb, took up again

1

the arguments that appellate judges Reena Raggi, Barrington Parker and Rosemary Pooler rejected. The country believed that the ruling puts in danger future debt restructurings around the world and violates the U.S. law of sovereign immunity, which states that a state cannot be attached if it is complying with its own laws – in this case the law from Congress which impedes making a better offer.

"The decision (by Appeals) commits dangerous legal errors that magnify the error of previous decisions of that Court," says the brief filed by the country. Bondholders with renegotiated bonds from the Exchange Bondholders Group also asked for review of the ruling.

On the other hand, Griesa received a request on Tuesday from the litigants to seek information about attachable assets in companies like Enarsa, YPF, the banks Barclays and Citi (which participated in restructurings), and others. This is in regard to "the discovery process (production of evidence) which has been pursued for two years and in which Argentina has had favorable rulings," said Finance Secretary Adrián Cosentino. "The vultures seek (…) mainly to find assets of the Argentine Republic abroad," he continued.

**DEBORAH A. GREEN**
**TRANSLATOR**
**4-74 48TH AVENUE**
**LONG ISLAND CITY, NY 11109**

## AFFIDAVIT OF ACCURACY

**STATE OF NEW YORK     )**
**CITY OF NEW YORK       :**
**COUNTY OF NEW YORK )**

DEBORAH A GREEN, being duly sworn, deposes and says:

That she is a translator of the English and Spanish languages and is fully conversant with said languages.

That on or about the 9th day of October 2013, she made the annexed English-language translation of the document described below:

*El Cronista:* "Para ganar tiempo, el Gobierno pidió otra revisión a la Corte de Nueva York"

That to the best of her knowledge and belief, said translation is a true and correct English rendering of the original document in Spanish.

Deborah A. Green

SWORN TO BEFORE ME THIS
9th DAY OF OCTOBER 2013

NOTARY PUBLIC

ROSELLE LEVIGNE
Notary Public - State of New York
NO. 01LE6189094
Qualified in Nassau County
My Commission Expires 6/23/16

*El Cronista*

## **Para ganar tiempo, el Gobierno pidió otra revisión a la Corte de Nueva York**

*Solicitó una revisión del plenario de la Cámara de Apelaciones y señaló que la sentencia en contra "comete graves errores". Se descuenta la negativa, pero es un paso previo a la Corte*

Lunes, 9 de septiembre de 2013

El viernes a última hora y al filo del plazo procesal, la Argentina pidió al plenario de la Cámara de Apelaciones de Nueva York que revea el fallo de una sala de ese tribunal que favoreció a los holdouts y que obliga al país a pagar u$s 1.500 millones por los bonos en default. El Ejecutivo dijo que la sentencia, que obliga a pagar con el dinero de la deuda renegociada, "comete graves errores legales" y "desafía lo comercialmente responsable".

El Gobierno pidió la revisión en banc (por el plenario de trece miembros de la Cámara de Apelaciones) de la sentencia que un tribunal de esa Corte emitió el 23 de agosto, en la que ratificó sin peros lo dispuesto por el juez de primera instancia, Thomas Griesa. El tribunal dispuso que el país debe pagar a NML Capital, de Paul Singer, Blue Angel y Aurelius el 100% del reclamo por la cláusula de pari passu o tratamiento igualitario. La Justicia obligó al Bank of New York a retener dinero de los pagos regulares de deuda si el Gobierno no cumple con el fallo, que quedó en suspenso.

La estrategia judicial busca ganar tiempo. El Gobierno asume que la revisión en banc será rechazada y que, luego, la apelación llegará a la Corte Suprema. Según estadísticas del Consejo Federal de Abogados citadas por Reuters, entre 2001 y 2010 la apelación en banc sólo se aceptó en el 0,03% de los casos. Una fuente oficial estimó que pasarán semanas hasta tener un veredicto y, luego, hay otros 60 días de plazo para apelar al máximo tribunal. El Gobierno aseguraría el próximo pago de deuda, a fines de septiembre, por u$s 164 millones. Mientras, el ministro de Economía Hernán Lorenzino prepara la reapertura del canje, última oferta argentina. Se espera que esta semana, Diputados convierta en ley la suspensión de la Ley Cerrojo que permite el tercer canje de deuda.

En tanto, la primera parte de la sentencia a favor de los fondos "buitre" está a la espera de una definición de la Corte Suprema de EE.UU., que debe decidir si acepta o no el caso. En esa

1

ocasión, el en banc fue denegado. Ahora, el Gobierno, patrocinado por el estudio Cleary Gottlieb, retomó los argumentos que los jueces de Apelaciones Reena Raggi, Barrington Parker y Rosemary Pooler rechazaron. El país consideró que el fallo pone en peligro futuras reestructuraciones de deuda en todo el mundo y viola la ley de inmunidad soberana estadounidense, que dispone que un Estado no puede ser embargado si cumple con sus propias leyes -en este caso, la ley del Congreso que impide hacer una mejor oferta.

"La decisión (de Apelaciones) comete peligrosos errores legales que magnifican el error de las decisiones previas de esa Cámara", dice el escrito presentado por el país. Bonistas con títulos renegociados del Exchange Bond Group también pidieron la revisión del fallo.

Por otro lado, Griesa recibió el martes un pedido de los litigantes para buscar información sobre bienes embargables en empresas tales como Enarsa, YPF, los bancos Barclays y Citi (que participaron en reestructuraciones), y otras. Se trata "del proceso de discovery (producción de prueba) que se viene llevando adelante hace unos dos años y en los que la Argentina ha tenido fallos favorables", dijo el secretario de Finanzas Adrián Cosentino. "Los buitres buscan (...) principalmente encontrar activos de la República Argentina en el exterior", prosiguió.