# 12-0105-cv(L),  12-0109-cv(con) 12-0111-cv(con)

### 12-0157-cv(con), 12-0158-cv(con), 12-0163-cv(con), 12-0164-cv(con), 12-0170-cv(con), 12-0176-cv(con), 12-0185-cv(con), 12-0189-cv(con), 12-0214-cv(con), 12-0909-cv(con), 12-0914-cv(con), 12-0916-cv(con), 12-0919-cv(con), 12-0920-cv(con), 12-0923-cv(con), 12-0924-cv(con), 12-0926-cv(con), 12-0939-cv(con), 12-0943-cv(con), 12-0951-cv(con), 12-0968-cv(con), 12-0971-cv(con), 12-4694-cv(con), 12-4829-cv(con), 12-4865-cv(con)

# United States Court of Appeals

*for the*

# Second Circuit

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPPOSITION TO MOTION TO VACATE STAY

O'SHEA PARTNERS LLP
521 Fifth Avenue, 25th Floor
New York, New York 10175
(212) 682-4426

– and –

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Non-Party Appellants
Exchange Bondholder Group*

ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS
OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA
INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA
CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA
ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN
VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA
VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees*,

– v. –

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant*,

THE BANK OF NEW YORK MELLON, as Indenture Trustee,
EXCHANGE BONDHOLDER GROUP, FINTECH ADVISORY INC.,

*Non-Party Appellants*,

EURO BONDHOLDERS, ICE CANYON LLC,

*Intervenors.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………....ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 4

I.    Procedural History and Previous Stay Orders .................................................. 4

II.   President Kirchner's Televised Speech ............................................................ 6

III.  The District Court Enters a Strengthened Anti-Evasion Injunction .................. 7

ARGUMENT ............................................................................................................ 8

I.    Lifting the Stay Would Trigger a Default on the Exchange Bonds, Which Would
      Irreparably Harm the EBG ............................................................................... 8

      A.    Lifting the Stay Will Trigger a Default on the Exchange Bonds ............... 8

      B.    Default Would Irreparably Harm the EBG .............................................. 9

II.   NML Offers Nothing To Justify Reversing This Court's Three Prior Rulings In Favor of a
      Stay ................................................................................................................ 11

      A.    This Court Has Repeatedly Rejected the Exact Arguments NML Raises In Its
            Current Motion .................................................................................... 11

      B.    There Is No Credible Evidence the Republic Is Engaged in a Secret "Plot" to
            Evade the Injunctions that Will Harm NML .......................................... 14

      C.    It Is Impossible for the Republic to Secretly Swap the Exchange Bonds or Modify
            Their Payment Mechanism ................................................................... 17

      D.    The District Court Already Has Entered An Anti-Evasion Injunction That
            Adequately Protects NML's Interests ................................................... 18

III.  There is No Basis for NML's Speculation About How the Supreme Court Would Decide
      A Timely Petition for a Writ of Certiorari ...................................................... 19

CONCLUSION........................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) .............................. 10

*NML Capital, Inc. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013). ......................... passim

*NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) ............................ 4, 10

*Statharos v. New York City Taxi and Limousine Comm'n,* 198 F.3d 317 (2d Cir. 1999)............. 11

The interested non-parties listed in Appendix A (collectively, the "Exchange Bondholder Group" or "EBG") submit this Opposition to Appellees' (collectively, "NML's") Motion to Vacate the Stay.[1]

## PRELIMINARY STATEMENT

NML's motion ignores the fact that lifting the stay and enforcing the Injunctions would immediately trigger an irreparable default on $65 billion in Exchange Bonds, thereby effectively depriving the EBG (as well as other aggrieved third parties) of the opportunity to exercise their appellate rights before they are stripped of billions of dollars worth of property.  The motion's fundamentally flawed premise is that because the ***Republic*** has purportedly been a bad actor, the ***EBG*** should not be given the benefit of a stay.  That position fails to address the substantial constitutional and equitable issues raised by the EBG, which should be entitled to pursue all avenues of appeal before this case ends. There is no basis whatsoever for NML's attempted end-run around due process; a stay has been in place almost continuously since March 5, 2012, with no harm to NML.  Continuing the stay for a few more months will ensure that the full

---

[1] By Order dated November 28, 2013, this Court granted the EBG leave to appear as interested non-parties for the purpose of appealing orders entered by the district court and for the purpose of seeking a stay pending appeal.  Ex. 1: Order dated November 28, 2013.  The Court subsequently dismissed the EBG's appeal on August 23, 2013.  *NML Capital, Inc. v. Republic of Argentina*, 727 F.3d 230, 248 (2d Cir. 2013).  The EBG has since filed a petition for rehearing *en banc* and, if necessary, intends to file a petition for a writ of *certiorari* with the Supreme Court.

1

membership of this Court, as well as the Supreme Court, can undertake orderly consideration of profound legal issues.

Every single factual argument that NML raises in support of its motion has previously been considered and rejected by this Court.  In November 2012, NML argued to both the district court and this Court that (i) the Republic had announced plans to defy and evade the Injunctions; (ii) the plans included swapping existing Exchange Bonds for new securities payable in Argentina, or removing U.S.-based financial institutions from the payment mechanism; (iii) the Republic had failed to deny the reported plans; and (iv) further delay would enable the Republic to implement its plans and thus cause irreparable harm to NML.  This Court denied relief.  Yet, NML now makes ***exactly*** the same arguments again nearly a year later, with no evidence of irreparable harm, nor any convincing explanation of why changed circumstances require a different result.

The reality is that nothing has changed.  Just as in November 2012, NML has no credible evidence that the Republic is implementing a plan to evade this Court's orders.  The statements by the Republic's officials cited by NML are nothing more than political rhetoric in an election season.  They are, in substance, no different from statements and rumors that have long been circulating, including in November 2012, when NML previously quoted them to this Court.

2

If anything, NML's attempted showing of irreparable harm is even weaker than it was a year ago, because the district court recently signed an injunction **drafted entirely by NML** that renders impossible the Republic's alleged evasion plan, or any similar plan. To negotiate any potential swap for new securities, or even to identify the beneficial owners of the Exchange Bonds, the Republic would require the cooperation of the Bank of New York Mellon ("BNYM") and the Depository Trust Company ("DTC"). These highly risk-averse financial institutions are specifically enjoined and subject to jurisdiction (and contempt proceedings) in New York, so there is no chance they would cooperate with the Republic in any evasion plan. The EBG has repeatedly noted the practical impossibility of any evasion by the Republic in its submissions to this Court, *see, e.g.*, Emergency Motion for Stay Pending Appeal dated Nov. 26, 2012 at 4, but NML offers no response.

Finally, NML's self-serving speculation about how the Supreme Court may treat a future petition for a writ of *certiorari* **by the Republic** is irrelevant, both because it has no basis in fact and because it does not concern a potential petition **by the EBG**.[2] This Court itself determined just two months ago—for the third time in the past eleven months—that the stay should remain in place until the Supreme

---

[2] As this Court has noted, the Republic's first petition for a writ of *certiorari* did not even concern a final judgment. *NML Capital, Inc. v. Republic of Argentina*, 727 F.3d 230, 238 & n.6 (2d Cir. 2013).

Court has had an opportunity to decide whether to hear this matter. NML's latest attempt to reargue the issue should be rejected.

## **BACKGROUND**

### I.     **Procedural History and Previous Stay Orders**

The district court first entered injunctions against the Republic on February 23, 2012. Ex. 2: Order dated Feb. 23, 2012. On March 5, 2012, the district court stayed enforcement of those injunctions pending the Republic's appeal to this Court. Ex. 3: Order dated March 5, 2012 (the "March 5 Stay"). To preserve the *status quo* pending appeal, the March 5 Stay imposed a variety of strictures on the Republic. *Id.* Among other things, the March 5 Stay enjoined the Republic from "tak[ing] any action to evade the directives of the February 23 [injunctions] … render them ineffective … or diminish the Court's ability to supervise compliance … in the event they are affirmed[.]" *Id.* at 2. For nine months, NML lodged no objection to the March 5 Stay.

On October 26, 2012, this Court partially affirmed the February 23 Injunctions but remanded pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994) for further development of the record concerning the application of the injunctions to third parties and the operation of the "ratable payment" formula. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 265 (2d Cir. 2012) ("*NML I*"). At that time, the EBG sought to intervene and raised numerous

4

constitutional, equitable and procedural arguments.  *See, e.g.*, Ex. 4: Memorandum of Law Regarding Issues Remanded By Second Circuit dated Nov. 16, 2012.  On November 21, 2012, the district court entered an opinion and separate order amending the February 23 injunctions (the "Injunctions").  *See* Ex. 5: Order dated Nov. 21, 2012; Ex. 6: Opinion dated Nov. 21, 2012.  The district court also issued an opinion lifting the March 5 Stay.  *See* Ex. 7: Opinion dated Nov. 21, 2012 (all November 21, 2012 opinions and orders collectively, the "November 21 Orders").

On November 26, 2012, the EBG and the Republic filed emergency motions in this Court seeking a stay pending appeal.  By Order dated November 28, 2012, this Court granted those motions and stayed the district court's November 21 Orders, thus restoring the March 5 Stay and preserving the *status quo ante*.  Ex. 8: November 28, 2012 Order.  Although NML had never previously complained about the terms of the March 5 Stay, on November 30, 2012 it filed an "emergency" motion to require the posting of a $1.45 billion bond.  Ex. 9: Emergency Motion to Amend or Modify the Stay dated Nov. 30, 2012.  NML's application was denied four days later by this Court, and the March 5 Stay remained in effect for nine months thereafter.  Ex. 10: Order dated Dec. 4, 2012.

On August 23, 2013, this Court issued an opinion affirming the Injunctions and dismissing the EBG's appeal.  *NML Capital, Inc. v. Republic of Argentina*, 727 F.3d 230, 248 (2d Cir. 2013) ("*NML II*").  However, *NML II* expressly stayed

enforcement of the Injunctions "pending the resolution by the Supreme Court of a timely petition for a writ of *certiorari*." *Id.* at 248.  The Court thus made clear its continued interest in ensuring the completion of the appeals process.

## II.   President Kirchner's Televised Speech

On August 27, 2013, President Kirchner delivered a 28-minute televised address, in Spanish, concerning the Republic's public finances.[3]  The speech was delivered two weeks after open political primaries held August 11, 2013, and just two months before legislative elections scheduled to be held on October 27, 2013. *See, e.g.*, Ex. 11: "Argentine primary makes Fernandez lame-duck leader," ASSOCIATED PRESS, August 12, 2013 ("Cristina Fernandez de Kirchner could lose control of Argentina's Congress during the last two years of her presidency if Sunday's primary results are repeated in October's midterm elections").

During the speech, President Kirchner reversed her longstanding position that the Republic would not pay "one dollar" to NML.  Specifically, the President stated that she would propose legislation enabling NML and other remaining holdout creditors to take part in a new exchange offer that would afford them the same treatment as the existing Exchange Bondholders.  Ex. 12: Transcript of Kirchner Address, dated Aug. 27, 2013 at 6.  Immediately thereafter, President

---

[3] *See* http://www.youtube.com/watch?v=SEJZaWmH1vk&feature=c4-overview-vl&list=PLry2W0bcBZ9zPOAakRdbzGn3YYSCi_EBl (last accessed October 17, 2013).

6

Kirchner noted that the Republic might also take steps to swap the existing

Exchange Bonds for new bonds with a different payment mechanism. *Id.*

However, in draft legislation submitted to the Republic's legislature the same day,

the President's office sought a partial repeal of the Lock Law to facilitate a new

exchange offer to the remaining FAA Bondholders, but did ***not*** propose any swap

of existing Exchange Bonds. *See* Ex. 13: Proposed Legislation dated Aug. 27,

2013. And the next day, Economy Minister Lorenzino stated publicly that the

Republic did not intend to evade the orders of this Court. *See* Ex. 14: Shane

Romig, *Argentina Submits Debt-Swap Bill to Congress*, WALL STREET JOURNAL,

Aug. 28, 2013.

## III.    The District Court Enters a Strengthened Anti-Evasion Injunction

Despite the fact that the Republic took no affirmative steps to evade the

Injunctions, on September 11, 2013, NML asked the district court to enter a

modified anti-evasion injunction expressly prohibiting the Republic from offering

to swap Exchange Bonds for new securities. Ex. 15: Letter from Robert Cohen

dated Sept. 11, 2013. On October 3, 2013, the district court granted NML's

application and entered an enhanced injunction that, among many other things,

specifically prohibits the Republic from taking any step towards "(i) the

implementation of the plan to allow Exchange Bonds to be exchanged for

securities or similar instruments payable in Argentina, which was announced by

7

President Fernández de Kirchner in her speech of August 26, 2013, [or] (ii) implementation of any functionally equivalent or reasonably similar plan" (the "October 3 Order").[4]  Ex. 16: October 3 Order ¶ 3.  The October 3 Order was entered in exactly the form that had been requested by NML.  Ex. 16: October 3 Order.

## ARGUMENT

### I.    Lifting the Stay Would Trigger a Default on the Exchange Bonds, Which Would Irreparably Harm the EBG

NML's motion ignores that this Court initially stayed enforcement of the Injunctions in response to an application *by the EBG*.  As NML knows, lifting the stay now will irreparably harm the EBG by triggering an irremediable default on the Exchange Bonds, before the EBG has the opportunity to have its constitutional and equitable arguments considered by the full membership of this Court, or the Supreme Court.

### A.    Lifting the Stay Will Trigger a Default on the Exchange Bonds

As the EBG has previously noted, the Republic's domestic legislation, as well as its political and economic situation, make it essentially impossible for it to

---

[4] The EBG reserves all rights to appeal the October 3 Order, which goes far beyond the strictures of the March 5 Stay.  The March 5 Stay unconstitutionally and inequitably infringed the Exchange Bondholders' rights to modify the payment mechanism on their bonds.  The October 3 Order imposes even broader prohibitions, and now purports to restrict Exchange Bondholders' rights to sell or transfer bonds that are indisputably their property.

pay NML on its FAA Bonds.  Ex. 17: EBG Opposition to Motion to Amend Stay at 3, 12; Ex. 18: EBG Appeal Brief at 10-12.  Thus, enforcement of the November 21 Injunctions must result in one of two scenarios.  Ex. 18: EBG Appeal Brief at 7-8, 24.

In the first scenario, the Republic acts in contempt of the Injunctions and pays amounts due to the Exchange Bondholders without paying the Plaintiffs.  Should that occur, the Exchange Bondholders' funds would be frozen at BNYM and the Republic would default on its payment obligations.  Ex. 19: Declaration of Stephen Choi, dated Nov. 16, 2012 ("Choi Dec.") ¶ 14.  In the second scenario, the Republic complies with the Injunctions and refuses to pay the Exchange Bondholders because it is unwilling to pay the Plaintiffs—likewise triggering a default.  Ex. 19: Choi Dec. ¶ 13.  Either way, enforcement of the Injunctions **will** trigger a default on the Exchange Bonds.

## B. Default Would Irreparably Harm the EBG

Default would irreparably harm the EBG.  Although the Republic's failure to pay would immediately spur an avalanche of litigation, *see* Ex. 19: Choi Dec. ¶¶ 8-22, it would not afford an effective remedy for the EBG, because the Republic is a foreign sovereign immune from execution and unwilling to pay money judgments.  This Court has already found that such circumstances constitute irreparable harm, because "monetary damages are an ineffective remedy when …

9

Argentina will simply refuse to pay[.]" *NML I*, 699 F.3d at 262**.** Even if the

Republic were somehow able and willing to resume payments at some point after

its default, many Exchange Bondholders insure against default using credit default

swaps, which if triggered would initiate a series of financial transfers that would be

difficult, if not impossible, to unwind.  Ex. 19: Choi Dec. ¶ 20.

Default also would have severely negative consequences for Argentina's

economy and its trading partners, as well as global financial institutions with

substantial holdings of sovereign debt instruments.  Ex. 19: Choi Dec. ¶ 21.  The

balance sheets of those institutions would be weakened, requiring them to increase

liquid capital reserves, and in turn spreading liquidity problems (including

potential insolvency) to others.  Ex. 19: Choi Dec. ¶ 21.  The negative cascade

could cause a large-scale loss of investor confidence that would ultimately lead

financial institutions to reduce lending activity.  Ex. 19: Choi Dec. ¶ 22.  In the

same vein, many Exchange Bondholders are investment funds required to mark to

market the value of their holdings, which in turn affects the funds' net asset value

("NAV").  Ex. 19: Choi Dec. ¶ 19.  Reductions in NAV could, by themselves,

cause massive investor withdrawals from those institutions.  Ex. 19: Choi Dec. ¶

15; *Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007)

("It is well-established that a movant's loss of current or future market share may

constitute irreparable harm.")

10

Since the consequences of default cannot be undone, lifting the August 23 Stay would effectively deprive the Supreme Court of the opportunity to decide whether to hear this case, in which Exchange Bondholders collectively have over $65 billion in financial interests at stake.  *See* Ex. 20: Declaration of Kevin F. Binnie, dated November 16, 2012 at ¶¶ 5-6.  If this Court were to lift the stay and trigger a default before the Supreme Court can rule on a timely petition for a writ of *certiorari*, the Exchange Bondholders will suffer irreparable harm, because they will be deprived of their due process rights to further appeals on their constitutional and equitable arguments.  *Statharos v. New York City Taxi and Limousine Comm'n,* 198 F.3d 317, 322 (2d Cir. 1999) (finding "no separate showing of irreparable harm is necessary" when a party alleges a violation of its constitutional rights).  This Court, which has repeatedly maintained a stay since first considering the issue in November 2012, should not alter its rulings.

## II.    NML Offers Nothing To Justify Reversing This Court's Three Prior Rulings In Favor of a Stay

### A.    This Court Has Repeatedly Rejected the Exact Arguments NML Raises In Its Current Motion

NML's previous attempts to vacate or modify the stay were based on precisely the grounds articulated in the current motion, yet were rejected by this Court.  Following the decision in *NML I*, numerous high officials of the Republic were quoted in the press expressing an intent to defy orders of this Court and the

11

district court.  *See, e.g.*, Ex. 21: "Argentina Grapples with Credit-Rating Challenges," WALL STREET JOURNAL, Oct. 31, 2012 (quoting Economy Minister Hernan Lorenzino as stating "Argentina isn't going to change its position of not paying vulture funds.  We will continue to follow that policy despite any ruling that could come out of any jurisdiction, in this case New York."); Ex. 22: "Argentina to blast 'vulture funds' at the G20 ministerial meeting in Mexico," MERCOPRESS, November 4, 2012 (quoting President Kirchner as stating "We are going to pay [the Exchange Bonds] in dollars, because we have them" but affirming that the Republic would pay "not one dollar to the 'vulture funds.'").  NML moved to vacate the March 5 Stay in the district court, relying specifically upon these statements to justify the relief sought.  *See, e.g.*, Ex. 23: Reply Brief of Plaintiffs in Response to Remand, dated Nov. 19, 2012 at 23-27.  On November 21, 2012, the district court granted NML's application, in an opinion that specifically referred to such press reports. Ex. 7: Opinion dated Nov. 21, 2012 at 2-3.  Yet on November 28, 2012, this Court stayed the district court's November 21 Order, thus re-imposing the March 5 Stay.  *See* November 28, 2012 Order.

On November 30, 2012, NML took its second bite at the apple, and moved to "amend or modify" the March 5 Stay to require a bond of $1.45 billion.  NML again made ***exactly*** the same arguments it raises on this motion, claiming that the Republic was "schem[ing]" to modify the payment mechanism for the Exchange

12

Bonds to facilitate payments in Argentina, outside the reach of United States courts.  Ex. 9: Emergency Motion to Amend or Modify the Stay dated Nov. 30, 2012 at 7-9, 12-14.  NML specifically referenced numerous press reports claiming that "***Argentina is seeking to alter how it pays the Exchange Bondholders to eliminate U.S.-based institutions***[.]"  *Id.* at 7-8 (emphasis added).  It noted "reports that an 'anti-vulture' team in the Argentine Economy Ministry has worked through different proposals … ***including offering Exchange Bondholders the opportunity to exchange their 'NY law bonds into local law bonds***.'"  *Id.* at 8-9 (internal citations omitted) (emphasis added).   It quoted defiant statements from the Republic's high officials.  *Id.* at 6-7.  It claimed the Republic's counsel had issued a "non-denial denial" of press reports concerning the alleged evasion plot. *Id.* at 13.  And it complained that the Republic was seeking to use the delays afforded by further appeals to facilitate its development of evasion schemes.  *Id.* at 12-14.  Nonetheless, within days, this Court declined to require the posting of a bond, and left undisturbed the November 28, 2012 Order re-imposing the March 5 Stay.  Ex. 10: Order dated Dec. 4, 2012.

Finally, on August 23, 2013 this Court yet ***again*** stayed enforcement of the Injunctions, pending resolution by the Supreme Court of a timely petition for a writ of *certiorari.  NML II* at 248.  The Court entered the stay despite acknowledging in its opinion that the Republic's officials had "publicly and repeatedly announced

13

their intention to defy any rulings of this Court and the district court with which they disagree." *Id.* at 238 & n.4; *see also id.* at 241 ("the Republic has made clear its intent to defy any money judgment issued by this Court"). Indeed, at oral argument, the Republic's counsel freely acknowledged that the Republic "would not voluntarily obey" the Injunctions, even if upheld by this Court. *Id.* at 238.

NML is now presenting exactly the same arguments that this Court has repeatedly rejected. Nothing in NML's papers justifies a different result.

### B. There Is No Credible Evidence the Republic Is Engaged in a Secret "Plot" to Evade the Injunctions that Will Harm NML

If this Court were inclined to consider NML's arguments a ***fourth*** time, it still should conclude that there is no credible evidence the Republic is seriously planning to evade the Injunctions. The only arguably new information in NML's motion is one passing comment in a 28-minute speech given by President Kirchner nearly two months ago, suggesting that the Republic might offer Exchange Bondholders new debt instruments with a changed place of payment. Ex. 12: Transcript of Broadcast Address by Cristina Fernandez de Kirchner, dated Aug. 27, 2013.

NML ignores two important facts concerning President Kirchner's speech. *First*, the speech ***reversed*** President Kirchner's longstanding opposition to paying even "one dollar" to NML, and announced her intention to propose legislation reopening the 2010 exchange offer to allow all remaining holdout creditors to

14

participate.  Ex. 12: Transcript of Kirchner Address, dated Aug. 27, 2013 at 6.

President Kirchner's comment about a potential swap of Exchange Bonds was

made immediately following her abrupt policy reversal and was likely intended to

mute potential criticism.  *Second*, President Kirchner's comments were made in the

context of open primary elections on August 11, 2013, and legislative elections on

October 27, 2013.  Ex. 11: "Argentine primary makes Fernandez lame-duck

leader," ASSOCIATED PRESS, Aug. 12, 2013 ("Cristina Fernandez de Kirchner could

lose control of Argentina's Congress during the last two years of her presidency if

Sunday's primary results are repeated in October's midterm elections.").

As this Court has indicated, election-related rhetoric is not credible evidence

of an attempt to evade Court orders.  Ex. 24: Oral Argument Transcript dated Feb.

27, 2013 at 38-39 (stating in response to quotation of the Republic's officials by

NML's counsel that "sometimes politicians say things and then they change their

minds …. [d]id you ever hear of that?").  The difference between political rhetoric

and concrete action was clarified immediately following President Kirchner's

speech by the Republic's Economy Minister, Hernan Lorenzino, who stated that

the Republic is ***not*** attempting to skirt the rulings of this Court.  *See* Ex. 14: Shane

Romig, "Argentina Submits Debt-Swap Bill to Congress," WALL STREET JOURNAL,

Aug. 28, 2013 ("Economy Minister Hernan Lorenzino on Wednesday said he

expects a favorable ruling from the Supreme Court and denied the country is trying

15

to skirt the U.S. legal rulings.").  And the draft legislation President Kirchner

actually submitted to the Argentine National Congress (which was subsequently

enacted by both houses of that body and signed into law) does not, contrary to the

President's televised remarks, seek to convert existing Exchange Bonds into new

debt instruments, or take any other action that could be construed as preparation to

circumvent the Injunction or any other Court order.  *See* Ex. 13: Draft Legislation

dated Aug. 27, 2013.  The absence of such provisions is telling, because the

legislation ***does*** implement the President's stated intent to offer a bond exchange to

NML.  *See supra* at 7.

President Kirchner has a history of indulging in strong rhetoric.  For

instance, she declared for years that the Republic would not offer "one dollar" to

the "vulture fund" NML, only to reverse herself on August 27, 2013, by proposing

a reopening of the 2005 and 2010 exchange offers for NML's benefit.  *Compare,*

*e.g.*, Ex. 22: "Argentina to blast 'vulture funds' at the G20 ministerial meeting in

Mexico," MERCOPRESS, Nov. 4, 2012,  (quoting President Kirchner stating

Argentina would pay "not one dollar to the vulture funds"); Mariano Obarrio,

"Fear in the government of an adverse ruling and the consequences," LA NACION,

Nov. 17, 2012 (Straker trans.) (reporting President Fernandez de Kirchner's

statement that "we must forget about another exchange, speculators who bet on

cheap stocks looking for another default will not be paid"), *with* Ex. 12: Transcript

16

of Broadcast Address by Cristina Fernandez de Kirchner, dated Aug. 27, 2013 at 6

(noting intent to seek reopening of the 2005 and 2010 exchange offers to enable

participation by holdout FAA Bondholders, including Plaintiffs).  NML provides

no basis to believe that anything will be different this time, or that President

Kirchner's statements two months ago constitute a "repudiation" of the Republic's

repeated assurances to this Court (and NML) that it "has complied, is complying,

and will comply" with all court orders.  Ex. 25: Declaration of Francisco Guillermo

Eggers dated Nov. 16, 2012 ¶ 4.

### C.    It Is Impossible for the Republic to Secretly Swap the Exchange Bonds or Modify Their Payment Mechanism

NML's motion also fails to address a crucial point that the EBG has pointed

out repeatedly in prior motion practice regarding the stay:  Even if the Republic

wanted to evade the Injunctions by unilaterally swapping the Exchange Bonds or

modifying their payment mechanism to provide for payment in Argentina, ***it would

be impossible***.  Other parties, including BNYM and DTC, would have to cooperate

in any such scheme.  Ex. 26: Supplemental Declaration of Stephen Choi dated

Nov. 26, 2012 ("Supp. Choi Dec.") ¶¶ 5-13.  Under the terms of the Exchange

Bond indentures (collectively, the "Indenture"), the Republic is required to

transmit payments owed to the Exchange Bondholders to BNYM, the indenture

trustee.  *Id.* ¶ 6.  BNYM then transfers payments from the Republic to

clearinghouses such as DTC, which in turn distribute the money to their

17

participating brokers and, through them, to the bonds' beneficial owners. *Id.* ¶ 7. Thus, the Republic cannot even identify the beneficial owners of the Exchange Bonds (who change every day), much less alter the payment mechanism in the Indenture, without the cooperation of BNYM and DTC. *Id.* ¶¶ 8-13.

BNYM and DTC are no doubt aware of the district court's October 3 Order, which expressly enjoins any attempt to modify the payment mechanism in the Exchange Bonds, or to swap them for new debt instruments providing for payment in Argentina. *See* October 3 Order. Both BNYM and DTC are subject to jurisdiction in New York, and it is virtually certain that neither of them would risk being found in contempt by assisting the Republic in violating the October 3 Order. Ex. 26: Supp. Choi Dec. ¶¶ 10-11. Moreover, pursuant to the Indenture, any attempt to replace BNYM as Trustee for the Exchange Bondholders would require a vote, which could not be held surreptitiously and therefore could be easily enjoined. Ex. 27: Indenture § 5.9(c). Although the EBG raised these points with the Court nearly a year ago, ***NML has never responded to them***.

### D. The District Court Already Has Entered An Anti-Evasion Injunction That Adequately Protects NML's Interests

This Court also should decline to lift the stay because, as NML concedes, the district court recently entered an even more expansive anti-evasion injunction—at NML's request—that prohibits both the Republic and any party acting in active concert or participation with it from taking any steps that could prejudice NML's

18

rights.  Ex. 16: October 3 Order.  The October 3 Order is certain to be highly

effective, because both BNYM and DTC—parties whose cooperation would be

necessary to any attempted evasion—are subject to jurisdiction in New York.  *See*

*supra* at 18.  Even if the Republic were somehow engaged in the alleged plot to

evade the Injunctions (an assertion for which there is no credible evidence), its

efforts cannot bear fruit given that BNYM and DTC are barred from cooperating.

Under these circumstances, NML is already fully protected, and it would be

grossly inequitable to lift the stay and effectively deprive the EBG of its rights to

further appellate review.

**III.    There is No Basis for NML's Speculation About How the Supreme
          Court Would Decide A Timely Petition for a Writ of *Certiorari***

Finally, NML engages in extensive and unfounded speculation about why

the Supreme Court denied the Republic's initial petition for a writ of *certiorari*,

and baselessly suggests it can predict the outcome of a future petition by the

Republic.  As this Court recognized when it continued the stay on August 23,

2013, the Republic's initial petition concerned only the October 26 Order, which

was not a final judgment.  *NML II* at 238 & n.6.  The petition was denied in a plain

vanilla, standard form summary order.  Ex. 28: Supreme Court Summary

Dispositions dated Oct. 7, 2013 at 77.  There is simply no way for NML or its

counsel to infer from that order the disposition of any future petition—especially if

19

brought by the EBG, which is a different party raising completely different issues.[5]

As this Court's repeated continuations of the stay indicate, no harm will result

from allowing the exercise of appellate rights before the Injunctions are enforced.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny NML's motion.

Dated:  October 25, 2013

By:  \_\_\_\_/s/ Sean F. O'Shea\_\_\_\_

Sean F. O'Shea                           David Boies
Michael E. Petrella                       David A. Barrett
Daniel M. Hibshoosh                   Nicholas A. Gravante, Jr.
**O'SHEA PARTNERS LLP**            Steven I. Froot
521 Fifth Avenue, 25th Floor        **BOIES, SCHILLER & FLEXNER LLP**
New York, New York 10175          575 Lexington Avenue
Tel.: (212) 682-4426                     New York, NY 10022
                                                  Tel.: (212) 446-2300

*Attorneys for the Exchange Bondholder Group*

---

[5] Nor does NML address the fact that the EBG's petition for rehearing *en banc* is still pending before this Court.

20

## APPENDIX A

The following interested non-parties are members of the Exchange Bondholder Group: Gramercy Funds Management LLC; Gramercy Argentina Opportunity Fund, Ltd.; Gramercy Distressed Debt Master Fund; Gramercy Distressed Opportunity Fund, Ltd.; Gramercy Distressed Opportunity Fund II, L.P.; Gramercy Emerging Markets Fund; Gramercy Local Currency Emerging Market Debt Master Fund; Gramercy Master Fund; Gramercy Opportunity Fund - Special Opportunities II Offshore SP; Gramercy Opportunity Fund – Special Opportunities II SP; Gramercy Opportunity Fund - Special Opportunities SP; Gramercy U.S. Dollar Emerging Market Debt Master Fund; Gramercy Select Master Fund; Massachusetts Financial Services Company d/b/a MFS Investment Management; MFS Diversified Income Fund; MFS Emerging Markets Debt Fund; MFS High Yield Opportunities Fund; MFS Emerging Markets Debt Local Currency Fund; MFS Global Bond Fund; MFS Multimarket Income Trust; MFS Charter Income Trust; MFS Meridian Funds – Emerging Markets Debt Fund; MFS Meridian Funds – High Yield Fund; MFS Meridian Funds – Global Bond Fund; MFS Meridian Funds – Emerging Markets Debt Local Currency Fund; MFS Investment Management Co. (Lux), S.a.r.l., on behalf of (i) MFS Investment Funds – Emerging Markets Debt Fund, and (ii) MFS Investment Funds – Emerging Markets Debt Local Currency Fund II; MFS Heritage Trust Company Collective Investment Trust – Emerging Markets Debt Fund; MFS Emerging Markets Debt LLC; Brevan Howard Asset Management LLP and Brevan Howard Master Fund Limited; AllianceBernstein L.P. on behalf of certain accounts managed by AllianceBernstein L.P. and its affiliates; Transamerica Partners Core Bond; Transamerica Partners Institutional Core Bond; Transamerica Partners Balanced; Transamerica Partners Institutional Balanced; Transamerica Multi-Managed Balanced VP; Transamerica Multi-Managed Balanced Portfolio; BlackRock Balanced Capital Portfolio of BlackRock Series Fund, Inc.; BlackRock Balanced Capital Fund, Inc.; BlackRock Strategic Income Opportunities Portfolio; BlackRock Balanced Capital V.I. Fund; BlackRock Total Return Portfolio; BlackRock Total Return V.I. Fund; iShares Emerging Markets High Yield Bond Fund; iShares J.P. Morgan USD Emerging Markets Bond Fund; BlackRock Emerging Markets Bond Fund; BlackRock Emerging Markets Fund; BGF Emerging Markets Bond Fund; Emerging Markets Fixed Income Fund B; Strategic Income Opportunities Bond Fund; and Fixed Income Fundamental Trading Fund Three.

21