# 12-0105-cv(L),

### 12-0109-cv(con)
### 12-0111-cv(con)

## 12-0157-cv(con), 12-0158-cv(con), 12-0163-cv(con), 12-0164-cv(con), 12-0170-cv(con), 12-0176-cv(con), 12-0185-cv(con), 12-0189-cv(con), 12-0214-cv(con), 12-0909-cv(con), 12-0914-cv(con), 12-0916-cv(con), 12-0919-cv(con), 12-0920-cv(con), 12-0923-cv(con), 12-0924-cv(con), 12-0926-cv(con), 12-0939-cv(con), 12-0943-cv(con), 12-0951-cv(con), 12-0968-cv(con), 12-0971-cv(con), 12-4694-cv(con), 12-4829-cv(con), 12-4865-cv(con)

# United States Court of Appeals

*for the*

# Second Circuit

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## DECLARATION WITH EXHIBITS 1 – 28 IN SUPPORT OF OPPOSITION TO MOTION TO VACATE STAY
## VOLUME 1 OF 3

O'SHEA PARTNERS LLP
521 Fifth Avenue, 25th Floor
New York, New York 10175
(212) 682-4426

– and –

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Non-Party Appellants
Exchange Bondholder Group*

ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS
OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA
INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA
CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA
ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN
VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA
VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees*,

– v. –

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant*,

THE BANK OF NEW YORK MELLON, as Indenture Trustee,
EXCHANGE BONDHOLDER GROUP, FINTECH ADVISORY INC.,

*Non-Party Appellants*,

EURO BONDHOLDERS, ICE CANYON LLC,

*Intervenors.*

## DECLARATION OF SEAN F. O'SHEA

Pursuant to 28 U.S.C. § 1746, Sean F. O'Shea declares as follows:

1.      I am a partner in the law firm of O'Shea Partners, LLP, counsel for interested non-party Exchange Bondholder Group ("EBG").[1]   I submit this declaration in support of the EBG's Opposition to Motion to Vacate Stay, dated October 25, 2013.

2.      Attached as Exhibit 1 is a true and correct copy of an Order of this Court dated November 28, 2012.

3.      Attached as Exhibit 2 is a true and correct copy of an Order of the district court dated February 23, 2012.

4.      Attached as Exhibit 3 is a true and correct copy of an Order of the district court dated March 5, 2012.

5.      Attached as Exhibit 4 is a true and correct copy of the Defendants' Memorandum of Law Regarding Issues Remanded by the Second Circuit, dated November 16, 2012.

6.      Attached as Exhibit 5 is a true and correct copy of an Order of the district court dated November 21, 2012.

7.      Attached as Exhibit 6 is a true and correct copy of an Opinion of the district court dated November 21, 2012.

---

[1] The membership of the EBG is listed in Appendix A to the accompanying Opposition to Motion to Amend Stay.

1

8.     Attached as Exhibit 7 is a true and correct copy of an Opinion of the district court dated November 21, 2012.

9.     Attached as Exhibit 8 is a true and correct copy of an Order of this Court dated November 28, 2012.

10.     Attached as Exhibit 9 is a true and correct copy of NML Capital's Emergency Motion to Amend or Modify the stay, dated November 30, 2012.

11.     Attached as Exhibit 10 is a true and correct copy of an Order of this Court dated December 4, 2012.

12.     Attached as Exhibit 11 is a true and correct copy of "Argentine Primary Makes Fernandez Lame-Duck Leader," ASSOCIATED PRESS, Aug. 12, 2013.

13.     Attached as Exhibit 12 is a true and correct copy of a Transcript of President Cristina Fernandez de Kirchner's Address dated August 27, 2013.

14.     Attached as Exhibit 13 is a true and correct copy of Proposed Legislation dated August 27, 2013.

15.     Attached as Exhibit 14 is a true and correct copy of "Argentina Submits Debt-Swap Bill to Congress," WALL STREET JOURNAL, Aug. 28, 2013.

16.     Attached as Exhibit 15 is a true and correct copy of a Letter from Robert Cohen to the Hon. Thomas P. Griesa, dated September 11, 2003.

17.     Attached as Exhibit 16 is a true and correct copy of an Order of the district court dated October 3, 2013.

18.     Attached as Exhibit 17 is a true and correct copy of the Exchange Bondholder Group's Opposition to Motion to Amend Stay, dated December 3, 2012.

19.     Attached as Exhibit 18 is a true and correct copy of the Exchange Bondholder Group's Appeal Brief, dated December 28, 2012.

20.     Attached as Exhibit 19 is a true and correct copy of the Declaration of Stephen Choi, dated November 16, 2012.

21.     Attached as Exhibit 20 is a true and correct copy of the Declaration of Kevin F. Binnie, dated November 16, 2012.

22.     Attached as Exhibit 21 is a true and correct copy of "Argentina Grapples with Credit-Rating Challenges," WALL STREET JOURNAL, Oct. 31, 2012.

23.     Attached as Exhibit 22 is a true and correct copy of "Argentina to Blast 'Vulture Funds' at the G20 Ministerial Meeting in Mexico," MERCOPRESS, Nov. 4, 2012.

24.     Attached as Exhibit 23 is a true and correct copy of the Reply Brief of Plaintiffs in Response to Remand, dated November 19, 2012.

25.     Attached as Exhibit 24 is a true and correct copy of the Transcript of Oral Argument before this Court, dated February 27, 2013.

3

26.    Attached as Exhibit 25 is a true and correct copy of the Declaration of Francisco Guillermo Eggers, dated November 16, 2012.

27.    Attached as Exhibit 26 is a true and correct copy of the Supplemental Declaration of Stephen Choi, dated November 26, 2012.

28.    Attached as Exhibit 27 is a true and correct copy of Trust Indenture issued to The Bank of New York from the Republic of Argentina, dated June 2, 2005.

29.    Attached as Exhibit 28 is a true and correct copy of Summary Dispositions issued by the United States Supreme Court, dated October 7, 2013.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 25, 2013 in New York, New York.

SEAN F. O'SHEA

4

Exhibit 1

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT
_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 28th day of November, two thousand and twelve.

Before:     Rosemary S. Pooler,
            *Circuit Judge.*
_____

NML Capital, Ltd., Aurelius Capital Master, Ltd., ACP Master, Ltd., Blue Angel Capital I LLC, Aurelius Opportunities Fund II, LLC, Pablo Alberto Varela, Lila Ines Burgueno, Mirta Susana Dieguez, Maria Evangelina Carballo, Leandro Daniel Pomilio, Susana Aquerreta, Maria Elena Corral, Teresa Munoz De Corral, Norma Elsa Lavorato, Carmen Irma Lavorato, Cesar Ruben Vazquez, Norma Haydee Gines, Marta Azucena Vazquez, Olifant Fund, LTD.,

    Plaintiffs-Appellees,

            v.

The Republic of Argentina,

    Defendant-Appellant.
_____

**ORDER**
Docket Nos. 12-105(L), 12-109(Con),
          12-111(Con),12-157(Con),
          12-158(Con), 12-163(Con),
          12-164(Con), 12-170(Con),
          12-176(Con), 12-185(Con),
          12-189(Con), 12-214(Con),
          12-909(Con), 12-914(Con),
          12-916(Con), 12-919(Con),
          12-920(Con), 12-923(Con),
          12-924(Con), 12-926(Con),
          12-939(Con), 12-943(Con),
          12-951(Con), 12-968(Con),
          12-971(Con)

IT IS HEREBY ORDERED that the motion by the Exchange Bondholder Group for leave to intervene as interested non-parties for the purpose of appealing orders entered by the district court on 11/21/12 and for the purpose of seeking a stay pending appeal is GRANTED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court



# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

NML CAPITAL, LTD.                                    08 Civ. 6978 (TPG)
                                                     09 Civ. 1707 (TPG)
                        Plaintiff,                   09 Civ. 1708 (TPG)

                v.

REPUBLIC OF ARGENTINA,

                        Defendant.
-------------------------------------------------------x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____             │
│ DATE FILED: 2/23/12              │
└─────────────────────────────────┘
```

## [PROPOSED] ORDER

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

14293534

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.     It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

    a.   Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

    b.   There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear—indeed, it has codified in Law 26,017 and Law 26,547—its intention to defy any money judgment issued by this Court.

    c.   The balance of the equities strongly supports this Order in light of the clear text of Paragraph 1(c) of the FAA and the Republic's repeated failures to make required payments to NML. In the absence of the equitable relief provided by this Order, the Republic will continue to violate Paragraph 1(c) with impunity, thus subjecting NML to harm. On the other hand, the Order requires of the Republic only that which it

promised NML and similarly situated creditors to induce those creditors to purchase the Republic's bonds. Because the Republic has the financial wherewithal to meet its commitment of providing equal treatment to both NML (and similarly situated creditors) and those owed under the terms of the Exchange Bonds, it is equitable to require it to do so. Indeed, equitable relief is particularly appropriate here, given that the Republic has engaged in an unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to NML, in direct violation of its contractual commitment set forth in Paragraph 1(c) of the FAA.

d. The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order, particularly here, where creditors of the Republic have no recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises. No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2. The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

a. Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the

2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" (as defined below) to NML.

b.  Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.  Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d.  The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e.  Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all parties involved, directly or indirectly, in advising upon, preparing, processing, or facilitating any payment on the Exchange Bonds (collectively, "Agents and Participants"), with a copy to counsel for NML. Such Agents and Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and

4

prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f.   Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Agents and Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.   NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.   The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval of the Court;

5.     This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated: _Feb. 23, 2012_

_Thomas P. Griesa_
Thomas P. Griesa

Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/5/2012
```

-------------------------------------------------x

NML CAPITAL, LTD.,

                     Plaintiff,

          - against -

THE REPUBLIC OF ARGENTINA,

                  Defendant.

No. 08 Civ. 6978 (TPG)
No. 09 Civ. 1707 (TPG)
No. 09 Civ. 1708 (TPG)

-------------------------------------------------x

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER, LTD.,

                    Plaintiffs,

          - against -

THE REPUBLIC OF ARGENTINA,

                  Defendant.

No. 09 Civ. 8757 (TPG)
No. 09 Civ. 10620 (TPG)

-------------------------------------------------x

AURELIUS OPPORTUNITIES FUND II, LLC
and AURELIUS CAPITAL MASTER, LTD.,

                    Plaintiffs,

          - against -

THE REPUBLIC OF ARGENTINA,

                  Defendant.

No. 10 Civ. 1602 (TPG)
No. 10 Civ. 3507 (TPG)

*(captions continue on following pages)*

-------------------------------------------------x

## ~~[PROPOSED]~~ ORDER PURSUANT TO FRCP 62(C)

```
--------------------------------------------------------------- x
AURELIUS CAPITAL MASTER, LTD. and        :
AURELIUS OPPORTUNITIES FUND II, LLC,     :
                                         :   No. 10 Civ. 3970 (TPG)
                           Plaintiffs,   :   No. 10 Civ. 8339 (TPG)
                                         :
            - against -                  :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                           Defendant.    :
                                         :
--------------------------------------------------------------- x
                                         :
BLUE ANGEL CAPITAL I LLC,                :
                                         :   No. 10 Civ. 4101 (TPG)
                           Plaintiff,    :   No. 10 Civ. 4782 (TPG)
                                         :
            - against -                  :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                           Defendant.    :
--------------------------------------------------------------- x
                                         :
PABLO ALBERTO VARELA, et al.,            :
                                         :   No. 10 Civ. 5338 (TPG)
                           Plaintiffs,   :
                                         :
            - against -                  :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                           Defendant.    :
                                         :
---------------------------------------------------------------x
```

```
------------------------------------------------------------- x
                                              :
OLIFANT FUND, LTD.,                           :
                                              :   No. 10 Civ. 9587 (TPG)
                          Plaintiff,          :
                                              :
         - against -                          :
                                              :
THE REPUBLIC OF ARGENTINA,                    :
                                              :
                          Defendant.          :
                                              :
-------------------------------------------------------------x
```

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this

Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the

Republic is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs'

Bonds at least equally with all the Republic's other present and future unsecured and

unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court

granted partial summary judgment to Plaintiffs on their claims that the Republic has breached,

and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things,

"ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to

satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned

actions (the "February 23, 2012 Orders"), this Court granted Plaintiffs' motion for equitable

---

[1] The "Exchange Bonds" refer to bonds or other securities issued by the Republic
pursuant to its 2005 and 2010 exchange offers.

relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of

Civil Procedure and the Court's inherent equitable powers.[2]

And WHEREAS the Republic intends to appeal the February 23, 2012 Orders and

all underlying and/or associated orders to the U.S. Court of Appeals for the Second Circuit, and

has moved for a stay of the February 23, 2012 Orders during the pendency of such appeal,

It is HEREBY ORDERED that:

1. Pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, the effect

of the February 23, 2012 Orders is stayed until the U.S. Court of Appeals for the Second Circuit

has issued its mandate disposing of the Republic's appeal of the February 23, 2012 Orders.

2. To secure Plaintiffs' rights during the pendency of the Republic's appeals

of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not

during the pendency of the appeal to the Second Circuit take any action to evade the directives of

the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event

they are affirmed, or diminish the Court's ability to supervise compliance with the February 23,

2012 Orders in the event they are affirmed, including without limitation, altering or amending

the processes or specific transfer mechanisms by which it makes payments on the Exchange

Bonds, without prior approval of the Court.

3. With consent of the Plaintiffs and on terms agreeable to the parties, the

Republic shall file a motion in the Second Circuit requesting that the court of appeals accord the

Republic's forthcoming appeal of the February 23, 2012 Orders expedited treatment in

accordance with a schedule agreed upon by the parties.

_____

[2] The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

4.     This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

Dated:   New York, New York
      March _5_, 2012

                                          Thomas P. Griesa
                                          U.S. District Judge

3

Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

NML Capital, LTD

                   Plaintiff,

v.

THE REPUBLIC OF ARGENTINA

                   Defendant.

08 Civ. 6978 (TPG)
08 Civ. 1707 (TPG)
08 Civ. 1708 (TPG)
and related cases

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW OF EXCHANGE BONDHOLDER GROUP REGARDING
ISSUES REMANDED BY THE SECOND CIRCUIT AND IN SUPPORT OF MOTION
TO VACATE PURSUANT TO RULE 60(b)**

**O'SHEA PARTNERS LLP**
Sean F. O'Shea
Michael E. Petrella
Daniel M. Hibshoosh
521 Fifth Avenue, 25th Floor
New York, New York 10175
Tel.: (212) 682-4426

**BOIES, SCHILLER & FLEXNER LLP**
David Boies
David A. Barrett
Nicholas A. Gravante, Jr.
Steven I. Froot
575 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-2300

*Attorneys for the Exchange Bondholder Group.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ......................................................................................................................................... 2

    A.    The FAA Bonds and the Republic's Default ................................................. 2

    B.    The Exchange Offers ........................................................................................ 3

    C.    The Republic's Payment Mechanism .............................................................. 3

    D.    Gramercy's Status as an EBH........................................................................... 4

    E.    Other EBHs......................................................................................................... 4

ARGUMENT ............................................................................................................................... 5

    I.    THE COURT SHOULD MODIFY OR REMOVE § 2(e) OF PLAINTIFFS'
        PROPOSED INJUNCTION TO AVOID IMPOSING UNFAIR AND
        UNREASONABLE BURDENS ON EXCHANGE BONDHOLDERS. .................... 5

        A.    Plaintiffs' Proposed Injunction is Unreasonable in its Inevitable Effect
            on the EBHs' Property. ..................................................................................... 6

        B.    Plaintiffs' Proposed Injunction is Unreasonable Because It Attempts to
            Use the Property of the Innocent Non-Party EBHs to Collect a Judgment
            for Plaintiffs. ..................................................................................................... 8

    II.    THE SECOND CIRCUIT'S OPINION PRECLUDES ANY DIVISION OR
        DIVERSION OF PAYMENTS MADE BY THE REPUBLIC TO BNYM.............. 11

    III.    ENTRY OF § 2(e) OF PLAINTIFFS' PROPOSED INJUNCTION WOULD
        DENY DUE PROCESS AND EFFECT AN UNLAWFUL TAKING IN
        VIOLATION OF THE FIFTH AMENDMENT......................................................... 12

        A.    Plaintiffs' Proposed Injunction Violates the Due Process Clause. .................... 12

        B.    Plaintiffs' Proposed Injunction Would Constitute an Unlawful Taking........... 14

    IV.    THE INJUNCTION MUST BE VACATED UNDER FED. R. CIV. P. 60(b)(4)
        FOR FAILURE TO PROVIDE MOVANTS WITH NOTICE AND AN
        OPPORTUNITY TO BE HEARD BEFORE IT WAS ENTERED. ......................... 16

V.  THE INJUNCTION MUST BE VACATED FOR FAILURE TO JOIN THE
    EXCHANGE BONDHOLDERS AS NECESSARY PARTIES. .............................. 18

VI.  PLAINTIFFS ARE NOT ENTITLED TO PREFERENTIAL TREATMENT
     AT THE EXPENSE OF EXCHANGE BONDHOLDERS. ...................................... 20

     A.  The Injunction Inequitably Fails to Account for the Losses Already
         Suffered by the Innocent EBHs as a Result of the Republic's Default. ............ 20

     B.  At a Minimum, the Injunction Should Be Modified to Provide for More
         Equitable Treatment of the EBHs. ..................................................................... 22

VII. PLAINTIFFS HAVE FAILED TO SHOW ANY BASIS TO CHANGE THE
     STAY ALREADY ENTERED BY THE COURT, AND RELIED UPON BY
     THE SECOND CIRCUIT. ........................................................................................... 23

CONCLUSION ............................................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Cases**

*Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930)................................................................. 6

*Amchem Products, Inc. v. Costle*, 481 F. Supp. 195 (S.D.N.Y. 1979) ......................................... 15

*Aurelius Capital Partners, LP v. Argentina*, 584 F.3d 120 (2d Cir. 2009).................................... 5

*Capital Ventures Int'l v. Republic of Argentina*, 282 Fed. Appx. 41 (2d Cir. 2008)................... 10

*Century Exploration New Orleans, Inc. v. United States*, 103 Fed. Cl. 70 (2012)....................... 15

*Chicago, St. Paul, Minn. & Omaha Railway Co. v. Holmberg*, 282 U.S. 162 (1930) ................ 12

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ............................................ 15

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)...................................................................... 13

*Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737 (7th Cir. 2003)........................................................ 6

*Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690 (2d Cir. 1980) ............................................ 19

*Dial Corp. v. Skinner & Assocs.*, 180 Fed. Appx. 661, 2006 WL 1307892
    (9th Cir. May 12, 2006)...................................................................................................... 16, 17

*Doctor's Assocs., Inc. v. Reinert & Dupree, P.C.*, 191 F.3d 297 (2d Cir. 1999)......................... 18

*Edward G. Bashian & Sons v. Am. Nat'l. Bank & Trust Co. of Chicago*, No. 96-CV-6021,
    1997 WL 337434 (N.D. Ill. June 16, 1997) ............................................................................ 20

*Edwards v. Habib*, 397 F.2d 687 (D.C. Cir. 1968) ...................................................................... 13

*Fengler v. Numismatic Am., Inc.*, 832 F.2d 745 (2d Cir. 1987).................................................... 17

*FG Hemisphere Assocs., LLC v. Democratic Rep. of* Congo, 637 F.3d 373 (D.C. Cir. 2011)..... 10

*First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*,
    482 U.S. 304 (1987) ................................................................................................................ 15

*Freedom N.Y., Inc. v. United States*, No. 86-CV-1363, 1986 WL 6163
    (S.D.N.Y. May 27, 1986).......................................................................................................... 19

*General Bldg. Contractors Assoc., Inc. v. Penn.*, 458 U.S. 375 (1982) ......................................... 6

iii

*Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180 (2d Cir. 2006) ........................................ 16

*Granite Enterprises Ltd. v. Virgoz Oils & Fats Pte. Ltd.*, Nos. 09-cv-4534, 09-cv-4750,
   09-cv-4751, 2011 WL 4072146 (S.D.N.Y. Sept. 13, 2011)........................................................ 5

*Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229 (1984)................................................................ 12

*In re Aztec Supply Corp.*, 399 B.R. 480 (N.D. Ill. 2009)............................................................... 17

*In re Center Wholesale, Inc.*, 759 F.2d 1440 (9th Cir. 1985) ...................................................... 17

*In re Metzger*, 346 B.R. 806 (Bankr. N.D. Cal. 2006)................................................................. 16

*Kelo v. City of New London*, 545 U.S. 469 (2005) ...................................................................... 12

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .......................................................... 15

*Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975) ............................................................... 20

*Krimstock v. Kelly*, 464 F.3d 246 (2d Cir. 2006)........................................................................... 5

*Leblanc-Sternberg v. Fletcher*, 763 F. Supp. 1246 (S.D.N.Y. 1991) ......................................... 19

*Local 78 v. Termon Constr., Inc.*, No. 01-CV-5589 (JGK), 2003 WL 22052872
   (S.D.N.Y. Sept. 2, 2003) ........................................................................................................ 17

*Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145 (1st Cir. 2012)................................. 15

*Missouri Pacific Railway Co. v. Nebraska Bd. of Trans.*, 164 U.S. 403 (1896) .......................... 12

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)......................................... 16

*Museum of Modern Art v. Schoeps*, 549 F. Supp. 2d 543 (S.D.N.Y. 2008) ................................ 20

*Nature's First Inc. v. Nature's First Law, Inc.*, 436 F. Supp. 2d 368 (D. Conn. 2006) ............... 17

*Orix Financial Services v. Phipps*, No. 91-CV-2523, 2009 WL 2486012 (S.D.N.Y. Aug. 14,
   2009).......................................................................................................................................... 16

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) ........................................................................ 15

*Pediatric Specialty Care, Inc. v. Arkansas Dep't. of Human Servs.*, 364 F.3d 925
   (8th Cir. 2004) ........................................................................................................................... 19

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922).............................................................. 11

iv

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) .......................................................... 21

*Shelly v. Kraemer*, 334 U.S. 1 (1948) ................................................................................................. 13

*Stahl v. Gibralter Fin. Corp.*, 967 F.2d 335 (9ᵗʰ Cir. 1922)........................................................... 20

*Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006 (3d Cir. 1987) ...................... 19

*Stop the Beach Renourishment, Inc. v. Florida Dep't of Envt'l Protection*,
130 S. Ct. 2592 (2010) ......................................................................................................... 13, 14

*Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55 (1937) ............................................ 12

*Triad Energy Corp. v. McNell*, 110 F.R.D. 382 (S.D.N.Y. 1986) ................................................. 16

*United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994) .................................................................... 23

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ................................... 6

*United States v. Zang*, 703 F.2d 1186 (10th Cir. 1983) .................................................................... 6

*United States. v. Ambrosio*, 575 F. Supp. 546 (E.D.N.Y. 1983)................................................... 13

*Virginia v. Rives*, 100 U.S. 313 (1879) ............................................................................................. 13

**Rules**

Fed R. Civ. P. 19(a) ........................................................................................................................ 18

Fed. R. Civ. P. 60(b)(4)............................................................................................................ 16, 17

The interested non-parties listed in Appendix A (collectively, the "Exchange Bondholder Group" or "EBG") submit this Memorandum Regarding Issues Remanded by the Second Circuit and in Support of Motion to Vacate Pursuant to Rule 60(b).  Together the EBG represents holdings of over $1 billion worth of exchange bonds.[1]

## PRELIMINARY STATEMENT

The Plaintiffs' proposed revisions to the Court's February 23, 2012 Order (the "Injunction") seriously threaten the interests of numerous innocent third party creditors of the Republic of Argentina (the "Republic"), including the EBG, who have not had a proper opportunity to be heard.  These creditors and their predecessors-in-interest have already suffered tens of billions of dollars in losses as a result of the Republic's 2001 debt default and subsequent exchange offers under which 92% of aggrieved bondholders accepted less than thirty cents on the dollar.  Yet the Injunction threatens to magnify the losses of these guiltless third-parties by making it impossible for them to receive payments that *everyone* agrees are lawfully owed, solely in an effort to force the Republic to make payments to the Plaintiffs.

If the Republic continues to comply with its domestic legislation prohibiting any payment to Plaintiffs—and for numerous reasons the Court must assume that it will—§ 2(e) of the Injunction will make it impossible for the EBG and others to receive payments to which they are lawfully entitled.  The Court should make every effort to avoid a situation in which the Plaintiffs' non-payment of approximately $1.3 billion snowballs into a $20 billion crisis for innocent third parties.  It is far beyond the bounds of equity to seek to enforce the rights of one litigant by jeopardizing the rights of others.

Plaintiff's attempt to silence the EBG members (*see* NML 11.13.12 Brief, at 24-25) — who have never had formal notice or an opportunity to be heard even though Plaintiffs' proposed injunction terms were unlawfully seize EBG's property—is particularly unseemly.  Plaintiffs

---

[1]       Other entities are expected to join the EBG.  *See* Declaration of James P. Taylor dated November 16, 2012 ("Taylor Dec.") ¶ 2.

have every incentive to understate the default risk to encourage the Court to enter an injunction that ignores third-party rights. Argentine press reports, however, indicate that ***Plaintiffs have been purchasing credit default swaps effectively betting that the Republic will default***. Declaration of Stephen Choi dated November 16, 2012 ("Choi Dec.") ¶ 18. With the Republic's senior officials stating publicly that they will not pay the Plaintiffs, and the Plaintiffs making $100 million bets that the Republic will default on its obligations to the EBG, it is inarguable that the Injunction gravely jeopardizes the rights of third parties.

Recognizing the potential for injustice, the Second Circuit has requested that this Court "more precisely determine the third parties to which the Injunction[] will apply before [the Circuit] can decide whether [its] application to them is reasonable." Second Circuit Order dated Oct. 26, 2012 (the "2d Cir. Op."). As demonstrated below, Plaintiffs' proposal is not only at odds with fundamental principles of equity, but threatens to deprive the EBG members of their Due Process rights, and would be a taking under the Fifth Amendment.

The EBG fully understands that, in entering the Injunction, the Court sought to secure the a remedy for the Plaintiffs. Respectfully, we ask the Court to accept the Second Circuit's invitation to consider the effect of the Injunction on the interests of third parties like the EBG, recognize the serious harm that Plaintiffs' proposal would impose on innocent bondholders, and take necessary steps to ensure that any remedy does not interfere with payment of the Republic's lawful obligations to those creditors.

<div align="center">

**FACTS**

</div>

### A.      The FAA Bonds and the Republic's Default

The relevant background is well known. Between 1994 and 2001, the Republic issued debt securities in the aggregate amount of approximately $82 billion pursuant to a Fiscal Agency Agreement (the "FAA Bonds"). Ex. 1: 2d Cir. Op., at 4, 7. The Republic defaulted on the FAA

<div align="center">

2

</div>

Bonds in 2001. Ex. 1:[2] 2d Cir. Op., at 3. In the eleven years since its default, the Republic has not made payments under the FAA Bonds. Moreover, in 2005 the Republic enacted Law 26,017 (the "Lock Law"), which expressly prohibited any further payments under the FAA Bonds.[3] Ex. 1: 2d Cir. Op., at 6. The Lock Law has prohibited the Republic's courts from enforcing numerous judgments entered in respect of the FAA Bonds, and the holders of the bonds have had difficulty attaching the Republic's foreign assets to satisfy such judgments. Ex. 1: 2d Cir. Op., at 9. As recently as this week, numerous government officials including the President, Cristina Fernández de Kirchner, have stated publicly that they have no intention of paying even "one dollar" to holders of the FAA Bonds including the Plaintiffs. Ex. 2.

### B. The Exchange Offers

In 2005 and 2010, the Republic initiated exchange offers pursuant to which the holders of FAA Bonds, including the Plaintiffs, were permitted to replace them with new unsecured and unsubordinated external debt at a rate of 25 to 29 cents on the dollar (the "Exchange Bonds"). Ex. 1: 2d Cir. Op., at 5-6. The vast majority of FAA Bond holders elected to participate in these exchange offers. Ex. 1: 2d Cir. Op., at 9. By the conclusion of the 2010 exchange offer, holders of over 91% of the par value of the original FAA Bonds had agreed to allow the Republic to restructure approximately $74.5 billion worth of debt, incurring discounts of over 70 cents on the dollar (the "Exchange Bond Holders" or "EBHs"). Ex. 1: 2d Cir. Op., at 6-8. To date, the Republic has fully honored its obligations under the Exchange Bonds. Ex. 1: 2d Cir. Op., at 8.

### C. The Republic's Payment Mechanism

The mechanism the Republic uses to make payments on the Exchange Bonds is set forth in the Trust Indenture between the Republic and the Bank of New York as Trustee dated June 2, 2005 (the "Indenture"). Ex. 3, ¶ 3. The Trustee is a fiduciary of the EBHs and is **_not_** an agent of

---

[2]     All Exhibits cited are attached to the Declaration of Sean F. O'Shea dated November 16, 2012.

[3]     The Lock Law was briefly suspended in 2010 to enable Argentina to make an exchange offer, but it has since been reinstated. Ex. 1: 2d Cir. Op., at 7.

3

the Republic.[4]  Ex. 3, ¶ 4.  Pursuant to the Indenture, the Republic makes principal and interest payments on the Exchange Bonds to the Trustee, which receives them ***in trust for the EBHs***. Ex. 4, § 3.1.  Once money has been paid to the Trustee, ***it is the property of the EBHs***, "and the Republic shall have no interest whatsoever in such amounts."  Ex. 4, § 3.5; *see also* Ex. 3, ¶ 4. The Republic has paid all amounts due under the Exchange Bonds to the Trustee outside the United States in Argentina. Ex. 3, ¶ 4.

### D.  Gramercy's Status as an EBH

Beginning with its launch in 1999, Gramercy Emerging Markets Fund has, at various times, held an interest in FAA Bonds. Declaration of Robert S. Koenigsberger dated November 16, 2012 ("Koenigsberger Dec.") ¶ 2.  Gramercy organized the 2010 Argentine debt restructuring, and tendered approximately $2.7 billion in face value of debt in connect therewith. *Id.* ¶ 3.  In agreeing to accept a significant discount on the face value of its FAA Bonds in 2010, Gramercy relied on the Republic's willingness and ability to make payments on its Exchange Bonds.  *Id.* ¶ 4.  Currently, various Gramercy entities hold significant interests in Exchange Bonds with par values exceeding $400 million. *Id.* ¶ 8-9.

### E.  Other EBHs

Other large EBHs are members of the EBG.  MFS and its affiliates hold nearly $392 million in Exchange Bonds; Brevan Howard and its affiliates hold nearly $237 million in Exchange Bonds; and SW and its affiliates hold approximately $12 million in Exchange Bonds. *See* Declaration of Robin A. Stelmach dated November 16, 2012 ¶¶ 1-3; Taylor Dec. ¶ 3; Declaration of David C. Hinman dated November 16, 2012 ¶ 2.  The EBHs comprise a wide swath of the investing public, including such diverse organizations as pension funds, charitable foundations, and endowments.  Koenigsberger Dec. ¶ 7.  The interests of the EBHs, amounting to over ***$20 billion***, are at risk if the Injunction is not modified or vacated.  Consequently,

---

[4]  The Trustee was originally The Bank of New York ("BNY"),  later The Bank of New York Mellon ("BNYM").  Ex. 3, ¶ 3.

numerous EBHs have expressed an interest in joining the EBG on this brief, but time has not permitted them to do so.  Taylor Dec., ¶ 2.

## ARGUMENT[5]

**I.    THE COURT SHOULD MODIFY OR REMOVE § 2(e) OF PLAINTIFFS' PROPOSED INJUNCTION TO AVOID IMPOSING UNFAIR AND UNREASONABLE BURDENS ON EXCHANGE BONDHOLDERS.**

The Second Circuit has __*not*__ affirmed the portion of the Plaintiffs' requested injunction (§ 2(e)), which prohibits the BNYM from remitting the EBHs' property to them, but rather has directed this Court to consider the impact of the injunction on innocent non-parties:

> Our concerns about the Injunctions' application to third parties do not end [with intermediary banks].  Oral argument and, to an extent, the briefs revealed some confusion as to how the challenged order will apply to __*third parties generally*__. Consequently, __*we believe the district court should more precisely determine the third parties to which the Injunctions will apply before we can decide whether the Injunctions' application to them is reasonable*__.  Accordingly, we remand . . . for such further proceedings as are necessary to address the Injunctions' application to __*third parties*__  . . . .

Ex. 1: 2d Cir. Op., at 28 (emphasis added).  In its conclusion, the Court directed further proceedings as necessary to address the impact of the injunction on "__*third parties **and*__ intermediary banks.*"*[6]

---

[5]    Not for the first time, Plaintiffs' brief seeks to silence the EBHs and deprive the Court of their views.  NML 11/13/12 Brief, at 24-26;  Ex. 5; Ex. 6: 11/9/12 Hearing, T31:24-32:9. However, the Court has already ruled that it will consider the EBHs' arguments (Ex. 6: 11/9/12 Hearing, T24:18-20; T33:1-6), and the Second Circuit has clearly instructed this Court to consider the impact of the proposed injunction on "third parties generally" (Ex. 1: 2d Cir. Op., at 28).    Thus, the Court is acting well within its discretion in considering the EBHs' views as interested non-parties.  *See, e.g., Aurelius Capital Partners, LP v. Argentina*, 584 F.3d 120 (2d Cir. 2009) (approving submissions by interested non-party without intervention because "[t]he district court acted well within its discretion to consider arguments presented by the Administration to secure a full understanding of the jurisdictional issues"); *Krimstock v. Kelly*, 464 F.3d 246 (2d Cir. 2006) (district court allowed submissions by interested non-parties); *Granite Enterprises Ltd. v. Virgoz Oils & Fats Pte. Ltd*., Nos. 09-cv-4534, 09-cv-4750, 09-cv-4751, 2011 WL 4072146 (S.D.N.Y. Sept. 13, 2011) (releasing funds frozen by court order on interested non-party's motion to vacate).

A.      **Plaintiffs' Proposed Injunction is Unreasonable in its Inevitable Effect
on the EBHs' Property.**

The Second Circuit's discomfort with the third party impact of the injunction is well-founded.  The law prohibits injunctions that place an unreasonable burden on third parties.  *See Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 743-44 (7th Cir. 2003) (modifying injunction in contract case to excise portion preventing defendant from using information at issue to seek regulatory approval on medical device because the language impermissibly affected non-parties; injunction "violate[d] the principle that in determining the appropriate scope of an injunction the judge must give due weight to the injunction's possible effect on third parties."); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1141-42, 1144 (D.C. Cir. 2009) (in context of RICO violation, vacating injunction causing "a potentially serious detriment to innocent persons not parties to or otherwise heard" where defendant's third party retailers would potentially lose substantial revenue: "Even though not explicitly bound by the terms of an injunction on pain of contempt, third parties may be so adversely affected by an injunction as to render it improper."); *United States v. Zang*, 703 F.2d 1186, 1195 (10th Cir. 1982) ("The untainted interests which may exist and the interests of innocent third parties should be protected") (in context of RICO violation, remanding order of forfeiture);  *Cf. Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (L. Hand, J.) ("no court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.") (holding that injunction cannot bind third party who is not legally identified with enjoined party and does not seek to abet enjoined party in committing an act forbidden under injunction); *see also General Bldg. Contractors Assoc., Inc. v. Penn.*, 458 U.S. 375, 399-400 (1982) (invalidating  injunction requiring co-defendants who were not found liable to incur expenses).  As explained in greater detail below, the conscription

---

[6]      As the structure and language of its opinion makes clear, and contrary to Plaintiffs' suggestion that the injunction "inevitabl[y] bars payments to the EBHs" (NML 11/13/12 Brief, at 25), the Court of Appeals was drawing a distinction between intermediary banks and all other third parties affected by the Injunction.

of the EBHs' property into the service of collecting a civil contract judgment for entirely unrelated parties (the Plaintiffs), to whom the EBHs owe nothing and have done no harm, is an unsupported exercise of judicial power.

Plaintiffs' proposed modification to § 2(e) of the injunction is grossly unfair, unprecedented, and unreasonable in its application to EBHs.[7]  There is no dispute that the EBHs are entitled to full and timely payments under the Exchange Bonds, or that those payments, once transferred from the Republic to BNYM in Argentina,[8] are the legal and exclusive property of the EBHs.  *See* Facts, supra, Section C.   It is further beyond serious dispute that the Republic is not going to pay the Plaintiffs. The Court (and the Second Circuit) has repeatedly and emphatically acknowledged as much,[9] and Plaintiffs' latest brief convincingly demonstrates that the Republic will never pay them.  NML 11/13/12 Brief, at 1-2. This is unfortunate, but due in absolutely no part to the actions of the innocent EBHs. Given the Republic's position, there are only two realistic responses by the Republic to the injunction Plaintiffs seek.

The first scenario is that the Republic pays the amount due to the EBHs to the Trustee, but refuses to pay Plaintiffs.  Under Plaintiffs' proposed order, the EBHs' funds – their **undisputed property** – will be then be frozen at BNYM indefinitely.[10]  This result will obtain despite the fact that the EBHs – many of whom have investors that include the pension plans of public employees (including police officers and firefighters) and charitable foundations – (i) are

---

[7] Plaintiffs cite no case granting an injunction comparable to what they seek.

[8] Plaintiffs dispute whether the EBHs are paid via transfers to BNYM Argentina as opposed to BNYM New York.  NML 11/13/12 Brief, at 11 n.6.  Although the EBHs understand this is wrong, it is irrelevant in any event.  The salient point is that payments by the Republic to BNYM at *any* location are the property of the EBHs.

[9] *See* Ex. 6: 11/9/12 Hearing, T10-16; Ex. 7: 2/23/12 Hearing, T3-4, 15, 31, 48-49; Ex. 8: 2d Cir. Hearing, T13-14, 23, 26-27, 78-79.

[10] The genesis of § 2(e), according to Plaintiffs, was to prevent BNYM from "aiding and abetting" the Republic's ongoing violations.  Of course, as the Court has already recognized, BNYM has a contractual and fiduciary duty to remit the EBHs' property to them, and doing so does not "aid and abet" anything other than the satisfaction of the Trustee's legal obligations as the EBHs' fiduciary (and certainly not the Republic's payment, which is already accomplished at the time BNYM receives the funds). Ex. 7: 2/23/12 Hearing, T7:13-8:5.

plainly without fault, (ii) owe no obligation of any kind to the Plaintiffs, and (iii) have already taken a massive discount on their original investment in order to facilitate the type of restructuring that has become critical to the global economy.

The only other plausible response to the injunction by the Republic is a refusal to pay BNYM the amount due to the EBHs. If that occurs, the injunction will have turned a relatively minor default into a *cataclysmic* default that will further unsettle the already fragile global economy, (*see* Choi Dec. ¶¶ 8-22) and unquestionably spur an avalanche of follow-on litigation involving the EBHs, multiple banks, and the Republic, which may be the intended consequence of Plaintiffs' motion.[11] Plaintiffs will therefore be successful in their efforts to goad this Court into "solving" a $1.3 billion problem affecting fewer than 0.92% of the original foreign denominated Bondholders (Ex. 7: 2/23/12 Hearing, T26:5-8), by creating a potential over $20 billion problem affecting 100% of the Republic's Bondholders (to say nothing of the collateral effects on the skittish and frail international markets).[12]

### B. Plaintiffs' Proposed Injunction is Unreasonable Because It Attempts to Use the Property of the Innocent Non-Party EBHs to Collect a Judgment for Plaintiffs.

The Court's initial reaction to Plaintiffs' injunction request went beyond deep skepticism, to outright rejection:

- THE COURT: Now, look, [the proposed injunction] would indeed be a mechanism for enforcement but it also presents a *very serious problem*. So let me ask you this. Is there any legal authority, is there any legal basis for me to *use the pari passu clause to interfere with the payment to the exchangers*? . . . Now, if I entered this order, this would impose an obligation on the banks and it might *impose an impediment* upon the banks *with respect to the exchange offer people which does not exist now*. They get the

---

[11]    As Plaintiffs are reportedly trading credit default swaps betting on an Argentine default (a bet that directly contradicts their representations to this Court that the injunction they requested would lead to payment by the Republic), they presumably welcome default. *See* Choi Dec. ¶ 18; Ex. 12. Whatever the chaos that would ensue, Plaintiffs are playing both sides of the litigation and stand to profit whatever the outcome.

[12]    In a 2004 amicus brief filed in a related case before this Court, the Federal Reserve predicted that the Plaintiffs' holdout status would allow them to "terrorize" lawful sovereign restructurings. Ex. 10, at 13. With the current injunction, that prediction has now become the unfortunate reality.

money and presumably they pay the exchangers. There is no condition, no impediment. ***This would obviously present an impediment, a condition. Is there any legal basis for doing that?*** Ex. 7: 2/23/12 Hearing, T7:2-6, T7:24-8:5 (emphasis added).

- THE COURT: ***[T]he exchange offers were lawful, people subscribed to them and have rights under them, the exchange offer provides for payments . . . .*** Ex. 7: 2/23/12 Hearing, T11:2-4 (emphasis added).

- THE COURT: ***I don't understand the pari passu clause or my order to mean that the Republic is forbidden to pay the exchange offers unless they pay NML.*** Ex. 7: 2/23/12 Hearing, T11:25-12:2 (emphasis added).

- MR. OLSEN: So we are saying to Argentina you must, if you are going to pay the one, you have to pay the other, and we are telling you in an order from this court that you must do that and your agents and subordinates and people acting with you must not assist in evading that order.
  THE COURT: ***I really don't agree with that. The rights of the exchangers were not conditional on NML getting paid under the pari passu clause.*** Ex. 7: 2/23/12 Hearing, T13:5-12 (emphasis added).

- THE COURT: If you had a normal law-abiding, asset-holding [debtor], that would be enforceable; ***you wouldn't have to interfere with the rights of the first people.*** Ex. 7: 2/23/12 Hearing, T15:1-4 (emphasis added).

- THE COURT: ***I am sticking to my position. I think that I cannot interfere with the rights of the exchange offers by putting conditions on them or impediments on them.*** Ex. 7: 2/23/12 Hearing, T15:25-16:2 (emphasis added).

Nevertheless, the Court, although correct in its view that the Republic would not pay the Plaintiffs, brushed aside its concern for the EBHs' rights in favor of the Plaintiffs' interests as paramount in the hope that the injunction would finally force the Republic to pay the Plaintiffs:[13]

> THE COURT: - . . . The facts of life are this, that there is a pari passu clause in the documents. We do not have a normal situation. We don't have a situation where you have an honest debtor with assets available that can be subjected to the normal processes of the court. We don't have it. We have litigation that goes on and on.
>
> What the plaintiffs here are trying to do is to see if there is yet another device which might get them their just payments and end the litigation. ***It has a lot of problems***, but Mr. Olson and his colleagues, they know their problems. They are not poor law students. But ***they are trying to do something which is intended to overcome the lawlessness of the Republic***.
>
> ***I am going to sign this order. It's not the first time that a court has signed an order that may have problems***. But to me ***the bigger overriding problem is the lawlessness of the Republic***. When I say lawlessness I mean the deliberate, continued failure to honor the most clear-cut obligations in the debt instruments, the most clear-cut assurances in the

---

[13]  Plaintiffs have falsely suggested that the EBHs can get the Plaintiffs paid simply by demanding it of the Republic. NML 11/13/12 Brief, at 26. The EBHs have **no control whatsoever** over this issue. Koenigsberger Dec., ¶ 6.

debt instruments. Those have been turned into a dead letter by the Republic. Well, they were not a dead letter in this courtroom.

*I fully recognize that there are problems with the order* that the plaintiffs present and I am sure this will go very quickly to the Court of Appeals and *there are problems on appeal. There are problems.* . . . Ex. 7: 2/23/12 Hearing, T48:12-49:10 (emphasis added).

To be sure, a judicial mousetrap designed to secure a remedy for the Plaintiffs is entirely appropriate. But the EBHs' lawful and exclusive property cannot and should not be used as the cheese.[14] Even before the instant appeal, the Second Circuit recognized the EBHs' rights, and it directed this Court to "take care to craft attachment orders so as to avoid interrupting Argentina's regular payments to [exchange] bondholders." *Capital Ventures Int'l v. Republic of Argentina*, 282 Fed. Appx. 41, 42 (2d Cir. 2008). Yet Plaintiffs' proposed injunction ignores this clear admonition, which may well be why the Second Circuit remanded expressly for consideration of non-parties' rights before ruling on whether the injunction's application to them is "reasonable." Ex. 1: 2d Cir. Op., at 28.

While this litigation has been extraordinary and caused the Court justifiable frustration, Plaintiffs, at base, are ordinary civil litigants with an ordinary judgment on an ordinary contract. Ex. 1: 2d Cir. Op., at 16. Their debtor happens to be a sovereign nation (a fact obviously known when Plaintiffs acquired their bonds), and that status has frustrated their efforts to pursue successfully the usual methods of collection. Consequently, like thousands of others civil litigants, they have a judgment that has not been and may never be satisfied. That is unfortunate, but it is also the hard reality of our legal system. *See FG Hemisphere Assocs., LLC v. Democratic Rep. of* Congo, 637 F.3d 373, 377 (D.C. Cir. 2011) ("a court may have jurisdiction over an action against a foreign state and yet be unable to enforce its judgment;" and absent property subject to FSIA immunity exceptions, "a plaintiff must rely on the government's diplomatic efforts, or a foreign sovereign's generosity, to satisfy a judgment."). The proper

---

[14] Even Plaintiffs' counsel has admitted that the injunction engrafts a "condition" on the EBHs' ability to enjoy their own property that otherwise does not exist. Ex. 7: 2/23/12 Hearing, T5:12-17.

solution is not to allow the disappointed minority of unimpaired FAA Bondholders to shift the consequences of that reality onto the vast majority of heavily discounted EBHs. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) ("In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders.") (Holmes, J.). Rather, the correct approach is the one the Court cogently understood and expressed at the outset – vigilantly and aggressively pursue all remedies available to Plaintiffs **without compromising the property rights of innocent non-parties**. Indeed, at the November 9th hearing, the Court repeatedly admonished the Republic that the Court has ample means available to enforce its judgments. Ex. 6: 11/9/12 Hearing, T18:3-14. Plaintiffs should pursue those remedies, but they cannot do so at the expense of the innocent EBHs.[15] Accordingly, the Court should reject Plaintiffs' proposed injunction and strike § 2(e).[16]

## II.  THE SECOND CIRCUIT'S OPINION PRECLUDES ANY DIVISION OR DIVERSION OF PAYMENTS MADE BY THE REPUBLIC TO BNYM.

At the November 9 hearing, certain of the Court's comments suggested that it might take some action to apportion sums paid by the Republic to the EBH Trustee, and divert them to Plaintiffs. Ex. 6: 11/9/12 Hearing, T30:20-22. Such an action, however contravenes the Second Circuit's opinion. Specifically, in rejecting the Republic's argument that the injunction violates New York trust or attachment law because it "execute[s] upon" funds that do not belong to the Republic, the Court of Appeals found that "[n]othing in the Injunctions suggests that plaintiffs would 'execute upon' any funds, **much less those held in trust for the exchange bondholders**." Ex. 1: 2d Cir. Op. at 25 n.14 (emphasis added). Apart from the impropriety of seizing the EBHs' property and giving it to the Plaintiffs, any such action would be exceedingly improvident, as it

---

[15] Plaintiffs' brief suggests that the EBHs are somehow in league with the Republic in seeking to ensure that Plaintiffs do not get paid. NML 11/13/12 Brief, at 8. That is false. (Koenigsberger Dec., ¶ 5.) The EBHs simply believe that their property cannot be used as leverage to achieve any objective of the Plaintiffs.

[16] Plaintiffs may argue that such a modification makes the Injunction ineffective, but that only serves to underscore their use of improper "leverage" at the expense of the EBHs.

could trigger an immediate and much wider default, as well as litigation by the EBHs against the Republic.

## III. ENTRY OF § 2(e) OF PLAINTIFFS' PROPOSED INJUNCTION WOULD DENY DUE PROCESS AND EFFECT AN UNLAWFUL TAKING IN VIOLATION OF THE FIFTH AMENDMENT.

### A. Plaintiffs' Proposed Injunction Violates the Due Process Clause.

As demonstrated in Point I, *supra*, the effect of Plaintiffs' Proposed injunction is to use the private property of the non-party EBHs for the private benefit of the Plaintiffs. It thus violates the Due Process Clause of the Fifth Amendment. "[I]t has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B,* even though *A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). *See also Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand . . . scrutiny . . . .; it would serve no legitimate purpose of government and would thus be void"). Indeed, Supreme Court authority holds that State action which places any significant imposition on the private property of one for the private use of another is a core violation of fundamental due process rights.[17] *See Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 76-80 (1937) (striking down state administrative order requiring majority of private gas producers to curtail desired production and purchase shortfall from minority of private gas producers with no available market); *Chicago, St. Paul, Minn. & Omaha Railway Co. v. Holmberg*, 282 U.S. 162, 166-67 (1930) (order requiring railroad to build underground pass for private benefit of private landowners violated due process); *Missouri Pac. Ry. Co. v. Nebraska Bd. of Trans.*, 164 U.S. 403, 417 (1896) (order requiring private railroad to allow private party to construct elevator on its property for private use violated due process).[18]

---

[17] The market's reaction proves that the EBHs' property is encumbered by the injunction – Exchange Bond prices have plummeted in the wake of the Second Circuit's decision. Choi Dec., ¶¶ 15-18

[18] The Supreme Court cited both *Thompson* and *Missouri* in *Kelo*, a 2005 decision, *see* 545 U.S. at 500, and thus both cases remain good law.

*See also United States v. Ambrosio*, 575 F. Supp. 546, 551-52 (E.D.N.Y. 1983) (assets of defendant corporation not accused of RICO violations could not be restrained even though 30% interest was owned by co-defendant facing RICO charges; restraint would unconstitutionally deprive corporation of property rights under due process principles).

Further, judicial orders can (and often do) qualify as "state action" for purposes of Constitutional provisions limiting governmental power. *See, e.g., Stop the Beach Renourishment, Inc. v. Florida Dep't of Envt'l Protection*, 130 S. Ct. 2592, 2601-02 (2010) ("It would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat. Our precedents provide no support for the proposition that takings effected by the judicial branch are entitled to special treatment, and in fact suggest the contrary."); *Shelly v. Kraemer*, 334 U.S. 1, 18 (1948) ("[F]rom the time of the adoption of the Fourteenth Amendment until the present, it has been the consistent ruling of this Court that the action of the States to which the Amendment has reference includes action of state courts and state judicial officials…[I]t has never been suggested that state court action is immunized . . . simply because the act is that of the judicial branch of the state government."); *Virginia v. Rives*, 100 U.S. 313, 318 (1879) ("It is doubtless true that a State may act through different agencies, – either by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another."); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) (court enforcement of promissory estoppel principles was state action for purposes of Fourteenth Amendment); *Edwards v. Habib*, 397 F.2d 687, 691 (D.C. Cir. 1968) ("There can now be no doubt that the application by the judiciary of the state's common law, even in a lawsuit between private parties, may constitute state action which must conform to the constitutional strictures which constrain the government.") (Skelly Wright, J.).

As Justice Kennedy recognized in *Stop the Beach*, a judicial intrusion on a private party's property violates their due process rights:

> If a judicial decision, as opposed to an act of the executive or the legislature, eliminates an established property right, the judgment could be set aside as a deprivation of property without due process of law. The Due Process Clause, in both its substantive and procedural aspects, is a central limitation upon the exercise of judicial power. . . . It is thus natural to read the Due Process Clause as limiting the power of courts to eliminate or change established property rights

> ****

> When courts act without direction from the executive or legislature, they may not have the power to eliminate established property rights by judicial decision. "Given that the constitutionality" of a judicial decision altering property rights "appears to turn on the legitimacy" of whether the court's judgment eliminates or changes established property rights . . . the more appropriate constitutional analysis arises under general due process principles

> ****

> The Court would be on strong footing in ruling that a judicial decision that eliminates or substantially changes established property rights, which are a legitimate expectation of the owner, is "arbitrary or irrational" under the Due Process Clause.

130 S. Ct. at 2614-15 (citations omitted).

This Court recognized the inevitable impact of its order on the property rights of the EBHs, and the lack of legal authority for it (see Point I, *supra*), but nevertheless (perhaps out of sheer frustration) entered an injunction that would use the EBHs' property as a fulcrum in attempting to collect an ordinary contract judgment for the Plaintiffs. But this would constitute a State seizure of private property for private, not public, purposes – a result forbidden by the law. As noted above, it would constitute an "arbitrary and irrational" deprivation of private property under long-standing due process principles.

### B. Plaintiffs' Proposed Injunction Would Constitute an Unlawful Taking.

In *Stop the Beach*, a plurality of the Supreme Court expressly recognized a cause of action for a "judicial taking." 130 S. Ct. at 2601-02. The remaining Justices either expressed a preference for a Due Process Clause remedy, or did not reach the issue, but none rejected the concept outright. *Id*. at 2614-15, 2618-19. As noted in Point I, *supra*, although the EBHs'

14

property is not being seized outright by the government, the practical outcome of the proposed injunction will inevitably be, at a minimum, a "significant restriction … placed upon [the EBHs'] use of [their] property," *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012) – clearly a "taking." *See also Palazzolo v. Rhode Island,* 533 U.S. 606, 617 (2001) ("[T]here will be instances when government actions . . . affect and limit [property] use to such an extent that a taking occurs."); *Amchem Products, Inc. v. Costle*, 481 F. Supp. 195, 199 (S.D.N.Y. 1979) (disclosure of company's research data mandated by federal statute stated claim for taking that was "not absolute but consist[ed] instead of a severe diminution of the value of plaintiff's property").

And the possibility that the EBHs may lose their property rights indefinitely also does not change the fact that the property is being taken by the injunction. *See First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 318 (1987) (even "'temporary' takings . . . are not different in kind from permanent takings . . . ."); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 14 (1949) (government's wartime year-to-year use of laundry business constituted compensable temporary taking of, *inter alia*, laundry's "opportunity to profit from its trade routes," since "[t]here was nothing [laundry] could do, therefore, but wait")*; Cienega Gardens v. United States*, 331 F.3d 1319, 1353 (Fed. Cir. 2003) (owners of low-income apartments stated compensable takings claim where federal statute indefinitely suspended their contractual right to prepay their mortgages; "a taking need not be permanent to be compensable"). *See also Century Exploration New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 76 (2012) (noting that temporary interference with contractual right can be a taking).[19]  The proposed injunction thus results in a taking that violates the Fifth Amendment, and should be vacated.

---

[19]    If the Court were to order outright that the EBHs' money be given to the Plaintiffs, as it suggested at the November 9th hearing might occur (Ex. 6: 11/9/12 Hearing, T30:20-22), that would be a "taking" in the most prototypical sense of the concept.

## IV. THE INJUNCTION MUST BE VACATED UNDER FED. R. CIV. P. 60(b)(4) FOR FAILURE TO PROVIDE MOVANTS WITH NOTICE AND AN OPPORTUNITY TO BE HEARD BEFORE IT WAS ENTERED.

Pursuant to Fed. R. of Civ. P. 60(b)(4), a judgment is void "if the court that rendered it … acted in a manner inconsistent with due process of law." *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 193 (2d Cir. 2006) (internal quotations and citations omitted) (granting Rule 60(b)(4) motion brought by nonparty). Nonparties may bring a motion under Rule 60(b)(4) where their interests are adversely affected. *Id.* at 188. Procedural due process requires that parties with an interest in the proceedings be provided with adequate notice and an opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Here, although the Court recognized the EBHs' rights were at stake (see Point I, *supra*), no steps were taken to give the EBHs notice prior to an opportunity to be heard at the February 23, 2012 hearing; rather, the Proposed Order drafted by Plaintiffs was signed, unaltered, on the same day as the hearing. Even if the EBHs had actual notice of the Plaintiffs' motion for injunctive relief, the absence of formal service invalidates the order. *See Orix Financial Services v. Phipps*, No. 91-CV-2523, 2009 WL 2486012, at *3 (S.D.N.Y. Aug. 14, 2009) (granting 60(b)(4) motion, in part, because "[t]he Second Circuit has rejected the argument that 'actual notice' is sufficient to cure improper service") (citation omitted); *Triad Energy Corp. v. McNell*, 110 F.R.D. 382, 385-86 (S.D.N.Y. 1986) (granting Rule 60(b)(4) motion and vacating default judgment where defendants were not properly served, notwithstanding any constructive or actual notice defendants had); *In re Metzger*, 346 B.R. 806, 818 (Bankr. N.D. Cal. 2006) (applying Rule 60(b)(4) to void fourteen-year-old sale order for defective notice even though creditor had actual notice of bankruptcy proceedings; creditor had no duty to investigate and inject himself into the proceedings).

The absence of notice and an opportunity to be heard renders the injunction void. *See Dial Corp. v. Skinner & Assocs.*, 180 Fed. Appx. 661, 664, 2006 WL 1307892, at **3 (9th Cir. May 12, 2006) (judgment based on defendant's indemnification claim against co-defendant who was earlier released from action which was only mentioned "near the end of trial and without any

prior notice" was void under Rule 60(b)(4)); *In re Aztec Supply Corp.*, 399 B.R. 480, 492-494 (Bankr. N.D. Ill. 2009) (granting Rule 60(b)(4) motion where party affected by bankruptcy proceedings was not given notice); *Nature's First Inc. v. Nature's First Law, Inc.*, 436 F. Supp. 2d 368, 374-77 (D. Conn. 2006) (granting Rule 60(b)(4) motion and vacating default and permanent injunction where defendant had not been served);[20] *Local 78 v. Termon Constr., Inc.*, No. 01-CV-5589 (JGK), 2003 WL 22052872, at *5 (S.D.N.Y. Sept. 2, 2003) (granting motion to vacate default judgment pursuant to Rule 60(b)(4) where valid service of process was not effected on defendant). As in *Dial*, the possibility of an injunction restraining the funds of the EBHs and their trustee was not addressed until the February 23, 2012 hearing, whereas the litigation prior to that time concerned only the contractual rights between Plaintiffs and the Republic.

Given these due process issues, the Court should revisit the injunction in its entirety and afford the EBHs an adequate opportunity to be heard, including a reasonable briefing schedule and evidentiary hearings as appropriate. *See Fengler v. Numismatic Am., Inc.*, 832 F.2d 745, 747-48 (2d Cir. 1987) (parties bound by injunctions are entitled to evidentiary hearing). The three days granted the EBHs to reply to Plaintiffs' November 13, 2012 brief is insufficient for this purpose.[21] Plaintiffs' proposed injunction directly affects billions of dollars legally owed to the EBHs. The Second Circuit directed "such further proceedings as are necessary to address the Injunctions' application to third parties … including intermediary banks …" Ex. 1: 2d Cir. Op., at 28. The Court of Appeals did not order expedition. Nor did it direct a resolution prior to the scheduled December payments to the EBHs. Indeed, implicit in its directive is ***careful and***

---

[20]   As the court noted in *Nature's Promise*, a heightened standard of due process applies for a permanent injunction. 436 F. Supp. 2d at 375 ("Given the Second Circuit's preference for resolution of suits on the merits and the prejudice resulting to defendants if the default judgment and permanent injunction are not vacated, the procedural posture is of paramount importance.").

[21]   *See In re Center Wholesale, Inc.*, 759 F.2d 1440, 1448 (9th Cir. 1985) (granting Rule 60(b)(4) motion where one day's notice of hearing to junior secured party in bankruptcy proceeding did not satisfy due process).

*deliberate* consideration. While it may be *Plaintiffs'* goal to rush these issues past the Court so as to seize the EBHs' property for their private purposes, a highly compacted schedule frustrates the Second Circuit's objective in remanding on the issue of third party impact. It will also be impossible for many other EBHs that wish to be heard to appear within the short timeframe allowed. Taylor Dec., ¶ 2. With EBHs (and the third-parties) having three days to respond to Plaintiffs' brief, no hearings, and little opportunity to present fact and expert testimony, there is a grave risk that the remanded issue of impact on third parties cannot be given full and deliberate consideration as the Court of Appeals must have contemplated.[22]

## V. THE INJUNCTION MUST BE VACATED FOR FAILURE TO JOIN THE EXCHANGE BONDHOLDERS AS NECESSARY PARTIES.

The EBHs are necessary parties to this action due to the injunction's confiscatory impact on their right to payment under the Exchange Bonds, and their absence at the time the injunction was entered requires modification of the order as it applies to them. Under Federal Rule of Civil Procedure 19, a party is "necessary" if

> . . . (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest . . . .

*Fed R. Civ. P.* 19(a)(1)(B). Even without expressly invoking Rule 19, courts have denied or vacated injunctions directed "against [non-parties] who are innocent of misconduct and are strangers to the district court." *Doctor's Assocs., Inc. v. Reinert & Dupree, P.C*, 191 F.3d 297, 306 (2d Cir. 1999) (partially vacating injunction barring nonparty franchisees from commencing separate state court actions against franchisor); *see also Pediatric Specialty Care, Inc. v.*

---

[22] Moreover, there is no reason why the EBHs' rights should be trampled upon in order to push through the final form of an injunction in this case, which has been ongoing for over a decade. That is particularly so because, as this Court has found, the Republic has sufficient assets to pay both the Plaintiffs and the EBHs. Ex. 7: 2/23/12 Hearing, T32:12-33:5. Furthermore, the December payments to the EBHs do not represent a final payment. In fact, those income streams run out as far as 25 years into the future. Ex. 1: 2d Cir. Op., at 4.

*Arkansas Dep't. of Human Servs.*, 364 F.3d 925, 933 (8th Cir. 2004) (reversing injunction as to federal agency that "was not a party to the underlying action and did not actively participate" in proposed budget cutbacks that plaintiffs were suing to enjoin); *Leblanc-Sternberg v. Fletcher*, 763 F. Supp. 1246, 1249 (S.D.N.Y. 1991) (denying plaintiffs' application to enjoin local election where officials managing election were not named defendants and stating that "[a] party to be enjoined must be before the court").

Under the foregoing standards, a party is necessary under Rule 19(a) when its contractual or property rights would otherwise be adjudicated in the party's absence, especially where those interests are being threatened with an injunction. *See, e.g.*, *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 700-701 (2d Cir. 1980) (necessary to join third party where defendant's counterclaims sought to enjoin third party's merger agreement with plaintiff); *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1013 (3d Cir. 1987) (factory owner was indispensable party where industry association moved to enjoin owner from closing factory, as "preservation of such a *status quo* would obviously defeat any prospects that [owner] might have to develop the property … [Plaintiff] as a part of its relief, seeks to restrict, limit, and affect [owner's] rights and/or interests in the property"); *Freedom N.Y., Inc. v. United States*, No. 86-CV-1363, 1986 WL 6163, at *1 (S.D.N.Y. May 27, 1986) (winning bidder for government contract was necessary party in losing bidder's action to enjoin government's performance under contract, because injunction would have "as a practical matter an equally decisive impact on [winning bidder's] interests").

In the present case, as shown in Point I, the proposed injunction substantially impacts the EBHs' right to payment under the Exchange Bonds, a property right that indisputably belongs solely to them. Further, the proposed injunction would effectively leave the EBHs with no remedy. If the Republic chooses to pay only the EBHs, then their payments will be frozen at BNYM indefinitely. If the Republic chooses not to pay BNYM, the EBHs will, from a practical standpoint, have no recourse other than to "stand in line" with the Plaintiffs. Simply put, this is a classic situation where two wrongs (the Republic's refusal to pay Plaintiffs and an injunction that

almost certainly will lead to failure to pay the EBHs) do not make a right; rather, they make a bad situation worse.

Given the Court's recognition at the February hearing that the proposed injunction could affect the rights of absent parties (see Point I, *supra*), the necessity of joining them should have been considered. *See Museum of Modern Art v. Schoeps*, 549 F. Supp. 2d 543, 548 (S.D.N.Y. 2008) ("Although neither party has moved for joinder, courts frequently do—**and indeed should**—consider the issue *sua sponte* because a primary purpose of Rule 19 is to protect the rights of an absentee party.") (emphasis added). "An injunction entered in the absence of an indispensable party should be vacated." *Edward G. Bashian & Sons v. Am. Nat'l. Bank & Trust Co. of Chicago*, No. 96-CV- 6021, 1997 WL 337434, at *6 (N.D. Ill. June 16, 1997) (partially vacating injunction for failure to join bank as necessary party at time injunction was entered, because bank held interest in subject matter of lawsuit); *see also Klaus v. Hi-Shear Corp.*, 528 F.2d 225, 234-35 (9th Cir. 1975) *overruled on other grounds by Stahl v. Gibralter Fin. Corp.*, 967 F.2d 335 (9th Cir. 1922) (vacating preliminary injunction restraining voting of defendant corporation's stock entered before corporation was party to suit, because corporation "clearly was an indispensable party" under Rule 19 standard). Accordingly, the injunction here should be dissolved, and a reasonable schedule for presentation of evidence, hearings, and briefing.

## VI. PLAINTIFFS ARE NOT ENTITLED TO PREFERENTIAL TREATMENT AT THE EXPENSE OF EXCHANGE BONDHOLDERS.

### A. The Injunction Inequitably Fails to Account for the Losses Already Suffered by the Innocent EBHs as a Result of the Republic's Default.

The Court of Appeals ordered remand "to address the operation of the payment formula." Ex. 1: 2d Cir. Opp., at 28-29. Accordingly, if the Court were to find that the injunction was properly entered, the "operation of the payment formula" still must be addressed. Basic considerations of fairness and equity require rejecting Plaintiffs' proposal to enter an equitable remedy that requires the Republic immediately to pay 100% of the face value of Plaintiffs FAA Bonds, plus significant amounts of interest totaling more than the full face value, before it can

make payment due to the EBHs under the Exchange Bonds. NML 11/13/12 Brief, at 12. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) ("in deciding whether to grant injunctive relief a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts"). Plaintiffs' formula is inequitable because it completely ignores that the EBHs hold securities derived from FAA Bonds that have already incurred discounts of over 70 cents on the dollar. *See* Facts, Section B, *supra*. These discounts—which were granted by the holders of 92% of all FAA Bonds and provided tens of billions of dollars in debt relief to the Republic — are a major reason the Republic has sufficient foreign currency reserves to honor its obligations to anyone — including Plaintiffs.[23] Moreover, a significant fraction of the EBHs are not only successors in interest to the FAA Bondholders, but individually participated in the 2005 and 2010 exchange offers and incurred large discounts. *See* Facts, Section C, *supra*. While Plaintiffs were within their rights in refusing to accept discounts on the FAA Bonds, it would stand equity on its head to have the Republic reallocate the sacrifices made by the EBHs (and their predecessors in interest) so that the most aggressive and litigious holdouts can receive over 200 cents on the dollar.

Accordingly, equity and fairness require that, the Ratable Payment formula should recognize that the EBHs have already suffered losses as a result of the Republic's default. The adjustment should ensure that if Plaintiffs receive Ratable Payments on their FAA Bonds, they do not profit from debt relief provided by the EBHs (or their predecessors in interest) or receive more preferable treatment than the EBHs, but rather receive payments in proportion to Plaintiffs' holdings as a fraction of the Republic's total defaulted debt. Thus, if Plaintiffs hold FAA Bonds with a face value of $428 million, and the Republic defaulted approximately $46.6 billion were FAA Bonds subject to a *pari passu* clause, the Court should require a Ratable Payment to Plaintiffs of no more than 0.92% ($428 million / $46.6 billion) of the amount of any given

---

[23] Indeed, Argentina's total reserves of foreign exchange and gold amounted to just $46.35 billion in December 2011. *See* https://www.cia.gov/library/publications/the-world-factbook/rankorder/2188rank.html. So tens of millions of dollars was a material contribution.

payment to the EBHs.  Proceeding in this manner will accord with basic principles of equity and ensure fair treatment for Plaintiffs and the EBHs.

### B.    At a Minimum, the Injunction Should Be Modified to Provide for More Equitable Treatment of the EBHs.

Alternatively, the Court should at a minimum address basic principles of fairness in interpreting the formula as currently drafted.  The Injunction provides, in relevant part: "Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers … the Republic shall … make a 'Ratable Payment' … to NML."  Ex. 9: Feb. 23 Order at 3-4.  "Ratable Payment" is defined as "an amount equal to the 'Payment Percentage' … multiplied by the total amount currently due to NML in respect of the bonds at issue … including pre-judgment interest …."  Ex. 9: Feb. 23 Order at 4.  "Payment Percentage" is defined as "the fraction calculated by dividing the amount actually paid … under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds."  As the Second Circuit noted, the definition of "Payment Percentage" leaves it ambiguous whether "the total amount then due under the terms of the Exchange Bonds" refers to the amount due at that particular moment in time, or total principal and interest outstanding.  Ex. 1: 2d Cir. Op., at 11.

The phrase should be interpreted to mean total principal and interest outstanding.  Doing so will ensure the EBHs are treated equitably and their rights to incremental payments from the Republic are not made conditional on the full satisfaction of all obligations due to Plaintiffs under the FAA Bonds.  Contrary to Plaintiffs' assertion (*see* NML 11/13/12 Brief, at 15), enjoining the payment of $3.3 billion due to the EBHs under the Exchange Bonds unless the Republic pays Plaintiffs $1.43 billion is not "wholly consistent with the equities."  The EBHs represent 92% of the victims of Argentina's default, and have already lost tens of billions of

dollars.  Plaintiffs hold FAA Bonds that account for less than 1% of the debt on which the Republic defaulted in 2001.[24]

## VII. PLAINTIFFS HAVE FAILED TO SHOW ANY BASIS TO CHANGE THE STAY ALREADY ENTERED BY THE COURT, AND RELIED UPON BY THE SECOND CIRCUIT.

Plaintiffs misleadingly urge the Court to "[d]ecline to [e]xtend" the stay of the Proposed Injunction it entered on March 5, 2012 (the "Stay").  NML 11/13/12 Brief, at 20; Ex. 11: Stay. In fact, there is no need for an "exten[sion]" because the Stay's express terms already provide that it applies "until the … Second Circuit has issued its ***mandate disposing of the Republic's appeal*** of the [Proposed Injunction]."  Ex. 11: Stay ¶ 1 (emphasis added).  The Second Circuit has issued no "mandate," much less one "disposing" of the appeal.  Instead, the Court of Appeals entered an "Order" directing supplemental proceedings under United States *v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994), with the express aim of "further consider[ing] … the merits of the remedy"—in particular as it affects third parties.  *See* Docket Entry 387 (the referenced document is marked merely as a "Certified Copy" of the Opinion, and is not stamped as a "Mandate").  By proceeding in this manner, the Court of Appeals retained jurisdiction over this case.  *Jacobson*, 15 F.3d at 22 (noting the Second Circuit's authority to "seek supplementation of the record while retaining jurisdiction, ***without a mandate issuing*** or the need for a new notice of appeal").[25]  Plaintiffs' invitation to tamper with the Stay entered by this Court would do violence

---

[24]     It is the EBG's understanding that Plaintiffs have not offered any formula to support their interest calculations, which total nearly $1 billion.  If the Court elects to proceed with requiring a ratable payment from the Republic, further proceedings will be necessary to verify Plaintiffs' calculations.

[25]     The Second Circuit also stated that, "[o]nce the district court has conducted [supplemental] proceedings[,] the mandate should automatically return to [the Court of Appeals] … without need for a new notice of appeal."  Ex. 1: 2d Cir. Op., at 28-29.  This is consistent with an alternative procedure set forth in *Jacobson*, under which the Second Circuit may "direct that a mandate issue forthwith and that [it] state the conditions that will restore jurisdiction to [the Court of Appeals]."  *Jacobson*, 15 F.3d at 22.  Whichever procedure the Second Circuit intended to follow, there is in fact no applicable "Mandate" in the Second Circuit case file, as there would have to be if a mandate had actually issued.  And the Court of Appeals' opinion is crystal clear that it has not yet spoken its last word on the Injunction.  This Court's intent in issuing the stay

to the Second Circuit's direction that this Court should supplement the record before the Court of Appeals further evaluates the Injunction.[26]

The consequences of vacating the Stay cannot be exaggerated—if it is lifted, and the Republic defaults as the market expects, the Second Circuit's review of the merits of the Proposed Injunction will be rendered moot.[27]  Choi Dec. ¶¶ 8-22.  In effect, Plaintiffs will have succeeded in performing an end run around the Second Circuit and rushing this case to its conclusion while trampling the very third-party interests about which the Court of Appeals expressed "concerns."  Ex. 1: 2d Cir. Op., at 28.  There is no reason the process needs to be hurried in a way that could ultimately frustrate the further appellate review that the Second Circuit expressly contemplates.  The Second Circuit did not indicate any need for expedition, or any particular concern about the Republic's scheduled December payments to the EBHs.  The Exchange Bonds do not mature for many years,[28] and Plaintiffs will have ample opportunity to recover money owed to them regardless of whether the Second Circuit deems it necessary to take additional steps to protect the interests of the EBHs.  Ex. 1: 2d Cir. Op., at 4.  Moreover, if the stay were lifted and Plaintiffs were paid billions of dollars, there is no assurance that they would be able to repay the money if, for example, an appeal finally determines that the FSIA bars enforcement § 2(e) of the Injunction.  If Plaintiffs were paid, because they are investment funds they will no doubt distribute that recovery immediately to their shareholders; the Plaintiff funds also could dissolve themselves; in either case obtaining repayment of the money would be difficult or impossible if this Court is later reversed.  This is true irreparable injury, and it would

---

seems clearly to have been that the stay would remain in effect until the appeal was finally "dispos[ed] of."

[26]   Because the Stay has already been entered, Plaintiffs' lengthy explication of reasons why it should not be *re*-entered is irrelevant.  *See* NML 11/13/12 Brief, at 21-24.

[27]   Lifting the stay would be particularly problematic if, notwithstanding the Second Circuit's Opinion, this Court were to modify the proposed injunction to enable Plaintiffs to execute their judgment using funds paid to the EBHs Trustee.  Ex. 1: 2d Cir. Op., at 5; Point II, *supra*.

[28]   The relevant maturity dates are 2017, 2033, 2035, and 2038.  Koenigsberger Dec. ¶ 10.

be suffered by the EBHs (or the Republic). Accordingly, the Stay should remain in effect, as this Court provided, until the Court of Appeals has "issued its mandate disposing of the Republic's appeal[.]"

## **CONCLUSION**

For the foregoing reasons, the Court should vacate § 2(e)the Injunction, reject Plaintiffs' proposed injunction (particularly with respect to proposed § 2(e)) and schedule further proceedings consistent with the EBHs' Due Process rights.

Dated: November 16, 2012
     New York, New York

<div style="margin-left:40%">

By:    _/s/ Sean F. O'Shea_____
     Sean F. O'Shea
     Michael E. Petrella
     Daniel M. Hibshoosh
     **O'SHEA PARTNERS LLP**
     521 Fifth Avenue, 25th Floor
     New York, New York 10175
     Tel.:   (212) 682-4426
     soshea@osheapartners.com

     **BOIES, SCHILLER & FLEXNER LLP**
     David Boies
     David A. Barrett
     Nicholas A. Gravante, Jr.
     Steven I. Froot
     575 Lexington Avenue
     New York, NY 10022
     Tel.: (212) 446-2300

     *Attorneys for the Exchange Bondholder Group*

</div>

# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------x
                                         :
NML CAPITAL, LTD.,                       :
                                         :              ORDER
                    Plaintiff,           :
                                         :        08 Civ. 6978 (TPG)
        – against –                      :        09 Civ. 1707 (TPG)
                                         :        09 Civ. 1708 (TPG)
REPUBLIC OF ARGENTINA,                   :
                                         :
                    Defendants.          :
                                         :
----------------------------------------x
```

## AMENDED FEBRUARY 23, 2012 ORDER

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

1

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.      It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

  a. Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

  b. There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear – indeed, it has codified in Law 26,017 and Law

26,547 – its intention to defy any money judgment issued by this Court.

c.  The balance of the equities strongly supports this Order in light of the clear text of Paragraph 1(c) of the FAA and the Republic's repeated failures to make required payments to NML.  In the absence of the equitable relief provided by this Order, the Republic will continue to violate Paragraph 1(c) with impunity, thus subjecting NML to harm.  On the other hand, the Order requires of the Republic only that which it promised NML and similarly situated creditors to induce those creditors to purchase the Republic's bonds.  Because the Republic has the financial wherewithal to meet its commitment of providing equal treatment to both NML (and similarly situated creditors) and those owed under the terms of the Exchange Bonds, it is equitable to require it to do so.  Indeed, equitable relief is particularly appropriate here, given that the Republic has engaged in an unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to NML, in direct violation of its contractual commitment set forth in Paragraph 1(c) of the FAA.

d.  The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order, particularly here, where creditors of the Republic have no

3

recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises. No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2. The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

a. Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML (as defined below and as further defined in the Court's Opinion of November 21, 2012).

b. Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c. Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic

4

intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d. The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e. Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f. "Participants" refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York);

(2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees; (3) the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System); (4) trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A. and The Bank of New York Mellon (including but not limited to the Bank of New York Mellon (London)); and (5) attorneys and other agents engaged by any of the foregoing or the Republic in connection with their obligations under the Exchange Bonds.

g. Nothing in this ORDER shall be construed to extend to the conduct or actions of a third party acting solely in its capacity as an "intermediary bank," under Article 4A of the U.C.C. and N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in connection with the Exchange Bonds.

h. Any non-party that has received proper notice of this ORDER, pursuant to Rule 65(d)(2), and that requires clarification as to

its duties, if any, under this ORDR may make an application to this Court, with notice to the Republic and NML. Such clarification will be promptly provided.

i. Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3. NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4. The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court;

5. This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Case 1:08-cv-06978-TPG    Document 425    Filed 11/21/12    Page 8 of 8

Dated:  New York, New York
        November, 21 2012

                                        Thomas P. Griesa

                                        Thomas P. Griesa
                                        U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/21/12

8

Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
                                             :
NML CAPITAL, LTD.,                           :
                                             :          **OPINION**
                              Plaintiff,     :
                                             :          08 Civ. 6978 (TPG)
                  – against –                :          09 Civ. 1707 (TPG)
                                             :          09 Civ. 1708 (TPG)
REPUBLIC OF ARGENTINA,                       :
                                             :
                              Defendants.    :
                                             :
------------------------------------------------x

      On October 26, 2012, the Court of Appeals handed down an opinion affirming certain injunctions entered by the District Court.  These injunctions were designed to remedy Argentina's breach of the *Pari Passu* Clause, including the "Equal Treatment Provision," contained in the contractual provisions of the Fiscal Agency Agreement Bonds ("FAA Bonds") at issue in this litigation.  This breach resulted from the fact that Argentina had issued new debt pursuant to exchange offers in 2005 and 2010 ("Exchange Bonds"), and was making the payments required on this new debt, but had declared that it would make no payments to those still holding the FAA Bonds.  It is of note that the Court of Appeals affirmed the finding of the District Court that, although there had originally been a default on the FAA Bonds because of a well-known financial crisis, currently Argentina is able to make the payments on both the FAA Bonds owned by plaintiffs and the Exchange Bonds.

An essential part of the ruling of the Court of Appeals was to affirm the injunctive relief fashioned by the District Court. It ruled that Argentina must make appropriate payments to plaintiffs on their FAA Bonds concurrent with or in advance of any payments to holders of the 2005 and 2010 Exchange Bonds. However, the Court of Appeals remanded, directing that the District Court clarify precisely how the payment formula, regarding payments to plaintiffs, is intended to operate. Also, the Court of Appeals directed a more precise determination as to how the injunctions would apply to third parties, including intermediary banks.

On remand, the court has not only received briefs from plaintiffs and Argentina, but has also received briefs and letters from exchange bondholders, parties responsible for handling the payment process to these bondholders, and the Federal Reserve Bank. The court has considered these materials without requiring formal interventions.

Payment Formula

The injunctions affirmed by the Court of Appeals are contained in an Order of the District Court dated February 23, 2012, which contains a number of injunction provisions and which is referred to by the Court of Appeals as the "Injunctions." Paragraph two of the Injunctions provides:

> The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

2

a. Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" (as defined below) to NML.

b. Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c. Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

The Court of Appeals stated that it is unable to discern from the record precisely how this formula is intended to operate, and further stated:

It could be read to mean that if, for example, Argentina owed the holders of restructured debt $100,000 in interest and paid 100% of that amount then it would be required to pay the plaintiffs 100% of the accelerated principal and all accrued interest. Or it could be read to mean that, if such a $100,000 payment to the exchange bondholders represented 1% of the principal and interest outstanding on the restructured debt, then Argentina must pay plaintiffs 1% of the amount owed to them.
The following discussion is intended to provide the clarification requested by the Court of Appeals.

Although the provisions of the February 23, 2012 Injunctions regarding the "Ratable Payment" are phrased in a somewhat complicated manner, the actual meaning is quite straightforward. The obligation to plaintiffs under the February 23, 2012 Injunctions accrues whenever Argentina "pays any amount due" under the terms of the Exchange Bonds. The next time this will occur will be in December 2012, when Argentina is scheduled to make interest payments

3

on the Exchange Bonds of about $3.14 billion: $42 million on December 2, $3
billion on December 15, and $100 million on December 31.  When this occurs,
Argentina will be required to make a "Ratable Payment" to plaintiffs.  Assuming
that Argentina pays 100% of what is then due on the Exchange Bonds, this is
the "Payment Percentage" referred to in paragraph 2(b).  Argentina would be
required to pay 100% "multiplied by the <u>total amount currently due</u>" to
plaintiffs.  There is no question about what is "currently due" to plaintiffs.  The
amount that is currently due is the amount of the unpaid principal, the due
date of which has been accelerated, and accrued interest.[1]  The total of these
amounts due to plaintiffs is approximately $1.33 billion.  Thus, at some time in
December 2012, when Argentina makes the interest payments on the
Exchange Bonds, amounting to a total of about $3.14 billion, Argentina will be
required to pay plaintiffs approximately $1.33 billion.

This is in accord with the first hypothetical situation posed in the Court
of Appeals' opinion, describing the situation in which Argentina owes the
holders of restructured debt $100,000 in interest and pays 100% of that
amount, resulting in the requirement to pay plaintiffs 100% of the accelerated
principal plus all accrued interest.

---

[1] Although judgments have been entered in other related cases, the cases before the court in
this matter are ones where judgment has not been entered.  <u>See</u> Transcript of Oral Argument
at 26-27, <u>NML Capital v. The Republic of Argentina</u>, (February 23, 2012) (03 Civ. 8845).

The second hypothetical situation posed by the Court of Appeals, resulting in Argentina paying plaintiffs 1% of the amount owed to them, is based on a misinterpretation of the relevant language of the Injunctions.  The second hypothetical assumes a $100,000 payment to the Exchange bondholders, representing 1% of the total "principal and interest outstanding on the restructured debt," most of which is payable in the future.  But the obligation of Argentina under the payment formula in the Injunctions arises when Argentina "pays any amount due" to the exchange bondholders.  In the present case, this would next occur when Argentina pays the interest due on the Exchange Bonds in December 2012.  Also, the Payment Percentage is calculated on the basis of "the amount actually paid or which the Republic intends to pay," as a percentage of "the total amount then due."  None of this relevant language refers to any calculation based upon the total amount of principal and interest outstanding on the restructured debt, including large amounts of principal and interest to be paid into the future.

To recapitulate, the Ratable Payment provisions in the Injunctions, as correctly interpreted and as intended by the court, would be currently applied as follows.  In December 2012, there are interest payments of approximately $3.14 billion due on the Exchange Bonds.  Presumably, Argentina intends to pay 100% of what is owed.  There are currently debts owed to plaintiffs by Argentina of approximately $1.33 billion.  It should be emphasized that these are debts currently owed, not debts spaced out over future periods of time.  In

5

order to comply with the terms of the Injunctions, Argentina must pay plaintiffs 100% of that $1.33 billion concurrently with or in advance of the payments on the Exchange Bonds.

This result is not only in accordance with the payment formula provisions of the Injunctions, it is consistent with the *Pari Passu* Clause and its Equal Treatment Provision.  In saying this, the court recognizes that the debt now owed to the exchange bondholders is of a <u>different amount</u> and of a <u>different nature</u> from what is owed to plaintiffs.  What is owed in December 2012 to exchange bondholders are interest payments, which are part of a series which will go on being paid until the maturity of the Exchange Bonds.  The debt owed to plaintiffs is accelerated principal plus accrued interest.  But it is obvious that a *Pari Passu* Clause does not require that the debts in question be in the same amount or of the same nature.  What is required is that the obligations under the various debts are complied with to the same extent, rather than having the obligations on one debt honored and the obligations on the other debt repudiated, as has occurred in the present case.

Of course, what is being done here is not literally to carry out the *Pari Passu* Clause, as would be done in a normal commercial situation, but to provide a remedy for Argentina's violation of the Clause.  <u>NML Capital v. The Republic of Argentina</u>, No. 12-105(L), at 19 n.10 (2d Cir. Oct. 26, 2012)(hereinafter "Opinion").  Yet, the remedy must bear some reasonable relation to the *Pari Passu* Clause in order to be a sensible remedy.  One

6

definition of *pari passu* in Black's Law Dictionary (8th ed. 2004) is "proportionally," obviously referring to the use of the same proportion in paying down two kinds of debts. This is clearly reflected in the Ratable Payment provisions in the Injunctions, as correctly interpreted. These provisions properly start with the fact that if 100% of what is <u>currently due</u> to the exchange bondholders <u>is paid</u>, then 100% of what is currently due to plaintiffs must also be paid. The payment to plaintiffs must surely relate to a debt actually due to them. And this leads to the problem which this court finds in the second hypothetical posed by the Court of Appeals. There is simply no debt owed to plaintiffs on terms providing for payments of 1% of some sum of money, spaced out over 100 installments of 1% each. The second hypothetical of the Court of Appeals would involve a radical departure from the payment formula in the Injunctions and from the *Pari Passu* Clause.

Again, there is no suggestion of interfering with what the exchange bondholders are due to be paid. The question raised by the Court of Appeals relates solely to how much plaintiffs are to be paid at the time exchange bondholders are paid. But the fact is that the amount owed to plaintiffs by Argentina is the accelerated principal plus accrued interest. Argentina owes this and owes it now. No one has suggested any basis in contract or in policy why Argentina deserves to have payment of the amount due to plaintiffs spread over some period of time.

Moreover, and this is most important, to apply the second hypothetical of the Court of Appeals and spread payment to plaintiffs over a period of time, would be a far cry from a proper remedy for the flagrant and intentional contract violations committed by Argentina.

Argentina and certain exchange bondholders argue that it is unjust for them to be receiving thirty cents on the dollar by virtue of the Exchange Bonds, while plaintiffs receive full payment pursuant to the court rulings. The Court of Appeals essentially answered this argument (Opinion at 26 n.15). However, some further discussion is in order.

In accepting the exchange offers of thirty cents on the dollar, the exchange bondholders bargained for certainty and the avoidance of the burden and risk of litigating their rights on the FAA Bonds. However, they knew full well that other owners of FAA Bonds were seeking to obtain _full payment_ of the amounts due on such bonds through persisting in the litigation. Indeed, the exchange bondholders were able to watch year after year while plaintiffs in the litigation pursued methods of recovery against Argentina which were largely unsuccessful. However, decisions have now been handed down by the District Court and the Court of Appeals based on the _Pari Passu_ Clause, which give promise of providing plaintiffs with full recovery of the amounts due to them on their FAA Bonds. This is hardly an injustice. The exchange bondholders made the choice not to pursue the route which plaintiffs have pursued. Moreover, it is hardly an injustice to have legal rulings which, at long last, mean that

8

Argentina must pay the debts which it owes.  After ten years of litigation this is a just result.

Third Parties

It is the intention of the court to properly apply Rule 65(d) of the Federal Rules of Civil Procedure.  This Rule provides that an injunction binds the parties, the parties' agents, and other persons who are in active concert or participation with the parties or their agents.  It is further provided that an injunction binds these people only if they receive actual notice of the injunction.

The issue arises because of the need to ensure enforcement of the Injunctions' requirement that payments are to be made on the Exchange Bonds only if appropriate payments are made concurrently or in advance to plaintiffs. The Court of Appeals noted that the District Court was invoking Rule 65(d), "Anticipating that Argentina would refuse to comply with the Injunctions and in order to facilitate payment."  It goes without saying that if Argentina is able to make the payments on the Exchange Bonds without making the payments to plaintiffs, the District Court and Court of Appeals' rulings and the Injunctions will be entirely for naught.  To avoid this, it is necessary that the process for making payments on the Exchange Bonds be covered by the Injunctions, and that the parties participating in that process be so covered.

The February 23, 2012 Injunctions contain a provision prohibiting Argentina from taking any action to evade the directives of the Injunctions and further prohibiting Argentina from altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval of the court.

The process and the parties involved in making payments on the Exchange Bonds are as follows.  Argentina transfers funds to the Bank of New York Mellon ("BNY"), which is the indenture trustee in a Trust Indenture of 2005.[2]  Presumably there is a similar indenture for the 2010 exchange offer. BNY then forwards the funds to the "registered owner" of the Exchange Bonds. There are two registered owners for the 2005 and 2010 Exchange Bonds.  One is Cede & Co. and the other is the Bank of New York Depositary ("BNY Depositary").  Cede and BNY Depositary transfer the funds to a "clearing system" such as the Depository Trust Company ("DTC").  The funds are then deposited into financial institutions, apparently banks, which then transfer the funds to their customers who are the beneficial interest holders of the bonds.

Plaintiffs assert that under Rule 65(d), the Injunctions should bind Argentina, the indenture trustee, the registered owners, and the clearing system, whoever they are.  It is probably true that these parties are not all

---

[2] There is apparently a dispute as to whether this payment takes place in Argentina or the United States.  However, BNY is surely a United States entity.  The rest of the process, without question takes place in the United States.

agents of Argentina, but they surely are "in active concert or participation" with Argentina in processing the payments from Argentina to the exchange bondholders.

There is a problem under Article 4A of the U.C.C. about including intermediary banks. But plaintiffs address this in seeking a carve-out in the Injunctions for such intermediary banks. Plaintiffs are also not requesting that the financial institutions receiving funds from the DTC be bound by the Injunctions.

It would appear that plaintiffs have requested that a reasonable set of parties be bound by the Injunctions, and this is in compliance with Rule 65(d).

BNY, and to some extent others on the above list, object to any application of Rule 65(d) to them. Particularly BNY strenuously asserts that it has duties as indenture trustee, and these duties should be the beginning and the end of its responsibilities.

These arguments miss the point. If Argentina complies with the rulings of the Court of Appeals, there will be no problem about funds destined for exchange bondholders being deposited with BNY and going up the chain until they arrive in the hands of such bondholders. But if Argentina attempts to make payments to the exchange bondholders, contrary to the ruling of the Court of Appeals and thus contrary to law, this would not involve the normal and proper situation dealt with by BNY under the indenture, and dealt with by

11

others in the chain.  Under these circumstances, these third parties should properly be held responsible for making sure that their actions are not steps to carry out a law violation, and they should avoid taking such steps.

<div align="center">The Order</div>

Since the Court of Appeals has essentially affirmed the February 23, 2012 Order containing the Injunctions, that Order will remain in effect, subject to the following qualifications.  In paragraph 2a, there will be an appropriate reference to the definitions contained in the current opinion, which does not change the relevant wording but further defines it.

The court believes that plaintiffs properly recommend specific wording listing the parties bound by the Order under Rule 65(d).  Accordingly, that listing will be included.

Dated:  New York, New York
       November 21, 2012

Thomas P. Griesa
U. S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
FILED:  11/21/12

12

Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------x
                                       :

NML CAPITAL, LTD.,                :

                                  :          **OPINION**

                     Plaintiff,     :

                                  :      08 Civ. 6978 (TPG)

         – against –        :      09 Civ. 1707 (TPG)

                                  :      09 Civ. 1708 (TPG)

REPUBLIC OF ARGENTINA,    :

                                  :

                   Defendants.   :

                                  :
--------------------------------------------x

      On March 5, 2012, this court signed an order staying the effect of the February 23, 2012 Order pending Argentina's appeal. Specifically, the stay was to remain in effect until the Court of Appeals issued its mandate disposing of Argentina's appeal. However, the March 5, 2012 Order contained the following provision in paragraph 2:

> 2. To secure Plaintiffs' rights during the pendency of the Republic's appeals of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

Finally, the concluding paragraph 4 of the March 5, 2012 Order provided:

> 4. This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and account

1

for materially changed circumstances, including any failure by
the Republic to abide by Paragraph (2) herein.

The February 23, 2012 Order was affirmed by the Court of Appeals on
October 26, 2012, subject to a remand to the District Court for clarification on
two specified questions. The District Court is this day filing an opinion
responding to the questions raised by the Court of Appeals. The matter will
now return to the Court of Appeals to deal with the District Court's responses
to the questions posed. After that, there will be a final ruling by the Court of
Appeals. However, it should be made clear that the questions posed to the
District Court did not affect the basic ruling of the Court of Appeals that there
can be no payments by Argentina to exchange bondholders without an
appropriate payment to plaintiffs.

Under these circumstances, the District Court would ordinarily leave the
March 5, 2012 Stay in effect until the Court of Appeals has finished its work.
However, an extraordinary circumstance has arisen, which clearly demands
judicial action, and that action can only be taken now by the District Court,
where the case now resides.

From the moment of the October 26, 2012 Court of Appeals' decision, the
highest officials in Argentina have declared that Argentina would pay the
exchange bondholders but would not pay one dollar to holders of the original
FAA Bonds. President Cristina Kirchner made such a statement. The Minister

2

of Economy, Lorenzino, declared that despite any ruling to come out of any jurisdiction, Argentina would not pay the FAA bondholders.

On November 9, 2012, the court met with counsel and asked the attorney for Argentina if the press reports of the above statements were correct. In response, the attorney turned to other subjects, meaning that the press reports were not denied. At the November 9, 2012 meeting, the court reminded all concerned that Argentina is subject to the jurisdiction of the federal courts in New York, to which Argentina has consented. For the past ten years Argentina has repeatedly submitted matters to the District Court and the Court of Appeals, and received what was undoubtedly fair treatment, since Argentina prevailed in most matters. The court went on to urge that the Argentine government should back away from these ill-advised threats to defy the current court rulings, and that any defiance of the rulings of the courts would not only be illegal but would represent the worst kind of irresponsibility in dealing with the judiciary.

This did not stop the highest Argentine officials who have continued to the present time their inflammatory declarations that the court rulings will not be obeyed.

These statements are a violation of paragraph 2 of the March 5, 2012 Stay Order. In that paragraph, Argentina is prohibited, during the appeal, from taking any action to evade the February 23, 2012 Order in the event it is affirmed, and is further prohibited from taking any action to diminish the

3

court's ability to supervise compliance with the February 23, 2012 Order in the event of affirmance. Pursuant to paragraph 4 of the Stay Order, the Court retains jurisdiction to deal with materially changed circumstances, including any failure by Argentina to abide by paragraph 2.

It could be argued that the statements of the high Argentine officials do not literally constitute the kind of "action" referred to in paragraph 2. But the essential issue goes beyond this.

Surely an extraordinary circumstance of the most serious nature arises from continuous declarations by the President of Argentina and cabinet officers, that Argentina will not honor or carry out the current rulings of the District Court and Court of Appeals in the litigation to which Argentina is a party.

It is the view of the District Court that these threats of defiance cannot go by unheeded, and that action is called for.

After due consideration, the court has resolved that the following steps should be taken. The court believes that the Order regarding Ratable Payments should be put into effect at the earliest possible time. The less time Argentina is given to devise means for evasion, the more assurance there is against such evasion. Therefore, the provision in the March 5, 2012 Order staying the carrying out of the February 23, 2012 Order is vacated and it is directed that the February 23, 2012 Order, as now somewhat modified, is to be

4

carried out forthwith. This means that the February 23, 2012 Order will be applicable to the interest payments made to exchange bondholders in December 2012. In order to avoid confusion and to give some reasonable time to arrange mechanics, the court specifies that the precise interest payment involved will be that of December 15, 2012. Counsel for Argentina is directed to consult with counsel for plaintiffs in order to arrive at the exact amount to be paid to plaintiffs and other mechanics.

Since the Court of Appeals has not finally spoken on the subject of the calculation of the payment to plaintiffs, such payment is to be made into an escrow account, so that any adjustments required by the final Court of Appeals' ruling can be made. The court will consult with counsel about the proper party or institution to hold the escrow account.

Copies of this opinion, together with copies of the Amended February 23, 2012 Order, such amendment to be dated as of this date, will be promptly provided to the parties involved in payments to exchange bondholders, who will be on notice that the December 15, 2012 interest payments due to exchange bondholders cannot be made unless Argentina certifies that it is making the appropriate payment for the benefit of plaintiffs to the escrow account, either in advance of or concurrent with any payment to exchange bondholders.

The Amended February 23, 2012 Order is being issued today. It will be called "Amended February 23, 2012 Order," and will be dated today, November 21, 2012.

Dated: New York, New York
November 21, 2012

_____
Thomas P. Griesa
U. S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/21/12

Exhibit 8

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 28th day of November, two thousand and twelve.

Present:    Rosemary S. Pooler,
            Barrington D. Parker,
            Reena Raggi,
                    *Circuit Judges.*

---

NML Capital, Ltd., Aurelius Capital Master, Ltd.,
ACP Master, Ltd., Blue Angel Capital I LLC, Aurelius
Opportunities Fund II, LLC, Pablo Alberto Varela,
Lila Ines Burgueno, Mirta Susana Dieguez, Maria
Evangelina Carballo, Leandro Daniel Pomilio, Susana
Aquerreta, Maria Elena Corral, Teresa Munoz De
Corral, Norma Elsa Lavorato, Carmen Irma Lavorato,
Cesar Ruben Vazquez, Norma Haydee Gines, Marta
Azucena Vazquez, Olifant Fund, Ltd.,

Plaintiffs-Appellees,

v.

The Republic of Argentina,

Defendant-Appellant.

**ORDER**
Docket Nos. 12-105(L), 12-109(Con),
        12-111(Con),12-157(Con),
        12-158(Con), 12-163(Con),
        12-164(Con), 12-170(Con),
        12-176(Con), 12-185(Con),
        12-189(Con), 12-214(Con),
        12-909(Con), 12-914(Con),
        12-916(Con), 12-919(Con),
        12-920(Con), 12-923(Con),
        12-924(Con), 12-926(Con),
        12-939(Con), 12-943(Con),
        12-951(Con), 12-968(Con),
        12-971(Con).

---

It is hereby ORDERED that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of this Court.

It is further ORDERED that the appeal from the November 21, 2012 orders of the district court is expediated *nostra sponte*, with appellant's papers filed by December 28, 2012; opposition papers filed by January 25, 2013; and reply papers filed by February 1, 2013. Parties granted *amicus* or intervenor status shall file their briefs by January 4, 2013. Oral argument for appellant and appellees shall be at 2 p.m. on February 27, 2013.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court



# Exhibit 9

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

**Docket Number(s)**: 12-105(L)          Caption [use short title]

**Motion for**: Emergency Motion to Amend Stay Order

Set forth below precise, complete statement of relief sought:

An order amending the November 28, 2012 stay

to require the Republic of Argentina to post security

in order to maintain the stay.

NML Capital, Ltd. v. Republic of Argentina

**MOVING PARTY**: NML Capital, Ltd., et al.      **OPPOSING PARTY**: Republic of Argentina

☐ Plaintiff     ☐ Defendant
☐ Appellant/Petitioner     ☑ Appellee/Respondent

**MOVING ATTORNEY**: Theodore B. Olson      **OPPOSING ATTORNEY**: Carmine D. Boccuzzi

[name of attorney, with firm, address, phone number and e-mail]

Gibson Dunn & Crutcher LLP      Cleary Gottlieb Steen & Hamilton LLP
1050 Connecticut Ave., N.W.      One Liberty Plaza
Washington, D.C. 20036      New York, N.Y. 10006
(202) 955-8500,   tolson@gibsondunn.com      (212) 225-2000,   cboccuzzi@cgsh.com

Court-Judge/Agency appealed from: United States District Court for the S.D.N.Y., Hon. Thomas P. Griesa

**Please check appropriate boxes:**      **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):    Has request for relief been made below?   ☐ Yes ☑ No
☑ Yes ☐ No (explain):      Has this relief been previously sought in this Court?   ☐ Yes ☑ No
     Requested return date and explanation of emergency: 12/4/2012

Opposing counsel's position on motion:      There is a risk Appellees will be deprived of the relief
☐ Unopposed ☐ Opposed ☑ Don't Know
Does opposing counsel intend to file a response:      sought if the motion is not granted by December 15.
☐ Yes ☐ No ☑ Don't Know

Is oral argument on motion requested? ☑ Yes ☐ No   (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☑ Yes ☐ No   If yes, enter date: February 27, 2013

**Signature of Moving Attorney:**
/s/ Theodore B. Olson    **Date**: 11/30/2012    Service by: ☑ CM/ECF    ☐ Other [Attach proof of service]

---

**ORDER**

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED  DENIED**.

**FOR THE COURT:**
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____      By: _____

**Form T-1080** (rev. 7-12)

# 12-105(L)

12-109 (CON), 12-111 (CON), 12-157 (CON), 12-158 (CON),
12-163 (CON), 12-164 (CON), 12-170 (CON), 12-176 (CON),
12-185 (CON), 12-189 (CON), 12-214 (CON), 12-909 (CON),
12-914 (CON), 12-916 (CON), 12-919 (CON), 12-920 (CON),
12-923 (CON), 12-924 (CON), 12-926 (CON), 12-939 (CON),
12-943 (CON), 12-951 (CON), 12-968 (CON), 12-971 (CON)

## In the United States Court of Appeals
## for the Second Circuit

NML CAPITAL, LTD., *ET AL.*,

*Plaintiffs-Appellees*,

-v.-

REPUBLIC OF ARGENTINA,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**EMERGENCY MOTION OF APPELLEES TO AMEND OR MODIFY THE
STAY TO REQUIRE THE REPUBLIC OF ARGENTINA TO POST
SECURITY IN ORDER TO MAINTAIN THE STAY**

ROBERT A. COHEN
ERIC C. KIRSCH
DECHERT LLP
1095 Avenue of the Americas
New York, N.Y. 10036
(212) 698-3500

THEODORE B. OLSON
MATTHEW D. MCGILL
JASON J. MENDRO
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500

*Attorneys for Plaintiff-Appellee NML Capital, Ltd.*

[Additional counsel on inside cover]

EDWARD A. FRIEDMAN
DANIEL B. RAPPORT
FRIEDMAN KAPLAN SEILER
& ADELMAN LLP
7 Times Square
New York, N.Y. 10036
(212) 833-1100

JEFFREY A. LAMKEN
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

*Attorneys for Plaintiffs Aurelius Capital Master, Ltd., Aurelius Opportunities Fund II, LLC, ACP Master, Ltd., Blue Angel Capital I LLC*

STEPHEN D. POSS
ROBERT D. CARROLL
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
(617) 570-1000

*Attorneys for Plaintiff-Appellee Olifant Fund, Ltd.*

MICHAEL C. SPENCER
MILBERG LLP
One Pennsylvania Plaza
New York, N.Y. 10119
(212) 594-5300

*Attorney for Plaintiffs-Appellees Pablo Alberto Varela, et al.*

# TABLE OF CONTENTS

Page

STATEMENT OF EMERGENCY ................................................................ 1

BACKGROUND ....................................................................................... 4

    A.    This Court Holds That Argentina Breached The Equal Treatment Provision And That Argentina Is Required To Specifically Perform Its Obligations Under That Provision ..................................................................................... 4

    B.    Argentina's Highest Officials Declare That Argentina Will Defy The Injunction And This Court's October 26 Opinion ...................................................................................... 6

    C.    The District Court Enters Its Orders On Remand And Lifts The Stay .......................................................................... 9

ARGUMENT ........................................................................................ 11

    I.    This Court Should Condition The Stay On Argentina's Posting Of Security ................................................................ 11

        A.    Appellees Will Be Irreparably Harmed Absent Argentina's Posting Of Security .................................. 12

        B.    Conditioning Maintenance Of The Stay On The Posting Of Security Will Not Harm Argentina ........................................ 15

        C.    Requiring Security Would Serve The Public Interest By Eliminating Any Potential Harm To Third Parties And Promoting The Rule Of Law ...................................... 16

        D.    Argentina Has No Likelihood Of Success On The Merits ........................................................................ 17

    II.    Conditioning A Stay On The Posting Of A Reasonable Security Is Consistent With The FSIA .................................. 18

    III.    Alternatively, This Court Should Expedite The Briefing Schedule ...................................................................... 19

CONCLUSION ..................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adsani v. Miller*,
   139 F.3d 67 (2d Cir. 1998) ............................................................. 12, 14

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) .......................................................................... 11

*Lightfoot v. Walker*,
   797 F.2d 505 (7th Cir. 1986) ............................................................ 12

*Morgan Guar. Trust Co. v. Republic of Palau*,
   702 F. Supp. 60 (S.D.N.Y. 1988) .................................................. 15, 19

*Motorola Credit Corp. v. Uzan*,
   561 F.3d 123 (2d Cir. 2009) ............................................................. 17

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992) ....................................................... 15, 19

*Sales v. U.S. Underwriters Ins. Co.*,
   No. 93-Civ.-7580-CSH, 1995 WL 14478 (S.D.N.Y. Apr. 3, 1995).................. 15, 19

*Texaco, Inc. v. Pennzoil Co.*,
   784 F.2d 1133 (2d Cir. 1986) ........................................................ 11, 14

**Statutes**

28 U.S.C. § 1609 ................................................................................ 19

**Other Authorities**

Fed. R. App. P. 8 ............................................................................. 1, 11

Fed. R. App. P. 27 ............................................................................... 1

Fed. R. Civ. P. 65 ........................................................................... 9, 17

**Regulations**

16A Charles Alan Wright, Arthur Miller, & Edward H. Cooper,
   Federal Practice and Procedure § 3954.1 (4th ed. 2012) ........................ 11

Pursuant to Rules 8 and 27(b) of the Federal Rules of Appellate Procedure, Appellees respectfully move to modify the Court's November 28, 2012 Order Granting A Stay Of The District Court's November 21, 2012 Orders to condition the Court's stay as to Defendant-Appellant the Republic of Argentina ("Argentina") on Argentina posting appropriate security on or prior to December 10, 2012, before Argentina makes a $3 billion payment scheduled for December 15, 2012.

## STATEMENT OF EMERGENCY

This Court's decision of October 26, 2012 affirmed the district court's Injunction "ordering Argentina to make 'Ratable Payments' to plaintiffs." Op. 28, Ex. CC.[1]  In the wake of that ruling, Argentina's President pronounced that Argentina will not comply with any injunction under which Argentina would pay Appellees.  Argentina's Minister of Economy agreed, adding that "*[w]e are never going to pay the 'vulture funds.'* . . . *That's not going to change because of rulings*." Ex. AA (emphasis added).  Consistent with these threats of defiance, Argentina is now actively planning to evade the Injunction that this Court affirmed.  According to numerous reports in both the U.S. and Argentine media—reports Argentina conspicuously never has denied—Argentina is exploring alternate structures for payments under the Exchange Bonds beyond the district court's jurisdiction and supervisory powers.  The emergency giving rise to this motion is that if Argentina is

---

[1]    All exhibits cited are contained in the Declaration of Matthew D. McGill.

not required to post security as a condition for maintaining the stay when its December 2012 payments on the Exchange Bonds come due, Argentina will have at least an additional three months to continue developing its scheme to attempt to evade the Injunction.

The context within which Argentina is making its plans to evade is critical. Argentina has sought and obtained from this Court a stay that permits it to make payments exceeding $3 billion to its Exchange Bondholders in December 2012, while paying Appellees nothing, notwithstanding the findings and decisions of this Court and the district court that:

(1)  Argentina agreed to the application of New York law, submitted to the jurisdiction of the courts of New York, and agreed to be bound by those courts' decisions (Op. 16, 25);

(2)  Argentina is nonetheless actively planning to evade the Injunction by attempting to move offshore its payment structure under the Exchange Bonds and **will use the time permitted by the stay to implement such plans** (Stay Opinion at 3-4, Ex. H);

(3)  The December payments, if not accompanied by ratable payments to Appellees, would amount to *another* of Argentina's repeated and continuing violations of its contractual obligations to Appellees to rank its "*payment obligations*"

to Appellees equally with its payment obligations to the Exchange Bondholders (Op. 19-20);

(4)     Argentina has "sufficient funds, including over $40 billion in foreign currency reserves, to pay Appellees the judgments they are due." *Id.* at 26.  In fact, "Argentina makes no real argument that . . . it cannot afford to service the default-ed debt" (*id.*);

(5)     Meeting its obligations to Appellees will not in any way jeopardize the rights of any third parties, including the Exchange Bondholders (*id.*);

(6)     Foreign indebtedness restructuring by other countries will ***not*** be adversely affected by Argentina's payments to Appellees (*id.* at 27); and

(7)     Compliance with its equal payment obligations to Appellees "[will] not deprive Argentina of control over any of its property, [nor constitute an attachment] of foreign property prohibited by the FSIA" (*id.* at 24).

In short, while Appellees are threatened with serious irreparable harm if the Injunction is stayed without security to ensure compliance, no damage will be done to Argentina, the Exchange Bondholders, or the financial community if appropriate security is posted or if Appellees receive the payments to which they are entitled by contract and by the decisions of the courts.  Under these circumstances, Argentina should be required to post security as a condition of continuing the stay.

Requiring Argentina to post security for the stay is particularly appropriate given Argentina's routinized defiance of judgments and its pronouncements to defy the Injunction in this case. Far more reliable judgment debtors, including sovereign nations, are regularly required to post security as a condition of a stay. At the very least, Argentina should be called upon to post security of $250 million, which is a small fraction of full security and just 8% of the sums Argentina will be paying to Exchange Bondholders in the coming month alone. If Argentina refuses to post even that minimal security even as it prepares to pay more than $3 billion to Exchange Bondholders, that will amply demonstrate its intention not to comply with this Court's mandates and that the stay should be lifted at as to Argentina itself.

## BACKGROUND

### A. This Court Holds That Argentina Breached The Equal Treatment Provision And That Argentina Is Required To Specifically Perform Its Obligations Under That Provision

Appellees moved in the district court for an injunction requiring Argentina to live up to its promise to "rank" its "payment obligations" under the FAA Bonds "at least equally" with its payment obligations under "future unsecured and unsubordinated External Indebtedness." On February 23, 2012, the district court granted the Injunction, ordering Argentina to specifically perform its obligations under the Equal Treatment Provision, providing that "[w]henever the Republic pays any amount due under the terms of the [exchange] bonds," it shall make a "Ratable

Payment" to Appellees.  Feb. 23 Orders ¶ 2(a), Ex. FF.  Argentina appealed, and the district court issued a stay pending appeal together with a preliminary injunction, mandating that Argentina not "take any action to evade the directives of the [Injunction]," including "altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court."  Ex. EE ¶ 1 ("March 5 Stay Order").

On October 26, 2012, this Court affirmed the district court's decisions: "(1) granting summary judgment to Appellees on their claims for breach of the Equal Treatment Provision and (2) ordering Argentina to make 'Ratable Payments' to plaintiffs concurrent with or in advance of its payments to the holders of 2005 and 2010 restructured debt."  Op. 28.  This Court had "little difficulty" concluding that Argentina had breached the Equal Treatment Provision, "even under Argentina's interpretation" of that Provision.  *Id.* at 20.  This Court also held that the equitable relief that the district court ordered in the Injunction was permitted by law and amply justified by the equities.  The Court explained that Argentina's "disregard of its legal obligations exceeds any affront to its sovereign powers resulting from the" Injunction and upheld the district court's conclusion that "the Republic had sufficient funds, including over $40 billion in foreign currency reserves, to pay plaintiffs the judgments they are due."  *Id.* at 26.

5

Having affirmed the substantive provisions of the Injunction, this Court remanded for the district court to clarify "how the injunctions are to function" in two respects. *Id.* at 1. First, it requested clarification only as to "precisely how [the Ratable Payment] formula is intended to operate." *Id.* at 11. Second, it expressed "concerns about the [Injunction's] application to banks acting as pure intermediaries" and "confusion as to how the challenged order will apply to third parties generally," and thus requested that the district court "more precisely determine the third parties to which the Injunctions will apply." *Id.* at 27-28.

### B. Argentina's Highest Officials Declare That Argentina Will Defy The Injunction And This Court's October 26 Opinion

Immediately following this Court's October 26 Opinion, Argentina's highest officials repeatedly declared—in direct defiance of this Court's Opinion—that Argentina will pay the Exchange Bondholders, but will never pay Appellees. For example, Economy Minister Hernan Lorenzino proclaimed that "Argentina's capacity and willingness to pay has been demonstrated, again and again," but that "*[w]e are never going to pay the vulture funds. . . . That's not going to change because of rulings.*" Ex. AA (emphasis added). Minister Lorenzino reiterated that Argentina will continue its discriminatory payments "despite any ruling that could come out of any jurisdiction, in this case New York." Ex. X. As recently as this weekend, Economy Ministry personnel "roundly dismissed that [Argentina's] appeal would include any class of offer for the [Appellees]." Ex. F.

6

Argentine President Cristina Kirchner took the same position following this Court's decision, openly vowing that "we are going to pay [the Exchange Bonds], in dollars, because we have them," but "not one dollar to the 'vulture funds.'" Ex. W at 1; Ex. V at 1-2. Minister Lorenzino reiterated on November 14 that the "***President [will] not accept the reopening of the exchange nor pay as ruled by the judge***." Ex. K (emphasis added); *see also* Ex. O; Ex. P. Key members of President Kirchner's government, including the Foreign Minister and its Ambassador to the United States, made similar statements. Ex. M; Ex. N.

Argentina's November 16, 2012 brief to the district court on remand presented a similarly hard line. Rather than proposing an alternative to the payment formula advocated by Appellees, Argentina argued that it should not be required to pay Appellees at all—implicitly proposing a payment percentage of ***zero***. *See* Ex. L at 14.[2]

Consistent with that message, news sources report that Argentina is seeking to alter how it pays the Exchange Bondholders to eliminate U.S.-based institutions

---

[2] In seeking a stay in this Court, Argentina implied—for the first time in the two years of this litigation—that Argentina ***might*** permit the Appellees to extinguish their equal treatment rights entirely in exchange for discounted bonds like the ones it issued in 2010. This wholly inadequate and untimely suggestion is nothing more than a delaying tactic. The day after this Court entered the stay, the Argentine press reported that "[Economy] Minister Lorenzino had put in doubt that the government was going to present a new swap proposal." Ex. A.

and thereby evade the district court's supervisory jurisdiction. As early as July 13, 2012, an Argentine newspaper reported that Argentine officials were looking to "pay out the bonds at the Caja de Valores in Buenos Aires" to avoid compliance with U.S. court orders. Ex. DD at 2. Reports of Argentina's planned evasion multiplied following this Court's ruling. On October 29, 2012, Argentine news sources reported that Argentina's "technical staff" spent "all weekend" after the decision was issued "on the various scenarios that will be opening up from here on out to confront the vulture funds," and that Argentina is "now preparing alternative payment schemes . . . so that they can make [the Exchange Bond payments] abroad." Ex. Y at 3; Ex. Z at 1.

One article published on November 13, 2012 by a prominent Argentine newspaper reported that Argentina is considering, as one of two alternatives, ignoring the Orders and paying **only** on the Exchange Bonds outside of New York. Ex. R. Another analyst known for his contacts with Argentine officials advised his clients on November 9 that, "once the appeals process is over, our view is that Argentina would seek to reroute payments away from the US, rather than pay holders of defaulted debt." Ex. S at 1. *Bloomberg News* also reported that, according to Argentine news sources, certain Exchange Bondholders are "considering collecting interest payments in France or Switzerland, beyond the reach of U.S. District Judge Thomas Griesa." Ex. Q. And in the past several days, there have been reports that

8

an "anti-vulture" team in the Argentine Economy Ministry has worked through different proposals (Ex. D), including offering Exchange Bondholders the opportunity to exchange their "NY Law bonds into local law bonds" (Ex. C).

In December 2012, Argentina is scheduled to make three payments to the Exchange Bondholders—on the 2nd, 15th, and 31st—totaling approximately $3.3 billion. The most significant payment, scheduled for December 15, 2012, is expected to be nearly $3 billion. Once these December 2012 payments have passed, Argentine officials could continue their planned evasions with more deliberation, as Argentina's next scheduled Exchange Bond payment is not due until March 2013, when it must pay approximately $180 million.

## C.  The District Court Enters Its Orders On Remand And Lifts The Stay

On November 21, 2012, the district court entered its orders on remand. In an opinion ("Remand Opinion," Ex. G), the district court clarified the Ratable Payment formula to require Argentina to pay Appellees the full amount of the accelerated principal and interest if Argentina pays the full amount it is obligated to pay on the Exchange Bonds on any given date. The district court also explicitly set out the third parties bound by the Injunction under Rule 65(d).

That same day, the district court also lifted the stay of the Injunction. Under Fed. R. Civ. P. 65(c), the district court had authority to "suspend, modify, restore, or grant" further injunctive relief even during the pendency of the appeal. Citing

"extraordinary circumstance[s]," the court determined that it was appropriate to modify that relief here. It explained that, "[f]rom the moment of the October 26, 2012 Court of Appeals' decision, the highest officials in Argentina have declared that Argentina would pay the exchange bondholders but would not pay one dollar to holders of the original FAA Bonds." Stay Opinion at 2, Ex. H. Emphasizing that the March 5 Stay Order prohibited Argentina "from taking any action to evade the February 23, 2012 Order in the event that it is affirmed" (*id.* at 3), the district court explained that "action is called for" to confront the possibility "that Argentina will not honor or carry out the current rulings of the District Court and Court of Appeals" (*id.* at 4). It found that, the more time Argentina had beyond December 15 during which to "devise means for evasion," the more likely it became that Argentina could and would effectuate that evasion. *Id.* "The less time Argentina is given to devise means for evasion, the more assurance there is against such evasion." *Id.*

Accordingly, the district court lifted the stay and ordered Argentina to comply with the Injunction, as amended, as of Argentina's December 15, 2012 payment. *Id.* at 4-5. Because the Ratable Payment formula had not yet been reviewed by this Court, the district court declined to order that Argentina make any Ratable Payment to Appellees. Instead, it allowed Argentina to make any Ratable Payment

10

into an escrow account so funds could be returned to Argentina depending on the result of this Court's review of the formula. *Id.* at 5.

Argentina and several non-parties then filed emergency motions to stay the Injunction pending appeal. This Court granted a stay and set a schedule concluding with oral argument on February 27, 2013.

## ARGUMENT

### I. This Court Should Condition The Stay On Argentina's Posting Of Security

To decide whether a party is entitled to a stay, a court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In addition, a court must consider whether equity requires the stay applicant to post security during the stay to protect the rights of the prevailing party. *See* Fed. R. App. P. 8(a)(2)(E); *accord* 16A Charles Alan Wright, Arthur Miller, & Edward H. Cooper, Federal Practice and Procedure § 3954.1 (4th ed. 2012). Security is required "where there is some reasonable likelihood of the judgment debtor's inability or unwillingness to satisfy the judgment in full upon ultimate disposition of the case" (*Texaco, Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1154-55 (2d Cir. 1986)), such as when the applicant "has no assets in

the United States" (*Adsani v. Miller*, 139 F.3d 67, 79 (2d Cir. 1998)). That requirement reflects the practical policy that "a plaintiff who has won in the trial court should not be put to the expense of defending his judgment on appeal unless the defendant takes reasonable steps to assure that the judgment will be paid if it is affirmed." *Lightfoot v. Walker*, 797 F.2d 505, 507 (7th Cir. 1986).

These factors weigh strongly in favor of requiring Argentina to post security as a condition of a stay of the Injunction as applied to itself.

### A. Appellees Will Be Irreparably Harmed Absent Argentina's Posting Of Security

The extraordinary developments since this Court issued its October 26 Opinion show precisely why security is necessary. As discussed above, from the moment this Court issued its decision, Argentina's President and high ministers have declared their intent to evade the Injunction. *See supra* 6-9. They have declared that they "are going to pay [the Exchange Bondholders], in dollars, because we have them," but are "never" going to pay Appellees—not even a "cent" or "one dollar" or "a single peso"—and "[t]hat's not going to change because of rulings." Ex. AA; Ex. J; Ex. M; Ex. W at 1; Ex. V at 1-2. When presented with these statements, the district court recognized them for what they were: "they are simply saying we will not comply." Nov. 9 Tr. 12:5-6, Ex. T.

Consistent with those threats of noncompliance, Argentina is developing plans to move its Exchange Bond payment structure offshore. *See supra* 8-9.

12

When confronted with the daily press reports of Argentina's plans—in sources ranging from *The Wall Street Journal* to *Bloomberg News* to Argentina's leading newspapers—Argentina criticized the reports as "newspaper hearsay" but refused to dispute their accuracy. Ex. U at 3. This classic non-denial denial confirms that Argentina is actively and aggressively attempting to create a plan to evade the Injunction. And while Argentina has proffered a declaration merely asserting that it is complying with the stay pending appeal, ***it has never denied that it is actively engaged in developing a plan to evade the Injunction when the stay is lifted***.[3] As the district court explained, if Argentina moved its payment mechanisms offshore, then this Court's October 26 Opinion affirming the Injunction might "be entirely for naught." Remand Opinion at 9.

Although Argentina had been investigating ways to evade the district court's orders, executing such plans would take time—more time than permitted by the December 15 payment deadline. For example, Argentina would need to consider the non-U.S. institutions it uses to re-route payments. One analyst noted that even the Caja de Valores, the Argentine institution frequently cited as an alternate payment center (Ex. DD), "is not bulletproof because Caja de Valores has foreign as-

---

[3] The declaration—offered by a less senior official within Minister Lorenzino's Ministry of Economy—merely states that Argentina "has complied, is complying, and will comply with the terms of the March 5 Stay Order." Ex. GG.

sets that could be affected." Ex. E. And another exchange offer that effectively converts the Exchange Bonds from New York law securities into Argentine law securities likely could not be consummated before December 15. *Id.* Argentina's strategy has thus been "to engineer a stay that would give the government more time to solve the payment issue." *Id.*

With the stay now in place for the December 2012 payments, Argentina will be able to make its $3.3 billion payments on the Exchange Bonds while paying Appellees nothing and then enjoy ***at least*** an additional ***three months*** to attempt to devise its evasion scheme. The risk grows exponentially to the extent the stay is extended beyond March and potentially during Argentina's efforts to obtain further review. The more time "Argentina is given to devise means for evasion," the more likely it is that such evasion will occur. Stay Opinion at 4.

In sum, there is far more than "some reasonable likelihood of [Argentina's] unwillingness to" comply with the Injunction "upon ultimate disposition of the case." *Texaco*, 784 F.2d at 1154-55. Far more reliable judgment debtors, without Argentina's history of serial defaults and non-compliance, are routinely required to post bonds pending appeal. Regardless of whether Argentina actually succeeds in rerouting its payments during the pendency of this appeal, Appellees should not have to bear the risk that it will do so. *See Texaco*, 784 F.2d at 1154-55; *Adsani*, 139 F.3d at 79.

14

## B. Conditioning Maintenance Of The Stay On The Posting Of Security Will Not Harm Argentina

Argentina will suffer no harm if it elects to post security to maintain the stay. Argentina does not lack for funds. As this Court explained, "the Republic ha[s] sufficient funds, including over $40 billion in foreign currency reserves, to pay [Appellees] the judgments they are due" and also to pay the Exchange Bondholders. Op. 26. Any security would be returned to Argentina in the unlikely event that it should prevail before this Court or the Supreme Court. Similarly, if Argentina or the Exchange Bondholders convince this Court to order a different Ratable Payment formula than the one the district court provided, or if Argentina pays less than 100% of what it owes on the Exchange Bonds, Appellees would only be entitled to the portion of the security provided for by the payment formula.

Nor will posting security infringe on Argentina's sovereignty. There is ample precedent for conditioning a stay on a sovereign posting security. *See, e.g.*, *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1478 (9th Cir. 1992) (China not entitled to stay because it "refused to post a supersedeas bond or letter of credit to stay execution"); *Sales v. U.S. Underwriters Ins. Co.*, No. 93-Civ.-7580-CSH, 1995 WL 144783, at *6 (S.D.N.Y. Apr. 3, 1995) (Uganda not entitled to a stay because it "refused to post a bond"); *Morgan Guar. Trust Co. v. Republic of Palau*, 702 F. Supp. 60, 65-66 (S.D.N.Y. 1988) (imposing bond of less than total defaulted debt where defaulted debt was 145% of Palau's governmental

15

revenue). To the extent Argentina would argue that its Lock Law prohibits com-

pliance with a conditional security, that notion would be belied by indications that

the Argentine Congress is so dominated by President Kirchner's allies that it could

and would repeal the Lock Law *in an hour* if asked. Ex. B. In any event, this

Court held that "Argentina's disregard for its legal obligations exceeds any affront

to its sovereign powers resulting from the" district court's orders. Op. 26. That is

as true now as it will be at the conclusion of these proceedings. *Id.*

### C. Requiring Security Would Serve The Public Interest By Eliminating Any Potential Harm To Third Parties And Promoting The Rule Of Law

Requiring Argentina to post security in the amount Appellees are owed

would resolve any concerns about the impact of the Injunction on third parties, in-

cluding the Exchange Bondholders. Once Argentina posts such security, that

would settle any uncertainly in the market, as it would provide all interested parties

with assurance that Argentina will honor *all* of its obligations—to both Appellees

and to the Exchange Bondholders—once this Court finally determines what those

obligations are and lifts the stay. And even if Argentina only posted security of

$250 million, a mere fraction of what it owes to Appellees, this would at least pro-

vide an indication of Argentina's good faith that would calm the concerns of the

markets, Exchange Bondholders, Appellees, and the courts.

Only if Argentina refused to post any security at all, thereby evincing an intention not to comply with this Court's orders, could countervailing concerns arise. But a threat not to comply cannot possibly justify—much less dictate—continuing an unconditional stay.[4]

Argentina's vows not to comply, and its ongoing plans to evade the Injunctions, present a serious challenge to the rule of law. The obligation to protect that value supports denying equitable relief to litigants that threaten to undermine it. *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 127-29 (2d Cir. 2009). Requiring Argentina to post security will ensure its compliance with this Court's ruling and therefore protect the rule of law.

### D.    Argentina Has No Likelihood Of Success On The Merits

Argentina's bid for an unbonded stay of the Injunction as to itself is also inappropriate because there is no appreciable probability—much less a likelihood—that Argentina will, at this phase of the proceedings, prevail on its contention that it should not be required to specifically perform its obligations under the Equal Treatment Provision. This Court already has affirmed "the judgments of the district court (1) granting summary judgment to plaintiffs on their claims for breach of

---

[4]  Nor would the third parties that act with Argentina in making the Exchange Bond payments be adversely affected by the proposed relief. Even if Argentina fails to post security and the stay is lifted *as to Argentina*, this Court's stay could remain in place as to any institutions that might be bound under Federal Rule of Civil Procedure 65(d).

the Equal Treatment Provision and (2) ordering Argentina to make 'Ratable Payments' to plaintiffs concurrent with or in advance of its payments to holders of the 2005 and 2010 restructured debt."  Op. 28.  This Court remanded to the district court to clarify only two narrow issues: the Ratable Payment formula and the extent of the Injunction's binding effect on third parties such as intermediary banks.

Although Appellees expect the district court's careful decision on these issues to be affirmed, no modification to the payment formula or the reach of the Injunction to third parties could make Argentina the prevailing party in this appeal. This Court has already held that Argentina must "make 'Ratable Payments' to plaintiffs concurrent with or in advance of its payments to holders of the 2005 and 2010 restructured debt."  Op. 28.  If this Court ultimately determines that Appellees are owed a lesser amount under the Ratable Payment formula than what the district court ordered, then Argentina will have still lost on the merits and, in the event of non-compliance, Appellees would merely draw less from Argentina's security.  And whatever this Court determines as to the Injunction's reach to third parties, that would not affect whether Argentina is bound by the Injunction.  This Court has already held that it will be bound once the Injunction comes into effect.

## II.     Conditioning A Stay On The Posting Of A Reasonable Security Is Consistent With The FSIA

In affirming the district court's orders, this Court held that requiring Argentina to make a Ratable Payment to Appellees if Argentina paid the Exchange

Bondholders did not violate section 1609 of the FSIA (28 U.S.C. § 1609), which prohibits "attachment arrest and execution" of a sovereign's property in the United States. That section does not apply, this Court explained, because Argentina retained the right to choose whether and how much to pay Appellees—it could "pay all amounts owed," "[o]r it can decide to make partial payments," so long as Argentina made similar proportionate payments to the Exchange Bondholders. Op. 25.

A condition of security would permit Argentina the same choice. Argentina may choose to post security to continue its stay. It may choose not to post security and to comply with the Injunction by paying Appellees when it pays the Exchange Bondholders. Or Argentina may choose not to post security and not to pay anyone. *Id.* Conditioning Argentina's stay on its posting of security thus is not prohibited by the FSIA. Rather, it is common practice when a sovereign's ability or willingness to satisfy a judgment is in doubt. *See Richmark*, 959 F.2d at 1478; *Sales*, 1995 WL 144783, at *6; *Morgan Guar.*, 702 F. Supp. at 65-66.

## III. Alternatively, This Court Should Expedite The Briefing Schedule

If this Court determines that requiring Argentina to post security is unwarranted, Appellees respectfully request that this Court expedite the briefing and consideration of the present appeal. The parties fully briefed the two remaining issues in this case in 10 days before the district court and can do so just as quickly before

this Court. Expediting the briefing schedule will allow this Court to resolve this case fully before the nearly $3 billion payment due on December 15 or, at minimum, before the $500 million payment due on December 31. This would not prejudice the parties or the Court, but would ensure that Argentina does not have until March 2013 to attempt to devise a means to evade the U.S. courts.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that the Court modify its order granting a stay of the November 21, 2012 orders to provide that the stay will dissolve unless Argentina elects to post security of $1.45 billion, or at least $250 million, on or prior to December 10, 2012. Alternatively, Appellees respectfully request that the remaining proceedings be further expedited to permit this Court to decide the remaining issues in this case before Argentina's December 2012 payments.

DATED:  November 30, 2012                    Respectfully submitted,

By: /s/ Theodore B. Olson

Robert A. Cohen
(robert.cohen@dechert.com)
Eric. C. Kirsch
(eric.kirsch@dechert.com)
DECHERT LLP
1095 Avenue of the Americas
New York, N.Y. 10036-6796
(212) 698-3500

Theodore B. Olson
(tolson@gibsondunn.com)
Matthew D. McGill
(mmcgill@gibsondunn.com)
Jason J. Mendro
(jmendro@gibsondunn.com)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500

*Attorneys for Plaintiff NML Capital, Ltd.*

Stephen D. Poss
(sposs@goodwinprocter.com)
Robert D. Carroll
(rcarroll@goodwinprocter.com)
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
(617) 570-1000

*Attorneys for Plaintiff-Appellee Olifant Fund, Ltd.*

Edward A. Friedman
(efriedman@fklaw.com)
Daniel B. Rapport
(drapport@fklaw.com)
FRIEDMAN KAPLAN SEILER
& ADELMAN LLP
7 Times Square
New York, N.Y. 10036
(212) 833-1100

Jeffrey A. Lamken
(jlamken@mololamken.com)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

*Attorneys for Plaintiffs Aurelius Capital Master, Ltd., Aurelius Opportunities Fund II, LLC, ACP Master, Ltd., Blue Angel Capital I LLC*

Michael C. Spencer
MILBERG LLP
(MSpencer@milberg.com)
One Pennsylvania Plaza
New York, N.Y. 10119
(212) 594-5300

*Attorney for Plaintiffs Pablo Alberto Varela, et al.*

Exhibit 10

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 4th day of December, two thousand and twelve.

Present:     Rosemary S. Pooler,
             Barrington D. Parker,
             Reena Raggi,
                  *Circuit Judges.*

_____

| | |
|---|---|
| NML Capital, Ltd., Aurelius Capital Master, Ltd., ACP Master, Ltd., Blue Angel Capital I LLC, Aurelius Opportunities Fund II, LLC, Pablo Alberto Varela, Lila Ines Burgueno, Mirta Susana Dieguez, Maria Evangelina Carballo, Leandro Daniel Pomilio, Susana Aquerreta, Maria Elena Corral, Teresa Munoz De Corral, Norma Elsa Lavorato, Carmen Irma Lavorato, Cesar Ruben Vazquez, Norma Haydee Gines, Marta Azucena Vazquez, Olifant Fund, Ltd., | **ORDER** |

**ORDER**
Docket Nos. 12-105(L), 12-109(Con),
            12-111(Con),12-157(Con),
            12-158(Con), 12-163(Con),
            12-164(Con), 12-170(Con),
            12-176(Con), 12-185(Con),
            12-189(Con), 12-214(Con),
            12-909(Con), 12-914(Con),
            12-916(Con), 12-919(Con),
            12-920(Con), 12-923(Con),
            12-924(Con), 12-926(Con),
            12-939(Con), 12-943(Con),
            12-951(Con), 12-968(Con),
            12-971(Con).

Plaintiffs-Appellees,

v.

The Republic of Argentina,

Defendant-Appellant.

_____

Appellees request that this Court amend its November 28, 2012 stay order by requiring the Republic of Argentina to post security on or before December 10, 2012. IT IS HEREBY ORDERED that the motion is DENIED.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court



# Exhibit 11

Case: 12-105     Document: 1026-1     Page: 116     10/25/2013     1076012     203

# Argentine primary makes Fernandez lame-duck leader

**Charter**

**The Associated Press** - *By MICHAEL WARREN - Associated Press*                    (August 12, 2013 3:52pm)

Close Window

**Print Story**

BUENOS AIRES, Argentina (AP) — Cristina Fernandez de Kirchner could lose control of Argentina's Congress during the last two years of her presidency if Sunday's primary results are repeated in October's midterm elections. The results also end any hopes of changing constitutional term limits to enable her to stay in power beyond 2015, a key ally said Monday.

But Fernandez made it clear at a post-election pep rally that she has no intention of changing her ways: "We're going to keep deepening this transformation, because it's our obligation," she said.

Fernandez failed the first electoral test of her second term as the ruling party gathered just 26 percent of the votes nationwide — far below the 54 percent that re-elected her nearly two years ago, and five points below the party's showing in the last mid-term elections.

But far from admit defeat, she urged her followers to redouble their efforts, and warned Argentines to beware of alternatives to her government.

"There may be other politicians showing up offering something different," she added. "I ask that all of you think about what we've done in the last 10 years."

The governing Front for Victory party remains the only political force in Argentina with a nationwide organization, but it trailed in every major city, including the capital and the all-important surrounding province of Buenos Aires, a traditional Kirchner stronghold, where 35 percent of the voters live.

With 98 percent of the vote counted, Sergio Massa's Renewal Front commanded 35 percent of the vote in the key suburbs around Argentina's capital, compared to 30 percent for the list led by the president's hand-picked candidate, Martin Insaurralde.

Massa, who broke from Fernandez only 40 days before the primaries, sounded more like a candidate for the presidency than for the house of deputies in his victory speech. He invited people from all over Argentina's polarized political landscape to join him in a new movement that would rule from the center, build coalitions and protect the middle class, a group that he said hasn't been represented.

"We have to think of the future. We have to learn to stop looking at the past as a way to build a future for all Argentines," Massa said. "We feel proud that the path we have chosen is one of unity in diversity, of coming together without aggression ... the people who have joined us are saying 'enough with confrontation in Argentina.'"

Insaurralde, a 43-year-old mayor of Lomas de Zamora, was hand-picked by Fernandez and showered with attention as she sought to improve his name recognition. She even brought him to Rio de Janeiro for a photo-opportunity with Pope Francis.

Massa, the 41-year-old mayor of the wealthy riverfront Tigre municipality, briefly served as Fernandez's Cabinet chief and now leads a breakaway branch of Peronism, the broad and splintered political movement that many Argentines claim some allegiance to.

Support for Fernandez has dropped amid corruption scandals, discontent over inflation, deteriorating public services and what many see as a weakening of institutions in the face of authoritarian presidential power.

Sunday's vote was Argentina's first obligatory nationwide primary, but most parties settled on "pre-candidates" beforehand and presented unified slates, turning the election into a party-popularity contest ahead of the Oct. 27 vote.

Fernandez hasn't needed the votes of any opposition lawmakers to provide the quorums required to push through legislation or quash investigations. But with half the seats in Congress and a third of seats in the Senate up for grabs, her opponents are hoping to impose new checks on her power.

The president's opponents — and even some of her allies — had raised the possibility that if the ruling party could increase its share of both houses to a solid two-thirds, it could change the constitution to eliminate term limits and keep her in power. Instead, the ruling party lost ground Sunday night, so much so that a key ally said the vote has definitively taken the idea off the political agenda.

Whoever wins big in October also could become a leading candidate to succeed Fernandez.

"Now it's been definitively cleared up that there will be no constitutional reform, that there's no possibility of a re-re-election," said Ricardo Forster, a ruling party congressional candidate, told the radio La Red station on Monday. Forster said that's a good thing for Argentina, since it will force her opponents to develop better platforms.

———

Associated Press writer Debora Rey contributed to this report.
2013 AP

**Original article can be found at:**

http://www.charter.net/news/read/category/Top News/article/ap-argentine_government_loses_ground_in_pri-ap

© 2013 Synacor, Inc. All Rights Reserved

# Exhibit 12

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

A very good evening to you all: last Friday the Appeals Chamber of New York City confirmed the ruling by Judge Griesa in favor of the vulture funds that are already well-known to the Argentine people, because it was they who last year seized the Libertad frigate in the Republic of Ghana, forcing us to resort to International Law and the International Courts to recover one of Argentina's symbols at no cost to the public purse. Other seizures had taken place previously, of Tango 01, embassies and other funds. However, what we really want to talk about today, making it known not only to domestic public opinion and the inhabitants of the Argentine Republic, but also to all those bond-holders who have trusted in Argentina – who represent 93% of all bond-holders – is that in reality the Appeals Chamber ruling ignores this agreement, that we have had success with 93%, or at least it minimizes its value, and I also believe that – in our humble opinion – it ignores the sovereign immunity of debt restructuring, which was carried out first in 2005 and then in 2010 because, as stated in the National Constitution of Argentina, negotiating foreign debt is a specific power of the National Congress, which may only be agreed upon with its approval.

In any case it is worth remembering what is at the origin of all this; because, even if it seems a long time ago, December 31, 2001, the date on which Argentina defaulted by exactly 81,836 million dollars, is not that long ago. I repeat: On December 31, 2001 Argentina, our country, defaulted on 81,836 million dollars worth of bond debt.

The source of this was that 49%, or 40,363 million, had been issued during the Government Administration between the years 1989 and 1999; the remaining 51%, that is, 41,473 million, was issued by the Administration between 1999 and the time at which the default was declared.

It should also be recalled that in 2003 President Kirchner recognized and faced this debt problem, which in fact dates from March 24, 1976, when the country began accumulating more and more debt, creating a constant "financial bicycle" which was aggravated during the convertibility and finally imploded on December 31, 2001.

President Kirchner had a radically different idea from what had been supported up until then. Until then, the motto of permanent indebtedness, if there was such a thing, was: pay in order to grow. He said that it was the exact opposite; that we needed to grow in order to be able to pay. Well, he was not trying to be smart; he was simply observing what had happened in Argentina over the last 30 or 40 decades, and the conclusion

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

was always the same: we would not be able to pay if we didn't grow, on the contrary, we were paying with more debt and the debt was growing ever larger, which represented a very severe restriction on the Argentine economy in terms of education, culture, infrastructure, society, health, work creation and production. In fact, as we all know, when Néstor took office Argentina had a 25% unemployment rate, faltering industries and a situation we can all remember.

I remember how, at the first UN Assembly he attended in September 2003, he forcefully addressed the foreign debt issue and insisted that the world had to understand that it should allow the Argentine economy to grow so it that it would be able to pay. He used a phrase that I will never forget: "we must be allowed to grow in order to be able to pay, because dead men don't pay their debts." And from that moment on, he inverted the logic of paying in order to grow, for that of growing in order to pay.

And precisely since 2003 and up to today large payments have been made, following two rounds of restructuring: in 2005, in March 2005 debt was restructured during the presidency of Néstor Kirchner. I remember well that that negotiation was difficult and long, and at one point the first bank that intervened as negotiator and eventual fiduciary, Wachovia, withdrew in the middle of the process, causing a severe crisis at a time in which the former Minister of Economy tendered his resignation to President Kirchner because it seemed that he had failed in his attempt to restructure the debt, but Kirchner said: "let's stay confident and let's carry on." The decision was made to appoint the Bank of New York, known in the financial industry as BoNY, as negotiator initially and ultimately as fiduciary. Finally that first exchange took place. Very few trusted it and very few invested in it, but Néstor had great expectations for it and ended up restructuring 76% of the sovereign debt, with the most important principal reduction in recorded history. In order to understand the importance this principal reduction had on Argentina's subsequent growth, it can be quantified at over 79,000 million pesos.

To help you understand how much this represents, it is the entire Universal Child Allowance, it is the more than 2,000 schools built over that 10 year period in the Argentine Republic, and it is all the housing and accompanying infrastructure, all social housing built since 2003. This should give you a sense of the magnitude and importance of this action.

What was the argument for this principal reduction? Over the entire period when it was in debt, Argentina was paying outrageous dollar interest rates; while the entire world was paying one or two percent interest rates, we were paying double-digit rates. The

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

main argument for this principal reduction was that anyone who knows they are going to a place that pays an exorbitant interest rate, which is paid nowhere else in the world, will, logically, be aware of the risk they are taking in placing their assets there. Because of this we said that the risks should be between a country that had wagered on a "financial belly," and, on the other hand, those who knew that it was impossible to get their money back at that kind of interest.

This is when the holdout problem began, consisting – let's say – of those who had not participated in the first exchange. Although all countries have some form of bankruptcy law, our country has one under which it is enough for 66% of all creditors to be in agreement for a judge to approve the bankruptcy, or its proceedings, which is a figure similar to that in the United States. In this initial agreement we secured 76% agreement. However, the holdout problem continued. It was logical, since many people did not believe in Argentina, which, after all, had never paid its debt. We, too, would have liked to contribute and show even more goodwill by creating what was called the Growth Coupon, under which, if Argentina grew, its creditors would receive even larger returns, which resulted from their decision of going along with and going into partnership with the Argentine growth.

Then, in 2010, during my presidency, we reopened the exchange and reached record levels of debt restructuring acceptance, which is the 93% to whom we were indebted. More confidence had been built up: not only had we repaid debt issued under foreign jurisdiction, but also debt issued under domestic law; we had also paid off debt at the Bank of New York; we had paid off debt here in the country, with which we achieved that 93%, which was a great achievement by the Minister of Economy at the time, who, along with his team, traveled the world. But so did our current Minister of Economy, Dr. Lorenzino, to bring in many other bondholders, from Italy and Japan, who were smaller and had been left out of the first exchange. We arrived – I repeat – at that figure of 93%.

I consider that the ruling from the Appeals Chamber of New York is somewhat unfair to Argentina. It is based on an argument from the "Financial Times" and says that he rules against us because Argentina is a "recalcitrant debtor." Between 2003 and 2012, Argentina, this country considered a recalcitrant debtor, has paid off 173,733 million dollars. I repeat: since 2003 we have paid off 173,733 million dollars. 41,044 million dollars have been paid within the national public sector itself, between different bodies of the national public sector who lend to each other for infrastructure financing, and for everything else that makes the State work. We have paid 81,487 million dollars to the private sector (foreign and national bondholders, in dollars) and to multilateral credit entities, among them the International Monetary Fund, when we settled some of our debt in 2006, to the Inter-American Development Bank for the loans it granted us, to the

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

World Bank, to Corporación Argentina de Fomento, 51,201 million dollars, to a total of 173,733 million dollars.

Let us say that, rather than recalcitrant debtors, we are serial payers. Furthermore on the plus side, we have done this with legitimate resources - resources obtained from commercial administration, and by better management of State resources, without accessing capital markets. I think that, just as we were entered into the Guinness Book of Records as the largest sovereign debt that was ever defaulted on, we should also be entered as the country that has paid the most, since we have complied with all of our obligations over the past ten years, without accessing capital markets.

That is why I think it is important that all Argentineans learn about our efforts and that the whole world is made aware of all that we have achieved. When Kirchner took office, the Argentinean debt, in dollars, was approximately 150% of GDP; today, all our debt before national or foreign creditors is a little less than 10% of GDP in foreign currency. This means that we have brought it down from 150% of GDP to a little less than 10% of GDP.

And in a few more days we will pay 2,000 million dollars in cash for BONAR 7; on September 12 to be precise. This is a national legislation bond which will also be paid out by the local Securities Depository, although most bondholders will collect their returns overseas from local branches of foreign banks that pay their headquarters or affiliates wherever their international creditors are located, since it is easier for most of them as they are located outside of the country. In this way, the debt is paid down.

From that moment on, that is, from September 12, Argentina's liabilities in foreign currencies, either Euros or dollars, will be 8.3% of GDP.

It should also be remembered that this is one of the lowest debt ratios among developed countries – not to mention among the other countries in the region.

It should also be remembered that our current Government is a serial payer but not a serial debtor, since debt was accumulated by previous administrations, and it was they

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

who defaulted. This has allowed the Argentine people, and this Administration, to grow and thus be able to repay its debt.

Now, about this ruling... I heard some comments today that I would consider short-termist, as they mentioned that "in reality, the ruling will only have immediate effects because it will be appealed and ultimately will be decided by the Supreme Court of the United States in 2014 or 2015."

This really does not sound too sensible; it is irresponsible for a good government to believe that 2014, 2015 or the short term is any kind of solution to a problem. We believe that problems must be resolved not only in the short term, but also in the mid- and long-term.

Hence, our decision... we have made some decisions on this basis because as a country, we cannot condone having the sword of Damocles hanging over our neck saying that at any moment someone will make a decision, that the 2005 and 2010 exchanges will collapse, that our creditors will not pay and that our country will go back to 2001. This is the one thing we will not allow, at least for as long as I am President.

For that reason, the first decision that we have taken is to ask God to enlighten the Supreme Court of the United States because, in reality, we really would be faced with a case that would not only tear down one of the most important debt restructuring plans in living memory, but also invalidate other debt plans. You also have to bear in mind that these vulture funds only amount to 0.45%.

To be clear: 93% of Argentina's creditors settled; 7% did not settle, but it is only the vulture funds that are in court in New York and who have obtained this ruling, and they represent 0.45% of the total debt. Bonds that were bought as recently as 2008, when they had already been defaulted on, were worth very little and if what they intend takes place, the profit in dollars would be a little over 1,300%, something which really lacks logic and common sense. I think that one does not have to be an expert in law or economics to realize that this way, not only the Republic of Argentina, but the entire country would melt down. In particular, at times when several of the developed countries of the First World are also restructuring their debt.

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

For this reason, the decision taken by the Supreme Court of Justice of the United States would not only have an impact on Argentina, but it would also have an impact throughout the International financial world. It is not in vain that several "amicus curiae" have been presented to the Court, which is not exactly a friend of Argentina; it is sufficient to recall the former Director of the International Monetary Fund, Anne Krueger, and several administration funds that also have interests and have presented, the Government of the Republic of France, who we also thank for their presentation before the Supreme Court of the United States.

But also, because, as I said, we cannot have a Sword of Damocles hanging over our heads, we have taken two more decisions, in addition to the quasi-spiritual and quasi-earthly one of entrusting ourselves to God and the Supreme Court of the United States: firstly, tomorrow, we will send a new proposed Law to the Argentinean Parliament, which, under the Constitution and article 75, is the only body qualified to rule on Argentina's external debt. The Executive Power will always act as a negotiator, as a delegate, but ultimately the agreements must pass through the Parliament to be approved or rejected. This proposed Law will consist of, specifically, opening up the debt exchange for a third time to the 7% that has not yet participated. Once again, we want to demonstrate the Republic of Argentina's profound will to honor its commitments.

Today we cannot, because we would be in breach of the law of our country that already established the 93% and closed the second exchange in 2010. Nevertheless I reiterate that we are going to propose a Law to Parliament precisely so that the 7% has the ability to take part, the possibility of taking part and, well, then to receive payment under the same conditions as the rest of the creditors.

However, we have also taken the decision to safeguard those who have put their trust in the Republic: the 93% of bondholders who have trusted Argentina and have been being paid, some since 2005 and others since 2010. This would involve replacing the bonds with the same currency, under the same terms, and simply changing the place of payment to avoid potential seizures that the funds could suffer because we have already suffered seizures in the past.

To be clear: those who hold Argentine bonds, the 93%, will be issued with similar bonds in their stead, in foreign currency and under the same terms, but they will simply be paid out here in the Republic of Argentina from the Securities Depository.

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

Because we have already paid back, to give you an idea of the certainty and legal security that this signifies, the BODEN 12, which were the bonds that Argentina issued to pay all those who were trapped by the bank freeze, when, you remember, they could not withdraw their funds from the banks; the Argentine Government, with bonds issued by Argentine Law and payments made here at the Securities Depository in Argentina, has already totally paid down this debt, which amounted to 19,600 million dollars.

Argentina paid the total amount of savings confiscated from Argentineans and non-Argentineans, in other words, those of citizens and foreigners, to the value of 19,600 million dollars with bonds issued through local legislation and paid here in the Republic of Argentina under the terms and in the currency that had been stipulated.

Furthermore in a few days' time, or on September 12 to be precise, as I mentioned a few moments ago, we will pay out another bond also issued, the BONAR 7, for 2,000 million dollars, also issued under local law and with payments made here at the Securities Depository of the Republic of Argentina, just as we have already paid thousands of millions of dollars of bonds issued through local legislation and with payments made here in Argentina.

Therefore, this certainty and legal security derives not only from our conviction that we should face our obligations that Argentina as a State has committed to, even though it was not our government's doing, but also fundamentally from those objective, concrete actions that we have taken by paying bonds issued here in Argentina.

The fundamental duty of this is not a commitment to pay. I know that here there are some sectors that say that we should not pay anything, or only the absolute minimum, because to pay would be unreasonable. Yet it is important to remember that the Republic of Argentina has 40 million inhabitants who demand that the Government authorities take responsibility in terms of being able to guarantee ongoing growth in Argentina within a framework of legal security and facing up to its obligations.

For this reason, today I wanted to address not only the 40 million Argentineans, but also those who have put their trust in us, private domestic and foreign investors, and who have formed part of the 93% that accepted bonds from Argentina with a growth coupon

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

that has paid out regularly, and also the rest of the International financial world and specifically the authorities of the United States and, ultimately, its Court, because in fact we would indeed be inflicting certain harm on legal security, on trust, on the confidence that debt restructuring must rely on at this very difficult time globally for matters financial.

It seems to us that only the 1.45% that joined in 2008 with junk bonds, bought for very little, are those aiming today to spoil what we have achieved in terms of debt restructuring, growth, payment, and contribution to the world, because ultimately it is a contribution from Argentina to the legal certainty of the world and to the confidence of those who put their trust in Argentina. I think it is important that we have that contact and that we can say these things.

Finally, to those who often tell us that we like to speak of the past and who think that the past is past, I think that last Friday, Friday of last week, it was conclusively confirmed that the past, particularly in economics, is always just round the corner. It is enough for someone to make a mistake or for someone to have other interests that are not those of representing the interests of the 40 million Argentinean people, for the things that we have worked so hard to achieve over the last few years to be undermined at the last minute.

When we sometimes say things about the past it is not in the spirit of drawing parallels, in the spirit of accusing or placing greater value on what we have done, but quite the opposite; we are trying to avoid repeating the mistakes that we Argentineans have made, and I include myself here even though I have not been part of any indebting government. However, I am part of Argentina and I feel I have as much responsibility as the 40 million other Argentineans, but also the greatest responsibility because they have elected me to direct the fate of this country.

That is why, in short, I wanted to tell you about these two important decisions, to reopen a third debt exchange law. I hope that, as we say here in Argentina, it will be third time lucky and we can finally bring in that 7%.

It is also a call for reason and common sense that the 0.45 %, who acquired their bonds at such a low price, should not put in jeopardy the 93% of creditors along with the amounts that we have paid and we will keep on paying, and also, crucially, Argentina's

**Debt exchange reopening project: Speech by the President broadcast to the nation**
Tuesday, August 27, 2013

ability to grow further to generate employment, provide healthcare and education and, at the same time, to face up to our obligations.

For these reasons, I wanted to address the people of Argentina today and also, crucially, those who have believed in Argentina, who have backed us, who continue to do so, because we are all at the prow of the ship and ultimately we will steer it safely to port and we also believe, we have firm hopes, that common sense will prevail over the formidable lobby that we have seen over recent days where the 0.45% is able to impose its will over the 93%.

I am also a lawyer and I know that this decidedly is a question of equality between the parties; I know that it is a question of fairness; I know that it is a question legal security; I know that it is a question of the certainty that must be felt when entering into economic and financial relations in the world and, therefore, we ask that, in the same spirit of responsibility with which we have acted over the last 10 years, with punctual payments for all our commitments for the first time in our history, those who hold this decision in their hands act in the same spirit of responsibility.

In any case, we also state that Argentina will not violate its own laws and will specifically enable the participation of the Argentine Parliament in a matter as important as this, as we did in 2005 and 2010, which has enabled us to experience growth and face up to our commitments.

Many thanks for listening and good night to you all.



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Mariela Lopez, hereby affirm that the document "Debt Exchange Reopening Project: President Kirchner's Broadcast to the Nation, August 26, 2013" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Mariela Lopez

Sworn to before me this
29th of August, 2013

_____
Signature, Notary Public

RYAN ALEXANDER DROST
Notary Public - State of New York
No. 01DR6262048
Qualified in NEW YORK County
My Commission Expires MAY 21, 2016

Stamp, Notary Public
State of New York



**TRANSPERFECT**

Ciudad de Nueva York, Estado de Nueva York, Condado de Nueva York

Yo, Mariela Lopez, por la presente certifico que los documentos "Debt Exchange Reopening Project: President Kirchner's Broadcast to the Nation, August 26, 2013" son, según mi leal saber y entender, una traducción fiel y exacta del Español al Ingles.

_____
Mariela Lopez

Juramentado ante mí este
29 de Agosto 2013

_____
Firma, Notario Público

_____
Sello, Notario Público

RYAN ALEXANDER DROST
Notary Public - State of New York
No. 01DR6262048
Qualified in NEW YORK County
My Commission Expires MAY 21, 2016

Muy buenas tardes a todos y a todas: el día viernes pasado, la Cámara de Apelaciones, de la Ciudad de Nueva York, confirmó el fallo del juez Griesa, que la da la razón a los fondos buitres que ya son conocidos por los argentinos, porque fueron precisamente los que embargaron, el año pasado, la Fragata Libertad, en la República de Ghana, y por la cual tuvimos que recurrir al Derecho Internacional y también a tribunales internacionales, para obtener sin ninguna relación por parte del erario público, la restitución de uno de los símbolos de la Argentina. Antes habían existido algunos otros embargos sobre el Tango 01, sobre embajadas, sobre otros fondos. Pero en realidad lo que queremos hablar, hoy, y dar a conocer no solamente a la opinión pública nacional, a los habitantes de la República Argentina, sino también a aquellos tenedores de bonos, que han confiado en la Argentina - el 93 por ciento de los tenedores de bonos – es que en realidad este fallo de la Cámara de Apelaciones ignora este acuerdo, que hemos logrado con el 93 por ciento, o por lo menos lo minimiza y también creo que – a nuestro humilde criterio – ignora la inmunidad soberana que tiene la reestructuración de la deuda, que se logró, primero, en el 2005, y luego, en el 2010, porque, como marca la Constitución Nacional Argentina, la negociación de la deuda externa es facultad expresa del Congreso de la Nación y solamente puede realizarse bajo su autorización.

De cualquier modo es bueno recordar, un poco, el origen de todo esto porque si bien pareciera que estuviera muy lejos, el 31 de diciembre de 2001, no está tan lejos y fue allí donde la Argentina defaulteó exactamente 81.836 millones de dólares. Vuelvo a repetir: 31 de diciembre de 2001, la Argentina, nuestro país defaultea la deuda de bonos por 81.836 millones de dólares.

El origen de esto era un 49 por ciento, esto es 40.363 millones habían sido contraídos durante la administración gubernamental, que tuvo lugar entre los años 1989 y 1999; el 51 por ciento restante, que es 41.473 millones fue contraído por la administración que tuvo su origen entre los años 1999 y el momento de declararse el default.

Bueno es también saber que cuando, en el año 2003, el Presidente Kirchner asume encara precisamente este problema de la deuda, que en realidad es un problema que proviene desde el 24 de marzo de 1976, cuando el país comienza a endeudarse cada vez más y hacer permanentemente una bicicleta financiera se ve agravado durante la convertibilidad y, finalmente, implosiona ese 31 de diciembre del año 2001.

El Presidente Kirchner tuvo una idea totalmente opuesta a la que se venía sosteniendo hasta ese momento. Hasta ese momento en el endeudamiento permanente el lema, si se puede

decir, era: pagar para crecer. Él sostenía que era a la inversa, que necesitábamos crecer para pagar. Bueno, no era que lo hacía de inteligente, simplemente él observaba lo que había pasado en la Argentina durante las últimas treinta o cuarenta décadas y la conclusión se daba por sí misma: no se podía pagar si no se crecía, al contrario, se pagaba con más deuda y cada vez la deuda era mayor y constituía una severísima restricción a la economía argentina en lo educativo, en lo cultural, en infraestructura, en lo social, en la salud, en la generación de la producción del trabajo. Bueno de una Argentina que - como todos sabemos – cuando Néstor asumió tenía un 25 por ciento de desocupados, industrias cerradas y una situación que todos recordamos.

Me acuerdo que él, en la Asamblea de la ONU, en la primera asamblea que le tocó asistir, que fue en septiembre del año 2003, encaró decididamente este tema de la deuda externa y sostuvo que era necesario que el mundo comprendiera que era preciso que nos dejaran crecer a la economía argentina para poder pagar. Sostuvo una frase que no me voy a olvidar nunca más, dijo: "es necesario que nos dejen crecer para poder pagar, porque los muertos no pagan las deudas". Y bueno, a partir de allí, invirtió la lógica de pagar para crecer, por la crecer para pagar.

Y precisamente desde el año 2003 a la fecha se hicieron importantes pagos, basados en dos reestructuraciones: en el año 2005, en marzo de 2005 se reestructura la deuda en la presidencia de Néstor Kirchner. Recuerdo muy bien que fue una negociación dura, larga, en un momento dado el primer banco que intervino como negociador y eventual fiduciario: el Wachovia, se retira en medio de la negociación provocando una severa crisis que fue en un momento en que el entonces ministro de Economía, le ofreció la renuncia al Presidente Kirchner porque parecía que había fracasado el intento de reestructurar la deuda y Kirchner dijo: "tengamos confianza, sigamos adelante", y se decidió tomar como negociador y luego posterior fiduciario al Banco de Nueva York, normalmente conocido en la jerga financiera como BoNY. Finalmente ese primer canje en el que muy pocos confiaban y en el que muy pocos apostaban, pero que Néstor tenía una gran esperanza terminó reestructurando el 76 por ciento de la deuda soberana, con la quita más importante que se recuerde en la historia. Quita que para medir la importancia que tuvo, en el crecimiento posterior de la Argentina la podemos cuantificar en más de 79.000 millones de pesos.

Y para que ustedes tengan una idea de lo que representa es la totalidad de la Asignación Universal por Hijo, es la totalidad de las más de 2.000 escuelas que se construyeron – en estos 10 años – en la República Argentina y es todas las viviendas y sus respectivas infraestructuras, todos los planes sociales de viviendas que se construyeron entre el 2003 y la fecha. Esto marca la envergadura de la importancia.

¿Cuál fue el argumento para la quita? Durante el momento de endeudamiento, en realidad, la Argentina pagaba tasas exorbitantes en dólares, en todo el mundo las tasas eran del uno, del dos por ciento y acá se pagaban tasas de dos dígitos. El argumento central para esa quita fue que quien sabe que va a un lugar donde están pagando una tasa exorbitante que se no paga en ninguna parte del mundo es lógico que conoce el riesgo que asume al colocar su fondo. Por eso dijimos que debían ser riesgos compartidos entre un país que había apostado a una timba financiera y también, del otro lado, a los que sabían que era imposible que alguien les devolviera ese dinero con esos intereses.

Ahí surgió el problema de los holdouts, que era – digamos – los que no habían entrado en este primer canje. Si bien todos los países tienen una ley de quiebra, nuestro país la tiene y basta con que el 66 por ciento de los acreedores esté de acuerdo para que el juez apruebe la quiebra, o el concurso de quiebra y también es una cifra similar en los Estados Unidos, en este primer acuerdo conseguimos un 76 por ciento. Pero siguió el problema de los holdouts. Era lógico porque había mucha gente que no creía en esta Argentina que nunca había pagado las deudas. Nosotros, inclusive, habríamos querido participar y demostrar aún más buena fe creando lo que se denominó el Cupón de Crecimiento, de modo tal que si la Argentina crecía los acreedores iban a recibir más dinero producto de acompañar y de asociarse al crecimiento de esa Argentina.

Luego, durante mi presidencia, en el año 2010, volvimos a abrir el canje y de ahí llegamos a una cifra récord de aceptación de reestructuración de deuda, que es el 93 por ciento a quienes les debíamos. Ya había más confianza, se había pagado deuda no solamente emitida en ley extranjera, sino también emitida en ley nacional; se había pagado deuda en el Banco de Nueva York; se había pagado deuda, aquí en el país, con lo cual logramos este 93 por ciento, una tarea también muy buena que se dio en ese momento, a través del entonces ministro de Economía, que recorrió, junto a su equipo, todo el mundo. Pero el actual ministro de Economía, también el Doctor Lorenzino, para precisamente incorporar a muchos bonistas italianos, japoneses, que eran más pequeños y que habían quedado fuera del primer canje. Llegamos – repito – a esta cifra de 93 por ciento.

El fallo de la Cámara de Apelaciones de Nueva York creo que es un poco injusto con la Argentina. Toma un argumento del "Financial Times" y dice que nos condena porque la Argentina es "un deudor recalcitrante". La Argentina ha pagado, entre el año 2003 y el año 2012, este país al que califican como deudor recalcitrante 173.733 millones de dólares. Vuelvo a repetirlo: desde el año 2003 a la fecha, hemos pagado 173.733 millones de dólares. 41.044 millones de dólares es dentro del propio sector público nacional, entre distintos organismos del sector público nacional, que se prestan entre sí para financiamiento, para infraestructura, en fin para lo que hace al funcionamiento del Estado; 81.487 millones de dólares hemos pagado al sector privado (extranjero y nacional, en dólares, tenedores de bonos) y a los organismos

multilaterales de crédito, entre ellos al Fondo Monetario Internacional, cuando nos desendeudamos, en el año 2006, al Banco Interamericano de Desarrollo por los préstamos que nos ha dado, al Banco Mundial, a la Corporación Argentina de Fomento, 51.201 millones de dólares; en total, 173.733 millones de dólares.

Digamos que más que deudores recalcitrantes somos pagadores seriales. Pero, además, con un aditamento: esto lo hemos hecho absolutamente con recursos genuinos, con recursos que hemos logrados a partir de la administración de comercio, y a partir de la mejor administración de los recursos del Estado, sin acceder al mercado de capitales. Creo que así como fuimos el país que entró en el Guinness por ser la deuda soberana más importante que se ha defalteado creo que también debemos estar en el Guinness de los países que más hemos pagado, que más hemos cumplido con nuestras obligaciones en los últimos diez años, sin acceso al mercado de capitales.

Por eso me parece importante que todos los argentinos sepamos el esfuerzo que hemos hecho y también el mundo tenga conocimiento del esfuerzo que hemos hecho. Hoy, la deuda de los argentinos en dólares, que cuando Kirchner asumió representaba algo así como el 150 por ciento aproximadamente del PBI, ha pasado a representar en moneda extranjera, ya sea que se le deba a privados nacionales o extranjeros, algo menos del 10 por ciento del PBI. O sea, del 150 del PBI, hemos pasado a algo menos del 10 por ciento del PBI.

Y en pocos días más, vamos a pagar el BONAR 7, vamos a pagar 2.000 millones de dólares cash, exactamente el día 12 de septiembre. Este es un bono en legislación nacional que se paga también aquí en la Caja de Valores pero que la mayoría se cobra en el extranjero porque la mayoría son tenedores extranjeros que lo hacen muy fácilmente, con filiales locales de bancos extranjeros pagan a sus otra casas matrices o filiales en el lugar donde están los acreedores internacionales y de esa manera se salda la deuda.

A partir de ese momento la Argentina, o sea, a partir del 12 de septiembre, la Argentina va a pasar a deber en moneda extranjera, euro o dólares, 8,3 por ciento de su PBI.

Bueno también es recordar que esto es una ratio de deuda que es de las más bajas de los países desarrollados y ni qué hablar de los países de la región.

Bueno también es recordar que nuestro Gobierno es un pagador serial pero no es un endeudador serial, porque la deuda se tomó durante otras gestiones y también se defalteó durante otras gestiones. Y esto nos ha permitido a los argentinos, esta administración, crecer y precisamente poder pagar la deuda.

Ahora bien, este fallo...Yo escuchaba algunos comentarios hoy sobre este fallo que me atrevo a calificar un poco de cortoplacistas porque el fallo...dicen, bueno, "en realidad es un fallo que recién podrá tener efectos porque va a ser apelado y tendrá que decidir la Corte Suprema de los Estados Unidos en el año 2014 o 2015".

Realmente, no parece demasiado serio, no hay responsabilidad, me parece de un buen gobierno, de una buena gobernanza creer que el 2014 o el 2015 o el corto plazo son una solución para los problemas. Nosotros creemos que los problemas deben resolverse, no solamente en el corto plazo, sino en el mediano y en el largo plazo.

Por eso, la decisión...hemos tomados decisiones en virtud de esto porque no podemos tener como país una Espada de Damocles sobre nuestro cuello diciendo que en cualquier momento alguien va a tomar una decisión, se van a caer los canjes del año 2005, 2010, los acreedores nuestros no van a pagar y el país va a volver al 2001. Esto es lo único que no vamos a permitir por lo menos mientras yo sea Presidenta.

Por eso, la primera decisión que hemos tomado, bueno, es pedirle a Dios que ilumine a la Corte Suprema de los Estados Unidos porque, en realidad, estaríamos realmente ante un caso que, no solamente tiraría abajo una de las reestructuraciones de deuda más importantes de las que se tenga memoria, sino que también invalidaría otras reestructuraciones de deuda. Porque téngase en cuenta que estos fondos buitres solo representan el 0,45 por ciento.

Para tenerlo claro: el 93 por ciento de los acreedores de Argentina, arregló; un 7 por ciento no arregló, pero solamente están haciendo juicio en Nueva York y han obtenido esta sentencia, fondos buitre por el 0,45 por ciento del total de la deuda. Bonos que fueron comprados recién en el 2008, cuando ya habían sido defaulteados, valían muy poco y si se le hace lugar a lo que ellos pretenden, la ganancia en dólares sería de algo más del 1.300 por ciento, algo que realmente carece de lógica, de sentido común. Creo que no hace falta ser un experto en Derecho o en Economía para darse cuenta que de esta manera solamente funde la República Argentina, sino que fundiría el país. Sobre todo, en momentos en los cuales numerosos países desarrollados del primer mundo, están también reestructurando sus deudas.

Por eso, la decisión que tome la Suprema Corte de Justicia de los Estados Unidos, no solamente influiría en la Argentina, sino influiría en todo el mundo financiero internacionales. No en vano se han presentado numerosos "amicus curiae" frente a la Corte, que no son precisamente amigos de la Argentina, baste recordar a la exdirectora del Fondo Monetario Internacional, Anne Krueger, también a numerosos fondos de administración que también tienen intereses y se han presentado, al gobierno de la República de Francia, a quien agradecemos también su presentación ante la Corte Suprema de los Estados Unidos.

Pero también, como les decía y como no podemos tener una Espada de Damocles sobre nuestras cabezas, hemos tomado 2 decisiones más además de esta casi espiritual y casi terrenal de encomendarnos a Dios y a la Corte Suprema de los Estados Unidos: en primer lugar, en el día de mañana, vamos a enviar un nuevo proyecto de Ley al Parlamento argentino, que por imperio de la Constitución y del artículo 75 es el único capacitado para decidir sobre la deuda externa argentina, el Poder Ejecutivo actúa siempre como negociador, como delegado pero finalmente los acuerdos deben pasar por el Parlamento para ser aprobados o rechazados, y este proyecto de Ley va a consistir, precisamente, en abrir por tercera vez el canje de deuda para ese 7 por ciento que no ha ingresado. Queremos una vez más, demostrar la profunda vocación de hacer frente a los compromisos que tiene la República Argentina.

Hoy no lo podemos hacer porque estaríamos violando la propia ley de nuestro país que estableció ya en el 93 por ciento y cerró el segundo canje en el año 2010. Pero vamos a enviar, reitero, un proyecto de Ley al Parlamento para que, precisamente, ese 7 por ciento tenga la capacidad de ingresar, la posibilidad de ingresar y, bueno, y cobrar en paridad de condiciones con el resto de los acreedores.

Pero también hemos tomado una decisión para salvaguarda de quienes han confiado en la República, el 93 por ciento de los tenedores de bonos que han confiado en Argentina y que vienen cobrando, algunos del año 2005 y otros del año 2010. Y es, precisamente, hace un reemplazo de títulos por la misma moneda, por los mismos plazos nada más que cambiando el lugar de pago para evitar eventuales embargos que pudieran sufrir los fondos porque ya hemos sufrido embargos anteriores.

Para ser claros: los que tienen bonos argentinos, el 93 por ciento, vamos a reemplazar esos títulos, esos bonos por bonos similares, por moneda extranjera, por los mismos plazos, únicamente que serán pagaderos aquí en la República Argentina en la Caja de Valores.

Como ya hemos pagado, para que ustedes tengan una idea de la certeza y de la seguridad jurídica que esto significa, los BODEN 12, que fueron precisamente los bonos que Argentina emitió para pagarles a todos aquellos que habían atrapados por el corralito, se acuerdan cuando no pudieron sacar los depósitos de los bancos, el Gobierno argentino, con bonos emitidos por ley argentina y pagaderos aquí en la Caja de Valores en la Argentina, ya ha cancelado totalmente esa deuda que fue de 19.600 millones de dólares.

La Argentina pagó la totalidad de los ahorros confiscados de argentinos y de no argentinos, o sea, de nacionales y de extranjeros, por 19.600 millones de dólares con títulos emitidos con legislación local y pagada aquí en la República Argentina en los plazos y en la moneda que habían sido estipulados.

Y en unos días más, para ser más precisos el día 12 de septiembre, como les decía hace unos instantes, vamos a pagar otro bono también emitido que es el BONAR 7, 2.000 millones de dólares, también emitidos en legislación local y pagaderos aquí en la Caja de Valores de la República Argentina, de modo tal que ya hemos pagado miles de millones de dólares de títulos emitidos con legislación local y pagaderos aquí en la Argentina.

Por lo tanto, la certeza y la seguridad jurídica, no solamente emana de nuestra convicción en cuanto a hacer frente a las obligaciones a las que la Argentina como Estado se había comprometido, aunque no haya sido nuestro gobierno, sino fundamentalmente también a los hechos objetivos, concretos que ya hemos protagonizado pagando títulos emitidos aquí en la Argentina.

Y el deber fundamental de esto, no es una vocación de pago, yo sé que por allí hay algunos sectores que dicen que no habría que pagar nada, mínimos, absolutamente, porque sería disparatado. Pero bueno es recordar que la República Argentina tiene además 40 millones de habitantes que exigen responsabilidad por parte de las autoridades del Gobierno y poder seguir garantizando el crecimiento de Argentina en un marco de seguridad jurídica y de hacerse cargo de las obligaciones.

Por eso, quería hoy dirigirme, no solamente a los 40 millones de argentinos, sino también a todos aquellos que han confiado, nacionales o extranjeros privados, y han formado parte de ese 93 por ciento que aceptó bonos de Argentina con cupón de crecimiento que ha venido

pagando regularmente, dirigirme también al resto del mundo financiero internacional y específicamente a las autoridades de Estados Unidos y, fundamentalmente, a su Corte, porque en realidad, estaríamos infligiendo un seguro daño sí a la seguridad jurídica, sí al trust, a la confianza que se tienen que tener en la reestructuración de deuda en un momento muy difícil de todo el mundo en materia financiera.

Nos parece realmente que solo un 1,45 por ciento que ingresó en el 2008 con bonos basura, comprados por muy poco dinero, hoy pretenda malograr lo que hemos logrado en materia de reestructuración de deuda, de crecimiento, de pago, de aporte al mundo, porque en definitiva es un aporte de la Argentina a la certidumbre jurídica del mundo y a la confianza de quienes confiaron en la Argentina, me parece que es importante que podamos tener este contacto y poder decir estas cosas.

Finalmente, para los que muchas veces nos dicen que nos gusta hablar del pasado y creen que el pasado ya pasó, yo creo que este viernes pasado, el viernes de la semana pasada, se ha comprobado definitivamente que el pasado y sobre todo en Economía, siempre está a la vuelta de la esquina. Que basta que alguien cometa una equivocación o que alguien tenga otros intereses que no sean la de representar los intereses de los 40 millones de argentinos, para que las cosas que tanto nos han costado lograr en estos últimos años, finalmente se malogren.

Estas cosas que a veces decimos sobre el pasado, no es con el ánimo de fiscalizar, con el ánimo de acusar o de poner en mayor valor lo que nosotros hemos hecho, sino por el contrario, tratar de evitar volver a cometer los errores que hemos cometido los argentinos, miren, me involucro yo también a pesar de no haber formado parte en ningún gobierno endeudador, pero sí formo parte de la Argentina y me siento tan responsable como los 40 millones de argentinos, pero la más responsable porque me han elegido para conducir los destinos del país.

Por eso, quería en síntesis, comentarles estas dos decisiones importantes, la de la reapertura de una tercera ley de canje. Espero que como decimos aquí en la Argentina, la tercera sea la vencida y podamos finalmente incorporar a ese 7 por ciento.

También un llamado a la razonabilidad y al sentido común que no puede ser que un 0,45 por ciento, que adquirió bonos a tan bajo precio, pueda poner en juego al 93 por ciento de los acreedores y con las cifras que hemos pagado y que tendremos que seguir pagando y, fundamentalmente, las posibilidades de seguir creciendo en la Argentina para generar trabajo,

para dar salud, educación y al mismo tiempo, para hacer frente a nuestras obligaciones.

Por esos motivos es que quería hoy comunicarme con el conjunto del pueblo argentino y también fundamentalmente, con quienes han creído en la Argentina, han apostado por ella, que sigan haciéndolo porque estamos al frente de la nave y fundamentalmente la vamos a conducir a buen puerto y creemos también, tenemos fuertes esperanzas, de que el sentido común impere por sobre el lobby formidable que hemos visto en estos días donde un 0,45 por ciento se pueda imponer sobre la voluntad de un 93 por ciento.

Soy abogado al mismo tiempo y sé que esto afecta decididamente la igualdad entre las partes; sé que afecta la equidad; sé que afecta la seguridad jurídica; sé que afecta la certeza que deben tener las relaciones económicas y financieras el mundo y, por eso, solicitamos que con la misma responsabilidad que hemos actuado en estos 10 años, pagando puntualmente todo lo que nos habíamos comprometido por primera vez en nuestra historia, también pedimos responsabilidad a los que tengan la decisión en sus manos.

De cualquier manera, también decir que la Argentina no va a violar sus propias leyes y va a, precisamente, darle participación al Parlamento argentino en un tema tan importante como este, como también se lo hemos dado en el año 2005 y 2010, que nos ha permitido tener un crecimiento y hacer frente a nuestros compromisos.

Muchas gracias por escuchar y buenas noches a todos y a todas.

Exhibit 13

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

1241

[illegible stamp]
1

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
AUG. 27, 2013
FILE [hw:] *PE* No. [hw:] *112113* Time [hw:] *9:50 p.m.*

[stamp:]BUENOS AIRES, AUG. 27, 2013

TO THE HONORABLE NATIONAL CONGRESS:

I am writing to Your Honor in order to submit to your consideration a draft law intended to authorize the NATIONAL EXECUTIVE, through the MINISTRY OF ECONOMY AND PUBLIC FINANCE, to carry out all actions necessary to conclude the process of restructuring of securities in deferment of payment.

In order to bring a proper framework to the draft delivered, it is indispensable to remember the origin of the debt.

Although it seems that it is very far away, December 31, 2001 is not that far and it was the time Argentina defaulted on exactly 81.836 billion dollars.

From this amount of 81.836 billion dollars, 49 percent, i.e. 40.363 billion dollars, had been contracted during the government administration that took place between 1989 and 1999; the remaining 51 percent, i.e. 41.473 billion dollars was contracted between 1999 and the time the default was declared.

In 2003, when President Néstor Kirchner was appointed, he faced precisely this problem of the debt, which in reality comes from March 24, 1976, when the country started to get increasingly indebted and permanently engage in a financial up and down,

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *2*

became aggravated during the convertibility and finally imploded that December 31, 2001.

From 2003 to date, significant payments were made, based on two restructurings, the first in 2005 and then in 2010.

This first exchange -in which very few trusted and on which very few bet- ended by restructuring 76% of the sovereign debt, with the most important reduction in the amount of the debt remembered in history. At the time, the problem of the holdouts came up, meaning those that had not been part of this first exchange.

In order to measure the importance of said reduction of the debt in the subsequent growth of Argentina, we can quantify it at more than 79.000 billion pesos.

To have a more precise idea of the importance represented by this reduction of the debt: it is the entire Universal Allocation per Child, it is all of the more than 2,000 schools that were built – in these 10 years – in the Argentine Republic, it is all the housing units and their respective infrastructure and all housing social plans built between 2003 and today.

Later, in 2010, we opened the exchange again, and we reached a record figure of acceptance of the restructuring of the debt, namely 93 percent of those to whom we owed money.

This constituted an indicator of increased confidence,

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *3*

since not only the debt issued under foreign law had been paid, but also that issued under national law; the debt to the Bank of New York had been paid and debt had been paid here, in the country, with which we achieved this 93 percent.

We must indicate that, between 2003 and 2012, Argentina paid the amount of 173.733 billion dollars: 41.044 billion dollars in its own national public sector, among various bodies of the national public sector concerning the operation of the State; 81.4875 billion dollars were paid to the private sector (foreign and national in dollars, bondholders) and to multilateral credit bodies, including the International Monetary Fund, when we got out of debt, in 2006, the Interamerican Development Bank for the loans it gave us, the World Bank and Corporación Argentina de Fomento, 51.2015 billion dollars.

Currently, the debt of the Argentineans in dollars, which in 2003 represented approximately 150 percent of the GDP came to represent in foreign currency less than 10 percent of the GDP.

And, as of September 12 of this year, when BONAR 7 will be paid in the amount of 2 billion dollars, Argentina will owe in foreign currency, euro or dollars, 8.3 percent of its GDP.

In addition to all the above considerations,

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *4*

we cannot forget the international context in which the enactment of this draft law is decided.

It is public knowledge that our country is being sued by several deferred public debt securities, in their majority holders who purchased this debt in the secondary markets with large discounts, with the only purpose of suing Argentina and collect the total value of said instruments.

These "vulture funds" are financial players generally created in jurisdictions considered fiscal shelters, which take advantage and benefit from the judicial and legal systems of the central countries, suing and trying to twist the arm not only to sovereign countries that face serious financial and economic difficulties, but also to the great mass of creditors in good faith, as well as the very foundation of the international financial structure.

It is public and well known that our country is the object of ruthless judicial attacks and strong political pressure by these vulture funds. Large quantities of public securities are being sued, mainly before the courts of New York City, but with ramifications in many other courts around the world.

In particular, the vulture funds NML and Aurelius, together with other holds that have smaller quantities of securities, started in 2010 a complaint intended to enforce an alleged right to collect their

*"2013 – Year of the Bicentenial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *5*

securities or the total nominal value, in parallel to the payments of the restructured debt made by Argentina.

The Argentine Republic faced this interpretation in all available judicial levels and, in particular, questioned a judicial order in which there is an attempt to condition the normal flow of payments of the restructured debt to the preliminary payment, in cash, of the total amount claimed by these holders.

In this context, our country sustained in its last judicial appearances that the only way to pay the debt claimed that it may assume, under its internal regulations and public order principles regulating the treatment of creditors, is some form of restructuring respecting the equity among creditors, in other words, substantially similar to the treatment given to the holders who participated in the exchanges of 2005 and 2010.

In particular, concerning the ruling of the New York Court of Appeals of the 23rd of this month, which grants the request of the vulture funds, first we must clarify that 93 percent of the creditors of Argentina reached an agreement; 7 percent did not reach it, but are only suing in New York –and have obtained the judgment of said Chamber of Appeals- which vulture funds represent 0.45 percent of the total debt.

The Bonds that constituted the origin of the complaint were

*"2013 – Year of the Bicentenial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] 6

purchased recently in 2008, when they had already been defaulted and were worth very little. If their claim is granted, the gain in dollars would be somewhat more than 1,300 percent, which is illogical.

The reason and common sense cannot conceive that 0.45 percent, who purchased bonds at such low price, can place at risk 93 percent of the creditors, given the figures we have paid and that our country will have to continue paying and, fundamentally, the possibilities of continuing to grow in Argentina to generate work, to offer health, education and, at the same time, to face our obligations.

After the above statement, we must indicate that our country has decreed the suspension of the payment of the public debt originally contracted prior to December 31, 2001, or based on the laws dictated before that date, without prejudice to which, the same laws that establish the deferment, authorize the NATIONAL EXECUTIVE to continue normalizing the service of this debt, pursuant to article 65 of the Law of Financial Administration and Control Systems of the National Public Sector No. 24,156, as amended, with the limits imposed by Law No. 26,017.

The latter, precisely limits the possibilities of the NATIONAL EXECUTIVE to normalize the debt instrumented in public securities that were declared eligible for the exchange provided by Decree No. 1,735 of December 9, 2004. The limitations consisted, first

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *7*

of all, of the impossibility to reopen the exchange provided by Decree No. 1,735/04 and, secondly, of the prohibition to make any type of judicial, extrajudicial or private settlement on the bonds concerned by said law.

Law No. 26,017 was approved by the HONORABLE NATIONAL CONGRESS on February 9, 2005, i.e. during the period of acceptance of presentation of securities for exchange in 2005. It had a clear intent to maximize the participation of the holders in said offer, since its essential basis was precisely to assure those who decided to participate in said operation that Argentina would not organize afterwards a second operation, under more beneficial conditions for the holders who did not accept the first offer.

In fact, the review of the presentations of the debates in the HONORABLE NATIONAL CONGRESS concerning said law shows what is obvious. Faced with the operations of the international press that stressed that the Country was going to defraud the parties that entered the exchange, there was the political will of all the representatives to establish that prioritizing the payment capacity as a central factor of the exchange operation and the affirmation of the payment of the debt were a Policy of State that arose quite legitimately from a decision of the entire Society.

This law must be analyzed together with a clause included in the bonds issued in the exchange 2005 called Clause of Right Upon Future Offers or RUFO Clause.

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *8*

The RUFO Clause was intended to assure the holders who participated in the exchange of 2005 that these holders could participate in any subsequent exchange operation made by Argentina. Thus, they were assured that they could participate in any subsequent offer whatsoever, under the optic of the holders that participated in the exchange of 2005, that would be better for their interests.

But what the RUFO Clause did not guarantee, because its description did not include it expressly, was that Argentina would enter into settlement agreements either in court or privately, under better conditions than those offered in the exchange of 2005. For this reason, the clear declaration of the NATIONAL LEGISLATIVE was found convenient, in the sense that, for it to happen, it had to be approved by the National Congress itself.

Law No. 26,017 was temporarily suspended by Law No. 26,547 to allow organizing the exchange of 2010, without prejudice to the fact that this law expressly established in its article 3 that the financial terms and conditions offered in 2010 could not be equal or better than those offered to the creditors that participated in the operation of 2005 and, in its article 5, second paragraph, that the holders of public debt who had filed judicial, administrative or arbitration actions could not be offered better treatment than those who did not. In other words, the operation of 2010 was done in a context of guarantees to the holders who had participated in the exchange of 2005 that this second opportunity would not be better

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] 9

than the one in which they had participated.

This harmonious play of the RUFO Clause and not only of Laws No. 26,017 and 26,547, but also of the budget laws since 2004, and the provisions of the Law of Financial Administration and of the Control Systems of the National Public Sector, constitutes a clear and sure demonstration that, for Argentina, equity before creditors is the cornerstone of this process of debt restructuring, which, we cannot stress it enough, was and continues being a direct consequence of the worst political, institutional, social, economic and financial crisis experienced by our country. For this NATIONAL EXECUTIVE, the restructuring of the public debt following a strict sense of equity among creditors is not only an obligation taken contractually and legally, but also a Policy of the State.

Equally, it is a Policy of the State to tend to put an end to the process of normalization of the debt deferred since the stoppage of payments of 2001. This process, year after year, is said to be pending by the HONORABLE NATIONAL CONGRESS which also emphasizes year after year in the Law of Laws the guidelines under which this process must be concluded. Policy of State does not mean to deny the debt by repudiating it, but normalize the pending debt within parameters consistent with national growth, good faith and the provisions of the laws. This is the mandate of the HONORABLE NATIONAL CONGRESS.

Consequently, Law No. 26,017 was a

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *10*

means, in a certain historic circumstance, necessary to support the process of exchange of the debt established in Decree No. 1,735/04.

Under these historic circumstances, and within the framework established by the HONORABLE NATIONAL CONGRESS, in connection with the regulatory pillars referring to the administration and restructuring of the Public Debt, i.e. the Budget Laws, the Law of Financial Administration and Control Systems of the National Public Sector and the commitments assumed towards the creditors who participated in the exchange established in Decree No. 1,735/04, we bring for the consideration of the HONORABLE NATIONAL CONGRESS a draft law that would allow this NATIONAL EXECUTIVE to have the powers to handle and settle the debt which, under strict parameters of equity among creditors and within said regulatory framework, would allow it to complete the process of regularization of public debt in payment deferment.

On the other hand, the draft brought for the consideration of this HONORABLE NATIONAL CONGRESS maintains the elements necessary to guarantee equity among creditors, concretely the requirement of the NATIONAL EXECUTIVE that any payment formula to the holders of deferred securities may not be better than that offered to the creditors in the restructuring of the debt provided by Decree No. 563/10.

In particular, inter alia, the draft

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *11*

authorizes the NATIONAL EXECUTIVE, through the MINISTRY OF ECONOMY AND PUBLIC FINANCE, to do everything necessary to complete the process of restructuring of the public securities that were eligible for the exchange provided in Decree No. 1,735 of December 9, 2004 and its additional rules that were not presented to it or to the exchange provided by Decree No. 563 dated April 26, 2010, in the terms of article 65 of Law No. 24,156 of Financial Administration and Control Systems of the National Public Sector, as amended, in order to adapt the service of said debt to the payment possibilities of the National State on the medium and long term.

Furthermore, it is expressly stated that the financial terms and conditions offered may not be better than that offered to the creditors in the restructuring of the debt provided by Decree No. 563/10.

It is provided that the holders of public securities who were eligible for the exchange provided in Decree No. 1,735/04 and its additional rules who wish to participate in any restructuring operation made under the provisions of this law must waive all their rights under said securities, including the rights recognized to them by any judicial or administrative judgment, arbitral award or decision of any other authority, and waive and release the Argentine Republic of any judicial, administrative, arbitral or

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *12*

any other type of action, filed or that may be filed in the future in connection with said securities or the obligations of the Argentine Republic arising from them, including any action intended to receive capital or interest services related to said securities.

It is prohibited to give the holders of public debt who filed judicial, administrative, arbitral or any other type of actions, a more favorable treatment than to those that did not.

It is foreseen that the bonds of the National State eligible according to Decree No. 1735/04, deposited for any reason or title to the order of the courts of any instance, competence and jurisdiction, whose holders have not adhered to the exchange provided by the aforementioned decree or by Decree No. 563/10 or who did not expressly indicate, in the respective judicial actions, their will not to adhere thereto will be replaced, ipso jure, by the "BONDS OF THE REPUBLIC OF ARGENTINA AT PAR IN PESOS STEP UP 2038," under the conditions established for the assignment, liquidation and issue of such bonds by Decree No. 1735/04 and its additional regulations.

Finally, the validity of articles 2, 3 and 4 of Law No. 26,017 is suspended until the NATIONAL EXECUTIVE declares completed the restructuring process of the Public Securities concerned by said law.

In light of everything stated above, we bring

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *13*

this draft law to the consideration of Your Honor.

May God Protect Your Honor.

MESSAGE No. [stamp:] 1241

[signature]

[signature]
[stamp:] DR. JUAN MANUEL ABAL MEDINA
HEAD OF THE COUNCIL OF MINISTERS

[signature]
[stamp:] DR. HERNAN GASPAR LORENZINO
MINISTER OF ECONOMY
AND PUBLIC FINANCE

*"2013 – Year of the Bicentenial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *14*

<div align="center">

THE SENATE AND CHAMBER OF DEPUTIES

OF THE ARGENTINE NATION, GATHERED IN CONGRESS,

SANCTION WITH FORCE OF

LAW:

</div>

ARTICLE 1.- We authorize the NATIONAL EXECUTIVE, through the MINISTRY OF ECONOMY AND PUBLIC FINANCE, to carry out all acts necessary for the conclusions of the process of restructuring of the public securities eligible for the exchange provided in Decree No. 1,735 of December 9, 2004 and its additional rules that were not presented to it or to the exchange provided by Decree No. 563 dated April 26, 2010, in the terms of article 65 of Law No. 24,156 of Financial Administration and Control Systems of the National Public Sector, as amended, in order to adapt the service of said debt to the payment possibilities of the National State on the medium and long term.

ARTICLE 2.- The financial terms and conditions offered may not be better than that offered to the creditors in the restructuring of the debt provided by Decree No. 563/10.

ARTICLE 3.- An exception will consist of the public debt securities issued as a consequence of the provisions of this law, the provisions of articles 7 and 10 of Law No. 23,928 as amended, if applicable.

ARTICLE 4.- The holders of public securities who were eligible for the exchange

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *15*

provided by Decree No. 1,735/04 and its additional regulations, who wish to participate in any restructuring operation done in the framework of the provisions of this law, must waive all their rights under said securities, including the rights recognized to them by any judicial or administrative judgment, arbitral award or decision of any other authority, and waive and release the Argentine Republic of any judicial, administrative, arbitral or any other type of action, filed or that may be filed in the future in connection with said securities or the obligations of the Argentine Republic arising from them, including any action intended to receive capital or interest services related to said securities.

It is prohibited to give the holders of public debt who filed judicial, administrative, arbitral or any other type of actions, a more favorable treatment than to those that did not.

ARTICLE 5.- THE MINISTRY OF ECONOMY AND PUBLIC FINANCE will inform quarterly the HONORABLE NATIONAL CONGRESS of the results of the provisions of this law.

ARTICLE 6.- The bonds of the National State eligible according to Decree No. 1735/04, deposited for any reason or title to the order of the courts of any instance, competence and jurisdiction, whose holders have not adhered to the exchange provided by the aforementioned decree or by Decree No. 563/10 or who did not expressly indicate, in the respective

*"2013 – Year of the Bicentennial of the General Constituent Assembly of 1813"*

National Executive

[stamp:]
NATIONAL SENATE
DEPARTMENT OF ENTRY DESK
FOLIO [hw:] *16*

judicial actions, their will not to adhere thereto will be replaced, ipso jure, by the "BONDS OF THE REPUBLIC OF ARGENTINA AT PAR IN PESOS STEP UP 2038," under the conditions established for the assignment, liquidation and issue of such bonds by Decree No. 1735/04 and its additional regulations.

The MINISTRY OF ECONOMY AND PUBLIC FINANCE is authorized to issue the additional regulations necessary to implement the replacement provided in this article.

ARTICLE 7.- The validity of articles 2, 3 and 4 of Law No. 26,017 is suspended until the NATIONAL EXECUTIVE declares completed the restructuring process of the Public Securities concerned by said law.

ARTICLE 8.- This law will enter into effect the day of its publication in the Official Bulletin.

ARTICLE 9.- To be communicated to the NATIONAL EXECUTIVE.

[signature]

[signature]
[stamp:] DR. JUAN MANUEL ABAL MEDINA
HEAD OF THE COUNCIL OF MINISTERS

[signature]
[stamp:] DR. HERNAN GASPAR LORENZINO
MINISTER OF ECONOMY
AND PUBLIC FINANCE



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Mariela Lopez, hereby affirm that the document "Draft Legislation, dated August 27, 2013" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Mariela Lopez

Sworn to before me this
29th of August, 2013

Signature, Notary Public

RYAN ALEXANDER DROST
Notary Public - State of New York
No. 01DR6262048
Qualified in NEW YORK County
My Commission Expires MAY 21, 2016

Stamp, Notary Public
State of New York



**TRANSPERFECT**

Ciudad de Nueva York, Estado de Nueva York, Condado de Nueva York

Yo, Mariela Lopez, por la presente certifico que los documentos "Draft Legislation, dated August 27, 2013" son, según mi leal saber y entender, una traducción fiel y exacta del Español al Ingles.

Mariela Lopez

Juramentado ante mí este
29 de Agosto 2013

Firma, Notario Público

Sello, Notario Público

RYAN ALEXANDER DROST
Notary Public - State of New York
No. 01DR6262048
Qualified in NEW YORK County
My Commission Expires MAY 21, 2016





1241

BUENOS AIRES, 2 7 AGO, 2013

AL HONORABLE CONGRESO DE LA NACIÓN:

Tengo el agrado de dirigirme a Vuestra Honorabilidad, con el objeto de someter a su consideración un proyecto de ley que tiene por finalidad autorizar al PODER EJECUTIVO NACIONAL, a través del MINISTERIO DE ECONOMÍA Y FINANZAS PÚBLICAS, para llevar adelante todas las acciones necesarias para la conclusión del proceso de reestructuración de los títulos públicos en estado de diferimiento de pago.

A fin de brindar un adecuado marco al proyecto que se remite, resulta imprescindible recordar el origen de la deuda.

Si bien pareciera que estuviera muy lejos, el 31 de diciembre de 2001 no está tan lejos y fue allí donde la Argentina defaulteó exactamente 81.836 millones de dólares.

De ese monto de 81.836 millones de dólares, un 49 por ciento, esto es 40.363 millones, habían sido contraídos durante la administración gubernamental que tuvo lugar entre los años 1989 y 1999; el 51 por ciento restante, es decir 41.473 millones, fue contraído entre los años 1999 y el momento de declararse el default.

Cuando en el año 2003 asume el Presidente Néstor Kirchner, encara precisamente este problema de la deuda, que en realidad es un problema que proviene desde el 24 de marzo de 1976, cuando el país comienza a endeudarse cada vez más y hacer permanentemente una bicicleta financiera, se







ve agravado durante la convertibilidad y, finalmente, implosiona ese 31 de diciembre del año 2001.

Desde el año 2003 a la fecha se hicieron importantes pagos, basados en dos reestructuraciones, la primera en el 2005 y posteriormente en el 2010.

Ese primer canje -en el que muy pocos confiaban y al que muy pocos apostaban- terminó reestructurando el 76 por ciento de la deuda soberana, con la quita más importante que se recuerde en la historia. En ese momento surgió el problema de los holdouts, es decir, los que no habían entrado en ese primer canje.

A fin de medir la importancia que tuvo la mencionada quita en el crecimiento posterior de la Argentina, la podemos cuantificar en más de 79.000 millones de pesos.

Para tener una idea más precisa de la importancia que representa esa quita: es la totalidad de la Asignación Universal por Hijo, es la totalidad de las más de 2.000 escuelas que se construyeron – en estos 10 años – en la República Argentina, son todas las viviendas y sus respectivas infraestructuras y todos los planes sociales de viviendas que se construyeron entre el 2003 y la fecha.

Posteriormente, en el año 2010, volvimos a abrir el canje y ahí llegamos a una cifra récord de aceptación de reestructuración de deuda, que es el 93 por ciento de a quienes les debíamos.

Esto constituía un indicador de más confianza,



*El Poder Ejecutivo Nacional*



toda vez que se había pagado deuda no solamente emitida en ley extranjera, sino también emitida en ley nacional; se había pagado deuda en el Banco de Nueva York y se había pagado deuda aquí, en el país, con lo cual logramos este 93 por ciento.

Cabe poner de manifiesto que la Argentina ha pagado, entre el año 2003 y el año 2012, la suma de 173.733 millones de dólares: 41.044 millones de dólares dentro del propio sector público nacional, entre distintos organismos del sector público nacional para lo que hace al funcionamiento del Estado; 81.487,5 millones de dólares se han pagado al sector privado (extranjero y nacional, en dólares, tenedores de bonos) y a los organismos multilaterales de crédito, entre ellos al Fondo Monetario Internacional, cuando nos desendeudamos, en el año 2006, al Banco Interamericano de Desarrollo por los préstamos que nos ha dado, al Banco Mundial y a la Corporación Argentina de Fomento, 51.201,5 millones de dólares.

Actualmente, la deuda de los argentinos en dólares, que en el año 2003 representaba aproximadamente el 150 por ciento del PBI, ha pasado a representar en moneda extranjera, una suma menor al 10 por ciento del PBI.

Y a partir del 12 de septiembre de este año, cuando se pagará el BONAR 7, por un valor de 2.000 millones de dólares, la Argentina va a pasar a deber en moneda extranjera, euro o dólares, el 8,3 por ciento de su PBI.

Además de todas las consideraciones que







anteceden, no puede perderse de vista el contexto internacional en el que se decide la elevación del presente proyecto de ley.

Resulta de público conocimiento que nuestro país está siendo demandado por varios tenedores de títulos de deuda pública en estado de diferimiento, en su mayoría, tenedores que compraron esta deuda en los mercados secundarios con grandes descuentos con el único objetivo de demandar a la Argentina y procurar el cobro del valor total de dichos instrumentos.

Estos "fondos buitres" son actores financieros que se constituyen generalmente en jurisdicciones consideradas guaridas fiscales, que aprovechan y se benefician de los sistemas judiciales y legales de los países centrales, demandando y tratando de torcer el brazo no sólo a los países soberanos que enfrentan graves dificultades financieras y económicas, sino también a la gran masa de acreedores de buena fe, como así también a los fundamentos mismos de la arquitectura financiera internacional.

Es público y notorio que nuestro país está siendo objeto de despiadados ataques judiciales y de una fuerte presión política por estos fondos buitres. Grandes cantidades de títulos públicos son objeto de demandas, principalmente ante los tribunales de la ciudad de Nueva York, pero con ramificaciones en muchos otros tribunales alrededor del mundo.

En particular los fondos buitres NML y Aurelius, junto con otros tenedores que poseen menores cuantías de títulos, iniciaron en el año 2010 un reclamo tendiente a hacer valer un supuesto derecho a cobrar sus





títulos por el total del valor nominal en forma paralela a los pagos que Argentina realiza de la deuda reestructurada.

La República Argentina ha venido enfrentando esta interpretación en todas las instancias judiciales disponibles y en particular, ha cuestionado una orden judicial a partir de la cual se pretende condicionar el normal flujo de pagos de la deuda reestructurada al previo pago, al contado y en efectivo del total del monto reclamado por estos tenedores.

En este contexto, nuestro país ha venido sosteniendo en sus últimas presentaciones judiciales que la única forma de cancelación de la deuda reclamada que puede asumir, bajo su normativa interna y los principios de orden público que regulan el tratamiento a los acreedores, es alguna forma de reestructuración que respete la equidad entre acreedores, es decir, que sea sustancialmente similar al trato otorgado a los tenedores que participaron en los canjes de 2005 y de 2010.

En particular, en relación al fallo de la Cámara de Apelaciones de Nueva York del día 23 del corriente, que hace lugar a lo solicitado por los fondos buitre, corresponde aclarar primero que el 93 por ciento de los acreedores de Argentina llegó a un acuerdo; un 7 por ciento no arregló, pero solamente están haciendo juicio en Nueva York -y han obtenido la sentencia de la referida Cámara de Apelaciones- fondos buitre que representan el 0,45 por ciento del total de la deuda.

Los Bonos que dan origen al reclamo fueron



*El Poder Ejecutivo*
*Nacional*



comprados recién en el 2008, cuando ya habían sido defaulteados y valían muy poco. En caso de hacer lugar a su pretensión, la ganancia en dólares sería de algo más del 1.300 por ciento, lo cual carece de lógica.

La razonabilidad y el sentido común no puede concebir que un 0,45 por ciento, que adquirió bonos a tan bajo precio, pueda poner en juego al 93 por ciento de los acreedores y con las cifras que hemos pagado y que nuestro país tendrá que seguir pagando y, fundamentalmente, las posibilidades de seguir creciendo en la Argentina para generar trabajo, para dar salud, educación y al mismo tiempo, para hacer frente a nuestras obligaciones.

Efectuada la reseña que antecede, cabe señalar que nuestro país ha venido decretando la suspensión del pago de la deuda pública contraída originalmente con anterioridad al 31 de diciembre de 2001, o en virtud de normas dictadas antes de esa fecha, sin perjuicio de lo cual, las mismas normas que establecen el diferimiento, autorizan al PODER EJECUTIVO NACIONAL a proseguir con la normalización de los servicios de esa deuda, en los términos del artículo 65 de la Ley de Administración Financiera y de los Sistemas de Control del Sector Público Nacional N° 24.156 y sus modificaciones, y con los límites impuestos por la Ley N° 26.017.

Esta última limita justamente las posibilidades del PODER EJECUTIVO NACIONAL de normalizar la deuda instrumentada en títulos públicos que fueron declarados elegibles para el canje dispuesto por el Decreto N° 1.735 de fecha 9 de diciembre de 2004. Las limitaciones consistieron, en primer



*"2013 - Año del Bicentenario de la Asamblea General Constituyente de 1813"*



lugar, en la imposibilidad de reabrir el canje dispuesto por el Decreto N° 1.735/04 y, en segundo término, en la prohibición de realizar cualquier tipo de transacción judicial, extrajudicial o privada, respecto de los bonos alcanzados por dicha norma.

La Ley N° 26.017 fue aprobada por el HONORABLE CONGRESO DE LA NACIÓN el 9 de febrero de 2005, es decir, durante el período de aceptación de presentaciones de títulos al canje 2005. La misma tuvo una clara intención de maximizar la participación de los tenedores en dicha oferta, ya que su fundamento esencial consistía justamente en asegurarles a aquellos que decidieran participar de dicha operación, que Argentina no haría luego, una segunda operación en condiciones más beneficiosas para aquellos tenedores que no aceptaran la primera oferta.

De hecho, el repaso de las exposiciones de los debates en el HONORABLE CONGRESO DE LA NACIÓN respecto de la mencionada norma pone de manifiesto lo evidente. Frente a operaciones de prensa internacional que enfatizaban que el País iba a defraudar a quienes ingresaran en el canje, remarcaba la voluntad política del conjunto de los representantes de establecer que la priorización de la capacidad de pago como factor central de la operación de canje, y la afirmación del desendeudamiento, eran una Política de Estado que surgía con total legitimidad de una decisión de toda la Sociedad.

Esta norma debe analizarse conjuntamente con una cláusula incluida en los bonos emitidos en el marco del canje 2005 llamada Cláusula de Derechos sobre Futuras Ofertas o Cláusula RUFO, por sus siglas en







inglés ("*Right Upon Future Offers*"). La Cláusula RUFO estaba destinada a asegurar a aquellos tenedores que participaran del canje de 2005 que, ante cualquier operación de canje posterior que Argentina realizara, estos tenedores podrían participar. De tal forma, se aseguraban que cualquier oferta posterior que fuera, bajo la óptica de los tenedores que participaron del canje de 2005, mejor para sus intereses, éstos podrían también participar.

Pero lo que la Cláusula RUFO no garantizaba, ya que su descripción no lo incluía expresamente, era que Argentina realizara acuerdos transaccionales ya sea en sede judicial o de forma privada, en mejores condiciones que las ofrecidas en el canje de 2005. Por tal razón, se entendió conveniente la clara manifestación del PODER LEGISLATIVO NACIONAL en el sentido de que para que tal cosa sucediera, debía ser aprobada por el propio Congreso de la Nación.

La Ley N° 26.017 fue suspendida temporalmente por la Ley N° 26.547 para permitir llevar adelante el canje de 2010, sin perjuicio de que esa norma expresamente estableció en su artículo 3° que los términos y condiciones financieros que se ofrezcan en 2010 no podían ser iguales ni mejores que los ofrecidos a los acreedores que participaron de la operación de 2005 y en su artículo 5°, segundo párrafo, que no podía ofrecerse a los tenedores de deuda pública que hubieran iniciado acciones judiciales, administrativas o arbitrales, un trato más favorable que a aquellos que no lo hubieran hecho. Es decir, la operación de 2010 se hizo en un contexto de garantías a aquellos tenedores que habían participado en el canje de 2005 de que esta segunda oportunidad no resultaría mejor





que la que ellos aprovecharon.

Este juego armónico de la Cláusula RUFO y no sólo de las Leyes Nros. 26.017 y 26.547, sino también de las leyes de presupuesto desde el año 2004, y de lo dispuesto en la Ley de Administración Financiera y de los Sistemas de Control del Sector Público Nacional, es una clara y cierta demostración de que para la Argentina la equidad entre acreedores resulta ser una piedra basal de este proceso de reestructuración de deudas, proceso que no está demás enfatizar, fue y sigue siendo una consecuencia directa de la peor crisis política, institucional, social, económica y financiera que viviera nuestro país. Para este PODER EJECUTIVO NACIONAL, la reestructuración de la deuda pública siguiendo un estricto sentido de equidad entre acreedores es, no sólo una obligación asumida contractual y legalmente, sino también una Política de Estado.

Así como también es una Política de Estado propender al fin del proceso de normalización de deuda diferida desde la cesación de pagos de 2001. Proceso que año a año es señalado pendiente por el HONORABLE CONGRESO DE LA NACIÓN, que además enfatiza, año a año en la Ley de Leyes las pautas bajo las cuales debe de concluirse ese proceso. Política de Estado no es negar la deuda repudiándola, sino normalizar la deuda pendiente dentro de parámetros consistentes con el crecimiento nacional, con la buena fe y con lo dispuesto por las leyes. Tal el mandato del HONORABLE CONGRESO DE LA NACIÓN.

Consecuentemente, la Ley N° 26.017 fue un



*"2013 - Año del Bicentenario de la Asamblea General Constituyente de 1813"*



medio, en una determinada circunstancia histórica, necesario para apuntalar el proceso de canje de deuda establecido en el Decreto N° 1.735/04.

En estas instancias históricas, y dentro del marco establecido por el HONORABLE CONGRESO DE LA NACIÓN, en relación a los pilares normativos que se refieren a la administración y reestructuración de la Deuda Pública, esto es las Leyes de Presupuesto, la Ley de Administración Financiera y de los Sistemas de Control del Sector Público Nacional, y los compromisos asumidos frente a los acreedores participantes en el canje establecido en el Decreto N° 1.735/04, es que elevamos a consideración del HONORABLE CONGRESO DE LA NACIÓN un proyecto de ley que le permita a este PODER EJECUTIVO NACIONAL contar con las facultades de manejo y arreglo de la deuda que, bajo estrictos parámetros de equidad entre acreedores, y dentro del marco normativo mencionado, le permitan concluir el proceso de regularización de deuda pública en estado de diferimiento de pagos.

Por otro lado, el proyecto que se eleva a consideración de ese HONORABLE CONGRESO DE LA NACIÓN mantiene los elementos necesarios para garantizar la equidad entre acreedores, concretamente, la exigencia al PODER EJECUTIVO NACIONAL de que cualquier fórmula de pago a los tenedores de títulos en estado de diferimiento, no podrá ser mejor que la ofrecida a los acreedores en la reestructuración de deuda dispuesta por el Decreto N° 563/10.

En particular, entre otros extremos, el proyecto





autoriza al PODER EJECUTIVO NACIONAL, a través del MINISTERIO DE ECONOMÍA Y FINANZAS PÚBLICAS, a realizar todos aquellos actos necesarios para la conclusión del proceso de reestructuración de los títulos públicos que fueran elegibles para el canje dispuesto en el Decreto N° 1.735 del 9 de diciembre de 2004 y sus normas complementarias que no hubiesen sido presentados al mismo ni al canje dispuesto por el Decreto N° 563 de fecha 26 de abril de 2010, en los términos del artículo 65 de la Ley N° 24.156 de Administración Financiera y de los Sistemas de Control del Sector Público Nacional y sus modificatorias, con el fin de adecuar los servicios de dicha deuda a las posibilidades de pago del Estado Nacional en el mediano y largo plazo.

Asimismo, se dispone expresamente que los términos y condiciones financieros que se ofrezcan no podrán ser mejores que los ofrecidos a los acreedores en la reestructuración de deuda dispuesta por el Decreto N° 563/10.

Se dispone que los tenedores de títulos públicos que fueran elegibles para el canje dispuesto en el Decreto N° 1.735/04 y sus normas complementarias que deseen participar de cualquier operación de reestructuración que se realice en el marco de lo dispuesto en la presente ley, deberán renunciar a todos los derechos que les correspondan en virtud de los referidos títulos, inclusive a aquellos derechos que hubieran sido reconocidos por cualquier sentencia judicial o administrativa, laudo arbitral o decisión de cualquier otra autoridad, y renunciar y liberar a la República Argentina de cualquier acción judicial, administrativa, arbitral o



*"2013 - Año del Bicentenario de la Asamblea General Constituyente de 1813"*





de cualquier otro tipo, iniciada o que pudiere iniciarse en el futuro con relación a los referidos títulos o a las obligaciones de la República Argentina que surjan de los mismos, incluyendo cualquier acción destinada a percibir servicios de capital o intereses de dichos títulos.

Se prohíbe ofrecer a los tenedores de deuda pública que hubieran iniciado acciones judiciales, administrativas, arbitrales o de cualquier otro tipo un trato más favorable que a aquellos que no lo hubieran hecho.

Se prevé que los bonos del Estado Nacional elegibles de acuerdo a lo dispuesto por el Decreto N° 1735/04, depositados por cualquier causa o título a la orden de tribunales de cualquier instancia, competencia y jurisdicción, cuyos titulares no hubieran adherido al canje dispuesto por el decreto antes citado o el dispuesto por el Decreto N° 563/10, o no hubieran manifestado, en forma expresa, en las respectivas actuaciones judiciales, su voluntad de no adherir a los mismos, quedarán reemplazados, de pleno derecho, por los "BONOS DE LA REPUBLICA ARGENTINA A LA PAR EN PESOS STEP UP 2038", en las condiciones establecidas para la asignación, liquidación y emisión de tales bonos por el Decreto N° 1735/04 y sus normas complementarias.

Finalmente, se suspende la vigencia de los artículos 2°, 3° y 4° de la Ley N° 26.017 hasta tanto el PODER EJECUTIVO NACIONAL declare terminado el proceso de reestructuración de los Títulos Públicos alcanzados por la referida norma.

Por todo lo expuesto precedentemente, se eleva



*"2013 - Año del Bicentenario de la Asamblea General Constituyente de 1813"*



para consideración de Vuestra Honorabilidad el presente proyecto de ley.

Dios Guarde a Vuestra Honorabilidad.

MENSAJE Nº  1241



DR. JUAN MANUEL ABAL MEDINA
JEFE DE GABINETE DE MINISTROS

Dr. HERNAN GASPAR LORENZINO
MINISTRO DE ECONOMIA Y
FINANZAS PUBLICAS



"2013 - Año del Bicentenario de la Asamblea General Constituyente de 1813"





EL SENADO Y CÁMARA DE DIPUTADOS

DE LA NACIÓN ARGENTINA, REUNIDOS EN CONGRESO, ...

SANCIONAN CON FUERZA DE

LEY:

ARTICULO 1º.- Autorízase al PODER EJECUTIVO NACIONAL, a través del MINISTERIO DE ECONOMÍA Y FINANZAS PÚBLICAS, a realizar todos aquellos actos necesarios para la conclusión del proceso de reestructuración de los títulos públicos que fueran elegibles para el canje dispuesto en el Decreto Nº 1.735 del 9 de diciembre de 2004 y sus normas complementarias que no hubiesen sido presentados al mismo ni al canje dispuesto por el Decreto N° 563 de fecha 26 de abril de 2010, en los términos del artículo 65 de la Ley N° 24.156 de Administración Financiera y de los Sistemas de Control del Sector Público Nacional y sus modificatorias, con el fin de adecuar los servicios de dicha deuda a las posibilidades de pago del Estado Nacional en el mediano y largo plazo.

ARTICULO 2º.- Los términos y condiciones financieros que se ofrezcan no podrán ser mejores que los ofrecidos a los acreedores en la reestructuración de deuda dispuesta por el Decreto Nº 563/10.

ARTICULO 3º.- Exceptúase a los títulos de deuda pública que se emitan como consecuencia de lo dispuesto en la presente ley, de lo dispuesto en los artículos 7º y 10 de la Ley N° 23.928 y sus modificaciones, de corresponder.

ARTICULO 4º .- Los tenedores de títulos públicos que fueran elegibles para el canje



"2013 - Año del Bicentenario de la Asamblea General Constituyente de 1813"



dispuesto en el Decreto N° 1.735/04 y sus normas complementarias que deseen participar de cualquier operación de reestructuración que se realice en el marco de lo dispuesto en la presente ley, deberán renunciar a todos los derechos que les correspondan en virtud de los referidos títulos, inclusive a aquellos derechos que hubieran sido reconocidos por cualquier sentencia judicial o administrativa, laudo arbitral o decisión de cualquier otra autoridad, y renunciar y liberar a la República Argentina de cualquier acción judicial, administrativa, arbitral o de cualquier otro tipo, iniciada o que pudiere iniciarse en el futuro con relación a los referidos títulos o a las obligaciones de la República Argentina que surjan de los mismos, incluyendo cualquier acción destinada a percibir servicios de capital o intereses de dichos títulos.

Prohíbese ofrecer a los tenedores de deuda pública que hubieran iniciado acciones judiciales, administrativas, arbitrales o de cualquier otro tipo un trato más favorable que a aquellos que no lo hubieran hecho.

ARTICULO 5°.- El MINISTERIO DE ECONOMÍA Y FINANZAS PÚBLICAS informará trimestralmente al HONORABLE CONGRESO DE LA NACIÓN los resultados de lo dispuesto en la presente.

ARTICULO 6°.- Los bonos del Estado Nacional elegibles de acuerdo a lo dispuesto por el Decreto N° 1735/04, depositados por cualquier causa o título a la orden de tribunales de cualquier instancia, competencia y jurisdicción, cuyos titulares no hubieran adherido al canje dispuesto por el decreto antes citado o el dispuesto por el Decreto N° 563/10, o no hubieran manifestado, en forma expresa, en las respectivas

*"2013 - Año del Bicentenario de la Asamblea General Constituyente de 1813"*



*El Poder Ejecutivo Nacional*



actuaciones judiciales, su voluntad de no adherir a los mismos, quedarán reemplazados, de pleno derecho, por los "BONOS DE LA REPUBLICA ARGENTINA A LA PAR EN PESOS STEP UP 2038", en las condiciones establecidas para la asignación, liquidación y emisión de tales bonos por el Decreto N° 1735/04 y sus normas complementarias.

Facúltase al MINISTERIO DE ECONOMÍA Y FINANZAS PÚBLICAS a dictar las normas complementarias que fueren necesarias para instrumentar el reemplazo dispuesto en el presente artículo.

ARTICULO 7°.- Suspéndese la vigencia de los artículos 2°, 3° y 4° de la Ley N° 26.017 hasta tanto el PODER EJECUTIVO NACIONAL declare terminado el proceso de reestructuración de los Títulos Públicos alcanzados por la referida norma.

ARTICULO 8°.- La presente ley entrará en vigencia el día de su publicación en el Boletín Oficial.

ARTICULO 9°.- Comuníquese al PODER EJECUTIVO NACIONAL.

DR. HERNAN GASPAR LORENZINO
MINISTRO DE ECONOMIA Y
FINANZAS PUBLICAS

DR. JUAN MANUEL ABAL MEDINA
JEFE DE GABINETE DE MINISTROS

Exhibit 14

SUBSCRIBE NOW >>

U.S. EDITION   Wednesday, August 28, 2013 As of 6:34 PM EDT                                   Subscribe | Log In

August 28, 2013, 6:34 p.m. ET

# UPDATE: Argentina Submits Debt-Swap Bill to Congress

By Shane Romig

BUENOS AIRES--Argentina's President Cristina Kirchner on Wednesday presented a bill to the Argentine congress to re-open a debt swap, the first part of a plan to try and lure in holdout creditors and shift overseas bonds to being under local jurisdiction and out of the reach of U.S. courts.

Argentina defaulted on about $100 billion in sovereign debt during the country's economic crisis in 2001. The terms unveiled on Wednesday are no better than swaps carried out in 2005 and 2010, in which creditors representing 93% of the bonds accepted a drastic two-thirds discount on the face value of the bonds. The remaining 7% of the bonds are held by so-called holdout creditors led by Aurelius Capital Management and Elliott Management Corp.'s NML Capital Ltd., which are expected to continue pursuing demands for full compensation in U.S. courts.

The bill is expected to be passed quickly by the legislature, where allies of President Kirchner hold a majority vote.

The government hasn't yet presented a parallel, more controversial plan, in which it's planning to switch payments on the new bonds issued as part of the debt restructuring to Buenos Aires, instead of New York.

Last Friday, the U.S. Second Circuit Appeals Court said Argentina cannot make payments in New York unless it makes good on over $1.33 billion owed to the holdout creditors. The ruling is on hold, as Argentina has appealed the decision to the U.S. Supreme Court, which hasn't yet said whether it will accept the appeal.

If the U.S. Supreme Court refuses to consider the appeal, or rejects it, Argentina will have to pay the holdout creditors or default on the new bonds. Argentina is set to make its next major debt payment of $2 billion on September 12.

Economy Minister Hernan Lorenzino on Wednesday said he expects a favorable ruling from the Supreme Court and denied the country is trying to skirt the U.S. legal rulings.

However, in a brief filed with the Supreme Court Wednesday, NML argued that an appeal should be denied "because Argentina has made clear that it will attempt to evade any order with which it disagrees."

Mr. Lorenzino told the Senate Wednesday that the new debt swap "shows that there is a profound commitment" from Argentina to pay its debts.

Government officials have repeatedly that they have no intention of paying the holdouts a dime more than the swap offers and frequently refer to the hedge funds as "vultures."

Write to Shane Romig at shane.romig@wsj.com

Exhibit 15

# Dechert
LLP

1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**ROBERT A. COHEN**

robert.cohen@dechert.com
+1 212 698 3501 Direct
+1 212 314 0001 Fax

September 11, 2013

**VIA HAND DELIVERY**

Honorable Thomas P. Griesa
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Room 1630
New York, NY 10007-1312

Re: *NML Capital, Ltd. v. the Republic of Argentina*, Nos. 08 Civ. 6978 (TPG); 09 Civ. 1707
(TPG); 09 Civ. 1708 (TPG); *Olifant Fund, Ltd. v. the Republic of Argentina*, No. 10 Civ.
9587 (TPG); *Pablo Alberto Varela v. the Republic of Argentina*, No. 10 Civ. 5338 (TPG);
*Aurelius Capital Master, Ltd. v. the Republic of Argentina*, Nos. 09 Civ. 8757 (TPG),
09 Civ. 10620 (TPG), 10 Civ. 3970 (TPG), 10 Civ. 8339 (TPG); *Aurelius Opportunities
Fund II, LLC v. the Republic of Argentina*, Nos. 10 Civ. 1602 (TPG), 10 Civ. 3507 (TPG);
*Blue Angel Capital I LLC v. the Republic of Argentina*, Nos. 10 Civ. 4101 (TPG), 10 Civ.
4782 (TPG).

Dear Judge Griesa:

We represent plaintiff NML Capital, Ltd. ("NML"), and write on behalf of NML and plaintiffs
Aurelius Capital Master, Ltd., Aurelius Opportunities Fund II, LLC, ACP Master, Ltd., Blue
Angel Capital I LLC, Olifant Fund, Ltd., and Pablo Alberto Varela, *et al.* (collectively, the
"Plaintiffs") to respectfully request that the Court enter the proposed order enclosed as Exhibit A,
to which defendant the Republic of Argentina ("Argentina") has already consented in part and
which relates to the Court's "Amended February 23 Order," dated November 21, 2012, which
was entered in each of the above-referenced actions.

On August 30, 2013, Plaintiffs wrote to the Court to advise that three days after the Second
Circuit affirmed Your Honor's November 21st "Equal Treatment" (pari passu) decision,
Argentine President Cristina Fernández de Kirchner announced in a nationally televised address a
plan in which holders of the securities issued in Argentina's 2005 and 2010 debt exchanges (the
"Exchange Bonds") could exchange those securities for "bonds instead, in foreign currency and
under the same terms, but they will simply be paid here in the Republic of Argentina in the
Securities Depository."

As Plaintiffs described in greater detail in their August 30 letter, Argentina's plan would
constitute—if any steps were taken towards implementing it—an unambiguous violation of the
Court's March 5, 2012 injunction ("the March 5 Order") against Argentina "tak[ing] any action to
evade the directives of the February 23, 2012 Orders in the event they are affirmed, render[ing]

15030817



Honorable Thomas P. Griesa
September 11, 2013
Page 2

them ineffective in the event they are affirmed, or diminish[ing] the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, ***including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds***, without prior approval of the Court" (the "Anti-Evasion Injunction") (emphasis added).  Moreover, it would constitute a repudiation of the Declaration of Francisco Guillermo Eggers, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

The Argentine President's televised announcement of a specific mechanism to evade the Amended February 23 Orders makes clear that the Republic does not feel constrained by the March 5 Order or the Eggers Declaration.  Plaintiffs seek additional relief to ensure that the Amended February 23 Orders will be enforceable and effective when all appellate proceedings have concluded or the stay is otherwise lifted.  In an effort to resolve these serious questions, Plaintiffs consulted with Carmine D. Boccuzzi, Jr., Esq. of Cleary Gottlieb Steen & Hamilton LLP, counsel for Argentina, regarding whether Argentina would agree to measures to ensure its compliance with the Anti-Evasion Injunction.

On August 29, 2013, Plaintiffs sent a proposed order to counsel for Argentina, which was identical to the proposed order that accompanies this letter except for minor changes to Paragraphs 3 and 4.  Plaintiffs sought the Republic's agreement to four forms of relief:  (1) a declaration that the Anti-Evasion Injunction has been and remains in effect; (2) an order clarifying that the Anti-Evasion Injunction will remain in effect during the pendency of a petition for a writ of certiorari and any subsequent proceedings; (3) a declaration clarifying that the plan announced by the Argentine President would, if any steps were taken towards implementing, violate the Anti-Evasion Injunction; and (4) limited discovery regarding plans (including the plan announced by the Argentine President) to evade the Amended February 23 Orders.

On September 10, 2013, counsel for Argentina informed Plaintiffs that Argentina would agree to the entry of only a limited portion of Plaintiffs' proposed order.  Argentina objects to the third and fourth points described above, which are the new and necessary points designed to address Argentina's freshly announced evasion plan and similar types of plans in the future: a declaration regarding the fact that Argentina's plan would violate the Anti-Evasion Injunction and discovery to determine what Argentina is doing to implement its plans to evade the Amended February 23 Orders.  Argentina also proposed the deletion of two "WHEREAS" clauses and the words "attempt to" in two places in paragraph 2 of Plaintiff's proposed order:  A true and correct copy of the email from Argentina's counsel is attached hereto as Exhibit B.

Each of the three points to which Argentina objects would materially aid Plaintiffs in preventing Argentina from formulating, designing, or implementing its scheme to evade the Amended



Honorable Thomas P. Griesa
September 11, 2013
Page 3

February 23 Orders. First, the declaratory relief sought by Plaintiffs would remove any doubt that the plan proposed by the Argentine President—to change the place of payment of the Exchange Bonds through an additional exchange offer—would violate the Anti-Evasion Injunction. Such a clarification would render frivolous any argument from Argentina or non-parties in active concert with it that such an exchange somehow would not violate the Anti-Evasion Injunction.

Second, the discovery sought from Argentina would enable Plaintiffs to determine if (and to what extent) Argentina has already violated the Anti-Evasion Injunction by taking steps to design and implement the President's plan, and to identify any non-parties acting in active concert with Argentina in implementing its plan, or any other plan to evade the Anti-Evasion Injunction, thereby enabling Plaintiffs to ensure that each such non-party is given actual notice of the Anti-Evasion Injunction and is thereby discouraged from aiding Argentina.

Finally, inclusion of the words "attempt to" in the clarification of the preliminary injunction would make plain that Argentina and its agents are prohibited from attempting to evade the injunction or render it ineffective. While plaintiffs believe that such conduct is already prohibited by the March 5 Order, disturbingly Argentina apparently believes otherwise. The additional language proposed by plaintiffs would make clear that Argentina and its agents violate this Court's order not only if they are *successful* in evading it or rendering it effective; their taking any steps toward doing so—*viz.* their efforts towards and planning of attempts to evade—just as clearly violate the order.

For these reasons, Plaintiffs respectfully request that the Court enter the proposed order enclosed as Exhibit A. If the Court wishes to have argument regarding the proposed order, Plaintiffs respectfully request that such a hearing be scheduled for the next date available on the Court's calendar.

Respectfully submitted,

Robert A. Cohen

Enclosures

cc:   Carmine D. Boccuzzi, Jr., Esq. (by email)
      Edward A. Friedman, Esq. (by email)
      Robert D. Carroll, Esq. (by email)
      Michael C. Spencer, Esq. (by email)

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

NML CAPITAL, LTD.,                       :        08 Civ. 6978 (TPG)
                                         :        09 Civ. 1707 (TPG)
                    Plaintiff,           :        09 Civ. 1708 (TPG)
                                         :
            v.                           :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                    Defendant.           :
                                         :
------------------------------------------------ x
                                         :
AURELIUS CAPITAL MASTER, LTD. and        :
ACP MASTER, LTD.,                        :        09 Civ. 8757 (TPG)
                                         :        09 Civ. 10620 (TPG)
                    Plaintiffs,          :
                                         :
            v.                           :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                    Defendant.           :
                                         :
------------------------------------------------ x
                                         :
AURELIUS OPPORTUNITIES FUND II, LLC      :
and AURELIUS CAPITAL MASTER, LTD.,       :        10 Civ. 1602 (TPG)
                                         :        10 Civ. 3507 (TPG)
                    Plaintiffs,          :
                                         :
            v.                           :
                                         :
THE REPUBLIC OF ARGENTINA,               :
                                         :
                    Defendant.           :        **(captions continued on next page)**
------------------------------------------------ x

## [PROPOSED] ORDER

```
------------------------------------------------- :
                                                  :
AURELIUS CAPITAL MASTER, LTD. and                 :
AURELIUS OPPORTUNITIES FUND II,                   :   10 Civ. 3970 (TPG)
LLC,                                              :   10 Civ. 8339 (TPG)
                                                  :
          Plaintiffs,                             :
                                                  :
v.                                                :
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
          Defendant.                              :
                                                  x
------------------------------------------------- 
BLUE ANGEL CAPITAL I LLC,                         :
                                                  :
          Plaintiff,                              :
                                                  :   10 Civ. 4101 (TPG)
                                                  :   10 Civ. 4782 (TPG)
v.                                                :
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
          Defendant.                              :
------------------------------------------------- x
OLIFANT FUND, LTD.,                               :
                                                  :
          Plaintiff,                              :   10 Civ. 9587 (TPG)
                                                  :
v.                                                :
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
          Defendant.                              :
------------------------------------------------- x
PABLO ALBERTO VARELA, et al.,                     :
                                                  :
          Plaintiff,                              :   10 Civ. 5338 (TPG)
                                                  :
v.                                                :
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
          Defendant.                              :
------------------------------------------------- x
```

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic of Argentina (the "Republic") is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23 Orders"), this Court granted Plaintiffs' motions for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

WHEREAS, in an Order dated March 5, 2012 (the "March 5 Order"), the Court stayed the February 23 Orders pending appeal, and also enjoined the Republic as follows (the "Anti-Evasion Injunction"):

> [T]he Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the

---

[1]    The term "Exchange Bonds," as in the Amended February 23 Orders, refers to the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future.

[2]    The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

> Court's ability to supervise compliance with the February 23, 2012
> Orders in the event they are affirmed, including without limitation,
> altering or amending the processes or specific transfer mechanisms
> by which it makes payments on the Exchange Bonds, without prior
> approval of the Court.
>
> …
>
> This Court shall retain jurisdiction to monitor and enforce this
> ORDER, and, on notice to the parties, to modify, amend, or extend
> it as justice requires to achieve its equitable purposes and account
> for materially changed circumstances, including any failure by the
> Republic to abide by Paragraph (2) herein.

WHEREAS, in an Opinion dated October 26, 2012 (the "October 26 Opinion"), the

United States Court of Appeals for the Second Circuit affirmed the February 23, 2012 Orders in

part and remanded in part "for such proceedings as are necessary to address the operation of the

payment formula and the Injunctions' application to third parties and intermediary banks."

WHEREAS, following this Court's request for an affidavit ensuring that the Anti-

Evasion Injunction would be complied with notwithstanding contrary statements to the press, the

Republic submitted the Declaration of Francisco Guillermo Eggers, the Republic's Director of

the National Bureau of Public Credit of the Ministry of Economy and Public Finance, dated

November 16, 2012, representing "that the Republic has complied, is complying, and will

comply with the terms of the March 5 Stay Order."

WHEREAS, the Court resolved the issues remanded for clarification by the Second

Circuit in an Opinion, dated November 21, 2012 and an "Amended February 23 Order," dated

November 21, 2012, entered in each of the above-referenced actions.

WHEREAS, in an "Order Concerning The March 5, 2012 Order," dated November 21,

2012, the Court vacated the clause staying enforcement of its injunction pending appeal, but left

in place its injunction prohibiting Argentina from taking any action to evade the injunction.

WHEREAS, in an Order dated November 28, 2012, the Second Circuit ordered "that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of [the Second Circuit]," but did not stay the March 5 Order.

WHEREAS, on June 24, 2013, the Republic filed a petition for a writ of certiorari with respect to the October 26 Opinion.

WHEREAS, in an Opinion dated August 23, 2013 (the "August 23 Opinion"), the Second Circuit affirmed the Amended February 23 Orders, but stayed enforcement of the Amended February 23 Orders pending the resolution of a petition for a writ of certiorari.

WHEREAS, the August 23, 2013 opinion noted that "Argentina's officials have publicly and repeatedly announced their intention to defy any rulings of this Court and the district court with which they disagree." *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, 2013 WL 4487563, at *1 (2d Cir. Aug. 23, 2013).

AND WHEREAS, on August 26, 2013, the President of Argentina, Cristina Fernández de Kirchner, announced in a nationally-televised address that the Republic will establish procedures allowing holders of Exchange Bonds to replace these instruments with nearly identical instruments that are payable within the Republic, in an apparent attempt to evade the directives of the Amended February 23 Orders.

**IT IS HEREBY**:

1.      DECLARED that the Anti-Evasion Injunction of the March 5 Order has been and remains continuously in full force and effect.

2.      ORDERED that the Republic shall not—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic—take any action to attempt to evade the purposes and directives of the

Amended February 23 Orders, attempt to render those Orders ineffective, or attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court. This paragraph shall remain in effect during the pendency of any petition to the United States Supreme Court for a writ of certiorari with respect to the October 26 Opinion or the August 23 Opinion, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand, unless a further order of the Court states otherwise.

3.      DECLARED that for the avoidance of doubt (i) the implementation of the plan to allow Exchange Bonds to be exchanged for securities or similar instruments payable in Argentina, which was announced by President Fernández de Kirchner in her speech of August 26, 2013, (ii) implementation of any functionally equivalent or reasonably similar plan, or (iii) any step towards implementing (including without limitation the formulation or design of) such a plan or a functionally equivalent or reasonably similar plan, each would violate the Anti-Evasion Injunction of the March 5 Order and Paragraph 2 of this ORDER.

4.      ORDERED that with respect to any plan or proposal that may have the purpose, effect or intent, either directly or indirectly, of violating the Anti-Evasion Injunction or Paragraph 2 of this ORDER, including without limitation the measures described in Paragraph 3 of this ORDER, or which may be deemed by a reasonable person to have such purpose, effect or intent, the Republic shall disclose to Plaintiffs, within five business days of the entry of this ORDER, the existence and content of any communications between the Republic (or any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic) and: (i) any holders of beneficial interests in the Exchange Bonds or any

registered owners of the Exchange Bonds; (ii) any trustee, indenture trustee, paying agent, trustee paying agent, transfer agent, or any agent under the relevant indenture and global notes for the Exchange Bonds; (iii) any registrar, clearing corporations and systems, operators of clearing systems, settlement agents, depositary, depositary participant or custodian for the Exchange Bonds; (iv) any banking, financial, trust or custodial institution and any coordinator, manager, solicitation agent, tender or exchange agent, or financial advisor; (v) any United States or international regulator or government entity; or (vi) any agent, representative, or other person acting on behalf of the persons identified in parts (i), (ii), (iii), (iv), or (v) of this paragraph.  For the avoidance of doubt, this disclosure shall include the identity of all parties to the communication, the date and nature of the communication, a detailed description of the content of the communication, and any documents or records constituting or associated with the communication (including without limitation any e-mails, attachments, facsimile transmissions, or other written materials).  To the extent that any such communications come into existence after the date of this ORDER, such communications shall be disclosed to the Court and to Plaintiffs' respective counsel within five business days of the sending or receipt of such communications.

5.     This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by the terms of the ORDER.

Dated: New York, New York
       September ___, 2013

_____
                                       Thomas P. Griesa
                                       U.S. District Judge

7

Exhibit B

**Kirsch, Eric**

| | |
|---|---|
| **From:** | Boccuzzi Jr., Carmine D. [cboccuzzi@cgsh.com] |
| **Sent:** | Tuesday, September 10, 2013 11:52 AM |
| **To:** | 'Rapport, Daniel B.'; Boccuzzi Jr., Carmine D. |
| **Cc:** | Friedman, Edward A.; Cohen, Robert; Kirsch, Eric; 'Spencer, Michael'; 'gsnitow@skhmlaw.com' (gsnitow@skhmlaw.com); 'Carroll, Robert D' (RCarroll@goodwinprocter.com); Sanchez Herrera, Ezequiel; Brennan, Michael M. |
| **Subject:** | RE: NML Capital, Ltd. et al. v. the Republic of Argentina |
| **Attachments:** | Revised draft proposed order.doc; Blackline 9-10.pdf |

Dear Dan – Following up on your email of Sunday I attach our comments to plaintiffs' proposed order. I am available to discuss.

Carmine D. Boccuzzi, Jr.
Cleary Gottlieb Steen & Hamilton LLP
Assistant: trusso@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2508 | f: +1 212 225 3999
www.clearygottlieb.com | cboccuzzi@cgsh.com

---

**From:** Rapport, Daniel B. [mailto:drapport@fklaw.com]
**Sent:** Sunday, September 08, 2013 1:10 PM
**To:** Boccuzzi Jr., Carmine D.
**Cc:** Friedman, Edward A.; robert.cohen@dechert.com; Kirsch, Eric (Eric.Kirsch@dechert.com); 'Spencer, Michael'; 'gsnitow@skhmlaw.com' (gsnitow@skhmlaw.com); 'Carroll, Robert D' (RCarroll@goodwinprocter.com); Sanchez Herrera, Ezequiel
**Subject:** RE: NML Capital, Ltd. et al. v. the Republic of Argentina

Carmine --

We are disappointed that we did not receive last week the Republic's response to our proposed order, as you had promised. We understand that you hope to provide a response by Tuesday. Please provide a response – identifying what provisions the Republic will and will not agree to, and any specific drafting changes the Republic is proposing -- by noon on Tuesday; if we do not receive such a response by then, we will take appropriate steps to seek Court intervention.

Best,

Dan

---

**From:** Boccuzzi Jr., Carmine D. [mailto:cboccuzzi@cgsh.com]
**Sent:** Friday, August 30, 2013 11:01 AM
**To:** Cohen, Robert; Friedman, Edward A.
**Cc:** Kirsch, Eric; Sanchez Herrera, Ezequiel
**Subject:** RE: NML Capital, Ltd. et al. v. the Republic of Argentina

Ed and Robert:

I write in follow up to the call that Ed, Ezequiel and I just had this morning with Ed and in response to Robert's email which Robert sent to us last night at 8:01 pm, demanding a response by this morning. The Republic objects to the arbitrary deadline. There is no emergency of any kind as you well know. Indeed, on Thursday morning at 12:39 am Eric wrote to inform me that plaintiffs intended to adjourn the "emergency" hearing they had scheduled with the Court for yesterday at noon (plaintiffs then in fact adjourned the hearing).

1

In any event we can confirm my statement on the call with Ed that the Republic understands as accurate the declaratory statement in Paragraph 1 of your proposed order. As to the remainder of the 7-page proposed order you sent to us last night at 8:01 pm we are reviewing it, and consulting with our client, and reserving all objections and defenses, will respond to you next week.

Regards, Carmine

Carmine D. Boccuzzi, Jr.
Cleary Gottlieb Steen & Hamilton LLP
Assistant: trusso@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2508 | f: +1 212 225 3999
www.clearygottlieb.com | cboccuzzi@cgsh.com

**From:** Cohen, Robert [mailto:robert.cohen@dechert.com]
**Sent:** Thursday, August 29, 2013 8:01 PM
**To:** Boccuzzi Jr., Carmine D.
**Cc:** Kirsch, Eric
**Subject:** NML Capital, Ltd. et al. v. the Republic of Argentina

Carmine,

Attached is the proposed order concerning equal treatment-related issues. Please let us know if your client will consent to its entry. In particular, please let us know as soon as possible if the Republic believes that the declaratory statement in numbered Paragraph 1 is accurate. If the Republic cannot respond with respect to Paragraph 1 by 11:00 a.m. tomorrow, we will ask the Court to hear us as soon as possible, including tomorrow afternoon.

Regards,

Robert A. Cohen
Partner
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Direct: +1 (212) 698-3501
Fax:  +1 (212) 314-0001
Cell:  +1 (215) 715-5000
Email: robert.cohen@dechert.com
www.dechert.com

This e-mail is from Dechert LLP, a law firm, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any attachments. Thank you.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the
intended recipient, please advise the sender immediately by reply e-mail and delete this message and any
attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and
its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

**CGSH COMMENTS – 9/10/13**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

NML CAPITAL, LTD.,                              :          08 Civ. 6978 (TPG)
                                               :          09 Civ. 1707 (TPG)
                    Plaintiff,                  :          09 Civ. 1708 (TPG)
                                               :
          v.                                    :
                                               :
THE REPUBLIC OF ARGENTINA,                      :
                                               :
                    Defendant.                  :
                                               :
------------------------------------------------ x
                                               :
AURELIUS CAPITAL MASTER, LTD. and              :
ACP MASTER, LTD.,                               :          09 Civ. 8757 (TPG)
                                               :          09 Civ. 10620 (TPG)
                    Plaintiffs,                 :
                                               :
          v.                                    :
                                               :
THE REPUBLIC OF ARGENTINA,                      :
                                               :
                    Defendant.                  :
                                               :
------------------------------------------------ x
                                               :
AURELIUS OPPORTUNITIES FUND II, LLC            :
and AURELIUS CAPITAL MASTER, LTD.,             :          10 Civ. 1602 (TPG)
                                               :          10 Civ. 3507 (TPG)
                    Plaintiffs,                 :
                                               :
          v.                                    :
                                               :
THE REPUBLIC OF ARGENTINA,                      :
                                               :
                    Defendant.                  :          **(captions continued on next page)**
                                               :
------------------------------------------------ x

## [PROPOSED] ORDER

15019832

```
------------------------------------------  :
AURELIUS CAPITAL MASTER, LTD. and           :
AURELIUS OPPORTUNITIES FUND II,             :     10 Civ. 3970 (TPG)
LLC,                                        :     10 Civ. 8339 (TPG)
                                            :
          Plaintiffs,                       :
                                            :
v.                                          :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
          Defendant.                        :
                                            x
------------------------------------------  :
BLUE ANGEL CAPITAL I LLC,                   :
                                            :
          Plaintiff,                        :     10 Civ. 4101 (TPG)
                                            :     10 Civ. 4782 (TPG)
v.                                          :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
          Defendant.                        :
------------------------------------------  x
OLIFANT FUND, LTD.,                         :
                                            :
          Plaintiff,                        :     10 Civ. 9587 (TPG)
                                            :
v.                                          :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
          Defendant.                        :
------------------------------------------  x
PABLO ALBERTO VARELA, et al.,               :
                                            :
          Plaintiff,                        :     10 Civ. 5338 (TPG)
                                            :
v.                                          :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
          Defendant.                        :
------------------------------------------  x
```

**CGSH COMMENTS – 9/10/13**

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic of Argentina (the "Republic") is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23 Orders"), this Court granted Plaintiffs' motions for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

WHEREAS, in an Order dated March 5, 2012 (the "March 5 Order"), the Court stayed the February 23 Orders pending appeal, and also enjoined the Republic as follows (the "Anti-Evasion Injunction"):

> [T]he Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the

---

[1]     The term "Exchange Bonds," as in the Amended February 23 Orders, refers to the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future.

[2]     The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

> Court's ability to supervise compliance with the February 23, 2012
> Orders in the event they are affirmed, including without limitation,
> altering or amending the processes or specific transfer mechanisms
> by which it makes payments on the Exchange Bonds, without prior
> approval of the Court.
>
> …
>
> This Court shall retain jurisdiction to monitor and enforce this
> ORDER, and, on notice to the parties, to modify, amend, or extend
> it as justice requires to achieve its equitable purposes and account
> for materially changed circumstances, including any failure by the
> Republic to abide by Paragraph (2) herein.

WHEREAS, in an Opinion dated October 26, 2012 (the "October 26 Opinion"), the United States Court of Appeals for the Second Circuit affirmed the February 23, 2012 Orders in part and remanded in part "for such proceedings as are necessary to address the operation of the payment formula and the Injunctions' application to third parties and intermediary banks."

WHEREAS, following this Court's request for an affidavit ensuring that the Anti-Evasion Injunction would be complied with notwithstanding contrary statements to the press, the Republic submitted the Declaration of Francisco Guillermo Eggers, the Republic's Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

WHEREAS, the Court resolved the issues remanded for clarification by the Second Circuit in an Opinion, dated November 21, 2012 and an "Amended February 23 Order," dated November 21, 2012, entered in each of the above-referenced actions.

WHEREAS, in an "Order Concerning The March 5, 2012 Order," dated November 21, 2012, the Court vacated the clause staying enforcement of its injunction pending appeal, but left in place its injunction prohibiting Argentina from taking any action to evade the injunction.

WHEREAS, in an Order dated November 28, 2012, the Second Circuit ordered "that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of [the Second Circuit]," but did not stay the March 5 Order.

WHEREAS, on June 24, 2013, the Republic filed a petition for a writ of certiorari with respect to the October 26 Opinion.

WHEREAS, in an Opinion dated August 23, 2013 (the "August 23 Opinion"), the Second Circuit affirmed the Amended February 23 Orders, but stayed enforcement of the Amended February 23 Orders pending the resolution of a petition for a writ of certiorari.

**IT IS HEREBY**:

1.      DECLARED that the Anti-Evasion Injunction of the March 5 Order has been and remains continuously in full force and effect.

2.      ORDERED that the Republic shall not—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic—take any action to evade the purposes and directives of the Amended February 23 Orders, render those Orders ineffective, or attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.  This paragraph shall remain in effect during the pendency of any petition to the United States Supreme Court for a writ of certiorari with respect to the October 26 Opinion or the August 23 Opinion, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand, unless a further order of the Court states otherwise.

3.     This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by the terms of the ORDER.

Dated: New York, New York
       August ___, 2013

                                              _____

                                                 Thomas P. Griesa
                                                 U.S. District Judge

CGSH COMMENTS – 9/10/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

NML CAPITAL, LTD.,                              :         08 Civ. 6978 (TPG)
                                               :         09 Civ. 1707 (TPG)
                   Plaintiff,                  :         09 Civ. 1708 (TPG)

          v.                                   :

THE REPUBLIC OF ARGENTINA,                     :

                   Defendant.                  :

---------------------------------------------------x
                                               :
AURELIUS CAPITAL MASTER, LTD. and              :
ACP MASTER, LTD.,                              :         09 Civ. 8757 (TPG)
                                               :         09 Civ. 10620 (TPG)
                   Plaintiffs,                 :

          v.                                   :

THE REPUBLIC OF ARGENTINA,                     :

                   Defendant.                  :

---------------------------------------------------x

AURELIUS OPPORTUNITIES FUND II, LLC            :
and AURELIUS CAPITAL MASTER, LTD.,             :         10 Civ. 1602 (TPG)
                                               :         10 Civ. 3507 (TPG)
                   Plaintiffs,                 :

          v.                                   :

THE REPUBLIC OF ARGENTINA,                     :

                   Defendant.                  :

                                               :         **(captions continued on next page)**
---------------------------------------------------x

**[PROPOSED] ORDER**

15019832

```
-----------------------------------------  :
AURELIUS CAPITAL MASTER, LTD. and          :
AURELIUS OPPORTUNITIES FUND II,            :   10 Civ. 3970 (TPG)
LLC,                                       :   10 Civ. 8339 (TPG)
                                           :
        Plaintiffs,                        :
                                           :
v.                                         :
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
        Defendant.                       x
-----------------------------------------
-
BLUE ANGEL CAPITAL I LLC,                   :
                                           :
        Plaintiff,                         :   10 Civ. 4101 (TPG)
                                           :   10 Civ. 4782 (TPG)
v.                                         :
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
        Defendant.                       x
-----------------------------------------
-
OLIFANT FUND, LTD.,                         :
                                           :
        Plaintiff,                         :   10 Civ. 9587 (TPG)
                                           :
v.                                         :
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
        Defendant.                       x
-----------------------------------------
-
PABLO ALBERTO VARELA, et al.,               :
                                           :
        Plaintiff,                         :   10 Civ. 5338 (TPG)
                                           :
v.                                         :
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
        Defendant.                       x
-----------------------------------------
```

2

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic of Argentina (the "Republic") is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23 Orders"), this Court granted Plaintiffs' motions for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

WHEREAS, in an Order dated March 5, 2012 (the "March 5 Order"), the Court stayed the February 23 Orders pending appeal, and also enjoined the Republic as follows (the "Anti-Evasion Injunction"):

> [T]he Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the

---

[1]  The term "Exchange Bonds," as in the Amended February 23 Orders, refers to the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future.

[2]  The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

> February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.
>
> …
>
> This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

WHEREAS, in an Opinion dated October 26, 2012 (the "October 26 Opinion"), the United States Court of Appeals for the Second Circuit affirmed the February 23, 2012 Orders in part and remanded in part "for such proceedings as are necessary to address the operation of the payment formula and the Injunctions' application to third parties and intermediary banks."

WHEREAS, following this Court's request for an affidavit ensuring that the Anti-Evasion Injunction would be complied with notwithstanding contrary statements to the press, the Republic submitted the Declaration of Francisco Guillermo Eggers, the Republic's Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance, dated November 16, 2012, representing "that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order."

WHEREAS, the Court resolved the issues remanded for clarification by the Second Circuit in an Opinion, dated November 21, 2012 and an "Amended February 23 Order," dated November 21, 2012, entered in each of the above-referenced actions.

WHEREAS, in an "Order Concerning The March 5, 2012 Order," dated November 21, 2012, the Court vacated the clause staying enforcement of its injunction pending appeal, but left in place its injunction prohibiting Argentina from taking any action to evade the injunction.

WHEREAS, in an Order dated November 28, 2012, the Second Circuit ordered "that the November 21, 2012 orders of the district court entered in relation to this matter are all stayed pending further order of [the Second Circuit]," but did not stay the March 5 Order.

WHEREAS, on June 24, 2013, the Republic filed a petition for a writ of certiorari with respect to the October 26 Opinion.

WHEREAS, in an Opinion dated August 23, 2013 (the "August 23 Opinion"), the Second Circuit affirmed the Amended February 23 Orders, but stayed enforcement of the Amended February 23 Orders pending the resolution of a petition for a writ of certiorari.

~~WHEREAS, the August 23, 2013 opinion noted that "Argentina's officials have publicly and repeatedly announced their intention to defy any rulings of this Court and the district court with which they disagree." *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, 2013 WL 4487563, at \*1 (2d Cir. Aug. 23, 2013).~~

~~AND WHEREAS, on August 26, 2013, the President of Argentina, Cristina Fernández de Kirchner, announced in a nationally-televised address that the Republic will establish procedures allowing holders of Exchange Bonds to replace these instruments with nearly identical instruments that are payable within the Republic, in an apparent attempt to evade the directives of the Amended February 23 Orders.~~

**IT IS HEREBY**:

1.    DECLARED that the Anti-Evasion Injunction of the March 5 Order has been and remains continuously in full force and effect.

2.    ORDERED that the Republic shall not—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic—take any action ~~to attempt~~ to evade the purposes and directives of the

Amended February 23 Orders, ~~attempt to~~ render those Orders ineffective, or attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court. This paragraph shall remain in effect during the pendency of any petition to the United States Supreme Court for a writ of certiorari with respect to the October 26 Opinion or the August 23 Opinion, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand, unless a further order of the Court states otherwise.

3.    ~~DECLARED that for the avoidance of doubt (i) the implementation of the plan to allow Exchange Bonds to be exchanged for securities or similar instruments payable in Argentina, which was announced by President Fernández de Kirchner in her speech of August 26, 2013, (ii) implementation of any functionally equivalent or reasonably similar plan, or (iii) any step towards implementing such a plan or a functionally equivalent or reasonably similar plan, each would violate the Anti-Evasion Injunction of the March 5 Order and Paragraph 2 of this ORDER.~~

4.    ~~ORDERED that with respect to any plan or proposal that may have the purpose, effect or intent, either direct or indirectly, of violating the Anti-Evasion Injunction or Paragraph 2 of this ORDER, including without limitation the measures described in Paragraph 3 of this ORDER, or which may be deemed by a reasonable person to have such purpose, effect or intent, the Republic shall disclose to Plaintiffs, within five business days of the entry of this ORDER, the existence and content of any communications between the Republic (or any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of the Republic) and: (i) any holders of beneficial interests in the Exchange Bonds or any registered~~

6

~~owners of the Exchange Bonds; (ii) any trustee, indenture trustee, paying agent, trustee paying agent, transfer agent, or any agent under the relevant indenture and global notes for the Exchange Bonds; (iii) any registrar, clearing corporations and systems, operators of clearing systems, settlement agents, depositary, depositary participant or custodian for the Exchange Bonds; (iv) any banking, financial, trust or custodial institution and any coordinator, manager, solicitation agent, tender or exchange agent, or financial advisor; (v) any United States or international regulator or government entity; or (vi) any agent, representative, or other person acting on behalf of the persons identified in parts (i), (ii), (iii), (iv), or (v) of this paragraph. To the extent that any such communications come into existence after the date of this ORDER, such communications shall be disclosed to the Court and to Plaintiffs' respective counsel within five business days of the sending or receipt of such communications.~~

~~5.~~ **3.**    This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by the terms of the ORDER.

Dated: New York, New York
       August ___, 2013

                           _____

                              Thomas P. Griesa
                              U.S. District Judge