# 12-105-cv(L)

**12-109-cv (CON), 12-111-cv (CON), 12-157-cv (CON), 12-158-cv (CON), 12-163-cv (CON), 12-164-cv (CON), 12-170-cv (CON), 12-176-cv (CON), 12-185-cv (CON), 12-189-cv (CON), 12-214-cv (CON), 12-909-cv (CON), 12-914-cv (CON), 12-916-cv (CON), 12-919-cv (CON), 12-920-cv (CON), 12-923-cv (CON), 12-924-cv (CON), 12-926-cv (CON), 12-939-cv (CON), 12-943-cv (CON), 12-951-cv (CON), 12-968-cv (CON), 12-971-cv (CON), 12-4694-cv (CON), 12-4829-cv (CON), 12-4865-cv (CON)**

## United States Court of Appeals

*for the*

## Second Circuit

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,

*Plaintiffs-Appellees,*

— v. —

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant,*

*(Caption Continued on Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPPOSITION OF DEFENDANT-APPELLANT THE REPUBLIC OF ARGENTINA TO PLAINTIFFS-APPELLEES' MOTION TO VACATE THE STAY

*Of Counsel:*
Jonathan I. Blackman
Carmine D. Boccuzzi

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for Defendant-Appellant*
One Liberty Plaza
New York, New York 10006
(212) 225-2000

ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS
OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES
BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA
CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA
LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ,
NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, OLIFANT
FUND, LTD.,

*Plaintiffs-Appellees,*

THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE,
EXCHANGE BONDHOLDER GROUP, FINTECH ADVISORY INC.,

*Non-Party Appellants,*

EURO BONDHOLDERS, ICE CANYON LLC,

*Intervenors.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT ....................................................................................................3

    A.    Statements By Political Officials And Newspaper Articles Do Not Represent Changed Circumstances Warranting Vacatur Of The Stay .......................................................................................5

    B.    Continuing The Stay Will Not Harm Plaintiffs ..................................9

    C.    Vacating The Stay Threatens Immense Harm To The Republic And Numerous Third Parties, And Is Against The Public Interest ..............................................................................11

CONCLUSION ...............................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Khulumani v. Barclay Nat'l Bank Ltd.*,
509 F.3d 148 (2d Cir. 2007).................................................................. 3-4

*Motorola Credit Corp. v. Uzan*,
561 F.3d 123 (2d Cir. 2009).................................................................. 14

*NML Capital, Ltd. v. Republic of Argentina*,
727 F.3d 230 (2d Cir. 2013)........................................................ 1, 4, 14

*Perry v. Brown*,
639 F. 3d 1153 (9th Cir. 2011) ........................................................ 4

*Reliance Ins. Co. v. National Superlease, Inc.*,
No 84 Civ. 3121 (RWS), 1985 U.S. Dist. LEXIS 15904
(S.D.N.Y. Sept. 17, 1985)................................................................. 4-5

*Rostker v. Goldberg*,
448 U.S. 1306 (1980)....................................................................... 4

*Se. Alaskan Conservation Council v. U.S. Army Corps of Eng'rs*,
472 F.3d 1097 (9th Cir. 2006) ........................................................ 4

**Rules and Statutes**

Fed. R. App. P. 41(d)(2)(A)............................................................ 3

**Other Authorities**

IMF, *Sovereign Debt Restructuring – Recent Developments and Implications
for the Fund's Legal and Policy Framework*, Apr. 26, 2013, *available at*
http://www.imf.org/external/ np/pp/eng/2013/042613.pdf............................ 13-14

Joshua Goodman, *IMF Should Ask U.S. to Review Argentina Case: Lagarde*,
Bloomberg, Jul. 20, 2013 .............................................................. 14

## PRELIMINARY STATEMENT

This Court, in its August 23, 2013 decision affirming the Amended Injunctions, *sua sponte* extended its November 28, 2012 stay of those Injunctions (the "Stay") "pending resolution of a timely petition to the Supreme Court for a writ of *certiorari*," because it recognized that the significant "nature of the issues presented" warranted that result. *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 238 (2d Cir. 2013); *see also id.* at 248. That Stay decision was and remains entirely correct. The Court should accordingly deny plaintiffs' motion to vacate the Stay, as it rightly rejected plaintiffs' prior efforts to avoid appellate review based on similar unsupported claims of purportedly imminent evasion, both when it entered the Stay last November and when it denied plaintiffs' motion to condition the Stay on the Republic's posting of security.

Critically, plaintiffs have shown no change in circumstances warranting a reversal of the Court's decision to continue the Stay pending Supreme Court review. Instead, plaintiffs point to a speech made by the President of Argentina on August 26 in the wake of this Court's August 23 decision, and argue that the Court "infer" from it that the Republic is preparing to "evade" the Amended Injunctions. Plaintiffs are wrong. Consistent with prior statements, the President, who has a right and an obligation to address matters of deep importance to her

nation, expressed her disagreement with this Court's decision, her hope for review by the Supreme Court, and her commitment to the holders of restructured debt.

Indeed, in the last two months, the Republic has stated that the district court's March 5, 2012 Order (the "Anti-Evasion Injunction") – which prevents the Republic from taking actions during the pendency of its appeal to render the pari passu Injunctions ineffective – remains in effect and that the Republic is following it. The Republic now unequivocally reaffirms that commitment in the Declaration of the Chief of Cabinet of Ministry of Economy and Public Finance of the Republic, Fabián Gustavo Dall'O, which is submitted contemporaneously with this opposition. The "equitable calculus" has thus not "fundamentally changed" since the August 23 decision. The Anti-Evasion Injunction has maintained the status quo for over nineteen months, and will continue to do so while the Republic pursues further review of that decision. While plaintiffs may desire to precipitate a court-ordered default – and no doubt windfall profits for themselves as reported holders of credit default swaps on the Republic's restructured debt – that is not a basis for lifting the Stay, which would deprive the Republic and numerous third parties of the possibility of the additional review contemplated by this Court.

The Republic's appeal – as the Court recognized – has raised issues of immense significance. The governments and institutions that oversee the stability of the international financial system, including the United States, the Republic of

France, and the International Monetary Fund ("IMF"), have stressed their critical nature, not only for the Republic and the numerous third parties affected by the Amended Injunctions, including holders of more than $24 billion in restructured Argentine debt, but also for the international payments system and sovereign debt restructuring generally. Clearly, the Court considered it appropriate for the Supreme Court to decide a timely *certiorari* petition addressing these issues, and did not intend, as plaintiffs would like, to preclude such review by allowing the Injunctions to prevent payment on the exchange bonds before the Supreme Court acts. Vacating the Stay now will expose the Republic and innocent third parties to a potential court-ordered default on over $24 billion. The same considerations that led this Court to grant the Stay in the first place continue to apply, and nothing in plaintiffs' motion justifies ignoring them.

## ARGUMENT

This Court regularly stays the issuance of its mandate pending the filing and disposition of a petition for a writ of *certiorari* when "the certiorari petition would present a substantial question and . . . there is good cause for a stay." Fed. R. App. P. 41(d)(2)(A); *Khulumani v. Barclay Nat'l Bank Ltd.*, 509 F.3d 148, 152 (2d

Cir. 2007).[1]   As the Court correctly concluded in the August 23 decision, this

standard is met here.  *NML Capital, Ltd.*, 727 F.3d at 238; *see also id.* at 248.

Where a party asks a court to vacate a stay order that it has already

granted, as plaintiffs do now, that party may not simply reargue whether the

requirements for a stay have been satisfied, but must show that changed

circumstances warrant a reversal of that order.  *See, e.g.*, *Perry v. Brown*, 639 F. 3d

1153, 1154 (9th Cir. 2011) (denying motion to vacate based in part on Ninth

Circuit's standard for vacating an injunction pending appeal); *Se. Alaskan*

*Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir.

2006) (to justify vacatur, movant "must demonstrate that facts have changed

sufficiently since the court issued its order"); *Reliance Ins. Co. v. National*

---

[1] Plaintiffs are wrong that this standard requires a reasonable probability that *certiorari* will be granted and that the decision will be reversed.  Plaintiffs' Motion to Vacate the Stay ("Pls. Mot.") at 9-10.  That is the standard applied by a *Circuit Justice of the Supreme Court* when considering a stay motion that, in all but exceptional circumstances, an appellate court has already denied.  *See Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980).  Although plaintiffs cite authority to suggest that the Third Circuit has adopted the Supreme Court's standard, to our knowledge this Court has not.  Rule 41 requires only that an appeal present a "substantial question."  Indeed, this Court has granted stays to these same plaintiffs when it decided other appeals in the Republic's favor without referencing the standard plaintiffs now claim to be the rule (and plaintiffs' motion papers in those appeals were likewise devoid of any reference to the inapplicable standard they now cite in their Motion).  *See* Order, *NML Capital, Ltd. v. Banco Central de la República Argentina*, No. 10-1487-cv(L) (2d Cir. Aug. 26, 2011); Order, *Aurelius Capital Partners v. Republic of Argentina*, No. 08-5621-cv(L) (2d Cir. Dec. 4, 2009).  In any event, as the Republic's rehearing petition makes clear, the Supreme Court's stay standard is satisfied.

*Superlease, Inc.*, No. 84 Civ. 3121 (RWS), 1985 U.S. Dist. LEXIS 15904, at *1 (S.D.N.Y. Sept. 17, 1985) ("From the papers thus far submitted, no change in circumstances has occurred warranting the vacatur of the stay.").  Plaintiffs fail to identify any such change in circumstances here, and the facts of this case, along with the significance of the issues presented, plainly establish that the Stay already granted by this Court should be maintained.

**A. Statements By Political Officials And Newspaper Articles Do Not Represent Changed Circumstances Warranting Vacatur Of The Stay**

Plaintiffs' motion to vacate the Stay rests entirely on the allegation that the Republic is imminently preparing to implement a "scheme" to evade the Amended Injunctions.  These allegations repeat plaintiffs' previous attempts to claim an emergency where none exists, and are unsupported by the record.

At numerous stages in this appeal, the Republic has confirmed that it has complied, is complying, and will comply with the Anti-Evasion Injunction.[2] The Republic made this clear in November 2012 with the Declaration of the Director of the Republic's National Bureau of Public Credit of the Ministry of Economy, Francisco Guillermo Eggers, *see* Declaration of Francisco Guillermo Eggers ¶ 4, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 16, 2012) (Ex. J), and has repeated on multiple occasions since the

_____

[2] *See* Order Pursuant to FRCP 62(c), *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Mar. 5, 2012) (Ex. K).  All exhibits are attached to the Declaration of Carmine D. Boccuzzi, dated October 25, 2013.

5

August 23 Decision that there is no "plan to evade." On August 30, the Republic responded to plaintiffs' purported concern by stating its understanding that the Anti-Evasion Injunction remains in effect. *See* E-mail from C. Boccuzzi to E. Friedman and R. Cohen, dated Aug. 30, 2013 (Ex. C). The Republic now once more reaffirms, through the Declaration of its Chief of Cabinet of the Republic's Ministry of Economy and Public Finance, Fabián Gustavo Dall'O, that it will continue to comply with the Anti-Evasion Injunction. Declaration of Fabián Gustavo Dall'O, dated October 25, 2013 (Ex. A). In light of this repeated reassurance – and the lack of any evidence that the status quo has been or will be altered – plaintiffs are wrong to claim that there is a "plan to evade," or that the Republic has been deficient in responding to disclosure requirements of the district court concerning any alleged plans.

   Plaintiffs' arguments to the contrary ignore this lack of any changed circumstances, and mischaracterize the President's speech from over two months ago as confirming "beyond all doubt" that the Republic is violating the Anti-Evasion Injunction. Pls. Mot. at 11-13. They are wrong. As a head of State, the Republic's President has a right and an obligation to address matters of national importance that profoundly affect her country's economy and the wellbeing of its population, including the threat that the Amended Injunctions pose to the Republic's performing debt. As the leader of a sovereign country, the President expressed her

disagreement with this Court's decision, and stated the Republic's intent to seek review by the Supreme Court. *See* Transcript of Speech by President Christina Fernández de Kirchner at 3, dated Aug. 26, 2013 (Ex. D) ("the first decision we have made is . . . to beseech God to enlighten the Supreme Court of the United States"). President Kirchner's address explained the critical importance to Argentina that the Republic's servicing of its restructured debt not be disrupted. *See id.* ("We've made decisions on this because as a country *we can't have a Sword of Damocles hanging over us stating that someone could make a decision at any time, and that the exchanges of 2005 and 2010 are going to fall through*, that our creditors won't [be paid]*, and the country will return to the same situation as 2001*.") (emphasis added). These appropriate statements of concern do not warrant the extraordinary remedy of vacating the Stay and depriving the Republic and the multitude of other interested parties and nonparties of Supreme Court review.

Developments that have occurred in the last two months demonstrate that plaintiffs' alleged "plan" simply does not exist. Legislation passed by the Republic in early September provides not for any alleged "evasion" of the Amended Injunctions, but for the *lifting* of the "Lock Law" indefinitely – the very legislation on which the Court rested a large part of its finding of a violation of the pari passu clause in the first place – and an exchange of *defaulted* debt, *not* the exchange bonds that are the subject of the Injunctions. *See* Argentine Law 26,886,

7

dated Sept. 20, 2013 (Ex. B).  The legislation enacted is exclusively designed to authorize the Executive of Argentina to launch a third exchange offer to the holders of defaulted debt on similar terms as the 2010 Exchange Offer.  The legislation is therefore consistent with the proposal made by the Republic to this Court in response to the Court's direction in its March 1, 2013 order and, of course, is not a violation of any order of this Court or the district court.

The statements by the President – far from being changed circumstances – were entirely consistent with earlier statements on these topics, and this Court previously rejected arguments by plaintiffs that those prior, similar statements were a basis for denying a stay.  When this Court remanded the original Injunctions for clarification by the district court, plaintiffs urged the district court to vacate its stay of those Injunctions because "Argentina's President and Minister of Economy ha[d] boldly asserted that they will defy the injunctions," Plaintiffs' Remand Brief at 4, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 13, 2012), and because "Argentina ha[d] – according to its own press – already been actively plotting" to "relocate its payment mechanisms outside of th[e] Court's supervisory jurisdiction." *id.* at 22.  When the district court did so, this Court promptly granted the Stay in order to prevent immediate irreparable harm to the Republic, the exchange bondholders, and other third parties, notwithstanding plaintiffs' assertion below that those statements by political officials

8

and newspaper reports warranted depriving the Republic and innocent third parties

of appellate review.[3]  Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-

105 (2d Cir. Nov. 28, 2012).  The Court did the same when plaintiffs repeated the

accusation that statements by political officials and news reports demonstrated that

"Argentina [was] actively planning to evade the Injunction[s]" in their motion to

condition the Stay on the Republic's posting over $1 billion as security by denying

their motion.  *See* Plaintiffs' Emergency Motion to Amend Stay Order at 6, Dkt.

# 506; Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105 (2d Cir. Dec.

4, 2012).  Plaintiffs have shown no changed circumstances since then.

**B. Continuing The Stay Will Not Harm Plaintiffs**

Plaintiffs argue that the Stay is causing them irreparable harm, but

provide no plausible basis for their claim.  The only "harm" alleged by plaintiffs –

the supposed "plan" to conduct an exchange of restructured debt – does not exist.

Moreover, even if the President's address did constitute such a "plan"– which it did

not – plaintiffs *still* would not be harmed by the continuance of the Stay.

Notwithstanding plaintiffs' conclusory assertion to the contrary, debt restructurings

cannot be conducted in secret or "on a turnkey basis."  Pls. Mot. at 12.  Exchange

---

[3] Because of the extent of the interests affected by the Amended Injunctions, the
Republic was joined in seeking an emergency stay by holders of its restructured
debt.  *See* Emergency Motion for Stay Pending Appeal of Exchange Bondholder
Group, Dkt. # 483; Emergency Motion of Fintech Advisory Inc. for Stay Pending
Appeal, Dkt. # 487.

Offers take *months* to complete, and would require substantial marketing as well as

Executive Decrees and Resolutions – all of which would be *public*.  Plaintiffs

themselves acknowledge as much, stating that such a transaction would be a

"complex endeavor, involving billions of dollars of Exchange Bonds and requiring

the cooperation of numerous financial institutions and sophisticated investors."  *Id.*

at 15; *accord* Supplemental Declaration of Stephen Choi ¶ 5, Dkt. # 483 ("There is

no mechanism whereby the Republic could pay the Exchange Bondholders directly

outside of the existing payment system; indeed, the Republic has no means to

know the identities and holdings of all Exchange Bondholders even if it wanted to

pay them through some other mechanism.").

  Plaintiffs' contention that the Stay must be immediately lifted to

prevent any purported imminent irreparable harm is therefore baseless.  *If* plaintiffs'

hypothetical exchange offer were to happen, plaintiffs, the international financial

community, and any reader of the *New York Times* or *Wall Street Journal* would

know about it.

  What is really behind plaintiffs' repeated efforts to have the Stay

vacated is of course the desire to preclude review of the critical issues raised in this

case, as well as, to be blunt, their effort to profit from side bets on market

uncertainty and a risk of default.  Plaintiffs have reportedly purchased credit default

swaps for the Republic's restructured debt, a fact they dismissed as "utterly

irrelevant" but have never expressly denied, despite being pressed by Judge Pooler at argument on February 27. Feb. 27, 2013 Tr. at 63:16. Plaintiffs would no doubt like to put further pressure on the Republic to be paid *now* and block *certiorari* review. But as they frequently remind the Court, the defaulted debt has not been paid since the end of 2001, and they cannot seriously claim that permitting the opportunity for Supreme Court review is either a changed circumstance or the kind of irreparable injury that could justify vacating the Stay, given the weighty interests on the other side of the scales.

## C. Vacating The Stay Threatens Immense Harm To The Republic And Numerous Third Parties, And Is Against The Public Interest

Those other interests are profound. Depriving the Republic of Supreme Court review threatens an immensely destructive collapse of Argentina's $75 billion debt restructuring because the Amended Injunctions would enjoin the Republic from servicing more than $24 billion of its restructured debt, unless the Republic pays plaintiffs alleged money damages of over $1.3 billion on their defaulted debt (and, an inescapable consequence of the Court's pari passu ruling, similar claims for a total of over $15 billion based on the exact same pari passu "rights"). Plaintiffs' suggestion that this presents the Republic with a harmless "choice" to pay everyone all amounts owed, to pay everyone half, or to not pay anyone, Pls. Mot. at 14, is wrong: anything other than full payment is a default that would make any holder of restructured debt entitled to demand the full payment

11

that plaintiffs do.  The "choice" offered to the Republic by the Amended Injunctions is thus no choice at all – either to face a court-ordered default and over $24 billion in legal claims that the Amended Injunctions forbid it to pay, or the potential of having its Central Bank's reserves of $34.4 billion depleted by *over 40%* to pay the "holdouts," which would undoubtedly plunge the Republic back into a devastating financial and economic crisis.

As demonstrated by the amici and interested third parties who have appeared in both this Court and in the Supreme Court, the threatened harm also extends beyond the Republic to countless third parties.  They include the holders of the Republic's restructured debt, who the Amended Injunctions would make a "leverage" device for enforcing respondents' monetary claims.  *See* Brief for the Euro Bondholders as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013 (Ex. H); Brief for the Exchange Bondholder Group as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013 (Ex. F); Brief for Fintech Advisory Inc. as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013 (Ex. G); Brief of Intervenor ICE Canyon LLC, Dkt. # 698, Brief of *Amicus Curiae* Puente Hnos. Sociedad de Bolsa S.A., Dkt. # 800.

They also include participants in the international payment system, including those located outside the United States.  *See* Brief for Caja de Valores, S.A. as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari at 7-10, dated July 26, 2013 (Ex. I); Brief for *Amicus Curiae* The Clearing House Association L.L.C., Dkt. # 699; Brief of the American Bankers Association as *Amicus Curiae*, Dkt. # 787; Brief for *Amicus Curiae* Euroclear Bank SA/NV, Dkt. # 808; Brief for Non-Party Appellant The Bank of New York Mellon, As Indenture Trustee, Dkt. # 637.

And far beyond that, the Amended Injunctions pose a significant threat to the sustainability of the debt restructuring process for all foreign states going forward.  *See* Brief for the United States of America as *Amicus Curiae* in Support of the Republic of Argentina's Petition for Panel Rehearing and Rehearing *En Banc* at 4, Dkt. # 653 ("[T]he creation of new rights and new vehicles for enforcement alters and destabilizes the landscape of sovereign debt restructuring."); Brief for the Republic of France as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari at 14, dated July 26, 2013 (Ex. E) (Injunctions "will have a chilling effect on creditors' willingness to grant concessions in order to facilitate voluntary and negotiated debt restructurings as a means of last resort."); IMF, *Sovereign Debt Restructuring – Recent Developments and Implications for the Fund's Legal and Policy Framework* at 31,

Apr. 26, 2013, *available at* http://www.imf.org/external/np/pp/eng/2013/042613.pdf
(Injunctions "risk undermining the sovereign debt restructuring process" because
they discourage creditors from participating in voluntary restructurings and
"increase the risk that holdouts will multiply . . . due to inter-creditor equity
concerns"); *see also* Joshua Goodman, *IMF Should Ask U.S. to Review Argentina
Case: Lagarde*, Bloomberg, Jul. 20, 2013 (IMF Managing Director noting
"detrimental consequence" Amended Injunctions "would have on [the IMF's] ability
to discharge [its] mandate, which is intended to maintain financial stability in the
world."); Brief for *Amicus Curiae* Professor Anne Krueger, Dkt. # 778.

   We recognize that the Court has not accepted these arguments, but
plaintiffs cannot seriously claim that they do not pose a huge concern, which the
Court recognized when it extended the Stay so that the Supreme Court would have
the opportunity to review its final judgment. *NML Capital, Ltd.*, 727 F.3d at 238.
The Court's decision is a sea change in the law of sovereign debt and the remedies
to enforce it, and the Republic and other interested parties like the exchange
bondholders, who also previously sought the Stay that this Court granted, should
have the ability to seek review of the decision.[4]

---

[4] Plaintiffs are wrong to suggest that *Motorola Credit Corp. v. Uzan*, 561 F.3d 123
(2d Cir. 2009) – which involved fraud, and not breach of contract – supports
overriding all of these interests and vacating the Stay.  Pls. Mot. at 11.  That
decision did not concern a stay at all, let alone a request that this Court vacate a
stay that it had already entered, notwithstanding a lack of changed circumstances.

Finally, plaintiffs are wrong that the Supreme Court's denial of the

Republic's first petition for *certiorari* – which both this Court and plaintiffs

characterized as untimely – is indicative of what the Supreme Court will do with the

Republic's second, timely petition. *Id.* at 238 n.4; Pls. Mot. at 16-17.[5]  Plaintiffs'

lead argument in their opposition to the *certiorari* petition was that the petition

should be denied as a procedural matter because it was "premature" and sought

review of an "interlocutory decision."  NML Opposition Brief at 16-17, *Republic of*

*Argentina v. NML Capital, Ltd.*, No. 12-1494 (Aug. 28, 2013).  Plaintiffs assured the

Supreme Court – after the President's speech – that denying the Republic's first

petition would avoid the potential for "piecemeal review" because this Court had

"*stayed enforcement of the Amended Injunction[s]*" and thus the Supreme Court

would be able to review all of the relevant issues at a later date in connection with

the Republic's second petition.  *Id.* (emphasis added); *see also id.* ("This court

should not review Argentina's petition without having before it all of the Second

Circuit's relevant reasoning.").  It is disingenuous for plaintiffs to suggest now that

_____

[5] The Republic filed that petition as a protective measure, at a time when neither it
nor anyone else knew how or when this Court would decide the issues raised by its
remand to the district court, and if the Republic had not done so, it would
undoubtedly be accused by plaintiffs of having waived its right to seek review of
anything in the Court's October 26, 2012 decision.

the Supreme Court's denial of that petition has any bearing on what the Court will

do with a timely petition for review of this Court's final decision.[6]

## CONCLUSION

For the foregoing reasons, this Court should deny plaintiffs' motion.

Dated:  New York, New York
        October 25, 2013

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By:___/s/ Carmine Boccuzzi___
    Jonathan I. Blackman (jblackman@cgsh.com)
    Carmine D. Boccuzzi (cboccuzzi@cgsh.com)


One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for the Republic of Argentina

---

[6] In addition to being irrelevant to plaintiffs' request here, *see supra* at 4 n.1, plaintiffs' characterizations of the merits of the Republic's position are demonstrably wrong.  Among other things, plaintiffs are incorrect that the Republic did not cite *Great-West Life* in its briefs before the Court.  *See* Pls. Mot at 18; Republic Brief at 25, Dkt. # 657; Republic Reply at 7, Dkt. # 842; *see also* Feb. 27, 2013 Tr. at 76:18.  And plaintiffs' belated attempt to distinguish *Great-West Life* as inapplicable, Pls. Mot. at 18-19, runs contrary to their *own* position below, when they cited it as support for the Injunctions under the theory (not accepted by this Court) that plaintiffs' damages are somehow incalculable.  *See* Plaintiffs' Memorandum of Law in Support of Partial Summary Judgment and for Injunctive Relief at 21, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (S.D.N.Y. Oct. 20, 2010).

16

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

------------------------------------------------------------X
                                            :

NML CAPITAL, LTD.,                    :

              Plaintiff-Appellee,     :

                    v.           :      12-105-cv(L)

THE REPUBLIC OF ARGENTINA,    :

             Defendant-Appellant.  :

                                              :

------------------------------------------------------------X

### DECLARATION OF CARMINE D. BOCCUZZI

Pursuant to 28 U.S.C. § 1746, Carmine D. Boccuzzi declares as follows:

1.     I am an attorney admitted to practice before this Court and a partner at Cleary Gottlieb Steen & Hamilton LLP, counsel for defendant the Republic of Argentina (the "Republic") in these matters.  I submit this declaration on behalf of the Republic in opposition to plaintiffs' Motion to Vacate the Stay.

3.     Attached to this declaration as Exhibits A-K are true and correct copies of the following documents:

| Ex. | Document |
|-----|----------|
| A | Declaration of Fabián Gustavo Dall'O, dated Oct. 25, 2013; |
| B | Argentine Law 26,886, dated Sept. 20, 2013; |

| Ex. | Document |
|-----|----------|
| C | E-mail from C. Boccuzzi to E. Friedman and R. Cohen, dated Aug. 30, 2013; |
| D | Transcript of Speech by President Cristina Fernández de Kirchner, dated Aug. 26, 2013; |
| E | Brief for the Republic of France as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013; |
| F | Brief for the Exchange Bondholder Group as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013; |
| G | Brief for Fintech Advisory Inc. as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013; |
| H | Brief for the Euro Bondholders as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013; |
| I | Brief for Caja de Valores, S.A. as *Amicus Curiae* in Support of the Republic of Argentina's Petition for a Writ of Certiorari, dated July 26, 2013; |
| J | Declaration of Francisco Guillermo Eggers, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Nov. 16, 2012); |
| K | Order Pursuant to FRCP 62(c), *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG) (S.D.N.Y. Mar. 5, 2012); |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 25, 2013 in New York, New York.

                                               ___/s/ Carmine Boccuzzi___
                                               CARMINE D. BOCCUZZI

# EXHIBIT A

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 --------------------------------------------------X
                                                :
NML CAPITAL, LTD.,                              :
                                                :
                          Plaintiff-Appellee,   :
                                                :        12-105-cv(L)
                  v.                            :
                                                :
THE REPUBLIC OF ARGENTINA,                      :
                                                :
                          Defendant.            :
                                                :
--------------------------------------------------X


## DECLARACIÓN DE FABIÁN GUSTAVO DALL'O

Pursuant to 28 U.S.C. § 1746, Fabián Gustavo Dall'O declares as

follows:

1.      I am Chief of Cabinet of the Ministry of Economy and Public

Finance of the Republic of Argentina (the "Republic").

2.      I am familiar with the facts of this case and submit this

declaration on behalf of the Republic in opposition to plaintiffs' motion to vacate

the Stay, dated October 15, 2013.

3.      I confirm that the Republic continues to act in accordance with

the declaration of Francisco Guillermo Eggers, dated November 16, 2012.

I declare under penalty of perjury under the laws of the United States

that the foregoing is true and correct.

Executed on October 25, 2013 in Buenos Aires, Argentina.

_____
/s/
Fabián Gustavo Dall'O

## AFFIDAVIT OF TRANSLATOR
## REGARDING ACCURACY OF TRANSLATION

STATE OF NEW YORK )

                      :ss.:

COUNTY OF NEW YORK )

        EZEQUIEL SANCHEZ HERRERA, being duly sworn, deposes and says:

        I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York and declare:

        I am proficient with the Spanish language and the English language, have had prior experience in translating documents in those languages, have translated the foregoing document (Declaration of Fabián G. Dall'O dated October 25, 2013) from Spanish into English and believe that the translation is complete and accurate.

                                              Ezequiel Sánchez Herrera

Sworn to before me this
25th day of October 2013

Notary Public

ELLEN M. KRIEGER
Notary Public, State of New York
No. 01KR4953304
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires July 10, 2015

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 ---------------------------------------------------X
                                                   :
NML CAPITAL, LTD.,                                 :
                                                   :
                        Plaintiff-Appellee,        :
                                                   :        12-105-cv(L)
                 v.                                :
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                        Defendant.                 :
                                                   :
---------------------------------------------------X


## DECLARACIÓN DE FABIÁN GUSTAVO DALL'O

Conforme el Titulo 28 del Código de los Estados Unidos § 1746, Fabián Gustavo

Dall'O declara lo siguiente:

1.      Soy el Jefe de Gabinete de Asesores del Ministerio de Economía y

Finanzas Públicas de la República Argentina (la "República").

2.      Me encuentro familiarizado con los hechos del caso y presento esta

declaración en nombre de la República en oposición a la moción de los demandantes para

levantar el Stay, de fecha 15 de octubre de 2013.

3.      Por la presente confirmo que la República continua actuando de

conformidad con la declaración de Francisco Eggers de fecha 16 de noviembre de 2012.

Declaro bajo pena de perjuicio bajo las leyes de los Estados Unidos que lo anterior es cierto y correcto.

Firmado el 25 de octubre de 2013 en Buenos Aires, Argentina.

_____
Lic. Fabián Gustavo Dall'O

2

# EXHIBIT B

**GOVERNMENT DEBT**

**Law No. 26,886**

**Restructuring process of government-issued debt.**

**Enacted: September 11, 2013**

**Promulgated: September 20, 2013**

The Senate and Chamber of Representatives of Argentina, Meeting in Congress, etc. sign into

Law:

**ARTICLE 1 –** The Federal Executive Branch is authorized, through the Ministry of Economy and Public Finance, to carry out all acts necessary for the conclusion of the restructuring process of government-issued debt eligible for the swap provided by Decree No. 1,735 dated December 9, 2004, and supplementary regulations, that were not submitted to the same nor to the swap provided by Decree No. 563 dated April 26, 2010, as provided by Article 65 of the Law of Financial Administration and Oversight Systems of the Federal Government No. 24,156 and modifications thereof, for the purpose of adjusting debt service to the payment possibilities of the National State in the medium and long term.

**ARTICLE 2 –** The financial terms and conditions to be offered are prohibited from being more favorable than those offered to creditors in the debt restructuring provided by Decree No. 563/10.

**ARTICLE 3 –** Government-issued debt issued as a consequence of the provisions of this law, the provisions of Articles 7 and 10 of Law No. 23,928 and modifications thereof, as applicable, shall be exempted.

**ARTICLE 4 –** Holders of government-issued debt that are eligible for the swap provided under Decree No. 1,735/04 and supplementary regulations who wish to participate in any restructuring operation carried out within the framework of the provisions of this law, shall waive all rights under the referenced government-issued debt, including rights recognized by any court or administrative ruling, arbitral award or decision of any authority, and release the Argentine Republic from any court, administrative or arbitral action or any other type of action that has been filed or may be filed in the future in relation to the referenced government-issued debt or the obligations of the Argentine Republic that may arise therefrom, including any action for the purpose of receiving services related to capital or interest from the referenced government-issued debt.

It is forbidden to offer to holders of government-issued debt who have filed court, administrative or arbitral actions or actions of any other type treatment more favorable than that given to those who have not done so.

**ARTICLE 5 –** The Ministry of Economy and Public Finance will inform the Federal Congress of the results of the provisions of this law on a quarterly basis.

**ARTICLE 6 –** Government-issued debt eligible pursuant to the provisions of Decree No. 1,735/04 deposited for any reason due to an order from courts of any instance, authority or jurisdiction, whose holders did not observe the provisions of the swap provided by the aforementioned decree or the provisions of Decree No. 563/10, or who did not expressly state in the respective legal proceedings their wish not to abide by the same, shall be automatically replaced by "2038 Par Value Step-Up Bonds of the Argentine Republic," under the conditions established for assignment, liquidation, and issuance of such bonds by Decree No. 1,735/04 and supplementary regulations.

The Ministry of Economy and Public Finance is authorized to issue any supplementary rules necessary to implement the replacement provided in this article.

**ARTICLE 7 –** Articles 2, 3, and 4 of Law No. 26,017 are suspended until the Federal Congress declares the termination of the restructuring process for the government-issued debt under the referenced law.

**ARTICLE 8 –** This law will enter into effect on the day of its publication in the Official Bulletin.

**ARTICLE 9 –** Be it notified to the Federal Executive Branch.

ISSUED IN THE HALL OF SESSIONS OF THE ARGENTINE CONGRESS, IN BUENOS AIRES, ON THE ELEVENTH DAY OF THE MONTH OF SEPTEMBER IN THE YEAR TWO THOUSAND THIRTEEN.

–REGISTERED UNDER NUMBER 26,886–

AMADO BOUDOU. – JULIAN A. DOMINGUEZ. – Gervasio Bozzano. – Juan H. Estrada.



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK    )
                                )
                                )    ss
COUNTY OF NEW YORK  )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached Law No. 26,886, enacted on

September 11, 2013.

Ken Hetzel, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this 24ᵗʰ day of October , 20 13 .

LYNDA GREEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GR6205401
Qualified in New York County
My Commission Expires May 11, 2017

New York 259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco 220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London 8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong 20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com | www.geotext.com

InfoLEG Información Legislativa    CDI Centro de Documentación e Información    MECON Ministerio de Economía y Finanzas Públicas

Esta norma fue consultada a través de InfoLEG, base de datos del Centro de Documentación e Información, Ministerio de Economía y Finanzas Públicas.

**DEUDA PUBLICA**

**Ley 26.886**

**Proceso de reestructuración de títulos públicos.**

**Sancionada: Septiembre 11 de 2013**

**Promulgada: Septiembre 20 de 2013**

El Senado y Cámara de Diputados de la Nación Argentina reunidos en Congreso, etc. sancionan con fuerza de

Ley:

**ARTICULO 1° —** Autorízase al Poder Ejecutivo nacional, a través del Ministerio de Economía y Finanzas Públicas, a realizar todos aquellos actos necesarios para la conclusión del proceso de reestructuración de los títulos públicos que fueran elegibles para el canje dispuesto en el Decreto N° 1.735 del 9 de diciembre de 2004 y sus normas complementarias que no hubiesen sido presentados al mismo ni al canje dispuesto por el Decreto N° 563 de fecha 26 de abril de 2010, en los términos del artículo 65 de la ley 24.156 de Administración Financiera y de los Sistemas de Control del Sector Público Nacional y sus modificatorias, con el fin de adecuar los servicios de dicha deuda a las posibilidades de pago del Estado nacional en el mediano y largo plazo.

**ARTICULO 2° —** Los términos y condiciones financieros que se ofrezcan no podrán ser mejores que los ofrecidos a los acreedores en la reestructuración de deuda dispuesta por el Decreto N° 563/10.

**ARTICULO 3° —** Exceptúase a los títulos de deuda pública que se emitan como consecuencia de lo dispuesto en la presente ley, de lo dispuesto en los artículos 7° y 10 de la ley 23.928 y sus modificaciones, de corresponder.

**ARTICULO 4° —** Los tenedores de títulos públicos que fueran elegibles para el canje dispuesto en el Decreto N° 1.735/04 y sus normas complementarias que deseen participar de cualquier operación de reestructuración que se realice en el marco de lo dispuesto en la presente ley, deberán renunciar a todos los derechos que les correspondan en virtud de los referidos títulos, inclusive a aquellos derechos que hubieran sido reconocidos por cualquier sentencia judicial o administrativa, laudo arbitral o decisión de cualquier otra autoridad, y renunciar y liberar a la República Argentina de cualquier acción judicial, administrativa, arbitral o de cualquier otro tipo, iniciada o que pudiere iniciarse en el futuro con relación a los referidos títulos o a las obligaciones de la República Argentina que surjan de los mismos, incluyendo cualquier acción destinada a percibir servicios de capital o intereses de dichos títulos.

Prohíbese ofrecer a los tenedores de deuda pública que hubieran iniciado acciones judiciales, administrativas, arbitrales o de cualquier otro tipo un trato más favorable que a aquellos que no lo hubieran hecho.

**ARTICULO 5° —** El Ministerio de Economía y Finanzas Públicas informará trimestralmente al Honorable Congreso de la Nación los resultados de lo dispuesto en la presente.

**ARTICULO 6° —** Los bonos del Estado nacional elegibles de acuerdo a lo dispuesto por el Decreto N° 1.735/04, depositados por cualquier causa o título a la orden de tribunales de cualquier instancia, competencia y jurisdicción, cuyos titulares no hubieran adherido al canje dispuesto por el decreto antes citado o el dispuesto por el Decreto N° 563/10, o no hubieran manifestado, en forma expresa, en las respectivas actuaciones judiciales, su voluntad de no adherir a los mismos, quedarán reemplazados, de pleno derecho, por los "Bonos de la República Argentina a la Par en Pesos Step Up 2038", en las condiciones establecidas para la asignación, liquidación y emisión de tales bonos por el Decreto N° 1.735/04 y sus normas complementarias.

Facúltase al Ministerio de Economía y Finanzas Públicas a dictar las normas complementarias que fueren necesarias para instrumentar el reemplazo dispuesto en el presente artículo.

**ARTICULO 7° —** Suspéndese la vigencia de los artículos 2°, 3° y 4° de la ley 26.017 hasta tanto el Congreso de la Nación declare terminado el proceso de reestructuración de los Títulos Públicos alcanzados por la referida norma.

**ARTICULO 8° —** La presente ley entrará en vigencia el día de su publicación en el Boletín Oficial.

**ARTICULO 9° —** Comuníquese al Poder Ejecutivo nacional.

DADA EN LA SALA DE SESIONES DEL CONGRESO ARGENTINO, EN BUENOS AIRES, A LOS ONCE DIAS DEL MES DE SEPTIEMBRE DEL AÑO DOS MIL TRECE.

—REGISTRADO BAJO EL N° 26.886—

AMADO BOUDOU. — JULIAN A. DOMINGUEZ. — Gervasio Bozzano. — Juan H. Estrada.

# EXHIBIT C

| | |
|---|---|
| **From:** | Boccuzzi Jr., Carmine D. |
| **To:** | Cohen, Robert; efriedman@fklaw.com |
| **Cc:** | Kirsch, Eric; Sanchez Herrera, Ezequiel |
| **Subject:** | RE: NML Capital, Ltd. et al. v. the Republic of Argentina |
| **Date:** | Friday, August 30, 2013 11:01:04 AM |

Ed and Robert:

I write in follow up to the call that Ed, Ezequiel and I just had this morning with Ed and in response to Robert's email which Robert sent to us last night at 8:01 pm, demanding a response by this morning.  The Republic objects to the arbitrary deadline. There is no emergency of any kind as you well know.  Indeed, on Thursday morning at 12:39 am Eric wrote to inform me that plaintiffs intended to adjourn the "emergency" hearing they had scheduled with the Court for yesterday at noon (plaintiffs then in fact adjourned the hearing).

In any event we can confirm my statement on the call with Ed that the Republic understands as accurate the declaratory statement in Paragraph 1 of your proposed order.  As to the remainder of the 7-page proposed order you sent to us last night at 8:01 pm we are reviewing it, and consulting with our client, and reserving all objections and defenses, will respond to you next week.

Regards, Carmine

_____

Carmine D. Boccuzzi, Jr.
Cleary Gottlieb Steen & Hamilton LLP
Assistant: trusso@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2508 | f: +1 212 225 3999
www.clearygottlieb.com | cboccuzzi@cgsh.com

**From:** Cohen, Robert [mailto:robert.cohen@dechert.com]
**Sent:** Thursday, August 29, 2013 8:01 PM
**To:** Boccuzzi Jr., Carmine D.
**Cc:** Kirsch, Eric
**Subject:** NML Capital, Ltd. et al. v. the Republic of Argentina

Carmine,

Attached is the proposed order concerning equal treatment-related issues.  Please let us know if your client will consent to its entry.  In particular, please let us know as soon as possible if the Republic believes that the declaratory statement in numbered Paragraph 1 is accurate.  If the Republic cannot respond with respect to Paragraph 1 by 11:00 a.m. tomorrow, we will ask the Court to hear us as soon as possible, including tomorrow afternoon.

Regards,

Robert A. Cohen
Partner
Dechert LLP

1095 Avenue of the Americas
New York, NY 10036-6797
Direct: +1 (212) 698-3501
Fax:  +1 (212) 314-0001
Cell:  +1 (215) 715-5000
Email: robert.cohen@dechert.com
www.dechert.com

This e-mail is from Dechert LLP, a law firm, and may contain information that is
confidential or privileged. If you are not the intended recipient, do not read, copy or distribute
the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any
attachments. Thank you.

# EXHIBIT D

### President Kirchner August 26 Speech

Good afternoon to each and every one of you. Last Friday the Court of Appeals of New York City confirmed the judgment of Judge Griesa supporting the vulture funds, by now known to the Argentine people, since it was these very funds that last year impounded the tall ship *Libertad* in the Republic of Ghana, requiring us to resort to International Law as well as to international courts to secure the return of one of the symbols of Argentina, without involving the public purse. There had already been several other embargoes with respect to Tango 01, embassies and other funds.

But what I really want to talk to you about today, and share not only with domestic public opinion, with the people of the Argentine Republic, but also with those bondholders who have placed their trust in Argentina—93 percent of the bondholders—is that this judgment of the Court of Appeals in fact ignores, or at least minimizes, this agreement we have reached with that 93 percent. And I also believe that—in my humble opinion—it ignores the sovereign immunity enjoyed by the debt restructuring worked out, first in 2005, and then in 2010, because, as provided for in the Argentine National Constitution, the negotiation of foreign debt is a power expressly reserved to the Nation's Congress and may only be carried out with its authorization.

Whatever the case, it's worth looking back at the origins of all this for a moment, because even though December 31, 2001 seems like a long time ago, in fact it is not so distant, and it was then when Argentina defaulted on exactly 81.836 billion dollars. Let me say that again: On December 31, 2001, our country Argentina defaulted on its bond debt of 81.836 billion dollars.

The origin of this was 49 percent of the debt—or $40.363 billion—which had been contracted by the administration in power between 1989 and 1999; the remaining 51 percent, or $41.473 billion, was borrowed by the administration in power between 1999 and the time the default was declared.

It's also worth remembering that when President Kirchner took office in 2003, he confronted this very debt problem, which in fact is a problem that dates back to March 24, 1976, when the country began to fall more and more heavily into debt and the financial spiral became a permanent state of affairs during the convertibility period, before finally imploding on December 31, 2001.

President Kirchner had a totally different idea to the one prevalent up to that point. Until that time the motto of indebtedness had effectively been "pay in order to grow." He believed that the opposite was true, that we needed to grow in order to pay. Well, it wasn't that he'd figured it out intellectually, but it was simply a case of him having observed what had happened in Argentina over the previous thirty or forty decades [sic] and an obvious conclusion presented itself: there could be no payment without growth; on the contrary, payments were being made by incurring greater debt and the debt got larger and larger until it came to represent a severe burden on the Argentine economy with respect to education, culture, infrastructure, society, health and labor productivity. This is the Argentina that, as we all know, when Néstor [Kirchner] took office, had a 25 percent rate of unemployment, abandoned factories, and the general situation we all remember.

I remember that at the General Assembly of the United Nations, the first that he had to attend, which was in September 2003, he took a decisive stance on this issue of foreign debt and stated that it was important for the world to understand that the Argentine economy needed to be allowed to grow in order for payment to be made. He used a phrase that I will never forget: "it's necessary that you let us grow in order for us to pay, because the dead don't pay debts." And so from that point on he flipped the logic of paying to grow for that of growing to pay.

And indeed significant payments have been made since 2003 to the present time, based on two restructurings: in 2005, in March 2005, the debt was restructured during the presidency of Néstor Kirchner. I remember well how difficult and lengthy the negotiations were. At one point, the first bank to take the role of negotiator and eventually that of trustee, Wachovia, withdrew from the negotiations, provoking a serious crisis and prompting the then Finance Minister to tender his resignation to President Kirchner because he believed he had failed in his attempt to restructure the debt. Kirchner replied: "Let us have confidence and keep moving forward," and the decision was made to select the Bank of New York, usually known in financial jargon as BoNY, as negotiator and subsequently as trustee. Ultimately, this first exchange that very few people trusted and very few thought would succeed, but which Néstor had high hopes for, ended up restructuring 76 percent of the sovereign debt thanks to the largest debt cancellation in living memory.

As a measure of the importance of this debt cancellation to the subsequent growth of Argentina, we can say that it was worth in excess of 79 billion pesos.

To give you an idea of what this amounts to, it's equivalent to the Asignación Universal por Hijo [Universal Child Allowance], it's equivalent to the more than 2,000 schools that have been built over these past ten years in Argentina, it's equivalent to all the homes and their respective infrastructure, all the social housing schemes that have been built from 2003 to the present time. This gives you an idea of the scale of its importance.

What was the argument for the debt cancellation? The truth is that Argentina was paying exorbitant interest rates in dollars during the period of indebtedness. Whereas elsewhere in the world rates stood at one or two percent, here in Argentina we were paying double-digit interest rates. So the core argument was that anyone who goes to a place where exorbitant interest rates are being paid, and such as are paid nowhere else in the world, plainly understands the risks they are assuming in placing their funds there. That's why we stated that the risks should be shared between, on one hand, the country that had entered into a financial gamble and, on the other hand, those who were fully aware of the impossibility of anyone repaying the money at such interest rates.

That's where the problem of the holdouts arose, who were—shall we say—those who had not agreed to this first exchange. Like all countries, ours has a bankruptcy law under which it is sufficient for 66 percent of the creditors to be in agreement in order for a judge to approve the bankruptcy or bankruptcy proceedings, which is a similar percentage to that of the United States. In this first agreement we obtained a quorum of 76 percent. However, the problem of the holdouts continued. This is understandable because there were many people who had no faith in

this Argentina, a country that had never paid off its debts. We ourselves wanted to participate and show even more good faith by creating what was known as the Cupón de Crecimiento [Growth Coupon] so that, were Argentina to grow, its creditors would receive more money as a result of participating and sharing in the growth of that Argentina.

Then, during my presidency, we proceeded to reopen the exchange in 2010, accomplishing a record debt-restructuring acceptance rate of 93 percent of those to whom we owed. There was by now greater confidence; we had paid off not only debt issued under foreign law, but also debt issued under domestic law; we had paid off debt at the Bank of New York; we had paid off debt here in this country, and so we were able to reach this 93 percent agreement, a superbly executed task accomplished by the then Minister of Finance, who together with his team traveled all over the world, but also by the current Minister of Finance, Dr. Lorenzino, who did likewise to incorporate many Italian and Japanese bondholders who being smaller had remained outside the first exchange. And so, to reiterate, we attained this figure of 93 percent.

I find the judgment of the Court of Appeals of New York to be somewhat unfair to Argentina. It adopts an argument from the *Financial Times* and condemns us on the grounds that Argentina is a "recalcitrant debtor." Between 2003 and 2012, this country which has been classified as a recalcitrant debtor has repaid 173.733 billion dollars. I'll say that again: between 2003 and the present time we have repaid 173.733 billion dollars. 41.044 billion dollars have been repaid to various bodies in the domestic public sector, which borrow from each other for purposes of financing, infrastructure, and ultimately for everything relating to the operation of the State; we have paid 81.487 billion dollars to the private sector (foreign and domestic bondholders, in dollars) and to multilateral credit bodies including the International Monetary Fund, to whom we ceased to be indebted in 2006, to the Inter-American Development Bank for the loans they had given us, to the World Bank, to the Corporación Argentina de Fomento [Argentine Development Corporation], 51.201 billion dollars; a total of 173.733 billion dollars.

I would say that more than recalcitrant debtors we are serial payers. And there's something else: we've done this with resources that are absolutely genuine, with resources that we have obtained through trade management and through an improved administration of State resources, and without having to resort to capital markets. I think that just as we entered the Guinness Book of World Records by having the largest sovereign debt in default in the world, I believe that we should also appear in the Guinness Book of World Records among those countries who have paid the most, who have complied the most with our obligations over the past ten years, without resorting to capital markets.

That's why I think it's important that all Argentineans should understand the efforts we've made and that the world at large should be aware of the efforts we've made. Today, Argentine debt in dollars, which stood at around 150 percent of GDP when Kirchner took office, now stands at less than 10 percent of GDP in foreign currency owed to private entities both domestic and foreign. In other words, from 150 percent of GDP we're now down to less than 10 percent of GDP.

And in a few days' time we are going to pay BONAR 7, we're going to pay 2 billion dollars in cash specifically on September 12. This is a bond issued under national legislation that is also paid here to the Caja de Valores [Central Securities Depository], though most of it is collected

abroad, since most holders are foreigners, who can do so very simply by using local branches of foreign banks which pay their parent or subsidiary entities wherever these international creditors are located, and in this way the debt is paid off.

From that date on, that is from September 12, Argentina will owe 8.3 percent of its GDP in foreign currency, whether euros or dollars.

It's also worth remembering that this is one of the lowest debt ratios among developed countries, not to mention among the countries in this region.

And it's also worth remembering that our Government is a serial payer but not a serial debtor, because this debt was assumed during different administrations and there was also default during other administrations. And this has allowed us Argentineans, this administration, to grow and to effectively pay down the debt.

Now, with respect to this judgment…Today I was listening to some commentaries on this judgment and I venture to suggest that these may represent something of a short-term view because the judgment…well, they state that "the truth is that this is a judgment that could quickly have repercussions because it will be appealed and it is the Supreme Court of the United States that will have to decide in 2014 or 2015."

In fact, it doesn't seem very serious, there is no responsibility, it seems to me from a good government and on good governance to believe that the solution to these problems will appear in 2014 or 2015 or in the short term. We believe that these problems should be resolved, not only in the short term, but also in the medium and in the long term.

That's why the decision…We've made decisions on this because as a country we can't have a Sword of Damocles hanging over us stating that someone could make a decision at any time, and that the exchanges of 2005 and 2010 are going to fall through, that our creditors won't pay us, and the country will return to the same situation as 2001. This is the only scenario that we will not allow, at least while I'm President.

That's why the first decision we have made is, well, to beseech God to enlighten the Supreme Court of the United States, because the truth is that we would find ourselves facing a case that would not only demolish one of the most important debt restructurings in living memory, but would also invalidate other debt restructurings. Because it needs to be borne in mind that these vulture funds represent only 0.45 percent of the whole.

Let's get this clear: 93 percent of Argentina's creditors settled; 7 percent didn't settle, but they are only suing in New York and the vulture funds have been able to obtain this judgment amounting to only 0.45 percent of the total debt. These bonds were bought as recently as 2008, by which time they were already in default and were worth very little, and were their case to be upheld they would earn a profit in dollars of a little over 1,300 percent, something that is totally lacking in logic or common sense. I don't think it takes an expert in Law or Economics to realize that this would ruin not only the Argentine Government but also the country as a whole.

Especially at a time when many developed countries in the First World are also restructuring their debts.

Therefore, the United States Supreme Court decision will not only have an impact on Argentina, but also on the entire world of international finance. It is no wonder that numerous *amicus curiae* have come before the Court, who are not exactly friends of Argentina. Take for example the former director of the International Monetary Fund, Anne Krueger, as well as numerous managed funds that also have an interest and have come forward, [and] the government of the Republic of France, to whom we are also grateful for its presentation before the Supreme Court of the United States.

But also, as I was saying, since we can't have a Sword of Damocles hanging over our heads, we have made two decisions in addition to this partly spiritual and partly secular decision to commend ourselves to God and to the Supreme Court of the United States. First of all, tomorrow we will submit a new bill to the Argentine Parliament, which under Article 75 of the Constitution is the only body qualified to make decisions with regard to Argentina's foreign debt. The Executive Branch always acts as a negotiator, as a representative, but ultimately all agreements must be approved or rejected by the Parliament, and this bill will specifically entail opening the exchange for the third time for that 7 percent who have yet to enter into it. We once again wish to demonstrate our deep willingness to meet the obligations of the Argentine Republic.

Today we are unable to do so, because we would be violating the law of our own country which has already set at 93 percent and closed the second exchange in 2010. But, I repeat, we are going to submit a bill to the Parliament so that that remaining 7 percent may have the ability to enter into it, have the opportunity to enter into the exchange and, well, collect on equal terms with the rest of the creditors.

But we have also made a decision to protect those who have had faith in the Republic, that 93 percent of bond holders who have had faith in Argentina and have been collecting, some of them since 2005 and others since 2010. It consists precisely in replacing the securities with new ones in the same currency, under the same terms, simply changing the place in which they will be paid so as to avoid any potential embargoes of funds because we have already endured embargoes in the past.

To be clear: for those who hold Argentine bonds, the 93 percent, we will replace those securities, those bonds with similar bonds in foreign currency under the same terms, except that they will be paid here in the Argentine Republic at the Central Securities Depository.

To give you an idea of legal certainty and security this involves, since we have already paid the BODEN 12, which were precisely the bonds that Argentina issued to pay all those who were trapped by the *corralito*, which if you remember was when you couldn't make withdrawals from banks, the Argentine Government, with bonds issued under Argentine law and payable here at the Central Securities Depository, has already paid off that debt which amounted to 19.6 billion dollars.

Argentina repaid all of the savings seized both from Argentineans and non-Argentineans, in other words, citizens and foreigners, in the amount of 19.6 billion dollars, with bonds issued under Argentine law and paid here in the Argentine Republic on the dates and in the currency that were agreed upon.

And in a few more days, specifically on September 12, as I was just saying a few minutes ago, we are going to pay another bond that was also issued, which is the BONAR 7, for 2.0 billion dollars, also issued under Argentine law and payable here at the Central Securities Depository of the Argentine Republic, so we have already paid billions of dollars in securities issued under Argentine law and payable here in Argentina.

Therefore, legal certainty and security not only arise from our commitment to meeting the obligations undertaken by Argentina as a Nation, despite the fact that it was not our administration that incurred them, but also from the objective, concrete fact that we have already been paying securities issued here in Argentina.

And the fundamental duty here has nothing to do with a will to pay—I know that there are some sectors out there who say that we shouldn't have to pay anything beyond minimal amounts since it would be crazy. But it is worth remembering that the Argentine Republic has over 40 million inhabitants who demand responsible behavior from Government authorities and that these continue to ensure the growth of Argentina within a framework of legal certainty, and meet its obligations.

Therefore, I today wish to address not only those 40 million Argentineans, but also all those who have had faith, both Argentinean and foreign private citizens alike, who were among the 93 percent who accepted Argentine bonds with growth coupons who have received regular payments, and I would also like to address the rest of the international finance world, and specifically the United States authorities and particularly its Supreme Court, because in reality we would indeed be damaging the legal certainty, the trust and faith that must be placed in the debt restructuring process at a very difficult juncture for everyone in the financial sphere.

It seems to us truly that a mere 1.45 percent, who entered just recently in 2008 with junk bonds purchased for very little money, are now attempting to ruin everything we have accomplished in the areas of debt restructuring, growth, payment, contribution to the world, because it certainly is a contribution Argentina is making to the legal certainty of the world and the trust of those who had faith in Argentina. I feel it is important for us to be able to have this dialog and say these things.

Lastly, for those who often say that we like to talk about the past and that what is past is past, I think that it was definitively proven last Friday—Friday of last week—that especially when it comes to the Economy, the past is always just around the corner. It would only require someone making a mistake or someone with an interest other than that of representing the interests of Argentina's 40 million people for the things we have sacrificed so much to achieve in the last few years to be brought to ultimate ruin.

These things we sometimes say about the past are not for the purpose of finding fault, or making accusations, or placing greater value on what we ourselves have done, but rather to try to avoid committing the same errors we Argentineans have committed in the past. In this I implicate myself since even though I have never been part of any administration that assume debt, I am nonetheless a part of Argentina and feel as responsible as the 40 million Argentinean people, in fact even more so than any, because I have been elected to guide the destiny of the country.

That is why I essentially wanted to tell you about these two important decisions, regarding reopening a third exchange. I hope that, as we say here in Argentina, the third time will be the charm and we can finally get those 7 percent on board.

I would also like to make a call for reason and common sense in not allowing a mere 0.45 percent, who purchased bonds at very low prices, to jeopardize the 93 percent of the creditors, what with the amounts we have already paid and will continue to pay, and basically, the ability to continue to work towards Argentina's growth in order to create jobs, provide health care, education and at the same time meet our obligations.

That is why I wanted to address the Argentinean people today and also especially those who have had faith in Argentina, who have believed in it, in hopes they will continue to do so because we are at the helm of this ship and we are going to steer it to a safe harbor. And we also believe, we have strong hopes, that common sense will prevail over the formidable lobby we have seen in recent days in which 0.45 percent can impose its will over the will of 93 percent.

At the same time, I am an attorney and I know that this significantly affects the equality of the parties; it affects fairness; it affects legal certainty; it affects the certainty that must be accorded to international economic and financial relationships, and we therefore request that with the same level of responsibility with which we have conducted ourselves over the past 10 years, punctually paying everything we agreed to pay for the first time in our history, we ask those in whose hands rests the decision to act equally responsibly.

In any event, Argentina will not violate its own laws and will specifically involve the Parliament in such an important matter as this, just as we did in 2005 and 2010, which allowed us to grow and meet our obligations.

Thank you very much for your attention and good night to each and every one of you.


**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK                )
                                 )
                                 )        ss
COUNTY OF NEW YORK               )


### **CERTIFICATION**


This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached President Kirchner August 26

Speech.


Ken Hetzel, Project Manager
Geotext Translations, Inc.


Sworn to and subscribed before me

this 25ᵗʰ day of October, 20 13.

LYNDA GREEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GR6205401
Qualified in New York County
My Commission Expires May 11, 2017

New York  259 West 30th Floor, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

### Discurso Presidencial del 26 de Agosto

Muy buenas tardes a todos y a todas: el día viernes pasado, la Cámara de Apelaciones, de la Ciudad de Nueva York, confirmó el fallo del juez Griesa, que la da la razón a los fondos buitres que ya son conocidos por los argentinos, porque fueron precisamente los que embargaron, el año pasado, la Fragata Libertad, en la República de Ghana, y por la cual tuvimos que recurrir al Derecho Internacional y también a tribunales internacionales, para obtener sin ninguna relación por parte del erario público, la restitución de uno de los símbolos de la Argentina. Antes habían existido algunos otros embargos sobre el Tango 01, sobre embajadas, sobre otros fondos.

Pero en realidad lo que queremos hablar, hoy, y dar a conocer no solamente a la opinión pública nacional, a los habitantes de la República Argentina, sino también a aquellos tenedores de bonos, que han confiado en la Argentina – el 93 por ciento de los tenedores de bonos – es que en realidad este fallo de la Cámara de Apelaciones ignora este acuerdo, que hemos logrado con el 93 por ciento, o por lo menos lo minimiza y también creo que – a nuestro humilde criterio – ignora la inmunidad soberana que tiene la reestructuración de la deuda, que se logró, primero, en el 2005, y luego, en el 2010, porque, como marca la Constitución Nacional Argentina, la negociación de la deuda externa es facultad expresa del Congreso de la Nación y solamente puede realizarse bajo su autorización.

De cualquier modo es bueno recordar, un poco, el origen de todo esto porque si bien pareciera que estuviera muy lejos, el 31 de diciembre de 2001, no está tan lejos y fue allí donde la Argentina defaulteó exactamente 81.836 millones de dólares. Vuelvo a repetir: 31 de diciembre de 2001, la Argentina, nuestro país defaultea la deuda de bonos por 81.836 millones de dólares.

El origen de esto era un 49 por ciento, esto es 40.363 millones habían sido contraídos durante la administración gubernamental, que tuvo lugar entre los años 1989 y 1999; el 51 por ciento restante, que es 41.473 millones fue contraído por la administración que tuvo su origen entre los años 1999 y el momento de declararse el default.

Bueno es también saber que cuando, en el año 2003, el Presidente Kirchner asume encara precisamente este problema de la deuda, que en realidad es un problema que proviene desde el 24 de marzo de 1976, cuando el país comienza a endeudarse cada vez más y hacer permanentemente una bicicleta financiera se ve agravado durante la convertibilidad y, finalmente, implosiona ese 31 de diciembre del año 2001.

El Presidente Kirchner tuvo una idea totalmente opuesta a la que se venía sosteniendo hasta ese momento. Hasta ese momento en el endeudamiento permanente el lema, si se puede decir, era: pagar para crecer. Él sostenía que era a la inversa, que necesitábamos crecer para pagar. Bueno, no era que lo hacía de inteligente, simplemente él observaba lo que había pasado en la Argentina durante las últimas treinta o cuarenta décadas y la conclusión se daba por sí misma: no se podía pagar si no se crecía, al contrario, se pagaba con más deuda y cada vez la deuda era mayor y constituía una severísima restricción a la economía argentina en lo educativo, en lo cultural, en infraestructura, en lo social, en la salud, en la generación de la producción del trabajo. Bueno de una Argentina que – como todos sabemos – cuando Néstor asumió tenía un 25 por ciento de desocupados, industrias cerradas y una situación que todos recordamos.

Me acuerdo que él, en la Asamblea de la ONU, en la primera asamblea que le tocó asistir, que fue en septiembre del año 2003, encaró decididamente este tema de la deuda externa y sostuvo que era necesario que el mundo comprendiera que era preciso que nos dejaran crecer a la economía argentina para poder pagar. Sostuvo una frase que no me voy a olvidar nunca más, dijo: "es necesario que nos dejen crecer para poder pagar, porque los muertos no pagan las deudas". Y bueno, a partir de allí, invirtió la lógica de pagar para crecer, por la crecer para pagar.

Y precisamente desde el año 2003 a la fecha se hicieron importantes pagos, basados en dos reestructuraciones: en el año 2005, en marzo de 2005 se reestructura la deuda en la presidencia de Néstor Kirchner. Recuerdo muy bien que fue una negociación dura, larga, en un momento dado el primer banco que intervino como negociador y eventual fiduciario: el Wachovia, se retira en medio de la negociación provocando una severa crisis que fue en un momento en que el entonces ministro de Economía, le ofreció la renuncia al Presidente Kirchner porque parecía que había fracasado el intento de reestructurar la deuda y Kirchner dijo: "tengamos confianza, sigamos adelante", y se decidió tomar como negociador y luego posterior fiduciario al Banco de Nueva York, normalmente conocido en la jerga financiera como BoNY. Finalmente ese primer canje en el que muy pocos confiaban y en el que muy pocos apostaban, pero que Néstor tenía una gran esperanza terminó reestructurando el 76 por ciento de la deuda soberana, con la quita más importante que se recuerde en la historia.

Quita que para medir la importancia que tuvo, en el crecimiento posterior de la Argentina la podemos cuantificar en más de 79.000 millones de pesos.

Y para que ustedes tengan una idea de lo que representa es la totalidad de la Asignación Universal por Hijo, es la totalidad de las más de 2.000 escuelas que se construyeron – en estos 10 años – en la República Argentina y es todas las viviendas y sus respectivas infraestructuras, todos los planes sociales de viviendas que se construyeron entre el 2003 y la fecha. Esto marca la envergadura de la importancia.

¿Cuál fue el argumento para la quita? Durante el momento de endeudamiento, en realidad, la Argentina pagaba tasas exorbitantes en dólares, en todo el mundo las tasas eran del uno, del dos por ciento y acá se pagaban tasas de dos dígitos. El argumento central para esa quita fue que quien sabe que va a un lugar donde están pagando una tasa exorbitante que se no paga en ninguna parte del mundo es lógico que conoce el riesgo que asume al colocar su fondo. Por eso dijimos que debían ser riesgos compartidos entre un país que había apostado a un timba financiera y también, del otro lado, a los que sabían que era imposible que alguien les devolviera ese dinero con esos intereses.

Ahí surgió el problema de los holdouts, que era – digamos – los que no habían entrado en este primer canje. Si bien todos los países tienen una ley de quiebra, nuestro país la tiene y basta con que el 66 por ciento de los acreedores esté de acuerdo para que el juez apruebe la quiebra, o el concurso de quiebra y también es una cifra similar en los Estados Unidos, en este primer acuerdo conseguimos un 76 por ciento. Pero siguió el problema de los holdouts. Era lógico porque había mucha gente que no creía en esta Argentina que nunca había pagado las deudas. Nosotros, inclusive, habríamos querido participar y demostrar aún más buena fe creando lo que se

denominó el Cupón de Crecimiento, de modo tal que si la Argentina crecía los acreedores iban a recibir más dinero producto de acompañar y de asociarse al crecimiento de esa Argentina.

Luego, durante mi presidencia, en el año 2010, volvimos a abrir el canje y de ahí llegamos a una cifra récord de aceptación de reestructuración de deuda, que es el 93 por ciento a quienes les debíamos. Ya había más confianza, se había pagado deuda no solamente emitida en ley extranjera, sino también emitida en ley nacional; se había pagado deuda en el Banco de Nueva York; se había pagado deuda, aquí en el país, con lo cual logramos este 93 por ciento, una tarea también muy buena que se dio en ese momento, a través del entonces ministro de Economía, que recorrió, junto a su equipo, todo el mundo. Pero el actual ministro de Economía, también el Doctor Lorenzino, para precisamente incorporar a muchos bonistas italianos, japoneses, que eran más pequeños y que habían quedado fuera del primer canje. Llegamos – repito – a esta cifra de 93 por ciento.

El fallo de la Cámara de Apelaciones de Nueva York creo que es un poco injusto con la Argentina. Toma un argumento del "Financial Times" y dice que nos condena porque la Argentina es "un deudor recalcitrante". La Argentina ha pagado, entre el año 2003 y el año 2012, este país al que califican como deudor recalcitrante 173.733 millones de dólares. Vuelvo a repetirlo: desde el año 2003 a la fecha, hemos pagado 173.733 millones de dólares. 41.044 millones de dólares es dentro del propio sector público nacional, entre distintos organismos del sector público nacional, que se prestan entre sí para financiamiento, para infraestructura, en fin para lo que hace al funcionamiento del Estado; 81.487 millones de dólares hemos pagado al sector privado (extranjero y nacional, en dólares, tenedores de bonos) y a los organismos multilaterales de crédito, entre ellos al Fondo Monetario Internacional, cuando nos desendeudamos, en el año 2006, al Banco Interamericano de Desarrollo por los préstamos que nos ha dado, al Banco Mundial, a la Corporación Argentina de Fomento, 51.201 millones de dólares; en total, 173.733 millones de dólares.

Digamos que más que deudores recalcitrantes somos pagadores seriales. Pero, además, con un aditamento: esto lo hemos hecho absolutamente con recursos genuinos, con recursos que hemos logrados a partir de la administración de comercio, y a partir de la mejor administración de los recursos del Estado, sin acceder al mercado de capitales. Creo que así como fuimos el país que entró en el Guinness por ser la deuda soberana más importante que se ha defaulteado creo que también debemos estar en el Guinness de los países que más hemos pagado, que más hemos cumplido con nuestras obligaciones en los últimos diez años, sin acceso al mercado de capitales.

Por eso me parece importante que todos los argentinos sepamos el esfuerzo que hemos hecho y también el mundo tenga conocimiento del esfuerzo que hemos hecho. Hoy, la deuda de los argentinos en dólares, que cuando Kirchner asumió representaba algo así como el 150 por ciento aproximadamente del PBI, ha pasado a representar en moneda extranjera, ya sea que se le deba a privados nacionales o extranjeros, algo menos del 10 por ciento del PBI. O sea, del 150 del PBI, hemos pasado a algo menos del 10 por ciento del PBI.

Y en pocos días más, vamos a pagar el BONAR 7, vamos a pagar 2.000 millones de dólares cash, exactamente el día 12 de septiembre. Este es un bono en legislación nacional que se paga también aquí en la Caja de Valores pero que la mayoría se cobra en el extranjero porque la

mayoría son tenedores extranjeros que lo hacen muy fácilmente, con filiales locales de bancos extranjeros pagan a sus otra casas matrices o filiales en el lugar donde están los acreedores internacionales y de esa manera se salda la deuda.

A partir de ese momento la Argentina, o sea, a partir del 12 de septiembre, la Argentina va a pasar a deber en moneda extranjera, euro o dólares, 8,3 por ciento de su PBI.

Bueno también es recordar que esto es una ratio de deuda que es de las más bajas de los países desarrollados y ni qué hablar de los países de la región.

Bueno también es recordar que nuestro Gobierno es un pagador serial pero no es un endeudador serial, porque la deuda se tomó durante otras gestiones y también se defaulteó durante otras gestiones. Y esto nos ha permitido a los argentinos, esta administración, crecer y precisamente poder pagar la deuda.

Ahora bien, este fallo…Yo escuchaba algunos comentarios hoy sobre este fallo que me atrevo a calificar un poco de cortoplacistas porque el fallo…dicen, bueno, "en realidad es un fallo que recién podrá tener efectos porque va a ser apelado y tendrá que decidir la Corte Suprema de los Estados Unidos en el año 2014 o 2015".

Realmente, no parece demasiado serio, no hay responsabilidad, me parece de un buen gobierno, de una buena gobernanza creer que el 2014 o el 2015 o el corto plazo son una solución para los problemas. Nosotros creemos que los problemas deben resolverse, no solamente en el corto plazo, sino en el mediano y en el largo plazo.

Por eso, la decisión…hemos tomados decisiones en virtud de esto porque no podemos tener como país una Espada de Damocles sobre nuestro cuello diciendo que en cualquier momento alguien va a tomar una decisión, se van a caer los canjes del año 2005, 2010, los acreedores nuestros no van a pagar y el país va a volver al 2001. Esto es lo único que no vamos a permitir por lo menos mientras yo sea Presidenta.

Por eso, la primera decisión que hemos tomado, bueno, es pedirle a Dios que ilumine a la Corte Suprema de los Estados Unidos porque, en realidad, estaríamos realmente ante un caso que, no solamente tiraría abajo una de las reestructuraciones de deuda más importantes de las que se tenga memoria, sino que también invalidaría otras reestructuraciones de deuda. Porque téngase en cuenta que estos fondos buitres solo representan el 0,45 por ciento.

Para tenerlo claro: el 93 por ciento de los acreedores de Argentina, arregló; un 7 por ciento no arregló, pero solamente están haciendo juicio en Nueva York y han obtenido esta sentencia, fondos buitre por el 0,45 por ciento del total de la deuda. Bonos que fueron comprados recién en el 2008, cuando ya habían sido defaulteados, valían muy poco y si se le hace lugar a lo que ellos pretenden, la ganancia en dólares sería de algo más del 1.300 por ciento, algo que realmente carece de lógica, de sentido común. Creo que no hace falta ser un experto en Derecho o en Economía para darse cuenta que de esta manera solamente funde la República Argentina, sino que fundiría el país. Sobre todo, en momentos en los cuales numerosos países desarrollados del primer mundo, están también reestructurando sus deudas.

4

Por eso, la decisión que tome la Suprema Corte de Justicia de los Estados Unidos, no solamente influiría en la Argentina, sino influiría en todo el mundo financiero internacionales. No en vano se han presentado numerosos "amicus curiae" frente a la Corte, que no son precisamente amigos de la Argentina, baste recordar a la exdirectora del Fondo Monetario Internacional, Anne Krueger, también a numerosos fondos de administración que también tienen intereses y se han presentado, al gobierno de la República de Francia, a quien agradecemos también su presentación ante la Corte Suprema de los Estados Unidos.

Pero también, como les decía y como no podemos tener una  Espada de Damocles sobre nuestras cabezas, hemos tomado 2 decisiones más además de esta casi espiritual y casi terrenal de encomendarnos a Dios y a la Corte Suprema de los Estados Unidos: en primer lugar, en el día de mañana, vamos a enviar un nuevo proyecto de Ley al Parlamento argentino, que por imperio de la Constitución y del artículo 75 es el único capacitado para decidir sobre la deuda externa argentina, el Poder Ejecutivo actúa siempre como negociador, como delegado pero finalmente los acuerdos deben pasar por el Parlamento para ser aprobados o rechazados, y este proyecto de Ley va a consistir, precisamente, en abrir por tercera vez el canje de deuda para ese 7 por ciento que no ha ingresado. Queremos una vez más, demostrar la profunda vocación de hacer frente a los compromisos que tiene la República Argentina.

Hoy no lo podemos hacer porque estaríamos violando la propia ley de nuestro país que estableció ya en el 93 por ciento y cerró el segundo canje en el año 2010. Pero vamos a enviar, reitero, un proyecto de Ley al Parlamento para que, precisamente, ese 7 por ciento tenga la capacidad de ingresar, la posibilidad de ingresar y, bueno, y cobrar en paridad de condiciones con el resto de los acreedores.

Pero también hemos tomado una decisión para salvaguarda de quienes han confiado en la República, el 93 por ciento de los tenedores de bonos que han confiado en Argentina y que vienen cobrando, algunos del año 2005 y otros del año 2010. Y es, precisamente, hacer un reemplazo de títulos por la misma moneda, por los mismos plazos nada más que cambiando el lugar de pago para evitar eventuales embargos que pudieran sufrir los fondos porque ya hemos sufrido embargos anteriores.

Para ser claros: los que tienen bonos argentinos, el 93 por ciento, vamos a reemplazar esos títulos, esos bonos por bonos similares, por moneda extranjera, por los mismos plazos, únicamente que serán pagaderos aquí en la República Argentina en la Caja de Valores.

Como ya hemos pagado, para que ustedes tengan una idea de la certeza y de la seguridad jurídica que esto significa, los BODEN 12, que fueron precisamente los bonos que Argentina emitió para pagarles a todos aquellos que habían atrapados por el corralito, se acuerdan cuando no pudieron sacar los depósitos de los bancos, el Gobierno argentino, con bonos emitidos por ley argentina y pagaderos aquí en la Caja de Valores en la Argentina, ya ha cancelado totalmente esa deuda que fue de 19.600 millones de dólares.

La Argentina pagó la totalidad de los ahorros confiscados de argentinos y de no argentinos, o sea, de nacionales y de extranjeros, por 19.600 millones de dólares con títulos emitidos con

legislación local y pagada aquí en la República Argentina en los plazos y en la moneda que habían sido estipulados.

Y en unos días más, para ser más precisos el día 12 de septiembre, como les decía hace unos instantes, vamos a pagar otro bono también emitido que es el BONAR 7, 2.000 millones de dólares, también emitidos en legislación local y pagaderos aquí en la Caja de Valores de la República Argentina, de modo tal que ya hemos pagado miles de millones de dólares de títulos emitidos con legislación local y pagaderos aquí en la Argentina.

Por lo tanto, la certeza y la seguridad jurídica, no solamente emana de nuestra convicción en cuanto a hacer frente a las obligaciones a las que la Argentina como Estado se había comprometido, aunque no haya sido nuestro gobierno, sino fundamentalmente también a los hechos objetivos, concretos que ya hemos protagonizado pagando títulos emitidos aquí en la Argentina.

Y el deber fundamental de esto, no es una vocación de pago, yo sé que por allí hay algunos sectores que dicen que no habría que pagar nada, mínimos, absolutamente, porque sería disparatado. Pero bueno es recordar que la República Argentina tiene además 40 millones de habitantes que exigen responsabilidad por parte de las autoridades del Gobierno y poder seguir garantizando el crecimiento de Argentina en un marco de seguridad jurídica y de hacerse cargo de las obligaciones.

Por eso, quería hoy dirigirme, no solamente a los 40 millones de argentinos, sino también a todos aquellos que han confiado, nacionales o extranjeros privados, y han formado parte de ese 93 por ciento que aceptó bonos de Argentina con cupón de crecimiento que ha venido pagando regularmente, dirigirme también al resto del mundo financiero internacional y específicamente a las autoridades de Estados Unidos y, fundamentalmente, a su Corte, porque en realidad, estaríamos infligiendo un seguro daño sí a la seguridad jurídica, sí al trust, a la confianza que se tienen que tener en la reestructuración de deuda en un momento muy difícil de todo el mundo en materia financiera.

Nos parece realmente que solo un 1,45 por ciento que ingresó en el 2008 con bonos basura, comprados por muy poco dinero, hoy pretenda malograr lo que hemos logrado en materia de reestructuración de deuda, de crecimiento, de pago, de aporte al mundo, porque en definitiva es un aporte de la Argentina a la certidumbre jurídica del mundo y a la confianza de quienes confiaron en la Argentina, me parece que es importante que podamos tener este contacto y poder decir estas cosas.

Finalmente, para los que muchas veces nos dicen que nos gusta hablar del pasado y creen que el pasado ya pasó, yo creo que este viernes pasado, el viernes de la semana pasada, se ha comprobado definitivamente que el pasado y sobre todo en Economía, siempre está a la vuelta de la esquina. Que basta que alguien cometa una equivocación o que alguien tenga otros intereses que no sean la de representar los intereses de los 40 millones de argentinos, para que las cosas que tanto nos han costado lograr en estos últimos años, finalmente se malogren.

Estas cosas que a veces decimos sobre el pasado, no es con el ánimo de fiscalizar, con el ánimo de acusar o de poner en mayor valor lo que nosotros hemos hecho, sino por el contrario, tratar de evitar volver a cometer los errores que hemos cometido los argentinos, miren, me involucro yo también a pesar de no haber formado parte en ningún gobierno endeudador, pero sí formo parte de la Argentina y me siento tan responsable como los 40 millones de argentinos, pero la más responsable porque me han elegido para conducir los destinos del país.

Por eso, quería en síntesis, comentarles estas dos decisiones importantes, la de la reapertura de una tercera ley de canje. Espero que como decimos aquí en la Argentina, la tercera sea la vencida y podamos finalmente incorporar a ese 7 por ciento.

También un llamado a la razonabilidad y al sentido común que no puede ser que un 0,45 por ciento, que adquirió bonos a tan bajo precio, pueda poner en juego al 93 por ciento de los acreedores y con las cifras que hemos pagado y que tendremos que seguir pagando y, fundamentalmente, las posibilidades de seguir creciendo en la Argentina para generar trabajo, para dar salud, educación y al mismo tiempo, para hacer frente a nuestras obligaciones.

Por esos motivos es que quería hoy comunicarme con el conjunto del pueblo argentino y también fundamentalmente, con quienes han creído en la Argentina, han apostado por ella, que sigan haciéndolo porque estamos al frente de la nave y fundamentalmente la vamos a conducir a buen puerto y creemos también, tenemos fuertes esperanzas, de que el sentido común impere por sobre el lobby formidable que hemos visto en estos días donde un 0,45 por ciento se pueda imponer sobre la voluntad de un 93 por ciento.

Soy abogado al mismo tiempo y sé que esto afecta decididamente la igualdad entre las partes; sé que afecta la equidad; sé que afecta la seguridad jurídica; sé que afecta la certeza que deben tener las relaciones económicas y financieras el mundo y, por eso, solicitamos que con la misma responsabilidad que hemos actuado en estos 10 años, pagando puntualmente todo lo que nos habíamos comprometido por primera vez en nuestra historia, también pedimos responsabilidad a los que tengan la decisión en sus manos.

De cualquier manera, también decir que la Argentina no va a violar sus propias leyes y va a, precisamente, darle participación al Parlamento argentino en un tema tan importante como este, como también se lo hemos dado en el año 2005 y 2010, que nos ha permitido tener un crecimiento y hacer frente a nuestros compromisos.

Muchas gracias por escuchar y buenas noches a todos y a todas

# EXHIBIT E

No. 12-1494

IN THE

# Supreme Court of the United States

REPUBLIC OF ARGENTINA,

*Petitioner*,

—v.—

NML CAPITAL, LTD., ET AL.

*Respondents.*

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

**BRIEF FOR THE REPUBLIC OF FRANCE AS *AMICUS
CURIAE* IN SUPPORT OF THE REPUBLIC OF
ARGENTINA'S PETITION FOR A WRIT OF CERTIORARI**

DIANA BILLIK
ALLEN & OVERY LLP
52 Avenue Hoche
75379 Paris Cedex 08
France

ANDREW RHYS DAVIES
  (*Counsel of Record*)
MOLLY C. SPIECZNY
MICHAEL WESTFAL
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300
andrew.rhys.davies@allenovery.com

*Counsel for Amicus Curiae*

July 26, 2013

i

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES.................  iii

INTEREST OF THE *AMICUS CURIAE* ....  1

SUMMARY OF THE ARGUMENT .........  4

ARGUMENT ................................  6

I.  THE COURT OF APPEALS' AFFIRM-
    ANCE OF AN INJUNCTION DESIGNED
    TO COMPEL PAYMENT OF PAST-DUE
    SOVEREIGN DEBT DEVIATED FROM
    FUNDAMENTAL TENETS OF EQUITY
    JURISPRUDENCE......................  6

II. THE DECISION OF THE COURT OF
    APPEALS THREATENS WIDER
    PUBLIC INTERESTS...................  7

    A.  The Court Of Appeals' Decision
        Will Have A Global Impact .........  7

    B.  The Court Of Appeals' Decision
        Jeopardizes The Ability Of Sovereign
        Debtors To Achieve Orderly And
        Negotiated Restructurings Of Their
        External Debt......................  10

        1.  The Court Of Appeals' Decision
            Creates Disincentives For
            Creditors To Participate In
            Orderly Debt Restructurings ...  10

ii

PAGE

2. The Court Of Appeals' Decision
Threatens The *Ad Hoc* Sovereign
Debt Restructuring Process
And Has Wide Implications
For Inter-Creditor Equity . . . . . .    13

C. The Court Of Appeals' Decision Also
Threatens Sovereign Lending,
Particularly Development Aid In
The Form Of Loans To Developing
Countries . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

D. Contrary To The Court Of Appeals'
View, Collective Action Clauses
Do Not Ameliorate The Problems
Created By Its Ruling . . . . . . . . . . . . . . .    17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

iii

## TABLE OF AUTHORITIES

**Cases:**                                                    PAGE

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ...................... 6

*Harrisonville v. W.S. Dickey Clay Mfg. Co.*,
    289 U.S. 334 (1933) ...................... 7

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ...................... 6

*NML Capital, Ltd. v. Argentina*,
    699 F.3d 246 (2d Cir. 2012) ............*passim*

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ...................... 6

*Salazar v. Buono*,
    130 S. Ct. 1803 (2010).................... 6

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ...................... 7

*Younger v. Harris*,
    401 U.S. 37 (1971) ...................... 6

**Statutes and Rules**

Sup. Ct. R. 37.2 .............................. 1

Sup. Ct. R. 37.6 .............................. 1

**Other Authorities:**

Udaibir S. Das et al., Sovereign Debt
    Restructurings 1950-2010: Literature
    Survey, Data, and Stylized Facts,
    International Monetary Fund Working
    Paper No. 12/203 (August 2012) ........8, 11

iv

PAGE

International Monetary Fund, *Eligibility
To Use The Fund's Facilities For
Concessional Financing*
(March 15, 2013) .......................... 15

International Monetary Fund, *Sovereign
Debt Restructuring—Recent Develop-
ments and Implications for the Fund's
Legal and Policy Framework*
(April 26, 2013) ........................*passim*

Julian Schumacher et al., *Sovereign Defaults
in Court: The Rise of Creditor Litigation
1976-2010* (2013) .......................... 11

Horatia Muir Watt, *Private International
Law Beyond the Schism*, 2(3) Trans-
national Legal Theory (2011) ........... 12

The World Bank, *International Debt
Statistics 2013* (2013)................... 9

World Bank, World Development Indicators,
*available at* http://databank.worldbank.
org (last visited July 22, 2013) ......... 15

Jeromin Zettelmeyer et al., *The Greek
Debt Exchange: An Autopsy*
(September 11, 2012) .................... 19

## INTEREST OF THE *AMICUS CURIAE*[1]

As an active and prominent participant in the financial community, the Republic of France has a substantial interest in issues surrounding international financial stability and global sovereign lending markets.

In its decision of October 26, 2012, the United States Court of Appeals for the Second Circuit held that the Republic of Argentina's decision to pay only holders of the exchange bonds it issued but not holders of its old bonds (among which are the plaintiffs) constituted a breach of the *pari passu* clause contained in the Republic's 1994 Fiscal Agency Agreement (the "FAA"). It further affirmed the grant of an injunction providing that whenever Argentina pays any amount due under the terms of the exchange bonds, it must concurrently, or in advance, make a "ratable payment" to the plaintiffs in respect of the old bonds. This decision is based on an erroneous understanding of the meaning of *pari passu* clauses and contradicts the well-settled mainstream market understanding that *pari passu* clauses do not covenant that all payments will be made by a borrower ratably with the borrower's other unsubordinated

---

[1]    Pursuant to Rules 37.2 and 37.6, counsel of record for all parties received timely notice of *amicus curiae*'s intention to file this brief. *Amicus curiae* files this brief with the written consent of all parties, and copies of the parties' consent letters are being filed herewith. *Amicus* and its counsel state that none of the parties to this case nor their counsel authored this brief in whole or in part, and that no person other than *amicus* or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

2

debts, but rather that such clauses provide protection against legal subordination of claims.

In upholding the injunction, the Court of Appeals rendered a decision threatening international financial stability:

<u>First</u>, France has extensive experience in sovereign debt-related issues through its active participation in the Paris Club, an informal group of sovereign creditors that deals with the restructuring of official debt, *i.e.*, intergovernmental debt.[2] Although it does not speak here on behalf of the Paris Club, France, as a long-standing and active member, has participated in the development and application of the Paris Club's principles guiding orderly sovereign restructurings since 1956.[3] France accordingly wishes to draw the Court's attention to the adverse consequences that the Court of Appeals' decision will have in this regard. As the decision effectively grants a veto

---

[2]    The Paris Club is comprised of nineteen permanent member states, which, in addition to the United States and France, include Australia, Austria, Belgium, Canada, Denmark, Finland, Germany, Ireland, Italy, Japan, The Netherlands, Norway, the Russian Federation, Spain, Sweden, Switzerland, and the United Kingdom. Other official sector creditors may also actively participate in Paris Club negotiations, subject to the agreement of permanent members and of the sovereign debtor. The International Monetary Fund ("IMF") and the World Bank are represented at the Paris Club's monthly meetings and participate in negotiations as observers.

[3]    Since 1956, the Paris Club has reached 429 agreements with ninety sovereign debtors for a total amount of more than $570 billion of restructured sovereign debt. *See* CLUB DE PARIS, http://www.clubdeparis.org (last visited July 23, 2013).

3

right to hold-out creditors over both a sovereign's voluntary restructuring and over future payments on restructured obligations, it will have a destabilizing effect on a sovereign debtor's ability to engage in orderly and negotiated debt restructuring as a means of last resort to prevent default when the sovereign's debt has been deemed unsustainable.

<u>Second</u>, in addition to the policy concerns outlined above, France has a practical concern with the effects of the Court of Appeals' decision. As one of the largest sovereign lenders in the international financial system, France has substantial exposure to sovereign borrowers, and particularly to developing countries as part of its official development aid program. The Court of Appeals' decision will undoubtedly have a deleterious effect on the ability of borrower states to honor their financial commitments to lenders, including France, as well as on the practicability of negotiated debt crisis resolution.

France strongly supports the fair treatment of creditors by borrowers and it does not intervene in support of Argentina's repayment decisions. Nonetheless, because the Court of Appeals' decision threatens wider societal and economic harm, France supports Argentina's petition for a writ of *certiorari*. The Court of Appeals' decision warrants review by this Court.

4

## SUMMARY OF THE ARGUMENT

In its petition, Argentina states that the Court of Appeals' decision raises issues that are of critical importance to sovereigns and their creditors, including creditors that hold restructured sovereign debt. *See* Petition for Writ of Certiorari at 17. This brief is respectfully submitted to explain why France believes that analysis to be correct, and to outline for this Court the harmful impacts that the Court of Appeals' decision could have on sovereign debt markets.

As an initial matter, the injunctive remedy affirmed by the Court of Appeals conflicts with the fundamental tenets of equity jurisprudence. Injunctive relief is not available when the plaintiff has an adequate remedy at law and, as such, injunctive relief cannot be used to compel payment of a debt. Any perceived difficulty of enforcing judgments against sovereign debtors provides no exception to these principles.

This Court has also firmly established that a federal court may not grant injunctive relief unless it first considers the effect on the public interest. The Court of Appeals simply failed to consider the wide-ranging and significant harms to various public interests caused by the injunctive remedy at issue. Indeed, the inordinate leverage given to hold-out creditors by this remedy will have a truly global impact.

This injunctive remedy threatens to disrupt the orderly restructuring of a distressed sovereign's debt. As an active participant in the Paris Club, France has extensive experience in the sovereign debt restructuring process and with the complex

5

balancing of interests of sovereign lenders, bank lenders, bondholders and the sovereign debtor in this process. This injunctive remedy threatens to disturb the balance of such interests that has been achieved through a voluntary and orderly restructuring process, which takes place entirely outside of any sovereign bankruptcy context.

This balance is disturbed by the powerful incentive that the injunctive remedy provides for private creditors to forgo participation in voluntary restructuring in order to enforce full payment of their debt against an already distressed sovereign debtor. The Court of Appeals' decision will inevitably lead to an increase in the number of hold-out creditors and specifically "vulture funds" that will seek to leverage the Court of Appeals' decision in future restructurings. Other creditors such as sovereign and bank lenders that would have otherwise participated in the restructuring process may then choose not to as long as any payment on the restructured debt could be conditioned on a ratable payment to the hold-out creditors and vulture funds. Such lenders may also, as a result, be less willing to extend loans to sovereign debtors in the first place.

Finally, although the Court of Appeals assumed that the threat posed by the injunctive remedy would no longer be relevant in light of collective action clauses included in newly issued sovereign bonds, France respectfully submits that such clauses cannot and will not resolve the significant harms outlined above.

6

## ARGUMENT

### I.  THE COURT OF APPEALS' AFFIR-MANCE OF AN INJUNCTION DESIGNED TO COMPEL PAYMENT OF PAST-DUE SOVEREIGN DEBT DEVIATED FROM FUNDAMENTAL TENETS OF EQUITY JURISPRUDENCE

As this Court has long held, it is a fundamental doctrine of equity jurisprudence that injunctive relief is unavailable when the plaintiff has an adequate remedy at law. *See, e.g., Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992) (citing *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974); *Younger v. Harris*, 401 U.S. 37, 43-44 (1971)). For that reason, it is equally well-established that injunctive relief is unavailable to compel payment of a debt. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210-11 (2002).

The Court of Appeals essentially crafted an exception to these fundamental tenets, based on a perceived difficulty of enforcing judgments against sovereign debtors. *NML Capital, Ltd. v. Argentina,* 699 F.3d 246, 262-63 (2d Cir. 2012). It did so, moreover, without considering the harm its decision would cause to the sovereign debt markets.

In doing so, the Court of Appeals erred. This Court has repeatedly held that a federal court must consider the public interest before it exercises its injunctive authority. *See Salazar v. Buono*, 130 S. Ct. 1803, 1816 (2010) ("An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief. . . . Equitable relief is not

7

granted as a matter of course, and a court should be particularly cautious when contemplating relief that implicates public interests.") (citations omitted); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."); *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 338 (1933) ("Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling.").

As demonstrated below, in addition to overlooking the above-referenced principles of equity jurisprudence, the Court of Appeals' decision overlooked the public harm that will result from making injunctive relief readily available to a sovereign debtor's hold-out creditors.

## II. THE DECISION OF THE COURT OF APPEALS THREATENS WIDER PUBLIC INTERESTS

### A. The Court Of Appeals' Decision Will Have A Global Impact

This case is not only about the named plaintiffs and Argentina. To the contrary, the Court of Appeals' decision, if upheld, will have a global impact.

*Pari passu* clauses such as the one set out in the FAA appear in virtually all sovereign bonds and in all loans made to sovereigns, whether on a syndicated or bilateral basis. These clauses are, in effect, boilerplate provisions in most sovereign financing agreements.

8

Moreover, New York law is so widely utilized in global finance that it is no exaggeration to characterize it as an international public utility. New York law applies in the large majority of outstanding emerging market sovereign bonds, followed by English law. *See* Udaibir S. Das et al., *Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts*, International Monetary Fund Working Paper No. 12/203 (August 2012) at 41, *available at* http://www.imf.org/external/pubs/ft/wp/2012/wp12203.pdf. For example, as of March 2009, New York law was the governing law applying to emerging market sovereign bonds in a total outstanding amount of $272 billion, out of a total of $411 billion, representing 435 issuances out of a total of 631 issuances. *Id*. Thus, New York law plays a substantial role in sovereign borrowing in many parts of the world, including in many of the large emerging markets and among low-income borrowers.

As a result, the Court of Appeals' decision will constitute a precedent in numerous cases involving alleged breaches of *pari passu* clauses and New York law.

In fact, the reach of the Court of Appeals' decision is so wide that it may also impact creditors whose bonds are *not* governed by New York law. If, for example, a sovereign borrower has bonds governed by New York law and also has bonds governed by another foreign law, then, following the Court of Appeals' decision, a court could condition payments of bonds governed by the foreign law upon the making of ratable payments on the New York law governed bonds. The rights of investors holding bonds governed by a different

9

law would thereby be affected by the injunctive remedy upheld by the Court of Appeals on the basis of a New York law-governed contract to which such investors are not a party.

This decision may also impact official bilateral loans contracted by a sovereign if it has a mix of bond, bank and official bilateral borrowing—as do many sovereigns. *See* The World Bank, *International Debt Statistics 2013* (2013) at 24-29, *available at* http://data.worldbank.org/sites/default/files/ids-2013.pdf. The mere existence of a New York law-governed bond among a sovereign's borrowing structure may expose payments under its loans to the Court of Appeals' injunctive remedy if the bonds include a common *pari passu* clause that links the ranking of payments on loans and bonds within the scope of the sovereign's external indebtedness.

In light of the reach that its decision will have and the considerable amounts of money involved internationally, the Court of Appeals should have addressed the public interest implications of its decision; yet the court did not adequately do so, resulting in a ruling that may exacerbate sovereign debt crises and in turn threaten international financial stability.

10

**B. The Court Of Appeals' Decision Jeop-
ardizes The Ability Of Sovereign
Debtors To Achieve Orderly And
Negotiated Restructurings Of Their
External Debt**

**1. The Court Of Appeals' Decision
Creates Disincentives For Credi-
tors To Participate In Orderly
Debt Restructurings**

The Court of Appeals' decision, if it stands, will
raise significant obstacles to good-faith negotia-
tions and voluntary sovereign debt restructurings
precisely because it grants disproportionate power
to a small group of hold-out bondholders, to the
detriment of the majority of bondholders, in the
event of a sovereign debt crisis. For instance, in
this case, less than ten percent of Argentina's pre-
2001 foreign bonds are held by the plaintiffs,
while approximately ninety-two percent of
Argentina's bondholders participated in its two
exchange offers. *See NML Capital,* 699 F.3d
at 253.

Often, once a sovereign borrower is known to be
in financial difficulty, distressed debt investors
purchase bonds from their original holders, either
shortly before or after the debt restructuring
takes place. In the instant case, the Court of
Appeals noted that plaintiffs had bought their
defaulted bonds as recently as June 2010, *i.e.*,
almost nine years after Argentina's default. *See
id.* at 251.

11

Some of these investors, known as "vulture funds," purchase distressed sovereign debt obligations in the secondary markets at deep discount to their face value with the intent of blocking voluntary restructuring of particular classes of debt obligations and also blocking broader debt restructuring carried out through cooperative processes as a means of last resort to restore debt sustainability.[4] They deliberately adopt a non-cooperative stance during the restructuring process by bringing enforcement actions or seeking out-of-court settlements on their claims.

Although this behavior should be discouraged, it is decidedly encouraged and rewarded by the injunctive remedy affirmed by the Court of Appeals. Prior to the Court of Appeals' decision, the leverage of hold-out creditors over sovereigns' restructuring efforts had indeed been limited. International Monetary Fund, *Sovereign Debt Restructuring–Recent Developments and Implications for the Fund's Legal and Policy Framework* (April 26, 2013) at 31, *available at* http://www.imf.org/external/np/pp/eng/2013/04261 3.pdf (hereinafter, the "IMF Report"). However, the Court of Appeals has now granted hold-out creditors a powerful means of extracting full payment on the un-restructured debt of the borrower.

---

[4]    *See generally* Julian Schumacher et al.*, Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010* (2013) at 3, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2189997 ("Vulture" funds have accounted for nearly ninety percent of all cases in sovereign debt litigation, and are "particularly likely to initiate legal disputes against Highly Indebted Poor Countries (HIPCs). Of the twenty cases filed against HIPCs, thirteen were filed by 'vultures.'").

12

If the sovereign borrower is to avoid breaching the injunction of a U.S. court, it must pay whatever is demanded by hold-out creditors. Hold-out creditors thus have the leverage of seeking the injunctive remedy affirmed by the Court of Appeals and thereby blocking payments due to other creditors who voluntarily took part in the restructuring, to the detriment of the interests of the sovereign debtor and of those other creditors. *Id*.; *see also* Horatia Muir Watt, *Private International Law Beyond the Schism,* 2(3) Transnational Legal Theory (2011) 347-427 (discussing the disruptive effect on sovereign funding of a private international law framework that empowers vulture fund hold-out creditors to seek enforcement against debtor states on the basis of erroneous interpretations of *pari passu* clauses as ratable payment clauses, without political accountability); Das et al., at 50 (describing vulture funds).

The legal enforcement advantages conferred to creditors who refuse any restructuring effort, no matter how small their holding of un-restructured debt, are potentially enormous. Private creditors other than the hold-out creditors, who otherwise would be prepared to accede to a restructuring, may be discouraged from participating if they believe that hold-out creditors may block payments on the debtors' restructured obligations and may thus choose to refrain from participating in the restructuring.

13

## 2. The Court Of Appeals' Decision Threatens The Ad Hoc Sovereign Debt Restructuring Process And Has Wide Implications For Inter-Creditor Equity

There is no international bankruptcy law to guide the restructuring of a distressed sovereign, as there is for a corporation, and the mechanisms of *ad hoc* sovereign debt restructurings have evolved based on accepted practices among participants. Broadly, these participants are sovereign lenders (primarily in the context of the Paris Club), bank lenders (often working through organized creditor committees, and referred to as the London Club) and bondholders. Modern sovereign restructuring depends on coordination, close dialogue and fair negotiations among all creditors and the sovereign debtor.

The Paris Club is a pivotal actor in orderly sovereign debt crisis resolution. Its restructuring framework provides each participating creditor State with guidelines that form the basis of subsequent legally binding bilateral agreements. Notably, Paris Club agreements include a "comparability of treatment" clause, which aims specifically to ensure balanced treatment of the sovereign's debt and fair burden-sharing among *all* external creditors—sovereign lenders, bank lenders and bondholders. As a general rule, the principle of comparability of treatment incorporated in the Paris Club agreements is a crucial touchstone for catalyzing the effective coordination of private creditors and thereby enabling effective, fair and orderly restructurings that will allow the sovereign to attain its objective of debt

14

sustainability and meet payment obligations to all its cooperating creditors. Furthermore, as a matter of equality of treatment, this clause is designed to ensure that claims of taxpayers in the lender countries—for example, U.S. or French taxpayers—are not subordinated to those of other, private-sector creditors. Crucially, it facilitates fair burden-sharing among sovereign creditors.

If private creditors are incentivized not to participate in sovereign debt restructuring, bilateral official creditors—and, therefore, their taxpayers—will bear an outsized share of the resulting debt relief burden. As a result, sovereign lenders will be less willing to grant debt relief, resulting in adverse consequences on broader official sector participation in aiding low-income countries in economic distress.

As is clear from the above, the Court of Appeals' empowerment of hold-out creditors through injunctive relief, if upheld, will represent a strong disincentive to any future sovereign debt restructurings: it will have a chilling effect on creditors' willingness to grant concessions in order to facilitate voluntary and negotiated debt restructurings as a means of last resort. The Court of Appeals' decision threatens the ability of concerned creditors and borrowers to address a sovereign debt crisis and consequently, to limit risks to the international financial system.

15

### C. The Court Of Appeals' Decision Also Threatens Sovereign Lending, Particularly Development Aid In The Form Of Loans To Developing Countries

Although private funding, notably in the form of bonds, is a growing source of financing for sovereigns, financing *by* sovereigns remains a large component of international financial flows, and is of particular relevance for the most vulnerable countries, notably for the 72 countries eligible to use the concessional financing window of the IMF.[5] While private funding for the most vulnerable countries amounted to less than 10% of the total external public and publicly-guaranteed debt stock of these countries as of 2011, bilateral sovereign loans accounted for close to 40%. In addition, sovereign bilateral disbursements represent a steady share of new external financing for these countries, at more than 35% of total disbursements in 2011.[6]

France is a major participant in this funding market and ranks among the largest lenders to low-income countries.[7] France and its lending

---

[5]    *See* International Monetary Fund, *Eligibility To Use The Fund's Facilities For Concessional Financing* (March 15, 2013), *available at* http://www.imf.org/external/np/pp/eng/2013/031813a.pdf.

[6]    Percentages calculated based on data available at World Bank, World Development Indicators, *available at* http://databank.worldbank.org (last visited July 22, 2013).

[7]    As of December 31, 2011, France had a total exposure of EUR 7 billion (including outstanding principal, overdue amounts, and penalty interest but excluding guarantees not called) to the 72 countries eligible to use the IMF's concessional financing window. As of the same date, France's

16

entities make lending decisions on the assumption that loans extended will be repaid by the borrower. In line with customary banking practice, France assesses the probability of default and loss given default in connection with these loans. Expectations relating to any restructuring that might arise in the future are based on an assumed orderly sovereign debt restructuring, in the context of an appropriate international forum, including the Paris Club, just as expectations relating to a private borrower would be assessed in light of corporate bankruptcy law.

The injunctive remedy upheld by the Court of Appeals, if it stands, will increase significantly the risk of default on bilateral sovereign loans extended by sovereign lenders, including France.

As a prominent official bilateral lender to sovereigns, France is concerned about the effects of granting unintended rights to hold-out creditors in sovereign debt restructuring, such as the right to block payments on restructured debt obligations, irrespective of the governing law of the restructured obligation.[8]

---

total exposure to more than 100 sovereign debtors amounted to EUR 36 billion. *See* Encours des créances de la France sur les États étrangers au 31 décembre 2011, http://www.tresor.economie.gouv.fr/5597_Encours-des-creances-de-la-France-sur-les-Etats-etrangers-au-31-decembre-2011 (last visited July 22, 2013).

[8]   The injunctive remedy upheld by the Court of Appeals has already been relied upon by plaintiffs in other pending cases. *See*, *e.g.*, Memorandum of Law of The Export-Import Bank of the Republic of China in Opposition to

17

For France, as well as other sovereign lenders, the effects of the Court of Appeals' decision could have a major impact on its policy of development aid in the form of loans. The heightened risk of default on bilateral sovereign loans extended by France, as a result of impediments to orderly sovereign restructuring, would adversely affect the external financing of sovereign borrowers, and of low-income countries in particular. Indeed, this heightened risk of default could lead to a reduction in international capital flows as a result of negative incentives for foreign lenders to extend new loans, and to an increase in the cost for borrowers of external loans driven by a higher cost of risk.

### D. Contrary To The Court Of Appeals' View, Collective Action Clauses Do Not Ameliorate The Problems Created By Its Ruling

The Court of Appeals mistakenly determined that collective action clauses "effectively eliminate the possibility of 'holdout' litigation," and that, therefore, the deleterious effects of its decision would not impact future sovereign restructurings because most sovereign bonds now contain such clauses. *See NML Capital*, 699 F.3d at 264. To the contrary, the Court of Appeals' decision actually empowers hold-out creditors to threaten orderly sovereign debt restructurings, notwithstanding

Grenada's Motion for Judgment on the Pleadings Dismissing Plaintiff's Complaint and in Support of Ex-Im Bank's Cross-Motion for Judgment on the Pleadings, at 14, 23, *Export-Import Bank of the Republic of China v. Grenada*, Case No. 13 Civ. 1450 (HB) (S.D.N.Y. May 9, 2013) (ECF No. 18).

18

the prevalence of collective action clauses in inter-national bond issues.

Collective action clauses allow a defined major-ity of holders of a bond series to bind other holders of that series to a restructuring of that series. In a limited number of cases, aggregation clauses—allowing a defined majority of holders to bind *all* holders of bonds issued by a sovereign and not just one series of bonds—may be included.

The Court of Appeals was incorrect to surmise that the problem of hold-out creditors is resolved by collective action clauses, and that, in this respect, "it is highly unlikely that in the future sovereigns will find themselves in Argentina's predicament." *NML Capital*, 699 F.3d at 264.

First, collective action clauses are not universal in sovereign bonds. Even if the clauses were uni-versal in recently issued bonds, older classes of bonds would still exist without the benefits of such clause.

Second, the collective action clauses in most international bonds do not have aggregation clauses and therefore, hold-out creditors can buy up small issues to block a resolution of a defined class of instruments. IMF Report at 28.

Third, collective action clauses have had mixed results in past restructurings and may therefore offer significantly less contractual certainty than posited by the Court of Appeals. *See* Jeromin Zettelmeyer et al., *The Greek Debt Exchange: An Autopsy* (September 11, 2012) at 26, 33-34, *avail-able at* http://papers.ssrn.com/sol3/papers.cfm? abstract_id=2144932; Das et al., at 44-45. In some restructurings, collective action clauses did not

19

prevent serious hold-out problems. *See*, *e.g.*, Das
et al., at 45 (noting the cases of Dominica in 2004
and Argentina in 2005). Thus, a collaborative pro-
cess among different classes of creditors—bank,
state and bondholders—remains crucial for suc-
cessful restructurings.

The largest-ever sovereign debt restructuring, of
Greek public debt in 2012, has been cited by
respondents as an example where hold-out credi-
tors did not have a detrimental effect on voluntary
restructuring.[9] This is not accurate, as free-rider,
hold-out creditors actually blocked the restruc-
turing of certain classes of Greece's external debt.
Of thirty-six bonds governed by foreign (English)
law containing collective action clauses that were
eligible to participate in the debt exchange, only
seventeen bonds were able to be successfully
restructured using collective action clauses. IMF
Report at 28. Hold-out creditors prevented the
operation of the collective action clauses in the
remaining bonds, amounting to approximately
EUR 6.5 billion in un-restructured claims, or
thirty percent of the total value of bonds governed
by foreign law. *Id.*

---

[9]    *See* Joint Response Brief of Plaintiffs-Appellees NML
Capital, Ltd. and Olifant Fund, Ltd. at 39, *NML Capital,
Ltd. v. Republic of Argentina*, No. 12-0105-cv(L) (2d Cir. Jan.
25, 2013) (ECF No. 821), 2013 WL 388621 at *39. *But see*
Zettelmeyer et al., at 26 (discussing the limitations of using
bond-by-bond collective action clauses, as well as the impor-
tance of having a stock of debt governed by domestic law,
which can unilaterally be used to change the terms of such
bonds).

20

Thus, the injunctive remedy affirmed by the Court of Appeals constitutes a strong disincentive for bondholders to participate in restructuring, if the creditor is holding a New York law-governed bond and can seek full payment with the aid of an injunction, and the Court of Appeals was incorrect in its view that collective action clauses ameliorate the problem.

21

## CONCLUSION

For the foregoing reasons, the petition for a writ of *certiorari* should be granted and the Court of Appeals' decision should be reversed.

Respectfully submitted,

ANDREW RHYS DAVIES
    (*Counsel of Record*)
MOLLY C. SPIECZNY
MICHAEL WESTFAL
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile:  (212) 610-6399
andrew.rhys.davies@allenovery.com

DIANA BILLIK
ALLEN & OVERY LLP
52 Avenue Hoche
CS90005
75379 Paris Cedex 08
France

*Attorneys for Amicus Curiae*

July 26, 2013

# EXHIBIT F

No. 12-1494

Iɴ ᴛʜᴇ

# Supreme Court of the United States

REPUBLIC OF ARGENTINA

*Petitioner,*

*v.*

NML CAPITAL, LTD., *et al.,*

*Respondents.*

Oɴ Pᴇᴛɪᴛɪᴏɴ ғᴏʀ ᴀ Wʀɪᴛ ᴏғ Cᴇʀᴛɪᴏʀᴀʀɪ ᴛᴏ ᴛʜᴇ
Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Cᴏᴜʀᴛ ᴏғ Aᴘᴘᴇᴀʟs ғᴏʀ ᴛʜᴇ Sᴇᴄᴏɴᴅ Cɪʀᴄᴜɪᴛ

## BRIEF OF *AMICUS CURIAE*
## THE EXCHANGE BONDHOLDER GROUP
## IN SUPPORT OF PETITIONER

Sᴇᴀɴ F. O'Sʜᴇᴀ
Mɪᴄʜᴀᴇʟ E. Pᴇᴛʀᴇʟʟᴀ
Dᴀɴɪᴇʟ M. Hɪʙsʜᴏᴏsʜ
Aɴᴅʀᴇᴡ B. Nɪᴄᴋ
O'Sʜᴇᴀ Pᴀʀᴛɴᴇʀs LLP
    521 Fifth Avenue,
    25th Floor
    New York, New York 10175
    (212) 682-4426

Dᴀᴠɪᴅ Bᴏɪᴇs
    *Counsel of Record*
Dᴀᴠɪᴅ A. Bᴀʀʀᴇᴛᴛ
Bᴏɪᴇs, Sᴄʜɪʟʟᴇʀ & Fʟᴇxɴᴇʀ LLP
    333 Main Street
    Armonk, New York 10504
    (914) 749-8200
    dboies@bsfllp.com

*Counsel for Amicus Curiae*



*i*

**TABLE OF CONTENTS**

*Page*

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . ii

INTEREST OF *AMICUS CURIAE* . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   I.　THE INJUNCTIONS ARE BARRED
　　　BY THE FSIA . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   II.　THE COURTS BELOW EXCEEDED
　　　THEIR EQUITABLE POWERS IN
　　　GRANTING INJUNCTIVE RELIEF
　　　AND SPECIFIC PERFORMANCE. . . . . . . . . 5

   III. THE INJUNCTIONS VIOLATE THE
　　　EBG'S FIFTH AMENDMENT RIGHTS . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

APPENDIX A — LIST OF MEMBERS OF EBG . . . 1a

*ii*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Af-Cap, Inc. v. Republic of Congo,*
    462 F.3d 417 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . .5

*Chi., St. Paul, Minn. & Omaha Ry. Co. v.*
    *Holmberg,*
    282 U.S. 162 (1930). . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Gen. Bldg. Contractors Assoc., Inc. v.*
    *Pennsylvania,*
    458 U.S. 375 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Grupo Mexicano de Desarrollo S.A. v.*
    *Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Hawaii Housing Auth. v. Midkiff,*
    467 U.S. 229 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Kelo v. City of New London,*
    545 U.S. 469 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Me. Educ. Ass'n Benefits Trust v. Cioppa,*
    695 F.3d 145 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . .11

*Mo. Pac. Ry. Co. v. Nebraska,*
    164 U.S. 403 (1896). . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Nat'l Grid P.L.C. v. Republic of Argentina,*
    No. 09-CV-00248(RBW) (D.D.C. Feb. 6, 2009) . . . . .7

*iii*

### Cited Authorities

*Page*

*Nemer Jeep-Eagle, Inc. v.*
  *Jeep-Eagle Sales Corp.,*
  992 F.3d 430 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . .7

*Palazzolo v. Rhode Island,*
  533 U.S. 606 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Peterson v. Islamic Republic of Iran,*
  627 F.3d 1117 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . .8

*Republic of Mexico v. Hoffman,*
  324 U.S. 30 (1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*Shelly v. Kraemer,*
  334 U.S. 1 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Stop the Beach Renourishment, Inc. v.*
  *Fla. Dep't of Envt'l Prot.,*
  130 S. Ct. 2592 (2010). . . . . . . . . . . . . . . . . . . . . . .10, 11

*Thompson v. Consol. Gas Utils. Corp.,*
  300 U.S. 55 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*U.S. Trust Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*United States v. Philip Morris USA Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . .6

*Whiteman v. Dorotheum GmbH & Co.,*
  431 F.3d 57 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . .5

*iv*

## Cited Authorities

*Page*

**Statutes and Other Authorities**

28 U.S.C. § 1602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 3, 5

28 U.S.C. § 1609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

28 U.S.C. § 1610(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

28 U.S.C. § 1610(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Awards, ICSID Case Nos. ARB/97/3; ARB/01/8; RB/01/12; ARB/02/1; ARB/03/15; ARB/03/23; ARB/07/17, available at http://italaw.com . . . . . . . . . .7

Camila Russo, *Argentine Bonds Fall as S&P Cuts Rating After U.S. Court Ruling*, Bloomberg, Oct. 31, 2012, available at http://www.bloomberg.com/news/2012-10-31/argentine-bonds-fall-as-s-p-cuts-rating-after-u-s-court-ruling.html . . . . . . . .10

Financial Times Beyondbrics Blog, "*Argentina: one debt-pile down, many more to go,*" Ian Mount, July 31, 2012, http://blogs.ft.com/beyond-brics/2012/07/31/argentina-one-debtpile-down-many-more-to-go/#axzz2JEHCHI1d) . . . . . . .7

H. Fox, "International Law and the Restraints on the Exercise of Jurisdiction by National Courts of States," in M. Evands, ed., *International Law*, 364 (2003) . . . . . . . . . . . . . .5

*v*

*Cited Authorities*

*Page*

Monetary Market from 8th to 12th of July,
CENT. BANK OF ARG. (July 25, 2013),
http://www.bcra.gov.ar/pdfs/polmon/
infomondiai.pdf (last visited July 25, 2013).........8

*Repsol files int'l complaint on Argentina YPF
takeover*, Reuters, Dec. 3, 2012, http://www.
reuters.com/article/2012/12/03/argentina-
repsolidUSL1E8N36H92012 1203) ...............7

Republic of Argentina, Annual Report
(Form 18-K) (Sept. 30, 2011), available at
http://www.sec.gov/Archives/edgar/
data/914021/000090342311000486/
roa-18k_0928.htm.........................4-5, 7

World Bank Finances, IBRD: Summary of Current
Loans for Argentina, June 30, 2013, available
at http://finances.worldbank.org/countries/
Argentina; Fullfact.org, "*Does Argentina Owe
the UK $225 million?*" Owen Spottiswoode,
June 8, 2012, http://fullfact.org/factchecks/does_
argentina_owe_the_uk_225_million-27390 ......7-8

1

### INTEREST OF *AMICUS CURIAE*

The Exchange Bondholder Group ("EBG") consists of third-party creditors of the Republic of Argentina (the "Republic") whose rights to receive payments on over $1.5 billion in lawful debt obligations are threatened with confiscation under the decision below.[1] The EBG holds Exchange Bonds issued by the Republic and to date has received full and timely payments pursuant to their contractual terms.[2] However, in an effort to compel the Republic to make payments on separate FAA Bonds on which the Republic defaulted in 2001, the court of appeals affirmed Injunctions that condition any further payments to the EBG under the Exchange Bonds on the Republic's willingness to pay respondents on their defaulted FAA Bonds. These unprecedented Injunctions effectively hold the EBG hostage for the sole benefit of the respondent FAA Bondholders. If the Injunctions are allowed to stand, they will have massively adverse financial effects on the EBG, other holders of Exchange Bonds and the broader international sovereign debt market.

The EBG joins in the arguments set forth in the Republic's Petition for a Writ of Certiorari (the "Petition"),

---

1. The EBG's members are listed in Appendix A. Letters from counsel of record for all parties consenting to the filing of this brief are on file with the Clerk. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amicus curiae*, its members, or its counsel made a monetary contribution to the brief's preparation or submission.

2. Capitalized terms not defined herein shall have the meanings ascribed to them in the Petition.

2

but makes this independent submission to emphasize additional points of particular concern to third-party bondholders.[3]

## SUMMARY OF ARGUMENT

The Injunctions are an unprecedented violation of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, in that a United States court is attempting to coerce another nation to use its sovereign property in a manner forbidden by that country's own law. *See* Pet. at 19-28. The Injunctions also exceed the boundaries of a federal court's equitable powers and amount to an unconstitutional deprivation of the EBG members' property rights under the Fifth Amendment.[4] *See* Pet. at 28-34. Because the decision below threatens to trigger a default by the Republic on $24 billion in sovereign debt obligations; infringes upon the property rights of innocent third parties, including the EBG; and impermissibly interferes with the foreign relations of the United States, this Court should grant the Petition and vacate the Injunctions.

---

3.  The court of appeals granted the EBG permission to intervene as Non-Party Appellants for purposes of challenging orders of the district court that were entered in November 2012 after, and in response to, the decision that is the subject of the instant Petition. Appeals by multiple parties, including petitioner and the EBG, from the November 2012 district court orders are currently sub judice in the court of appeals.

4.  As noted by *amicus curiae* Euro Bondholders, the Injunctions also undermine a necessary global mechanism for accomplishing sovereign debt restructurings. The EBG joins in the arguments presented in the Euro Bondholders' *amicus* brief.

3

## ARGUMENT

## I.  THE INJUNCTIONS ARE BARRED BY THE FSIA

The Injunctions' express purpose is to coerce the Republic to comply with its payment obligations to respondents. Pet. App. A at 32 (THE COURT: "[N]obody really has any hope that the Republic will honestly honor its obligations without some unusual mechanisms. That's why this is being done."). They seek to do so by prohibiting the Republic from using its sovereign assets to make contractually mandated payments to Exchange Bondholders without first tendering a "ratable payment" to FAA Bondholders. According to the court of appeals, this "do[es] not operate as [an] attachment[] of foreign property prohibited by the FSIA" because "compliance with the Injunctions would not deprive Argentina of control over any of its property." *Id.* In fact, the Injunctions either require the Republic to pay the FAA Bondholders in violation of its domestic law (and its sovereign policy decision), or require it to refrain from paying the Exchange Bondholders in contravention of New York law (and its sovereign policy decision). Under either scenario, the Republic is being "deprive[d] . . . of control over . . . its property." *Id.* This violates the FSIA, which renders the property of foreign nations "immune from attachment arrest and execution" unless it is located in the United States and used here for commercial activity. *See* 28 U.S.C. §§ 1609, 1610(a), 1610(d) (Pet. App. Z, AA at 295, 298); *see also* Pet. App. A at 32 n.13 (defining "attachment," "arrest," and "execution"); Pet. at 22-28.

4

The court of appeals' insistence that the Republic can make payments on the FAA Bonds also is unfounded. The Republic has not made any payments on the FAA Bonds since its default in 2001. Nor can it; as the court of appeals itself elsewhere recognized, the Lock Law "preclud[es] [Argentine] officials from paying defaulted bondholders." Pet. at 27. It is also clear the Republic has no interest in changing its law: petitioner's counsel informed the Second Circuit that the Republic's "public policy" remains "firm[ly]" opposed to making payment on the FAA Bonds. Pet. App. BB at 312. And respondents' counsel quoted several of the Republic's highest officials as affirming that the Republic would comply with the Lock Law. Specifically, he quoted the Republic's President, Cristina Fernández de Kirchner, as saying she would not pay "one dollar" to respondents; and quoted the Republic's Minister of Economy as saying "We are never going to pay the vulture funds [i.e., respondents] . . . it doesn't matter what the courts of the United States say, we are never going to do that." *Id.* at 341.

Absent action by this Court, the Republic's inability to make payments on the FAA Bonds is certain to result in a *de facto* attachment of the Republic's property, *see* Pet. at 26-28, likely triggering a catastrophic default on *$24 billion* in continuing obligations to Exchange Bondholders. Pet. App. BB at 370 (petitioner's counsel acknowledging that "[t]he way the [I]njunctions stand, the money can't get to the [E]xchange [B]ondholders."). This would be a particularly unfair result because the Exchange Bonds were issued at discounts of over 70 cents on the dollar under the exchange offers that made possible the Republic's economic revival over the past decade. *See* Republic of Argentina, Annual Report (Form 18-K), at 16

5

(Sept. 30, 2011), *available at* http://www.sec.gov/Archives/
edgar/data/914021/000090342311000486/roa-18k_0928.
htm.

A default also would have catastrophic consequences
for the Republic's economy and access to capital, and likely
would trigger a severe crisis in United States-Argentina
relations. *See* US Br. at 29 (noting the importance of
recognizing the "strongly held view of many foreign
states that they are not subject to coercive orders of U.S.
courts" and urging that no "injunction or order for specific
performance be directed by a national court against a
foreign State on pain of penalty if not obeyed.") (quoting
H. Fox, "International Law and the Restraints on the
Exercise of Jurisdiction by National Courts of States,"
in M. Evands, ed., *International Law*, 364, 371 (2003)).[5]

## II. THE COURTS BELOW EXCEEDED THEIR EQUITABLE POWERS IN GRANTING INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE

The Injunctions also exceed the scope of a federal
court's equitable powers, for three reasons. First, as
explained in the Petition, the Injunctions attempt to

---

5. The courts should defer to the views of the United States
regarding the foreign policy implications of particular exercises
of jurisdiction under the FSIA. *See, e.g., Af-Cap, Inc. v. Republic
of Congo*, 462 F.3d 417, 428 n.8 (5th Cir. 2006); *Whiteman v.
Dorotheum GmbH & Co.*, 431 F.3d 57, 69-74 (2d Cir. 2005); *see also
Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) (in cases
touching upon foreign sovereignty, "the judicial department of this
government follows the action of the political branch, and will not
embarrass the latter by assuming an antagonistic jurisdiction").

6

compel payment of a past due debt—a purely legal claim capable of redress by money damages—through the use of an equitable remedy. *See* Pet. at 28-34. Because such a remedy was "unknown to equity jurisprudence" at the time of the Judiciary Act of 1789, the courts below were without power to order it. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999).

Second, the Injunctions impermissibly infringe the rights of innocent third parties in violation of the most fundamental principles of equity. The courts below expressly acknowledged and intended that the Injunctions would use the Republic's need to preserve its market standing by paying the Exchange Bondholders as leverage to coerce the Republic to pay respondents. Yet in practical effect, the Injunctions are virtually certain to block payments under the Exchange Bonds. However laudable the lower courts' objectives, the interests of the innocent third-party Exchange Bondholders cannot be jeopardized for this purpose. *See, e.g., Gen. Bldg. Contractors Assoc., Inc. v. Pennsylvania*, 458 U.S. 375, 399-400 (1982) (invalidating injunction requiring co-defendants who were not found liable to incur expenses); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1141-42, 1144 (D.C. Cir. 2009) (vacating injunction in RICO context because it caused "a potentially serious detriment to innocent persons not parties . . . or otherwise heard" by threatening them with loss of substantial revenue).

Third, the Injunctions purport to direct specific performance of the *pari passu* clause in the FAA Bond indenture, even though such specific performance may be ordered only when "plaintiff and defendant are each

7

able to continue performing their parts of the agreement"
at issue. Pet. App. A at 30 n.12 (quoting *Nemer Jeep-
Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.3d 430, 433
(2d Cir. 1993)). The court of appeals concluded, without
explanation, that there was "no dispute" the Republic
could perform its obligations under the FAA Bonds. *Id.*
The Second Circuit itself, however, recognized elsewhere
that any payments on the FAA Bonds were expressly
forbidden by the Republic's Lock Law.[6] *Id.* at 25, 27.

---

6.  It is doubtful that the Republic is even capable of paying
its outstanding obligations on the FAA Bonds. According to the
Petition, there is approximately *$6 billion* in claims and judgments
outstanding on defaulted FAA Bonds (not including this case), as
well as approximately *$11.2 billion* in defaulted and untendered
debt outstanding—a figure that increases to over *$15 billion* with
the inclusion of penalty interest. Pet. at 11 n.8. Separately, the
Republic has liabilities of approximately *$10 billion* to the Paris
Club (Financial Times Beyondbrics Blog, *"Argentina: one debt-pile
down, many more to go,"* Ian Mount, July 31, 2012, http://blogs.
ft.com/beyond-brics/2012/07/31/argentina-one-debtpile-down-
many-more-to-go/#axzz2JEHCHI1d); approximately *$1 billion*
in outstanding ICSID and UNCITRAL arbitration awards and
interest (*see* Awards, ICSID Case Nos. ARB/97/3; ARB/01/8;
RB/01/12; ARB/02/1; ARB/03/15; ARB/03/23; ARB/07/17, available
at http://italaw.com*; Nat'l Grid P.L.C. v. Republic of Argentina*,
No. 09-CV-00248(RBW), (D.D.C. Feb. 6, 2009), ECF No. 1-2);
and *$23.6 billion* in pending ICSID arbitrations (*see* Republic of
Argentina, Form 18-K, Sept. 30, 2011, 190, http://www.sec.gov/
Archives/edgar/data/914021/000090342311000486/roa-18k_0928.
htm; *Repsol files int'l complaint on Argentina YPF takeover*,
Reuters, Dec. 3, 2012, http://www.reuters.com/article/2012/12/03/
argentina-repsolidUSL1E8N36H92012 1203). The Republic also
owes over *$5.8 billion* to the World Bank and approximately *$10.6
billion* to the Inter-American Development Bank. World Bank
Finances, IBRD: Summary of Current Loans for Argentina, June
30, 2013, available at http://finances.worldbank.org/countries/

8

The Republic's inability to perform under the FAA Bonds should have foreclosed any specific performance order. Because the courts below overlooked this fundamental limitation on their equitable powers and promulgated Injunctions with which compliance would be unlawful, the Republic has been placed in an impossible situation. Enjoined from making scheduled payments on the Exchange Bonds without simultaneously making payments on the FAA Bonds that are forbidden by its own law, the Republic will be forced to choose between a $24 billion default and attempting to repeal the Lock Law—a product of its democratic processes—at the command of a United States court. As the Government has noted, the Injunctions are "particularly likely to raise foreign relations tensions" by "dictating to a sovereign state the implementation of its sovereign debt policy within its own territory." *See* US. Br. at 29; *cf. Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1128 (9th Cir. 2010) ("In light of the special sensitivities implicated by executing against foreign state property, courts should proceed carefully in enforcement actions against foreign states.").

---

Argentina; Fullfact.org, "*Does Argentina Owe the UK $225 million?*" Owen Spottiswoode, June 8, 2012, http://fullfact.org/factchecks/does_argentina_owe_the_uk_225_million-27390. Thus, the Republic has outstanding liabilities of over $21 billion on the FAA Bonds and over $50 billion in additional indebtedness, against central bank reserves of less than $37.5 billion (of which only approximately $23.5 billion is available taking into account foreign denominated private sector loans, deposits, and foreign lines of credit). *See* Monetary Market from 8th to 12th of July, CENT. BANK OF ARG. (July 25, 2013), http://www.bcra.gov.ar/pdfs/polmon/infomondiai.pdf (last visited July 25, 2013).

9

### III. THE INJUNCTIONS VIOLATE THE EBG'S FIFTH AMENDMENT RIGHTS

Even if equity could abide the unprecedented Injunctions at issue (and it cannot), the Injunctions are prohibited by the Constitution. As demonstrated above, the Injunctions seek to use the Exchange Bondholders' property for the private benefit of respondents. As a result, they violate the Due Process Clause of the Fifth Amendment.

Like all contractual rights, the Exchange Bondholders' rights to payment constitute "property" under the Fifth Amendment. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n. 16 (1977) ("Contract rights are a form of property."). And "it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); s*ee Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand . . . scrutiny . . . ; it would serve no legitimate purpose of government and would thus be void.").

Indeed, state action[7] placing any significant encumbrance on the private property of one person for the

---

7.  Judicial orders can (and often do) constitute "state action" for purposes of Constitutional provisions limiting governmental power. *See, e.g., Shelly v. Kraemer*, 334 U.S. 1, 18 (1948) ("[F]rom the time of the adoption of the Fourteenth Amendment until the present, it has been the consistent ruling of this Court that the action of the States to which the Amendment has reference includes action of state courts and state judicial officials… [I]t has never been suggested that state court action is immunized . . . simply because the act is that of the judicial branch of the state government.").

10

private use of another is a core violation of fundamental due process rights.[8] *See Thompson v. Consol. Gas Utils. Corp.*, 300 U.S. 55, 76-80 (1937) (invalidating administrative order requiring certain private gas producers to curtail production and purchase the resulting shortfall from other private gas producers who had no available market).[9] Further—even leaving aside this Court's long-standing recognition of an unqualified Constitutional prohibition against governmental action that conscripts the property of private citizens into the service of the private property rights of other citizens—such conduct cannot survive even minimal scrutiny: "[A] judicial decision that eliminates or substantially changes established property rights, which are a legitimate expectation of the owner, is 'arbitrary or irrational' under the Due Process Clause." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envt'l Prot.*, 130 S. Ct. 2592, 2615 (2010) (Kennedy, J., concurring).

---

8.  Evidence from the market proves that the Exchange Bondholders' property is encumbered by the Injunctions—Exchange Bond prices have plummeted in the wake of the Second Circuit's decision. *See, e.g.,* Camila Russo, *Argentine Bonds Fall as S&P Cuts Rating After U.S. Court Ruling*, Bloomberg, Oct. 31, 2012, *available at* http://www.bloomberg.com/news/2012-10-31/argentine-bonds-fall-as-s-p-cuts-rating-after-u-s-court-ruling.html.

9.  *See also Chi., St. Paul, Minn. & Omaha Ry. Co. v. Holmberg*, 282 U.S. 162, 166-67 (1930) (vacating on due process grounds order requiring railroad to build underground pass for benefit of private landowners); *Mo. Pac. Ry. Co. v. Nebraska*, 164 U.S. 403, 417 (1896) (vacating on due process grounds order requiring railroad to allow private party to construct elevator on its property for private use).

11

The courts below recognized the inevitable impact of the Injunction on the Exchange Bondholders' property rights, as well as the lack of supporting legal authority. *See* Pet. App. M at 172 (THE COURT: "I think that I cannot interfere with the rights of the exchange offers by putting conditions or impediments on them."); *see also id.* at 161 (counsel for respondent NML explaining that the Injunctions would require "payments to be made to the NML Bondholders as a condition of payments to the exchange bondholders"). Nonetheless, the district court, with approval from the court of appeals, deliberately fashioned an injunctive remedy expressly designed to use the Exchange Bondholders' property as a fulcrum to collect an ordinary contract debt for respondents. *See id.* at 203 (counsel for respondent NML asserting that if the Injunctions are issued "Argentina is going to pay the exchange bondholders because it cannot afford not to… But what it will also do is … pay the NML bondholders"). The Injunctions thus would impose substantial burdens on the Exchange Bondholders' otherwise unconditional property rights, thereby effecting an unlawful, irrational and arbitrary deprivation of private property for ***private***, not public, purposes.[10]

---

10.  Alternatively, and under similar principles, the Injunctions constitute an impermissible "judicial taking." *See Stop the Beach*, 130 S. Ct. 2592 (plurality recognizing cause of action for judicial taking). Although the Injunctions do not seize the Exchange Bondholders' property outright, their practical effect inevitably will be, at a minimum, a "significant restriction . . . placed upon [the] use of [their] property—" clearly a "taking." *Me. Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("[T]here will be instances when government actions . . . affect and limit [property] use to such an extent that a taking occurs.").

# EXHIBIT G

No. 12-1494

In the

# Supreme Court of the United States

—◆❘❙◆—

THE REPUBLIC OF ARGENTINA,

*Petitioner,*

v.

NML CAPITAL, LTD., *et al.*,

*Respondents.*

_____

ON PETITION FOR A WRIT OF CERTIORARI TO
THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

## BRIEF OF *AMICUS CURIAE* FINTECH ADVISORY INC. IN SUPPORT OF PETITIONER

VINCENT T. CHANG
  *Counsel of Record*
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Attorneys for Amicus Curiae
  Fintech Advisory Inc.*

i

## QUESTIONS PRESENTED

1.   Does an injunction which restrains a trustee from distributing funds held in trust for a bondholder constitute a judicial taking within the meaning of *Stop the Beach Renourishment v. Florida Department of Environmental Protection*, 560 U.S. 2592 (2010) when the injunction contravenes the bondholder's established property rights to funds held by the trustee?

2.   Does an injunction which broadly covers non-parties including the trustee, various clearinghouses and other financial participants violate the rule in *Zenith Radio v. Hazeltine Research*, 395 U.S. 100 (1969) when the enjoined non-parties were afforded no right to meaningfully participate in the proceedings leading to the injunction and when the injunction covers purported aiders and abettors who engaged in nothing more than routine financial transactions pursuant to pre-existing contracts?

iii

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................... v

STATEMENT OF INTEREST ................................ 1

STATEMENT OF THE CASE ............................... 2

SUMMARY OF ARGUMENT................................ 5

ARGUMENT ............................................................ 7

  I.   By Limiting the Exchange Bondholders'
       Right to Payment From The Trustee
       and Other Participants, The Injunction
       Effected A Judicial Taking .......................... 7

      A.  The Injunction Violates the
           Fifth Amendment.................................... 9

      B.  The Injunction Contravenes Clearly
           Established Property Rights .................. 12

 II.  The Injunction Impermissibly Affects
      The Rights of Innocent Non-Parties ........... 15

      A.  The Injunction Cannot Be Enforced
           Against Non-Parties, As They Have
           Not Had Their Day in Court .................. 16

      B.  There Is No Basis To Enjoin The
           Players In The Payment Process ........... 19

CONCLUSION ....................................................... 22

v

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Alemite Mfg. Corp. v. Staff,*
    42 F.2d 832 (2d Cir. 1930) ................................... 18

*Ascom Hasler Mailing Sys., Inc. v.*
    *U.S. Postal Serv.,*
    815 F. Supp. 2d 148 (D.D.C. 2011) ................ 12-13

*Brown v. J.P. Morgan & Co., Inc.,*
    265 A.D. 631, 40 N.Y.S. 2d 229
    (1st Dep't 1943) *aff'd,* 295 N.Y. 867,
    67 N.E.2d 263 (1946) ........................................... 14

*Central Bank of Denver v. First Interstate Bank,*
    511 U.S. 164 (1994) ............................................. 19

*Chase National Bank v. City of Norwalk,*
    291 U.S. 431 (1934)............................................. 18

*Chicago, St. Paul, Minn. & Omaha*
    *Railway Co. v. Holmberg,*
    282 U.S. 162 (1930)............................................. 12

*Cienega Gardens v. United States,*
    331 F.3d 1319 (Fed. Cir. 2003) ........................... 13

*Eastern Enterprises v. Apfel,*
    524 U.S. 498 (1998)............................................. 11

*E.A. Renfroe & Co. Inc. v. Moran,*
    338 Fed. App'x 836 (11th Cir. 2000) ................... 21

*EM Ltd. v. Republic of Argentina,*
    865 F. Supp. 2d 415 (S.D.N.Y. 2012) ................. 20

*First English Evangelical Church of Glendale v.*
    *County of Los Angeles, California,*
    482 U.S. 304 (1987)............................................. 11

*G&C Merriam Co. v. Webster*
  *Dictionary Co., Inc.,*
    639 F.2d 29 (1st Cir. 1980) .................................. 17

*Hansberry v. Lee,*
    311 U.S. 32 (1940) .............................................. 16

*Hawaii Housing Auth. v. Midkiff,*
    467 U.S. 229 (1984) ............................................. 12

*Herrlein v. Kanakis,*
    526 F.2d 252 (7th Cir. 1975) ........................ 17, 20

*Heyman v. Kline,*
    444 F.2d 65 (2d Cir. 1971) ................................. 21

*Hitchman Coal & Coke Co. v. Mitchell,*
    245 U.S. 229 (1917) ............................................. 16

*Hodel v. Irving,*
    481 U.S. 704 (1987) ............................................. 10

*In re Sharp Int'l Corp.,*
    403 F.3d 43 (2d Cir. 2005) ................................. 20

*Kaiser Aetna v. United States,*
    444 U.S. 164 (1979) ............................................. 10

*Kelo v. City of New London,*
    545 U.S. 469 (2005) ........................................ 11, 12

*Lake Shore Asset Mgmt. v. CFTC,*
    511 F.3d 762 (7th Cir. 2007) ............................. 17

*Lynch v. United States,*
    292 U.S. 571 (1934) ............................................. 13

*Me. Educ. Ass'n Benefits Trust v. Cioppa,*
    695 F.3d 145 (1st Cir. 2012) ............................. 10

*Microsystems Software Inc. v. Scandinavia Online AB,*
   226 F.3d 35 (1st Cir. 2000) ................................. 21

*Missouri Pac. Ry. Co. v. Nebraska Bd. of Trans.,*
   164 U.S. 403 (1896)............................................. 12

*NML Capital, Ltd., et al. v. The Republic of Argentina,*
   No. 08-cv-06978 (TPG), 2012 WL 5895784
   (S.D.N.Y. Nov. 21, 2012)....................................... 4

*NML Capital, Ltd., et al. v. The Republic of Argentina,*
   699 F.3d 246 (2d Cir. 2012) .............................. 3, 4

*Nollan v. California Coastal Comm'n,*
   483 U.S. 825 (1987)............................................. 11

*Palazzolo v. Rhode Island,*
   533 U.S. 606 (2001)............................................. 11

*Parker v. Ryan,*
   960 F.2d 543 (5th Cir. 1992) .............................. 21

*Regal Knitwear Co. v. NLRB,*
   324 U.S. 9 (1945)................................................ 17

*Richards v. Jefferson County,*
   517 U.S. 793 (1996)............................................. 16

*Ridge Line, Inc. v. United States,*
   346 F.3d 1346 (Fed. Cir. 2003)........................... 11

*Rosner v. Bank of China,*
   528 F. Supp. 2d 419 (S.D.N.Y. 2007) ................. 20

*Scott v. Donald,*
   165 U.S. 107 (1897)......................................... 16-17

*Seattle-First National Bank v. Carlstedt,*
　800 F.2d 1008 (10th Cir. 1986) ............................ 19

*Shelley v. Kraemer,*
　334 U.S. 1 (1948) ................................................ 9

*Stop the Beach Renourishment, Inc. v.*
　*Florida Dep't of Envt'l Prot.,*
　130 S. Ct. 2592, 177 L. Ed. 2d 184 (2010) .......... 7, 9

*Tahoe-Sierra Preservation Council, Inc. v.*
　*Tahoe Regional Planning Agency,*
　535 U.S. 302 (2002) ............................................ 11

*Taylor v. Sturgell,*
　553 U.S. 880 (2008) ............................................ 16

*Thompson v. Consolidated Gas Utilities Corp.,*
　300 U.S. 55 (1937) .............................................. 12

*Travelhost, Inc. v. Blandford,*
　68 F.3d 958 (5th Cir. 1995) ................................ 20

*United States Fidelity & Guaranty v.*
　*McKeithen,*
　226 F.3d 412 (5th Cir. 2000) .............................. 10

*United States v. Coluccio,*
　51 F.3d 337 (2d Cir. 1995) ................................. 13

*United States v. Dickinson,*
　331 U.S. 745 (1947) ............................................ 11

*Virginia v. Rives,*
　100 U.S. 313 (1879) ............................................ 9

*Willis Mgmt. (Vt.), Ltd. v. United States,*
　652 F.3d 236 (2d Cir. 2011) ................................ 14

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
　395 U.S. 100 (1969) .......................................... 16, 17

**Rules:**

Supreme Court Rule 37.2(a) ................................... 1

Supreme Court Rule 37.6 ........................................ 1

Federal Rule of Civil Procedure 65 ........................ 19

**Other Authorities:**

D. Benjamin Barros, *The Complexities
of Judicial Takings*,
45 U. Rich. L. Rev. 903 (2011) ............................ 7

John D. Echeverria*, Stop the Beach
Renourishment: Why the Judiciary
Is Different*,
35 Vt. L. Rev. 475 (2010) ................................... 8

Michael B. Kent, Jr., *More Questions Than
Answers: Situating Judicial Takings Within
Existing Regulatory Takings Doctrine*,
29 Va. Envt'l L.J. 143 (2011) ............................. 7

William F. Fratcher, *Scott on Trust*, § 12.1 (4th
ed. 1987) ............................................................... 13

Josh Patashnik, *Bringing A Judicial
Takings Claim*,
64 Stan. L. Rev. 255 (2012) ................................ 7

Mitch L. Walter, *From Background Principles
to Bright Lines: Justice Scalia and the
Conservative Bloc of the U.S. Supreme Court
Attempt to Change the Law of Property As
We Know It*,
50 Washburn L.J. 799 (2011) ............................ 8

1

## STATEMENT OF INTEREST[1]

As a holder of Exchange Bonds[2], the interests of Fintech Advisory Inc. ("Fintech") are adversely affected by the orders of the district court and the Second Circuit, which are the subject of the Republic's petition for a *writ of certiorari*. These orders enjoin distributions of money belonging to Fintech and the Exchange Bondholders unless the Republic first pays large amounts of accelerated payments of principal and interest to a small group of holders of other bonds – Respondents herein. Fintech's separate and constitutionally protected property has been dragged into a long-term dispute between the Republic and Respondents by the Courts below in an effort to coerce the Republic to pay the Respondents. These orders do not pass constitutional muster or long-held principles of equity, and therefore cannot stand.

In recognition of the interest that third parties such as Fintech hold in this matter, on October 26, 2012 the Second Circuit required the district court on remand to consider the Injunction's application to

---

[1] Pursuant to Supreme Court Rule 37.2(a), all parties have consented to the filing of this brief. Written confirmation of such consent has been filed with the Clerk of the Court. Counsel of record for all parties received notice at least 10 days prior to the due date of *amicus curiae's* intention to file in support of Petitioner's *writ of certiorari*. In addition, pursuant to Rule 37.6, *amicus curiae* affirms that no counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

[2] All terms not defined herein are set forth below.

third parties. The district court accordingly accepted submissions from third parties, including Fintech. Thereafter, when the matter returned to it, the Second Circuit granted Fintech non-party appellant status on an appeal still pending in the Second Circuit from the district court's orders on the initial remand. Accordingly, as the Courts below here have recognized, Fintech has property interests affected by the orders of the district court and the Second Circuit as they currently stand.

## STATEMENT OF THE CASE

When the Republic of Argentina (the "Republic") issued bonds in or around 1994 (the "Original Bonds") pursuant to a Fiscal Agency Agreement, dated October 19, 1994 (the "FAA"), Fintech was among the purchasers (the "Original Bondholders"). Fintech eventually held $834 million face value of the Original Bonds. After the Republic defaulted on the Original Bonds on December 24, 2001, the Republic in 2005 and 2010 (the "2005 Exchange" or the "2010 Exchange") offered the opportunity for all Original Bondholders to exchange their defaulted bonds for new, unsecured, subordinated bonds at a substantially reduced value on which the Republic would begin making payments (the "Exchange Bonds," the holders of which are referred to as "Exchange Bondholders"). Fintech was one of the largest participants of the 2005 Exchange and ultimately surrendered the balance of its Original Bonds in the 2010 Exchange. While Fintech's Original Bonds had a face value of $834 million, after the 2005 and 2010 Exchanges, it held approximately $247 million face value of the Exchange Bonds.

3

As a holder of the Exchange Bonds, Fintech has received regular interest payments from the Republic since 2005, the monies for which Fintech understands originate in Argentina, are subsequently transferred to the Bank of New York, as Indenture Trustee (the "Trustee"), and are ultimately distributed to the Exchange Bondholders.

On October 26, 2012, the United States Court of Appeals for the Second Circuit issued an order which affirmed in part and remanded in part an order issued by the United States District Court for the Southern District of New York in *NML Capital, Ltd., et al. v. The Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) (the "October 26 Decision"). The October 26 Decision affirmed that the Republic had breached the so-called pari passu clause of the FAA, which provides that the payment obligations of the Republic "rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness." *Id.* at 259. It also affirmed the entry of permanent injunctive relief in favor of Respondents, which are among the 9% of Original Bondholders that refused to participate in the 2005 and 2010 Exchanges.

The injunction issued by the district court on February 23, 2012, which the Second Circuit affirmed in the October 26 Decision, provided that "whenever the Republic pays any amount due under the terms of the [exchange] bonds," it must "concurrently or in advance" pay plaintiffs the same fraction of the amount due to them (the "Injunction"). *Id.* at 254. The Injunction enjoined "all parties involved, directly or indirectly, in advising upon, preparing, processing, or facilitating any payment on the Exchange Bonds" unless payments were first

4

made to the Original Bondholders. *Id*. at 255. The Injunction described such parties as "Agents" and "Participants" and "prohibited [them] from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1 (c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to [Respondents]." *Id*.

In its October 26 Decision, the Second Circuit expressed "concerns about the Injunctions' application to banks acting as pure intermediaries in the process of sending money from Argentina to the holders of the Exchange Bonds," as well as concerns about "how the challenged order will apply to third parties generally," and subsequently remanded to the district court for further analysis as to the application of the Injunction to third parties.[3] *Id*. at 264. However, by affirming the district court, the Second Circuit left in place the core of its decision

---

[3] On November 21, 2012, the district court on remand issued an order enjoining any "Participant" from "aiding and abetting" violations of its order including any "effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML" (the "November 21 Order"). *See NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (TPG), 2012 WL 5895784, at *2 (S.D.N.Y. Nov. 21, 2012). "Participants" were expressly defined to include "those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds." *Id*. The November 21 Order prohibits the Trustee and such "participants" from disbursing funds rightfully owed to the Exchange Bondholders without simultaneously issuing payments to Respondents.

that it is appropriate to coerce the Republic to pay one set of creditors by interfering with the payment rights of other creditors.

Fintech's property and constitutional rights are significantly impacted by the October 26 Decision, specifically the Injunction affirmed therein which seeks to coerce the Republic to pay Respondents by holding the property of third parties, including Fintech, "hostage." Accordingly, Fintech submits its *amicus curie* brief in support of the Republic's petition for *writ of certiorari* seeking review of the remedy affirmed by the October 26 Decision.

## SUMMARY OF ARGUMENT

The Second Circuit's effort to craft a remedy to coerce the Republic to pay Respondents herein has swept broadly and ensnared the property of innocent parties such as Fintech. Fintech is one of many Exchange Bondholders which face the loss of their property as a result of the district court's unprecedented ruling which restrains the Republic and the Trustee from paying monies due to Fintech unless the Republic makes payments to other, unrelated parties on different obligations. Specifically, the October 26 Decision prevents the Republic from paying Exchange Bondholders such as Fintech unless the Republic also pays Respondents herein on other debt. The payments owed to Fintech by the Republic, however, become Fintech's property the moment the money is in the hands of the Trustee. Thus, by restricting the Trustee from paying Fintech and the other Exchange Bondholders despite the fact that they have done nothing themselves to cause such restriction, the Injunction violates the Fifth Amendment of the U.S.

Constitution as a taking of Fintech's property without due process.

Fintech's constitutionally protected property which is being taken without due process includes its contractual rights, investment expectations and the monies owed to it once in the hands of the Trustee. Moreover, the taking is impermissible as a taking of private property (belonging to the Exchange Bondholders) for the benefit of other private parties (Respondents), not the public at large. The Injunction also runs contrary to long-held precedent of this Court that prohibits an injunction from reaching parties who have not had their day in Court.

Finally, as a fundamental issue, this effort at equitable relief is entirely inequitable as to Fintech and other Exchange Bondholders. Fintech surrendered a substantial amount of money owed to it in exchange for the promise of certainty of payment on the reduced obligation of the Republic. Indeed, the Courts below specifically upheld the 2005 and 2010 Exchanges and permitted them to proceed over Respondents' efforts to enjoin same. It is difficult to fathom that the same Courts are now using the property the Exchange Bondholders received in those same Exchanges to benefit parties who refused to participate in the Exchanges. This twist in approach by the Courts below completely undermined and ignored the reasonable investment expectations of the parties who decided to participate in the Exchanges, influenced at least in part by the Courts' upholding of the Exchanges. Had this result been known to be in any way possible, Fintech would not have participated in the Exchanges; indeed, it is hard to believe that any other Original Bondholder

would have participated. Should the October 26 Decision stand, Fintech would entertain serious doubts about participating in future sovereign debt restructurings where U.S. Courts have the ability to enjoin monies belonging to the participant creditors for the benefit of holdouts. The Respondents are free to seek their remedy to obtain a judgment from the Republic; they are not, however, entitled to obtain that result by utilizing Fintech's property.

## ARGUMENT

## I.    By Limiting The Exchange Bondholders' Right to Payment From The Trustee and Other Participants, The Injunction Effected A Judicial Taking

This Court should grant the writ because this case presents an opportunity to clarify the contours of the judicial taking doctrine enunciated in *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envt'l Prot.*, 130 S. Ct. 2592, 2614-18, 177 L. Ed. 2d 184 (2010), a decision which has left the law of judicial taking unsettled and thus is ripe for clarification.[4]

---

[4] *See* Josh Patashnik, *Bringing A Judicial Takings Claim*, 64 Stan. L. Rev. 255, 259 (2012) ("as Justice Kennedy recognized in his concurring opinion, it remains 'unclear' both 'how a party should properly raise a judicial takings claim' and 'what remedy a reviewing court could enter after finding a judicial taking'") (citing *Stop the Beach*, 130 S. Ct. 2616-17); D. Benjamin Barros, *The Complexities of Judicial Takings*, 45 U. Rich. L. Rev. 903, 960 (2011) ("*Stop the Beach* dramatically raised the profile of judicial takings, but left all of the important issues open."); Michael B. Kent, Jr., *More Questions Than Answers: Situating Judicial Takings Within Existing Regulatory Takings Doctrine*, 29 Va. Envt'l L.J. 143, 146 (2011) ("the theory of judicial takings endorsed by the *Stop the Beach* plurality raises more questions than it helps to answer and, in the process, has

8

The Injunction effectuates a judicial taking of the Exchange Bondholders' property rights by prohibiting the Trustee from distributing funds belonging to the Exchange Bondholders unless the Republic simultaneously pays Respondents. Under firmly established New York law and the documents controlling the Exchange Bonds (as addressed below), the Exchange Bondholders have a property interest in these funds which are held in trust for, and must be distributed to, the Exchange Bondholders. The district court's failure to afford the non-party Exchange Bondholders due process prior to issuing the Injunction and then circumscribing their property interests constitutes a classic "judicial taking."

The Injunction has profound implications for trustees throughout the country, as well as investors who utilize and rely on the services of trustees. If, due to no conduct of its own, a beneficiary's money held in trust can be seized for purely private purposes without due process, current and future beneficiaries of such trusts correctly will perceive a threat to the safety of their funds. Such a perception could undermine the trust industry in the United States – an industry that holds trillions of dollars

---

backtracked on the promises of clarity made in *Lingle*."); Mitch L. Walter, *From Background Principles to Bright Lines: Justice Scalia and the Conservative Bloc of the U.S. Supreme Court Attempt to Change the Law of Property As We Know It (Stop the Beach Renourishment, Inc. v. Florida Department)*, 50 Washburn L.J. 799, 831 (2011) ("Unfortunately, *Stop the Beach* left much unsettled."); John D. Echeverria, *Stop the Beach Renourishment: Why the Judiciary Is Different*, 35 Vt. L. Rev. 475, 475 (2010) (describing *Stop the Beach* as a an "inconclusive outcome" resulting from "undoubtedly contentious internal debate").

in trust for beneficiaries worldwide. Moreover, if current trust arrangements are unraveled and future trust arrangements are chilled, the resulting instability could jeopardize the fixed income market worldwide.

### A. The Injunction Violates the Fifth Amendment

The Exchange Bondholders, including Fintech, have had an unfettered property and contractual right to receive payments under the Exchange Bonds, a right which they have enjoyed for the past seven years, and which is entirely separate from the Republic's obligations to Respondents under the Original Bonds. By issuing an Injunction that acts to prevent the Exchange Bondholders from receiving the payments they are owed, the district court authorized a judicial taking and "declare[d] that what was once an established right of private property no longer exists." *Stop the Beach*, 130 S. Ct. at 2602. *See also Shelley v. Kraemer*, 334 U.S. 1, 18 (1948) ("the action of the States to which the [Fourteenth] Amendment has reference includes action of state courts and state judicial officials. . . [I]t has never been suggested that state court action is immunized . . . simply because the act is that of the judicial branch of the state government.").[5]

---

[5] Judicial orders can (and often do) constitute "state action" for purposes of Constitutional provisions limiting governmental power. *See, e.g.*, *Stop the Beach*, 130 S. Ct. at 2601-02 ("It would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat. Our precedents provide no support for the proposition that takings effected by the judicial branch are entitled to special treatment, and in fact suggest the contrary.") (citation omitted); *Virginia v. Rives*, 100 U.S. 313, 318 (1879) ("It is doubtless true that a

The Injunction impermissibly limits and diminishes the Exchange Bondholders' property and contract rights. A compensable taking occurs when regulation effectively destroys "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Hodel v. Irving*, 481 U.S. 704, 716 (1987) (citation omitted) (holding that property owners were entitled to compensation where regulation destroyed their right to pass property to heirs). *See also Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) (property owner entitled to compensation where regulation destroyed their right to exclude others).

Here, restraining Fintech's right to receive payment under the Exchange Bonds from the Trustee unless Respondents receive their own claimed payments from the Republic has deprived Fintech of the most important "stick" in its bundle of rights. The practical outcome of the Injunction inevitably will be, at a minimum, a "significant restriction . . . placed upon [the Exchange Bondholders'] use of [their] property," *Me. Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012) (internal citation and quotation omitted), which is clearly a "taking." *See United States Fidelity & Guaranty v. McKeithen*, 226 F.3d 412, 416-20 (5th Cir. 2000) (holding that additional restrictions on insurance company contracts and rates were a taking even though the entirety of the insurance company's business was not affected and only

State may act through different agencies, – either by its legislative, its executive, or its judicial authorities; and the prohibitions of the [Fourteenth] amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another.").

$5 million was at stake during first year) (citing, *inter alia*, *Eastern Enterprises v. Apfel*, 524 U.S. 498, 528-29 (1998)).[6]

The writ should also be granted to establish standards as to whether judicial takings can occur without any arguable public use. Here, the Injunction deprives Fintech of its property rights without any arguable public use. To the contrary, the October 26 Order affirmed the issuance of an injunction for the sole purpose of benefiting Respondents, which consist of only 9% of the Original Bondholders. The Injunction allows Respondents to leapfrog all other bondholders and receive preferential accelerated principal and interest payments. Such a taking for a private purpose is impermissible. *See Kelo v. City of New*

---

[6] A taking may be impermissible even if it does not deprive the plaintiff of the entirety of its property rights. Here, the limitation imposed upon the Exchange Bondholders' rights rises to the level of a taking. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) (taking occurs "regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof"); *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("[T]here will be instances when government actions . . . affect and limit [property] use to such an extent that a taking occurs.") (citation omitted); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) (appropriation of an easement constitutes compensable taking); *First English Evangelical Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 318 (1987) (temporary takings no different from permanent takings); *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1353 (Fed. Cir. 2003) (appropriation of temporary flowage easement results in compensable taking). "[A] landowner's reclaiming his land does not disentitle him to be compensated for the original taking by the government." *Ridge Line*, 346 F.3d at 1354 (citing *United States v. Dickinson*, 331 U.S. 745, 751 (1947)).

12

*London*, 545 U.S. 469, 477 (2005) ("[I]t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation."); *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand . . . scrutiny . . . it would serve no legitimate purpose of government and would thus be void"). Indeed, Supreme Court authority holds that State action which places any significant imposition on the private property of one for the private use of another is a core violation of fundamental due process rights.[7]

### B. The Injunction Contravenes Clearly Established Property Rights

The Injunction constitutes a judicial taking because it "declare[d] that what was once an established right of property no longer exists." *Stop the Beach*, 130 S. Ct. at 2614-15. Fintech's contractual rights and investment expectations through its holdings of the Exchange Bonds are "property" protected by the Fifth Amendment. *See Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*,

---

[7] *See Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 76-80 (1937) (striking down state administrative order requiring majority of private gas producers to curtail desired production and purchase shortfall from minority of private gas producers with no available market); *Chicago, St. Paul, Minn. & Omaha Railway Co. v. Holmberg*, 282 U.S. 162, 166-67 (1930) (order requiring railroad to build underground pass for private benefit of private landowners violated due process); *Missouri Pac. Ry. Co. v. Nebraska Bd. of Trans.*, 164 U.S. 403, 417 (1896) (order requiring private railroad to allow private party to construct elevator on its property for private use violated due process).

13

815 F. Supp. 2d 148, 173-76 (D.D.C. 2011) (citing *Cienega Gardens v. United States*, 331 F.3d 1319, 1330 (Fed. Cir. 2003) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States"))). By taking Fintech's property as a mechanism in which to coerce the Republic to distribute payments to Respondents, the October 26 Decision contravenes Fintech's "established property rights."

The October 26 Decision affirms the issuance of an injunction solely for the benefit of Respondents, and places restraint on the parties who make payment to Fintech unless Respondents are paid. Under the governing Indenture for the Exchange Bonds, however, the Trustee, who receives funds from the Republic, holds all monies paid to it under the Indenture "in trust" for itself and the Exchange Bondholders. The beneficial owners of the Exchange Bonds, such as Fintech, hold equitable title to the Trust assets and are the "real owners" of the Trust property. *See*, *e.g.*, *United States v. Coluccio*, 51 F.3d 337, 341-42 (2d Cir. 1995) ("If she were the beneficiary of such a trust, then she would be "the equitable owner" of those funds") (citing William F. Fratcher, *Scott on Trust*, § 12.1 (4th ed. 1987)).

Thus, the funds held by the Trustee are no longer the property of the Republic, but rather belong to the Exchange Bondholders and are held by the Trustee for their benefit. As the Indenture makes clear, the Republic has "no interest whatsoever" in the monies it transfers to the Trustee for the benefit of the

14

Exchange Bondholders, and such property in the Trustee's possession belongs to the Exchange Bondholders. *See* Indenture § 3.5(a) ("such amounts shall be held in trust by the Trustee for the exclusive benefit of the Trustee and the Holders entitled thereto in accordance with their respective interests and the Republic shall have no interest whatsoever in such amounts")). Since June 2005, the Republic has effectuated regular interest payments to the Exchange Bondholders by transferring the required funds to the Trustee. Once the Trustee possesses those funds, it holds those amounts for the benefit of the Exchange Bondholders, including Fintech. Accordingly, any payments made by the Republic to the Trustee belong to the beneficial owners, the Exchange Bondholders such as Fintech, and cannot be restrained from being distributed to them in an effort to "assist" Respondents. *See Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 245 (2d Cir. 2011) (" . . . if a constructive trust properly should be imposed on particular property that was in the possession of the defendant, it was never truly the defendant's property and is not subject to forfeiture . . . "); *Brown v. J.P. Morgan & Co., Inc.*, 265 A.D. 631, 635, 40 N.Y.S. 2d 229, 233 (1st Dep't 1943) (bondholder cannot attach money in the hands of trustee for other bondholders because the money "belongs to the [other] bondholders"), *aff'd*, 295 N.Y. 867, 67 N.E.2d 263 (1946).

Accordingly, the imposition of limitations on the distribution of the Exchange Bondholders' own money in the hands of the Trustee and its agents constitutes a judicial taking because it interferes with the Exchange Bondholders' unfettered right and justified expectation to be paid irrespective of what the Republic does as to the Original Bondholders.

*See Stop the Beach*, 130 S. Ct. at 2602 (taking occurs when a court declares that "what was once an established right of private property no longer exists.").

## II.  The Injunction Impermissibly Affects The Rights of Innocent Non-Parties

The writ should also be granted so that this Court can address the issue of the extent to which court orders and injunctions can affect the rights of absent non-parties. Here, the Injunction applies to a number of non-parties, including those responsible for transferring the Exchange Bondholders' property to them. By enjoining these entities, the proper recipients of the payments, namely, the Exchange Bondholders such as Fintech, are deprived of their property rights. None of these non-parties, including Fintech, was a party in the proceedings before the district court or the Second Circuit, and none of them engaged in any discovery or had any meaningful participation in the proceedings before the district court or the Second Circuit prior to the October 26 Decision and the Injunction.

If the writ is not granted and the Second Circuit's decision is allowed to stand, routine financial transactions, undertaken pursuant to longstanding contracts, may be declared to "aid and abet" violations of law, even if the alleged aiders and abettors were not parties to the underlying litigation. Such a result effectuates, with almost no analysis, a dramatic change in existing law that would make New York a less effective place in which to engage in financial transactions.

### A. The Injunction Cannot Be Enforced Against Non-Parties, As They Have Not Had Their Day in Court

"'It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969). This principle is based on the "'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor*, 553 U.S. at 892-93 (quoting *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)). It limits the extent to which an injunction may be enforced against nonparties. *See, e.g.*, *Zenith Radio*, 395 U.S. at 112 (holding that it is "error to enter [an] injunction against" a non-party "without having made this determination in a proceeding to which the [non-party] was a party"). For example, in *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229 (1917), this Court reversed an injunction against named defendants who had not been "served with process . . . ." 245 U.S. at 234. The Court explained that because "the injunction operates only in personam, it was erroneous to include" these un-served parties "as defendants" subject to the injunction. *Id*. *See also Scott v.*

*Donald*, 165 U.S. 107, 117 (1897) ("The decree is also objectionable because it enjoins persons not parties to the suit.").[8]

Indeed, the principle that non-parties to a litigation should not be bound by an injunction is so powerful that in *Zenith Radio*, this Court struck down an injunction that attempted to cover a non-party parent of an antitrust defendant because there were no findings that the parent was an alter ego or controlled the litigation in question. So too, should the Injunction be struck down here as against the non-parties in this case. Critically, the Court made clear in *Zenith Radio* that, to be effective, any such findings would have to have been made in a proceeding in which the parent itself was a party. *See Zenith Radio*, 395 U.S. at 110 (to be bound by an injunction the non-party's rights must be "adjudged according to law").

As this Court held in *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945), the injunctive power is not "so broad as to make punishable the conduct of persons who act independently and whose rights have not

---

[8] A non-party may be bound by an injunction individually only where "it can be fairly said that he has had his day in court in relation to the validity of the injunction." *G&C Merriam Co. v. Webster Dictionary Co., Inc.*, 639 F.2d 29, 37 (1st Cir. 1980). "[W]hether a particular person . . . is among the . . . persons in active concert or participation with [the defendant] is a decision that may be made only after the person is given notice and an opportunity to be heard." *Lake Shore Asset Mgmt. v. CFTC*, 511 F.3d 762, 767 (7th Cir. 2007); *see also Herrlein v. Kanakis*, 526 F.2d 252, 255 (7th Cir. 1975) (it is a "primary axiom of our jurisprudence that no man shall be subject to judicial sanction without the opportunity for a hearing on the merits of the claim against him").

been adjudged according to law." In *Chase National Bank v. City of Norwalk*, 291 U.S. 431, 436 (1934), the Court found clearly erroneous an injunction that was directed at "all persons to whom notice of the order of injunction should come." Writing for a unanimous Court, Justice Brandeis explained that it was improper for the district court there to make punishable as contempt the conduct of persons who act independently and whose rights have not been adjudged according to the law. *See Chase*, 291 U.S. at 437. "Unless duly summoned to appear in a legal proceeding," he added, "a person not a privy [of a party] may rest assured that a judgment recovered therein will not affect his legal rights." *Chase*, 291 U.S. at 441. As Judge Learned Hand eloquently stated:

> [No] court can make a decree which will bind any one but a party; a Court of equity is as much so limited as a Court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words it decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court.

*Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930).

### B. There Is No Basis To Enjoin The Players In The Payment Process

The writ should also be granted because the Injunction appears to sweep in a host of non-parties including the Trustee, various clearinghouses, and other financial institutions, and prohibit them from "aiding and abetting" the Injunction. *See* pp. 3-4, *supra.* This expansive prohibition of "aiding and abetting," untethered to any language in Federal Rule of Civil Procedure 65, cannot be reconciled with the limitations placed on aiding and abetting liability in such cases as *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 176 (1994) (language covering all parties who directly or indirectly engage in securities fraud does not encompass aiding and abetting liability).

Such a sweeping Injunction, entered without any process afforded to the alleged aiders and abettors, also cannot be reconciled with *Regal Knitwear* and *Zenith Radio.* As set out above, the rights of non-parties can only be affected if a finding is made with respect to those nonparties in proceedings in which they were allowed to participate. Moreover, even with the proper proceedings, the label of "aiding and abetting" simply does not fit here.

First, there is the legion of cases holding that a financial institution does not aid and abet a customer when it does nothing more than provide its usual banking services. *See*, *e.g.*, *Seattle-First National Bank v. Carlstedt*, 800 F.2d 1008, 1011 n.2 (10th Cir. 1986) ("to the extent the counterclaim and amended counterclaim seek to impose aiding and abetting liability under the securities laws on SeaFirst based on routine participation in the loans to the

defendants, such claims would not satisfy Rule 9(b)")
(citations omitted); *Rosner v. Bank of China*, 528 F.
Supp. 2d 419, 427 (S.D.N.Y. 2007) (bank could not be
held liable for aiding and abetting violation when
there was "no evidence that [the bank] was doing
anything more than providing its usual banking
services to a customer"). "Financial transactions that
are not considered 'atypical' or 'non-routine' do not
constitute substantial assistance, as would be
necessary to establish aiding and abetting liability."
*In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005)
(internal citations omitted).[9]

Second, it cannot be meaningfully disputed that
the non-parties involved in making payments to the
Exchange Bondholders, such as the Trustee and the
Depository Trust & Clearing Corporation are
independent, arms-length actors that do not act on
behalf of the Republic. Each of these non-parties
seeks to meet its own contractual obligations which
are entirely separate from any obligations they may
have with the Republic. Indeed, the transfer of
monies that rightfully belong to the Exchange
Bondholders as beneficial owners of the Exchange
Bonds is a process in which Respondents have no
legal interest. *See*, *e.g.*, *EM Ltd. v. Republic of
Argentina*, 865 F. Supp. 2d 415, 423 (S.D.N.Y. 2012).

The Trustee acts solely for the benefit of the
Exchange Bondholders, and any payment to them is
distributed pursuant to the legal obligations it has to
the beneficial owners of the Exchange Bonds. In the

---

[9] *See also Travelhost, Inc. v. Blandford*, 68 F.3d 958, 965 (5th
Cir. 1995) (ruling that "an arms-length transaction and a
legitimate transfer of assets" was not a conspiracy); *Herrlein*,
526 F.2d at 254-55.

event of a default by the Republic, the Trustee's interests would become adverse to that of the Republic. Moreover, the non-party banks function as "paying agents" of the Trustee, as opposed to "agents" of the Republic. *See* Indenture ("[A]ny trustee paying agents appointed pursuant to this Indenture shall be agents solely of the Trustee, and the Republic shall have no authority over or any direct relationship with any such trustee paying agent or agents"). Finally, neither the Trustee nor the paying agents have any role in deciding whether the Republic makes a concurrent payment to Respondents. Accordingly, the Trustee and its agents cannot be said to be in "active concert" with the Republic, and its obligations upon receipt of money from the Republic run only to the Exchange Bondholders pursuant to the Indenture. *See Parker v. Ryan*, 960 F.2d 543, 546 (5th Cir. 1992) ("if a nonparty asserts an independent interest in the subject property and is not merely acting on behalf of the defendant, then Rule 65(d) does not authorize jurisdiction over the party") (citing, *inter alia, Heyman v. Kline*, 444 F.2d 65 (2d Cir. 1971)).[10]

---

[10] *See E.A. Renfroe & Co. Inc. v. Moran*, 338 Fed. App'x 836, 840 (11th Cir. 2000) ("The law is clear that a court may not enforce an injunction against a nonparty who acts independently of the enjoined party") (internal quotations and citation omitted) (holding non-party attorney's actions in delivering documents to attorney general did not constitute aiding and abetting employees who were enjoined to return documents, which would subject the attorney to contempt jurisdiction of district court for failing to comply with injunction, since attorney acted on his own and independently of enjoined employees); *Microsystems Software Inc. v. Scandinavia Online AB*, 226 F.3d 35, 43 (1st Cir. 2000) ("A nonparty who has acted independently of the enjoined defendant will not be bound by the injunction").

## CONCLUSION

For the foregoing reasons, this Court should grant the Republic of Argentina's petition for *writ of certiorari*.

Respectfully submitted,

VINCENT T. CHANG
    *Counsel of Record*
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Attorneys for Amicus Curiae*
    *Fintech Advisory Inc.*

# EXHIBIT H

No. 12-1494

IN THE

# Supreme Court of the United States

REPUBLIC OF ARGENTINA,

*Petitioner*,

—v.—

NML CAPITAL, LTD., ET AL.

*Respondents.*

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

## BRIEF FOR *AMICI CURIAE* THE EURO BONDHOLDERS IN SUPPORT OF THE REPUBLIC OF ARGENTINA'S PETITION FOR A WRIT OF CERTIORARI

CHRISTOPHER J. CLARK
*Counsel of Record*
CRAIG A. BATCHELOR
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200
christopher.clark2@lw.com

*Attorneys for* Amici Curiae
*The Euro Bondholders*

July 26, 2013

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................ii

INTEREST OF AMICI CURIAE ........................................1

I.  THE DECISION BELOW CONFLICTS
    WITH DECISIONS OF THE FIFTH AND
    D.C. CIRCUITS AND WITH THE CLEAR
    LANGUAGE OF THE FSIA.......................................2

II. THE SECOND CIRCUIT'S DECISION
    WILL IMPAIR FUTURE SOVEREIGN
    DEBT RESTRUCTURINGS, CAUSING
    SIGNIFICANT HARM FOR SOVEREIGN
    NATIONS, INCLUDING THE UNITED
    STATES, AND THEIR CITIZENS. ...........................4

CONCLUSION ...................................................................9

ii

## TABLE OF AUTHORITIES

### <u>CASES</u>

*Atwood Turnkey Drilling, Inc. v. Petroleo
Brasileiro, S.A.*,
875 F.2d 1174 (5th Cir. 1989) ..........................................2

*Autotech Tech. LP v. Integral Research & Dev.
Corp.*,
499 F.3d 737 (7th Cir. 2007) ............................................3

*Janvey v. Libyan Inv. Auth.*,
478 F. App'x 233 (5th Cir. 2012)....................................2

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) ........................................3

*Phoenix Consulting Inc. v. Republic of Angola*,
172 F.3d 920 (D.C. Cir. 1998)..........................................3

*S&S Machinery Co. v. Masinexportimport*,
706 F.2d 411 (2d Cir. 1983) ............................................2

### <u>STATUTES</u>

28 USC § 1609 ....................................................................2

28 USC § 1610(a) ..............................................................2

28 USC § 1610(d) ..............................................................2

### <u>RULES</u>

Supreme Court Rule 37.6.....................................................1

### <u>OTHER AUTHORITIES</u>

Financial Markets Law Committee Report ...........................8

1

## INTEREST OF AMICI CURIAE[1]

The Euro Bondholders are a group of investors that hold Euro-denominated bonds ("Euro Bonds") issued by the Republic of Argentina (the "Republic") in its 2005 and 2010 exchanges.[2]  The Euro Bondholders represent tens of billions of capital held in the United States and abroad, including over €1.2 billion of Euro Bonds.  The total notional amount of Euro Bonds issued by the Republic of Argentina exceeds €10 billion.  Thus, the Euro Bondholders have a substantial interest in the issues presented by this case and a unique perspective on the consequences of the Second Circuit's decision.

---

[1]    Pursuant to Supreme Court Rule 37.6, amici state that no counsel for a party authored this brief in whole or in part, and no such counsel or any party has made a monetary contribution intended to fund the preparation or submission of this brief.  No person or entity, other than the amici and their counsel, has made a monetary contribution intended to fund the preparation and submission of this brief.  Counsel of record for all parties have consented to the filing of this brief.  Letters of consent from the appropriate counsel have been submitted to the Clerk concurrently with this filing.

[2]    The Euro Bondholders consist of Knighthead Capital Management, LLC, Redwood Capital Management, LLC, Perry Capital, LLC, Silver Point Capital, LP, GoldenTree Asset Management, LP, QVT Financial, LP (each on behalf of one or more investment funds or accounts managed or advised by it), and Monarch Master Funding 2 (Luxembourg) S.à.r.l.

2

**ARGUMENT**

**I.    THE DECISION BELOW CONFLICTS WITH DECISIONS OF THE FIFTH AND D.C. CIRCUITS AND WITH THE CLEAR LANGUAGE OF THE FSIA.**

As a remedy for the Republic's purported violation of the *pari passu* clause in its bond agreements, the district court enjoined the Republic from paying its exchange bondholders unless it also paid the "holdout" bondholders that did not participate in the exchanges.   The Second Circuit's affirmance of that injunction conflicts not only with that court's own precedent, but also with decisions of the Fifth and D.C. Circuits regarding the scope of the Foreign Sovereign Immunities Act of 1976 ("FSIA").   The FSIA provides that a foreign sovereign's property is "immune from attachment arrest and execution" unless it is located in the United States and used for a commercial activity.   28 USC §§ 1609, 1610(a), 1610(d).   This Court should grant certiorari to resolve this circuit split regarding the application of the FSIA.

The injunction violates the FSIA in two ways.   First, the Second Circuit improperly attempted to "grant, by injunction, relief which [it] may not provide by attachment." *S & S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983).   Because the Republic is a sovereign, its property is immune from attachment under the FSIA and, under *S & S Machinery*, cannot be restrained through an injunction.   Not only does the injunction violate the Second Circuit's own precedent, but it also is in direct conflict with decisions of the Fifth and D.C. Circuits, which have squarely held that courts cannot use an injunction to achieve what it cannot through attachment. *See Janvey v. Libyan Inv. Auth.*, 478 F. App'x 233, 236 (5th Cir. 2012) (holding that "the FSIA's prohibition on 'attachment[s]' of property belonging to a foreign sovereign prevented the district court from entering a preliminary injunction"); *Atwood Turnkey*

3

*Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1177 (5th Cir. 1989) (holding that property is immune under the FSIA where "the purpose of [an] injunction is to secure the payment of a judgment"); *Phoenix Consulting Inc. v. Republic of Angola*, 172 F.3d 920, at *1 (D.C. Cir. 1998) (affirming denial of preliminary injunction because it would have been "in effect a prejudgment attachment in violation of the [FSIA]").

Second, the decision below wrongly enjoined the Republic from using property that is immune from attachment under the FSIA because it is located *outside of the United States*. This constitutes a "breathtaking assertion of extraterritorial jurisdiction." *Autotech Techs. LP v. Integral Research & Dev. Corp*., 499 F.3d 737, 750 (7th Cir. 2007); *see id.* (holding that the FSIA does not authorize execution against a sovereign's property "wherever that property is located around the world"). Here, it is undisputed that the Republic's payments on its exchange bonds are made from funds in Argentina. Accordingly, under the FSIA, such funds are immune from attachment by U.S. courts. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1131-32 (9th Cir. 2010) (holding that property rights were immune under the FSIA because they were not located in the United States). The Second Circuit did not even address the extraterritorial aspect of the injunction. This Court should clarify that federal courts cannot exercise jurisdiction over immune property located outside of the United States under the FSIA.

The sweeping scope of the Second Circuit's decision is an unprecedented expansion of the FSIA. Moreover, the injunction is unnecessarily broad to the extent that it enjoins the Republic from paying its exchange bondholders, including the Euro Bondholders. The Second Circuit could have simply ordered the Republic to pay the holdouts, rather than affirm an injunction that endangers payments to innocent third parties that voluntarily exchanged their

4

securities and agreed to steep reductions on what they were owed.  The Euro Bondholders take no position on whether the Republic should pay the holdouts, but the courts' attempt to coerce the Republic into paying the holdouts by restricting its ability to pay its valid debts to  the exchange bondholders is clearly improper and inconsistent with U.S. law governing injunctions.

## II.    THE SECOND CIRCUIT'S DECISION WILL IMPAIR FUTURE SOVEREIGN DEBT RESTRUCTURINGS, CAUSING SIGNIFICANT HARM FOR SOVEREIGN NATIONS, INCLUDING THE UNITED STATES, AND THEIR CITIZENS.

The Second Circuit's decision has profound implications for sovereign nations' ability to respond to debt crises.  If permitted to stand, the decision is certain to jeopardize an important tool for sovereign nations in economic distress by removing any incentive for investors to participate in sovereign debt restructurings.  In so doing, the Second Circuit's decision threatens the stability of international financial markets and the wellbeing of sovereign nations and their citizens.  Amici urge the Court to grant the petition to review the Second Circuit's troubling decision.

When a sovereign nation faces a debt crisis, the principal means by which the sovereign and its creditors resolve the crisis is consensual restructuring through exchange offers.  When a sovereign is  unable to meet its financial   obligations   and   otherwise   might   default, restructuring allows the sovereign to reduce its debt burden and attempt to revive its economy.  These restructurings play a vital role in the proper functioning of the international financial system, particularly because sovereigns cannot declare bankruptcy.

5

The Second Circuit's decision undermines this critical tool in responding to debt crises. If the decision is allowed to stand, it is all but certain that creditors will no longer agree to participate in debt restructurings. This is because, according to the Second Circuit, holdout creditors that did not participate in the Republic's restructurings are entitled to be paid 100% of what they are owed, even though the vast majority of holders exchanged their securities and agreed to substantial reductions of the value of their holdings. The Second Circuit's decision thus creates a perverse incentive for creditors to refuse to participate in debt restructurings because they know that holdouts will be able to collect the full amount of what they are owed. Moreover, facing the prospect of similar injunctions and endless litigation, the financial institutions and intermediaries necessary to carry out sovereign debt restructurings will refuse to participate in light of the uncertainty that the decision has created.

The United States noted the dire consequences of the Second Circuit's decision in one of its briefs before that court:

> [V]oluntary sovereign debt restructuring *will become far more difficult* if holdout creditors can use novel interpretations of boilerplate bond provisions to interfere with the performance of a restructuring plan accepted by most creditors, and to greatly tilt incentives away from voluntary debt exchanges and negotiated restructuring in the first place. … If enough creditors adopt [a holdout] strategy, foreign sovereign debt restructuring will become *impossible*.

Brief for the United States of America as Amicus Curiae in Support of the Republic of Argentina's Petition for Panel Hearing and Rehearing En Banc at 3-4 (emphases added). In this way, the Second Circuit's decision makes future restructurings entirely unsustainable.

6

The Second Circuit attempted to minimize the dire result of its decision by claiming that collective action clauses ("CACs") would eliminate this threat to restructurings. Pet. App. A at 35-36. That is incorrect. CACs bind all holders of a particular securities issuance if a certain percentage (typically 75%) of the holders vote in favor of a restructuring. However, CACs only became prevalent around 2005, and billions of dollars of outstanding sovereign debt do not contain such clauses. Moreover, because many CACs bind only the holders of a particular issuance, holdouts can try to block the application of CACs in a particular bond issuance, making it less likely that bondholders in other issuances will agree to restructure. This supposed remedy is thus no remedy at all.

If sovereign nations in financial distress are unable to restructure their debt, they will readily be locked out of the worldwide capital markets. This will lead to utter chaos in the international financial community. As recent years have shown, the list of nations facing this type of crisis has only grown. The list already includes Greece, Ireland, Portugal, Spain, Mexico, Japan, Grenada, Cyprus, Peru, and Nicaragua, among others. These countries, and their citizens, would face unprecedented economic catastrophes if they defaulted and were unable to restructure their debt or find investors to provide the necessary capital to sustain their economies. Moreover, given the intertwined nature of the global economy, such a result would likely lead to chaos in worldwide financial markets and negatively affect even stable nations. No one except respondents is arguing for this result, and even they do not defend this outcome as good policy.

The Second Circuit's decision in this case is particularly unfair to the Republic's exchange bondholders, like amici, which participated in, or purchased debt that was issued through, the Republic's exchanges. The Second Circuit essentially has rewritten the terms of those exchanges

7

by imposing a brand new, flawed interpretation of the boilerplate *pari passu* clauses found in many bond agreements. As explained in the Republic's petition for certiorari, the Second Circuit's interpretation of the *pari passu* clause is contrary to the long-held understanding of the clause by market participants, governments, and academics.

Both the International Monetary Fund ("IMF") and the United States Department of Treasury support and encourage bondholders to participate in sovereign debt restructurings. Here, the exchanges were presented as the only way for creditors to continue receiving payments from Argentina, even after taking a substantial haircut on the value of their holdings. None of the entities that supported or participated in the exchanges, including the bondholders themselves, could have anticipated the Second Circuit's novel interpretation of the *pari passu* clause, or they never would have supported or participated in the restructuring. The Second Circuit's decision essentially pulled the rug out from under the exchange bondholders, imposing an understanding of the exchanges that no one shared at the time. Even worse, the Second Circuit's decision may lead to the Republic defaulting on its exchange bonds, which it has consistently paid since their issuance.

The Second Circuit's interpretation of the *pari passu* clause is dangerous and unprecedented. The United States has stated that it "threatens *core U.S. policy* regarding international debt restructuring." Brief for the United States of America as Amicus Curiae in Support of the Republic of Argentina's Petition for Panel Hearing and Rehearing En Banc at 3 (emphasis added). If this new definition of *pari passu* is allowed to stand, it also could raise challenges to the implicit preferred creditor status the IMF has historically enjoyed, which would have profound implications for sovereign restructuring.

Indeed, courts in other nations have expressly rejected the Second Circuit's interpretation of the *pari passu*

8

clause.  Under English law, the *pari passu* clause would be interpreted to impose a requirement of only equal ranking—not equal payment.  In 2005, the Financial Markets Law Committee, a committee of English legal experts organized by the Bank of England, concluded that "so far as English law is concerned, the wide 'payment' interpretation [given to various *pari passu* clauses] is incorrect and … the 'ranking' interpretation is correct."[3]    FMLC Report 19-21.  Importantly, the Committee expressly confronted and analyzed a *pari passu* clause close in language to that governing plaintiffs' bonds.  Notwithstanding the inclusion of a "payment" clause, the Committee concluded that these additional words did not create an equal payment obligation under English law.  *See id.*  Rather, unlike the Second Circuit, the Committee interpreted the clause only to impose an equal ranking requirement.  A German court also recently rejected a similar attempt to impose this *pari passu* interpretation on the Republic's bonds.

If not reversed, the Second Circuit's decision will have significant, adverse consequences for the global economy that cannot be exaggerated.  It will become impossible for distressed sovereign nations to restructure their debt and access capital markets, which will result in enormous defaults.  The disastrous effects of such defaults will fall most directly on the innocent citizens of those nations, but also will impact other nations and investors around the world.

---

[3]    The Committee found its conclusion compelled by three factors: (1) the unworkable and unacceptable consequences of the payment interpretation to debtors and creditors "would offend the 'business commonsense' principle used by English courts when construing a contract"; (2) general principles of contract construction in the context of debt obligation transactions; (3) English case law.  FMLC Report 19-21.

9

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to grant the petition for certiorari and reverse the decision of the Second Circuit.

Respectfully submitted,

CHRISTOPHER J. CLARK
   *Counsel of Record*
CRAIG A. BATCHELOR
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200
christopher.clark2@lw.com

July 26, 2013

# EXHIBIT I

No. 12-1494

IN THE

## Supreme Court of the United States

————

REPUBLIC OF ARGENTINA,

*Petitioner,*

v.

NML CAPITAL, LTD., *et al*,

*Respondents.*

————

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

————

**BRIEF OF *AMICUS CURIAE*
CAJA DE VALORES, S.A.
IN SUPPORT OF PETITIONER**

————

RAUL R. HERRERA
R. REEVES ANDERSON
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC 20004
(202) 942-5000

RAMON MARKS
  *Counsel of Record*
STEWART D. AARON
DANIEL R. BERNSTEIN
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
(212) 715-1000
ramon.marks@aporter.com

*Counsel for Amicus Curiae Caja de Valores, S.A.*

WILSON-EPES PRINTING CO., INC. – (202) 789-0096 – WASHINGTON, D. C. 20002

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................ ii

INTEREST OF *AMICUS CURIAE* ..................... 1

INTRODUCTION ............................................. 2

ARGUMENT ..................................................... 3

  I.  THE INJUNCTION CONTRAVENES THE PRESUMPTION AGAINST EXTRATERRITORIALITY ....................... 3

 II.  THE INJUNCTION THREATENS TO DISRUPT INTERNATIONAL BOND MARKETS AND PAYMENT SYSTEMS .. 7

CONCLUSION ................................................... 10

ii

## TABLE OF AUTHORITIES

CASES                                         Page(s)

*Af-Cap, Inc. v. Republic of Congo*,
   462 F.3d 417 (5th Cir. 2006) ...................... 5

*Argentine Republic v. Amerada Hess
   Shipping Corp.*,
   488 U.S. 428 (1989)................................... 4

*Autotech Techs. LP v. Integral Research &
   Dev. Corp.*,
   499 F.3d 737 (7th Cir. 2007) ...................... 6

*EEOC v. Arabian American Oil Co.*,
   499 U.S. 244 (1991)................................... 4

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013) ............................... 4

*Morrison v. National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) ............................... 4, 5, 7

*Reebok Int'l Ltd. v. McLaughlin*,
   49 F.3d 1387 (9th Cir. 1995) ..................... 7, 9

*Rose v. Himley*,
   8 U.S. (4 Cranch) 241 (1808)..................... 4

*S&S Machinery Co. v. Masinexportimport*,
   706 F.2d 411 (2d Cir. 1983)....................... 6

*Vanity Fair Mills v. T. Eaton Co.*,
   234 F.2d 633 (2d Cir. 1956)....................... 7

*W. Union Tel. Co. v. Pennsylvania*,
   368 U.S. 71 (1961) ...................................... 9

STATUTES

28 U.S.C. § 1609 ............................................ 5

28 U.S.C. § 1610 ............................................ 5

iii

TABLE OF AUTHORITIES—Continued

Page(s)

Argentine Public Law No. 20.643 .................    1

OTHER AUTHORITIES

Br. for Amicus Curiae The Clearing House
Association L.L.C. in Support of Reversal,
*NML Capital, Ltd. v. Republic of
Argentina*, No. 12-105 (2d Cir. Jan. 4,
2013), 2013 WL 100420 .............................    8

Br. for United States of America as Amicus
Curiae in Support of Reversal, *NML
Capital, Ltd. v. Republic of Argentina*,
699 F.3d 246 (2d Cir. 2012) (reh'g denied
Mar. 26, 2013) (No. 12-105), 2012 WL
1150791 ......................................................    9

Br. for the United States of America as
Amicus Curiae in Support of Panel
Rehearing and Rehearing En Banc, *NML
Capital, Ltd. v. Republic of Argentina*,
699 F.3d 246 (2d Cir. 2012) (reh'g denied
Mar. 26, 2013) (No. 12-105), 2012 WL
6777132 ......................................................    6-7

Ltr. from Euroclear Bank SA/NV, *NML
Capital, Ltd. v. Republic of Argentina*,
No. 12-105 (2d Cir. Jan. 10, 2013) .............    9

United Nations Convention on Jurisdic-
tional Immunities of States and Their
Property, G.A. Res. 59/38, U.N. Doc.
A/RES/59/38 (Dec. 2, 2004) ........................    6

## INTEREST OF *AMICUS CURIAE* [1]

Caja de Valores, S.A. ("Caja") is a private financial institution based in Buenos Aires, Argentina. Caja is organized as a joint stock company under Argentine law and is authorized by Argentina's National Securities Commission under Argentine law 20.643 to operate as a securities depository. Caja provides custodial, clearing, and other services to assist customers in the completion of domestic and international securities transactions, just like Caja's counterparts the Depository Trust Company in the United States and Euroclear Bank SA/NV in Europe. Caja holds over US$65 billion in custodial assets—including tens of billions in sovereign bonds—and handles over seven million transactions per year. The Republic owns no shares in Caja. Caja has no employees or offices in the United States. It is not a party to the proceedings below.

Caja has a substantial interest in this action because the unprecedented, extraterritorial injunction affirmed by the Second Circuit in the decision below impairs third-party financial institutions—such as Caja—that are involved in the processing of sovereign debt payments outside the territory of the United States. The injunction disregards the strict territorial limits imposed by the Foreign Sovereign

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No one other than *amicus curiae* or its counsel made a monetary contribution to the preparation or submission of this brief. Letters from the parties consenting to the filing of this brief have been filed with the Clerk of the Court. Counsel of record for all parties received notice at least ten days prior to the due date of *amicus curiae*'s intention to file this brief.

2

Immunities Act ("FSIA") and the well-established presumption against the extraterritorial operation of federal law. Moreover, the injunction threatens the integrity of international bond markets and fund transfer systems. Properly delimiting the global powers of U.S. courts is critically important to the financial institutions around the world that process sovereign debt payments and to the customers they serve.

## INTRODUCTION

Following the Republic's historic default on its sovereign debt in 2001 and 2002, the Republic restructured its debt through exchange offerings in 2005 and 2010. Most of the Republic's creditors participated in these offerings, but a few creditors elected to sue on defaulted bonds governed by New York law.

On February 23, 2012, after years of litigation between holders of the defaulted debt and the Republic, a New York district court issued the sweeping, unprecedented injunction at issue here, sending shockwaves throughout international financial markets. The district court, apparently frustrated by the FSIA's statutory bar against attachment or execution on the Republic's property located outside the United States, granted the plaintiffs' extraordinary request for an injunction requiring *pari passu* payments on the Republic's defaulted bonds before the Republic can make any payments anywhere in the world on its restructured debt. Thus, the injunction—by design and effect— restrained a foreign state's use of its property located *outside* the United States, unless the foreign state transferred property also located *outside* the United States to holders of the defaulted debt. As written,

3

the injunction could curb payments on bonds held outside the United States, denominated in foreign currency, and governed by foreign law. Going even further, this worldwide injunction explicitly purports to bind "all parties involved, directly or indirectly, in advising upon, preparing, processing, or facilitating any payment on the Exchange Bonds." Pet. App. 16. Innocent third-party financial institutions—some of which have little or no connection to the United States—suddenly found themselves in the crosshairs of a U.S. judge sitting in New York.

On October 26, 2012, the Second Circuit largely affirmed the injunction, holding that immunity defenses under the FSIA did not prohibit the equitable relief ordered by the district court. This decision—which did not address the well-established presumption against the extraterritorial application of U.S. law—effectively erases the territorial limits imposed by the FSIA and upsets the settled expectations of sovereigns, creditors, multilateral organizations, and financial institutions around the world. The Republic and various concerned third parties asked the Second Circuit for a rehearing, which was denied.

## ARGUMENT

### I. THE INJUNCTION CONTRAVENES THE PRESUMPTION AGAINST EXTRATERRITORIALITY.

The Court should grant certiorari because the decision below conflicts with other circuit court decisions and is inconsistent with Supreme Court precedent regarding the presumption against extraterritoriality. In an eagerness to regulate conduct

4

beyond the reach of U.S. courts, the Second Circuit disregarded the FSIA's explict territorial limits.

For over two hundred years, this Court has applied a presumption against the extraterritorial application of federal law. *See Rose v. Himley*, 8 U.S. (4 Cranch) 241, 279 (1808) (holding that "the legislation of every country is territorial" and "the pacific rights of sovereignty must be exercised within the territory of the sovereign"). This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).

In two recent opinions, this Court has reaffirmed the importance of the presumption against extraterritoriality with respect to both substantive and jurisdictional statutes. In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), the Court limited the territorial reach of the Securities Exchange Act of 1934, explaining that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id*. at 2878. The Court likewise applied the presumption to limit the reach of the Alien Tort Statute, a subject-matter jurisdictional law, in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

Given the foreign policy concerns that underpin the presumption against extraterritoriality, the presumption applies with special force in the context of the FSIA, which "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). The FSIA "also provides the sole, comprehensive scheme for enforcing judgments against foreign sovereigns in civil litigation."

5

*Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 428
(5th Cir. 2006) (citing 28 U.S.C. § 1609).

The FSIA contains no "clear indication" that a
federal court may enjoin the conduct of a foreign
sovereign outside the territory of the United States.
*Morrison*, 130 S. Ct. at 2878. To the contrary, the
FSIA's asset execution provisions could hardly be
clearer in prohibiting a U.S. court's disposition of
a foreign sovereign's property located outside U.S.
borders. Section 1609 provides that "the property *in
the United States* of a foreign state shall be immune
from attachment arrest and execution except as
provided in sections 1610 and 1611." 28 U.S.C. § 1609
(emphasis added). This provision does not even
contemplate execution on sovereign assets *outside* the
United States. Likewise, Section 1610 is limited to
"property *in the United States* of a foreign state." *Id.*
§ 1610 (emphasis added). These specific references
to "property in the United States" demonstrate
Congress's unmistakable intent to apply the FSIA's
asset execution provisions only within the territory of
the United States, not extraterritorially.

The FSIA's express territorial limits over assets
of a foreign sovereign align with international
consensus on the scope of sovereign immunity.
Article 19 of the United Nations Convention on
Jurisdictional Immunities of States and Their
Property, provides:

> No post-judgment measures of constraint . . .
> against property of a State may be taken in
> connection with a proceeding before a court of
> another State unless and except to the extent
> that: (a) the State has expressly consented to
> the taking of such measures . . . (b) the State
> has allocated or earmarked property for the

6

satisfaction of the claim which is the object of that proceeding; or (c) it has been established that the property is specifically in use or intended for use by the State for other than government non-commercial purposes and is *in the territory of the State of the forum* . . . .

G.A. Res. 59/38, art. 19, U.N. Doc. A/RES/59/38 (Dec. 2, 2004) (emphasis added).

The decision below is irreconcilable with the Seventh Circuit's (correct) holding that "the FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world." *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007).   Applying an appropriate caution mandated by the presumption against extraterritoriality, the Seventh Circuit demanded "some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction." *Id*.

Federal courts should not be allowed to evade the FSIA's territorial limitations through an untethered assertion of injunctive power.  *See S&S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983) ("The FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property."); *see also* Br. for the United States of America as Amicus Curiae in Support of Panel Rehearing and Rehearing En Banc at 7, *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) (reh'g denied Mar. 26, 2013) (No. 12-105), 2012 WL 6777132 ("When judicial action constrains a foreign state's use of its property,

7

§ 1609's protections apply." (citing *Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007); *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229 (5th Cir. 2004); *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir. 2004))). Indeed, the principles that constrict the extraterritorial jurisdiction of U.S. courts should apply with greater force here. Asserting jurisdiction to control conduct outside the United States—particularly conduct in Argentina—will make it "difficult to secure compliance" and "is fraught with possibilities of discord and conflict with the authorities of another country." *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 647 (2d Cir. 1956). *See also Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1394 (9th Cir. 1995) ("[T]here *are* limits to the district court's reach, and those limits became palpable when the court sought to extend its arm into the territory of another nation and to impose discordant duties upon the subjects of that nation whose actions were solely within its own borders.").

This Court should grant certiorari to clarify that lower federal courts may not enjoin the extraterritorial conduct or assets of a foreign sovereign without a "clear indication" from Congress. *Morrison*, 130 S. Ct. at 2878.

## II. THE INJUNCTION THREATENS TO DISRUPT INTERNATIONAL BOND MARKETS AND PAYMENT SYSTEMS.

The Court should also grant the petition because allowing the decision below to stand would undermine the efficient operation of international bond markets and payment systems.

8

When a country (or corporation) makes a bond payment, that entity does not in most cases simply mail a check to the beneficial holder of the bond. The payment typically travels through various intermediaries, including clearing houses such as Caja, before reaching its ultimate recipient. Clearing houses not only facilitate the transfer of funds around the world but also eliminate the need for a buyer and seller of securities to physically exchange certificates. In doing so, clearing houses reduce settlement risks. The smooth, efficient functioning of international debt markets depends on clearing houses and other intermediaries.

The district court's injunction—and the dangerous precedent it sets—threatens the efficient operation of these markets by imposing significant costs and delays on international payment systems and by subjecting financial institutions to conflicting legal obligations in different jurisdictions. As the Clearing House Association L.L.C. explained to the Second Circuit, "[p]ayment systems are designed to work automatically and quickly, but as a result of the [i]njunction . . . banks might be forced to hold many potentially unrelated transfers until the issue could be sorted out, delaying the payment process and undermining participants' and customers' expectations of real-time payment processing." Br. for Amicus Curiae The Clearing House Association L.L.C. in Support of Reversal at 21, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105 (2d Cir. Jan. 4, 2013), 2013 WL 100420. Compliance with the injunction will be especially burdensome for financial institutions and customers that have little or no connection to the United States.

9

The extraterritorial nature of the injunction is also likely to subject third-party financial institutions such as Caja to competing claims in different jurisdictions. Steps required to comply with the injunction may conflict with legal obligations under contracts or local laws where the relevant transactions take place, resulting in ancillary litigation all over the world. This litigation would not only increase the costs and decrease the efficiencies of payment systems, but also could deny due process of law if financial intermediaries face double liability. *See W. Union Tel. Co. v. Pennsylvania*, 368 U.S. 71, 75 (1961); *see also Reebok*, 49 F.3d at 1394-95 ("[W]e cannot arrogate to the federal courts the power to control the banking systems of other countries within their own territory."). Another clearing house warned that "[a] conflict of laws of this nature will impact the legal certainty underpinning the international bond markets and could cause a loss of confidence in the role of key market infrastructure providers." Ltr. from Euroclear Bank SA/NV at 4, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105 (2d Cir. Jan. 10, 2013).

The disruption to financial markets caused by the decision below is not limited to Argentina or its government's bond offerings. The United States acknowledged below that the ruling "is likely to disrupt financial markets for a considerable period" and "undermines the orderly consensual restructuring process the United States has been at pains to foster for several decades" worldwide. Br. for United States of America as Amicus Curiae in Support of Reversal at 11, 18, *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) (reh'g denied Mar. 26, 2013) (No. 12-105), 2012 WL 1150791. This Court's guidance is needed immediately to avoid unnecessary

10

friction in international bond markets, and this case presents an excellent vehicle to resolve questions of substantial importance to the international community.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

RAUL R. HERRERA
R. REEVES ANDERSON
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC 20004
(202) 942-5000

RAMON MARKS
*Counsel of Record*
STEWART D. AARON
DANIEL R. BERNSTEIN
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
(212) 715-1000
ramon.marks@aporter.com

*Counsel for Amicus Curiae Caja de Valores, S.A.*

July 26, 2013

# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

NML CAPITAL, LTD.,

                      Plaintiff,

          - against -

THE REPUBLIC OF ARGENTINA,

                     Defendant.

08 Civ. 6978 (TPG)
09 Civ. 1707 (TPG)
09 Civ. 1708 (TPG)

------------------------------------------------------------- X

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER, LTD.,

                      Plaintiffs,

          - against -

THE REPUBLIC OF ARGENTINA,

                     Defendant.

09 Civ. 8757 (TPG)
09 Civ. 10620 (TPG)

------------------------------------------------------------- X

AURELIUS OPPORTUNITIES FUND II, LLC
and AURELIUS CAPITAL MASTER, LTD.,

                      Plaintiffs,

          - against -

THE REPUBLIC OF ARGENTINA,

                     Defendant.

10 Civ. 1602 (TPG)
10 Civ. 3507 (TPG)
10 Civ. 3970 (TPG)
10 Civ. 8339 (TPG)

------------------------------------------------------------- X *(captions continue on following pages)*

## DECLARATION OF FRANCISCO GUILLERMO EGGERS

```
----------------------------------------------------- X
BLUE ANGEL CAPITAL I LLC,                              :
                                                      :
                              Plaintiff,              :    10 Civ. 4101 (TPG)
                                                      :    10 Civ. 4782 (TPG)
              - against -                             :
                                                      :
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                              Defendant.              :
                                                      :
----------------------------------------------------- X
OLIFANT FUND, LTD.,                                   :
                                                      :
                              Plaintiff,              :    10 Civ. 9587 (TPG)
                                                      :
              - against -                             :
                                                      :
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                              Defendant.              :
                                                      :
----------------------------------------------------- X
PABLO ALBERTO VARELA, et al.,                         :
                                                      :
                              Plaintiffs,             :    10 Civ. 5338 (TPG)
                                                      :
              - against -                             :
                                                      :
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                              Defendant.              :
----------------------------------------------------- X
```

## DECLARATION OF FRANCISCO GUILLERMO EGGERS

Pursuant to 28 U.S.C. § 1746, Francisco Guillermo Eggers declares as follows:

  1.  I am the National Director of the National Bureau of Public Credit of the Ministry of Economy and Public Finance of the Republic of Argentina (the "Republic").

  2.  I am familiar with the facts of this case and submit this declaration on behalf of the Republic and in support of the Memorandum of the Republic in Response to Plaintiffs' Brief on Remand.

  3.  During the November 9, 2012 conference before the Court, the Court read the following provision of the Order dated March 5, 2012 (the "March 5 Stay Order") into the record: "[t]o secure Plaintiffs' rights during the pendency of the Republic's appeals of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court" (March 5 Stay Order ¶ 2).

  4.  As requested by the Court, on behalf of the Republic, I confirm that the Republic has complied, is complying, and will comply with the terms of the March 5 Stay Order as set forth above in paragraph 3.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 16, 2012, in Buenos Aires, Argentina.

Francisco Guillermo Eggers

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

NML CAPITAL, LTD.,

      Plaintiff,

   - against -

THE REPUBLIC OF ARGENTINA,

      Defendant.

:
:
:
: No. 08 Civ. 6978 (TPG)
: No. 09 Civ. 1707 (TPG)
: No. 09 Civ. 1708 (TPG)
:
:
:
:
:
:
:

------------------------------------------------------------x

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER, LTD.,

      Plaintiffs,

   - against -

THE REPUBLIC OF ARGENTINA,

      Defendant.

:
:
:
: No. 09 Civ. 8757 (TPG)
: No. 09 Civ. 10620 (TPG)
:
:
:
:
:
:
:

------------------------------------------------------------x

AURELIUS OPPORTUNITIES FUND II, LLC
and AURELIUS CAPITAL MASTER, LTD.,

      Plaintiffs,

   - against -

THE REPUBLIC OF ARGENTINA,

      Defendant.

:
:
:
: No. 10 Civ. 1602 (TPG)
: No. 10 Civ. 3507 (TPG)
:
:
:
:
: *(captions continue on following pages)*
:

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/5/2012

## ~~[PROPOSED]~~ ORDER PURSUANT TO FRCP 62(C)

```
------------------------------------------------------------ x
AURELIUS CAPITAL MASTER, LTD. and          :
AURELIUS OPPORTUNITIES FUND II, LLC,       :
                                           :   No. 10 Civ. 3970 (TPG)
                             Plaintiffs,   :   No. 10 Civ. 8339 (TPG)
                                           :
          - against -                      :
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
                             Defendant.    :
                                           :
------------------------------------------------------------ x
                                           :
BLUE ANGEL CAPITAL I LLC,                  :
                                           :   No. 10 Civ. 4101 (TPG)
                             Plaintiff,    :   No. 10 Civ. 4782 (TPG)
                                           :
          - against -                      :
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
                             Defendant.    :
------------------------------------------------------------ x
                                           :
PABLO ALBERTO VARELA, et al.,              :
                                           :   No. 10 Civ. 5338 (TPG)
                             Plaintiffs,   :
                                           :
          - against -                      :
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
                             Defendant.    :
                                           :
------------------------------------------------------------ x
```

```
----------------------------------------------------------------- x
                                                    :
OLIFANT FUND, LTD.,                                 :
                                                    :   No. 10 Civ. 9587 (TPG)
                                    Plaintiff,      :
                                                    :
                                                    :
                  - against -                       :
                                                    :
THE REPUBLIC OF ARGENTINA,                          :
                                                    :
                                    Defendant.      :
                                                    :
-----------------------------------------------------------------x
```

WHEREAS, in Orders dated December 7, 2011, and December 13, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to Plaintiffs' Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 and December 13, 2011 Orders, this Court granted partial summary judgment to Plaintiffs on their claims that the Republic has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under Plaintiffs' bonds."[1]

WHEREAS, in Orders dated February 23, 2012 entered in the above-captioned actions (the "February 23, 2012 Orders"), this Court granted Plaintiffs' motion for equitable

---

[1] The "Exchange Bonds" refer to bonds or other securities issued by the Republic pursuant to its 2005 and 2010 exchange offers.

relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.[2]

And WHEREAS the Republic intends to appeal the February 23, 2012 Orders and all underlying and/or associated orders to the U.S. Court of Appeals for the Second Circuit, and has moved for a stay of the February 23, 2012 Orders during the pendency of such appeal,

It is HEREBY ORDERED that:

1. Pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, the effect of the February 23, 2012 Orders is stayed until the U.S. Court of Appeals for the Second Circuit has issued its mandate disposing of the Republic's appeal of the February 23, 2012 Orders.

2. To secure Plaintiffs' rights during the pendency of the Republic's appeals of the February 23, 2012 Orders to the Second Circuit, it is ordered that the Republic shall not during the pendency of the appeal to the Second Circuit take any action to evade the directives of the February 23, 2012 Orders in the event they are affirmed, render them ineffective in the event they are affirmed, or diminish the Court's ability to supervise compliance with the February 23, 2012 Orders in the event they are affirmed, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court.

3. With consent of the Plaintiffs and on terms agreeable to the parties, the Republic shall file a motion in the Second Circuit requesting that the court of appeals accord the Republic's forthcoming appeal of the February 23, 2012 Orders expedited treatment in accordance with a schedule agreed upon by the parties.

---

[2] The Court granted to Olifant Fund, Ltd. the relief that it granted to the plaintiffs in the other above-captioned actions in a single order, dated February 23, 2012.

4.      This Court shall retain jurisdiction to monitor and enforce this ORDER, and, on notice to the parties, to modify, amend, or extend it as justice requires to achieve its equitable purposes and to account for materially changed circumstances, including any failure by the Republic to abide by Paragraph (2) herein.

Dated:   New York, New York
         March  5  , 2012

Thomas P. Griesa
U.S. District Judge

3